# EXHIBIT 2

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| NORTHERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

| R.R. DONNELLEY & SONS COMPANY | SUBPOENA IN A CIVIL CASE |
|---|---|
| V. | |
| QUARK, INC. et al. | Case Number:[1] 06-cv-032-JJF <br> U.S. District Court for <br> the District of Delaware |

TO: KP Corporation
c/o Leslie T. Isozaki
12647 Alcosta Boulevard, Suite 425
San Ramon, CA 94583

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE <br> KP Corporation <br> 12647 Alcosta Boulevard, Suite 425, San Ramon, CA 94583 | DATE AND TIME <br> 8/31/2006 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) <br> *[signature]* Attorney for Defendants Creo, Inc., Eastman Kodak Company and Kodak Graphic Communications Company | DATE <br> 8/11/2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Brian M. Koide
Crowell & Moring, 1001 Pennsylvania Avenue, NW, Washington, DC 20004 (202) 624-2500

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                    DATE                              SIGNATURE OF SERVER

                                                      _____
                                                      ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.



## ATTACHMENT A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Eastman Kodak Company, Kodak Graphic Communications Company, and Creo, Inc., (collectively "Kodak") request that you produce for inspection and copying, as set forth in the Instructions and Definitions below, all of the documents and things in your possession, custody, or control responsive to these requests at your business address as identified on the accompanying Subpoena on or before August 31, 2006.

## INSTRUCTIONS AND DEFINITIONS

A. R.R. Donnelley & Sons Company ("RRD") has sued Kodak for patent infringement in the United States District Court for the District of Delaware. In its Complaint, RRD alleges that Kodak infringed U.S. Patent No. 6,205,452, U.S. Patent No. 6,327,599, U.S. Patent No. 6,844,940, and U.S. Patent No. 6,952,801. A copy of RRD's Complaint is enclosed as Attachment B to the Subpoena.

B. "The '452 Patent" means United States Patent No. 6,205,452.

C. "The '599 Patent" means United States Patent No. 6,327,599.

D. "The '940 Patent" means United States Patent No. 6,844,940.

E. "The '801 Patent" means United States Patent No. 6,952,801.

F. "The Patents in Suit" mean the '452 Patent, the '599 Patent, the '940 Patent and/or the '801 Patent either individually, collectively, or in some combination thereof.

G. "The Effective Filing Dates of the Patents in Suit" means October 29, 1997 (for the '452 Patent), June 7, 1995 (for the '599 Patent), February 11, 1997 (for the '940 Patent), and February 11, 1997 (for the '801 Patent).

H. The words "any" and "all" shall mean "any, all, and each" inclusively.

2819023_1

## REQUESTED DOCUMENTS

1. All documents relating to any of the Patents in Suit.

2. All documents reflecting use, knowledge, sale, or offer for sale of the subject matter claimed in the Patents in Suit before respective Effective Filing Dates of the Patents in Suit.

3. All documents related to KP's use of Indigo-developed Quark Xtension and Toyo Ink-developed I-Layout Generator described in Seybold Special Report, Apr. 21, 1995 (enclosed as Attachment C).

B

C

ing, it boils down to 100% yield or reprinting those sheets on which there were problems. This is a cumbersome solution.

**Other cost issues.** KP customers that have embraced the technology are those who understand the difference between unit cost and total cost, Goldman said. If customers are fixed on unit cost and have a low per-sheet cost in mind, then they don't understand the benefits of the technology and the services KP offers. At KP, the sheet is only one part of the entire job. Digital-printing customers also need to understand the influences of reduced inventory, customization, etc., on cost.

**Maintenance.** Maintenance frequencies are also an issue at Moore, according to Kilgore. Digital presses can require extensive maintenance every 30,000 to 70,000 sheets. Machine uptime has been a challenge that is affected not just by maintenance but by overall workflow and customer file formats. Moore has found that its machines average about 60% uptime, regardless of engine (E-Print or DCP-1).

