## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

R.R. DONNELLEY & SONS COMPANY,

     Plaintiff,

     v.

CREO, INC., NEXPRESS SOLUTIONS, INC.,
KODAK VERSAMARK, INC., EASTMAN
KODAK COMPANY, and KODAK GRAPHIC
COMMUNICATIONS COMPANY,

     Defendants.

EASTMAN KODAK COMPANY,

     Counterclaim-Plaintiff,

     v.

R.R. DONNELLEY & SONS COMPANY,

     Counterclaim-Defendant.

C.A. No. 06-032-JJF

**REDACTED
PUBLIC VERSION**

## KODAK'S OPENING CLAIM CONSTRUCTION MEMORANDUM

OF COUNSEL:

Richard McMillan, Jr. (pro hac vice)
  rmcmillan@crowell.com
Jeffrey D. Sanok (pro hac vice)
  jsanok@crowell.com
Brian M. Koide (pro hac vice)
  bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Dated:  July 30, 2007

Frederick L. Cottrell, III (#2555)
  cottrell@rlf.com
Jameson A L. Tweedie (#4927)
  tweedie@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Attorneys for Defendants Creo, Inc.,
NexPress Solutions, Inc., Kodak VersaMark,
Inc., Eastman Kodak Company, and Kodak
Graphic Communications Company

RLF1-3183865-1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

I.      INTRODUCTION ......................................................................................1

II.     BACKGROUND .......................................................................................3

        A.     OVERVIEW OF VARIABLE DATA PRINTING..................................................3

               1.    Early VDP Using Two-Pass Printing Methods.........................................3

               2.    Introduction of Digital Printing Technology ...........................................4

               3.    *Mail-Merge:* The First Widely-Used VDP Application ...........................4

        B.     IMPROVING VDP EFFICIENCY IN HIGH-SPEED PRINTERS......................................6

               1.    Page-Based Overlay Operation .........................................................7

III.    THE PATENTS-IN-SUIT AND ASSERTED CLAIMS .........................................10

        A.     THE LINEAGE OF THE PATENTS-IN-SUIT ..............................................10

        B.     THE COMMON DISCLOSURE OF THE ASSERTED PATENTS....................................11

               1.    Background Prior Art..................................................................11

               2.    Description of the Invention ..........................................................12

        C.     THE '599 PATENT.....................................................................15

        D.     THE '940 PATENT.....................................................................16

        E.     THE '452 PATENT.....................................................................18

        F.     THE '801 PATENT.....................................................................18

IV.     ARGUMENT............................................................................................19

        A.     LEGAL FRAMEWORK FOR CONSTRUING CLAIM LANGUAGE................................19

               1.    Begin With the Language of the Claims..............................................19

               2.    Look to the Specification for Evidence That the Inventor Intended
                     to Deviate from Ordinary Meaning..............................................20

               3.    Consult the Prosecution History for Surrendered Subject Matter
                     Relevant to the Terms at Issue...................................................21

               4.    Special Rules for Construing Means-Plus-Function and Step-Plus-
                     Function Elements ................................................................22

        B.     CLAIM CONSTRUCTION ANALYSIS .....................................................23

               1.    Terms From Claim 11 of the '599 patent.............................................24

                     a.    "template file".............................................................24

                     b.    "fixed information".........................................................26

                     c.    "variable information" .....................................................28

*i*

d.  "a database having entries therein each representing variable information" .................................................................30

e.  "master page file" and "wherein the master page file defines the fixed information" .........................................30

f.  "converting the template file the database and the master page file into press commands specifying sequence and content of page production by the press" ...................................32

g.  "press commands specifying sequence and content of page production by the press" .........................................................34

2.  Related Claim Terms from the '940 and '452 patents ...........................34

a.  "template" and "template page file" ..........................................36

    (1)  "template" ('940 patent) ................................................36

    (2)  "template page file" ('452 patent) ...................................37

b.  "position data" ('940 patent) ...................................................38

c.  "fixed information" and "reusable object" ...............................39

    (1)  "fixed information" ('452 patent) ...................................39

    (2)  "reusable object" ('940 patent) .....................................40

d.  "master data" ...........................................................................41

    (1)  "master data" ('940 patent) ..........................................42

    (2)  "master data" ('452 patent) ..........................................42

e.  "variable information" and "variable object" ...........................43

    (1)  "variable information" ('452 patent) ..............................43

    (2)  "variable object" ('940 patent) .....................................44

f.  The Database Limitations ........................................................45

    (1)  "developing a database having a number of entries representing variable objects" ('940 patent) ...................45

    (2)  "a database having a number of fields, each of which represents variable information or variable graphics information" ('452 patent) .................................45

g.  The Step-Plus-Function Limitations ........................................46

    (1)  "causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" ('452 patent) ...................................................................46

*ii*

(2)  "causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set" ('940 patent)..............................................48

(3)  "separating the master data from the position data for each data set" ('940 patent – if not found to be step-plus-function) .............................................49

3.  The Dependent Claims of the '940 patent ..............................................50

    a.  "page sequence commands" ..............................................50

    b.  The "identical data sets" Limitations ..............................................51

4.  Additional Limitations of the '452 patent..............................................52

    a.  "variable graphics information"..............................................52

    b.  "Executing a graph file to generate a graph"..............................................53

    c.  QuarkXPress® ..............................................53

5.  Claim Terms From the '801 patent ..............................................54

    a.  "storing a first number of pages"..............................................55

    b.  "pagination information" ..............................................57

    c.  "specifying a first [and a second] set of pagination information…"..............................................58

    d.  "determining whether a stored page is to be assembled into the first book [and the second book]…"..............................................60

V.  CONCLUSION ..............................................61

RLF1-3183865-1

# TABLE OF AUTHORITIES

## Cases

*Autogiro Co. of America v. United States,*
   384 F.2d 391 (Ct.Cl. 1967) .................................................................................22

*Ballard Med. Prods. v. Allegiance Healthcare Corp.,*
   268 F.3d 1352 (Fed. Cir. 2001) ....................................................................20, 40

*Ex parte Simpson,*
   218 USPQ 1020 (Bd. App. 1982) ....................................................................54

*Ex Parte Zimmerly,*
   153 USPQ 367 (BPA 1966) ............................................................................23

*Georgia-Pacific Corp. v. United States Gypsum Co.,*
   195 F.3d 1322 (Fed. Cir. 1999) .....................................................................20

*Hockerson-Halberstadt, Inc. v. Converse Inc.,*
   183 F.3d 1369 (Fed. Cir. 1999) .....................................................................20

*In re Roberts,*
   470 F.2d 1399 (CCPA 1973) ..........................................................................23

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
   256 F.3d 1323 (Fed. Cir. 2001) .................................................................19, 21

*Lemelson v. Gen. Mills, Inc.,*
   968 F.2d 1202 (Fed. Cir. 1992) .....................................................................22

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995) ...............................................................19, 20, 21

*Masco Corp. v. United States,*
   303 F.3d 1316 (Fed. Cir. 2002) ...................................................23, 47, 48, 49

*O.I. Corp. v. Tekmar Co.,*
   115 F.3d 1576 (Fed. Cir. 1997) .....................................................................23

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ...........................................................19, 20, 21

*SealFlex, Inc. v. Athletic Track & Court Constr.,*
   172 F.3d 836 (Fed. Cir. 1999) ...............................................................22, 46, 48

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.,*
   2004 WL 1941340 (D. Del. 2004)...................................................................23

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) .......................................................................19

## Statutes

35 U.S.C. § 112 ...............................................................................15, 19, 22

RLF1-3183865-1

# GLOSSARY OF EXHIBITS[1]

Exhibit A          Proposed Order

Exhibit B          U.S. Patent No. 6,327,559 ("the '599 patent") (RRD015275-RRD015307)

Exhibit C          U.S. Patent No. 6,844,940 ("the '940 patent") (RRD022251-RRD022330)

Exhibit D          U.S. Patent No. 6,205,452 ("the '452 patent") (K00557566-K00557654)

Exhibit E          U.S. Patent No. 6,952,801 ("the '801 patent") (RRD252032-RRD252109)

Exhibit F          PENNY K. BENNETT, HARVEY R. LEVENSON, AND FRANK J. ROMANO, THE
                   HANDBOOK FOR DIGITAL PRINTING AND VARIABLE-DATA PRINTING (2006)
                   (K02446417-K02446626)

Exhibit G          FRANK J. ROMANO, POCKET GUIDE TO DIGITAL PREPRESS (1996)
                   (K02445393-K02445568)

Exhibit H          USER'S GUIDE TO FORMS MERGE (K01863184-K01863213)

Exhibit I

Exhibit J

                                    REDACTED
Exhibit K


Exhibit L          Plaintiff's Third Supplemental Responses to Defendants' Interrogatory
                   Nos. 1 and 2, Second Supplemental Responses to Defendants'
                   Interrogatory Nos. 3, 4, 7 and 9, and Supplemental Responses to
                   Defendants' Interrogatory Nos. 10, 11, 13, 15, 16 and 20

Exhibit M          GEORGE OMURA, MASTERING AUTOCAD RELEASE 12 (K02446724,
                   K02446895-K02446899, K02446913-K02446917) (selected excerpts)

Exhibit N          AMERICAN NATIONAL STANDARD, GRAPHIC TECHNOLOGY – VARIABLE
                   PRINTING DATA EXCHANGE USING PPML AND PDF (PPML/VDX)
                   (K00701104-K00701142)

Exhibit O          Plaintiff's Proposed Construction of Identified Claim Terms

---

[1]    Attached as Exhibits to Declarations of Nathaniel Grow.

## GLOSSARY OF EXHIBITS (cont'd)

Exhibit P　　　　　Deposition of James L. Warmus, December 5, 2006 (selected excerpts)

Exhibit FW1　　　U.S. Application Serial No. 08/478,397 (filed June 7, 1995) issued as U.S. Patent No. 6,327,599 (RRD004392-RRD005159)

Exhibit FW2　　　U.S. Application Serial No. 08/802,337 (filed Feb. 11, 1997) issued as U.S. Patent No. 6,332,149 (K02453303-K02453808)

Exhibit FW3　　　U.S. Application Serial No. 08/959,683 (filed Oct. 29, 1997) issued as U.S. Patent No. 6,205,452 (RRD000001-RRD004391)

Exhibit FW4　　　U.S. Application Serial No. 09/852,581 (filed May 10, 2001) issued as U.S. Patent No. 6,952,801 (RRD005907-RRD006891)

Exhibit FW5　　　U.S. Application Serial No. 10/755,743 (filed Jan. 12 2004) issued as U.S. Patent No. 6,844,940 (RRD005160-RRD005906)

Exhibit FW6　　　U.S. Application Serial No. 08/627,724 (filed Apr. 2, 1996) issued as U.S. Patent No. 5,857,209 (K02447912-K02448420)

Exhibit FW7　　　U.S. Application Serial No. 08/751,108 (filed Nov. 15, 1996) issued as U.S. Patent No. 5,987,461 (K02449018-K02450874)

Exhibit FW8　　　U.S. Application Serial No. 09/070,926 (filed Oct. 29, 1997) issued as U.S. Patent No. 5,963,968 (K02448668-K02449017)

Exhibit FW9　　　U.S. Application Serial No. 08/959,994 (filed Oct. 29, 1997) issued as U.S. Patent No. 6,246,993 (K02451755-K02453302)

Exhibit FW10　　U.S. Application Serial No. 09/059,950 (filed Apr. 14, 1998) issued as U.S. Patent No. 5,870,766 (K02448421-K02448667)

