IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY,<br><br>Defendants. | C.A. No. 06-032-JJF |
| EASTMAN KODAK COMPANY,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>R.R. DONNELLEY & SONS COMPANY,<br><br>Counterclaim-Defendant. | **REDACTED – PUBLIC VERSION** |

**PLAINTIFF R.R. DONNELLEY& SONS COMPANY'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:
John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
*Attorneys for Plaintiff R.R. Donnelley & Sons Company*

Original Filing Date: July 30, 2007
Redacted Filing Date: August 7, 2007

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND OF THE TECHNOLOGY ........ 3

ARGUMENT ........ 9

I. OVERVIEW OF APPLICABLE LAW ........ 9

II. U.S. PATENT NO. 6,327,599 ........ 11

A. "TEMPLATE FILE" (ELEMENT 1) (CLAIM 11 OF '599 PATENT) ........ 11

B. "FIXED INFORMATION" (ELEMENT 2) (CLAIM 11 OF '599 PATENT) ........ 13

C. "VARIABLE INFORMATION" (ELEMENT 3) (CLAIM 11 OF '599 PATENT) ........ 15

D. "THE MASTER PAGE FILE" (ELEMENT 5) (CLAIM 11 OF '599 PATENT) ........ 16

E. "A DATABASE HAVING ENTRIES THEREIN EACH REPRESENTING VARIABLE INFORMATION" (ELEMENT 4) (CLAIM 11 OF THE '599 PATENT) ........ 18

F. "PRESS COMMANDS SPECIFYING SEQUENCE AND CONTENT OF PAGE PRODUCTION BY THE PRESS" (ELEMENT 7) (CLAIM 11 OF '599 PATENT) ........ 19

G. "CONVERTING THE TEMPLATE FILE, THE DATABASE AND THE MASTER PAGE FILE INTO PRESS COMMANDS SPECIFYING SEQUENCE AND CONTENT OF PAGE PRODUCTION BY THE PRESS" (ELEMENT 6) (CLAIM 11 OF '599 PATENT) ........ 21

III. U.S. PATENT NO. 6,844,940 ........ 21

A. "TEMPLATE" (ELEMENT 8) (CLAIMS 11, 17, 18, 19, 20, 22 OF '940 PATENT) ........ 22

B. "REUSABLE OBJECTS" (ELEMENT 10) (CLAIMS 11, 18 OF '940 PATENT) ........ 23

C. "POSITION DATA" (ELEMENT 11) (CLAIM 11 OF '940 PATENT) ........ 24

D. "VARIABLE OBJECT" (ELEMENT 12) (CLAIMS 11, 20, 21, 22 OF '940 PATENT) ........ 24

E. "MASTER DATA" (ELEMENT 9) (CLAIMS 11, 18, 19 OF '940 PATENT) ........ 26

F. "DEVELOPING A DATABASE HAVING A NUMBER OF ENTRIES EACH OF WHICH REPRESENTS A VARIABLE OBJECT" (ELEMENT 13) (CLAIM 11 OF '940 PATENT)............. 28

G. "CAUSING THE ELECTRONIC PRESS TO PRINT OUTPUT PAGES WITH THE REUSABLE OBJECTS AND VARIABLE OBJECTS BY SEPARATING THE MASTER DATA FROM THE POSITION DATA FOR EACH DATA SET" (ELEMENT 14) (CLAIM 11 OF '940 PATENT)........ 29

H. "SEPARATING THE MASTER DATA FROM THE POSITION DATA FOR EACH DATA SET IN PREPARATION FOR RASTERIZATION" (ELEMENT 15) (CLAIM 11 OF '940 PATENT)........ 31

I. "PAGE SEQUENCE COMMANDS" (ELEMENT 16) (CLAIM 12 OF '940 PATENT)........ 32

J. "WHEREIN THE MASTER DATA OF THE FIRST AND SECOND DATA SETS ARE IDENTICAL" (ELEMENT 17) (CLAIM 19 OF '940 PATENT)........ 33

K. "WHEREIN THE VARIABLE OBJECTS OF THE FIRST AND SECOND DATA SETS ARE IDENTICAL" (ELEMENT 18) (CLAIM 20 OF '940 PATENT)........ 34

IV. U.S. PATENT NO. 6,205,452........ 34

A. "TEMPLATE PAGE FILE" (ELEMENT 22) (CLAIMS 1, 7 OF '452 PATENT)........ 35

B. "FIXED INFORMATION" (ELEMENT 24) (CLAIM 1 OF '452 PATENT)........ 36

C. "VARIABLE INFORMATION" (ELEMENT 21) (CLAIM 1 OF '452 PATENT)........ 36

D. "VARIABLE GRAPHICS INFORMATION" (ELEMENT 19) (CLAIMS 1, 2, 10 OF '452 PATENT)........ 37

E. "MASTER DATA" (ELEMENT 23) (CLAIM 1 OF '452 PATENT)........ 37

F. "A DATABASE HAVING A NUMBER OF FIELDS, EACH OF WHICH REPRESENTS VARIABLE INFORMATION OR VARIABLE GRAPHICS INFORMATION" (ELEMENT 20) (CLAIM 1 OF '452 PATENT)........ 38

G. "CAUSING THE DISPLAY DEVICE TO DISPLAY THE PAGES WITH THE FIXED INFORMATION, SELECTED VARIABLE INFORMATION FROM THE DATABASE, AND SELECTED VARIABLE GRAPHICS INFORMATION FROM THE DATABASE" (ELEMENT 25) (CLAIM 1 OF '452 PATENT)........ 38

H. "EXECUTING A GRAPH FILE TO GENERATE A GRAPH" (ELEMENT 26) (CLAIM 2 OF '452 PATENT)........ 39

I. "QUARKXPRESS" (ELEMENT 27) (CLAIM 7 OF '452 PATENT)........ 40

V. U.S. PATENT NO. 6,952,801 .......... 41

A. "STORING A FIRST NUMBER OF PAGES" (ELEMENT 28) (CLAIM 1 OF '801 PATENT) .......... 41

B. "PAGINATION INFORMATION" (ELEMENT 31) (CLAIMS 1, 4, 5, 13, 16, 17, 25 OF '801 PATENT) .......... 42

C. "SPECIFYING A FIRST SET OF PAGINATION INFORMATION INCLUDING AN INDICATION OF WHETHER A STORED PAGE IS TO BE SELECTIVELY INCLUDED IN THE FIRST BOOK" (ELEMENT 29) AND "SPECIFYING A SECOND SET OF PAGINATION INFORMATION INCLUDING AN INDICATION OF WHETHER A STORED PAGE IS TO BE SELECTIVELY INCLUDED IN THE SECOND BOOK" (ELEMENT 30) (CLAIM 1 OF '801 PATENT) .......... 43

D. "DETERMINING WHETHER A STORED PAGE IS TO BE ASSEMBLED INTO THE FIRST BOOK BASED ON THE FIRST SET OF PAGINATION INFORMATION WHEREIN A SECOND NUMBER OF STORED PAGES TO BE ASSEMBLED INTO THE FIRST BOOK IS LESS THAN THE FIRST NUMBER" (ELEMENT 32) AND "DETERMINING WHETHER A STORED PAGE IS TO BE ASSEMBLED INTO THE SECOND BOOK BASED ON THE SECOND SET OF PAGINATION INFORMATION WHEREIN A THIRD NUMBER OF STORED PAGES TO BE ASSEMBLED INTO THE SECOND BOOK IS DIFFERENT THAN THE SECOND NUMBER AND NO GREATER THAN THE FIRST NUMBER" (ELEMENT 33) (CLAIM 1 OF '801 PATENT) .......... 44

CONCLUSION .......... 45

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007)....10, 32

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
381 F.3d 1371 (Fed. Cir. 2004)....30

*S3 Inc. v. Nvidia Corp.*,
259 F.3d 1364 (Fed. Cir. 2001)....10, 31

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
418 F.3d 1225 (Fed. Cir. 2005)....*passim*

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
257 F.3d 1364 (Fed. Cir. 2001)....27, 31, 42

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
423 F.3d 1343 (Fed. Cir. 2005)....35

*Genentech v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997)....32

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
123 F.3d 1445 (Fed. Cir. 1997)....43

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005)....10, 33

*Lampi Corp. v. American Power Prods., Inc.*,
228 F.3d 1365 (Fed. Cir. 2000)....19, 28

*Masco Corp. v. United States*,
303 F.3d 1316 (Fed. Cir. 2002)....30, 39

*Masco Corp. v. United States*,
47 Fed. Cl. 449 (Fed. Cl. 2000)....29

*O.I. Corp. v. Tekmar Co.*,
115 F.3d 1576 (Fed. Cir. 1997)....29

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)........................................................................*passim*

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005)..............................................................9, 16, 28, 41

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005), *cert. denied,* 126 S.Ct. 1332
(U.S. Feb. 21, 2006)...................................................................................*passim*

*Regents of the University of Cal. v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997)...........................................................................19

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001)...........................................................................26

*Seal-Flex, Inc. v. Athletic Track and Court Constr.*,
172 F.3d 836 (Fed. Cir. 1999).............................................................................30

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004).............................................................................31

*Versa Corp. v. Ag-Bag Int'l, Ltd.*,
392 F.3d 1325 (Fed. Cir. 2004)...........................................................................22

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)........................................................................10, 11

*Vulcan Eng'g Co. v. Fata Aluminum, Inc.*,
278 F.3d 1366 (Fed. Cir. 2002)...........................................................................17

**FEDERAL STATUTES**

35 U.S.C. § 112, ¶ 6....................................................................................29, 30

**OTHER AUTHORITIES**

American Heritage Dictionary (2d ed. 1991) ...................................................*passim*

Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000)......................10, 19, 20, 43

Microsoft Computer Dictionary (2d ed. 1994) ..........................................................12, 18, 40

Webster's Third New International Dictionary (1993)...........................................*passim*

# INTRODUCTION

R.R. Donnelley & Sons Company ("RRD") has sued Defendants Creo, Inc., Nexpress Solutions, Inc., Kodak Versamark, Inc., Eastman Kodak Company, and Kodak Graphic Communications Company for infringing four patents: U.S. Patent Nos. 6,327,599 ("the '599 patent"), 6,844,940 ("the '940 patent"), 6,205,452 ("the '452 patent"), and 6,952,801 ("the '801 patent).