## Variable-data and custom printing

The State Street study did not focus specifically on variable and custom printing because deliveries of this capability for digital printing devices are just beginning. However, several of the speakers during the session had comments about their own experiences and future expectations.

**15%–20% of market?** Dyer, whose company has not yet installed the variable printing option for the Chromapress, believes that the ability to do variable and custom printing will fit well for clients who want to produce focused catalogs, for example, where they can change both the picture of an item and the price or name that might be generated for the catalog.

Dyer believes that variable printing will be useful for producing targeted point-of-purchase materials, demographic-oriented brochures and short-run proposals. However, he feels that variable printing is only a fit for maybe 15%–20% of the market. In other words, he said, not every page coming off the presses will be variable.

**Moore already may have won.** Moore, the only company with significant experience in variable printing, has put it to good use with ink-jet and toner-oriented web presses. (It prints many of the personalized Publishers Clearing House materials that adorn our doorsteps so frequently.) Just as it has developed many of its own software products to fit into each of the steps in digital printing, Moore has also modified existing technology to enable variable printing on the Indigo engine and hopes to adapt this approach to its Xeikon engines soon.

For variable imaging, Moore's software is called Digital Color-Quick. It can be used with a document storage-and-retrieval database called Digital Infobase.

Kilgore differentiates between personalized and variable or custom printing. He defines personalized printing as printing in which a fixed format is prepared and variable data are inserted in it. Examples of these include direct-mail pieces and brochures that are personalized with recipients' names and addresses. In variable applications, on the other hand, 100% of the contents of each page can be changed on the fly by assembling images, fonts, variable data, templates, etc., and rasterizing them on the fly. (Some approaches prerasterize all elements and assemble them at the time of imaging.)

Kilgore brought several samples of variable printing, including a direct mailer addressed from database records. It featured the insertion of a personalized message designed around a customer's specific interest. These were printed consecutively on the fly so that each page was different.



**KP's variable printing sample.** This is one side of a two-sided variable-printing job on card stock KP ran using the new Indigo-developed Quark Xtension. Printed specifically to accompany Greg Goldman's presentation in Boston, there were 500 sequentially numbered cards printed and distributed to attenders in the audience. At the end of the session, a number was picked at random and the holder of this card was entitled to a discounted digital printing job from KP.

Another unique variable-printing job Moore has handled enables franchisees of a nationwide hotel chain to access a database of text, images, corporate brochure templates and other elements and assemble customized brochures for their sales representatives. These brochures include pictures of individual salespersons and background material. The files are then transmitted to a digital printing site where a short run of perhaps 200 custom brochures is printed for each representative in the field.

**Variable printing with Indigo.** KP has begun to handle variable printing on its Indigo presses. According to Goldman, with the most basic, each page or document is different. There isn't much special software required for this application; each document is treated as a separate job and sent to the press as such. The processing capabilities in the RIP need to be efficient to handle a considerable quantity of this kind of work.

Most of the work KP handles today consists of a single, prerasterized document and multiple, prerasterized variable components that are merged on the fly as the job is sent to the press.

KP uses two different software modules to handle its variable printing applications. It has a new, Indigo-developed Quark Xtension that allows an independent personalization area on an Xpress page into which data can be poured from a database.

KP brought samples printed using this capability. The numerical data in the samples were imported from an Excel file. It is important to KP for personalization and customization software to be open so clients can define the extent of personalization they need. KP also has the ability to handle variable printing of Scitex linework and contones and PostScript files using the Toyo Ink-developed I-Layout Generator software for the E-Print.

Is the market ready for custom printing? Goldman says no, based on his experience. Clients are asking for simple personalization projects, although some of KP's larger customers are beginning to think about dealing with database work. To accommodate this orientation, Goldman foresees that KP will need to evolve its database management facilities as a further service to customers.

## The bottom line

In general, most of the digital press users surveyed are reasonably happy with their devices. Interestingly, according to the preliminary