Exhibit FW11　　U.S. Application Serial No. 09/060,274 (filed Apr. 14, 1998) issued as U.S. Patent No. 6,175,846 (K02450875-K02451754)

Exhibit FW12　　U.S. Application Serial No. 90/005,618 (filed Jan. 11, 2000) Reexam Certificate issued Sept. 11, 2001 (K02457919-K02458081)

Exhibit FW13　　U.S. Application Serial No. 09/599,799 (filed Jun. 22, 2000) issued as U.S. Patent No. 6,446,100 (K02453809-K02454146)

Exhibit FW14　　U.S. Application Serial No. 10/703,054 (filed Nov. 6, 2003) abandoned Nov. 15, 2006 (K02455668-K02456023)

*RLF1-3183865-1*

## GLOSSARY OF EXHIBITS (cont'd)

Exhibit FW15      U.S. Application Serial No. 11/207,359 (filed Aug. 19, 2005) abandoned Nov. 15, 2006 (K02456024-K02456273)

Exhibit FW16      U.S. Application Serial No. 11/208,256 (filed Aug. 19, 2005) abandoned Nov. 21, 2006 (K02456274-K02456595)

Exhibit FW17      U.S. Application Serial No. 11/208,369 (filed Aug. 19, 2005) abandoned Nov. 15, 2006 (K02456596-K02456846)

*RLF1-3183865-1*

Pursuant to the Court's scheduling orders, Defendants Creo, Inc., NexPress Solutions, Inc., Kodak Versamark, Inc., Eastman Kodak Company, and Kodak Graphic Communications Company (collectively, "Kodak"), respectfully submit this memorandum in support of their proposed claim constructions for disputed terms in the patent claims asserted by Plaintiff R. R. Donnelley & Sons Company ("Donnelley").[2]

## I.    INTRODUCTION

Donnelley asserts four patents in this litigation: U.S. 6,327,599 (the '599 patent), U.S. 6,844,940 (the '940 patent), U.S. 6,205,452 (the '452 patent), and U.S. 6,952,801 (the '801 patent).[3]  Each of the four patents relate to a field known as "variable data printing" ("VDP").

VDP provides for the printing of customized or personalized documents, such as direct-mail marketing materials (which may identify a recipient by name), advertising brochures (which may vary product pricing depending on store location), and personalized books.  For example, each page of a direct-mail form letter may contain some information that is fixed on that page (such as text located in a particular position on the page), as well as some information that may vary on that page (such as an individual name and address printed on the page within the context of the fixed information).  Instead of producing 100,000 copies of the same form letter delivering non-personalized, identical information to 100,000 customers, a VDP application could print 100,000 unique form letters containing the common fixed information on each page, but with personalized variable information (such as names, addresses, and pictures) for each recipient.

---

[2] Exhibit A lists Kodak's proposed constructions in the form of a proposed order.

[3] Copies of the '599 patent, the '940 patent, the '452 patent, and the '801 patent are attached as Exhibits B, C, D, and E, respectively.  This brief uses the convention "col. XX:YY" to refer to column XX at lines YY in a patent.  The four asserted patents collectively issued from five patent applications.  *See* Exhibits FW1 – FW5.  Kodak has included other applications that are related to the asserted patents in Exhibits FW6 – FW17.

1

All of Donnelley's asserted patents achieve VDP by beginning with the development of a template page or layout, from which multiple printed pages—based on the template page—can be produced. The produced pages contain the "fixed" information common to all of the pages printed from a respective template page, and the "variable" information potentially differing from printed page to printed page. Donnelley developed *only one* approach — that of separating the template page into: (1) a "master page" containing only the content and location of the fixed information and (2) "variable pages" containing only the variable content and its location on a page. Then, in order to reconstitute the page to be printed at the printer, Donnelley's patents describe merging or overlaying the variable pages onto a respective master page, based on a set of instructions, in order to print output pages containing the fixed and variable information— much like the traditional schoolhouse use of overlaying transparencies on an overhead projector. By utilizing master and variable "pages," the content of the pages can be properly aligned by registering the pages to one another when merged or overlaid together.

Donnelley thus patented aspects of what is known as a "page-based system," as will be described in greater detail below, and Kodak's proffered claim constructions are intended to keep Donnelley true to its actual development, notwithstanding the various obfuscations of the claim language in the continuing patent applications filed by Donnelley's patent attorneys. The constructions proposed by Donnelley, however, are divorced from the realities of its patents and attempt to broaden Donnelley's actual development in an effort to capture variable data printing systems never contemplated by Donnelley's inventors.

## II.    BACKGROUND

### A.    OVERVIEW OF VARIABLE DATA PRINTING

The following history and development of variable data printing is provided to assist the Court in understanding the patents.[4]

#### 1.    Early VDP Using Two-Pass Printing Methods

Variable data printing has long been available in the form of direct mail. One of the most famous examples is the Publishers Clearing House Sweepstakes letters mailed to homes in the 1980s, announcing, by personal name, that "John Doe" may have already won the Grand Prize. These early forms of direct mail VDP used a two-pass printing process. In the two-pass process, identical "master" pieces were printed in color using conventional printing plate technology, which required producing an engraved plate or cylinder to transfer the image. Then, in a separate variable printing step, the printed color master pieces were fed through a second, black & white printer under control of a computer. During this variable printing step, variable information—such as the recipient's name and address—was retrieved from a database and the printer was instructed to print appropriate customized information in designated copy-holes or placeholders on each master. Despite such attempts to customize direct mail in this fashion, the materials were still easily identified as mass mailings, since it was obvious to most readers that each individual recipient's name and address was printed separately on a different lower-quality printer, whereas the fixed or master information was printed using a higher quality printer.

---

[4] As background, Kodak provides two textbooks on digital and variable data printing. *See* PENNY K. BENNETT, HARVEY R. LEVENSON, and FRANK J. ROMANO, THE HANDBOOK FOR DIGITAL PRINTING AND VARIABLE-DATA PRINTING (2006), attached as Ex. F; FRANK J. ROMANO, POCKET GUIDE TO DIGITAL PREPRESS (1996), attached as Ex. G.

### 2.     Introduction of Digital Printing Technology

Introduced in the 1970s and 1980s, digital printing paved the way for VDP to evolve beyond the physical limits of early two-pass methods. Quite simply, digital printing is just printing that occurs directly from a digital computer to a printed page, rather than by first creating an intermediate plate from which printed images are made. In a digital printer, each image of a page is created and placed dynamically on a substrate (such as paper) using a toner, inkjet, dye, or some other pigment-based transfer system. Because of their flexibility under computer control, digital printers were thought to be ideal for implementing VDP.

### 3.     *Mail-Merge:* The First Widely-Used VDP Application

The *mail-merge* feature of PC-based word processing programs is perhaps the most widely-used example of a digital VDP application familiar to everyday consumers. Programs like Microsoft Word have featured *mail-merge* since the 1980s. Ex. F at K02446428. Using *mail-merge*, a large number of personalized letters, each with the same basic layout and content, could be printed with a unique name and address, as well as other customized information.

To create a personalized letter using *mail-merge*, an author first creates a template page representing the letter. The template page looks just like the finished personalized letter, except that variable information, such as a recipient's name and address, is identified using "placeholders" in the template page. During the actual merging process for preparing the print output, the placeholders are dynamically replaced by information obtained from a data source, such as a database or a spreadsheet. Thus, unique versions of the personalized letter—with the placeholders substituted with actual variable information—are sent to the printer. Donnelley generally describes *mail-merge* in its background art section of the asserted patents. *E.g.,* '599 patent, col. 1: 61-67.

4

The early versions of Microsoft Word represented variable placeholders in a template page using text descriptors surrounded by double-arrow characters '«' and '»'. The text descriptors used for each placeholder were important, because the text descriptor was used to locate the specific database field that stored the desired variable information. In the figure below, for example, the placeholder indicated by "«Title»" corresponds to the name of a field, *i.e.*, a column in a database or spreadsheet as shown below, where the actual variable content, such as "Mr.," "Mrs.," or "Ms." can be found for each recipient of the personalized letter.



| Title | FirstName | LastName | Company | Address1 | City | State | ZipCode |
|-------|-----------|----------|---------|----------|------|-------|---------|
| Mr. | David | Jones | Jones Advertising Co. | 1234 Main Street | Peoria | Illinois | 61601 |
| Ms. | Susan | Smith | Sewing Unlimited | 512 Oak Street | Dayton | Ohio | 45401 |
| Mrs. | Betsy | Rogers | Apollo Foods | 101 Elm Street | Memphis | Tenn. | 37501 |

*Printing VDP documents from a Microsoft Word mail-merge template page.*

When a mail-merge operation was initiated, early versions of Microsoft Word would first open the appropriate database or spreadsheet. Then, repeatedly, once for each row in the database or spreadsheet, the variable information found in that row would be merged with the fixed information in the template page by replacing the variable placeholders with the actual

5

variable information (for example, replacing "«FirstName»" with "David"). The resulting set of personalized letters would finally be sent to the printer, one completed page at a time.

**B.    IMPROVING VDP EFFICIENCY IN HIGH-SPEED PRINTERS**

While the two-pass and mail merge methods satisfied many needs in VDP, a parallel need began to emerge for high-speed VDP systems for use in the commercial printing industry. Commercial printers—due to the volume of many of their jobs—required printing presses that could operate at much faster speeds, without requiring the separate steps of the two-pass method.

To address these needs, as would be expected, industry leaders in the field of commercial printing—including IBM, Xerox, and Kodak—introduced high-speed black & white digital presses in the 1980s. These high-speed digital presses were run by state-of-the-art computers with processing power that dwarfed the typical PC of the day.

The main feature distinguishing digital printing presses from plate-based, high-speed offset presses, was the ability to bypass or eliminate the middle plate phase, by utilizing: (1) digital memory and (2) processors that could receive descriptions of a page, create a digital raster image based on the page descriptions (*i.e.*, "RIP" the page),[5] and then manipulate the rasterized information later during the printing process. For non-variable data printing, a digital press could store a collection of rasterized pages and print the same pages over and over again for each document. As such, when first introduced, digital presses were often used for print-on-demand applications, where one or several copies of a book or document are printed to meet a particular demand. For instance, a publisher might not stock out-of-print books, but instead print a copy of each book on an as-needed basis. Digital presses could also be used for short-runs,

---

[5] The term "RIP" is an acronym for "Raster Image Processor." When used as a verb, the term RIP refers to the process of *rasterizing* data, or converting the data to millions of colored dots that will be placed on a printed page to form an image. Due in part to the tremendous amount of data involved, RIPping frequently takes a significant amount of processing time.

typically jobs requiring a few thousand copies. In comparison to plate-based printing techniques requiring a costly plate to be formed, the early digital presses provided an economical alternative for print-on-demand and short-runs, especially when printing a small number of copies.

Although digital presses provided significant improvements in design flexibility and cost, the relatively slow speed of the rasterizing process during this time period—which was typically performed by the raster image processor—created a bottleneck for VDP applications. In other words, the RIPping process was slowing the rest of the press down. In VDP applications, this was particularly true, since the press had to potentially RIP a new digital image for each page that varied within a document.[6]

### C.      Improving Efficiency of RIP Engines in Variable Data Printing

To improve the efficiency of RIP engines in variable data printing, two technical paradigms began to emerge: (1) use of page-based overlays, which are merged together to form finished printed pages and (2) an element-based assembly approach, wherein individual layout elements are pieced together to form a printed page, much like assembling a puzzle.