RRD's patents-in-suit claim methods for efficiently printing personalized items, such as mailers and financial statements, which contain part static and part variable information – commonly known as variable digital printing. This technology, which RRD developed in 1994, allows personalized printing, even at a press's full speed. RRD developed the patented technology in response to a market need for an efficient use of digital printing presses.

Traditionally, conventional presses printed only longer jobs, such as entire publications, because creating the physical printing plates for these presses and configuring the press for a specific print job was time-consuming and expensive. These plates made traditional printing of short print jobs uneconomical.

Initially, RRD used digital presses for short printing jobs, such as reprints of individual magazine articles. A digital press does not use plates and, like a computer printer, accepts electronic signals that tell it what to print. In a short run print job, the electronic signals representing the print job are pre-stored because they do not vary – *e.g.*, any given magazine article always has the same pages. But in 1994, RRD was underutilizing its digital presses due to the high costs of such short run jobs.

Theoretically, the electronic signal driving a digital press could vary for each printed page and produce personalized content – a much higher value product. But digital presses, and the systems driving them, could not process jobs containing variable information efficiently. Creating

individual images for each printed page was resource intensive in both human labor and computer processing.

There were two prior art ways to print jobs involving variable content, such as personalized mailers or information in an employee benefits package. The first method required designers to create layouts and then programmers to convert these layouts into code for the press. Alternatively, each page in the variable job could be individually created with its own pre-set electronic signal. These processes took substantial processing time to produce the electronic signals, significant space to store such electronic signals, and significant time to process them, thus possibly delaying the start of production, slowing down the print lines, and adding more cost.

Recognizing that with then-current technology, digital presses were only marginally useful, RRD identified a market opportunity and in late 1994 developed technology that made digital presses highly attractive to a broad customer base. RRD created a system that allowed a designer to produce a "template" of each page in a print job. The template allowed the designer to define the content and location of fixed information (the information common from one printed product to the next) and the location and a cross-reference to a data source for variable information (the personalized information that typically differed between printed products) on each page. From this template, the system could identify the variable information and the fixed information, allowing individual processing of each. After processing the fixed and variable information, the disclosed process combined them to create the final printed product. By processing the repeating information only once, RRD dramatically reduced the total processing time and storage needs for variable print jobs. The digital presses could then run with highly customized data at their full rated speed. Since RRD invented the technology at issue, variable digital printing has grown substantially.

The '599 and '940 patents generally claim parts of this process. The other RRD patents-in-suit relate to specific features that make this process even more useful. The '452 patent

claims dynamically producing a graph or chart from the variable information. The '801 patent claims selecting pages for a printed product from a library of pages.

## BACKGROUND OF THE TECHNOLOGY

The four patents-in-suit disclose various inventions relating to variable digital printing. Although the patents describe a complete process from the design of the printed product through printing, the claims cover only part of that process.

As explained in the '599 patent, as of 1995, "new printing systems have been developed, called 'demand printers,' which are capable of high speed printing of images from electronic representations thereof."[1] These "demand printers," or digital presses, like copiers or printers today, accepted a bitmap[2] representing the image to reproduce on paper. As explained in the patents, the printed product must be "converted by a collator and raster image processor (RIP) into bitmaps which may be stored in a memory. The stored bitmaps are used to control one or more demand printers and/or any other type of display device, such as a laser printer, a CRT, an LCD display or the like so that the device displays pages having fixed and variable information thereon."[3]

Unlike traditional presses that required a physical plate for each printed page, a digital press could use different bitmaps for each page to generate personalized content. In addition, as the patents explain, the generation of personalized content in itself was not new because Word, WordPerfect, and CAD software had done this previously.[4] But "[w]hile the foregoing image manipulating systems allow[ed] some image gathering capability, none [wa]s effective [in] assist[ing] in the rapid production of different book versions."[5]

---

[1] '599 Patent col.2, ll.41-43, Ex. C.
[2] A bitmap is a series of binary 1s and 0s representing the colored dots making up a printed image. The 1s and 0s create a map of what the image looks like and tell the digital press what to print.
[3] '599 Patent col.5, ll.42-48.
[4] '599 Patent col.1, l.51 – col.2, l.8.
[5] '599 Patent col.2, ll.9-11.

The prior art software did not efficiently perform variable printing because it output only entire pages. That is, for each printed page that contained personalized information, the prior art generated pages with full content (including personalized and non-personalized information). Such pages could only be rasterized[6] into bitmaps representing each page as a whole. Rasterizing every page in a press run, many containing at least partially the same information, took so long that rasterizing could not keep up with the press, making production economically impractical.[7]

The inventions described in the patents-in-suit solved these problems. Instead of manually programming a print job, "one or more template files 106 are developed by a publisher specifying the content (including appearance) of fixed information and the positioning of all information (i.e., fixed and variable) on the different books or book versions."[8] For example, areas 110, 112 on the pages P1, P4 in Figure 6a from the '599 patent represent placeholders for variable data, and 116 presents fixed information, or master data, appearing on all iterations of page P1. The variable information placeholders on the template also identify which database field corresponds to variable information on a page.



FIG. 6a

[6] Rasterization is the process of converting the job into bitmaps that the digital press can print. Rasterization is done by a raster image process or RIP. *See* '599 Patent col.6, ll.51-53.
[7] As explained in the patents, the "data to be displayed or printed must be first rasterized by a raster image processor (RIP), which utilizes complex and time-consuming computational routines which further increase production time to an economically impractical level." '599 Patent col.2, ll.36-40.
[8] '599 Patent col.8, ll.5-9.

The "variable information" on the template corresponds to data in a database. This "database 108 is also developed by the publisher using the personal computer 54 specifying the content of variable information to be placed in variable information areas."[9] The specification includes a "sample database" containing the following information:

| Version | Addressline1 | Addressline2 | Addressline3 | Addressline4 | Addressline5 | Price1 | Image1 | Price2 | Copies | Barcode | Townsort |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | William Doe | 123 Elm | Chicago | Illinois | 606248923 | $22.95 | Shoes | $21.95 | 1 | !606248923! | |
| 03 | Hugh Jorgensen | 56 Maple | Chicago | Illinois | 606248923 | $21.95 | Shirt | $20.95 | 1 | !606248923! | |
| 02 | Jay P. Morgan | 1313 Park | Chicago | Illinois | 606248924 | $24.95 | Pants | $22.95 | 1 | !606248924! | ■ |
| 02 | Joe Louis | 819 Elm | LaGrange | Illinois | 605251093 | $19.95 | Pants | $18.95 | 1 | !605251093! | |
| 03 | John Smith | 926 Cossit | LaGrange | Illinois | 605251093 | $19.95 | Shoes | $15.25 | 1 | !605251093! | |
| 01 | Len Johnson | 882 Monroe | LaGrange | Illinois | 605251093 | $19.95 | Shoes | $17.25 | 1 | !605251093! | |
| 02 | Janet Cizmar | 916 Monroe | LaGrange | Illinois | 605251094 | $24.95 | Pants | $21.95 | 1 | !605251094! | ■ |
| 03 | Jay Schroeder | 88 W. 77th | Brookfield | Illinois | 605241391 | $21.95 | Shirt | $19.95 | 1 | !605241391! | |
| 03 | John Doe | 129 Madison | Brookfield | Illinois | 605241391 | $22.95 | Shirt | $19.95 | 1 | !605241391! | ■ |

As illustrated in the sample database, a "record" (*i.e.*, a row) may consist of an individual's name, contact information, order number, etc.[10] The "fields" or entries (*i.e.*, a column) are the different categories of information, and may include an individual's name (Addressline1), street address (denoted by Addressline2), etc.[11] In addition, the Image1 field identifies one of a catalogue of variable images (*e.g.*, shirt, shoes, pants), stored elsewhere, that are also associated with the customer. The database also contains a "control" field for each record (*e.g.*, "copies").[12]

Using this template and database, the process described in the patents creates press commands that identify the fixed information specified on the template and the variable information obtained from the database as specified on the template. The press commands also specify how to assemble the fixed information and the variable information into each printed page.

The patents describe using the press commands to control rasterization (*i.e.*, the conversion of fixed and variable information into bitmaps) and page production. "A collator is an electronic device for storing raster image processor files (i.e., bitmap files) and delivering selected

---

[9] '599 Patent col.8, ll.9-12.
[10] '599 Patent col.9, ll.36-50, col.10, ll.36-50.
[11] '599 Patent col.9, ll.36-50, col.10, ll.36-50.

files to a digital press in real time, such that the digital press can run at full speed while processing and printing unique page data for each book produced on the press."[13]

The process in the patents analyzes the press commands and causes the RIP to convert the fixed information and variable information (*i.e.*, the data from the database) into separate bitmaps.[14] By determining whether information has been previously rasterized, the RIP needs to create each bitmap only once. After the RIP rasterizes this information, the press commands allow assembling the resulting stored bitmaps into the final printed product, in a manner akin to creating a collage. Because the collator sends pre-stored bitmaps to the press, the inventive system enables printing of personalized content at the production speed of the press.

This process is best illustrated with an example. Assume that a business wishes to mail an advertisement to 10,000 existing customers and that the advertisement contains some common elements and some variable elements. The common elements are the same for the advertisements directed to all 10,000 customers. This type of content could include standard paragraphs, logos, or background graphics.