### 1.      Page-Based Overlay Operation

The page-based overlay approach to VDP, which Donnelley commercialized and describes in its patents, involves the creation of a master page description, which is a template page that is stripped of all placeholders for variable information, leaving only the content and location of fixed information on the page. Master pages are sent to the RIP engine only once, where they are processed in advance and stored in memory. Variable pages are sent to the RIP

---

[6] The need for RIP efficiency was critical in digital presses that were fed by rolls of paper. When a press is running, the rolls of paper do not stop. If the RIP cannot process digital information fast enough to keep up with the press, large sections of paper will go unused. The wasted paper not only represents lost raw material, it creates a significant amount of additional work to remove the blank gaps in the paper and re-align the printed images for folding, cutting and binding.

7

engine separately, and then merged or overlaid onto the stored master page.  The resulting combined images are then printed as a finished product.

The page-based overlay approach to VDP was initially developed shortly after printing technology evolved (and memory costs decreased) to the point where entire pages could be defined and stored in memory at the printer or the RIP engine.  One early printer that operated with the page-based approach was the Kodak 1392 Ektaprint Printer.[7]

The Ektaprint 1392 Printer was packaged with a VDP software application called "Forms Merge," a 1988 Kodak product that was one of the first VDP applications in the world to use the concept of page-based overlays to solve the inefficiency problems experienced by applications such as Microsoft Word's *mail-merge.  See* Ex. H.  With Forms Merge, fixed information was not processed by the printer over and over.  Instead, it was processed only once, and then merged on a page-by-page basis with variable information.  Using Forms Merge, the Kodak Ektaprint 1392 Printer could be run at full speed and still produce unique, customized VDP documents.

Five years after the introduction of Forms Merge, two Belgian companies found themselves immersed in the page-based approach to variable data printing.  In 1993, Xeikon, N.V. ("Xeikon") announced a new high-speed digital press called the Xeikon DCP-1.  Ex. F at K02446427-K02446428; Ex. G at K02445544.

REDACTED

---

[7] Kodak does not claim to be the first company to have developed this technology.  Other companies, including IBM and Xerox, developed similar technology around the same time.  Ultimately, Kodak abandoned these page-based methods in favor of the more robust, element-based assembly model.

8

REDACTED

In 1994, Donnelley used the Barco and Xeikon technology to develop the page-based approach to VDP described in Donnelley's patents, as well as Donnelley's commercial software—Target-IT™. Indeed, Donnelley's patents repeatedly refer to and rely upon the page-based electronic collator technology supplied by Barco's PrintStreamer, as well as the Xeikon DC-1 printer. *See, e.g.,* '599 patent, col. 6:58-62; '940 patent, col. 8:50-54; '452 patent, col. 9:62-66; '801 patent, col. 8:50-54.

REDACTED

RLF1-3183865-1

REDACTED

## 2.    Element-Based Assembly VDP Operation

The other emerging VDP paradigm used an element-based assembly approach. With the element approach, the content of particular reusable elements, such as graphic images, logos, and text, is sent to the printer to be RIPped once and stored without any reference to position on a page. Once RIPped and stored, these reusable elements could be quickly called up and pieced together into a printed page, wherever and whenever needed, based on positioning instructions.

## III.    THE PATENTS-IN-SUIT AND ASSERTED CLAIMS

All four asserted patents share the core portion of their disclosures describing the page-based approach to variable data printing.

### A.    THE LINEAGE OF THE PATENTS-IN-SUIT

The four asserted patents are interrelated in one manner or another.[8] The '599 patent was the earliest filed, having a U.S. filing date of June 7, 1995. From the '599 patent was spawned the '940 and '801 patents.

REDACTED

Regarding the '452 patent, it has a U.S. filing date of October 29, 1997. As acknowledged in the "Background Art" section of the '452 patent, the earlier work of the inventors of the '599 patent is prior art to the '452 patent.[9] '452 patent, col. 3:13-42.

---

[8]  In total, Donnelley managed, through the continuation application process, to obtain nine patents related to or resulting from continuations, divisionals, or continuations-in-part of the '599 patent.

[9] The cited Warmus *et al.* U.S. patent application serial no. 08/802,337, issued as U.S. Patent 6,332,149, which was a continuation-in-part from the '599 patent.

10

**B.    THE COMMON DISCLOSURE OF THE ASSERTED PATENTS**

**1.    Background Prior Art**

All of the patents share much of the same "Background Art" description—in particular describing known image manipulating systems including Microsoft Word and computer-aided design (abbreviated "CAD") software. CAD systems, as acknowledged by the inventors, had long used the concept of layering (sometimes called merging) of transparent pages over a "base page":

> A different image gathering capability provided by CAD (computer aided design) software, sometimes referred to as "layering," involves the creation and storage of a base page and one or more layer pages. A user can issue commands to display or print the base page and one or more of the layer pages simultaneously atop one another to achieve an effect similar to the overlay of transparencies so that a composite page appearance results.

'599 patent, col. 2:1-8; '940 patent, col. 2:11-18; '452 patent, col. 2:12-19; '801 patent, col. 2:11-18.    Such CAD layering techniques were indeed common in most CAD software applications.[10]

Beginning with the '599 patent, Donnelley extended the CAD layering concept to variable data printing. '599 patent, col. 2:10-11 (the inventors noting that CAD is not "effective

---

[10] For example, one CAD program could create the following layering example: Layer 1 shows the door and countertop of a bathroom; Layer 2 shows the plumbing fixtures; and Layer 3 shows the shower curtain rod, door header, and wall:





Figure 4.10:  A comparison of layers and overlays

Ex. M at K02446897 and K02446915.

RLF1-3183865-1

to assist in the rapid production of different book versions"). Donnelley, being a large commercial printer, adopted the "master page" and "variable page" terminology long used with respect to conventional printing methods instead of the "base page" and "layer page" terminology of CAD. '599 patent, col. 5:20-32. In that regard, Donnelley's "variable pages" are analogous to the transparent CAD layers, but contain only information that varies from page to page. Id.

### 2.    Description of the Invention

Figure 2 of each patent represents the process flow from publishing through to actual physical book distribution,[11] while Figure 5 of each patent diagrams the steps implemented by the method; i.e., the specific acts that are carried out.[12]

In Figure 2, Step 42 creates (i) the master page file and variable page file, both of which represent "pages to be produced" and (ii) a press command file (labeled a "book ticket file" in Figure 2), which specifies how to "merge[]" the master and variable page files. Thus, the creation of master and variable pages, and the subsequent merging or overlaying thereof, is fundamental to the operation of the asserted patents.

---

[11] The specification describes Figure 2 as the actual "present invention" itself, not merely an aspect or contemplated embodiment. '599 patent, col. 5:18-20 ("FIG. 2 illustrates a block diagram of a method 40 according to the present invention which may be used in place of the [prior art] method of FIG. 1 to produce books.").

[12] Indeed, all four patents state that "Fig. 5 is a generalized diagram of the steps implemented by the method of the present invention." '599 patent, col. 4:25-26; '940 patent, col. 4:25-26; '452 patent, col. 5:38-39; '801 patent, col. 4:26-27.



*Figures 2 & 5 of the Asserted Patents.*

Once the master and variable page files are created, they are both converted by a RIP into bitmaps, which are digital representations of the page images. The bitmaps are, in turn, stored in the memory of a device called a collator (such as the Barco PrintStreamer discussed above). Then, according to the press commands sent separately to the printer (in the form of the book ticket file), the master page bitmaps and variable page bitmaps are retrieved from collator memory and merged in the proper sequence to create the final printed images. *See* '599 patent, col. 5:18-35.

Figure 5 illustrates the page-based overlay approach taken by Donnelley, wherein one proceeds from template files to: (1) master page files, (2) final variable page files, and (3) a press command file, for input to a print system.

In particular, the patent specifications state that "one or more template files 106 are developed by a publisher specifying the content (including appearance) of fixed information and the positioning of all information (*i.e.*, fixed and variable) ... ." *E.g.*, '599 patent, col. 8:5-9. The "template files 106 define template pages wherein each template page includes data

13

representing any fixed information to be reproduced on corresponding pages ... and area data representing where variable information is to be reproduced." '599 patent, col. 8:16-23. Thus, the template files must include both the *content* and *position* of the fixed information on each page, as well as the *position* (but not content, which is why the template refers to "area data" or "placeholders") of the variable information on each page. *E.g.*, '452 patent, col. 5:10-22.

As shown in Figure 5, the template files are processed via two complementary paths, each of which defines information on a page-by-page basis in preparation for overlay or merger operations at the printer. The upper path provides "stripped master page files," which define pages containing only the content and position of fixed information. The lower path provides "stripped variable page files," which define pages where all the fixed information has been removed, leaving only position data representing areas on the corresponding pages where variable information is to be printed. *E.g.*, '599 patent, col. 8:16-43.[13]

One difficulty in understanding Donnelley's patents is that the term "variable page file," although used throughout the drawings and specifications, is never used in any of the asserted claims of any of the four patents. Thus, the method described in various claims (as distinguished from the specification) generally involves the creation of a template page, the stripping of variable information placeholders from the template page to create a master page of fixed information, followed by some generally undescribed process by which variable data is retrieved from a database and merged with the master page file. While this creates some problems of claim construction, the core idea remains that in all cases, a master page file (or master data representing such a page file) is created which contains information that does not vary its position or content from page to page (*i.e.*, it remains fixed). When properly construed,

---

[13] The specific software implementation disclosed to do this is shown in the flow charts of Figs. 10*a* and 10*b* of the '599 patent, for example.

14

Donnelley's inventors imagined a process by which fixed and variable information are separated into different pages (or data sets representing different pages), and then combined by some overlay or merging process during printing, as Figure 5 illustrates.

Page-by-page processing is thus critical to all of the asserted patents. Indeed, in describing the page-based approach, the supporting concept of "press commands" is elaborated upon. *See, e.g.*, '599 patent, col. 14:62-17:7. Press commands, as described in the asserted patents, are required to instruct a press how to merge (*i.e.*, "overlay") and sequence master pages and variable pages extracted from the template files. *See, e.g.*, '599 patent, col. 5:28-32 ("a press command file is developed which specifies the manner in which data contained within the master and variable page files are to be merged to produce printed pages"); '940 patent, col. 20:19-21 (describing press commands as "overlay[ing] the variable pages on the master pages"). This page-based approach by Donnelley allows it to take advantage of the page-based electronic collator technology supplied by Barco's PrintStreamer. *See, e.g.*, '599 patent, col. 5:32-35 ("The format of the press command file is specified by Barco Graphics . . . and is particularly suited for control of a DCP-1 digital color press manufactured by Xeikon.").

### C.    THE '599 PATENT

The application for the '599 patent was filed on June 7, 1995. Donnelley now asserts only method claim 11, which recites a page-based VDP method.[14] The disputed terms are in bold:

> 11.    A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising:

---

[14] Throughout this litigation Donnelley has accused Kodak of infringing both apparatus and method claims. Only seven days ago, Donnelley withdrew the apparatus claims, which utilized "means plus function" terminology and required identifying the "corresponding structure, materials or acts described in the specification... ." 35 U.S.C. §112 ¶ 6.

developing a **template file** defining pages to be printed with **fixed information** common to all of the pages and **variable information** unique to each page;

assembling a **database having entries therein each representing variable information** to be printed;

developing a **master page file** from the template file wherein the master page file defines the fixed information; and

**converting the template file[,] the database and the master page file into press commands specifying sequence and content of page production by the press.**

'599 patent, col. 20:33-47.[15]

As recited in claim 11, a template file is first developed that defines the pages to be printed. The template file thus includes template pages, which are the specific layouts for each page. Then, variable information placeholders are stripped from the template pages to develop a master page file defining only the content and location of the fixed information on each layout page. The method finally "converts" the template file, the database of variable information, and the "master page file" into "press commands," which instruct the press to merge or overlay the master page file with variable page files obtained from information extracted from the database.