Variable elements, which typically vary between customers, could include personalized text and images for each customer – *e.g.*, a personalized greeting ("Dear _____"), a reference to the customer's last purchase ("Thank you for your recent purchase of ______"), or a picture based on the customer's last purchase (an item that the customer may want based on the prior purchase). Variable information may also include some standard text (like "Dear" in the example above) or other type of content mixed with the variable information, for example, a paragraph of standard text incorporating personalized information (*e.g.*, the customer's name) or information based on customer-specific information (*e.g.*, identifying a local store).

---

[12] '599 Patent col.9, ll.36-50, col.10, ll.36-50, 57-59.
[13] '599 Patent col.6, ll.47-51.

As described in the patents, a business seeking to create such an advertisement would first create a template using a computer program, like QuarkXPress.[15] The patents explain that "one or more template files are developed by a publisher specifying the content (including appearance) of fixed information and the positioning of all information (i.e., fixed and variable) on the different books or book versions."[16] The template contains all the fixed information, which remains constant for all customers, and references to the variable information in the database needed for each page of the advertisement. For each variable element, the template identifies the type of variable information (*e.g.*, text or image) and links the variable information to a corresponding field in the database containing either the information to substitute for the variable placeholder (*e.g.*, the customer's name and address) or a field that identifies an image to place on the page (*e.g.*, a picture of shoes).[17]

After designing the advertisement and preparing the customer database, the disclosed process converts the template and the database into press commands. First, the process analyzes the template, identifying the fixed information and the variable information. For each of the 10,000 advertisements, the disclosed process then replaces the "variable information" placeholders on the template with the corresponding information in the database (*e.g.*, name, address, last purchase) and identifies the appropriate variable images based on each customer's information in the database (*e.g.*, a picture of shoes). The "press commands" then reference this fixed information and the customer-specific variable information for each printed page.

By distinguishing between the fixed and variable information, the press commands allow processing fixed and variable information separately. The disclosed process describes

---

[14] '599 Patent col.18, l.42 – col.19, l.13.
[15] '599 Patent col.8, ll.5-9.
[16] '599 Patent col.8, ll.5-9.
[17] '599 Patent col.9, ll.18-56.

analyzing the information referenced in the press commands to determine whether it has previously been rasterized. If so, that entry is ignored. If not, the process puts the entry on a list to be rasterized into a bitmap.[18] Finally, once "the end of the [press commands] file has been reached, a block 424 causes the RIP 82 to convert the files identified in the RIP list into bitmap format by issuing commands and files as appropriate to the RIP 82."[19] Although the rasterizing process takes some time, it does not have to be done while the press is printing. The RIP does not create full bitmaps of every page of the 10,000 advertisements, and the bitmaps for the fixed and variable information require less storage space than bitmaps for every page where the pages had not been separated into components.

After the RIP has created all the necessary bitmaps for the print run (or after it has processed enough data that it will finish creating bitmaps before they are needed), the press commands identify which of the resulting bitmaps to have the digital press print for each page. With this process, the press can print each page of 10,000 advertisements at full production speed.

The '599 and '940 patents generally claim part of the above process – basically the pre-processor that creates the "press commands." The other two patents-in-suit claim specific uses of the above process. The '452 patent describes adding variable graphics to the above process. Essentially, the '452 patent describes adding a graph or chart (*e.g.*, a pie chart or line graph) to a page and using the data in the database to generate variable graphics "on the fly."[20]

The '801 patent claims the use of the inventive process to generate different versions of a book. The invention is especially useful for printing brochures or other types of books containing different pages. The publisher defines a library of pages and provides pagination

---

[18] '599 Patent col.18, l.42 – col.19, l.13.
[19] '599 Patent col.19, ll.8-11.
[20] '452 Patent col.13, l.56 – col.14, l.63, Ex. E.

information specifying, *inter alia*, whether a certain page is to be included in a book.[21] The pages are then assembled into books with different pages.

## ARGUMENT

## I. OVERVIEW OF APPLICABLE LAW

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."[22] "When interpreting claims, we inquire into how a person of ordinary skill in the art would have understood claim terms at the time of the invention."[23] Moreover, claim terms are construed "in the context of the particular claim in which the disputed term appears," requiring examination of how the claim uses the term.[24]

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[25] The specification is "always highly relevant" in claim construction and is usually dispositive,[26] but limitations should not be read from the specification into the claim.[27] The specification, after all, is intended to "enable those of skill in the art to make and use the invention and to provide a best mode for doing so."[28] It is not expected that "persons of ordinary skill in the art . . . would confine their definitions of terms to the exact representations depicted in the embodiments" set forth in the specification.[29] Rather, "[t]he specification acts as a

---

[21] '801 Patent col.3, ll.36-40, col.10, l.59 – col.11, l.11, Ex. F.
[22] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), *cert. denied,* 126 S.Ct. 1332 (U.S. Feb. 21, 2006) (internal quotations and citations omitted).
[23] *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1372-73 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1313).
[24] *Phillips*, 415 F.3d at 1313.
[25] *Id.*
[26] *Id.* at 1315 (internal quotations and citations omitted).
[27] *Id.* at 1323.
[28] *Id.*
[29] *Phillips*, 415 F.3d at 1323

dictionary when it expressly defines terms used in the claims or when it defines terms by implication."[30]

Defendants seek to restrict the claims to the exact embodiment disclosed in the specification. But "[w]e do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive.'"[31] Indeed, by providing a detailed disclosure, RRD was "not narrowly defining the term[s] [at issue] or otherwise limiting the claims, but merely discharging [its] statutory duties 'to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.'"[32] The "preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary."[33]

Defendants also seek to construe the claims to require features not expressly recited therein. Claims, especially those utilizing the term "comprising," "including," or "having," as the ones at issue in this case, are not complete lists of everything described in the specification. "The transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements or method steps."[34]

---

[30] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

[31] *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005), *quoting Phillips*, 415 F.3d at 1323.

[32] *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 (Fed. Cir. 2007); *Cf. S3 Inc. v. Nvidia Corp.*, 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The purpose of claims is not to explain the technology or how it works, but to state the legal boundaries of the patent grant.").

[33] *Acumed*, 483 F.3d at 809.

[34] *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (internal quotations and citation omitted); *see also* Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000) ("The transitional term 'comprising', which is synonymous with 'including,' … is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.").

Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language."[35] It is also "less reliable than the patent and its prosecution history in determining how to read claim terms."[36] Thus, extrinsic evidence should be given less weight than the intrinsic evidence. But dictionaries and treatises are considered relevant and useful for informing the court of how one of ordinary skill in the art would understand the technology.[37]

## II. U.S. PATENT NO. 6,327,599[38]

U.S. Patent No. 6,327,599 is the "parent" patent in the family of patents describing RRD's variable digital printing technology. The asserted claims in the '599 patent describe preparatory steps to convert template files representing pages having both fixed and variable information into press commands.[39] Although the '599 patent discloses a complete process for variable digital printing, its claims focus on only one portion of that process.

### A. "Template File" (Element 1) (Claim 11 of '599 Patent)[40]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file** | a file that stores template pages, which are single page layouts defining the content and position of fixed information and the position of variable information on that page |

35 *Phillips*, 415 F.3d at 1317 (internal quotations and citations omitted).
36 *Id.* at 1318.
37 *Id.* (citing *Vitronics,* 90 F.3d at 1584 n.6).
38 For the Court's convenience, RRD includes Exhibit A, which lists each disputed term and identifies each with an "Element" number. Throughout this section, RRD will refer to the disputed terms with these Element numbers. Exhibit A also incorporates both RRD's and Defendants' proposed claim constructions, which RRD includes as Exhibits K and L, respectively.
39 '599 Patent col.8, ll.5-9.
40 This term appears in the following context in the claim: "template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page." Also for the Court's convenience, RRD includes Exhibit B, which contains the disputed terms (in bold type) in the context of the claims in which they appear.

The term "template file" should be construed as "data representing the position and content of the 'fixed information' and identifying the position and corresponding entry (or entries) in the database of the 'variable information,' which is stored in a file." RRD construes this element consistent with the ordinary meaning of the words in the claim.[41] The claim language explains the information that the "template file" must hold – the information "defining pages to be printed" including (1) "fixed information" and (2) "variable information," terms which are separately construed and therefore only referenced here. *See* Sections II.B, II.C. RRD's construction identifies the characteristics about the fixed and variable information that is in the "template file."

The specification confirms RRD's construction, explaining that:

> template files 106 include data specifying the position and content of fixed information on the pages to be printed. Specifically, the template files 106 define template pages wherein each template page includes data representing any fixed information to be reproduced on corresponding pages of the books or book versions and area data representing any area(s) on the corresponding pages where variable information is to be reproduced.[42]

Defendants' construction seeks to add new terms that do not appear anywhere in the patent claims and themselves need construction – including "template pages" and "single page layouts." Defendants construe "template file" to store "template pages,"[43] a term that appears nowhere in the claims of the '599 patent. Rather, a variant of "template page" appears in the '452 patent, where its meaning is disputed.[44] There is no reason to import this term into the '599 patent, or to confuse the jury about the "template file." Also, the term "single page layouts" is ambiguous and does not appear in the specification or the claims.

---

[41] In computer science, a template is "[a] pattern or form." Microsoft Computer Dictionary (2d ed. 1994), Ex. G, at 385.
[42] '599 Patent col.8, ll.5-9, 16-23.
[43] *See* Ex. A at 1.
[44] *See* Section IV.A.

Defendants also attempt to rewrite this term to restrict its scope. The claim language uses the term "defining pages," which Defendants construe as "stor[ing] pages." "Defining" and "storing" are not synonymous. The claim uses "define" in an ordinary sense to indicate the data included therein.[45] "Store," on the other hand, means "to record (information) in an electronic device (as a computer) from which the data can be obtained as needed."[46] The claim does not require "storing," only "defining." RRD's construction does not improperly limit the claim language and uses easily understood terms like "represent."[47]

**B. "Fixed Information"** (Element 2) (Claim 11 of '599 Patent)[48]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information that does not vary from printed product to printed product** | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |

The term "fixed information" should be construed as "information that does not vary from printed product to printed product." In addition to the ordinary English word "fixed," which indicates the information does not vary,[49] the specification defines "fixed information" as "printed information which does not vary from book to book of the same version."[50] The specification

[45] *See* '599 Patent col.8, ll.16-23; *see also* American Heritage Dictionary (2d ed. 1991), Ex. H, at 375 (describing "define" as "[t]o describe the nature or basic qualities of; explain" or "to specify distinctly"); Webster's Third New International Dictionary (1993), Ex. I, at 592 (describing "define" as "to discover and set forth the meaning of").