**D.    THE '940 PATENT**

Donnelley asserts method claims 11-12 and 17-22 of the '940 patent. Donnelley's patent attorneys filed the application for the '940 patent on January 12, 2004, and stated that it was entitled—through various continuation applications—to the filing date of the '599 patent, which had been filed years earlier in 1995. Since 1995, however, variable data printing had taken a decidedly different path away from page-based systems. Donnelley was keenly aware of this

---

[15] A typographical error appears in claim 11 of the '599 patent, which was corrected by a Certificate of Correction issued by the USPTO.

RLF1-3183865-1

through its participation in VDP standard-setting bodies, where specifications were developed for the reusable element-based VDP paradigm.[16]

Faced with the reality of having out-of-date patents, Donnelley's patent attorneys crafted new patent claims, which attempted to obfuscate and expand upon the meaning of "fixed information" and "variable information," while avoiding any mention of a "page". Thus, with the '940 patent, **fixed information** was transformed into "reusable objects" despite the term "reusable" appearing nowhere in the specification. **Variable information** morphed into "variable objects." And, the terms "pages" and "files defining pages" were banished from the claims. When properly construed, however, the '940 patent claims are quite similar to those of the '599 patent. Indeed, one need only compare the Abstract of the parent '599 patent with that of independent method claim 11 from the '940 patent to see the attorneys' handiwork:

| Abstract of the '599 patent | Claim 11 of the '940 patent |
| --- | --- |
| An apparatus and method for controlling an electronic press | A method of controlling an electronic press, the method comprising the steps of: |
| develops first and second **sets of template data** representing associated | developing first and second **data sets** representing associated |
| first and second **template pages**, respectively. | first and second **templates**, respectively, |
| Each set of template data includes master data representing **fixed information** to be printed and | each data set having master data representing **reusable objects** to be printed and |
| area data representing an area of a page in which **variable information** is to be printed. | position data representing a position on a page at which a **variable object** is to be printed; |

---

[16] Donnelley actively participated in several standard-making bodies relating to VDP. *See* Ex. N at K00701107 (listing Donnelley employee Riyaz Asaria as co-chairman of the CGATS.20-2002 standard-making process); *id.* at K00701120 (listing "REUSABLE_OBJECT" as one element of the CGATS.20-2002 standard).

| | |
|---|---|
| A database is developed having a number of entries, each of which represents **variable printed information**. | developing a database having a number of entries each of which represents a **variable object**; and |
| An electronic press is responsive to sets of template data and the database to print the first and second template pages with selected variable printed information. | causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. |

In the end, therefore, the '940 patent claims recite a page-based method as does the '599 patent.

### E.    THE '452 PATENT

Donnelley filed the application for the '452 patent on October 29, 1997. Donnelley asserts method claims 1-2, 7-10, 12, and 14. Independent method claim 1, the only asserted independent claim, recites a page-based VDP method for displaying variable graphics information based on specified graph parameters. The '452 patent claims utilize the same page-based VDP system described in the '599 patent, but add a variable graphing capability.

### F.    THE '801 PATENT

Donnelley filed the application for the '801 patent on May 10, 2001. Donnelley asserts independent method claim 1 and dependent claims 3-5, 12, 13, 15-17, and 25. Unlike the '599, '940 and '452 patents, the '801 patent—although having roots back to the '599 patent—claims the assembly of differing books, albeit in a peculiar manner. It requires producing two books in the same press run, where the two books have differing numbers of pages. Before finally allowing the '801 patent, the U.S. Patent & Trademark Office ("PTO") issued 5 office actions, each time rejecting the claims over prior art. In continuing attempts to overcome the prior art, the patentees extensively amended the claims, to the point that the end result is an exceedingly narrow claim that has almost no relevance to the commercial VDP marketplace.

18

## IV.    ARGUMENT

### A.    LEGAL FRAMEWORK FOR CONSTRUING CLAIM LANGUAGE

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). In interpreting a claim, a court should first look to the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A court has the discretion to use extrinsic evidence to aid claim construction, especially when "considered in the context of the intrinsic evidence." *Phillips v. AWH Corp*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc). Courts should also consider intrinsic evidence according to the hierarchy set forth by the Federal Circuit: (1) the claim language; (2) the specification; and (3) the prosecution history of the patents. *Vitronics*, 90 F.3d at 1582.

### 1.    Begin With the Language of the Claims

The first step in the claim interpretation process is to examine the language of the claims. *Phillips*, 415 F.3d at 1312. After all, it is the language of the claims that the patentee chose to particularly point out and distinctly claim the subject matter of the invention. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

In instances where it is possible, claims should be given their "ordinary and customary meaning" as would be understood by a person of skill in the relevant art as of the effective filing date, unless the patent expresses an intention to impart novel meaning to the claim terms. *Phillips*, 415 F.3d at 1312-13.

While the language of a given claim is important by itself, it is also important to avoid analyzing the language of a claim in isolation. *Phillips*, 415 F.3d at 1314-15. This is because the

19

surrounding words of a claim, as well as the language and context of other claims in the patent,

as well as other claims in the patent family, may provide guidance as to the proper construction.

*Id.* For example, unless the intrinsic evidence dictates otherwise, a term should be construed

consistently throughout a patent or family of patents. *Georgia-Pacific Corp. v United States*

*Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999) ("Unless the patent otherwise provides, a

claim term cannot be given a different meaning in the various claims of the same patent.");

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper

claim construction ... demands interpretation of the entire claim in context, not a single element

in isolation."). In addition, where a claim term appears in related patents, the term should be

construed consistently absent some indication to the contrary. *Ballard Med. Prods. v. Allegiance*

*Healthcare Corp.*, 268 F.3d 1352, 1360-1361 (Fed. Cir. 2001) (where two patents shared

identical disclosures, it was appropriate to construe claim terms *in pari material*).

### 2.    Look to the Specification for Evidence That the Inventor Intended to Deviate from Ordinary Meaning

While it is true that a claim term should be construed to mean "what one of ordinary skill

in the art at the time of the invention would have understood the term to mean," (*Markman*, 52

F.3d at 986), " the person of ordinary skill in the art is deemed to read the claim term not only in

the context of the particular claim in which the disputed term appears, but in the context of the

entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Accordingly, the

specification is usually "dispositive; it is the single best guide to the meaning of a disputed

term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In other words, a claim term can be

given its correct construction only within the context of "what the inventors actually invented

and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v.*

*Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Such a task is intricate, and

RLF1-3183865-1

precaution must be taken so that limitations are not fortuitously imported from the specification into the claim at issue:

> "We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." In locating this "fine line" it is useful to remember that we look "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention," and not merely to limit a claim term.

*Interactive Gift Express*, 256 F.3d at 1331-32 (internal citations omitted) (quoting *Comark Commc'ns. Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)).

The *Phillips* court explained:

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention, and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.

*Phillips*, 415 F.3d at 1323 (internal citations omitted).

### 3. Consult the Prosecution History for Surrendered Subject Matter Relevant to the Terms at Issue

In addition to consulting the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is part of the intrinsic evidence, consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. *Autogiro Co. of America v. United States*, 384 F.2d 391, 398-99 (Ct.Cl. 1967). Like the specification, the

21

prosecution history provides evidence of how the PTO and the inventor understood the patent.
*See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).

### 4.     Special Rules for Construing Means-Plus-Function and Step-Plus-Function Elements

Title 35, section 112, paragraph 6 of the United States Code provides the basis for step-plus-function claim elements:

> An element in a claim for a combination may be expressed as a . . . step for performing a specified function without the recital of . . . acts in support thereof, and such claim shall be construed to cover the corresponding . . . acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

In determining whether a claim element is written in step-plus-function form, the Court must first look at the language of the claim. If the claim element uses the phrase "step for," then a step-plus-function limitation is presumed, and Section 112, ¶ 6 is presumed to apply. On the other hand, if the claim element uses the word "step" alone or the phrase "steps of," then Section 112, ¶ 6 is presumed not to apply. *See SealFlex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 849 (Fed. Cir. 1999) (Rader, J., concurring). The presumption, however, may be overcome by showing that the claimed element is written to describe a function rather than a "specific act." *Id.* at 848.

"Acts" and "functions" are distinct concepts: a function "corresponds to what [the] element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002) (quoting *Seal-Flex*, 172 F.3d at 849-50). Acts, on the other hand, correspond to "how the function is accomplished." *Id.*

22

Equally important to the distinction between "functions" and "acts" is the requirement that the recited acts be specific in nature, not merely general actions:

> The price that must be paid for use of that convenience [of Section 112, ¶ 6] is limitation of the claim to the means specified in the written description and equivalents thereof. Similarly, a step for accomplishing a particular function in a process claim may also be claimed **without specificity** subject to the same price.

*O.I. Corp. v Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997) (emphasis added); accord *St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, 2004 WL 1941340 (D. Del. 2004) (holding that the presumption against step-plus-function applying was not overcome because a "definite act" was recited).

For instance, one of the Federal Circuit's predecessor courts found step-plus-function format where a claim recited "reducing the coefficient of friction to below about 0.40." *In re Roberts*, 470 F.2d 1399 (CCPA 1973); *Ex Parte Zimmerly*, 153 USPQ 367 (BPA 1966) (finding step-plus-function format for claim element which recited "raising the pH"). In general, "reducing" is in a sense an "act," but it is not specific enough to tell how to reduce the coefficient of friction. Thus, the emphasis is whether *specific* acts are recited in the claims, not merely acts in the general sense.

Once a court determines that a claim element is written in step-plus-function form, the court must first identify the claimed function, and then identify the corresponding acts disclosed in the specification. *Masco*, 303 F.3d at 1326-28.

### B.    CLAIM CONSTRUCTION ANALYSIS

In view of the large number of claims Donnelley chose to assert from its multiple patents, and hence the many terms to be construed, Kodak will begin with the earliest patent – the '599 patent – in which only method claim 11 is asserted. Because the disputed terms recited in claim 11, or slight variations thereof – either inadvertent or, for example, per Donnelley's attempts to

23

unduly broaden the language – carry over from patent to patent, some disputed terms from the remaining patents are grouped together.

### 1.    Terms From Claim 11 of the '599 patent

Kodak will address, in order, each of the disputed terms shown in claim 11 below in bold:

11.    A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising:

> developing a **template file** defining pages to be printed with **fixed information** common to all of the pages and **variable information** unique to each page;
>
> assembling a **database having entries therein each representing variable information** to be printed;
>
> developing a **master page file** from the template file **wherein the master page file defines the fixed information**; and
>
> **converting the template file[,] the database and the master page file into press commands** specifying sequence and content of page production by the press.

'599 patent, col. 20:33-47.

### a.    "template file"

| Kodak's Construction | Donnelley's Construction |
| --- | --- |
| A "template file" is a file that stores template pages, which are single page layouts defining the content and position of fixed information and the position of variable information on that page. | data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file |

Kodak's proposed construction for "template file" remains true to the disclosure of the '599 patent and reinforces the page-based technology of the '599 patent. Donnelley's proposed construction attempts to define this term in a manner that obscures or eliminates the page-based approach.

24

Claim 11 recites the phrase "a **template file** defining pages to be printed with fixed information common to all of the pages and variable information unique to each page." '599 patent, col. 20:36-38 (emphasis added). First and foremost, based on the claim language alone, a template file is a *file.* The language of the claim also makes it clear that a template file defines pages to be printed, or in other words, a template file defines and stores template *pages.* Consistent with the overall teachings of the '599 patent, a template file defines the content and position of fixed information together with the position of variable information on that page.