[46] Webster's Third New International Dictionary (1993), Ex. I, at 2252; *see also* American Heritage Dictionary (2d ed. 1991), Ex. H, at 1201 (defining "store" as "[t]o reserve or put away for future use").

[47] Webster's Third New International Dictionary (1993), Ex. I, at 1926 (defining "represent" as "delineate, depict" or "to describe as having a specified character or quality"); *see also* American Heritage Dictionary (2d ed. 1991), Ex. H, at 1049 (defining "represent" as "stand for; symbolize").

[48] This term appears in the following context in the claim: "fixed information common to all of the pages."

[49] American Heritage Dictionary (2d ed. 1991), Ex. H, at 508 (describing "fixed" as an "[n]ot subject to change or variation"); Webster's Third New International Dictionary (1993), Ex. I, at 861 (defining "fixed" as "not adjustable").

[50] '599 Patent col.6, ll.2-4.

further explains that for fixed information, the "image will be the same in all of the books of a given version."[51]

Although Defendants appear to agree that "fixed information" does not vary from printed product to printed product, their construction adds several limiting terms that are not in the claims. First, Defendants require the *location* of the fixed information to be the same on every printed product. The claim language does not require that the fixed information appear in the same location in each printed product.[52] Indeed, the specification expressly notes that fixed information may appear in a different position on different pages: "the books of different versions have different fixed and variable information. The fixed and/or variable information may vary in terms of content or appearance (i.e., style, *location*, rotation, position, etc.) or both in different versions."[53]

In addition, Defendants limit "fixed information" to information "common to all of the pages to be printed." This proposed construction has two problems. First, the claim does not state that the fixed information is "common to all pages *to be printed*." There is no reason to add this language to the construction. For example, pages could be produced for viewing on a monitor or stored for later. Second, claim 11 of the '599 patent separately recites that the "fixed information" is "common to all of the pages," and RRD does not dispute that this claim requires, at least literally, that the "fixed information" be common to all pages. But "fixed information" should have the same meaning in all the patents-in-suit,[54] and the term appears in the '452 patent without any requirement that the "fixed information" be common to all of the pages.[55] Furthermore, as discussed in Section III.B below, Defendants even attempt to read "fixed information" – with all the additional restrictions Defendants place on that term – into the '940 patent, even though that term

---

[51] '599 Patent col.12, ll.37-38.
[52] '599 Patent col.6, ll.2-4, col.12, ll.37-38.
[53] '599 Patent col.13, ll.31-35 (emphasis added).
[54] *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

does not appear in the '940 patent claims and those claims do not recite that the "fixed information" is "common to all pages."

C. **"Variable Information"** (Element 3) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information that typically varies from printed product to printed product** | information that varies from printed page to printed page and is retrieved from a database |

The term "variable information" should be construed as "information that typically varies from printed product to printed product." RRD's proposed construction of "variable information" tracks the ordinary meaning of the term[56] and the definition of "variable information" in the specification, which defines variable information as "information (which typically varies from book to book)."[57]

Although the first part of Defendants' proposed construction, "information that varies from printed page to printed page,"[58] is similar to RRD's construction, Defendants have added a requirement that the "variable information" *must* vary from printed product to printed product. The '599 patent requires only that the "variable information" *typically* vary from one printed page to the next.[59]

The specification discloses that variable information does not always vary for every printed product. In the specification's sample database, all recipients live in the same state.[60] Similarly, the sample database references only three variable images – shoes, shirts, and pants – and

55 *See, e.g.*, Claims 1, 28, 45 of '452 patent.
56 *See* American Heritage Dictionary (2d ed. 1991), Ex. H, at 1337 ("[l]iable or likely to vary; subject to variation"); Webster's Third New International Dictionary (1993), Ex. I, at 2533 (defining "variable" as "able or apt to vary or change: susceptible or subject to variation or changes").
57 '599 Patent col.6, l.5.
58 *See* Ex. A at 1.
59 '599 Patent col.6, l.5.
60 '599 Patent col.9, ll.36-50, col.10, ll.36-50.

uses them repeatedly. A construction that excludes the preferred embodiment is "rarely, if ever, correct."[61]

Defendants' construction is also incorrect because they add an extraneous limitation that the variable information be "retrieved from a database."[62] The claims contain no such requirement. Although the claim recites that the database holds variable information, it does not require that *all* the variable information be retrieved from the database. Nor is Defendants' added restriction supported by the specification. Indeed, immediately after defining variable information, the specification states that the "variable information *may* be stored in a database . . ."[63] Moreover, the database can hold data that references variable information, like variable images, that are not stored in the database. Thus, neither the claims nor the specification *requires* retrieving the variable content from the database.

### D. "The Master Page File" (Element 5) (Claim 11 of '599 Patent)[64]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing "fixed information," which is stored in a file** | a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information |

The term "master page file" should be construed as "data representing 'fixed information,' which is stored in a file." The claim language supports RRD's proposed construction of "master page file." Claim 11 recites that "the master page file defines the fixed information."[65] The master page therefore contains data representing – *i.e.*, defining – "fixed information."[66] The

[61] *Pfizer*, 429 F.3d at 1374.
[62] *See* Ex. A at 1.
[63] '599 Patent col.6, ll.5-7 (emphasis added).
[64] This term appears in the following context in the claim: "developing a master page file from the template file wherein the master page file defines the fixed information."
[65] '599 Patent col.19, ll.35-36, col.20, ll.43-44.
[66] "Representing" and "defining" are synonymous. *See* American Heritage Dictionary (2d ed. 1991), Ex. H, at 375 (describing "define" as "[t]o describe the nature or basic qualities of; explain"

portion of the construction stating "which is stored in a file" indicates that the "master page *file*" stores "fixed information" in a file.

Defendants propose limiting "master page file" to the exact embodiment in the specification – "a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information." In seeking to limit this term to the exact process the preferred embodiment uses to produce the "master page file," Defendants ignore that claims are not limited to the preferred embodiment in the specification.[67] Indeed, the claim language says nothing about a "master page file" constituting a "template file stripped of the placeholders for the variable information." Rather, the claims describe the "master page file" generally, requiring only that "the master page file defines the fixed information."[68]

Defendants also misconstrue the "master page file" as holding "*only* the content and location of the fixed information." The claim language does not require that the "master page file" hold "only" such information, only that it "defines the fixed information." So long as the "master page file defines the fixed information," nothing prohibits the "master page file" from defining (or doing anything else with) other information.[69]

Unasserted claim 6 further undermines Defendants' construction. Claim 6 expressly recites that "the master page file includes data defining the fixed information *only*." Defendants improperly import "only" into claim 11 when that claim, unlike claim 6, lacks such language.

---

or "to specify distinctly"); Webster's Third New International Dictionary (1993), Ex. I, at 1926 (defining "represent" as "delineate, depict" or "to describe as having a specified character or quality").

[67] *See Phillips*, 415 F.3d at 1323.

[68] '599 Patent col.19, ll.35-36, col.20, ll.43-44.

[69] *See Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1375 (Fed. Cir. 2002) ("It is irrelevant whether an element has capabilities in addition to that stated in the claim. When the claimed function is performed in the accused system, by the same or equivalent structure, infringement of that claim element is established.").

Finally, Defendants improperly read a "location" restriction into the "master page file" – *i.e.*, that the "master page file" must hold "the content and *location of* the fixed information."[70] The claims require only that the "master page file" define the fixed information, not the location of the "fixed information." Defendants' construction is also inconsistent with claim 19 in the '940 patent, which is related to the '599 patent.[71] That claim explains that "master data" on two pages can be in different locations. Obviously, if the "master data" itself defines the "location of" the fixed information as Defendants assert, it cannot appear at a different location.

### E. "A Database Having Entries Therein Each Representing Variable Information" (Element 4) (Claim 11 of the '599 patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **a collection of data representing the "variable information"** | each entry in the database represents variable information |

The phrase "a database having entries therein each representing variable information" should be construed consistent with its plain and ordinary meaning to mean "a collection of data representing the 'variable information.'"[72] The specification supports this construction too. According to the specification, "[t]he variable information may be stored in a database created by the publisher."[73]

---

[70] *See* Section II.B.

[71] Where the same or a similar term appears in related patents, the term is presumed to have the same meaning across the patents. *See Omega Eng'g*, 334 F.3d at 1334.

[redacted]

[73] '599 Patent col.6, ll.5-7. *See also* '599 Patent col.8, ll.9-15 ("A database 108 is also developed by the publisher using the personal computer 54 specifying the content of variable information to be placed in variable information areas, for example, the areas 110, 112 on the pages P1, P4,

Defendants do not construe "database" and instead add an unnecessary requirement that each entry – *i.e.*, *all* entries – in the database represent variable information. Defendants wrongly assert that "each entry in the database represents variable information." In a patent claim, "having," as in "a database having entries therein," means the database has entries that represent variable information, not that all entries do.[74] The specification explains that not all entries in the database represent variable information – some represent a "control code": "[t]he COPIES field may be used as a control code to select the number of book copies to be produced."[75] A construction inconsistent with the specification is rarely, if ever, correct.[76]

### F. "Press Commands Specifying Sequence and Content of Page Production by the Press" (Element 7) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **commands specifying what information goes where on the printed page and the order of the pages** | instructions to a press for sequencing pages defined by the template files, the database and the master page file |

The phrase "press commands specifying sequence and content of page production by press" should be construed to mean "commands specifying what information goes where on the printed page and the order of the pages." This construction tracks the plain and ordinary meaning of the words in this term – *i.e.*, "sequence" means "the order of the pages" and "content of page production" means the information on the page and where on the page it goes.[77]

respectively, of FIGS. 6a and 6b. The database 108 further includes control information, as noted in greater detail hereinafter.").