> [T]emplate files [specify] pages to be produced with master or fixed printed information (*i.e.*, printed information which does not vary from book to book of the same version) and variable printed information (which typically varies from book to book). The variable information may be stored in a database created by the publisher and the template file(s) specify the locations on particular pages for variable information stored in the database as noted in greater detail hereinafter.

*See, e.g.,* '599 patent, col. 6:1-9.

Kodak's proposed construction consistently tracks all of these features, and then adds a clarifying phrase "single page layout," to reinforce the page-by-page approach described in detail by the asserted patents.

In comparison, Donnelley's construction for "template file" fails to include any reference to page-based processing. It also adds an unnecessary limitation related to entries in a database, which is unsupported and superfluous. Accordingly, the Court should adopt Kodak's proposed construction and construe "template file" to mean "a file that stores template pages, which are *single page layouts* defining the content and position of fixed information and the position of variable information on that page."

RLF1-3183865-1

b.    *"fixed information"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| Information is "fixed" if the **substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page.** | information that does not vary from printed product to printed product |

Claim 11 recites the phrase "template file defining pages to be printed with **fixed information** common to all of the pages." '599 patent, col. 19:28-30; col. 20:36-38 (emphasis added). There is no ordinary meaning of the term "fixed information" in isolation. Accordingly, consistent with *Phillips*, one of ordinary skill in the art would need to consult the intrinsic evidence to properly ascertain the meaning of the claim.

The word "fixed" is used in the '599 patent to describe the concept of content that is common to all pages to be printed from a particular template page. As such, not only the content, but also the location of the content on the printed page is "fixed." *See, e.g.*, '599 patent, col. 8:6-9 and 16-17.

The Donnelley definition is arguably consistent with this, but is imprecise in at least two respects. First, it is unclear from Donnelley's definition what it is that does not "vary." The patent makes clear that fixed information is information that does not vary in position or content, but it is unclear whether Donnelley accepts this. The patent, however, has no such ambiguity. Consistent with the '599 patent being limited to the concept of merging or overlaying pages, the term "fixed information" is used throughout the '599 patent to refer to information where the content and location on a given printed page does not vary from book to book. For instance, the '599 patent describes a sample VDP job where three books are printed:

> In addition to the foregoing, in the first example, assume that the three books to be produced include variable and **fixed information** on the first and last pages of each book and fixed information only on the remaining pages. For example, the

26

> page P1 may include variable information in the form of a personalized message, a variable image, or the like in an area 110 whereas the page P4 may include other variable information in an area 112, for example, postal information for mailing the brochure to an addressee. Corresponding front and back pages of the remaining books may include different variable information. **The remaining printed information on pages P1-P4 is identical to the printed information on corresponding pages of the other two books.**

'599 patent, col. 7:24-35 (emphasis added). Thus, for each page of a book (*e.g.*, P1, P2, P3, and P4), the "fixed information" is the printed information that does not vary with respect to its content and location on a page.

Second, Donnelley's definition of "fixed information" is deficient because it is completely divorced from the notion of pages. For instance, Donnelley's definition of "fixed information" would encompass a fixed logo that appears on the first page of one book in the upper-right-hand corner and the last page of the very next book in the lower-left hand corner. Under Donnelley's definition and using this example, the logo would be "fixed information" because it "does not vary from printed product to printed product." In contrast, Kodak's definition captures what one skilled in the art would understand to have been the patentee's intended meaning of the term "fixed information," in view of the page-based nature of Donnelley's developments. Specifically, as is apparent from the '599 specification and drawings, the patentees intended information to be "fixed" when the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed from a particular template page and does not vary from page to page. Donnelley's definition introduces the phrase, "printed product," which itself does not appear in the '599 patent specification and has no well-defined meaning. Accordingly, an interpretation that does not require the "fixed information" to be tied to the notion of page would, at best, be incomplete, inaccurate, and inconsistent with the patentees' intended meaning of the term.

RLF1-3183865-1

c.    *"variable information"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "Variable information" is **information that varies from printed page to printed page and is retrieved from a database.** | information that typically varies from printed product to printed product |

Claim 11 recites the phrase "a template file defining pages to be printed with fixed information common to all of the pages and **variable information** unique to each page." '599 patent, col. 19:28-30; col. 20:36-38 (emphasis added). As with the previously-discussed term "fixed information," there is no ordinary meaning of the term "variable information" in isolation. Accordingly, consistent with *Phillips*, one skilled in the art would need to consult the intrinsic evidence to properly ascertain the meaning of the term.

Here, the claim language itself is helpful in understanding the meaning of "variable information." As discussed also below, "variable information" and the concept of a "database" are intertwined terms. The database created in the claim consists of the variable information to be used. "Each" entry in the database "represents variable information to be printed." *See* '599 patent, col. 20:33-53. In other words, the two terms are directly linked—variable information is the information contained in the database, and the information in the database consists of variable information, and only variable information, since by the terms of the claim language itself, "each entry" in the database is variable information.

This is confirmed in the specification:

A **database** 108 is also developed by the publisher using the personal computer 54 specifying the content of **variable information** to be placed in variable information areas, for example, the areas 110, 112 on the pages P1, P4, respectively, of FIGS. 6a and 6b.

\* \* \*

28

> The stored bitmaps are used to control one or more demand printers and/or any other type of display device . . . so that the device displays **pages** having fixed and **variable information** thereon. Alternatively, the master and variable **page** files may be premerged to create a plurality of combined files each **representing a page** to be reproduced with master and **variable information.**

'599 patent, col. 8:5-13; col. 5:43-51 (emphasis added).

Donnelley contends that variable information is simply "information that typically varies from printed product to printed product." First, there is no basis for insertion of the word "typically" into the definition, and Donnelley's goal in proffering it seems designed merely to muddy the definition. Donnelley offers no definition of what it means by "typically", or what conditions would be present in some "atypical" situation.

Moreover, Donnelley's definition simply departs from the plain text of the claims and specification. The parties generally agree that "variable information" is information that (not surprisingly) "varies" and that the variation is measured from the context of some printed medium. Donnelley's position, however, does not include any notion of a page. And yet, when arguing about the prior art to the Examiner, Donnelley belittled the prior art for not disclosing how variable information "could be placed in a fixed location on a finished page...." Ex. FW1 at RRD004577.

Donnelley substitutes the word "product" for "page," but the claim itself speaks of variable information "unique to each page." The phrase "printed product" does not appear in the '599 patent, and its introduction as a definitional phrase creates ambiguity and uncertainty as to its meaning. After reading the '599 patent claims and specification, one skilled in the art would understand that "variable information" must vary from one page to another, and must also be extracted from a database. Donnelley's proposed construction includes neither of these necessary features and must be rejected out of hand.

29

> **d.**     *"a database having entries therein each representing variable information"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[A] database having entries therein each representing variable information" means that **each entry in the database represents variable information**. | a collection of data representing the "variable information" |

Claim 11 recites the phrase "a database having entries therein each representing variable information." '599 patent, col. 19:31-32. The parties have proposed similar definitions of this phrase, but Kodak's is designed to eliminate any ambiguity and to be consistent with the plain language of the claim. It is true that the database consists of the data representing "variable information", at least as the term variable information has been defined by Kodak. But the claim itself explains that there is total congruence between the variable information and the database. Its plain language reads that "each" entry in the database "represents" variable information. In other words, there is no entry in the database that is not variable information, and the Court's construction should be consistent with this plain language.

> **e.**     *"master page file" and "wherein the master page file defines the fixed information"*

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| master page file | A "master page file" is **a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information.** | data representing "fixed information," which is stored in a file |
| wherein the master page file defines the fixed information | "Wherein the master page file defines the fixed information" should be given the **plain meaning** using definitions for "master page file" and "fixed information" | the "master page file" identifies the "fixed information" |

30

Claim 11 of the '599 patent recites the phrase "developing a **master page file** from the template file **wherein the master page file defines the fixed information.**" '599 patent, col. 20:42-44 (emphasis added). Here, the principal difference between the parties is that the Donnelley definition, at least explicitly, makes no reference to whether the master page file defines both the position and content of fixed information. But here the patent is very clear. A template file is created that "includes data specifying the position and content of fixed information on the pages to be printed." '599 patent, col. 8:16-17. The template file also includes "area data representing any area(s) on the corresponding pages where variable information is to be reproduced." *Id.*, col. 8:22-24. This "area data" (*i e.*, the placeholders) for variable information are then stripped out to create the master page file:

> One set of working files is stripped of all area data relating to placement of variable information to create stripped **master page files** 120 defining template pages having only fixed information thereon.

'599 patent, col. 8:24-27; *see also* col. 11:10-46; item 120 of Fig. 5; items 177-205 of Fig. 10a. Clearly, what is left is a master page file with both position and content of fixed information. Indeed, this is the whole idea behind the invention. Information isn't really fixed if it can vary all over the page. A master page file is not a moving target. It contains the fixed information, and by that, the patent clearly means the information which, both as to position and content, does not vary from page to page.

Donnelley's definition of "master page file" is so broad that it provides no useful guidance. For example, under Donnelley's construction, a master page file could be a smaller element of a larger template file. According to Donnelley, as long as the data representing fixed information is stored in a file (even a template file), it is a master data file. This, however, directly contradicts the positions Donnelley took during prosecution of the '599 patent. In

31

response to an office action issued by the PTO, Donnelley stated that the cited prior art did not disclose developing a master page file that is "separate and apart from a template file." FW1 at RRD004564. Because Donnelley's proposed construction of master page file is so broad as to cover concepts expressly disclaimed in order to obtain a patent, the Court should reject Donnelley's proposed construction and instead adopt Kodak's construction, which is more closely aligned with the specification and the prosecution history.

Finally, Donnelley's definition of the "wherein" clause states that a master page file "identifies" rather than "defines" the fixed information. This definition is clearly less precise and not in conformance with the patent. Once again, the claim itself states that the "master page file *defines* the fixed information." The Court's construction should therefore be consistent with this language rather than substituting the less precise term "identifies." *See also*, '599 patent, col. 8:24-27 ("master page files 120 **defining** template pages having only fixed information thereon").

f.    *"converting the template file the database and the master page file into press commands specifying sequence and content of page production by the press"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[C]onverting the template file the database and the master page file into press commands specifying sequence and content of page production by the press" means **generating instructions to a press for sequencing pages defined by the template files, the database and the master page file.** | using the "template file," the "database," and the "master page file" to produce "press commands specifying sequence and content of page production by the press" |

Claim 11 recites the phrase, "converting the template file the database and the master page file into press commands specifying sequence and content of page production by the press."

'599 patent, col. 20:45-47. This step is illustrated by Figs. 10a-f of the patent and described at length in col. 10:60-64, and col. 14:62-17:7.

The key difference between the parties concerns the extent to which the template file, the database and the master page file actually define the pages which are sent to the press and sequenced by the press commands. Donnelley contends that the output pages are not defined by the template file, the database and the master page file, but instead those inputs are merely "used" in some undescribed way in the process of producing press commands. Kodak disagrees. According to the entire teaching of the patent, the pages that are sent to the press are *defined* by the content of the template file and the database.