[74] *See Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1376 (Fed. Cir. 2000), *quoting*, Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000) ("Transitional phrases such as . . . 'having' . . . must be interpreted in light of the specification to determine whether open or closed language is intended."); *see also Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1573 (Fed. Cir. 1997) (construing term "having" as permitting inclusion of other entities).

[75] '599 Patent col.9, ll.40-50, col.10, ll.22-25, 40-50, 57-59.

[76] *See Phillips*, 415 F.3d at 1315-16, 1321.

[77] American Heritage Dictionary (2d ed. 1991), Ex. H, at 1119 (defining "sequence" as "[a]n order of succession; arrangement"); *see also* Webster's Third New International Dictionary (1993), Ex. I, at 2071 (defining "sequence" as "a continuous or connected series").

RRD's construction is also consistent with the specification, which describes press commands specifying the "manner in which data contained within the master and variable page files are to be merged to produce printed pages."[78] Thus, the press commands specify the information to be printed – *i.e.*, the fixed and variable information – and where it is to be placed on printed pages.

Defendants again seek to narrow the claim language improperly with their proposed construction. First, the claims do not require specific "instructions to a press." The "press commands" can undergo any number of unclaimed transformations before instructions are provided to the press.[79] Indeed, in the specification, a collator and RIP convert the press commands into instructions for the press.[80] Second, Defendants' construction changes "*converting* the template file, the database and the master page file into press commands" into press commands "*defined* by" those sources. "Converting" means "to change [something] into another form, substance, state, or product; transform."[81] "Defining," on the other hand, means "[t]o describe the nature or basic qualities of; explain" or "to specify distinctly."[82] In other words, the claim recites the sources from which the "press commands" are produced. Defendants' construction, conversely, limits the "press commands" themselves. RRD's construction is therefore more consistent with the claim language.

[78] '599 Patent col.5, ll.29-31.

[79] *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005); Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000).

[80] '599 Patent col.5, ll.41-43.

[81] American Heritage Dictionary (2d ed. 1991), Ex. H, at 320; *see also* Webster's Third New International Dictionary (1993), Ex. I, at 499 (defining "convert" as "to change or turn from one state to another").

[82] American Heritage Dictionary (2d ed. 1991), Ex. H, at 375 (describing "define" as "[t]o describe the nature or basic qualities of; explain" or "to specify distinctly"); *see also* Webster's Third New International Dictionary (1993), Ex. I, at 592 (describing "define" as "to discover and set forth the meaning of").

G. **"Converting the Template File, the Database and the Master Page File into Press Commands Specifying Sequence and Content of Page Production by the Press"** (Element 6) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **using the "template file," the "database," and the "master page file" to produce "press commands specifying sequence and content of page production by the press"** | Generating instructions to a press for sequencing pages defined by the template files, the database and the master page file |

This term incorporates several terms construed elsewhere, and therefore RRD's proposed construction incorporates the terms "template file" (*see* Section II.A), "database having entries therein each representing variable information" (*see* Section II.E), "master page file" (*see* Section II.D), and "press commands specifying sequence and content of page production by press" (*see* Section II.F). The ordinary meaning of the remaining term, "converting," is "using ... to produce."[83]

Defendants' proposed construction essentially mirrors their proposed construction for "press commands specifying sequence and content of page production by the press."[84] RRD therefore incorporates herein its discussion of Defendants' construction of that term. *See* Section II.F.

## III. U.S. PATENT NO. 6,844,940

U.S. Patent No. 6,844,940 is a descendant of U.S. Patent No. 6,327,599.[85] The claims of the '940 patent are similar to those of the '599 patent.

---

[83] American Heritage Dictionary (2d ed. 1991), Ex. H, at 320 (defining "convert" as "[t]o change [something] into another form, substance, state, or product; transform").

[84] *See* Ex. A at 1.

[85] Specifically, the '940 patent is a continuation of U.S. application Ser. No. 09/852,581, filed May 10, 2001, which, in turn, is a divisional of U.S. application Ser. No. 08/802,337, now U.S. Pat. No. 6,332,149, filed Feb. 11, 1997, is a continuation-in-part of U.S. application Ser. No. 08/478,397, now U.S. Pat. No. 6,327,599, filed Jun. 7, 1995, and a continuation-in-part of U.S. application Ser. No. 08/627,724, now U.S. Pat. No. 5,857,209, filed Apr. 2, 1996. RRD includes the '940 patent as Exhibit D.

### A. "Template" (Element 8) (Claims 11, 17, 18, 19, 20, 22 of '940 Patent)[86]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing the position and content of one or more "reusable objects" and identifying the position and corresponding entry (or entries) in the database of one or more "variable objects"** | a single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page |

RRD's proposed construction of "template" parallels its proposed construction of "template file" in the '599 patent, albeit without the requirement that the template be in a file and with reference to terms used in this patent. The '940 patent descends from the '599 patent, and "template" should be interpreted consistently with "template file."[87] The ordinary meaning of the terms is no different between the patents. And the '940 specification uses the same language in describing "template" that appears in the '599 specification.[88] RRD incorporates its analysis of that term here. *See* Section II.A.

The parties dispute: (1) whether the "template" represents *one or more* reusable and variable objects; (2) whether the disputed claim terms "fixed information" and "variable information" belong in the construction of "template," even though they appear nowhere in the claims of the '940 patent; and (3) whether Defendants can limit the "template" to a single page.

Although Claim 11 speaks of "reusable objects" and "variable objects" in the plural, Federal Circuit precedent allows the plural to include the singular as well.[89] Therefore, a "template" may include information about one, or more than one, reusable object or variable object.

---

[86] This term appears in the following context in the claim: "developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed."
[87] *See Omega Eng'g*, 334 F.3d at 1334.
[88] '599 Patent col.8, ll.5-9, 16-23; '940 Patent col.10, ll.37-45.
[89] *See Versa Corp. v. Ag-Bag Int'l, Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("[P]lural can describe a universe ranging from one to some higher number, rather than requiring more than one item." (citation omitted)).

With regard to the second dispute, Defendants utilize the disputed terms "fixed information" and "variable information" (disputed terms in the '599 and '452 patents) in their construction, attempting to read all of their proposed, extraneous limitations for these terms into the claims of the '940 patent. Although the '940 patent specification refers to "fixed information" and "variable information," those terms do not appear in the '940 patent claims. There is no reason to import those terms – and their controversy – into claims that simply lack them.

Finally, the "template" may include data for more than one page. Defendants erroneously propose that "template" represents "a single page layout" defining content "on that page."[90] Claim 11 recites that each data set representing the "template" has "master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed."[91] Defendants apparently take the "on a page" language used to describe "position data" and improperly import that language into the construction of "template," thereby concluding that it represents a single page. The claim states, however, that "position data" describes a location "on a page at which a variable object is to be printed." Nothing in this claim limits the "template," or the "data set" representing it, to a single page.[92] Indeed, the specification supports this construction with numerous references to "template" representing multiple "pages."[93]

### B. **"Reusable Objects"** (Element 10) (Claims 11, 18 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **element of "master data" that is reused from printed product to printed product** | fixed information |

[90] *See* Ex. A at 2.
[91] '940 Patent col.64, ll.27-30, col.65, ll.15-18.
[92] *See, e.g.*, '940 Patent col.10, ll.38, 42, 44.
[93] *See, e.g.*, '940 Patent col.10, ll.38-39 ("template files 106 include data . . . on the pages to be printed"), l.40 ("template files 106 define template pages").

The parties do not dispute that "reusable object" should be construed similarly to the disputed term "fixed information" that appears in the '599 and '452 patents. Indeed, RRD's construction largely parallels its construction of "fixed information" ("information that does not vary from printed product to printed product").[94] Claim 11 of the '940 patent defines "reusable objects" as "master data representing reusable objects to be printed." Thus, a reusable object is a subset of "master data" that is reused from printed product to printed product or, in other words, an element of the "master data" that does not vary from printed product to printed product.

Although Defendants take a similar approach, they literally define "reusable object" as "fixed information," which is a disputed term in the '599 and '452 patents and which does not appear in the claims of the '940 patent. As discussed in Section II.B, Defendants' proposed construction of "fixed information" is wrong for a number of reasons. Although the "reusable object" is "fixed information," as RRD construes it, Defendants cannot incorporate all the extraneous limitations they propose for "fixed information" into this term.

### C. **"Position Data"** (Element 11) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information about the location of a "variable object" on a page** | data representing a position on a page at which a variable object is to be printed |

RRD's construction provides the jury with a basis to understand the scope of the claim. Defendants' construction does nothing but repeat back the claim language without the introductory word "position."

### D. **"Variable Object"** (Element 12) (Claims 11, 20, 21, 22 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **element of information that typically varies from printed product to printed product** | variable information that is retrieved from a database and separately defined for each printed page |

---

[94] The '940 specification provides the same definition of fixed information. '940 Patent col.7, ll.49-50.

Both parties construe "variable object" in a similar manner to their proposed constructions for "variable information," a disputed term in the '599 and '452 patents, except that Defendants read even more extraneous limitations into "variable object." *See* Sections II.C and IV.C.

Although the term "variable object" does not appear in the '940 patent specification, the specification defines "variable printed information" as information "which typically varies from book to book."[95] Therefore, a "variable object" is an element of information that typically varies from printed product to printed product. Again here, RRD's construction essentially parallels its construction of "variable information" in the '599 and '452 patents ("information that typically varies from printed product to printed product"). *See* Sections II.C and IV.C.