Figure 5 of the '599 patent illustrates this concept in a straightforward manner by showing how the pages sent to the press are produced directly from information extracted from the template file, the database, and the master page file (which itself is extracted from the template file). With respect to Figures 10a-f, the specification states that the result of the programming defined by Figures 10a-f is a "press command file having a sequence of press commands which cause printing of pages in a desired order." '599 patent, col. 16:23-25. In addition, the content of the press commands themselves is described in the specification as referencing the master page file and the variable page files, both of which were derived directly from information in the template file and the database. *See* '599 patent, col. 16:59-17:7. Based on this specific description of the process of generating press commands, the Court should construe "converting the template file the database and the master page file into press commands specifying sequence and content of page production by the press" to mean generating instructions to a press for sequencing pages defined by the template files, the database and the master page file.

g.    *"press commands specifying sequence and content of page production by the press"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[P]ress commands specifying sequence and content of page production by the press" means **instructions to a press for sequencing pages defined by the template files, the database and the master page file.** | commands specifying what information goes where on the printed page and the order of the pages |

As noted in the previous section, the phrase "press commands specifying sequence and content of page production by the press" are not merely commands that happen to specify sequence and production of any random pages, but specifically they are commands for sequencing pages defined by the template files, the database, and the master page file. For instance, a press command file "specifies the manner in which data contained within the master and variable page files are to be merged to produce printed pages." '599 patent, col. 5:29-31. The example given of an actual press command calls out "file.m"1 and "file.1"1", which are particular pages of a master file and a variable file, respectively, to be merged. '599 patent, col. 16:62-67.

Donnelley's definition of "what goes where" on a particular page is unsupported in the '599 patent. It implies that the press commands arrange the components on the page. However, as already noted, the master and variable pages are already defined—all that is left for the press commands is to instruct the merging or overlaying of the pages, not their assembly. Kodak's construction is true to the page-based approach developed by Donnelley and should be adopted.

## 2.    Related Claim Terms from the '940 and '452 patents

The independent claims of the '940 and '452 patents are set forth below with the disputed terms in bold text:

34

11.    A method of controlling an electronic press, the method comprising the steps of:

developing first and second data sets representing associated first and second **templates**, respectively, each data set having **master data** representing **reusable objects** to be printed and **position data** representing a position on a page at which a **variable object** is to be printed;

**developing a database having a number of entries each of which represents a variable object; and**

**causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization.**

'940 patent, col. 65:11-25.

1.    A method of controlling a display device to display **variable graphics information** in graph format, wherein the variable graphics information is provided in **a database having a number of fields, each of which represents variable information or variable graphics information**, the method comprising the steps of:

(a) developing **template page files**, each page file having **master data** representing **fixed information** and placeholders representing an area of a page for variable information;

(b) selecting areas of the page for the variable graphics information;

(c) specifying graph parameters; and

(d) **causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database,** wherein the selected variable graphics information is displayed according to the specified graph parameters.

'452 patent, col. 76:45-63.

Several terms in both independent claims are similar to the '599 patent claim. These similar terms are addressed in this Section.

35

a.     *"template" and "template page file"*

The parties dispute the constructions for the terms "template" (claims 11, 17-20, and 22 of the '940 patent) and "template page file" (claim 1 and 7 of the '452 patent). In general, Kodak's proposed constructions for these template-related terms remain true to the overall teachings of the asserted patents, and track the construction of the "template file" in Donnelley's first-filed '599 patent. As with the '599 patent, Donnelley's proposed constructions attempt to define these terms so as to obscure or eliminate Donnelley's page-based approach to VDP.

(1)     "template" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| A "template" is a **single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page.** | data representing the position and content of one or more "reusable objects" and identifying the position and corresponding entry (or entries) in the database of one or more "variable objects" |

Independent claim 11 and dependent claims 17-20 and 22 of the '940 patent recite various phrases referring to "template." '940 patent, col. 65:11-25; 66:13-27; 66:30-32. For example, independent method claim 11 recites "developing first and second data sets representing associated first and second **templates**, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed." '940 patent, col. 65:13-18 (emphasis added).

Kodak's construction is essentially identical to its construction of "template file" in the '599 patent, though recognizing Donnelley's substitution of the undefined terms "reusable object" and "variable object" for the clearly defined "fixed information" and "variable information." Although Donnelley's attorneys substituted different words, no meaning other than "fixed information" and "variable information" can be ascribed to "reusable objects" and

36

"variable objects" as there is no mention of the latter two terms in the '940 specification.

REDACTED

Donnelley proposes a meaning of the term "template" that evades any page connotation, and uses the newly-coined "reusable object" terminology. However, neither the '940 nor the '599 patents suggest, or imply, a meaning other than "fixed information" for "reusable object."

REDACTED

Thus, Kodak proposes that "template" be construed essentially the same as that of the "template file" of the '599 patent as a single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page.

(2)     "template page file" ('452 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| A "template page file" is a **file containing a single page layout defining the content and position of fixed information and the position of variable information on that page (that is, a template page file is a single page version of a template file).** | data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file. |

Independent method claim 1 recites the phrase "developing **template page files**, each page file having master data representing fixed information and placeholders representing an area of a page for variable information." '452 patent, col. 76:51-54 (emphasis added). This

37

language is clearly attributable to the background art discussion of the inventor's earlier patent from the '599 patent family. *Id.*, col. 3:13-30. As such, Kodak's construction is consistent with its interpretation of "template file" in the '599 patent and "template" of the '940 patent. Indeed, Kodak submits all of the template-related terms in Donnelley's asserted patents should have a consistent construction.

Moreover, the claim language itself supports the idea that an individual "template page file" represents a single page layout defining the content and position of fixed information and the position of variable information on that page. *See also* '452 patent, col. 76:51-54 (reciting that "each page file having master data representing fixed information and placeholders representing an area of a page for variable information").

In contrast, Donnelley ignores the plain and unambiguous word "file," and instead attempts to broaden its meaning to "data." Donnelley should not be allowed to ignore plain limitations in the claim. Donnelley also repeats an error it made with respect to the term "template file" in the '599 patent: adding an unnecessary limitation related to entries in a database. Kodak asks the Court to construe "template page file" to mean "a file containing a single page layout defining the content and position of fixed information and the position of variable information on that page (that is, a template page file is a single page version of a template file)."

### b.    "position data" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[P]osition data" is data representing a position on a page at which a variable object is to be printed. | information about the location of a "variable object" on a page |

38

Claim 11 of the '940 patent recites the phrase "**position data** representing a position on a page at which a variable object is to be printed." '940 patent, col. 65:16-18 (emphasis added). Kodak proposes that "position data" should be interpreted just as the claim states, and as the Examiner stated as part of his reasons for allowing the claim. FW5 at RRD005420 (specifically noting as a reason for allowance that position data represents "a position on a page at which a variable object is to be printed"). In other words, "position data" is essentially a placeholder for the variable object, *i.e.*, the variable information.

Donnelley, however, proposes a less-precise construction than the claim requires. In the context of the '940 patent, position data is not "information *about* the location of a variable object on a page," as Donnelley suggests. Rather, it is data *representing* a position on a page at which a variable object is to be printed. The difference is one of precision. "About", as Donnelley would no doubt like, conveys only a rough approximation. To be printed, however, the location of a variable object must be specified accurately. Indeed, merely approximating a page position could lead to disastrous printing results as the variable page information, when overlaid on the fixed master page, would not necessarily be properly aligned and could blur or overprint other information. Kodak's definition is true to the claim language and introduces no ambiguities. It should therefore be adopted.

c.    *"fixed information" and "reusable object"*

(1)    "fixed information" ('452 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| Information is "fixed" if the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page. | information that does not vary from printed product to printed product |

39

Claims 1 of the '452 patent recites the term "fixed information," the exact same term recited in claim 11 of the '599. The parties do not dispute that "fixed information" should be construed consistently between the '452 and '599 patents. Rather, the dispute relates to the underlying meaning of "fixed information," which was previously discussed above in Section IV.B.1.b.

(2)    "reusable object" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| A "reusable object" is **fixed information**. | element of "master data" that is reused from printed product to printed product |

Independent claim 11 of the '940 patent recites the phrase "each data set having master data representing **reusable objects** to be printed." '940 patent. col. 65:14-16.

The concept of a "master page file" or "master data" is discussed throughout the Donnelley patents. In each instance, those terms connote a file or data that correspond to fixed information.

In their prosecution of the later-in-time '940 patent, however, Donnelley's patent attorneys sought to couple the term "master data" with a new term—"reusable object"—which has no predicate or definition in the patent specification. Indeed, the notion that master page file or master data could correspond with "fixed information" in one patent, and have some wholly different meaning associated with "reusable objects" in a second patent would essentially require the same term to be construed in two different ways. This is not appropriate, however, not only because the law clearly would preclude such a construction, *see Ballard*, 268 F.3d at 1360-1361, but also because in the context of the specification of the '940 patent, the only meaning that can

40

properly be ascribed to the term "reusable object" is the meaning of the term "fixed information."

Consistent with the specification, the master data or "master page" represents the fixed information in the template page once the placeholders for the variable information have been stripped away. '940 patent, col. 10:45-49. Although Donnelley's attorneys substituted different words, no meaning other than "fixed information" and "variable information" can be ascribed to "reusable objects" and "variable objects," as there is no mention of the latter two terms in the '940 specification.

REDACTED

Moreover, even in the '940 patent it is clear that "reusable objects" are what is left over once "variable information" is put in a separate file. "Variable information" once again is information retrieved from a database. There are only two kinds of information in the Donnelley patents—one is "variable" and the other is "fixed." The fact that Donnelley's lawyers would like to re-label the "fixed" information as "reusable" in no sense redefines the category, which still stands in juxtaposition to the "variable" information and is essentially everything that is not "variable." There was no new matter added in the '940 specification that provides any other meaning for the term "reusable object." Hence, any interpretation of "reusable object" – by Donnelley's own admission – must be based on the '599 patent specification. The concept of information being fixed on a page is the basis of Donnelley's system, and even though such "fixed information" masquerades as "reusable objects" in the '940 patent, there can be only one construction. "Reusable objects" are nothing more than "fixed information."

### d. "master data"

Both the '940 and '452 patents recite the term "master data."

41

(1)     "master data" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
| --- | --- |
| "[M]aster data" is **data that defines the position and content of reusable (fixed) objects not contained in the database.** | data representing information that does not vary from printed product to printed product |

(2)     "master data" ('452 patent)

| Kodak's Construction | Donnelley's Construction |
| --- | --- |
| "[M]aster data" is **data that defines the position and content of fixed information not contained in the database.** | data representing "fixed information" |

As can be seen from the proposed constructions, Donnelley is essentially offering two different constructions with respect to the same term—"master data." This supposedly flows from the fact that independent claim 11 of the '940 patent, from which claims 18 and 19 depend, recites the phrase "each data set having **master data** representing reusable objects to be printed." '940 patent, col. 65:14-16 (emphasis added), whereas independent claim 1 of the '452 patent recites "each page file having **master data** representing fixed information." '452 patent, col. 76:51-52 (emphasis added). However, the relevant language from the respective specifications of the patents is identical, and any reading of those specifications makes clear that the term "master data" has the meaning ascribed in Kodak's construction.

Kodak's construction of "master data" is consistent with the construction of "master page file" of the '599 patent. This is further grounds for adopting Kodak's construction, since the terms "master page file" and "master data" are clearly corresponding terms—*i.e.*, it is the master data that represents the master page file. Moreover, in the background section of the '452 patent, the patentees equated the concept of "master data" in the '452 patent with the concepts described and claimed in the '599 patent family. Accordingly, the term "master data" in the '452 patent

should also be given the same scope as the "master data" of the '940 patent or "master page file" of the '599 patent.

But this is a major problem for Donnelley. The '452 patent claims specifically include the phrase "**master data** representing fixed information." The claims themselves thus confirm the intended meaning. "Master data" represents "fixed information." Such information can be relabeled as "reusable objects," but this can not change the intended scope of the patents, or the underlying definition of master data. Reusable objects must be the same as fixed information— since there is no additional or different disclosure in either the '452 or 940 patents.