Defendants take a similar approach, incorporating "variable information" into their proposed construction. But Defendants cannot incorporate all the extraneous limitations they attempt to add to "variable information" in the '599 patent.

Although Defendants' construction of "variable information" already contains the extraneous limitation that the information *must be* "retrieved from a database," Defendants again add that limitation to their proposed construction of "variable object." The claim language contains no such requirement. And as discussed in Section II.C, the '599 patent specification, which contains the same language as the '940 patent,[96] directly contradicts Defendants' construction when it states that the "variable information *may* be stored in a database . . ."[97]

Defendants also add that the "variable object" must be "separately defined for each printed page." As an initial matter, Defendants' construction is less clear than the claim language itself and should be rejected for that reason alone. Do Defendants mean that each printed page

[95] '940 Patent col.7, l.51; '599 Patent col.6, l.5.
[96] '940 Patent col.7, l.51-53.

needs a "separately defined" "variable object," which would be inconsistent with the advantage of "variable objects" that are defined once and then act as placeholders for data that typically varies between printed products? Or do Defendants mean that each page must have different "variable objects"? Or something else? No matter which meaning Defendants intend, the claim contains no limitation that the "variable objects" be "separately defined for each printed page." Indeed, the "variable objects" on different pages could be the same – for example, where the first page contains an addressee's last name in an address and the second page contains a salutation using the same name. Dependent claim 20 covers this exact situation by claiming that "the variable objects of the first and second data sets are identical. . . ."[98] The specification clearly states, moreover, that the variable information need only "*typically* var[y] from book to book."[99] *See* Section II.C.

E. **"Master Data"** (Element 9) (Claims 11, 18, 19 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing information that does not vary from printed product to printed product** | data that defines the position and content of reusable (fixed) objects not contained in the database |

The term "master data" should be construed as data representing information that does not vary from printed product to printed product. Claim 11 describes "master data representing reusable objects to be printed." A "reusable object," as explained in Section III.B, is a subset of the "master data" and represents information that does not vary from printed product to printed product. Also, consistent with RRD's proposed construction, the '940 patent specification defines master data as "representing fixed information."[100] Similarly, and as set forth in Section II.B, the '940 specification defines "fixed information" as information that "does not vary

97 '599 Patent col.6, ll.5-7 (emphasis added).

98 *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

99 '940 Patent col.7, l.51 (emphasis added); '599 Patent col.6, l.5 (emphasis added).

from book to book of the same version."[101] In addition, RRD has defined "master data" consistent with "master page file" in the '599 patent, except that in the '940 patent, there is no file requirement.

Defendants attempt to limit "master data" by inserting the concept of "fixed" information into the construction of "master data." "Fixed information" is a disputed term in the '599 and '452 patents, where Defendants have attempted to read additional limitations into that term. Presumably, Defendants seek to do so here as well.

Defendants also add a requirement that the "master data" define the "position" of reusable objects. The claim language does not mention the position of the "master data." Moreover, claim 19, which depends from claim 11, recites that "a position of the master data in the first template differs from a position of the master data in the second template." Under Defendants' construction, moving the "master data" would change the "master data" into something else, as Defendants include the position as part of the "master data." Defendants' construction is inconsistent with claim 19 and therefore wrong.[102]

Defendants also improperly narrow "master data" by requiring that such data "not [be] contained in the database." Defendants' additional restriction has no source in the claim language or the specification. As an open-ended, "comprising" claim, the described method can have features not claimed, including storing master data in the database.[103] In other words, although the claims recite that the database contains variable data, they do not preclude the database from containing master data (or any other kind of data) as well.

---

[100] '940 Patent col.3, ll.20-21.
[101] '599 Patent col.6, ll.1-9; '940 Patent col.7, ll.49-50.
[102] *See Omega Eng'g*, 334 F.3d at 1334.
[103] *See CollegeNet*, 418 F.3d at 1235; *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380-81 (Fed. Cir. 2001) (the transitional phrase 'comprising' is an open transition that allows for additional unclaimed steps in a method claim).

### F. "Developing A Database Having A Number Of Entries Each Of Which Represents A Variable Object" (Element 13) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a collection of data representing the "variable objects" | each entry in the database represents a variable object |

Defendants neglect the key term in this element – a database – and simply repeat it in their construction. RRD has defined this term – a collection of data representing the "variable objects."

Rather than construing "database," Defendants' construction confusingly changes the claim language. The claim requires "a database having a number of entries each of which represents a variable object," not that "each entry in the database represents a variable object" as Defendants propose. "Having a number of entries" in the database does not refer to every entry in the database. Rather, the term "having" in a patent claim just identifies an object on which the claimed process acts – "a database having a number of entries" – and does not state that the acted upon entries represent the entire database.[104] Indeed, Defendants' construction is inconsistent with the preferred embodiment in the specification, which has entries that do not represent a variable object.[105] The specification expressly describes the "copies" field as a "control code," not a "variable object."[106]

---

[104] *See, e.g., Lampi*, 228 F.3d at 1376.
[105] *See Pfizer*, 429 F.3d at 1374.
[106] '940 Patent col.13, ll.26-27.

### G. "Causing the Electronic Press to Print Output Pages with The Reusable Objects and Variable Objects by Separating the Master Data from the Position Data for Each Data Set" (Element 14) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **providing the electronic press with information so it can "print output pages with the reusable objects and variable objects" "by separating the master data from the position data for each data set"** | This claim term is a step-plus-function limitation and should be interpreted under 35 U.S.C. § 112 ¶6. The corresponding acts are disclosed in Figure 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |

This term incorporates multiple terms construed elsewhere, including "reusable objects," "variable objects," "master data," "position data," and "separating the master data from the position data for each data set." *See* Sections III.B, III.D, III.E, III.C, III.H. There is no need to re-construe those terms, so RRD has incorporated them in its construction. The remainder of RRD's construction ("providing the electronic press with information so it can print output pages") follows directly from the ordinary meaning of the claim language itself ("causing the electronic press to print output pages").[107]

Defendants, on the other hand, try to limit this term with an uncommon doctrine[108] that allows steps in a method to be expressed in "step plus function" form, as described in 35 U.S.C.

[107] " Causing" means "produc[ing] an effect, result, or consequence." *See* Americ an Heritage Dictionary (2d ed. 1991), Ex. H, at 249. Thus, the plain and ordinary meaning of "causing the electronic press to print output pages" is providing the electronic press with information so that it can produce the intended result – the printing of output pages.

[108] RRD is not aware of any reported Federal Circuit case holding that a term was in step-plus-function form. Indeed, before 2000, the Federal Circuit only performed a detailed step-plus-function analysis once, deciding against a step-plus-function construction. *See Masco Corp. v. United States*, 47 Fed. Cl. 449, 452 (Fed. Cl. 2000) (citing *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1582 (Fed. Cir. 1997)). Since 2000, the Federal Circuit has performed a step-plus-function analysis in a few cases, but has declined to construe any disputed terms as step-plus-function. *See, e.g.*,

§ 112, ¶ 6. Like means-plus-function elements, "step-plus-function" elements are construed to include the detailed process described in the specification.

This term is presumptively *not* in "step-plus-function" form because it does not use the term "step for," which is intended to "signal[] the drafter's intent to invoke § 112, paragraph 6."[109] Nor is the preamble's introductory "method comprising the steps of" equivalent to the required "step for."[110] In considering virtually the same language as here, the Federal Circuit refused to apply step-plus-function analysis in *Masco Corp. v. United States,* 303 F.3d 1316 (Fed. Cir. 2002), where the preamble claimed a "method comprising the steps of" and the body of the claims used "ing" verbs to describe the act of the steps.[111] Like *Masco*, Claim 11 of the '940 patent similarly uses the preamble phrase "comprising the steps of" and has elements beginning with "ing" verbs.

Terms lacking "step for" presumptively fall outside § 112, ¶ 6 and can only come under that section if they do not recite an act to carry out the described function.[112] Defendants cannot make this showing because this claim term describes at least one act. The function of a method claim element "corresponds to what that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. 'Acts,' on the other hand, correspond to how the function is accomplished."[113] The function here is "causing the

---

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1382 (Fed. Cir. 2004); *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002).

109 *See Masco,* 303 F.3d at 1326 (citations omitted).

110 *Id.* at 1327 ("Neither of these claims employs the 'step for' language that signals the drafter's intent to invoke § 112, paragraph 6; rather, the claims employ the term 'steps of.' Thus, there is no presumption that these limitations are in step-plus-function format.").

111 *See id.* at 1326-27.

112 *See id.* at 1327 ("[W]here a method claim does not contain the term 'steps for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act.").

113 *Id.* at 1327 (quoting Judge Rader's concurrence in *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 849-50 (Fed. Cir. 1999)).

electronic press to print output pages" and is accomplished via the "acts" of "[1] print[ing] output pages with the reusable objects and variable objects by [2] separating the master data from the position data for each data set." This claim element therefore includes at least one "act" describing how to accomplish the claimed function and is not a "step-plus-function" term.[114]

Because this is not a step-plus-function element, Defendants' attempt to import portions of the specification into this claim element is improper. "[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."[115] Instead, this term encompasses the scope described by the ordinary meaning of its terms, as reflected in RRD's construction.

### H. "Separating The Master Data From The Position Data For Each Data Set In Preparation For Rasterization" (Element 15) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| distinguishing the "master data" from the "position data" for each "data set" | separating each data set, corresponding to a particular page (i.e., template), into a subset of reusable objects for that page and a separate subset of position data for variable objects for that page |

This element should be construed to mean distinguishing the "master data," as construed elsewhere, from the "position data," also construed elsewhere. The ordinary meaning of "separating" is "distinguishing."[116] By its very terms, this claim term requires no more than distinguishing between the "master data" and the "position data" in the template (which is represented by the "data set"). Because the disclosed process describes rasterizing "master data"

---

[114] The fact that this claim does not describe every act necessary to print output pages does not mean that it is in "step plus function" form either. Claims commonly recite only selected steps in a claimed method. *See S3*, 259 F.3d at 1369 (stating that a claim does not need to recite every step of a method because "the claims are not a self-contained explanation of every step"); *see also CollegeNet*, 418 F.3d at 1235; *Dow Chem. Co.*, 257 F.3d at 1380-81.