Donnelley's proposed construction has a second deficiency in its use of the phrase "data representing information that does not vary from printed product to printed product." The reference to the undefined term "printed product" once again strays from the claim language, and Donnelley's actual developments, by omitting any concept of page-related master data, and introduces ambiguity. For the same reasons discussed earlier, this should be rejected.

        *e.*     *"variable information" and "variable object"*

        (1)     "variable information" ('452 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[V]ariable information" is **information that varies from printed page to printed page and is retrieved from a database.** | information that typically varies from printed product to printed product |

This term is identical to the term that appears in the '599 patent, and Kodak proposes the same construction.

43

(2)     "variable object" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| A "variable object" is **variable information that is retrieved from a database and separately defined for each printed page.** | element of information that typically varies from printed product to printed product |

Independent claim 11 of the '940 patent, from which claims 20-22 depend, recites the phrase "each data set having . . . position data representing a position on a page at which a **variable object** is to be printed." '940 patent, col. 65:14-18 (emphasis added).

As discussed in conjunction with "template," a "variable object" is merely a substitution for the term "variable information." Consistent with the specification, the variable pages contain placeholders for variable information in the template page, which are filled with actual variable information retrieved from the database. '940 patent, col. 10:59-11:18.

Moreover, as noted above, the term "variable object" first appears in the claims of the '940 patent and is not found anywhere in its specification.

REDACTED

Hence, any interpretation of "variable object"—even according to Donnelley—should be based on the '599 patent specification's description of variable information.     Kodak proposes such a construction.

### f.    The Database Limitations

(1)    "developing a database having a number of entries representing variable objects" ('940 patent)

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[D]eveloping a database having a number of entries representing variable objects" means that **each entry in the database represents variable information**. | placing a data representing one or more "variable object[s]" in a "database" |

Independent claim 11 of the '940 patent recites "developing a database having a number of entries each of which represents a variable object." '940 patent, col. 65:19-20. Kodak proposes that this limitation means that each entry in the database represents variable information. Donnelley ignores the claim language and argues that the entire database represents the variable objects, whereas Kodak directly follows the language of the claim. Donnelley also attempts to incorporate the term "variable object" into the definition. As noted above, however, that term does not appear in either the '599 patent or the '940 patent. Kodak's proposed constructions track the language of the claims and rely on the proper disclosure as provided by the '599 patent, which Donnelley agrees provides all the disclosure that is necessary.

(2)    "a database having a number of fields, each of which represents variable information or variable graphics information" ('452 patent)

Claim 1 of the '452 patent recites "a database having a number of fields, each of which represents variable information or variable graphics information." '940 patent, col. 64:31-33; col. 65:19-20. The parties were unable to meet and confer regarding this topic, but believe that a dispute exists. Kodak proposes that the construction for the previous database term applies to this term as well. It is believed that Donnelley will again misinterpret the scope of the term and

45

argue that the entire database represents the variable objects. The proper construction offered by Kodak directly follows the language of the claim.

### g.    The Step-Plus-Function Limitations

Both the '452 and '940 patents each contain an element that should be construed as a step-plus-function element. Although Donnelley did not use the phrase "step for" in either patent, the lack of any specific acts require that both be construed as step-plus-function elements.

        (1)    "causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" ('452 patent)

| Kodak's Proposed Construction | Donnelley's Proposed Construction |
|---|---|
| This claim term is a step-plus-function limitation and **should be interpreted under 35 U.S.C. § 112 ¶ 6**. The corresponding acts are disclosed in Fig. 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. | providing the "display device" information such that it can "display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" |

Claim 1 of the '452 patent recites the phrase "causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database." '452 patent, col. 76:58-60.

An element in a method claim that does not recite the words "step for" should nevertheless be construed as a step-plus-function element when the claim language fails to recite any specific acts. *See SealFlex*, 172 F.3d at 848. Here, the phrase "causing the display device to display the pages with the fixed information, selected variable information from the database,

and selected variable graphics information from the database" merely recites the specific function that is to be accomplished—causing the display device to display pages—and provides no clue as to "how the function is accomplished." *Masco*, 303 F.3d at 1327. Indeed, no specific or definite acts are claimed. Admittedly, the word "causing" is a verb, but here it does nothing more than state a function, and mainly begs the question—how does one *cause* something to occur? As pointed out above in Section IV.A.4, there must be *specific* acts to avoid step-plus-function from being invoked, which are not found here. For these reasons, this claim element should be construed as a step-plus-function element under 35 U.S.C. § 112, ¶ 6.

Donnelley only contests the threshold issue of whether this element should be construed as a step-plus-function element, and does not contest the above-listed disclosed functions or offer any disclosed function and specific act. Accordingly, once the Court determines that this term should be construed as a step-plus-function element, it should adopt Kodak's proposed identification of the claimed function and the corresponding acts to perform it that are given in the specification. *Masco*, 303 F.3d at 1328. Kodak refers to the implemented acts/steps shown in Figure 5 and described in the specification. As Donnelley stated: "Fig. 5 is a generalized diagram of the steps implemented by the method of the present invention." '452 patent, col. 5:38-39.

(2)    "causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set" ('940 patent)

| Kodak's Proposed Construction | Donnelley's Proposed Construction |
|---|---|
| This claim term is a step-plus-function limitation and **should be interpreted under 35 U.S.C. § 112 ¶ 6.** The corresponding acts are disclosed in Fig. 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. | providing the electronic press with information so it can "print output pages with the reusable objects and variable objects" "by separating the master data from the position data for each data set" |

Claim 11 of the '940 patent recites the phrase "causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set." '940 patent, col. 65:22-25.

This claim term should also be construed as a step-plus-function element, because no specific acts are disclosed. *See SealFlex*, 172 F.3d at 848. Just as claim 1 of the '452 patent failed to recite how the "causing" function was to be accomplished, claim 11 of the '940 patent also fails to recite any specific or definite acts for performing its function of "causing the electronic press to print output pages." *Masco*, 303 F.3d at 1327. This functional step merely mirrors the same "means/function" clause in claim 1 of the '940 patent. Even the add-on recitation of "separating" provides no clue toward how output pages are caused to be printed. For these reasons, this claim element should be construed as a step-plus-function element under 35 U.S.C. § 112 ¶ 6. There must be *specific* acts to avoid step-plus-function from being invoked; there are no such specific acts here.

48

As above, Donnelley only contests the threshold issue of whether this element should be construed as a step-plus-function element.  Donnelley does not contest Kodak's disclosed functions or offer it's own disclosed function or specific act.  The Court should therefore adopt Kodak's proposed identification of the disclosed function and disclosed acts. *Masco*, 303 F.3d at 1328.

> (3)    "separating the master data from the position data for each data set" ('940 patent – if not found to be step-plus-function)

| Kodak's Alternative Construction | Donnelley's Construction |
|---|---|
| "[S]eparating the master data from the position data for each data set" means **separating each data set, corresponding to a particular page (*i.e.*, template), into a subset of reusable objects for that page and a separate subset of position data for variable objects for that page**. | distinguishing the "master data" from the "position data" for each "data set" |

The phrase "separating the master data from the position data for each data set" is part of the previously-recited step-plus-function element of claim 11 of the '940 patent.  '940 patent, col. 65:23-25.  Should the Court determine that step-plus-function does not apply, Kodak provides the above-listed construction in the alternative for the "separating" phrase.  The parties *disagree on the meaning of the word "separating" and the scope of the separating function.*

There is no ordinary meaning of the phrase "separating the master data from the position data…" in isolation.  Accordingly, consistent with *Phillips*, one skilled in the art would need to consult the intrinsic evidence to properly ascertain the meaning of the term.  The specification describes the separating concept where an original template file is copied and then stripped of all data relating to the placement of variable information, leaving a stripped master page file containing only fixed information.

49

> The template files are duplicated to create working files. One set of working files is stripped of all area data relating to placement of variable information to create *stripped master page files 120 defining template pages having only fixed* information thereon. The stripped master page files are then converted into PDL master page files 122 expressed in a page description language, such as PostScript.

'940 patent, col. 10:44-52.

Kodak's proposed construction for these terms emphasizes the "stripping" operation, which, in effect, sorts template data into two separate subsets: one of reusable objects (or fixed information) and the other of position data (placeholders) for variable objects (variable information). In contrast, Donnelley's proposed construction improperly attempts to blur the separation or stripping operation, and instead proposes that "separating" should mean "distinguishing" master data from position data. That is far too broad and introduces ambiguity as to what "distinguishing" means.

Also, consistent with the overall teachings of the asserted patents, Kodak's proposed construction reinforces the necessary page-based template concept, while Donnelley's proposed constructions continue to eviscerate the page-based approach adopted by the inventors.

### 3.    The Dependent Claims of the '940 patent

#### a.    *"page sequence commands"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[P]age sequence commands" are **instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database.** | commands specifying what information goes where on the printed page and the order of the pages |

Claim 12 of the '940 patent recites the phrase "converting the data sets and the database into page sequence commands." '940 patent, col. 65:27-28. As with other terms used in the '940 patent claims, the term "page sequence commands" is not found in the disclosure—just the

50

claims. Given Donnelley's position that it is entitled to claim priority to the '599 patent, Kodak construes the term consistent with the notions of press commands discussed in Section IV.B.1.g, above. Consistent with the wording of the phrase itself and the earlier discussion regarding "press commands," Kodak submits "page sequence commands" should be construed as "instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database."

### b.    The "identical data sets" Limitations

| Claim Term | Kodak's Proposed Construction | Donnelley's Proposed Construction |
|---|---|---|
| wherein the master data of the first and second data sets are identical | "[W]herein the master data of the first and second data sets are identical" means **the content of the master data of the first and second data sets are identical** | the "master data" in the first and second "data sets" are the same |
| wherein the variable objects of the first and second data sets are identical | "[W]herein the variable objects of the first and second data sets are identical" means **the content of the variable objects of the first and second data sets are identical** | the "variable objects in the first and second "data sets" are the same |

Claim 19 of the '940 patent recites the phrase "wherein the master data of the first and second data sets are identical." '940 patent, col. 66:20-21. Similarly, claim 20 of the '940 patent recites the phrase "wherein the variable objects of the first and second data sets are identical." '940 patent, col. 66:24-25.

Both of these terms from the '940 patent recite similar limitations that equate elements of the first and second data sets with each other. In claim 19, the master data in the first and second data sets are declared to be identical, whereas in claim 20, the variable objects in the first and second data sets are declared to be identical.

51

Donnelley contends that the claim terms simply mean that the respective elements are "the same." But read in the context of the entire claim language, Donnelley's position is imprecise. For example, claim 19 reads in its entirety, "[t]he apparatus of claim 11, wherein the master data of the first and second data sets are identical, *and a position of the master data in the first template differs* from a position of the master data in the second template." If the master data of the first and second data sets are identical in all respects, then their positions must also be identical. But this is contradicted by the second half of the claim, which requires the positions of the master data to differ. The only reasonable interpretation is that while the positions of the master data in the two data sets can differ, their content cannot. Thus, the content of the master data of the first and second data sets must be identical (with no restriction that the position also be identical). The same reasoning applies to claim 20.

### 4.    Additional Limitations of the '452 patent

#### a.    *"variable graphics information"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "[V]ariable graphics information" is **information for use in graphs that varies from printed page to printed page and is retrieved from a database.** | "variable information" used to produce graphics. |

The parties dispute the meaning of "variable graphics information," which is recited by claims 1, 2, 10, and 14 of the '452 patent. Both parties acknowledge that "variable graphics information" is a particular type of "variable information" that can be used with graphs. Accordingly, this dispute will depend on the resolution of "variable information" discussed above.