[115] *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citation omitted).

differently than "variable objects," the claimed process describes a predicate step of "separating" the "master data" from the position data, which the claim explains "represent[s] a position on a page at which a variable object is to be printed." Obviously, printing pages with "master data" and data substituted for the "variable objects" requires far more steps than claim 11 recites. But claims, and especially "comprising" claims, do not need to recite every step in a process.[117] Unclaimed steps should not be read into the claim, even if the specification describes those steps.[118]

Defendants make exactly this mistake, attempting to read in the process disclosed in the specification for performing the "separating" step. Claims, however, are limited by their language, not the preferred embodiment. The claim language does not mention any "subsets," although Defendants find two in this term. Although the claim describes acting on "each data set," the claim never requires a "data set" to represent only a single page, thereby rendering incorrect Defendants' addition of "a particular page (i.e., template)" to this term. On the other hand, Defendants repeat but do not construe a word actually in the claim – *i.e.*, "separating."

### I. **"Page Sequence Commands"** (Element 16) (Claim 12 of '940 Patent)[119]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| commands specifying what information goes where on the printed page and the order of the pages | instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database |

---

[116] *See* American Heritage Dictionary (2d ed. 1991), Ex. H, at 1118 (defining "separate" as "distinguish").

[117] *See Genentech v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

[118] *See Acumed*, 483 F.3d at 808 ("[L]imitations from the specification are not to be read into the claims.") (internal quotations and citation omitted).

[119] This term appears in the following context in the claim: "converting the data sets and the database into page sequence commands for the electronic press specifying sequence and content of page production."

This term should be construed consistent with the terms in the claim and their ordinary meaning – commands specifying what information goes where on the printed page and the order of the pages. The claim describes the "page sequence commands" as "specifying sequence and content of page production." *See also* Section II.F ("press commands").

Defendants again attempt to incorporate the exact process described in the specification, even though the claim does not include such detailed steps.[120] According to Defendants, "page sequence commands" are "instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database." The claim does not mention performing a "merge or overlay" or performing any step "on a page-by-page" basis. Similarly, the claim does not mention acting on "pages of the master file with corresponding pages containing variable information extracted from the database." There is no legal basis to incorporate the specific steps disclosed in the specification into this claim term.

**J. "Wherein The Master Data Of The First And Second Data Sets Are Identical"** (Element 17) (Claim 19 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the "master data" in the first and second "data sets" are the same | the content of the master data of the first and second data sets are identical |

RRD's construction of this term does not differ markedly from Defendants'. But Defendants' construction illustrates the arbitrariness of their constructions and their lack of grounding in the claim language. Defendants incorrectly construe "master data" as "data that defines the *position* and content of reusable (fixed) objects not contained in the database." *See* Section III.E. In this term, however, Defendants appear to adopt RRD's construction and read "master data" to be only the "content" of the "master data," perhaps because the remainder of claim

---

[120] *See JVW Enters.*, 424 F.3d at 1335.

19 makes it clear that the "position" is not part of the "master data": "a position of the master data in the first template differs from a position of the master data in the second template." Nothing in claim 19 requires reading "master data" differently in this claim than in its parent claim, claim 1.[121]

### K. "Wherein The Variable Objects Of The First And Second Data Sets Are Identical" (Element 18) (Claim 20 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the "variable objects" in the first and second "data sets" are the same | the content of the variable objects of the first and second data sets are identical |

Like the previous element, RRD's construction of this term does not differ markedly from Defendants'. RRD previously construed "variable objects" as an "element of information that typically varies from printed product to printed product."

Here too, Defendants' construction of this element undercuts its construction of the terms that appear in it. Defendants define "variable objects" to be "variable information that is retrieved from a database and separately defined for each printed page." *See* Section III.D. As explained above, nothing in the claim language requires such a limited construction. Defendants now contradict their earlier construction that the "variable objects" be "separately defined for each printed page" by acknowledging that the "variable objects of the first and second data sets are identical."

## IV. U.S. PATENT NO. 6,205,452

The '452 patent expands on the idea in the '599 and '940 patents by adding an inventive feature where the variable data can be used to generate graphs or charts. For example, a

[121] *See Omega Eng'g*, 334 F.3d at 1334.

company can print employee 401(k) statements by creating a different pie chart for each employee showing that individual employee's asset allocation (*e.g.*, stocks, bonds, etc.).[122]

### A. "Template Page File" (Element 22) (Claims 1, 7 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file** | a file containing a single page layout defining the content and position of fixed information and the position of variable information on that page (that is, a template page file is a single page version of a template file) |

As discussed in Section II.A, the '599 patent includes the disputed term "template file." Although the '452 patent is not related to the '599 patent, "template page file" should be interpreted consistently with "template file." The ordinary meaning of the terms is no different between the patents. And the '452 specification uses the same language in describing "template files" that appears in the '599 specification.[123]

Defendants wrongly assert that "a template page file is a single page version of a template file."[124] A "template page file" can hold the template for more than one page. The word "page" in this term indicates that the "template" defines the printed pages, not that it holds only a single page. In any event, the Federal Circuit construes singular claim terms to include the plural too.[125] Thus, this claim term includes "template *pages* file."

The remainder of Defendants' proposed construction is objectionable for the same reasons set forth in the discussion of "template file" in the '599 patent. *See* Section II.A.

[122] '452 Patent col.3, ll.34-38 ("For example, a financial institution may want to produce individual booklets relating to investment information and illustrate, using a bar graph or pie chart, the amount or percentage of money invested in a variety of funds.").
[123] '452 Patent col.11, ll.51-58.
[124] Defs.' Proposed Claim Constructions, Ex. F, at 8.
[125] *See Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350-51 (Fed. Cir. 2005).

**B. "Fixed Information"** (Element 24) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information that does not vary from printed product to printed product** | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |

"Fixed information" also appears in claim 11 of the '599 patent. Although the '452 patent is not related to the '599 patent, this term should be interpreted consistently in both patents. The ordinary meaning of the term is no different between the patents. And the '452 specification uses the same language in describing "fixed information" ("information which does not vary from book to book of the same version") that appears in the '599 specification.[126] *See* Section II.B.

Defendants appear to agree since they propose the same construction for "fixed information" in both patents, albeit one with extraneous restrictions. RRD incorporates its objections to Defendants' proposed construction of "fixed information" in Section II.B.

**C. "Variable Information"** (Element 21) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information that typically varies from printed product to printed product** | information that varies from printed page to printed page and is retrieved from a database" |

"Variable information" also appears in claim 11 of the '599 patent. The '452 patent specification uses the same language as the '599 patent specification (information "which typically varies from book to book") to define "variable information."[127] Accordingly, the terms should be interpreted consistently in both patents.

Here again, Defendants appear to agree, proposing the same erroneous construction for "variable information" in both patents. RRD incorporates its arguments with respect to Defendants' proposed construction of "variable information" in Section II.C.

---

[126] '452 Patent col.8, ll.60-62; *see also* '599 Patent col.6, ll.1-9.
[127] '452 Patent col.8, ll.63-64; *see also* '599 Patent col.6, l.5.

D. **"Variable Graphics Information"** (Element 19) (Claims 1, 2, 10 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"variable information" used to produce graphics** | information for use in graphs that varies from printed page to printed page and is retrieved from a database" |

RRD's proposed construction for "variable graphics information" references its construction for "variable information," adding that the "variable graphics information" is a particular kind of "variable information" – that used to produce graphics.

Although Defendants agree that "variable graphics information" is used in graphics, Defendants have otherwise repeated their incorrect construction of "variable information" in construing this term. RRD incorporates its arguments with respect to Defendants' proposed construction of "variable information" in Section II.C.

E. **"Master Data"** (Element 23) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing "fixed information"** | data that defines the position and content of fixed information not contained in the database |

"Master data" also appears in the '940 patent. This term should be interpreted consistently in both the '452 and '940 patents. In addition to having the same ordinary meaning, the '452 patent specification uses the same language as the '940 patent specification for this term.[128] Because the '940 patent claims do not use the term "fixed information," RRD's construction of "master data" for that patent includes the definition of "fixed information," which here RRD need only incorporate by reference to the claim term "fixed information." The result, in any case, is the same.

[128] *Compare* '452 Patent col.3, ll.20-30, *with* '940 Patent col.3, ll.20-30.

Defendants appear to agree that this term has the same meaning in both patents and offer the same erroneous construction for both. RRD incorporates its arguments with respect to Defendants' proposed construction of "master data" in Section III.E.

F. **"A Database Having A Number Of Fields, Each Of Which Represents Variable Information Or Variable Graphics Information"** (Element 20) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a collection of data representing the "variable information" and the "variable graphics information" | each entry in the database represents a variable object |

This element, consistent with similar terms in the '599 and '940 patents (*see* Sections II.E and III.F), should be construed to mean a collection of data representing the "variable information" and the "variable graphics information." This construction follows directly from the claim language. Defendants' construction of this term lacks any reference to the "variable graphics information" in this claim and should be rejected. Furthermore, "having," as in "a database having a number of fields," means the database has fields that represent variable information or variable graphics information, not that all fields do, as discussed in Sections II.E, III.F.