RLF1-3183865-1

b.     *"Executing a graph file to generate a graph"*

| Kodak's Proposed Construction | Donnelley's Proposed Construction |
|---|---|
| "[E]xecuting a graph file to generate a graph" means **using a graph file to generate a graph.** | interpreting a graph file to generate a graph |

Claim 2 of the '452 patent recites the phrase "wherein the step of causing the display device to display the pages with the selected variable graphics information from the database further comprises **executing a graph file to generate a graph.**" '452 patent, col. 76:64-67 (emphasis added).

The term "execute," as applied to computer file, simply means that the operation is carried out, or executed. As the term is readily understood, it requires no construction and the plain meaning should stand.

Donnelley's definition – "interpreting" – is no better than the plain meaning of executing and, in fact, simply muddies the waters. To state that a graph file is interpreted, only creates more ambiguity and would require an interpretation of "interpreting" by the Court. Therefore, if the Court believes that a construction is necessary, Kodak proposes that "executing a graph file to generate a graph" be construed to simply mean "using a graph file to generate a graph."

c.     *QuarkXPress®*

| Kodak's Proposed Construction | Donnelley's Proposed Construction |
|---|---|
| "QuarkXPress" means **the page make-up programs named QuarkXPress® existing as of Oct. 29, 1997.** | a program distributed by Quark, Inc. called QuarkXPress |

Claim 7 of the '452 patent recites the phrase "QuarkXPress®." '452 patent, col. 77:22. The scope of Donnelley's claims are limited to what was described at the time the application for the '452 patent was filed. As described, QuarkXPress® was a software program distributed by

53

Quark, Inc. *Id.*, col. 13:32-36. But numerous different versions of QuarkXPress® have been released since the filing date of the '452 patent. Kodak's definition stays true to what existed as of the filing date. Donnelley's definition is imprecise, uncertain and indefinite, by potentially including versions of QuarkXPress® that did not even exist as of the filing date. *See Ex parte Simpson*, 218 USPQ 1020 (Bd. App. 1982) (noting the uncertainties in claim scope when trademarks are used to describe a product or function).

### 5.     Claim Terms From the '801 patent

As discussed, the '801 patent traces its roots back to the '599 patent. But rather than claiming methods relating to separating master pages from a template file, or overlaying master pages with variable pages, the '801 patent claims a method for selecting pages for inclusion in a customized book, after the master pages have been separated from the template file and after all of the variable pages have been generated from information obtained from the database.

Upon filing their application for the '801 patent, Donnelley attempted to claim a method for selectively including pages in a book. Ex. FW4 at RRD006033. By itself, this concept was not new, and to overcome prior art rejections Donnelley added numerous additional limitations to its claims. *E.g.*, Ex. FW4 at RRD006284-94; RRD006330-35; RRD006360-69; RRR006388-96. First, all of the pages of the books must be generated and stored in advance. Second, a set of "pagination information" is specified for each book, indicating which stored pages are to be included in each book. And finally, during the book assembly process, the actual pages of each book are selected from the stored pages based on the book's pagination information, plus an unusual requirement that the number of pages in the second book must be different from the number of pages in the first book.

Upon issuance, claim 1 of the '801 patent had been narrowed considerably to recite the following limitations.

1.    A method of assembling first and second different books, the method comprising the steps of:

(A)    **storing a first number of pages;**

(B)    **specifying a first set of pagination information** including an indication of whether a stored page is to be selectively included in the first book;

(C)    **specifying a second set of pagination information** including an indication of whether a stored page is to be selectively included in the second book;

(D)    **determining whether a stored page is to be assembled into the first book** based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number;

(E)    **determining whether a stored page is to be assembled into the second book** based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number;

(F)    generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and

(G)    producing the first and second books in a single press run.

The parties disagree on the proper constructions of limitations (A) through (E).

a.    *"storing a first number of pages"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "Storing a first number of pages" means **storing all the pages from which the first and second books are to be printed**. | storing data describing a number of pages |

The first limitation of claim 1 of the '801 patent recites "storing a first number of pages" '801 patent, col. 62:54. Donnelley's proposed definition is imprecise. While it could include the concept of storing pages, it could also be read as storing almost any type of data that would

"describ[e]" pages. For instance, with Donnelley's definition, a whole host of page attributes –
such as page size (e.g., 8-1/2 x 11), page orientation (e.g., portrait or landscape), paper type
(white or bond) – could fall within the scope of "data describing" a number of pages. Donnelley
attempts to overlook the requirement that each page must be generated and stored in advance.
That is, using Donnelley's definition, it could be argued that the only information being stored is
the *number* of pages, not the pages themselves. In contrast, Kodak's definition makes it clear
that what is stored is the *pages* from which the first and second books will be printed.

The '801 patent requires all pages to be generated and stored before they are selected for
inclusion in a book. This feature of the invention is evident throughout the disclosure, but it is
most easily found in the other limitations of claim 1 itself. Limitations (D) and (E), for example,
require the step of "determining whether a *stored page* is to be assembled into the first [or
second] book...." '801 patent, col. 62:61-62; 62:66-67 (emphasis added). A stored page must
therefore be a required element of the claims.                     REDACTED

          REDACTED              If the term "storing a first number of pages" does not require
all of the pages to be stored, then the other limitations that refer to a stored page are rendered
indefinite or meaningless.

In the context of the '801 patent, the press command file instructs whether a particular
page should be printed. But the press command file is a computer file that contains records
referring to *actual files containing the page data* to be printed. *See* '801 patent, col. 19:35-20:02
(describing press command file as referencing a "master page file" and "variable page file").
Thus, at the point where a determination is made to print a given page, the pages themselves, as
represented by the master page file and the variable pages files, already exist and have been

stored in computer files. Accordingly, the term "storing a first number of pages" should mean storing all the pages from which the first and second books are to be printed.

b.      *"pagination information"*

| Kodak's Construction | Donnelley's Construction |
|---|---|
| "Pagination information" means **information specifying whether a stored page is to be selectively included for printing in a book.** | information about a page, including whether that page should be included in a book |

Claim 1 of the '801 patent recites "specifying a first set of **pagination information** including an indication of whether a stored page is to be selectively included in the first book." '801 patent, col. 55-57; *see also*, col. 58-60. The phrase "pagination information" is not expressly defined in the '801 patent. The only description relates to Figure 12, which purportedly illustrates the "information needed to create a pagination file." '801 patent, col. 55-57. But Figure 12 and the corresponding description in the specification provides very little information about what "pagination information" might be. Here, the best guidance is found in the language in the claim itself, which recites in both the context of the second and third steps that "pagination information" includes an "indication of whether a stored page is to be selectively included in the [a] book." *See* '801 patent, col. 55-57; col. 58-60.



*Figure 12 of the '801 patent.*

Kodak's definition tracks the language of the claim closely, stating that "pagination information" means *information specifying whether a stored page is to be selectively included for printing in a book.* Donnelley's proposed definition is – once again – imprecise. The phrase "*about* a page" creates unneeded ambiguity. Because Donnelley's proposed definition results in imprecision, the Court should construe "pagination information" as defined above.

    c.    *"specifying a first [and a second] set of pagination information…"*

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book | "Specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book" means **identifying whether each stored page is to be selectively included for printing in the first book.** | providing a first set of information that describes whether a stored page should be included in the first book |

58

RLF1-3183865-1

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book | "Specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book" means **identifying whether each stored page is to be selectively included for printing in the second book**. | providing a second set of information that describes whether a stored page should be included in the second book |

Claim 1 recites two similar phrases: "specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book" and "specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book." '801 patent, col. 55-57; col. 58-60.

As before, Kodak's definition tracks the language of the claim closely, stating that "specifying a first [or second] set of pagination information including an indication of whether a stored page is to be selectively included in the first [or second] book" means *identifying whether each stored page is to be selectively included for printing in the first [or second] book.* As with most of its definitions, Donnelley's proposed definition suffers from imprecision. Donnelley's proposed definition would only specify whether a stored page *should* be included in the second book, as opposed to being actually *included* in the book. Because Donnelley's proposed definition is imprecise and conflicts with the claim language, Kodak requests that the Court reject Donnelley's definitions and adopt Kodak's definitions, which are truer to the plain meaning of the claim.

> d.     *"determining whether a stored page is to be assembled into the
> first book [and the second book]..."*

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number | "Determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number" means **verifying that the number of stored pages specified for the first book is smaller than the total number of stored pages.** | using the "pagination information" to decide whether to include a stored page in the first book. The "second number of pages," which is the number of pages in the first book, is less than the "first number of pages." |
| determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number | "Determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number" means **verifying that the number of stored pages specified for the second book is (a) different from the number of stored pages in the first book and (b) no greater than the total number of stored pages.** | using the "pagination information" to decide whether to include a stored page in the second book. The "third number of pages," which is the number of pages in the second book, is less than the "first number of pages" and different from the "second number." |

Independent claim 1 recites two similarly-worded phrases: "determining whether a stored page is to be assembled into the *first book* based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number" and "determining whether a stored page is to be assembled into the *second book* based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number." Claim 1 of the '801 patent (emphasis added).

60

Kodak's construction is consistent with the claim language and requires the recited steps of "determining" whether certain numbers are greater than the other. In contrast, Donnelley ignores the claim language and would merely propose the claim limitations are met when the number of pages in the books and total number of pages just – by happenstance – coincide with certain predetermined greater-than relationships. This must be rejected as it cannot delineate the boundaries of the claim—and would eviscerate the public notice function of the claim.

Kodak's definition generally seeks to clarify the language of the terms by replacing the confusing phrase "third number of stored pages" with the equivalent "number of stored pages specified for the second book" and also replacing the similarly confusing phrase "first number" with its equivalent "total number of stored pages." Given the potentially confusing nature of the claim language, the Court should adopt Kodak's definitions, which more clearly track the language of the claim.

## V.    CONCLUSION

For the foregoing reasons, Kodak respectfully requests that the Court enters their proffered definitions of the disputed claim terms in the form attached as Exhibit A.

OF COUNSEL:

Richard McMillan, Jr.)
  rmcmillan@crowell.com
Jeffrey D. Sanok
  jsanok@crowell.com
Brian M. Koide
  bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Dated:  July 30, 2007

/s/ Frederick L. Cottrell, III (#2555)
  cottrell@rlf.com
Jameson A.L. Tweedie (#4927)
  tweedie@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
*Attorneys for Defendants Creo, Inc.,*
*NexPress Solutions, Inc., Kodak VersaMark,*
*Inc., Eastman Kodak Company, and Kodak*
*Graphic Communications Company*

61

### CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2007, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following, who have

also been served as noted:

**BY HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899


I hereby certify that on July 30, 2007, the foregoing was sent to the following non-

registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

Douglas I. Lewis                         John G. Hutchinson
Jamie L. Secord                          Sidley Austin, LLP
Sidley Austin, LLP                       787 Seventh Avenue
One South Dearborn Street                New York, NY  10019
Chicago, IL  60603

Jameson A. L. Tweedie (#4927)
tweedie@rlf.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2007, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following, who have

also been served as noted:

**BY HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE   19899

I hereby certify that on August 6, 2007, the foregoing was sent to the following non-

registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

Douglas I. Lewis
Jamie L. Secord
Sidley Austin, LLP
One South Dearborn Street
Chicago, IL   60603

John G. Hutchinson
Sidley Austin, LLP
787 Seventh Avenue
New York, NY   10019

Jameson A.L. Tweedie (#4927)
tweedie@rlf.com