G. **"Causing the Display Device to Display the Pages with the Fixed Information, Selected Variable Information from the Database, and Selected Variable Graphics Information from the Database"** (Element 25) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **providing the "display device" information such that it can "display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database"** | "[C]ausing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" is a step-plus-function limitation. The corresponding acts are disclosed in Fig. 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |

Defendants incorrectly attempt to apply step-plus-function analysis to this claim element. As discussed above in Section III.G, without "step for," this term is presumptively not in step-plus-function form.[129] Defendants must show that the claim limitation contains "nothing that can be construed as an act" to apply step-plus-function analysis.[130]

Defendants cannot do this because this claim element contains an act. This term accomplishes the function of "causing the display device to display the pages," which it performs by the act of "display[ing] the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database." This term is not in step-plus-function form.[131]

Applying step-plus-function analysis, Defendants import vast portions of the specific embodiment shown in the specification into the claim. RRD, on the other hand, references the constructions of other claim terms and proposes only minor explanatory words to apply widely accepted meanings to the commonly understood words of the claim for the clarity of the jurors.

### H. **"Executing a Graph File to Generate a Graph"** (Element 26) (Claim 2 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| interpreting a graph file to generate a graph | using a graph file to generate a graph |

RRD and Defendants dispute the meaning of "executing" in this claim term. Defendants contend that "executing" means "using." RRD has construed this term in the context of computer science and more specifically, this invention, to mean, more precisely, "interpreting." To "interpret," according to the Microsoft Computer Dictionary, means "[t]o decode and execute a

[129] *See Masco*, 303 F.3d at 1327.
[130] *Id.*
[131] *Id.*

statement or an instruction. The term usually refers to executing a program by decoding a statement, executing it, decoding the next statement, executing it, and so on."[132]

RRD's proposed construction of "executing" is consistent with the specification. According to the specification, one of the steps in the method is "interpreting the page files, including executing a graph file to generate a graph using the specified graph parameters and variable graph data entries."[133]

Defendants' definition, "using a graph file to generate a graph," is overly vague. RRD's construction is more accurate and more consistent with the specification and the definition of "execute" within the computer software industry.

### I. **"QuarkXPress"** (Element 27) (Claim 7 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a program distributed by Quark, Inc. called QuarkXPress® | the page make-up programs named QuarkXPress® existing as of Oct. 29, 1997 |

Claim 7 recites that "the template page files are creating using QuarkXPress." Defendants contend that the term means only the version of QuarkXPress existing as of October 29, 1997, the filing date of the '452 patent. R.R. Donnelley construes this term to mean the version of QuarkXPress existing at the time of the invention and any subsequently released version with the same ability to create a template.

Claims are construed based on how a person in the industry would have understood the terms at the time of the invention.[134] A person in the digital printing industry would understand "QuarkXPress" to mean the page make-up program QuarkXPress® existing as of October 29, 1997 that performs the function claimed in the patent, namely to create a template.

---

[132] Microsoft Computer Dictionary (2d ed. 1994), Ex. G, at 220.
[133] '452 Patent col.5, ll.18-21.
[134] *See Pfizer*, 429 F.3d at 1372-73.

R.R. Donnelley's proposed construction makes sense from the viewpoint of someone in the industry at the time of the invention. Digital printing developers use page make-up programs such as QuarkXPress® not for their name, but for their functionality. If Quark, Inc. released a new version of QuarkXPress the day after the patent was filed, on October 30, 1997, containing exactly the same functionality as the version existing on October 29, 1997, the new version would fall outside Defendants' proposed construction of "QuarkXPress" because that exact version did not exist at the time of the invention. Those skilled in the industry would recognize the inconsequentiality of new versions of software with the same functionality.

## V. U.S. PATENT NO. 6,952,801

U.S. Patent No. 6,952,801 describes printing books of varying length and content. The patent describes storing a library of templates for the available pages and selecting, for each book, the pages stored in the library to include in the book. Pagination information specifies whether a certain page is to be included in a book.[135]

### A. "Storing a First Number of Pages" (Element 28) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **storing data describing a number of pages** | storing all the pages from which the first and second books are to be printed |

The plain language of this term means storing data describing a number of pages. Defendants, however, add a requirement that this step store *all* the pages to be printed.

Defendants' proposed construction is inconsistent with the plain meaning of the claim term "storing a first number of pages." Nothing in the claim language requires storing "all the pages" to be printed. Rather, the claim involves storing "*a first number* of pages." The language here is ordinary, simple English. As an open-ended, comprising claim, this claim does not preclude an accused process from performing other unclaimed steps, such as including pages in a

book that are not part of the "first number of pages."[136] Claim construction should not add limitations the claims do not require.

### B. "Pagination Information" (Element 31) (Claims 1, 4, 5, 13, 16, 17, 25 of '801 Patent)[137]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information about a page, including whether that page should be included in a book** | information specifying whether a stored page is to be selectively included for printing in a book |

The term "pagination information" should be construed as information about a book, including whether that page should be included in a book. Defendants' construction excludes all functions except specifying whether a page should be included in a book.

The claim language here is decisive – "pagination information including an indication of whether a stored page is to be selectively included." The term "including," in ordinary English,[138] and in patent claims, indicates that the "indication of whether a stored pages is to be selectively included" in the book is not the sole function of the "pagination information."[139]

The specification contains several examples of types of pagination information, including "an indication of whether a page is to be selectively included in the book,"[140] "an

[135] '801 Patent col.10, l.59 – col.11, l.11, col.21, ll.18-53.
[136] *See CollegeNet*, 418 F.3d at 1235; *Dow Chem. Co.*, 257 F.3d at 1380-81.
[137] This term appears in the following context in the claim: "pagination information including an indication of whether a stored page is to be selectively included."
[138] *See* Webster's Third New International Dictionary (1993), Ex. I, at 1143 (defining "include" as "to place, list or rate as a part or component of a whole or of a larger group, class, or aggregate"); American Heritage Dictionary (2d ed. 1991), Ex. H, at 651 (defining "include" as "[t]o have or take in as a part or member; contain").
[139] *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997) ("The claim term 'including' is synonymous with 'comprising,' thereby permitting the inclusion of unnamed components."); Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000) ("The transitional term 'comprising', which is synonymous with 'including,' …is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.").
[140] '801 Patent col.3, ll.39-40.

indication of a maximum number of pages for the book,"[141] "filler page information,"[142] and "a specification of whether the page should be forced to one of a right side and a left side of the book."[143] Pagination information is not limited to whether that page should be included in a book.

### C. "Specifying A First Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In The First Book" (Element 29) and "Specifying A Second Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In The Second Book" (Element 30) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **providing a first set of information that describes whether a stored page should be included in the first book** | identifying whether each stored page is to be selectively included for printing in the first book |
| **providing a second set of information that describes whether a stored page should be included in the second book** | identifying whether each stored page is to be selectively included for printing in the second book |

The parties dispute whether the "pagination information" must exist for "each stored page" or not. The claim language does not require each "stored page" to have pagination information. Certainly some do, but it is not necessary that every page have such information. For example, some pages may appear in every book and not require pagination information. The specification supports RRD's construction, explaining that only some pages have "pagination information" and in particular, "master pages" do not:

> If the page is a master page, the page should always be printed and a block 368 'marks' the page to be printed. ... If the block 366 determines that the page is not a master page (i.e. it's a variable page), a decision-making block 370 determines whether the variable page should be printed at all times. (This was designated by the user at the block 340 in FIG. 11 during creation of the pagination file)."[144]

---

[141] '801 Patent col.3, ll.53-54.
[142] '801 Patent col.3, l.55.
[143] '801 Patent col.3, ll.56-58.
[144] '801 Patent col.21, ll.31-33, 40-44.

D. **"Determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number"** (Element 32)
and
**"Determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number"** (Element 33) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **using the "pagination information" to decide whether to include a stored page in the first book. The "second number of pages," which is the number of pages in the first book, is less than the "first number of pages."** | verifying that the number of stored pages specified for the first book is smaller than the total number of stored pages |
| **using the "pagination information" to decide whether to include a stored page in the second book. The "third number of pages," which is the number of pages in the second book, is less than the "first number of pages" and different from the "second number."** | verifying that the number of stored pages specified for the second book is (a) different from the number of stored pages in the first book and (b) no greater than the total number of stored pages |

RRD has construed these terms by referencing other construed terms and adding sufficient explanation to allow the jury to understand the scope of the claim. Defendants' construction, on the other hand, focuses on a function not even in the claim.

Nothing in the claim language requires "verifying that the number of stored pages" "is smaller than the total number of stored pages" or is "no greater than the total number of stored pages." Rather, the claim describes selecting pages for the first and second books from the collection or library of stored pages. Unless one selects every page in the library, the number of pages in the first and second books will necessarily be less than the number in the page library. The claimed method, therefore, never performs a "verifying" step as asserted by Defendants. Verification implies a proactive check that the first and second number of pages are different. No "verifying" needs to occur.

Similarly, the claimed method does not "verify" that the "number of stored pages specified for the second book is . . . different from the number of stored pages in the first book." The claim literally requires that the two books have a different number of pages. But no "verifying" step need be performed.

The specification supports this common-sense, ordinary meaning construction. The specification never mentions "verifying" either that the number of pages in the book is different from the number in the page store or that the number of pages in two books are different. Rather, the specification describes selecting pages for each book from a common page store, necessarily resulting in fewer pages in the book than in the page store (unless all pages are chosen).[145] Similarly, the specification describes two books with different numbers of pages – but does not actively "verify" that.[146]

## CONCLUSION

For the reasons explained herein, RRD requests that the Court construe the disputed claim terms as proposed by RRD in Exhibit A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Rodger D. Smith II

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
*Attorneys for Plaintiff*
*R.R. Donnelley & Sons Company*

[145] '801 Patent col.21, ll.40-53 (describing decision-making blocks that determine whether specific pages should be selected for printing).
[146] '801 Patent col.9, ll.43-45 ("The books to be produced may include the same or differing number of forms and may have the same or differing number of pages.").

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

July 30, 2007
1089365

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2007, he caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Frederick L. Cottrell III
Richards Layton & Finger, P.A.

I also certify that copies were caused to be served on August 7, 2007, upon the following in the manner indicated:

**BY EMAIL AND BY HAND**

Frederick L. Cottrell III
Richards Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com

**BY EMAIL**

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
rmcmillan@crowell.com

*/s/ Rodger D. Smith II*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com