IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY,<br><br>     Plaintiff,<br><br>     v.<br><br>CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY,<br><br>     Defendants. | C.A. 06-032-JJF<br><br>**REDACTED--PUBLIC VERSION** |
| EASTMAN KODAK COMPANY,<br><br>     Counterclaim-Plaintiff,<br><br>     v.<br><br>R.R. DONNELLEY & SONS COMPANY,<br><br>     Counterclaim-Defendant, | |

## MOTION TO COMPEL DISCOVERY

Plaintiff R.R. Donnelley & Sons Company ("RRD") is again refusing to provide Defendant Eastman Kodak Company ("Kodak") with highly relevant discovery to which Defendants are entitled.[1]   Rather than fully respond to five specifically-tailored document requests served by Kodak on May 1, 2007, RRD has chosen instead to once again stand on improper objections of undue burden or otherwise attempt to improperly restrict the scope of the

---

[1] On August 3rd, this Court ordered RRD to produce documents from its recently acquired companies involved in variable data printing (VDP).

document requests. Whereas before RRD improperly stood on corporate distinctions to attempt to limit its discovery obligations, RRD now seeks to limit its production duties through arbitrary custodian lists and date restrictions.

To provide context, Kodak was taken aback when its long-standing customer, RRD, sued Kodak for infringement of RRD patents over a year-and-a-half ago. The Kodak-RRD relationship – which continues to this day – has been forged over the course of at least three decades. Indeed, RRD currently purchases tens of millions of dollars of goods and services per year from Kodak.[2] The Kodak-RRD relationship is also a two-way street: Kodak pays substantial sums to RRD for its printing services.

Many of the prior Kodak-RRD dealings related to variable data printing ("VDP") – the subject matter of this litigation. As but one example, in approximately 1988 (more than 7 years before RRD's earliest-filed asserted patent), RRD purchased and used several Kodak Ektaprint 1392 printers. Ex. A at 8. The Ektaprint 1392 was a black and white laser printer that, along with printers offered by IBM and Xerox, virtually established the VDP field. The Ektaprint 1392 included a software package called FormsMerge, which Kodak has shown to anticipate RRD's patents through claim charts in written discovery. Ex. B at 20-30. Indeed, a former RRD employee has stated that the Ektaprint 1392 helped to "pioneer" the very same VDP concepts that were "reinvented" a decade later in the color context – which would include the purported inventions of RRD at issue in this case. Ex. A at 8. Thus, RRD's own use of Kodak's prior art system anticipates the patents in suit. Obtaining such "use" information by RRD is especially

---

[2]    As noted in earlier motion papers, both companies have acquired several companies over the years that have been involved in variable data printing ("VDP"). References in this Motion to Kodak and RRD include acts performed by those target companies prior to their acquisition.

important here, where RRD tactically asserts only its method claims thereby forcing Kodak to prove such use to invalidate those claims.

In addition to being relevant to anticipation, the Kodak-RRD dealings are also relevant to Kodak's equitable defenses – namely, RRD's behavior in continuing to do business with Kodak while at the same time lying in wait to assert its patents. Due to the large size of both companies, many of the Kodak-RRD dealings may not have originated from the central corporate headquarters of either party; accordingly, Kodak has been unable to locate certain documents. In addition, the timeframe of many of these dealings, combined with RRD's long delay in bringing suit – almost six years after the earliest asserted patent issued – has also made documentation difficult to locate for Kodak. To the extent documents detailing the Kodak-RRD relationship are still in the possession of RRD, Kodak is entitled to them in discovery as detailing the pervasiveness of the Kodak-RRD relationship.[3] To the extent that the documents have been lost or destroyed, Kodak is also entitled to this information as being relevant to the evidentiary prejudice component of the equitable defense of laches.

In addition to Kodak, RRD apparently acquired software and hardware from other third-party VDP vendors. Ironically, RRD has been sued by another company – Tesseron Ltd. – for RRD's use of its own internally-developed VDP solutions and other third-party VDP solutions. *See Tesseron Ltd. v. R.R. Donnelley & Sons Co.*, Civil No. 1:06-cv-02909CAB (N.D. Ohio filed Dec. 4, 2006). Given that both RRD and Tesseron apparently each view their inventions as covering the broad VDP field, the technical scope of both suits is one and the same.

---

[3]    The Kodak-RRD agreements and contracts likely include contractual provisions that would restrict or bar RRD from bringing suit against Kodak for the subject matter of this litigation. Kodak has already identified and produced a handful of agreements that contain these sorts of provisions. Ex. B at 50-52.

Accordingly, Kodak is entitled to symmetry, and any prior art or damages documents relevant to the Tesseron litigation should be produced in this suit.

This Motion seeks an order compelling RRD to produce documents relating to three categories of relevant documentation: 1) contractual agreements between RRD and Kodak related to VDP software and, in particular, its use by RRD; 2) documentation evidencing RRD's first knowledge of the accused software products; and 3) prior art and damages-related documents identified or produced by RRD in the Tesseron litigation. Because RRD has refused to produce such information, or has otherwise improperly sought to limit the scope of responsive materials it would produce, Kodak has been left with no option but to move for an order compelling RRD to produce all documents responsive to Kodak's Requests for Production Nos. 56, 60, 61 63, and 64. The bases for this motion are as follows:

    1.    On May 1, 2007, Kodak served a narrowly-tailored Second Set of Requests for Production (Ex. C) seeking the following:

- "All draft or final agreements, and any [related] documents ... between (i) RRD and (ii) any Kodak Entity regarding the use of" ten specifically-identified VDP software programs (Request 56);

- "All documents that RRD considers, analyzes, examines, or investigates as [or alleges to be] prior art ... in the Tesseron Suit, including all documents that refer to any such consideration, [etc.]" (Request 60);

- "All documents that are alleged by any party to support or refute, in whole or part, Tesseron's claim for damages in the Tesseron Suit" (Request 61);

- "All documents and things that indicate or refer to RRD's earliest knowledge of any Accused Software Product" (Request 63); and

- 4 -

- "All documents and things that indicate or refer to RRD's earliest knowledge of the operation of any Accused Software Product" (Request 64).

2.    After RRD allowed its original response deadline for Kodak's Second Set of Requests for Production to lapse, Kodak granted RRD a three-week extension to serve its written responses, which RRD ultimately served on June 21, 2007.  *See* Ex. D.  Yet when Kodak finally received RRD's written response, RRD refused to produce any documents responsive to Request 56, asserting that the Request included "no reasonable time frame limitation," and that the information sought by the Request "is as readily available to Kodak to Defendants [sic] as it is to [RRD]."  Ex. D at 11.  With respect to Requests 60 and 61, RRD agreed to only produce responsive documents after they had been produced in the Tesseron litigation, and to the extent RRD could produce such documents under the Tesseron Protective Order.  Ex. D at 15-17. Finally, RRD attempted to limit its production of documents responsive to both Requests 63 and 64 to only those documents evidencing "knowledge of the *operation*" of the accused software by "any [RRD] employee whose job or responsibilities included investigating infringement of [RRD] patents."  Ex. D at 18-19.

3.    Kodak addressed RRD's improper objections and limitations by letter of June 28, 2007.  Ex. E.  With respect to Request 56, Kodak noted that because some of the relevant agreements may be as many as 20 years old, and due to RRD's extended delay in filing suit, Kodak's record of such agreements may be incomplete.  Therefore, in many cases the documents requested are not as readily available to Kodak as they are to RRD.  Ex. E at 4-5.

4.    Kodak's June 28th letter also addressed RRD's response to Requests 60 and 61. Ex. E at 5-6.  Kodak noted that RRD's invocation of the Tesseron Protective Order was a red herring, as the Protective Order would not prevent RRD from disclosing public prior art

- 5 -

considered by RRD, nor would the Protective Order prevent RRD from producing materials that RRD itself designated as confidential. Further, Kodak noted that there was no basis for RRD delaying its production of documents responsive to these requests until after RRD produced the documents in the Tesseron litigation.

5.      Finally, Kodak's June 28th letter addressed the limitations RRD placed on its response to Requests 63 and 64. Ex. E at 6-7. First, Kodak noted that RRD's attempt to limit its production of documents for both Requests to only those evidencing RRD's "earliest knowledge of the operation of any Accused Software Product" was inappropriate, as documents reflecting both RRD's earliest knowledge of the accused products and RRD's earliest knowledge of the operation of such products are relevant to Kodak's equitable defenses. Moreover, Kodak explained that RRD's attempt to limit its search for documents to only those residing with RRD employees responsible for "investigating infringement of [RRD] patents" was improper. In many cases, RRD's first knowledge of the accused products may have resided with individuals responsible for other duties, including software purchasing or competitive intelligence. Such knowledge is highly relevant to Kodak's equitable defenses.

6.      RRD responded to Kodak on July 6, 2007. Ex. F. In addressing Request 56, RRD wrongly asserted that Kodak was simply "placing the burden on [RRD] to search for such agreements because Defendants do not wish to shoulder the cost and burden ... themselves." Ex. F at 3. Indeed, Kodak's June 28th letter noted that Kodak's records were incomplete due to the extensive passage of time. Ex. E at 5. Nevertheless, RRD's counsel agreed "to discuss with our client whether it would be unduly burdensome to undertake a search for final agreements between [RRD] and Kodak ... from 2000 to present." Ex. F at 4.

- 6 -

7.    RRD's July 6th letter also addressed Requests 60 and 61. Ex. F at 4-5. RRD again asserted that its ability to comply with these Requests may be precluded by the Tesseron Protective Order. RRD agreed to produce such documents, to the extent it believed it could, once such "documents are identified for production in the Tesseron Suit." However, RRD did not commit to producing documents responsive to Requests 60 and 61 as soon as they are identified by RRD, nor did RRD's response indicate whether RRD would produce prior art considered, but ultimately not produced in the Tesseron Suit.

8.    Finally, in its July 6th response, RRD slightly modified its position with respect to Requests 63 and 64. Ex. F at 5-6. In response to Request 63, RRD agreed to produce documents regarding RRD's earliest knowledge of any accused software product, as requested by Kodak. However, with respect to both Requests 63 and 64, RRD maintained its position that it would only search for documents belonging to "those [RRD] employees likely to have knowledge of the Patents in Suit and/or of Defendants' [allegedly] infringing activities." RRD's response wholly failed to address that knowledge outside of such a narrowly defined group of employees is relevant to Kodak's equitable defenses.

9.    On July 10, 2007, the parties had a telephone discussion regarding these issues, but were unable to reach a resolution to any of these disputes. Ex. G.

10.    On July 13, 2007, Kodak again wrote to RRD regarding the Requests for Production. Ex. H. With respect to Request 56, Kodak explained that many of the agreements in question were likely to be dated prior to the year 2000. Moreover, Kodak confirmed that it had searched its own records for such documents – and thus was not placing the sole burden for such searching on RRD – but again explained that Kodak's records were incomplete due to RRD's extended delay in filing suit. Ex. H at 2.

11.    Kodak's July 13th letter also addressed RRD's response to Requests 60 and 61. Ex. H at 2-4. Kodak noted that under the Tesseron Protective Order, RRD may produce information in another case when required to do so under a court order. Kodak stated that RRD was currently under such a court order – the Court's Scheduling Order – which obligated RRD to produce such materials.[4] To the extent RRD believed that the Court's Scheduling Order failed to satisfy the requirements of the Tesseron Protective Order, Kodak asked whether RRD would stipulate to a motion requiring RRD to produce the responsive documents in this case.

12.    Kodak further discussed Requests 63 and 64 in the July 13th letter. Ex. H at 4. Kodak again explained that RRD employees who purchase or use VDP software, or those tasked with competitive intelligence may have had RRD's first knowledge of the accused products. Kodak also noted that not only is such knowledge highly relevant – in and of itself – to Kodak's equitable defenses, but it may also lead to evidence that individuals knowledgeable of the Patents in Suit had earlier knowledge of the accused software products than is evidenced from their own documents.

13.    Kodak's July 13th letter also addressed a misstatement by RRD as to the proper scope of discovery. RRD apparently believes that it may limit its discovery obligations so as to only produce documents that RRD determines are "relevant to the claims, counterclaims, and defenses of the parties or the subject matter of the action." *See, e.g.*, Ex. F at 5, Ex. G at 1. As discussed both above and in the discovery correspondence, Kodak has repeatedly explained to RRD why the documentation sought by Request Nos. 56, 60, 61, 63, and 64 is highly relevant to this action. Moreover, Kodak explained in its July 13th letter that the Federal Rules of Civil

---

[4] The Court's August 3rd Order was issued after this letter was sent, but also now compels RRD to satisfy its discovery obligations.

Procedure provide for a "broad scope of discovery." *See* Ex. H at 2 (quoting *Advanced Medical Optics, Inc. v. Alcon Inc.*, No. 03-1095-KAJ, 2004 WL 1877724, *2 (D. Del. Aug. 18, 2004)). Therefore, under the Federal Rules, discovery requests are appropriate when "reasonably calculated to lead to the discovery of admissible evidence." FRCP 26(b)(1). All five of Kodak's Requests at issue here are so reasonably calculated, and thus RRD is obligated to respond accordingly.

14.    Kodak's July 13th letter concluded by requesting that RRD provide its availability to meet and confer on these issues. Ex. H at 4. Despite repeated requests by Kodak to schedule such a conference, RRD never responded to Kodak's July 13th letter. *See* Ex. I; Ex. J.

15.    The parties eventually held a meet and confer conference regarding these issues on August 15, 2007. *See* Ex. K. During this meet and confer, counsel for RRD stated they would check with their client to see whether RRD would be willing to search for documents responsive to Request 56 dating back to 1990. Ex. K at 2. Kodak again requested that RRD confirm it would produce any documents responsive to Request 60 as soon as they are identified by RRD; counsel for RRD refused to provide such confirmation during the meet and confer. Kodak further asked that RRD confirm whether it believed either the Court's Scheduling Order, or its Order of August 3rd, satisfied the requirements of the Tesseron Protective Order, and if not, Kodak requested that RRD confirm whether it would stipulate to a motion specifically ordering it to produce *Tesseron* documents in this litigation. Finally, Kodak reiterated that the discovery sought by Requests 63 and 64 was reasonable and appropriate. Ex. K at 3.

16.    Because over three-and-a-half months have elapsed since Kodak first served the Requests at issue here, Kodak asked that RRD provide the confirmation required during the meet

and confer no later than August 20, 2007. Ex. K at 3. To date, RRD had provided no such confirmation.

**Conclusion**

17.    RRD should not be permitted to continue its inequitable discovery practices. Kodak has propounded specifically-tailored discovery requests that are reasonably calculated to lead to the discovery of admissible evidence. Counsel for Kodak have made multiple attempts to try and work with RRD to reach a compromise solution to these disputes. RRD's failure to provide relevant documentation has and will continue to prejudice Kodak's ability to develop its case and defenses.

18.    WHEREFORE, Kodak respectfully asks the Court to order RRD to comply with its discovery obligations and supplement its document production including compliance with all issues raised in this motion. A Form Order is attached hereto.

OF COUNSEL:

Richard McMillan, Jr.
Jeffrey D. Sanok
Brian M. Koide
Clyde Findley
Nathaniel Grow
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
(212) 624-2500


Dated:  August 23, 2007

_____
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jameson A.L. Tweedie (#4927)
tweedie@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, DE  19899
(302) 651-7700
*Attorneys for Defendants Creo, Inc.,*
*NexPress Solutions, Inc., Kodak Versamark,*
*Inc., Eastman Kodak Company and Kodak*
*Graphic Communications Company*

- 10 -

## RULE 7.1.1 CERTIFICATE

I hereby certify that counsel for the defendants has discussed the subject of the foregoing motion with counsel for plaintiff, and that the parties have not been able to reach agreement on the issues raised in the motion.

_____
Frederick L. Cottrell, III

August 23, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2007, I electronically filed the foregoing with the

Clerk of Court using CM/ECF which will send notification of such filing(s) to the following,

who have also been served as noted:

### BY HAND DELIVERY

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899

I hereby certify that on August 23, 2007, the foregoing was sent to the following non-

registered participants in the manner indicated:

### BY FEDERAL EXPRESS

Douglas I. Lewis
Jamie L. Secord
Sidley Austin, LLP
One South Dearborn Street
Chicago, IL  60603

John G. Hutchinson
Sidley Austin, LLP
787 Seventh Avenue
New York, NY  10019

Jameson A.L. Tweedie (#4927)
tweedie@rlf.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY,<br><br>     Plaintiff,<br><br>     v.<br><br>CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY,<br><br>     Defendants. | C.A. No. 06-032-JJF |
| EASTMAN KODAK COMPANY,<br><br>     Counterclaim-Plaintiff,<br><br>     v.<br><br>R.R. DONNELLEY & SONS COMPANY,<br><br>     Counterclaim-Defendant, | |

## ORDER

Pursuant to Fed. R. Civ. P. 37(a), Local Rule 37.1, and paragraph 5 of the Rule 16 Scheduling Order, Defendants having moved for an order compelling Plaintiff to produce all documents responsive to Defendants' Requests for Production Nos. 56, 60, 61, 63, and 64, and good cause having been shown, Plaintiff shall produce all such documents by the _____ day of _____ 2007.

SO ORDERED this ___ day of _____ 2007.

_____
United States District Court Judge

# EXHIBIT A

# Lessons From the DocuTech

BY MARK W. FLEMING

A decade ago, the DocuTech set new benchmarks for quality, productivity and cost that triggered a major migration from offset to monochrome digital printing. Now the stage is set for an encore in color.

The Xerox DocuTech defined printing on demand in the last decade, displacing a large share of short-run monochrome offset printing along the way. Launched in October 1990, the DocuTech Production Publisher helped to reengineer the publishing and production process in many document-intensive industries. No other Xerox product since the original 914 copier was such a phenomenal success.

However, by the time the DocuTech had begun to achieve significant market penetration, much of the industry's attention was drawn to digital color printing. In 1994, newcomers Indigo and Xeikon introduced digital color presses positioned to follow the DocuTech's print-on-demand model. Promoters and consultants joined the print-on-demand revolution, forecasting explosive growth as digital color took on the short-run offset market.

Simply put, the color forecasts were a bit ahead of their time. Today, while digital monochrome printing has largely supplanted offset in production of mainstream products such as books, manuals, forms and financial documents in runs up to 1,500 copies, digital color printing is regarded as a technology for the ultra-short-run and variable-data-printing niches. Moreover, although mid-range color printers in the 40–60-impression-per-minute (ipm) speed category have sold well, no high-end digital color presses have matched the DocuTech's success of the early 1990s.

When and how will digital color move from the niches to the mainstream? A number of commentators and OEMs who did not experience the early growth of the monochrome market believe that the future of digital color will be in new high-value applications that do not compete with conventional short-run printing. However, this technology-driven view has not fared well in the marketplace because it ignores some economic realities.

The first is that the macroeconomic demand for production printing (commercial and in-plant) has historically tracked the gross domestic product, with minimal dependence on technology changes. It is true that non-impact printing has created new markets in the office. However, at the production level, new processes such as offset have grown by supplanting other processes, such as letterpress and gravure, rather than by increasing the size of the market overall.

The second reality is that at the microeconomic level the demand for print depends upon the price. While the technologists like to point out examples where digital color production printing has fetched up to $1 per 8.5x11-inch impression,[1] they neglect the fact that demand is very limited at that price level.

The bottom line is that most of the growth in digital color production printing will come at the cost of conventional printing. Offset will not disappear, but it will make room for non-impact printing technologies in increasing run lengths and volume. In order to accept this proposition, it is essential to understand the factors that contributed to the DocuTech's success. But the DocuTech story began long before the product was launched.

## A magnificent obsession

The offset market has intrigued Xerox for three decades. However, "offset transfer" was a difficult reach in the 1970s. Electronic marking technology had to undergo nearly 20 years of refinement in other high-speed production applications before the image quality and cost were ready to compete in the printing and publishing market.

Xerox's first real contender for the reprographic market was the 9200, a 120-ipm plain-paper duplicator introduced in 1974. In 1977, electrophotography went digital in the 120-ipm Xerox 9700 and the 167-ipm IBM 3800. Although these products were not positioned to compete with offset, they rapidly took market share from impact line printers in data-driven transaction-document and direct-mail imprinting markets. By 1990, the volume in these data-center printing segments had grown to more than 400 billion impressions per year worldwide, providing economies of scale and technology advancements in electrophotography that set the stage for a direct assault on offset. In the late 1980s, digital printers were capable of producing up to 200 ipm, with imaging capabilities up to 300 dpi, all at a direct printing cost[2] as low as one cent ($0.01) per impression. Through more than a decade of growth, the data-printing segment had attracted significant competition, led by Xerox, IBM, and Océ

[1] In this article, the impression size is 8.5x11 inches, unless otherwise stated.

[2] The direct printing cost includes the amortized equipment cost, direct maintenance, direct printing materials (excluding paper), direct labor and benefits, and the cost of space and utilities directly associated with the operation of the equipment. It does not include indirect costs such as supervision or factory overhead, nor does it include selling, general and administrative expenses.

K00146962

Digital Printing



DocuTech 135 Xerox introduced the original DocuTech Production Publisher 135 in 1990. It went on to become one of Xerox's most successful products.

Printing Systems. The market was approaching maturity.

**A ready market.** Meanwhile, digital printing was gaining converts in the printing and publishing industry. Beginning in the late 1980s, electronic printers were installed in the captive documentation-publishing operations of firms such as AT&T, IBM, Digital Equipment Corporation and Northern Telecom. The first commercialized digital production venture was R.R. Donnelley's Books on Demand facility, which opened in Harrisonburg, Virginia, in 1989. The operation included two Kodak 1392 PostScript printers as well as several high-speed Kodak and Xerox duplicators. With 300-dpi resolution, the 1392 provided adequate text and line-art quality, but was limited in halftone reproduction. Nevertheless, in the first year of business, Donnelley's operation produced more than 250,000 books and pioneered many of the variable-information and print-for-one concepts that were reinvented for digital color a decade later. By the end of 1990, the print-on-demand market was already growing, and the industry was ready for a higher-volume, higher-resolution engine that could propel digital printing into mainstream book and documentation applications.

**A just-in-time product.** The timing of the DocuTech was perfect, not only for the market but for Xerox itself. Although the product was conceived in 1981, most of the intensive market research and product development occurred later in the decade (see sidebar, "A 30-Year Quest").

The 1980s were tumultuous years for Xerox—not unlike today. While the company had been pursuing the high-end printing segments in the 1970s, Canon, Ricoh and other companies chipped away at Xerox's office-copier business and staked big claims on the desktop, leaving the company with a minor share of the market that it had pioneered. Xerox's foray into financial services soon proved to be more of a diver-

sion than a diversification. Worse yet, the growth trends in the high-end duplicator and data-center markets were turning south, and cross-town rival Eastman Kodak was advancing into the commercial printing and publishing market that Xerox had always coveted. By the end of the decade, Xerox needed another 914

## Competing with offset

Xerox launched the DocuTech Production Publisher (PP) with great fanfare in October 1990. The initial PP-135 product was internally digital but not network-connected—in essence, it was a digital duplicator. However, the PP-135 incorporated a number of advances that appealed to in-plant and commercial print shops. The most important improvement was in the area of print quality. Although a few traditionalists objected that the reproduction was not equivalent to offset, the DocuTech's 600-dpi resolution and internal image-processing technology cleared the quality hurdle for most books, manuals, directories, forms and some financial printing.

The image-scanning capability eliminated the need for continuous recycling of original documents in the document feeder—a major contributor to jams and degradation of the originals in light-lens duplicators. At a time before desktop publishing was pervasive, the DocuTech's digitization and editing features allowed the operator to perform a variety of electronic publishing functions and to create and save document files (albeit in a proprietary Interpress-derivative format). The DocuTech could handle sheet sizes up to 14×17 inches, which positioned it to compete with small-form offset duplicators and narrow-web presses. Finally, the machine could be integrated with an in-line saddle-stitch booklet maker and, later, with other finishing options for those operations where the work mix did not vary widely.

Recalls Bill Valentine, recently retired senior vice president of Production Solutions Group Operations and the chief engineer responsible for the initial DocuTech development, "We worked closely with customers from the time that we had prototypes stable enough to demonstrate. We brought customers into the lab, got their reactions, and used this information to refine the value proposition and to prioritize the development. The DocuTech was designed to streamline and de-skill the customer's entire production process, from makeready through finishing."

**Productivity.** However, Xerox needed to demonstrate that the DocuTech could compete with offset in high-volume applications. The company accomplished this goal through its introductory pricing plans, one of which featured a fixed monthly maintenance fee with no variable "click charges" for each impression, regardless of total monthly volume. For high-volume commercial or in-plant printers operating three shifts, five to seven days per week, this plan provided the

K00146963

fixed cost structure that they were accustomed to dealing with in an offset environment. The more volume they could load onto the equipment, the lower their unit costs. So they quickly loaded the DocuTech—a product conservatively rated by Xerox for an "average monthly print volume" of 1 million impressions. The first two DocuTechs installed in R.R. Donnelley's documentation manual printing operation each averaged over 2 million impressions per month and ran up to 4 million impressions per month on occasion. The nine DocuTechs installed in the Unisys Software and Publications Manufacturing Division produced a total of 1 million impressions per day on a regular basis.

**Cost.** Not only did these high utilization levels prove the mettle of the DocuTech, they also drove the direct printing costs down, positioning the DocuTech to compete for short-run offset production. Monthly volumes of 2 million impressions yielded a direct printing cost of less than one cent per impression, resulting in a breakeven run length (against common small-form offset presses) of about 800 copies. However, the advantage of digital printing was that a single 2,500-copy offset run every quarter, for example, could be divided into shorter digital print runs scheduled more frequently and more closely linked to actual end-user demand for the product. This was the essence of print on demand. As print customers began to understand this advantage, order sizes declined and order frequencies increased dramatically. For example, within a nine-month period in 1993 in R.R. Donnelley's largest on-demand software production operation, orders for less than 30 units increased from 5 percent to nearly 50 percent of all print runs, and the total number of monthly orders increased seven-fold.

The DocuTech was not perfect. For several years following the 1991 release of the Network Server, users struggled with a slow RIP that limited the productivity of the DocuTech in runs less than about 20 copies. File access was cumbersome in the Extended Storage Option; moreover, since the file format was proprietary, customers faced high conversion costs if they needed to move work to a different platform. However, the DocuTech's print quality, reliability and overall cost advantages outweighed these deficiencies. In any case, customers had few choices prior to 1996. The major alternative was the Kodak Lionheart 1392, a 92-ipm printer that excelled in RIP speed but was limited to an 8.5x14-inch maximum sheet size. However, Eastman Kodak was retreating from the printer/copier business in the mid-1990s.

## Selling high

Since the direct cost of printing on the DocuTech was about four times the direct cost of short-run (5,000-copy) offset printing, the DocuTech could not be positioned to compete as a drop-in replacement for an offset press. Xerox needed to change the rules of engagement, showing the advantages of print on demand over short-run printing in those markets where the difference mattered.

**Focused marketing.** In its marketing initiatives, Xerox took the high road, targeting executives in document-intensive industries such as financial services, high-technology manufacturing, government, pharmaceuticals and education. With carefully researched proposals, it showed how the DocuTech, in conjunction with

> *The advantage of digital printing was that a single 2,500-copy offset run every quarter, for example, could be divided into shorter digital print runs scheduled more frequently and more closely linked to actual end-user demand for the product. This was the essence of print on demand.*

document process reengineering, could reduce cycle time, improve productivity and reduce costs. The Xerox sell included managers of the commercial and in-plant print operations, but it clearly extended beyond them to encompass key information-technology and general management figures in the print customer's organization. Through the early 1990s, Xerox probably reached as many key decision influencers through its "Document Company" advertising in Sunday-morning news broadcasts and business publications as it did through its extensive promotion in the trade media.

**Print-on-demand growth.** In the short-run offset press market, the DocuTech literally became a category killer. According to the U.S. Department of Commerce, annual domestic shipments of offset duplicators with sheet widths less than 14 inches declined 22% from 1992 through 1997. The small-form offset press industry was fragmented; some manufacturers were already financially stressed before the DocuTech appeared; and certainly none was able to match Xerox's marketing muscle.

Xerox had installed more than 10,000 DocuTechs worldwide by the time the competition began to attack. In 1996, print-on-demand literally went on a roll, as Océ Printing Systems and IBM launched 500-ipm web-fed printers targeted to web-offset print operations as well as high-volume users of multiple DocuTechs with expiring leases. In this new competitive environment, direct printing costs declined quickly, by 1998 falling to less than 0.7 cents per impression in high-volume operations. Consequently, digital print-

K00146964

*Digital Printing*

# A 30-Year Quest

Frank Steenburgh, Xerox corporate officer and senior vice president and worldwide general manager of Xerox's e-Services Business, is a 28-year veteran of Xerox with long experience in the graphic arts industry. Prior to his current appointment, he headed the $3-billion Xerox worldwide graphic arts industry business and led the launch of the DocuTech. Recently Mark Fleming of Strategies on Demand, L.L.C., interviewed Steenburgh for his perspectives on what Xerox terms "offset transfer" in the DocuTech model.

**Fleming:** The notion of "offset transfer" is not new in Xerox. When and how did this concept become embedded in the culture?

**Steenburgh:** It really started in 1974, when we launched the 9200 [light-lens duplicator]. The target market was offset. However, the 9200 captured a very small fraction of the offset market. It had line quality equal to offset, but not halftone quality. It was only when we developed the 5090 [duplicator] and the DocuTech that we could deliver halftone quality equivalent to offset. Then the only differentiator was cost versus run length. You first have to get by the quality hurdle; then the next step is economics.

**Fleming:** What other key factors drove the Xerox decision to develop the DocuTech?

**Steenburgh:** In 1981, we put together a paper that concluded that the world was going to go digital and outlined the concept for what became the DocuTech. We were not as much focused on competition as on the opportunities presented in a digital environment. In 1983, a team was put together under the leadership of Chip Holt to develop a prototype.

**Fleming:** A major clean-sheet product like the DocuTech represented a huge investment for Xerox. How did you validate the market opportunity?

**Steenburgh:** It cost $500 million to bring out the 5090 engine [on which the DocuTech is based] in 1988, and it would cost nearly $500 million more to develop and launch the DocuTech itself. In July 1987, I joined the program to begin to

assemble the marketing and business plans for the product.

Beginning in 1988, we spent a lot of time going after targeted document-intensive markets, such as the pharmaceutical industry, in addition to the print center manager—who was the primary decision maker because he had the print budget—we also talked with the plant manager and data-center or IT manager, because we knew that these people would be decision influencers regarding a connected product. Before the concept of "business process reengineering" became popular, we were studying the entire documentation process.

For the release of a new drug we tracked who creates the documents, how they create them, how the information is collected from the doctor, and how it moves to the Food and Drug Administration. We sent in teams of analysts to benchmark the document process in different drug companies, and we showed how turnaround time could be reduced in a new drug release from 18 months to six months, for example, by reengineering the document process with digital technology. Depending on the pharmaceutical, each day saved could be worth $50,000 to $100,000!

Universities were another document-intensive target market. We set up advisory councils in key industries—about six in all—to help us develop the product requirements and the marketing requirements. We still have the Xerox Executive Advisory Forum of chief information officers as well as councils in the commercial print market.

In summary, we went to targeted markets that we knew were highly document-intensive, and we talked with the "C-level" people [CEOs, CFOs, CIOs, etc.] about how technology and business process reengineering could improve turnaround time, cost and productivity.

**Fleming:** In the early years, were your installations concentrated among the in-plant print operations in these industries?

**Steenburgh:** No, we went after both in-plants and commercial printers (including franchised quick printers), with close to a 50-50 split of installations in each segment. Our beta tests were also split evenly

between in-plants and print-for-pay operations.

**Fleming:** I recall that a lot of the post-launch promotion and advertising went into television and business media targeted to corporate management.

**Steenburgh:** Right—we knew that the higher ground was the way to go after this market. The DocuTech launch was the first occasion in a major campaign to reposition Xerox as "The Document Company", helping our customers to move from thinking about Xerox simply as a copier company to thinking about us in connection with their business processes overall.

**Fleming:** The DocuTech penetrated the market through offset transfer. Do you believe that the same model will drive FutureColor?

**Steenburgh:** We believe that what the DocuTech did for offset transfer in black and white, FutureColor will do in color. With an installed base of 25,000 DocuTechs, we still only have about 4% transition on eligible offset to digital. In color, the transition is less than 1% thus far. The print quality of the DocuColor 2045/2060 series approaches offset for many applications, but it's not quite offset quality for certain types of collaterals. However, the quality of FutureColor will be equivalent to offset for many, many applications. As for [running] cost, the DocuColor 2060 with volumes of 100,000 pages per month will get you down to the seven-cents-per-print range. With Future-Color, the cost will be less than a five cents, and five cents is the breakpoint that really opens up the color market.

In my view, the DocuColor 2045/2060 is doing the same thing in color that the 9000 family of duplicators did in black and white—it's beginning to get at offset. And major penetration will begin when we launch FutureColor. FutureColor will take the quality issue out of the equation, and then it will be simply a pricing issue—as it was with the DocuTech—regarding the volumes and run lengths that will move from offset. Direct-marketing and one-to-one kinds of applications will also help to achieve greater runs and volume. So the target market is offset—and in color, we're just beginning.  **TSR**

K00146965

ing began to move farther into cost-sensitive segments that previously had been out-of-bounds, such as trade books.

According to Strategies on Demand, L.L.C., by last year the value of domestic monochrome digital publication and commercial print shipments had increased to $7.4 billion, and it is on a 12% annual growth trajectory through 2005. Most of this volume is produced in short runs—on demand—in the model validated by the DocuTech 10 years ago.

## The color picture

The DocuTech was delivered after high-speed monochrome electrophotography had undergone nearly 20 years' refinement. By contrast, digital color production printing experienced a premature birth. The early digital color presses were thrust upon the printing industry with the unfounded confidence that they would revolutionize short-run color production in the manner of the DocuTech. However, digital color printing technology did not benefit from the sort of long-term refinements and experience-curve economies that had brought monochrome electrophotography up to a competitive level with offset when the DocuTech was launched. Although the first digital color presses had print-quality and reliability limitations, the most glaring problem was cost. In 1995, the direct cost of digital color printing was about 20 times the direct cost of short-run offset printing.

**In search of a market.** After it became obvious that digital color printing was not ready for most mainstream applications, the OEMs scrambled to identify opportunities where the variable-printing capabilities of the technology could add value. Thus the industry was led down the path followed by digital monochrome printing two decades earlier.

Variable-data printing and personalized printing have become opportunities in their own right for consultants who track and promote the technology, as well as for the OEMs and software vendors who are developing it. Since 1997, Indigo, Xeikon and their channel partners have been rolling out personalization products to help their customers ride the one-to-one marketing wave. However, in many of these variable-printing applications, digital color has encountered competition from digital monochrome printing, which, after 20 years, is well entrenched and highly cost-competitive in the direct-mail and transaction-document segments. Recently, in a tacit acknowledgement of this reality, a few OEMs have started to demonstrate monochrome personalization on four-color-offset preprinted forms—an economical, effective approach long used in the direct-mail industry.

In the commercial and in-plant printing markets, the digital color press manufacturers have confronted another phenomenon: Heidelberg. Unlike the fragmented group of small offset press manufacturers that



Source: Strategies on Demand, L.L.C.

Economics of digital printing. When the DocuTech was introduced, the direct cost of monochrome electrophotographic printing had already fallen to a level only four times the direct cost for offset. By comparison, digital color technology was launched in the printing industry before it had gained any economies of scale or experience in other markets. Within the next two years, however, the cost ratio for digital color printing will approach the monochrome ratio of the early 1990s, which produced significant transfer of market share from offset to digital printing. In this illustration, the direct costs for offset in 5,000-copy runs are 0.26 cents per impression for monochrome printing and 1.4 cents for color.

Xerox faced in 1990, Heidelberg has proven to be a formidable competitor, with greater financial and marketing resources than either Xeikon or Indigo could amass. For several years, Heidelberg aggressively positioned its direct-imaging GTO DI, Quickmaster DI and Speedmaster DI presses to box its digital competitors into a small corner of the market, bounded on the top by image quality and on the sides by a narrow range of economic run lengths.

## Looking forward

Where will digital color go from here? Most industry observers acknowledge that the quality on today's high-end Indigo and Xeikon presses is acceptable for a majority of print product categories, although color consistency and the range of compatible substrates continue to be challenges. Both Xerox and Heidelberg assert that their forthcoming products will practically eliminate the quality barrier.

The final hurdle is cost. In 1994, the direct printing cost for an 8.5x11-inch digital print impression with 55% total four-color coverage exceeded 25 cents. A 1998 Strategies on Demand analysis commissioned by Xeikon revealed that the direct printing cost of a market basket of publication and commercial print products had dropped to as little as five cents per impression in high-utilization operations, using a volume-based consumables pricing structure promoted by Xeikon at that time. However, during the past two years, Xeikon has devoted most of its marketing energy to its new monochrome business as well as to color

K00146966

Digital Printing



NexPress 2100. Heidelberg is scheduled to launch its NexPress 2100 in the middle of 2001. The toner-based printer is billed as providing "best-in-class image quality."

opportunities where the value is more important than the cost.

On the other hand, Xerox's strategy is clearly focused on lower costs. The company expects to pass under the five-cent bar next year, starting "a major migration of color pages from offset," according to Anshoo Gupta, president of Xerox's production systems group. "Running costs [supplies and maintenance only] have been cut in half every two years. They're now at seven cents per page for the DocuColor 2000 series at certain volume levels, and we expect that they will come down by half again in the next year."

Talk like that portends that digital color print prices should start falling from their current lofty levels above 50 cents per impression. A recent study by Strategies on Demand concluded that, at the current price elasticity of demand in the color segment, a decline in average digital color pricing to 20 cents per impression (including paper, print and finishing) would result conservatively in a 20-fold increase in volume across the market. At a direct printing cost of five cents per impression, this price level would yield an attractive operating profit for a commercial printer.

Color print on demand becomes a viable model at 20 cents per impression. The opportunity for digital color in marketing-response applications (with or without personalization) will increase significantly at this price level, although further declines will be necessary for digital color to displace digital monochrome imprinting in high-volume direct-mail "push" marketing.

Although lower costs will be welcome across the industry, not everyone is comfortable with the idea of reducing prices to capture offset volume. Traditionalists in the printing industry have carefully avoided positioning digital color printing in competition with conventional printing. For the offset press and materials manufacturers, the reasons are obvious. However, Heidelberg, for one, is modifying its position. The firm has shipped 2,000 Digimaster 9110 monochrome presses and is preparing for the mid-year launch of its NexPress 2100 color product. Recounting the 1990s as "the Direct Imaging (DI) Decade," when the company "developed a niche between high-end ink-based printing presses and lower-quality, but economical toner-based copy machines," Heidelberg projects that the NexPress 2100 will have "best-in-class image quality." The implication is that the direct-imaging niche will become a bit narrower as the quality of toner-based machines improves.

On the other side of the industry, commercial printers are naturally hesitant to take the lead in lowering prices. Moreover, many shops may not be prepared to let digital printing cannibalize their conventional business or accelerate the obsolescence of their existing assets. These are legitimate transition issues that will delay (but not forestall) the inevitable. As the lower cost of digital color printing is communicated throughout the industry, print buyers will pull prices downward in return for higher volumes. Nevertheless, it will take at least five years for the average price to drop to 20 cents across the entire market.

**Market forecasts.** In 2000, digital printing captured a 12% overall share of the market in publication and commercial printing. Based upon an economic analysis incorporating the price elasticity in the market, Strategies on Demand forecasts that the digital segment will grow at an annual rate of 12% through 2005—significantly faster than the 4% growth rate expected in the offset segment of the market. Although



Source: Strategies on Demand, LLC

Room for growth. The domestic market for digital publication and commercial production printing (excluding desktop and office printing, as well as wide-format graphics and transaction printing) will grow from $11.4 billion in 2000 to $20.2 billion in 2005. Although the volume of digital color printing will increase by 40% per year, the value of the shipments will increase by only 13% annually, due to significant price erosion. (The conventional printing segment includes direct-to-plate as well as direct-to-press offset.) Source: Strategies on Demand, L L C

K00146967

the value of digital color print shipments will increase at a 13% rate, the volume of impressions will rise much faster—40% per year—due to rapid cost and price declines in this segment. On the color side, competitive direct printing costs will fall from 11 cents per impression in 2000 to four cents in 2005, thanks to the OEMs' efforts in combination with greater capacity utilization. Monochrome costs will decline from 0.6 cents per impression in 2000 to 0.4 cents in 2005. These projections are based upon advances in toner-based printing and do not consider potential cost reductions from other technologies, such as ink-jet, that are still under development.

On the supply side, the digital color press market is quickly getting crowded. Pioneers Indigo and Xeikon are filling out their lines with new mid-range products and are competing for ever-higher print speeds. Canon is moving further into the mid-range category with its new CLC-5000. Currently, Heidelberg and Xerox are gearing up for launches of the NexPress 2100 and FutureColor, positioning these new products as major clean-sheet designs that will revolutionize the industry.

However, success depends not only on a good product but also on a focused marketing strategy and skillful execution. The DocuTech was conceived, designed and delivered as a solution for well-understood needs in selected markets. Combining quality and productivity at a competitive cost point, the product fulfilled its mission to capture a sizeable share of offset production. Without question, digital color printing will do the same. The next two years will be exciting.                                          TSR

**About the Author**

Dr. Mark W. Fleming is president of Strategies on Demand, L.L.C. a Naperville, Illinois, market research and management consulting firm focused on digital printing and publishing. A 21-year veteran of digital printing on both sides of the industry, he initiated R.R. Donnelley's Books on Demand venture in 1989 and held marketing and general management posts in two other large digital printing businesses. He can be reached at (630) 983-7746 or at stratondmd@aol.com.

K00146968



## On Demand *

**Strategies on Demand, L.L.C.**, provides market research and management consulting services worldwide, with a focus on digital printing and publishing. Based in Naperville, Illinois, the company serves an array of clients including suppliers of digital printing and publishing equipment, software, and consumables, as well as providers and corporate users of digital printing and publishing services.



Founded in 1995 by Mark W. Fleming, Strategies on Demand is uniquely positioned by virtue of Fleming's first-hand experience on both sides of the industry. As President, he brings twenty-one years' business and technology experience in digital printing and publishing. Prior to founding Strategies on Demand, he was General Manager of Electronic Printing and Mailing at Duplex Products, Inc., with overall responsibility for a business unit providing document management, electronic printing, and distribution services from a nationwide network of facilities and strategic alliances. In a variety of executive positions at R.R. Donnelley & Sons Company, he initiated the first digital book production venture in the industry and was responsible for development and marketing of the largest just-in-time software production business in the computer industry, a $40-million enterprise extending across a worldwide network of ten facilities. Before joining R.R. Donnelley, he managed product development in 3M's digital imaging and non-impact printer businesses.

Fleming has an MBA degree with an emphasis in marketing from Northwestern University and a PhD degree in physics from MIT. He is a member of the Institute of Management Consultants, Printing Industries of America, the National Association for Printing Leadership, and Xplor International. He has served as a director on the boards of two business and civic organizations and consults on two university advisory boards. He is the Digital Print Contributing Editor of *Digital Output,* and his articles appear frequently in other publications.

STRATEGIES ON DEMAND, L.L.C.
612 SOUTH CHARLES AVENUE
NAPERVILLE, ILLINOIS 60540-6808

PHONE 630 961 7746
FAX 630 961 0739
E-Mail stratondmd@aol.com

K00146969



## RECENT PUBLICATIONS

1. "Inside the NexPress 2100," *Digital Output,* October 2001
2. "High-Volume Production: The Next Test for NexPress," *The Seybold Report,* September 17, 2001
3. "Back to the Basics," *Digital Output,* August 2001
4. "Keeping Pace With Your Investments: How to Use Capital Budgeting Tools to Manage Technology Risk," *Digital Output,* May 2001
5. "Lessons from the DocuTech," *The Seybold Report,* April 16, 2001
6. "Let's Get Digital," *PrintWeek,* April 6, 2001
7. "Scaling Up," *Digital Output,* March 2001
8. "Taking the Plunge: A Checklist for Buying a Digital Press," *American Printer,* February 2001
9. "New Directions in Digital Printing," *Digital Output,* January 2001
10. "Seeking Fulfillment," *Digital Output,* October 2000
11. "Buying a Digital Color Press," *Digital Output,* August 2000
12. "The Bind that Ties," *Digital Output,* June 2000
13. "Digital Printing: The State of the Marketplace," *Digital Output,* March 2000
14. "Pressing Opportunities: Maximizing the Value of Digital Printing," *Printing Impressions,* February 2000
15. "Completing the Digital Printing Service Bundle," *Printing Impressions,* February 2000
16. "Straight Talk About the Cost of Digital Color Printing," *Digital Output,* December 1999
17. "Books on Demand–Ten Years Later," *Digital Output,* October 1999
18. "The Digital Print Marketing Plan: Part II–How to Position Your Business and Price Your Products," *Digital Output,* August 1999
19. "Building Your Digital Print Marketing Plan," *Digital Output,* June 1999
20. "Strategies for Value-Based Pricing," Printing Industries of America *Management Portfolio,* May 1999
21. "Successful Digital Printing Strategies," *Printing Impressions,* May 1999
22. "Value Judgments: Sorting Out the Digital Printing Opportunities for Your Company, " *Digital Output,* April 1999
23. "Print on Demand, Round 2," *Digital Design & Production,* March/April 1999
24. "Pricing Digital Printing for Profit," Printing Industries of America *Digital Impact,* March 1999
25. "Digital Color Printing in the Mainstream," *Printing Impressions,* March 1999
26. "Take Another Look at Digital Color Printing," *In-Plant Graphics,* March 1999
27. "Printing on Demand in Color," *Digital Output,* January 1999
28. "The Profits in Digital Printing," *Digital Output,* December 1998
29. *Digital Color Production Printing: Cost and Productivity Benchmarks,* prepared October 1998 for Xeikon, N V , and published by mutual agreement

Strategies on Demand, L.L.C.
617 South Charles Avenue
Naperville, Illinois 60540-6930

Phone 630 961 7746
Fax 630 961 0739
E-Mail stratondmd@aol.com

K00146970

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY, | |
| Plaintiff, | |
| v. | CIVIL ACTION No. 06-cv-032-JJF |
| CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY, | **REDACTED - PUBLIC VERSION** |
| Defendants. | |
| EASTMAN KODAK COMPANY, | |
| Counterclaim-Plaintiff, | |
| v. | |
| R.R. DONNELLEY & SONS COMPANY, | |
| Counterclaim-Defendant, | |

**CREO, INC.'S, EASTMAN KODAK COMPANY'S, AND KODAK GRAPHIC COMMUNICATIONS COMPANY'S FOURTH SUPPLEMENTAL RESPONSE TO R.R. DONNELLEY & SONS COMPANY'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 33 and 26(e) of the Federal Rules of Civil Procedure, Creo, Inc.,

Eastman Kodak Company, and Kodak Graphic Communications Company ("Defendants")

provide the following fourth supplemental response to the First Set of Interrogatories to

Defendants Creo, Inc., Eastman Kodak Company, and Kodak Graphics Communications

Company ("the Interrogatories") propounded by R.R. Donnelley & Sons Company ("RRD"):

1

## I.    GENERAL RESPONSES

Defendants' responses to the Interrogatories are made to the best of Defendants' current employees' present knowledge, information, and belief. These responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Defendants' recollection, are subject to such refreshing of recollection, and such additional knowledge of facts, as may result from its further discovery or investigation.

1.    Defendants reserve all objections or other questions as to the competency, relevance, materiality, privilege or admissibility as evidence in any subsequent hearing or proceeding of this or any other action for any purpose whatsoever of these responses.

2    Defendants reserve the right to object on any ground at any time to such other or supplemental interrogatories as RRD may at any time propound involving or relating to the subject matter of the Interrogatories.

## II.    GENERAL OBJECTIONS

Defendants make the following general objections, whether or not separately set forth, in response to each of the Interrogatories:

1.    Defendants object generally to the Interrogatories insofar as they seek information protected by the attorney-client privilege and/or the work-product doctrine. Such information shall not be produced in response to any interrogatory, and any inadvertent response thereto shall not be deemed a waiver of any privilege with respect to such information or of any work-product doctrine which may attach thereto.

2.    Defendants object to the introductory definitions and instructions to the Interrogatories to the extent the definitions and instructions purport to enlarge, expand, or alter in

any way the plain meaning and scope of any specific interrogatory, on the ground that such enlargement, expansion, or alteration renders the interrogatory vague, ambiguous, unintelligible, unduly broad, and uncertain.

3.    Defendants object to all instructions, definitions, and interrogatories to the extent they seek information not currently in Defendants' possession, custody, or control, or refer to persons, entities, or events not known to Defendants, on the grounds that such instructions, definitions, or interrogatories seek to require more of Defendants than any obligation imposed by law, would subject to unreasonable and undue annoyance, oppression, burden, and expense, and would seek to impose upon Defendants an obligation to investigate or discover information or materials from third parties or sources who are equally accessible to RRD.

## III.    SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

### INTERROGATORY NO. 1

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 46 of their Answer that "RRD has failed to state a claim upon which relief may be granted," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the persons most knowledgeable about the factual bases for those allegations.

### SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1

Subject to the foregoing general objections, RRD has failed to state a claim upon which relief can be granted for direct and indirect infringement of the asserted patents with respect to many of Defendants' products. RRD broadly and vaguely alleges that Kodak has infringed the asserted patents by performing actions, "which *include but are not limited to* (i) the making, using, offering to sell, and selling of one or more of the Kodak Software; (ii) the sale of one or more Digital Presses...; (iii) marketing and encouraging its customers to purchase, install, and use infringing third party software packages ...; and (iv) providing and supporting its Variable

3

Print Specification ('VPS') ...." *See* Amended Complaint ¶¶ 23, 28, 33, and 38 (emphasis added). Given that Defendants offer a multitude of diverse products and services, and collectively employ tens of thousands of employees worldwide, the above generic reference to unlimited and unspecified actions, which do not involve the specifically-named products alleged to directly or indirectly infringe RRD's patents, is not sufficient to satisfy proper notice pleading requirements under the Rules.

**INTERROGATORY NO. 2**

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 47 of their Answer that "Creo has not directly infringed any claim of the '452 patent, the '599 patent, the '940 patent or the '801 patent (collectively "Patents in Suit"), either literally or under the doctrine of equivalents," including, but not limited to, claim charts that set forth each claim element that allegedly is not met by Defendants' Software Products, the reasons each such element is not met (both literally and under the doctrine of equivalents) and the identity of the persons most knowledgeable about the factual bases for those allegations.

**RESPONSE TO INTERROGATORY NO. 2**

Defendants object to this interrogatory because it is overly broad and unduly burdensome to the extent it seeks information defined by the term "Defendants' Software Products," which is broadly defined to include "any other software product designed, marketed, sold, offered for sale, made, used, or imported by Defendants for use in Variable Digital Printing." The term Variable Digital Printing is also broadly defined by RRD as "digital printing in which the content of a page may be varied or in which the number of pages in a document may be varied." (RRD's 1st Interrogs. at 5.) RRD has admitted, however, that this broad definition encompasses technologies completely unrelated to the subject matter of this suit, such as "the ink jet printer sitting in many homes today." (D.I. 35 at 2.) In contrast, the Amended Complaint specifically identifies only "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer" (hereinafter "Kodak Software") as infringing

4

its patents. Yet RRD still seeks discovery on improper and overly broad subject matter. Defendants also object to this interrogatory as overbroad to the extent it seeks a response with respect to claims that RRD does not assert.

Defendants additionally object to this interrogatory as premature in view of the Court's Scheduling Order of February 15, 2007. Under that Order, the parties are not required to exchange proposed claim constructions until June 1, 2007. Subject to the foregoing general and specific objections, Defendants respond as follows.

With respect to the asserted apparatus claims, the Kodak Software does not contain all elements of the asserted claims, either literally or by equivalence.

With respect to the asserted method claims, Defendants do not directly infringe by selling, offering to sell, or making the Kodak Software in the United States and/or importing the software into the United States. As a matter of law, method claims can only be directly infringed by a "use," not through the sale, offer for sale, manufacture, or importation of software that allegedly performs the steps. Defendants also contend that Kodak Software does not infringe the asserted method claims, either literally or by equivalence, because when used, Kodak Software does not perform each step of the asserted method claims, for at least the reasons discussed below.

Although Defendants are not able at this juncture to fully itemize all grounds on which they should be found not to directly infringe the asserted claims of the patents in suit (once the terms of those claims are properly construed), Defendants nevertheless set forth the following preliminary bases for their non-infringement positions and reserve the right to update these bases once the Court issues its claim construction ruling.

5

In addition, with respect to the Kodak NexTreme DL-100 Variable Data Software and Kodak NexTreme DL-1000 Variable Data Software, Defendants are not in possession, custody or control of the source code for these products. Defendants also do not have detailed information regarding the functionality of these products. Accordingly, Defendants' responses with respect to these products are preliminary and, to a large extent, are based on current information and belief.

The Kodak Software does not directly infringe independent claim 1 of the '599 patent, or any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 of the '599 Patent | Non-Infringement Position |
|---|---|
| 1. An apparatus for controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | Kodak Software is not an apparatus for controlling an electronic press. |
| [a] first means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | When installed on a computer, Kodak Software does not perform the function of developing a template file using the same or equivalent structure as shown in Figs. 3-5 and corresponding descriptions. When installed on a computer, Kodak Software does not develop a template file defining pages that will be printed from fixed information and variable information. |
| [b] a database having entries therein each representing variable information to be printed; | Kodak Software does not have a database wherein each entry represents variable information to be printed. |
| [c] second means responsive to the first developing means for developing a master page file from the template file wherein the master page file defines the fixed information; and; | When installed on a computer, Kodak Software does not perform the function of developing a master page file from a template file using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions. When installed on a computer, Kodak Software does not develop a master page file. |

| Claim 1 of the '599 Patent | Non-Infringement Position |
|---|---|
| [d] means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying sequence and content of page production by the press. | When installed on a computer, Kodak Software does not perform the function of converting a template file and a database into press commands using the same or equivalent structure as shown in Figs. 5 & 11 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not utilize press commands. |

In operation, Kodak Software does not directly infringe independent claim 11 of the '599 patent, or any claims depending from claim 11, for at least the reasons provided below:

| Claim 11 of the '599 Patent | Non-Infringement Position |
|---|---|
| 11. A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | In operation, Kodak Software does not control an electronic press. |
| [a] developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | In operation, Kodak Software does not perform the step of developing a template file defining pages that will be printed from fixed information and variable information. |
| [b] assembling a database having entries therein each representing variable information to be printed; | In operation, Kodak Software does not perform the step of assembling a database wherein each entry represents variable information to be printed. |
| [c] developing a master page file from the template file wherein the master page file defines the fixed information; and; | In operation, Kodak Software does not perform the step of developing a master page file.<br><br>In operation, Kodak Software does not perform the step of developing a master page file from a template file. |
| [d] converting the template files[,] the database and the master page file into press commands specifying sequence and content of page production by the press. | In operation, Kodak Software does not utilize press commands.<br><br>In operation, Kodak Software does not perform the step of converting a template file, a database, and a master page file into press commands. |

The Kodak Software does not directly infringe independent claim 1 of the '940 patent, or any claims depending from claim 1, for at least the reasons provided below:

7

| Claim 1 – '940 Patent | Non-Infringement Position |
|---|---|
| 1. An apparatus for controlling an electronic press, comprising: | Kodak Software is not an apparatus for controlling an electronic press. |
| means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed; and | When installed on a computer, Kodak Software does not perform the function of developing template data using the same or equivalent structure as shown in Figs. 3-5 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not develop template data defining pages that will be printed from master data representing reusable objects and position data representing variable objects. |
| means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable object and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. | When installed on a computer, Kodak Software does not perform the function of causing an electronic press to print output pages by separating master data from position data using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not have a database having a number of entries representing variable objects.<br><br>When installed on a computer, Kodak Software does not cause an electronic press to print output pages by performing the function of separating master data from position data using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not separate master data from position data for each set of template data in preparation for rasterization. |

In operation, Kodak Software does not directly infringe independent claim 11 of the '940 patent, as well as any claims depending from claim 11, for at least the reasons provided below:

8

| Claim 11 of the '940 Patent | Non-Infringement Position |
|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | In operation, Kodak Software does not control an electronic press. |
| [a] developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | In operation, Kodak Software does not perform the step of developing a data set of master data. In operation, Kodak Software does not develop data sets representing templates defining pages that will be printed from master data representing reusable objects and position data representing variable objects. |
| [b] developing a database having a number of entries each of which represents a variable object; and | In operation, Kodak Software does not perform the step of developing a database wherein each entry represents a variable object. |
| [c] causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | In operation, Kodak Software does not perform the act of causing an electronic press to print output pages by separating master data from position data. Nor does Kodak Software act in accordance with or equivalent to Figs. 5 & 10 and corresponding descriptions. In operation, Kodak Software does not separate master data from position data for each data set in preparation for rasterization. |

In operation, Kodak Software does not directly infringe independent claim 1 of the '452 patent, or any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 of the '452 Patent | Non-Infringement Position |
|---|---|
| 1. A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | In operation, Kodak Software does not perform the step of developing a template page file of master data. |

9

| Claim 1 of the '452 Patent | Non-Infringement Position |
|---|---|
| (b) selecting areas of the page for the variable graphics information; | |
| (c) specifying graph parameters; and | |
| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | In operation, Kodak Software does not perform the act of causing a display device to display pages in accordance with or in a manner equivalent to Figs. 5, 9 & 10 and corresponding descriptions. |

In operation, Kodak Software does not literally infringe claim 1 of the '801 patent, as well as any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 – '801 Patent | Kodak's Proposed Constructions |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | In operation, Kodak Software does not assemble books. |
| (A) storing a first number of pages; | In operation, Kodak Software does not perform the step of storing a first number of pages. |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | In operation, Kodak Software does not perform the step of specifying a set of pagination information by indicating whether a stored page is to be selectively included in a book. |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | In operation, Kodak Software does not perform the step of specifying a set of pagination information by indicating whether a stored page is to be selectively included in a book. |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a book. In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a first book based on a first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number. |

10

| Claim 1 – '801 Patent | Kodak's Proposed Constructions |
|---|---|
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a book.  In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a second book based on a second set of pagination information wherein a third number of stored pages to be assembled into the second book is less than the second number and no greater than the first number. |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | |
| (G) producing the first and second books in a single press run | |

Defendants contend that for at least the reasons given above, Kodak Software does not directly infringe the asserted claims of the patents in suit when properly construed.

Persons knowledgeable about these facts include, but are not limited to, Ronen Cohen, Ron Peleg, Ronit Konfidan, Nardi Jaacobi, Gershon Alon, Roger Parrett, John Desautels, William Sullivan, the named inventors of the patents in suit, and unnamed individuals of Datalogics, Inc. and Printable Technologies, Inc.

Defendants reserve the right to supplement their response to this interrogatory after receipt of RRD's claim construction and infringement contentions, after the Court's order on claim construction, and at other appropriate times in this litigation.

**INTERROGATORY NO. 3**

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 48 of their Answer that "Creo has not indirectly infringed any claim of the Patents in Suit, either literally or under the doctrine of equivalents," including, but not limited to, claim charts that set forth each claim element that allegedly is not met by Defendants' Software

Products and Third Party Software Products suitable for the use with Defendants' Hardware Products (including, but not limited to, software products made or developed by XMPie, Atlas Software, Datalogics, GMC Software, Pageflex, PrintSoft, and Extream), the reasons each such element is not met (both literally and under the doctrine of equivalents) and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 3

Defendants object to this interrogatory because it is overly broad and unduly burdensome to the extent it (i) seeks information defined by the terms "Defendants' Software Products," "Defendants' Hardware Products" and "Third Party Software Products" and (ii) references XMPie, Atlas Software, Datalogics, GMC Software, Pageflex, PrintSoft, and Extream. The Amended Complaint only references "Kodak Software," which is defined as including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer." Further, the only hardware referenced in the Amended Complaint as allegedly "intended for use with infringing software" are "Digital Presses," which are defined in the Amended Complaint as including "the NexPress 2100 Plus Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300, CS 340, CS400, and CS600." Moreover, Defendants object to being required to answer Interrogatories relating to the operation of the Third Party Software Products given the absence of any specific allegations by RRD concerning such products. Defendants also object to this interrogatory as a premature contention interrogatory given that the Court has yet to construe the claims.

Subject to the foregoing general and specific objections, Defendants respond by incorporating by reference their response to Interrogatory No. 2 with respect to the Kodak Software. Defendants further respond that they cannot — as a matter of law — be found liable

12

for inducing infringement under 271(b) before becoming aware of the patents in suit and without having an affirmative intent to cause direct infringement. As a result, Defendants cannot be held liable for inducing infringement when Defendants are not in possession or control of information sufficient to explain how an accused product functions. Defendants did not intentionally engage in conduct or otherwise take action to induce infringement of the patents in suit by users of Kodak Software or Digital Presses, as those terms are defined in the Amended Complaint.

Likewise, Defendants are not liable for contributory infringement under 271(c) prior to first becoming aware of the patents in suit. Defendants are also not liable for indirect infringement to the extent that no single entity practices each of the steps or elements of the patents in suit, and thus, directly infringes. Finally, the Kodak Software and Digital Presses identified in the Amended Complaint are capable of substantial, noninfringing uses.

Persons knowledgeable of these facts include, but are not limited to, Ronen Cohen, Ron Peleg, Ronit Konfidan, Nardi Jaacobi, Gershon Alon, Leonid Khain, Eli Shalhon, Benny Shimshoni, Roger Parrett, John Desautels, William Sullivan, William Schweinfurth, John Peck, and the named inventors of the patents in suit.

Defendants reserve the right to supplement their response to this interrogatory after receipt of RRD's claim construction and infringement contentions, after the Court's order on claim construction, and at other appropriate times in this litigation.

## INTERROGATORY NO. 4

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 49 of their Answer that "RRD is estopped from alleging that Creo infringes the claims of the Patents in Suit under the doctrine of prosecution history estoppel," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

13

**RESPONSE TO INTERROGATORY NO. 4**

Subject to the foregoing general objections, Defendants respond as follows:

The documents and communications on which Defendants intend to rely include the patents in suit, prior art of record, prosecution histories of the patents in suit, and the prosecution histories of patents related thereto. The prosecution histories include numerous arguments and narrowing amendments that limit the scope of the asserted claims through argument-based estoppel and/or amendment-based estoppel. Ultimately, whether prosecution history estoppel applies will depend on the claim construction and any range of equivalents asserted by RRD. It is premature at this time, with a *Markman* hearing scheduled for September 2007, to speculate how RRD will attempt to read the claims and whether RRD will take a position that contradicts the prosecution histories. To date, however, Defendants have identified at least the following actions taken by RRD in the prosecution history, which may form estoppels.

### U.S. Patent No. 6,952,801

- Supplementary Amendment dated May 18, 2000 in U.S. Application Ser. No. 08/802,337 at 2-3 (claim amendments) & 4-5 (arguments to distinguish claims over prior art).

- Amendment A dated November 4, 2002 at 6-7 (arguments to distinguish claims over prior art).

- Amendment B dated March 28, 2003 at 2-3 (claim amendments) & 4 (remarks re claim amendments)

- Amendment C dated September 8, 2003 at 4-6 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated March 4, 2004 at 1-5 (remarks re prior art)

14

- Amendment D dated March 8, 2004 at 2-5 (claim amendments) & 6-7 (arguments to distinguish claims over prior art).

- Amendment E dated Jul 26, 2004 at 2-5 (claim amendments) & 6-8 (arguments to distinguish claims over prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 1 of the '801 patent:

| Claim Language | Estoppel |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | Amendment D (amendment) |
| (A) storing a first number of pages; | Amendment B (amendment; argument); Amendment C (argument) |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment D (amendment); Amendment E (amendment) |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment E (amendment) |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment D (amendment); Amendment E (amendment; argument) |
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment E (amendment; argument) |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | Amendment C (argument); Amendment D (amendment; argument); Amendment E (amendment; argument) |
| (G) producing the first and second books in a single press run. | Amendment D (amendment; argument); Amendment E (amendment; argument) |

15

## U.S. Patent No. 6,844,940

- Preliminary Amendment dated January 12, 2004 at 3-6 (claim amendments) & 7 (remarks).

- Supplemental Preliminary Amendment dated March 29, 2004 at 2-5 (claim amendments) & 6 (remarks).

- Petition to Make Special Under MPEP § 708.02 dated March 29, 2004 at 1-4 (arguments to distinguish claims over prior art).

- Request for Reconsideration of Petition to Make Special dated June 10, 2004 at 1-4 (arguments to distinguish claims over prior art)

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 11 of the '940 patent:

| Claim Language | Estoppel |
|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | |
| developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | Supplemental Preliminary Amendment (amendment) |
| developing a database having a number of entries each of which represents a variable object; and | Supplemental Preliminary Amendment (amendment) |
| causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | Petition to Make Special (argument); Request for Reconsideration (argument) |

## U.S. Patent No. 6,327,599

- Amendment A dated November 11, 1996 at 2 (claim amendments) & 3 (remarks).

- Amendment B dated May 19, 1997 at 1-3 (claim amendments) & 4-8 (arguments to distinguish claims over prior art).

16

- Amendment C dated November 19, 1997 at 1-2 (claim amendments) & 2-4 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated December 17, 1997 at 1-2 (remarks re prior art).

- Response After Final Rejection dated April 30, 1998 at 1 (claim cancellations and remarks).

- Amendment D dated April 2, 2001 at 1 (claim amendments) & 2-5 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated June 20, 2000 at 1-2 (remarks re prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 11 of the '599 patent:

| Claim Language | Estoppel |
|---|---|
| 11  A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | Amendment A (amendment; argument) |
| developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | |
| assembling a database having entries therein each representing variable information to be printed; | |
| developing a master page file from the template file wherein the master page file defines the fixed information; and | Amendment B (argument) |
| converting the template files the database and the master page file into press commands specifying sequence and content of page production by the press. | Amendment B (amendment; argument); Amendment D (argument) |

17

## U.S. Patent No. 6,205,452

- Amendment "A" dated January 7, 2000 at 2-3 (claim amendments) & 3-8 (arguments to distinguish claims over prior art).

- Response dated June 27, 2000 at 1-7 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated July 20, 2000 at 1-2 (remarks re prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 1 of the '452 patent:

| Claim Language | Estoppel |
|---|---|
| 1  A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | Amendment A (argument) |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | |
| (b) selecting areas of the page for the variable graphics information; | Amendment A (argument); Response (argument) |
| (c) specifying graph parameters; and | |
| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | Amendment A (argument); Response (argument) |

Persons knowledgeable of these facts include, but are not limited to, the named inventors of the patents in suit and those individuals involved in the prosecution of the patents in suit,

18

including William E. McCracken, G. Christopher Braidwood, Danielle M. Holmes, Trevor B.

Joike, Mark G. Hanley, and Erin J. Fox.

Defendants reserve the right to supplement their response to this interrogatory after

receipt of RRD's claim construction and infringement contentions, after the Court's order on

claim construction, and at other appropriate times in this litigation.

## INTERROGATORY NO. 5

State in detail all factual and legal bases for Defendants' allegations set forth in
Paragraph 50 of the Answer that "[o]ne or more claims of the Patents in Suit are invalid under
the patent laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35
U.S.C. §§ 101, 102, 103, and 112," including, but not limited to, an identification of all facts,
documents, prior art (with references to specific portions of the prior art by page, line, figure, or
description in claim chart format), activities, and alleged motivation or suggestion to combine
references.

## RESPONSE TO INTERROGATORY NO. 5

Defendants object that this interrogatory is overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to

this interrogatory as premature in that RRD has yet to reveal its claim construction and

infringement contentions, the Court has yet to construe the claims and expert reports are not yet

due. Defendants also object to this interrogatory as unduly burdensome to the extent it seeks

"identification of *all* facts, documents, prior art ..., activities, and alleged motivation or

suggestion to combine references," and "references to specific portions of the prior art by page,

line, figure, or description in claim chart format." Defendants will respond to the extent required

by the Federal Rules of Civil Procedure.

Subject to the foregoing general and specific objections, Defendants respond as follows:

This response is based on information currently available to Defendants, including

Defendants' present understanding of RRD's claim construction and infringement contentions.

19

RLF1-3138885-1

Defendants reserve the right to assert claim construction positions that are inconsistent with the claim construction positions relied on here. Defendants further reserve the right to supplement their response to this interrogatory—such as by identifying new prior art and/or identifying new portions of the cited prior art—in support of its defenses as this case progresses including, for example, at such time after the Court issues its claim construction.

### U.S. Patent Nos. 6,327,599

Claims 1 and 11 of the '599 patent may be invalid under 35 U.S.C. § 102(f) because James L. Warmus and Mark G. Dreyer did not invent the subject matter to be patented. Defendants contend that individuals associated with Barco Graphics, including Paul Notredame, may have invented all, or a portion, of the claimed subject matter.

Claims 1 and 11 of the '599 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by a variable printing application called "DijiComp," which was developed and used by a subsidiary of Kodak in the 1980s and 1990s, and which was marketed and sold as Begin Software. To the extent the asserted claims are interpreted to read on Darwin as RRD has contended in its responses to Defendants' Interrogatory No. 1, the asserted claims must also read on the prior art DijiComp application, rendering the claims invalid. *See, e.g.,* DijiComp PC Design, dated May 3, 1993 (K00004908-K00005098; K00557682-K00557885; K01200862-K01201061).

Claims 1 and 11 of the '599 patent also may be invalid under 35 U.S.C. § 102(b) as anticipated by one or more of (i) U.S. Patent No. 4,649,513 to Martin *et al.*, which issued on March 10, 1987, and (ii) Kodak's Forms Merge Software Package (Forms Merge), which was developed and commercialized by Eastman Kodak in at least 1987 and 1988. *See, e.g.,* User's Guide to Forms Merge, dated March 3, 1988 (K01863184-K01863213). The claim charts,

20

below, identify exemplary portions of each prior art reference that are sufficient to support

Defendant's contention that each element of the asserted claims may be disclosed therein:

| Claim 1 of the '599 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 1. An apparatus for controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See,* e.g., '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| first means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | Forms Merge includes means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See, e.g.,* User's Guide to Forms Merge at 1 & 3-7. | The '513 patent discloses means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See,* e.g., '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |
| a database having entries therein each representing variable information to be printed; | Forms Merge includes a database having entries therein representing information to be printed. *See, e.g.,* User's Guide to Forms Merge at 7. | The '513 patent discloses a database having entries therein representing information to be printed. *See,* e.g., '513 patent, col. 6, 48 to col. 7, l. 8 & Fig. 4. |
| second means responsive to the first developing means for developing a master page file from the template file wherein the master page file defines the fixed information; and | Forms Merge includes a second means responsive to the first developing means for developing a master pages file from the template file. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses a second means responsive to the first developing means for developing a master pages file from the template file. *See,* e.g., '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |

21

| means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying sequence and content of page production by the press. | Forms Merge includes means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying the sequence and content of page production by the press. *See, e g ,* User's Guide to Forms Merge at 10. | The '513 patent discloses means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying the sequence and content of page production by the press. *See, e g ,* '513 patent, Figs. 7 and 18a-b and accompanying text. |

| Claim 11 of the '599 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 11. A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | *See, e g ,* User's Guide to Forms Merge at 1. | *See,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| [a] developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | In operation, Forms Merge includes developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See, e g ,* User's Guide to Forms Merge at 1 & 3-7. | The '513 patent discloses a program performing the step of developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See,* e.g., '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |
| [b] assembling a database having entries therein each representing variable information to be printed; | In operation, Forms Merge includes assembling a database containing variable data to be merged with fixed information for printing. *See, e g ,* User's Guide to Forms Merge at 7-8. | The '513 patent discloses a program that assembles a database storing variable information to be printed. *See,* e.g., col. 6, 48 to col. 7, l. 8 & Fig. 4. |

RLF1-3138885-1

| [c] developing a master page file from the template file wherein the master page file defines the fixed information; and | In operation, Forms Merge converts the fixed information from the template file to a master page file defining the fixed information. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses a program that develops a master page file defining fixed information from the template file. *See,* e.g., '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |
| --- | --- | --- |
| [d] converting the template files[,] the database and the master page file into press commands specifying sequence and content of page production by the press. | In operation, Forms Merge converts the template files, the variable data and the master page file into commands specifying sequence and content of page production. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses a program that converts the template files, variable data and the master page file into commands specifying the sequence and content of page production. *See, e.g.,* '513 patent, Figs. 7 & 18a-b, and accompanying description. |

Defendants also assert that claims 1 and 11 of the '599 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following prior art: (i) DijiComp, (ii) Forms Merge, (iii) U.S. Patent No. 4,649,513, (iv) the prior art of record cited on one or more of the patents in suit, and/or (v) one or more of the references set forth below. The identified prior art is directed to variable printing systems that create a template file and merge variable data for printing. Defendants contend that claims 1 and 11 may have been obvious to a person having ordinary skill in the art in view of the combined teachings.

In addition to the prior art of record cited on the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other references, to the invalidity of claims 1 and 11 under 35 U.S.C. §§ 102 and 103(a):

- U.S. Patent Nos. 4,417,322; 4,445,795; 4,454,576; 4,470,120, 4,470,129, 4,649,513; 4,651,278; 4,809,220; 4,826,333; 4,860,219; 4,870,611; 4,878,085; 4,903,229; 4,939,670; 4,944,614; 5,091,868; 5,104,245; 5,144,693; 5,563,998; 5,563,999; 6,049,390; 6,330,073.

23

- Begin Software for High Speed Printing Systems (6/22/1994)

- Scitex Begin User's Guide (7/1/1995)

- Scitex Begin Reference Manual (7/1/1995)

- Scitex Catalogic Overview (8/23/1994)

- RR Donnelly Catalog Publishing System - Discussed in Retail Advertising and Catalogs, Seybold Special Report, vol. 2, no. 8 (4/29/1994)

- Specification PostScript Extension for Xeikon Variable Data System (7/1/1996)

- Adobe Technical Note #5113, published March 31, 1992.

- Interpress, The Source Book (published 1988).

- TrueForm User Guide. Adobe Systems, 1989.

- PostScript Language Reference Manual, Second Edition. Adobe Systems Incorporated, 1990.

- Guide to Document Processing, Kodak Ektaprint 1392 Printer, Model 24. June, 1991.

### U.S. Patent No. 6,844,940

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(f) because James L Warmus and Mark G. Dreyer did not invent the subject matter to be patented. Defendants contend that individuals associated with Barco Graphics, including Paul Notredame, may have invented all, or a portion, of the claimed subject matter.

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by a variable printing application called "DijiComp," which was developed and used by a subsidiary of Kodak in the 1980s and 1990s, and which was marketed and sold as Begin Software. To the extent the asserted claims are interpreted to read on Darwin as RRD has

24

contended in its responses to Defendants' Interrogatory No. 1, the asserted claims must also read on the prior art DijiComp application, rendering the claims invalid. *See, e.g.,* DijiComp PC Design, dated May 3, 1993 (K00004908-K00005098; K00557682-K00557885; K01200862-K01201061).

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by one or more of (i) U.S. Patent No. 4,649,513 to Martin *et al.*, which issued on March 10, 1987, and (ii) Kodak's Forms Merge Software Package (Forms Merge), which was developed and commercialized by Eastman Kodak in at least 1987 and 1988. *See, e.g.,* User's Guide to Forms Merge, dated March 3, 1988 (K01863184-K01863213). The claim charts, below, identify exemplary portions of each prior art reference that are sufficient to support Defendant's contention that each element of the asserted claims may be disclosed therein:

| Claim 1 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
| --- | --- | --- |
| 1. An apparatus for controlling an electronic press, comprising: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed; and | Forms Merge includes means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed. *See, e.g.,* User's Guide to Forms Merge at 1-7, 10 & 27. | The '513 patent discloses means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61; col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Figs. 5 & 6. |

| | | |
|---|---|---|
| means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable object and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization | Forms Merge includes means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable objects and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. *See, e g*, User's Guide to Forms Merge at 7 & 10. | The '513 patent discloses means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable objects and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. *See, e.g.*, col. 6, 48 to col. 7, l. 8 & Figs. 4, 7, 18a-b, and accompanying text. |

| Claim 2 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 2. The apparatus of claim 1, wherein the causing means includes means for converting the sets of template data and the database into commands for the electronic press specifying sequence and content of page production | Forms Merge includes means for converting template data and variable data into commands specifying the sequence and content of page production. *See, e g*, User's Guide to Forms Merge at 10. | The '513 patent discloses means for converting template data and variable data into commands specifying the sequence and content of page production. *See, e g*, 513 Patent at Figs. 7 & 18a-b and accompanying text. |

| Claim 7 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 7 The apparatus of claim 1, wherein the first set of template data and the second set of template data are different so that the first and second template pages are different. | Forms Merge may be used with two different templates. *See, e g*, User's Guide to Forms Merge at 1. | The '513 patent discloses using multiple templates. *See, e g*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

26

| Claim 8 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 8. The apparatus of claim 7, wherein the master data of the first and second sets of template data are different such that the reusable objects of the first and second template pages are different. | Forms Merge may be used with two different sets of master data. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 discloses use of two different sets of master data. *See, e.g.,* '513 patent col. 13, l. 32 to col. 14, l. 2. |

| Claim 9 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 9. The apparatus of claim 1, wherein the master data of the first and second sets of template data are identical, and a position of the master data in the first template page differs from a position of the master data in the second template page. | Forms Merge may be used with two different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses use of two different templates. *See,* '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5 |

| Claim 10 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 10. The apparatus of claim 1, wherein the variable objects of the first and second sets of template data are identical, and the position of the variable object in the first template page differs from the position of the variable object in the second template page. | Forms Merge may be used with two different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses use of two different templates. *See,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 11 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |

27

| [a] developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | In operation, Forms Merge includes developing multiple templates having master data representing reusable objects to be printed and position data representing a position on the page at which a variable object is to be printed. *See, e.g.,* User's Guide to Forms Merge at 1-7 and 27. | The '513 patent discloses a program performing the step of developing multiple templates having master data representing reusable objects to be printed and position data representing a position on the page at which a variable object is to be printed. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6; col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |
|---|---|---|
| [b] developing a database having a number of entries each of which represents a variable object; and | In operation, Forms Merge includes developing a database storing variable objects. *See, e.g.,* User's Guide to Forms Merge at 7. | The '513 patent discloses a program performing the step of developing a database storing variable objects. *See, e.g.,* '513 patent, col. 6, 48 to col. 7, l. 8 & Fig. 4. |
| [c] causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | In operation, Forms Merge causes the printing of output pages with reusable objects and variable objects by separating master data from position data in preparation for rasterization. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses the step of causing the printing of output pages with reusable objects and variable objects by separating master fata from position data in preparation for rasterization. *See, e.g.,* Figs. 7, 18a-b and accompanying text. |

| Claim 12 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 12. The method of claim 11, wherein the step of causing includes the step of converting the data sets and the database into page sequence commands for the electronic press specifying sequence and content of page production. | In operation, Forms Merge discloses the step of converting the data sets and the database into page sequence commands specifying sequence and content of page production. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses the step of converting the data sets and the database into page sequence commands specifying sequence and content of page production. *See, e.g.,* Figs. 7, 18a-b and accompanying text. |

28

| Claim 17 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 17. The method of claim 11, wherein the first data set and the second data set are different so that the first and second templates are different. | Forms Merge may be operated using different templates. *See, e g*, User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 18 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 18. The apparatus of claim 17, wherein the master data of the first and second data sets are different such that the reusable objects of the first and second templates are different. | Forms Merge may be operated using different templates. *See, e g*, User's Guide to Forms Merge at 1 | The '513 patent discloses using different templates. *See, e g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 19 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 19. The apparatus of claim 11, wherein the master data of the first and second data sets are identical, and a position of the master data in the first template differs from a position of the master data in the second template. | Forms Merge may be operated using different templates. *See, e g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 20 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 20. The apparatus claim 11, wherein the variable objects of the first and second data sets are identical, and the position of the variable object in the first template differs from the position of the variable object in the second template | Forms Merge may be operated using different templates. *See, e g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

29

| Claim 21 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 21. The apparatus of claim 11, wherein the variable objects of the first and second data sets are different. | Forms Merge may be operated using different templates. *See, e g*, User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e g*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 22 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 22. The apparatus of claim 21, wherein the position of the variable object in the first template is the same as the position of the variable object in the second template. | Forms Merge may be operated using different templates. *See, e g*, User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e g.*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

Defendants also assert that claims 1, 2, 7-12 and 17-22 of the '940 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following references: (i) DijiComp, (ii) Forms Merge, (iii) U.S. Patent No. 4,649,513, (iv) the prior art of record cited on one or more of the patents in suit, and/or (v) one or more of the references listed below. Each of the identified prior art is directed to a variable printing system that creates a template file and merges variable data for printing. Defendants contend that claims 1, 2, 7-12 and 17-22 may have been obvious to a person having ordinary skill in the art in view of the combined teachings.

In addition to the prior art of record cited on one or more of the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other references, to the invalidity of asserted claims 1, 2, 7-12 and 17-22 under 35 U.S.C §§ 102 and 103(a):

- U.S. Patent Nos. 4,417,322; 4,445,795; 4,454,576; 4,470,120, 4,470,129, 4,649,513; 4,651,278; 4,809,220; 4,826,333; 4,860,219; 4,870,611; 4,878,085;

4,903,229; 4,939,670; 4,944,614; 5,091,868; 5,104,245; 5,144,693; 5,563,998; 5,563,999; 6,049,390; 6,330,073.

- Begin Software for High Speed Printing Systems (6/22/1994)
- Scitex Begin User's Guide (7/1/1995)
- Scitex Begin Reference Manual (7/1/1995)
- Scitex Catalogic Overview (8/23/1994)
- RR Donnelly Catalog Publishing System - Discussed in Retail Advertising and Catalogs, Seybold Special Report, vol. 2, no. 8 (4/29/1994)
- Specification PostScript Extension for Xeikon Variable Data System (7/1/1996)
- Adobe Technical Note #5113, published March 31, 1992.
- Interpress, The Source Book (published 1988).
- TrueForm User Guide. Adobe Systems, 1989.
- PostScript Language Reference Manual, Second Edition.   Adobe Systems Incorporated, 1990.
- Guide to Document Processing, Kodak Ektaprint 1392 Printer, Model 24.  June, 1991.

## U.S. Patent No. 6,205,452

Defendants assert that claims 1, 2, 7-10, 12 and 14 of the '452 patent may be invalid under 35 U.S.C. § 102(b) because, on information and belief,

*REDACTED*

31

*REDACTED*

Defendants also assert that each of claims 1, 2, 7-10, 12 and 14 of the '452 patent may be invalid under 35 U.S.C. § 102(b) and/or § 103(a) in view of at least the following prior art:

1.  The Admitted Prior Art disclosed in the Background Art section of the '452 patent which includes, among other prior art references, *Warmus*, et al, U.S. patent application Ser. No. 08/802,337, filed February 11, 1997, and *Vinberg, et al*, U.S. Patent No. 4,800,510.

2.  Microsoft Access 7.0 (also known as Microsoft Access 95), is a relational database management system released in 1995.  In addition to the Microsoft Access 7.0 software itself, the prior art listed below provide further documentary evidence of the relevant features of Microsoft Access 7.0:

    -   Browne, Allen & Alison Balter, *Essential Access 95*, 1995.  K01114235-0001 to K01114235-0523.

    -   Balter, Alison, *Mastering Access 95 Development, Premier Edition*, 1996. K01104499-K01102313.

    -   Getz, Ken & Paul Litwin, *Microsoft Access 95 How-To*, 1996.  K01114238-0001 to K01114238-0789.

- Barker, F. Scott, *Access 95 Power Programming*, 1996.   K0109980-K01100732.

- Homer, Alex, *The Beginner's Guide to Access 95*, 1996.   K01095441-K01096119.

- Simpson, Alan & Elizabeth Olson, *Mastering Microsoft Access for Windows 95*, 1996.   K01101279-K01102313

- Cassel, Paul, *Teach Yourself Access 95 in 14 Days*, 1995.   K001097988-K01098669.

- Gifford, Dwayne, et al, *Access 95 Unleashed*, 1996.   K01103503-K01104498.

- Schneider, Bob, *Using Access 95: The Fast and Easy Way to Learn*, 1995.   K01097585-K01097987.

- Litwin, Paul, *Microsoft Access 95 Developer's Handbook*, 1996.   K01104499-K01106079.

- Microsoft Access Language Reference.  Microsoft 1995.

3. Paradox for Windows, Version 5.0 (Paradox 5.0), is a relational database management system released in 1994 by Borland Software Corporation.   In addition to the Paradox 5.0 software itself, the following prior art further evidences the relevant features of Paradox 5.0:

- Salcedo, Greg & Martin W. Rudy, *Paradox 5 For Windows Power Programming Secrets*, 1995.  K01114236-0001 to K01114236-933.

- Ageloff, Roy, *Comprehensive Paradox 5 for Windows*, 1995.  K01114234-0001 to K01114234-586.

33

- Ageloff, Roy, *Introductory Paradox 5 0 for Windows*, 1995.  K01100945-K01101278.

- Prestwood, Mike, *What Every Paradox 5 For Windows Programmer Should Know, Second Edition,* 1994.  K01114237-0001 to K01114237-1246.

- Wagner, Richard, et al., *Inside Paradox 5 For Windows*, 1994

- Robinson, Celeste, *Paradox 5 0 for Windows Handbook*, 1994.  K01102314-K01102953.

- Jones, Edward C., *Paradox 5.0 for Windows Power Toolkit*, 1995.  K01102954-K01103502.

- Chalnick, Leon, et al., *Killer Paradox 5 for Windows*, 1994.  K01106080-K01107309.

- Anderson, Derek, et. al, *Using Paradox 5 for Windows*, 1994.  K01098670-K01099879.

- Weingarten, Jan, *Paradox 5 for Windows Illustrated*, 1995.  K01100733-K01100944.

- Borland Paradox for Windows, Version 5.0:  ObjectPAL Quick Reference.  Borland Software, 1994

- Borland Paradox for Windows, Version 5.0:  Workgroup Desktop Guide.  Borland Software, 1994.

- Borland Paradox for Windows, Version 5.0:  Guide to ObjectPAL.  Borland Software, 1994.

- Borland Paradox for Windows, Version 5.0:  User's Guide.  Borland Software, 1994 ("Paradox 5 0 User's Guide").

34

The claim charts, below, provide an exemplary illustration of how the '452 patent may be anticipated and/or rendered obvious by each of Access 7.0, Paradox 5.0 and the Admitted Prior Art:

| Claim 1 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 1. A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | Access 7.0 is a relational database management system capable of generating database reports for display on a display device, the generated reports including charts that vary depending on data stored in the database. *See, e g.,* "Sales by Category" Report, Northwind Traders Sample Database. | Paradox 5.0 is a relational database management system capable of generating database reports for display on a display device, the generated reports including charts that vary depending on data stored in the database. *See, e.g.,* Paradox 5.0 User's Guide at pp. 431-525. | It was known in the prior art to preprocess variable graphics information for use in the prior art variable printing systems. *See, e g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50. |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | In Access 7.0, a report template, including fixed information and placeholders for variable information, may be developed using Access 7.0 Report Designer or Report Wizard features. *See, e g.,* "Sales by Category" Report, Northwind Traders Sample Database | In Paradox 5.0, the Report Designer, Quick Report and Report Expert features allow the development of a report template including fixed information and placeholders representing an area of a page for variable information. | It was known in the prior art systems to develop template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information. *See, e.g.,* '452 Patent, col. 1, l. 23 to col. 3, l. 50. |

35

| | | | |
|---|---|---|---|
| (b) selecting areas of the page for the variable graphics information; | Access 7.0 Report Designer allows the user to insert a chart at a user-selected location in the report template. | Paradox 5.0 Report Designer allows the user to insert a graph placeholder at a user-selected location in the report template. | It was known in the prior art systems to preprocess variable graphics as variable image files for merging with template page files at the location of a corresponding image placeholder. *See, e.g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50. |
| (c) specifying graph parameters; and | In Access 7.0, after the user inserts a chart, the user is prompted to specify graph parameters for the accompanying chart, including chart type, chart layout, and axis scale. | In Paradox 5.0, after the user inserts a graph placeholder in a report template, the user is prompted to specify graph parameters for the corresponding graph, including graph type, titles and labels. | It was known in the prior art for users to input graph format parameters. *See, e.g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50 |

36

| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | In Access 7.0, the user may run a report for printing on a printer or for display on the monitor through the "Preview" report option. The displayed report pages will display the fixed information from the report template, and variable information from the Access 7.0 database. The chart placeholder will be converted into a chart in accordance with the corresponding parameters and variable information from the Access 7.0 database. The chart may be generated by Microsoft Graph 5.0 via object linking and embedding. | In Paradox 5.0, the user may preview a report on the screen, or send the report to a printer. The displayed report pages will display the fixed information from the report template, and variable information retrieved from the Paradox 5.0 database.<br><br>The graph placeholder will be converted into a graph in accordance with the graph parameters and variable information from the Paradox 5.0 database. | It was known in the prior art systems to cause the display device to display pages with fixed information and selected variable information from the database, including variable image files representing preprocessed variable graphics information in accordance with specified graph parameters. '452 patent, col. 1, l. 23 to col. 3, l. 50. |

37

| Claim 2 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 2. The method of claim 1, wherein the step of causing the display device to display the pages with the selected variable graphics information from the database further comprises executing a graph file to generate a graph | Access 7.0 stores chart parameters in a graph object, which may be a Microsoft Graph 5.0 object. The graph information is passed to Microsoft Graph 5.0 to generate the graph. | Paradox 5.0 graph data is stored in a graph object embedded in the report template. The graph object is executed to generate the graph. | Admitted prior art inherently executed a graph file to generate a graph. |

| Claim 7 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 7. The method of claim 1, wherein the template page files are creating using QuarkXPress® | Access 7.0 includes template page files. | Paradox 5.0 includes template page files. | It was known in the prior art systems to use QuarkXPress to generate a template page file. |

| Claim 8 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 8. The method of claim 1, wherein the step of specifying the graph parameters comprises prompting a user to specify the graph type, scaling, labels and other graph parameters. | Access 7.0 includes prompts for the user to specify graph type, scaling, labels and other graph parameters. | Paradox 5.0 includes prompts for the user specify graph type, scaling, labels and other graph parameters. | Admitted prior art inherently prompts user to specify graph parameters. |

| Claim 9 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 9. The method of claim 8, further comprising the step of assigning a default value for each graph parameter that the user does not select. | Access 7.0 assigns default values to graph parameters. | Paradox 5.0 assigns default values to graph parameters. | Admitted prior art inherently assigns default values to graph parameters. |

38

| Claim 10 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 10. The method of claim 1, wherein the step of causing the display device to display the pages further comprises the steps of: | Access 7.0 causes the display device to display report pages in preview mode. | Paradox 5.0 causes the display device to display report pages in preview mode. | Prior art systems discloses causing the display device to display the pages. |
| determining if a page file contains an area selected for variable graphics information; and if a page file contains an area selected for variable graphics information, saving the specified graph parameters and selected fields from the database representing variable graphics information, and executing a graph file to generate a graph using the specified graph parameters and selected database fields. | Access 7.0 stores chart parameters in a graph object that defines the chart. The graph information is passed to an external program called Microsoft Graph 5.0 to generate the graph | Paradox 5.0 graph data is stored in a graph object embedded in the report template. The graph object is executed to generate the graph. | Admitted prior art inherently includes determining area of page for variable graphics information and saving corresponding parameters. |

| Claim 12 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 12. The method of claim 1, wherein the display device is a demand printer which prints the pages. | Access 7.0 allows a user to print reports including variable graphs | Paradox 5.0 allows a user to print reports including variable graphs. | It was known in the admitted prior art to use a demand printer which prints the pages. |

39

| Claim 14 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 14. The method of claim 1, wherein the variable graphics information is displayed as a bar chart and the step of causing the display device to display the pages with selected variable graphics information further comprises the steps of:<br><br>(i) generating a bar chart at the selected area on the page, wherein the chart includes a bar for each database field representing variable graphics information and each bar corresponds to a maximum value of the database entries representing variable graphics information; and<br><br>(ii) analyzing each database field representing variable graphics information and covering a portion of the bar corresponding to that field based on a comparison of the value of that field with the maximum value. | Access 7.0 charts in include bar chart types. | Paradox 5.0 graphs include bar graph types. | Admitted prior art discloses bar graphs as variable graphics information. |

Defendants also assert that each of the claims 1, 2, 7-10, 12 and 14 of the '452 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following references: (i) Access 7.0, (ii) Paradox 5.0, (iii) the Admitted Prior Art, (iv) the prior art of record cited in one or more the patents in suit, and/or (v) the prior art set forth in the list below. These references, alone or in combination, disclose systems and methods for developing a report template including fixed, variable and variable graphics information, generating a graph in accordance with stored data and graph parameters, and displaying the resulting pages.

40

In addition to the prior art of record in the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other prior art, to the invalidity of claims 1, 2, 7-10, 12 and 14 of the '452 patent under 35 U.S.C. §§ 102 and 103(a):

- U.S. Patent Nos. 4,723,209; 4,847,785; 4,852,019; 5,237,498; 5,245,535; 5,440,745; 5,937,708

- Japanese Patent Publication Nos. JP H08-44802; JP H08-115178; JP H09-16791; JP H08-171649

- Microsoft FoxPro Relational Database Management System for Windows, Versions 2.5 (1993) and 2.6 (1994)

- Microsoft FoxPro Relational Database System for Windows, Developer's Guide. Microsoft Corporation, 1993. K01097033-K01097584

- Holzgang, David A, *Understanding Postscript, For Postscript Levels 1 & 2*, 1992.

- Mueller, John & Wallace Wang, *OLE For Dummies*, 1995. K01096120-K01096483.

- Wickham-Jones, Tom, *Mathematica Graphics*, 1994.

- *Your "Un" Official Guide to using OLE Automation with Microsoft Office and Microsoft BackOffice*. Microsoft, 1995.

- Microsoft Office 95 Data Access Reference. Microsoft, 1995.

- IBM Graphical Data Display Manager (GDDM).

Defendants also assert that the claims of the '452 patent may be invalid under 35 U.S.C. § 112 for indefiniteness, lack of written description and/or lack of enablement, in that the claims require "causing" things to occur without adequate description or explanation. In addition, claim

41

7 may be invalid under 35 U.S.C. § 112 for being indefinite as to the scope and meaning of the trademarked term QuarkXPress®.

<u>**U.S. Patent No. 6,952,801**</u>

Defendants assert that claims 1, 3-5, 12, 13, 15-17, 24 & 25 of the '801 patent may each be invalid under 35 U.S.C. § 112, first or second paragraphs, on the ground that one or more of the following claim limitations recited in independent claim 1 is indefinite and/or that the specification does not enable, provide a written description of, or disclose the best mode for practicing one or more of the following claim limitations:

(C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book;

(D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number;

(E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number;

(F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information;

(G) producing the first and second books in a single press run.

In the event that the claims are ultimately found to be in compliance with 35 U.S.C. § 112, Defendants also assert that each of the asserted claims 1, 3-5, 12, 13, 15-17, 24 & 25 of

42

the '801 patent me be invalid under 35 U.S.C. § 102(b) and/or § 103(a) in view of at least the following prior art:

- The prior art of record cited in the patents in suit.

- Interpress, The Source Book (published 1988). Interpress is a page description language (PDL) developed by Xerox.

- U.S. Patent Nos. 4,498,150; 4,709,348; 5,136,316; 5,436,196; 5,442,732; 5,448,691; 5,495,561

- JP H06-180494

The claim charts, below, provide an exemplary illustration of how claims 1, 3-5, 12, 13, 15-17, 24 & 25 of the '801 patent may be anticipated and/or rendered obvious in view of one or more of U.S. Patent Nos. 5,390,354 (de Heus), 5,907,836 (Sumita), 5,346,196 (Nussbaum), 5,535,677 (Fannin) and 5,442,732 (Matysek). During the prosecution of the '801 patent before the United States Patent and Trademark Office, RRD argued that the pending claims were allowable over the prior art cited by the Examiner because, in part, none of the cited references "discloses or suggests the step of producing such first and second books in a single press run." The PTO, however, did not consider U.S. Patent No. 5,442,732 to Matysek, or other prior art, which discloses that it was known in the prior art to store multiple print jobs (e.g., first and second books), which are then sent to the printer as an individual print job.

43

| Claim 1 of the '801 Patent | Prior Art |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | *See, e g ,* de Heus. |
| (A) storing a first number of pages; | *See, e g ,* Sumita. <br><br> *See, e g.,* Matysek, cols. 1-2. |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14; <br><br> *See also* Sumita, Fig. 143. <br><br> *See also* Nussbaum, cols. 1-3. |
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. <br><br> *See also* Sumita, Fig. 143. <br><br> *See also* Nussbaum, cols. 1-3. |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

44

| (G) producing the first and second books in a single press run. | *See, e g ,* Fannin, cols. 1-2. |
| | *See, e g ,* Matysek, cols. 1-2. |

| Claim 3 of the '801 Patent | Prior Art |
| --- | --- |
| 3. The method of claim 1, further comprising the step of analyzing press commands directed to production of the first book to determine whether the page is to be assembled into the first book. | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 4 of the '801 Patent | Prior Art |
| --- | --- |
| 4. The method of claim 1, further comprising the step of generating a pagination file having data representative of the first set of pagination information. | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 5 of the '801 Patent | Prior Art |
| --- | --- |
| 5. The method of claim 1, further comprising the step of deriving a maximum number of pages for the first book based on the pagination information. | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 12 of the '801 Patent | Prior Art |
| --- | --- |
| 12. The method of claim 1, further comprising the step of delivering page description language instructions to an electronic press to print the first book. | *See, e g ,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 13 of the '801 Patent | Prior Art |
| --- | --- |
| 13. The method of claim 1, wherein the step of specifying the first set of pagination information comprises the step of providing a user interface for entry of the pagination information | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

45

| Claim 15 of the '801 Patent | Prior Art |
|---|---|
| 15. The method of claim 1, further comprising the step of analyzing press commands directed to production of the second book to determine whether the page is to be assembled into the second book. | *See, e g*, de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 16 of the '801 Patent | Prior Art |
|---|---|
| 16. The method of claim 1, further comprising the step of generating a pagination file having data representative of the second set of pagination information. | *See, e g*, de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 17 of the '801 Patent | Prior Art |
|---|---|
| 17. The method of claim 1, further comprising the step of deriving a maximum number of pages for the second book based on the pagination information. | *See, e g*, de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 24 of the '801 Patent | Prior Art |
|---|---|
| 24. The method of claim 1, further comprising the step of delivering page description language instructions to an electronic press to print the second book. | *See, e g*, de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 25 of the '801 Patent | Prior Art |
|---|---|
| 25. The method of claim 1, wherein the step of specifying the second set of pagination information comprises the step of providing a user interface for entry of the pagination information. | *See, e g*, de Heus, col. 3, l. 25 to col. 4, l. 14. |

Persons knowledgeable of these facts with respect to Defendants' response to Interrogatory No. 5 include Timothy Donahue, Pat McGrew, John Desautels, Paul Notredame, unknown individuals of Hewlett-Packard, and unknown individuals of Quark, Inc. The prior art, and documents describing the prior art, speak for themselves.

46

## INTERROGATORY NO. 6

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 51 of their Answer that "RRD's claim for damages accruing prior to the filing of the Complaint is barred, in whole or part, by the doctrine of laches," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 6

Subject to the foregoing general objections, Defendants respond by incorporating its response to Interrogatory Nos. 7, 8, 10, 11, and 14. Defendants further respond that the doctrine of laches precludes RRD from any alleged damages that may have been incurred due to Defendants' actions prior to the time that RRD filed and served its Complaint on January 17, 2006.


*REDACTED*


RRD thus delayed in bringing suit against Defendants by waiting over 4 years from the issuance of the '599 and '452 patents,

*REDACTED*                              to file suit.

During this period, RRD did, and continued to do, regular business with Defendants. At no point during this delay did RRD provide Defendants with any indication that it ever intended to file suit for patent infringement. Given the circumstances, RRD's delay was unreasonable and inexcusable.

RLF1-3138885-1

Due to RRD's delay in bringing suit, Defendants have suffered substantial prejudice. By way of example, due to RRD's delay, Defendants may be unable to present a full and fair defense on the merits because of the loss of records and other evidence, the inability to find material witnesses having knowledge of past events, the destruction of third-party documents, and the unreliability of memories of long past events. With respect to business prejudice, Defendants have continued to invest in and develop the accused software products during this delay period

Persons knowledgeable of these facts include, but are not limited to, William E. McCracken, Joseph Guiliano, Ronen Cohen, Gershon Alon, Ronny Fogel, James Katerberg, John Desautels, Roger Parrett, John Peck, William Scheinfurth, Venkat Purushotham, Nachum Shamir, and James Langley.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 7

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 52 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of equitable estoppel," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 7

Subject to the foregoing general objections, Defendants respond by incorporating its responses to Interrogatories Nos. 6, 8, 10, 11, and 14  Defendants further respond that RRD engaged in misleading conduct during both its business relationships with Defendants, and its participation in various standards-making bodies.

48

*REDACTED*

RRD thus delayed in bringing suit against Defendants by waiting over 4 years from the issuance of the '599 and '452 patents,                    *REDACTED*
to file suit. During this period, RRD did, and continued to do, regular business with Defendants. At no point during this delay did RRD provide Defendants with any indication that it ever intended to file suit for patent infringement. Given the circumstances, RRD's conduct was misleading.

Further, RRD engaged in misleading conduct while participating in the CGATS.20 standard-making process. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard." K00388563-K00388565. In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564. Moreover, at no time during the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants, or any other entities. RRD's filing of the Patent Holder Statement and subsequent silence regarding its litigation intentions during the CGATS.20 standards-making process was misleading.

49

RLF1-3138885-1

Defendants relied on RRD's misleading conduct when deciding to continue to invest in and develop the accused software products. Defendants now face material prejudice as a result of RRD's misleading conduct. In particular, due to RRD's misleading conduct, Defendants may be unable to present a full and fair defense on the merits because of the loss of records and other evidence, the inability to find material witnesses having knowledge of past events, the destruction of third-party documents, and the unreliability of memories of long past events. Defendants may also experience material economic prejudice, as a result of Defendants' continuing investment in and development of the accused software products.

Persons knowledgeable of these facts include, but are not limited to, William E. McCracken, Joseph Guiliano, Riyaz Asaria, Mary Abbott, Timothy Donahue, Ronen Cohen, Gershon Alon, Ronny Fogel, James Katerberg, John Desautels, Roger Parrett, John Peck, William Scheinfurth, Venkat Purushotham, Nachum Shamir, and James Langley.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 8

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 53 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of waiver," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 8

Subject to the foregoing general objections, Defendants respond by incorporating by reference its response to Interrogatories Nos. 6-7, 10, 11, and 14.

RRD voluntarily and intentionally relinquished its rights against Defendants with respect to the patents in suit, when it failed to pursue litigation against Defendants for more than 4 years

50

after the issuance of the '599 and '452 patents.

*REDACTED*

. During this period, RRD did, and continued to do, regular business with Defendants. RRD's silence and inaction constituted a waiver of any allegations of infringement of the patents in suit.

RRD also waived its right to pursue claims of infringement of the patents in suit against Defendants by virtue of its participation on the CGATS.20 standard-making committee. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard." K00388563-K00388565. In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564. Moreover, at no time in the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants or any other entities. Therefore, RRD has waived the right to seek more than a license under reasonable terms and conditions for the patents in suit.

Finally, RRD has waived its right to pursue patent infringement claims against Defendants by virtue of agreements signed by RRD with Scitex.

*REDACTED*

51

*REDACTED*

Scitex was

subsequently acquired by Versamark, which was then acquired itself by Kodak;

*REDACTED*

Persons knowledgeable of these facts include, but are not limited to, Riyaz Asaria, Paul

Lovern, Jim Gibson, Chloma Jarrett, Michael Spaul, William E. McCracken, Timothy Donahue,

Mary Abbott, Ronen Cohen, Gershon Alon, and Ronny Fogel.

Defendants reserve the right to supplement their response to this interrogatory at

appropriate times in this litigation.

### INTERROGATORY NO. 9

State in detail all factual and legal bases for Defendants' allegations set forth in paragraph 54 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of prosecution laches," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

### RESPONSE TO INTERROGATORY NO. 9

Defendants object that this interrogatory is overly broad and unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing

general and specific objections, Defendants respond that at least claims of the '599 patent, '940

patent and '801 patent are barred by the doctrine of prosecution laches.

52

RLF1-3138885-1

In the prosecution of the '599 patent, a Notice of Allowability issued on May 12, 1998, but RRD delayed the issuance of the allowed claims for over three and a half years by withdrawing the patent application from issue and filing successive Continued Prosecution Applications. *See* RRD004598-RRD004815. The delay was unreasonable and inexcusable, and Defendants will experience material economic prejudice as a result of its continued investment in and development of the Kodak Software during the period of delay without knowledge of RRD's intention to patent the subject matter of the '599 patent claims.

Regarding the '940 patent and '801 patent, RRD filed the earliest application to which these patents in suit claim on their face priority on June 7, 1995. The application that led to the issuance of the '801 patent was filed almost six years later; the application that led to the issuance of the '940 patent was filed 8 1/2 years later. RRD's delay in prosecuting these applications is unreasonable and unexplained and Defendants will experience material economic prejudice as a result of its continued investment in and development of the Kodak Software during the period of delay without knowledge of RRD's intention to patent the subject matter of the '940 and '801 patent claims.

Persons knowledgeable of these facts include, but are not limited to, the named inventors of the patents in suit, persons involved in the prosecution of the patents in suit, Ronen Cohen, Ron Peleg, Nardi Jaacobi, Gershon Alon, Roger Parrett, John Desautels, William Schweinfurth, John Peck, and William Sullivan.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation

53

**INTERROGATORY NO. 10**

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 55 of their Answer that "RRD's claims are barred, in whole or part, by the doctrines of license and/or implied license," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

**RESPONSE TO INTERROGATORY NO. 10**

Subject to the foregoing general objections, Defendants incorporate by reference its response to Interrogatory Nos. 6, 7, 8, 11, and 14. Defendants respond that there are two methods by which RRD has effected an implied license to Defendants.

First, RRD has granted Defendants an implied license to the patents in suit through equitable estoppel. The Kodak Software was developed to be compatible with the CGATS.20 standard. As further detailed in Defendants' responses to Interrogatory No. 7, RRD disclosed the existence of the patents in suit and/or their applications in RRD's "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard" to CGATS.20. K00388563-K00388565. In the statement, RRD represented that it would provide a license to the patents in suit "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564.

***REDACTED***

Having relied on RRD's conduct, Defendants will be materially prejudiced by its continued investment in and development of the accused software products if RRD is allowed to proceed with its infringement claims.

Second, an implied license arose from the course of conduct between RRD and Defendants. RRD has used and had access to various technologies produced by Defendants,

54

including those of Scitex.  Scitex was purchased by Versamark and has since been acquired by

Kodak.

***REDACTED***

The reasonable expectations of the parties and the

dictates of fairness and equity support an implied license when RRD and its assigns acquiesced

in the development of this variable data software.

Persons knowledgeable of these facts include, but are not limited to, Ronen Cohen,

Gershon Alon, Ronny Fogel, Timothy Donahue, Paul Lovern, Jim Gibson, Chloma Jarrett,

Michael Spaul, Riyaz Asaria, Mary Abbott, and unknown representative(s) of RRD.

Defendants reserve the right to supplement their response to this interrogatory at

appropriate times in this litigation.

## INTERROGATORY NO. 11

State in detail all factual and legal bases for Defendants' allegations set forth in
Paragraph 56 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of
unclean hands," including, but not limited to, the identification of all documents and
communications on which Defendants rely to support their contention and the identity of the
persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 11

Subject to the foregoing general objections, Defendants incorporate by reference its

response to Interrogatory Nos. 6, 7, 8, 10, and 14.

RRD engaged in unconscionable and inequitable conduct during the prosecution of the

patents in suit.  Specifically, RRD deceived the Patent and Trademark Office ("PTO"), by

55

withholding material prior art references and other information known to RRD. By way of example, such withheld material includes the over 50 prior art references that were not disclosed by RRD to the PTO during the prosecution of the '599 patent, but were subsequently identified during the prosecution of the '452 patent. Moreover, RRD failed to disclose material information known to RRD regarding commercial activities and other disclosures of Barco Graphics and Xeikon that occurred prior to the filing dates of the patents in suit. Further, RRD intentionally deceived the PTO by "burying" material references during the prosecution of the patents in suit, and by submitting only selected excerpts of cited references while withholding from the PTO non-cumulative material information disclosed elsewhere in the cited references.

RRD is also engaged in unconscionable and inequitable conduct in light of its participation on the CGATS.20 standard-making committee. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard." K00388563-K00388565. In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564. Moreover, at no time in the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants or any other entities. Therefore, it is inequitable and unconscionable for RRD to now seek more than a license under reasonable terms and conditions for the patents in suit.

By engaging in such unconscionable and inequitable conduct, RRD claims are barred by the doctrine of unclean hands.

56

Persons knowledgeable of these facts include, but are not limited to, persons involved in the prosecution of the patents in suit, Ronen Cohen, Gershon Alon, Ronny Fogel, Charles Cornelius, Paul Notredame, Rob Haak, Karel Tavernier, Grant Miller, Stefaan De Smedt, Francois Kremer, Brian L. Michaelis, Yves Vanhauwaert, Mary Lee Schneider, Ronnie Sarkar, Stella Shaw, Jim Turner, Barb Schetter, Jack Oberhill, Daryl P. Jones, Timothy Donahue, Riyaz Asaria, and Mary Abbott.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 12

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 57 of their Answer that "RRD's alleged damages are barred or limited, in whole or part, by 35 U.S.C. §§ 286 and/or 287," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 12

Defendants object that this interrogatory is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to this interrogatory as premature to the extent that discovery remains ongoing. Further, it is premature at this time, given that Defendants' rebuttal expert report including its damages analysis is not due under the Court's Rule 16 Scheduling Order until November 6, 2007. Subject to the foregoing general and specific objections, Defendants respond that RRD has failed to mark products and/or services as required by 35 U.S.C. § 287. Moreover, RRD has failed to provide actual notice to the extent it has failed to charge infringement of specific patents in suit against a specific Kodak accused product and/or service. In particular, RRD has failed to provide any actual notice of any product except for the Amended Complaint's references to "Kodak

57

Software," which is defined as including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer," and "Digital Presses," which are defined as including "the NexPress 2100 Plus Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300, CS 340, CS400, and CS600." With respect to 35 U.S.C. § 286, RRD is barred from recovering any damages resulting from any infringement committed more than six years prior to the filing of the Complaint on January 17, 2006.

Persons knowledgeable of these facts include, but are not limited to, unknown representative(s) of RRD.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 13

Identify and quantify all revenue and profit on a monthly, quarterly, and annual basis derived or earned by defendants, broken down by product, in connection with each of the Defendants' Software Products and Defendants' Hardware Products (beginning with the first receipt by Defendants of any such revenue) and explain how Defendants derive that revenue and profit, either directly or indirectly.

## RESPONSE TO INTERROGATORY NO. 13

Defendants object that this interrogatory is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. In particular, Defendants object to the interrogatory to the extent it seeks revenue and profit "beginning with the first receipt by Defendants of any such revenue." Such "first receipt" predates any notice (if any) provided by RRD and/or the issue dates of the patents in suit. Defendants also object that this interrogatory is overly broad and unduly burdensome and not relevant to the claim or defense of

58

any party or the subject matter of the action. In particular, Defendants object to the interrogatory as seeking information defined by the "Defendants' Software Products" and "Defendants' Hardware Products." The Amended Complaint only references "Kodak Software," which is defined as including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer," and "Digital Presses," which are defined as including "the NexPress 2100 Plus Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300, CS 340, CS400, and CS600." Subject to the foregoing general and specific objections, Defendants will respond to this interrogatory by producing business records with financial data as early as March 2001, to the extent the financial data exists, for "Kodak Software" and "Digital Presses," as those terms are defined in the Amended Complaint. Defendants will also produce summaries of financial information, to the extent it exists. To date, Defendants have produced the following documents responsive to this interrogatory:

> K00001484-K00001484, K00003328-K00003344, K00005108-K00005109,
> K00006655-K00006664, K00012563-K00012658, K00015737-K00015740,
> K00015882-K00015883, K00015946-K00015949, K00015950-K00015953,
> K00017845-K00017869, K00018364-K00018365, K00019098-K00019099,
> K00019100-K00019101, K00019556-K00019564, K00019565-K00019575,
> K00022203-K00022208, K00022272-K00022288, K00022479-K00022479,
> K00022926-K00022927, K00025360-K00025360, K00025747-K00025749,
> K00026103-K00026104, K00026109-K00026110, K00026356-K00026356,
> K00029598-K00029598, K00029599-K00029600, K00029601-K00029601,
> K00029639-K00029640, K00029715-K00029715, K00030453-K00030455,
> K00030478-K00030479, K00030480-K00030481, K00035544-K00035544,
> K00035589-K00035589, K00035606-K00035607, K00036240-K00036241,
> K00036832-K00036832, K00036835-K00036835, K00037697-K00037713,
> K00037714-K00037727, K00037728-K00037741, K00037933-K00037941,
> K00037942-K00037952, K00038552-K00038567, K00038927-K00038927,
> K00039645-K00039645, K00039668-K00039669, K00039996-K00039996,

59

K00042629-K00042663, K00042664-K00042664, K00046065-K00046065,
K00046515-K00046518, K00046519-K00046522, K00046557-K00046558,
K00046564-K00046565, K00046566-K00046565, K00046610-K00046615,
K00047051-K00047055, K00047096-K00047100, K00047132-K00047136,
K00048486-K00048496, K00048497-K00048507, K00048754-K00048766,
K00048788-K00048788, K00049239-K00049243, K00049244-K00049252,
K00049253-K00049263, K00049287-K00049291, K00049292-K00049296,
K00049315-K00049335, K00049372-K00049393, K00049394-K00049394,
K00050160-K00050165, K00050196-K00050201, K00050332-K00050363,
K00050364-K00050370, K00050969-K00050971, K00050972-K00050973,
K00051160-K00051173, K00051867-K00051867, K00051910-K00051918,
K00051919-K00051925, K00052008-K00052018, K00053562-K00053572,
K00053629-K00053635, K00054282-K00054504, K00056739-K00056744,
K00058365-K00058367, K00058443-K00058447, K00058448-K00058453,
K00061286-K00061304, K00061305-K00061341, K00062219-K00062251,
K00064613-K00064624, K00066093-K00066118, K00066119-K00066131,
K00066132-K00066157, K00066158-K00066179, K00066180-K00066207,
K00066208-K00066234, K00066235-K00066261, K00066262-K00066287,
K00066288-K00066300, K00068366-K00068368, K00068369-K00068371,
K00069475-K00069696, K00069697-K00069925, K00070277-K00070420,
K00070421-K00070499, K00071477-K00071822, K00073008-K00073082,
K00073310-K00073387, K00073565-K00073748, K00074419-K00074491,
K00074492-K00074577, K00075089-K00075093, K00076595-K00076596,
K00076597-K00076600, K00078622-K00078691, K00078745-K00078746,
K00078747-K00078748, K00082420-K00082464, K00082713-K00082737,
K00083027-K00083082, K00083111-K00083123, K00084233-K00084318,
K00085489-K00085494, K00085518-K00085534, K00086267-K00086271,
K00087549-K00087554, K00088084-K00088123, K00088124-K00088158,
K00090230-K00090250, K00090929-K00090936, K00093677-K00093690,
K00127004-K00127012, K00127013-K00127023, K00127077-K00127077,
K00140943-K00140943, K00153430-K00153430, K00153431-K00153431,
K00153432-K00153433, K00154784-K00154788, K00154789-K00154793,
K00154846-K00154847, K00154916-K00154918, K00154919-K00154921,
K00154950-K00154950, K00154966-K00154972, K00155091-K00155092,
K00155093-K00155117, K00155118-K00155152, K00155176-K00155177,
K00155195-K00155196, K00155201-K00155207, K00155208-K00155214,
K00155215-K00155215, K00155216-K00155218, K00155219-K00155219,
K00155220-K00155220, K00155221-K00155279, K00155283-K00155296,
K00155297-K00155297, K00155298-K00155298, K00155299-K00155310,
K00155311-K00155312, K00155313-K00155336, K00155337-K00155367,
K00155368-K00155378, K00155379-K00155389, K00155427-K00155460,
K00155477-K00155478, K00155479-K00155479, K00155480-K00155480,
K00155481-K00155489, K00155544-K00155551, K00155564-K00155565,
K00155636-K00155654, K00155771-K00155779, K00156024-K00156031,
K00156173-K00156174, K00156191-K00156225, K00156376-K00156448,
K00156755-K00156810, K00157592-K00157624, K00157657-K00157672,

60

K00158100-K00158121, K00169460-K00169532, K00169626-K00169647,
K00170948-K00171023, K00176673-K00176697, K00176698-K00176722,
K00176723-K00176747, K00176748-K00176760, K00176761-K00176785,
K00176786-K00176810, K00176819-K00176843, K00176844-K00176868,
K00194119-K00194132, K00194397-K00194397, K00195415-K00195415,
K00195716-K00195717, K00196779-K00196783, K00199371-K00199374,
K00202010-K00202010, K00202981-K00202981, K00203567-K00203577,
K00203578-K00203588, K00208168-K00208176, K00208177-K00208187,
K00213644-K00213648, K00215973-K00216048, K00231063-K00231063,
K00231073-K00231073, K00231089-K00231089, K00231093-K00231093,
K00276267-K00276267, K00285606-K00285646, K00285655-K00285664,
K00285665-K00285705, K00285940-K00285980, K00332715-K00332716,
K00333703-K00333704, K00333883-K00333883, K00335356-K00335360,
K00336946-K00336947, K00336958-K00336959, K00340223-K00340223,
K00340632-K00340632, K00344628-K00344644, K00344653-K00344669,
K00352212-K00352213, K00353387-K00353395, K00353396-K00353404,
K00353794-K00353804, K00354615-K00354619, K00355572-K00355576,
K00355998-K00355998, K00356039-K00356043, K00356258-K00356266,
K00356448-K00356452, K00357134-K00357138, K00359610-K00359626,
K00361061-K00361071, K00361072-K00361080, K00361137-K00361141,
K00363895-K00363896, K00366300-K00366340, K00371203-K00371218,
K00374725-K00374733, K00374734-K00374744, K00416831-K00416831,
K00418111-K00418111, K00419250-K00419257, K00419289-K00419363,
K00419384-K00419457, K00420476-K00420487, K00420693-K00420693,
K00421067-K00421140, K00425078-K00425085, K00455482-K00455482,
K00458961-K00458985, K00458986-K00459010, K00459011-K00459035,
K00459036-K00459048, K00459049-K00459073, K00459074-K00459098,
K00459107-K00459131, K00459132-K00459156, K00459653-K00459666,
K00459667-K00459680, K00459681-K00459694, K00459695-K00459708,
K00460015-K00460025, K00460026-K00460036, K00460037-K00460047,
K00460280-K00460290, K00465902-K00465909, K00466516-K00466520,
K00469079-K00469090, K00469114-K00469125, K00469130-K00469141,
K00469142-K00469153, K00469487-K00469498, K00469948-K00469959,
K00471562-K00471577, K00473662-K00473673, K00474450-K00474463,
K00474464-K00474477, K00475165-K00475175, K00475176-K00475186,
K00475651-K00475666, K00477736-K00477747, K00483967-K00483974,
K00483975-K00483986, K00484314-K00484325, K00484503-K00484510,
K00485078-K00485082, K00490539-K00490609, K00491064-K00491103,
K00491104-K00491143, K00491144-K00491217, K00491259-K00491266,
K00493983-K00493990, K00494852-K00494868, K00495505-K00495511,
K00503221-K00503231, K00503232-K00503242, K00504903-K00504918,
K00526068-K00526089, K00555535-K00555537, K00595173-K00595192,
K00612305-K00612365, K00616038-K00616038, K00684340-K00684340,
K00707179-K00707239, K00709869-K00709870, K00709881-K00709881,
K00717759-K00717759, K00717760-K00717760, K00717763-K00717765,
K00753081-K00753100, K00788946-K00788946, K00815693-K00817167,

61

RLF1-3138885-1

K00887843-K00887846, K00888261-K00888264, K00888265-K00888268,
K00888278-K00888281, K00888374-K00888376, K00888377-K00888379,
K00921810-K00921812, K00921834-K00921834, K00921838-K00921838,
K00921866-K00921868, K00921869-K00921871, K00924744-K00924746,
K00961495-K00961501, K00986846-K00986856, K00987256-K00987294,
K00987723-K00987725, K00990028-K00990040, K01004918-K01004929,
K01004931-K01004942, K01005465-K01005465, K01005466-K01005471,
K01005472-K01005472, K01005473-K01005478, K01009205-K01009205,
K01009206-K01009206, K01009208-K01009208, K01019983-K01019983,
K01083220-K01083221, K01084559-K01084560, K01094655-K01094665.

Persons knowledgeable of these facts include, but are not limited to, Gershon Alon, Ronen Cohen, Benny Shimshoni, Eli Shalhon, Chris O'Connor, Roger Parrett, John Desautels, John Peck, William Schweinfurth, and David Beck.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

As to objections only,

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Gregory E. Stuhlman (#4765)
stuhlman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
*Attorneys for Defendants Creo, Inc.,
NexPress Solutions, Inc., Kodak
VersaMark, Inc., Eastman Kodak
Company, and Kodak Graphic
Communications Company*

OF COUNSEL:
Richard McMillan, Jr.
rmcmillan@crowell.com
Jeffrey D. Sanok
jsanok@crowell.com
Brian M. Koide
bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Dated: April 13, 2007

62

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2007, I served the foregoing on counsel as follows:

**BY HAND AND ELECTRONIC MAIL**

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

| | | |
|---|---|---|
| Douglas I. Lewis | John G. Hutchinson | Jamie L. Secord |
| SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP |
| One South Dearborn Street | 787 Seventh Avenue | One South Dearborn Street |
| Chicago, IL 60603 | New York, NY 10019 | Chicago, IL 60603 |
| (312) 853-4169 | (212)839-5398 | (312) 853-2206 |
| dilewis@sidley.com | jhutchinson@sidley.com | jsecord@sidley.com |

Gregory E. Stuhlman(#4765)
stuhlman@rlf.com

RLF1-3138885-1

# EXHIBIT C

Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY,<br><br>      Plaintiff,<br><br>      v.<br><br>CREO, INC., NEXPRESS SOLUTIONS,<br>INC., KODAK VERSAMARK, INC.,<br>EASTMAN KODAK COMPANY, and<br>KODAK GRAPHIC COMMUNICATIONS<br>COMPANY,<br><br>      Defendants. | C. A. No. 06-032-JJF |
| EASTMAN KODAK COMPANY,<br><br>      Counterclaim-Plaintiffs,<br><br>      v.<br><br>R.R. DONNELLEY & SONS COMPANY,<br><br>      Counterclaim-Defendants, | |

CREO, INC.'S, NEXPRESS SOLUTIONS, INC.'S, KODAK VERSAMARK, INC.'S,
EASTMAN KODAK COMPANY'S, AND KODAK GRAPHIC COMMUNICATIONS
COMPANY'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
AND THINGS TO R.R. DONNELLEY & SONS COMPANY (NOS. 50-67)

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Creo, Inc., NexPress

Solutions, Inc., Kodak Versamark, Inc., Eastman Kodak Company, and Kodak Graphic

Communications Company ("Defendants") direct the following second set of requests that R.R.

Donnelley & Sons Company ("RRD") produce for inspection and copying documents and things

within RRD's possession, custody or control that are responsive to the requests set forth below at

the law office of Crowell & Moring LLP, 1001 Pennsylvania Ave., N.W., Washington, DC 20004-2595 within thirty (30) days of service.

## DEFINITIONS AND INSTRUCTIONS

Defendants incorporate herein by reference the Definitions and Instructions of Creo, Inc.'s, Eastman Kodak Company's, and Kodak Graphic Communications Company's First Set of Requests for Production of Documents and Things to R.R. Donnelley & Sons Company. In addition, the following definitions and instructions shall apply:

Y.    "Accused Software Product" means any apparatus, product, device, process, method, act, or other instrumentality produced, designed, manufactured, or sold by Defendants and identified by RRD in response to Interrogatory No. 1 in the Defendants' First Set of Interrogatories.

Z.    "Barco-Xeikon Entity" means Barco Graphics N.V. and/or Xeikon N.V., and includes all parent, subsidiary, sister, predecessor, or successor companies, corporations of either entity, partnerships, or other business entities of either entity, and the officers, directors, agents, employees, partners, and all other persons acting or purporting to act on behalf of or who are subject to the direction or control of any of the foregoing.

AA.    "Barco-Xeikon Components" means all versions of the following, either individually and/or in some combination:  (i) the Barco PrintStreamer electronic collation system; (ii) the Barco FastRIP image processor; (iii) the Barco FastRIP/X image processor; and (iv) the Xeikon DCP-1 digital press.

BB.    "Barco Suit" means *R.R. Donnelley & Sons, Co. v. Barco NV and Barco Graphics, Inc.*, No. 00-CV-03708 (N.D. Ill. filed June 19, 2000).

-2-

CC.   "Covered Lines of Business" means any activity, apparatus, process, product, device, method, act, technology, platform, solution, or service that RRD alleges, believes, or otherwise considers to fall within the scope of the subject matter claimed by any of the Patents in Suit, including any activity identified by RRD in response to Interrogatory Nos. 21 or 22.

DD.   "Kodak  Entity"  means  Eastman  Kodak  Company,  Kodak  Graphics Communications Company, Creo, Inc., Nexpress Solutions, Inc., Kodak Versamark, Inc., or Scitex Digital Printing, Inc., or any of their predecessors or successors in interest.

EE.   "Tesseron Suit" means *Tesseron Ltd  V  R.R. Donnelley & Sons Company*, Civil No. 1:06-cv-02909-CAB (N.D. Ohio filed Dec. 4, 2006).

## REQUESTS FOR PRODUCTION

50.   All documents regarding the settlement, resolution, or conclusion of the Barco Suit.

51.   All communications between any Barco-Xeikon Entity and RRD, including any communication received by or sent from counsel for any Barco-Xeikon Entity or RRD, regarding the inventorship, validity, invalidity, enforceability, unenforceability, ownership, conception, or reduction to practice of the Patents in Suit and/or U.S. Patent No. 5,963,968, and all documents that reference, discuss, consider, analyze, investigate, or examine any such communication.

52.   All draft or final agreements between RRD and any Barco-Xeikon Entity concerning (a) any Barco-Xeikon Component, (b) the Patents in Suit, or (c) the Barco Suit, including but not limited to all draft or final agreements identified by RRD when responding to Interrogatory No. 11 in the Defendants' Second Set of Interrogatories.

53. All strategic, business, competitive, or marketing plans, reports, studies, summaries, analyses, or presentations which discuss, analyze, address, or mention any Covered Lines of Business for which RRD is claiming lost profits.

54. Documents that summarize, memorialize, describe, outline, or define RRD's patent licensing practices, policies, and procedures, whether formal or informal, including documents identified by RRD when responding to Interrogatory No. 11 in the Defendants' Second Set of Interrogatories.

55. Documents most closely and accurately showing RRD's revenues, costs, and profits on a monthly, quarterly, and annual basis generated by or resulting from any Covered Lines of Business since 2000.

56. All draft or final agreements, and any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related to such agreements, between (i) RRD and (ii) any Kodak Entity regarding the use of any of the following software products: Begin, Composer, Darwin, DijiComp, DL-100, DL-1000, FormsMerge, FusionPro, KEEPs, or Mailscape.

57. All plans, reports, studies, summaries, analyses, or presentations discussing, considering, or reporting the prices charged by RRD, or any factors affecting the determination of the prices charged, for any Covered Lines of Business.

58. For each calendar year from 2000 to present, documents most closely and accurately showing both (i) the number of print jobs, orders or contracts processed, serviced or completed by RRD in any Covered Lines of Business (including, if available, both the total number of pages printed and the total number of orders, contracts or jobs processed or completed), and (ii) the total number of all print jobs, orders, or contracts processed, serviced or

-4-

completed by RRD on digital presses (including, if available, both the total number of pages printed and the total number of orders, contracts or jobs processed, serviced or completed).

59. All documents demonstrating, discussing, summarizing, analyzing, reporting, or referring to any competition for all Covered Lines of Business, including but not limited to lost jobs, contracts, or revenue.

60. All documents that RRD considers, analyzes, examines, or investigates as prior art, or that RRD alleges to be prior art to any of the patents in suit in the Tesseron Suit, including all documents that refer to any such consideration, analysis, examination, investigation, or allegation.

61. All documents that are alleged by any party to support or refute, in whole or part, Tesseron's claim for damages in the Tesseron Suit.

62. All documents and things related to any communication between RRD and any Kodak Entity regarding the Patents in Suit.

63. All documents and things that indicate or refer to RRD's earliest knowledge of any Accused Software Product.

64. All documents and things that indicate or refer to RRD's earliest knowledge of the operation of any Accused Software Product.

65. All documents and things concerning RRD providing actual notice of the Patents in Suit to any Kodak Entity.

66. All documents discussing, describing, estimating, analyzing, computing, or otherwise reporting the value or estimated value of the Patents in Suit.

67. All documents and things that refer to the subject matter of, or the identification of which is sought by, the Defendants' Second Set of Interrogatories (Nos. 11-20), or Third Set

- 5 -

of Interrogatories (Nos. 21-23), including without limitation all documents identified or referred

to in RRD's responses thereto, and all documents that RRD consulted or upon which RRD

relied, in framing, compiling or preparing its responses.

OF COUNSEL:

Richard McMillan, Jr.                          Frederick L. Cottrell, III (#2555)
rmcmillan@crowell.com                          cottrell@rlf.com
Jeffrey D. Sanok                               Gregory E. Stuhlman (#4765)
jsanok@crowell.com                             stuhlman@rlf.com
Brian M. Koide                                 Richards, Layton & Finger, P.A.
bkoide@crowell.com                             One Rodney Square
Crowell & Moring, LLP                          920 North King Street
1001 Pennsylvania Avenue, N.W.                 Wilmington, Delaware 19801
Washington, DC 20004-2595                      (302) 651-7700
(202) 624-2500                                 *Attorneys for Defendants*

Dated: May 1, 2007

- 6 -

RLF1-3145381-1

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2007, I served the foregoing on counsel as follows:

### BY HAND AND ELECTRONIC MAIL

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

### VIA FEDERAL EXPRESS AND ELECTRONIC MAIL

| | | |
|---|---|---|
| Douglas I. Lewis | John G. Hutchinson | Jamie L. Secord |
| SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP |
| One South Dearborn Street | 787 Seventh Avenue | One South Dearborn Street |
| Chicago, IL 60603 | New York, NY 10019 | Chicago, IL 60603 |
| (312) 853-4169 | (212)839-5398 | (312) 853-2206 |

Gregory E. Stuhlman(#4765)
stuhlman@rlf.com

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 06-032-JJF |
| ) | |
| CREO, INC., NEXPRESS SOLUTIONS, ) | |
| INC., KODAK VERSAMARK, INC.'S, ) | |
| EASTMAN KODAK COMPANY, and ) | |
| KODAK GRAPHIC COMMUNICATIONS ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| EASTMAN KODAK COMPANY, ) | |
| ) | |
| Counterclaim-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| R.R. DONNELLEY & SONS COMPANY, ) | |
| ) | |
| Counterclaim-Defendant. ) | |
| ) | |
| ) | |
| ) | |

**R.R. DONNELLEY & SONS COMPANY'S RESPONSES TO DEFENDANTS
CREO, INC.'S, NEXPRESS SOLUTIONS, INC.'S, KODAK VERSAMARK, INC.'S,
EASTMAN KODAK COMPANY'S, AND KODAK GRAPHIC COMMUNICATIONS
COMPANY'S SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS AND THINGS (NOS. 50-67)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

R.R. Donnelley & Sons Company ("R.R. Donnelley") hereby responds to Defendants Creo,

Inc.'s, Nexpress Solutions, Inc.'s, Kodak Versamark, Inc.'s, Eastman Kodak Company's, and

Kodak Graphic Communications Company's (collectively, "Defendants") Second Set of Requests for Production of Documents and Things as follows:

## GENERAL OBJECTIONS

Each of R.R. Donnelley's responses to Defendants' Second Set of Requests for the Production of Documents and Things is subject to, and incorporates, the following General Objections. R.R. Donnelley incorporates each of these General Objections into its specific responses to each of Defendants' Requests, whether or not each such General Objection is expressly referred to in a specific response. R.R. Donnelley's responses are made without waiving any applicable Specific or General objections to a Request.

1.    R.R. Donnelley incorporates by reference the General Objections set forth in its responses to Defendants' First Set of Requests for Production of Documents and Things Directed to Plaintiff.

2.    R.R. Donnelley objects to the Requests, including the Definitions and Instructions therein, on the ground and to the extent that they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, or any other applicable law. R.R. Donnelley will construe and respond to the Requests only in a manner consistent with the Federal Rules of Civil Procedure, the Local Rules, and other applicable law.

3.    R.R. Donnelley objects to the Requests on the ground and to the extent that they purport to seek discovery of documents or things protected from disclosure by a privilege or immunity, including without limitation the attorney-client privilege, the work-product doctrine, and the Federal Rules of Civil Procedure. R.R. Donnelley hereby asserts all such applicable privileges and protections, and excludes privileged and protected documents or

2

things. Any disclosure of such privileged or protected documents or things is inadvertent and is not intended to waive those privileges or protections.

      4.    R.R. Donnelley objects to the Requests to the extent they seek documents or things that R.R. Donnelley is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

      5.    R.R. Donnelley objects to the Requests to the extent that they seek to compel R.R. Donnelley to generate or create documents or things that do not exist, are not used, or are not generated by R.R. Donnelley in the ordinary course of business.

      6.    R.R. Donnelley objects to the Requests to the extent that they seek discovery of documents or things about ongoing research and development activities of R.R. Donnelley that have not yet been commercialized.

      7.    R.R. Donnelley objects to the Requests to the extent they seek documents or things that are publicly available, are as readily available to Kodak as they are to R.R. Donnelley, or are already in Kodak's possession, custody, or control.

      8.    R.R. Donnelley objects to the Requests as vague, ambiguous, and overly broad in scope to the extent the Requests contain no time limitations.

      9.    R.R. Donnelley objects to the Requests as vague, ambiguous, unduly burdensome, overly broad in scope, not relevant to the claims or defenses of the parties in this action and not reasonably calculated to lead to the discovery of admissible evidence.

      10.    R.R. Donnelley's discovery and investigation of the facts relevant to the subject matter of this action are ongoing. R.R. Donnelley's responses are based upon documents or things presently available to and located by R.R. Donnelley and their attorneys, and are without prejudice to R.R. Donnelley's right to produce evidence of any additional facts.

3

Accordingly, R.R. Donnelley reserves the right to supplement and/or amend these responses when its discovery and investigations are complete.

11.     R.R. Donnelley expressly reserves the right to supplement these responses under Fed. R. Civ. P. 26(e)(2) as necessary when discovery has further progressed.

12.     R.R. Donnelley objects to Defendants' Definition A as vague and overly broad to the extent that it includes any corporation, business, or entity other than the named R.R. Donnelley in this action.

13.     R.R. Donnelley objects to Defendants' Instruction P as unduly burdensome and oppressive to the extent it seeks to impose any requirement or obligation on R.R. Donnelley beyond the requirements set forth in the Federal Rules of Civil Procedure, the Local Rules, or this Court's Scheduling Order in this action.

14.     R.R. Donnelley objects to Defendants' Definition Z as vague and overly broad to the extent that it includes any corporation, business, or entity other than Barco Graphics N.V. and Xeikon N.V.

15.     R.R. Donnelley objects to Defendants' Definition CC as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence. In particular, R.R. Donnelley objects to Defendants' Definition CC insofar as it incorporates Defendants' Interrogatory Nos. 21-22, which seek information related to lost profits. As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits. R.R. Donnelley further objects to Defendants' Definition CC as overly broad, unduly burdensome, and seeking information that is not relevant to the

4

claims or defenses of the Parties in this action or the subject matter of this action and not

reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks

information regarding "*any activity, apparatus, process, product, device, method, act,*

*technology, platform, solution, or service*" that falls within the claims of the Patents in Suit.

R.R. Donnelley will define "Covered Lines of Business" to mean only R.R. Donnelley's

activities, apparatuses, processes, products, devices, methods, acts, technologies, platforms,

solutions, or services that fall within the claims of the Patents in Suit.

       16.     R.R. Donnelley objects to Defendants' Definition DD as vague and overly

broad to the extent that it includes any corporation, business, or entity other than the named

Defendants in this action.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION 50

       All documents regarding the settlement, resolution, or conclusion of the Barco

Suit.

### RESPONSE TO REQUEST NO. 50:

       R.R. Donnelley hereby incorporates by reference the foregoing General

Objections and Objections to Definitions and Instructions as though fully set forth herein.

R.R. Donnelley objects to this Request as seeking information that is neither relevant to the

claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery

of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly

burdensome insofar as it seeks "*all documents* regarding the settlement, resolution, or conclusion

of the Barco Suit." R.R. Donnelley also objects to this Request as overly broad and unduly

burdensome because there is no reasonable time frame limitation. R.R. Donnelley further

objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to show the settlement, resolution, or conclusion of the Barco Suit to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

## REQUEST FOR PRODUCTION 51

All communications between any Barco-Xeikon Entity and RRD, including any communication received by or sent from counsel for any Barco-Xeikon Entity or RRD, regarding the inventorship, validity, invalidity, enforceability, unenforceability, ownership, conception, or reduction to practice of the Patents in Suit and/or U.S. Patent No. 5,963,968, and all documents that reference, discuss, consider, analyze, investigate, or examine any such communication.

## RESPONSE TO REQUEST NO. 51:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*all communications* between any Barco-Xeikon Entity and RRD," regardless of the subject matter or time period of such communications. R.R. Donnelley also objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged communications between R.R. Donnelley and Barco Graphics N.V. or Xeikon N.V. regarding the inventorship, validity, alleged invalidity, enforceability, alleged unenforceability, ownership, conception, or reduction to practice of the Patents in Suit and/or U.S. Patent No. 5,963,968, to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

## REQUEST FOR PRODUCTION 52

All draft or final agreements between RRD and any Barco-Xeikon Entity concerning (a) any Barco-Xeikon Component, (b) the Patents in Suit, or (c) the Barco Suit, including but not limited to all draft or final agreements identified by RRD when responding to Interrogatory No. 11 in the Defendants' Second Set of Interrogatories.

## RESPONSE TO REQUEST NO. 52:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley also hereby incorporates by reference the General Objections to Defendants' Second Set of Interrogatories, Objections to Definitions and Instructions to Defendants' Second Set of Interrogatories, and Specific Objections to Defendants' Second Set of Interrogatories as though fully set forth herein.

R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*all draft or final agreements* between RRD and any Barco-Xeikon Entity" regarding any Barco-Xeikon Component, the Patents in Suit, or the Barco Suit. R.R. Donnelley also objects to this Request as overly broad and unduly burdensome

7

because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged draft or final agreements between R.R. Donnelley and Barco Graphics N.V. or Xeikon N.V. regarding the subject matter of the Patents in Suit, the Patents in Suit, or the Barco Suit, to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

## REQUEST FOR PRODUCTION 53

All strategic, business, competitive, or marketing plans, reports, studies, summaries, analyses, or presentations which discuss, analyze, address, or mention any Covered Lines of Business for which RRD is claiming lost profits.

## RESPONSE TO REQUEST NO. 53:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll strategic, business, competitive, or marketing plans, reports, studies, summaries, analyses, or presentations*" regarding "any Covered Lines of Business for which RRD is claiming lost profits." R.R. Donnelley also objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of

8

documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

R.R. Donnelley further objects to this Request as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence insofar as the Request seeks information related to lost profits. As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits.

## REQUEST FOR PRODUCTION 54

Documents that summarize, memorialize, describe, outline, or define RRD's patent licensing practices, policies, and procedures, whether formal or informal, including documents identified by RRD when responding to Interrogatory No. 11 in the Defendants' Second Set of Interrogatories.

## RESPONSE TO REQUEST NO. 54:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley also hereby incorporates by reference the General Objections to Defendants' Second Set of Interrogatories, Objections to Definitions and Instructions to Defendants' Second Set of Interrogatories, and Specific Objections to Defendants' Second Set of Interrogatories as though fully set forth herein.

R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley also objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of

9

documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents that summarize, memorialize, describe, outline, or define R.R. Donnelley's licensing practices, policies, and procedures relating to the Patents in Suit from 2000 to present, to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

**REQUEST FOR PRODUCTION 55**

Documents most closely and accurately showing RRD's revenues, costs, and profits on a monthly, quarterly, and annual basis generated by or resulting from any Covered Lines of Business since 2000.

**RESPONSE TO REQUEST NO. 55:**

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

R.R. Donnelley further objects to this Request as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence insofar as the Request seeks information related to lost profits.

10

As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits.

**REQUEST FOR PRODUCTION 56**

All draft or final agreements, and any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related to such agreements, between (i) RRD and (ii) any Kodak Entity regarding the use of any of the following software products: Begin, Composer, Darwin, DijiComp, DL-100, DL-1000, FormsMerge, FusionPro, KEEPs, or Mailscape.

**RESPONSE TO REQUEST NO. 56:**

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks *"[a]ll draft or final agreements, and any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related to such agreements"* between R.R. Donnelley and "any Kodak Entity" related to the enumerated products, regardless of the subject matter or time period of such agreements, documents, or notes. R.R. Donnelley objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley also objects to this Request because it seeks information that is as readily available to Kodak to Defendants as it is to R.R. Donnelley, or that is already in Kodak's possession, custody, or control. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

11

## REQUEST FOR PRODUCTION 57

All plans, reports, studies, summaries, analyses, or presentations discussing, considering, or reporting the prices charged by RRD, or any factors affecting the determination of the prices charged, for any Covered Lines of Business.

## RESPONSE TO REQUEST NO. 57:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll plans, reports, studies, summaries, analyses, or presentations* discussing, considering, or reporting the prices charged by RRD, or any factors affecting the determination of the prices charged, for any Covered Lines of Business." R.R. Donnelley objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

R.R. Donnelley further objects to this Request as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence insofar as the Request seeks information related to lost profits. As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits.

**REQUEST FOR PRODUCTION 58**

   For each calendar year from 2000 to present, documents most closely and accurately showing both (i) the number of print jobs, orders or contracts processed, serviced or completed by RRD in any Covered Lines of Business (including, if available, both the total number of pages printed and the total number of orders, contracts or jobs processed or completed), and (ii) the total number of all print jobs, orders, or contracts processed, serviced or completed by RRD on digital presses (including, if available, both the total number of pages printed and the total number of orders, contracts or jobs processed, serviced or completed).

**RESPONSE TO REQUEST NO. 58:**

   R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

   R.R. Donnelley further objects to this Request as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence insofar as the Request seeks information related to lost profits. As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits.

**REQUEST FOR PRODUCTION 59**

   All documents demonstrating, discussing, summarizing, analyzing, reporting, or referring to any competition for all Covered Lines of Business, including but not limited to lost jobs, contracts, or revenue.

**RESPONSE TO REQUEST NO. 59:**

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll documents* demonstrating, discussing, summarizing, analyzing, reporting, or referring to any competition for all Covered Lines of Business." R.R. Donnelley objects to this Request as overly broad and unduly burdensome because there is no reasonable time frame limitation. R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

R.R. Donnelley further objects to this Request as overly broad, unduly burdensome, and seeking information that is not relevant to the claims or defenses of the Parties in this action or the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence insofar as the Request seeks information related to lost profits. As indicated in the May 17, 2007 letter from R.R. Donnelley's counsel to Kodak's counsel, at this time R.R. Donnelley does not intend to seek damages based on lost profits.

**REQUEST FOR PRODUCTION 60**

All documents that RRD considers, analyzes, examines, or investigates as prior art, or that RRD alleges to be prior art to any of the patents in suit in the Tesseron Suit, including all documents that refer to any such consideration, analysis, examination, investigation, or allegation.

**RESPONSE TO REQUEST NO. 60:**

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll documents* that RRD considers, analyzes, examines, or investigates as prior art, or that RRD alleges to be prior art to any of the patents in suit in the Tesseron Suit." R.R. Donnelley objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity. R.R. Donnelley also objects to this Request to the extent it calls for confidential information of third parties that cannot be disclosed by R.R. Donnelley because of contractual obligation. R.R. Donnelley further objects to this request insofar as it calls for the production of documents tendered in confidentiality under the terms of the Protective Order in the Tesseron Suit. The Protective Order in the Tesseron Suit prohibits the production outside the Tesseron Suit of documents marked confidential.

R.R. Donnelley further objects to this Request as premature insofar as discovery only recently commenced in the Tesseron Suit and R.R. Donnelley's investigation and analysis of prior art is ongoing. Subject to and without waiving its General and Specific Objections, and subject to the Protective Order in the Tesseron Suit, R.R. Donnelley will produce responsive, non-privileged documents reflecting prior art that R.R. Donnelley produces or identifies to Tesseron in the Tesseron Suit after R.R. Donnelley produces or identifies such prior art in the Tesseron Suit, to the extent such documents have not already been produced in the present litigation and are located through a reasonable search.

15

## REQUEST FOR PRODUCTION 61

All documents that are alleged by any party to support or refute, in whole or part, Tesseron's claim for damages in the Tesseron Suit.

## RESPONSE TO REQUEST NO. 61:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad, unduly burdensome, and seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll documents* that are alleged by any party to support or refute, in whole or part, Tesseron's claim for damages in the Tesseron Suit." R.R. Donnelley objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity. R.R. Donnelley also objects to this Request to the extent it calls for confidential information of third parties that cannot be disclosed by R.R. Donnelley because of contractual obligation. R.R. Donnelley further objects to this request insofar as it calls for the production of documents tendered in confidentiality under the terms of the Protective Order in the Tesseron Suit. The Protective Order in the Tesseron Suit prohibits the production outside the Tesseron Suit of documents marked confidential.

R.R. Donnelley further objects to this Request as premature insofar as discovery only recently commenced in the Tesseron Suit and R.R. Donnelley's investigation and analysis of Tesseron's claim for damages is ongoing. Subject to and without waiving its General and Specific Objections, and subject to the Protective Order in the Tesseron Suit, R.R. Donnelley will produce responsive, non-privileged documents supporting R.R. Donnelley's refutation of

Tesseron's damages claim after R.R. Donnelley produces such information in the Tesseron Suit,

to the extent such documents exist, have not already been produced in the present litigation, and

are located through a reasonable search.

## REQUEST FOR PRODUCTION 62

All documents and things related to any communication between RRD and any
Kodak Entity regarding the Patents in Suit.

## RESPONSE TO REQUEST NO. 62:

R.R. Donnelley hereby incorporates by reference the foregoing General

Objections and Objections to Definitions and Instructions as though fully set forth herein.

R.R. Donnelley objects to this Request as seeking information that is neither relevant to the

claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery

of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly

burdensome insofar as it seeks "*[a]ll documents and things related to any communication*

between RRD and any Kodak Entity regarding the Patents in Suit." R.R. Donnelley objects to

this Request as overly broad and unduly burdensome because there is no reasonable time frame

limitation. R.R. Donnelley also objects to this Request because it seeks information that is as

readily available to Kodak to Defendants as it is to R.R. Donnelley, or that is already in Kodak's

possession, custody, or control. R.R. Donnelley further objects to this Request to the extent it

requires the production of documents that are immune from discovery under the attorney-client

privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections,

R.R. Donnelley will produce responsive, non-privileged communications between

R.R. Donnelley and the named Defendants regarding the Patents in Suit from 2000 to present to

the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

**REQUEST FOR PRODUCTION 63**
      All documents and things that indicate or refer to RRD's earliest knowledge of any Accused Software Product.

**RESPONSE TO REQUEST NO. 63:**

      R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as seeking information that is neither relevant to the claims, counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks *"[a]ll documents and things* that indicate or refer to RRD's earliest knowledge of any Accused Software Product." R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity. R.R. Donnelley further objects to Defendants' Definition of "RRD" as vague and overly broad to the extent that it includes any corporation, business, or entity other than the named R.R. Donnelley in this action and to the extent that it includes every individual employed by R.R. Donnelley regardless of his or her job or responsibilities with respect to investigating infringement of R.R. Donnelley patents.

      Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to show earliest knowledge of the operation of any Accused Software Product by any R.R. Donnelley employee whose job or responsibilities included investigating infringement of R.R. Donnelley patents, to

18

the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

## REQUEST FOR PRODUCTION 64

All documents and things that indicate or refer to RRD's earliest knowledge of the operation of any Accused Software Product.

## RESPONSE TO REQUEST NO. 64:

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll documents and things* that indicate or refer to RRD's earliest knowledge of the operation of any Accused Software Product." R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity. R.R. Donnelley further objects to Defendants' Definition of "RRD" as vague and overly broad to the extent that it includes any corporation, business, or entity other than the named R.R. Donnelley in this action and to the extent that it includes every individual employed by R.R. Donnelley regardless of his or her job or responsibilities with respect to investigating infringement of R.R. Donnelley patents.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to show earliest knowledge of the operation of any Accused Software Product by any R.R. Donnelley employee whose job or responsibilities included investigating infringement of R.R. Donnelley patents, to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

19

**REQUEST FOR PRODUCTION 65**

All documents and things concerning RRD providing actual notice of the Patents in Suit to any Kodak Entity.

**RESPONSE TO REQUEST NO. 65:**

R.R. Donnelley also objects to this Request because it seeks information that is as readily available to Kodak to Defendants as it is to R.R. Donnelley, or that is already in Kodak's possession, custody, or control. Subject to and without waiving its General or Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents reflecting R.R. Donnelley's actual notice of the Patents in Suit to the named Defendants to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

**REQUEST FOR PRODUCTION 66**

All documents discussing, describing, estimating, analyzing, computing, or otherwise reporting the value or estimated value of the Patents in Suit.

**RESPONSE TO REQUEST NO. 66:**

R.R. Donnelley hereby incorporates by reference the foregoing General Objections and Objections to Definitions and Instructions as though fully set forth herein. R.R. Donnelley objects to this Request as overly broad and unduly burdensome insofar as it seeks "*[a]ll documents* discussing, describing, estimating, analyzing, computing, or otherwise reporting the value or estimated value of the Patents in Suit." R.R. Donnelley further objects to this Request to the extent it requires the production of documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to show the value

or estimated value of the Patents in Suit, to the extent such documents exist, have not already

been produced in the present litigation, and are located through a reasonable search.

## REQUEST FOR PRODUCTION 67

All documents and things that refer to the subject matter of, or the identification of which is sought by, the Defendants' Second Set of Interrogatories (Nos. 11-20), or Third Set of Interrogatories (Nos. 21-23), including without limitation all documents identified or referred to in RRD's responses thereto, and all documents that RRD consulted or upon which RRD relied, in framing, compiling or preparing its responses.

## RESPONSE TO REQUEST NO. 67:

R.R. Donnelley hereby incorporates by reference the foregoing General

Objections and Objections to Definitions and Instructions as though fully set forth herein.

R.R. Donnelley also hereby incorporates by reference the General Objections to Defendants'

Second Set of Interrogatories, Objections to Definitions and Instructions to Defendants' Second

Set of Interrogatories, Specific Objections to Defendants' Second Set of Interrogatories, General

Objections to Defendants' Third Set of Interrogatories, Objections to Definitions and Instructions

to Defendants' Third Set of Interrogatories, and Specific Objections to Defendants' Third Set of

Interrogatories as though fully set forth herein.

R.R. Donnelley objects to this Request as vague, ambiguous, and seeking

information that is neither relevant to the claims, counterclaims, or defenses in the action nor

reasonably calculated to lead to the discovery of admissible evidence. R.R. Donnelley objects to

this Request as overly broad and unduly burdensome insofar as it seeks *"[a]ll documents and

things* that refer to the subject matter of, or the identification of which is sought by, the

Defendants' Second Set of Interrogatories (Nos. 11-20), or Third Set of Interrogatories (Nos. 21-

23)."* R.R. Donnelley further objects to this Request to the extent it requires the production of

documents that are immune from discovery under the attorney-client privilege and/or work product immunity.

Subject to and without waiving its General and Specific Objections, R.R. Donnelley will produce responsive, non-privileged documents identified or referred to in its responses to Defendants' Second Set of Interrogatories (Nos. 11-20) or Third Set of Interrogatories (Nos. 21-23) to the extent such documents exist, have not already been produced in the present litigation, and are located through a reasonable search.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiff*
  *R.R. Donnelley & Sons Company*

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
(312) 853-7036

June 21, 2007

867152.1

22

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2007, I caused a copy of R.R. DONNELLEY &

SONS COMPANY'S RESPONSES TO DEFENDANTS' SECOND SET OF REQUESTS FOR

PRODUCTION OF DOCUMENTS AND THINGS to be served as follows:

### BY EMAIL AND HAND

Frederick L. Cottrell, III
Richards Layton & Finger
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com

### BY EMAIL

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
rmcmillan@crowell.com


Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
rsmith@mnat.com

# EXHIBIT E

# crowell moring

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

**Nathaniel Grow**
202-624-2709
NGrow@crowell.com

June 28, 2007

3477:ng
025140.0000051

**VIA FACSIMILE AND U.S. MAIL**

Jamie L. Secord, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 606030

Re:    *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and
Kodak Graphic Communications Co.*, (D. Del.) (Civil Action No. 06-032-
JJF)

Dear Jamie:

I write to point out the many deficiencies in RRD's responses to Defendants'
Second Set of Requests for Production:

## RRD's Improper Objection to the Definition of "RRD"

RRD improperly objects to Defendants' Definition A, which defines "RRD" or
"you." By narrowly limiting RRD to just "R.R. Donnelley & Sons Co." – the ultimate
parent of a corporate family – RRD stands solely on corporate formalities to
suppress relevant, responsive documents relating to its subsidiaries, predecessors,
and affiliates. At the same time, RRD has itself defined "Creo," "Kodak," and
"KGCC" broadly to include parent, subsidiary, sister, predecessor, or successor
companies, and other affiliates. *See, e.g.*, RRD's First Set of Requests for Production
at 3. In addition to being unsupported by the law, the inequities of RRD's
untenable position are – quite frankly – troubling, and we doubt that the Court
would approve of RRD's actions.[1]

---

[1]    We understand RRD's objection as only being limited to the scope of the term
"RRD" or "you," and not taking the position that RRD does not have control over its
subsidiaries and affiliates. To the extent RRD maintains that it is only required to

(continued...)

Jamie Secord, Esq.
June 28, 2007
Page 2

In its recent corporate history, RRD has acquired companies that purchased and used anticipatory prior art. Rather than produce relevant documents on these topics, RRD instead attempts to hide the ball. For instance, Communicolor (a company that RRD acquired) purchased and used versions of the Begin software – a prior art invalidating reference. *See* Defendants' Response to Interrogatory No. 5. Communicolor's use of Begin was discussed in information disclosure statements filed with the PTO. Based on public documents, we understand that Communicolor was first acquired by RRD, and later became part of the Moore Wallace family of companies (all of which are subsidiaries of RRD). Thus, RRD's position would shield any responsive documents relating to Communicolor's (or Moore Wallace's) use of Begin. Given that RRD has acquired other commercial printing operations, we would expect that other uses of prior art may exist.

RRD has also acquired companies that developed – prior to the acquisition – technologies that either anticipated the patents in suit and/or are now accused by RRD of infringing. With respect to prior art and/or accused devices, Banta – which has also been acquired by RRD – developed and commercialized DesignMerge, a potential prior art reference. Indeed, a senior RRD vice-president describes Banta's DesignMerge as "something we may have patented." RRD089286. DesignMerge is also a third party software product which may fall within RRD's allegations of infringement.[2]

Moreover, this is a yet another issue on which the parties had already reached a prior consensus with RRD's former counsel. Almost a year ago, RRD – through its former counsel – asserted a substantially similar objection in RRD's response to Defendants' First Set of Requests for Production. *See* RRD's Response at 4. After Defendants explained to RRD that this objection was improper, RRD's former counsel confirmed that it had not narrowed its search or otherwise withheld responsive documents on the basis of such objection, and stated that RRD would so clarify in a future response. *See* Ltrs. from Koide to Badke of Sept. 19, 2006 and Oct. 9, 2006.

---

(continued)

search for documents in the direct possession, custody, or control of R.R. Donnelley & Sons Co., Defendants would note that this is improper.

[2]    Banta is relevant to other issues as documented in prior correspondence. *See, e.g.*, April 4th Ltr. from Koide to Secord, and May 10th Ltr. from Grow to Puri.

Jamie Secord, Esq.
June 28, 2007
Page 3

     Accordingly, Defendants once again ask RRD to withdraw this improper objection and also confirm that RRD will conduct (and has previously conducted) a reasonable search throughout any entity that it controls for documents responsive to Defendants' Requests for Production.

## RRD's Improper Objection to the Definition of "Barco-Xeikon Entity"

     Similarly, RRD has improperly objected to Defendants' Definition Z of "Barco-Xeikon Entity." Under its objection, RRD would limit "Barco-Xeikon Entity" to just Barco Graphics N.V. and Xeikon N.V. But RRD has already produced documents showing that other Barco entities, such as Barco N.V. (*see, e.g.*, RRD015813, RRD042356) and Barco Inc. (RRD015840) are relevant to the claims or defenses at issue in this litigation. Further, RRD has previously produced documents regarding royalty payments it was owed by Esko Graphics (RRD046122), an apparent successor in interest to Barco Graphics' license with RRD.

     Please confirm that RRD will produce documents relating to all known Barco-Xeikon entities, and responsive to Request for Production Nos. 51 and 52.

## RRD's Improper Use of "Sufficient to Show"

     RRD improperly relies on producing documents "sufficient to show" for Requests for Production Nos. 50, 63, and 66, which relate to the following topics:

- **Request No. 50:** "[a]ll documents regarding the settlement, resolution, or conclusion of the Barco Suit";

- **Request No. 63:** "[a]ll documents and things that indicate or refer to RRD's earliest knowledge of any Accused Software Product";

- **Request No. 64:** "[a]ll documents and things that indicate or refer to RRD's earliest knowledge of the operation of any Accused Software Product"; and

- **Request No. 66:** "[a]ll documents discussing, describing, estimating, analyzing, computing, or otherwise reporting the value or estimated value of the Patents in Suit."

     While producing documents "sufficient to show" is sometimes permissible when the response can be summarized objectively and the underlying facts are not likely to be relevant, it is improper to simply produce document "sufficient to show" otherwise. None of the above-listed requests cover topics that can be adequately

Jamie Secord, Esq.
June 28, 2007
Page 4

summarized with a "sufficient to show" response. As but one example, Defendants are entitled to all documents that discuss the value or estimated value of the Patents in Suit – not just those documents RRD determines "sufficiently show" such value – as different valuations and underlying calculations are relevant to damages.

Please confirm that RRD will produce all documents responsive to the above-listed topics.

## Request for Production 54

RRD has inappropriately limited the scope of its response to Request No. 54. Defendants asked for "[d]ocuments that summarize, memorialize, describe, outline, or define RRD's patent licensing practices, policies, and procedures, whether formal or informal." In response, RRD has only stated it will produce such documents "relating to the Patents in Suit from 2000 to present." Defendants are entitled to documents regarding RRD's patent licensing practices, policies, or procedures for patents other than the Patents in Suit. Defendants are also entitled to such documents dated prior to 2000. All such policies are relevant for the computation of a reasonable royalty.

Please confirm that RRD will produce documents summarizing, memorializing, describing, outlining, or defining its patent licensing practices, policies, and procedures, with respect to all patents RRD may own.

## Request for Production 56

In Request No. 56, Defendants sought "[d]raft or final agreements, and any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related to such agreements, between (i) RRD and (ii) any Kodak Entity regarding the use of" 10 software products. In its written response, RRD refused to produce any such documents, asserting that the request is "overly broad and unduly burdensome because there is no reasonable time frame limitation," and "because it seeks information that is as readily available to Kodak to Defendants [sic] as it is to" RRD. RRD's response is incorrect and inadequate.

First, Defendants have requested not only draft or final agreements, but also any documents or notes related to the negotiation of such agreements. Such documents are not as readily available to Defendants as they are to RRD. In many cases, Defendants will never have received copies of such documents or notes, in which case they will only reside with RRD.

Jamie Secord, Esq.
June 28, 2007
Page 5

However, even with regard to the draft or final agreements themselves, RRD's response is insufficient. RRD has done business with Defendants for many years, and some of the agreements at issue may be as many as 20 years old. These agreements are relevant to Defendants' defenses, including, but not limited to, laches, equitable estoppel, and waiver. RRD has further purchased a number of entities which may have also entered into agreements with Defendants for the software products at issue. Defendants cannot track RRD's acquisitions nearly as easily as RRD can itself.

Finally, as a result of RRD's extended delay in filing suit, Defendants' records may be incomplete. Defendants have themselves produced responsive documents to RRD regardless of whether the information was as readily available to RRD as it was to Defendants. Under the circumstances, RRD is required to do the same.

Please confirm that RRD will fully comply with Request No. 56, and will produce all draft or final agreements between RRD and any Kodak Entity relating to the software products identified in the Request, along with any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related thereto.

## Request for Production 60

RRD's response to Request No. 60 is also insufficient. Defendants sought the production of "[a]ll documents that RRD considers, analyzes, examines, or investigates as prior art, or that RRD alleges to be prior art to any of the patents in suit in the Tesseron Suit, including all documents that refer to any such consideration, [etc.]." RRD's response is insufficient for several reasons.

First, RRD incorrectly asserts that its production of documents responsive to this Request may be limited by the protective order in the Tesseron Suit. This argument is a red herring; the protective order in the Tesseron Suit has nothing to do with RRD's ability to produce such documents. Request No. 60 seeks only those documents that *RRD* considers, analyzes, examines, or investigates as prior art. These documents are largely public, and to the extent they aren't, the Protective Order in this litigation provides RRD with more than sufficient protection for any confidential material. The Tesseron protective order does not tie RRD's hands in waiving confidentiality for RRD confidential documents. In this Request, Defendants have not asked for any materials produced by Tesseron.

Moreover, RRD has stated it will only produce documents responsive to this Request "after [RRD] produces or identifies such prior art in the Tesseron Suit." There is absolutely no basis for such delay. Once RRD considers, analyzes,

Jamie Secord, Esq.
June 28, 2007
Page 6

examines, or investigates a document as prior art it should be produced. Similarly, any non-privileged document referring to such consideration, etc., should be produced once it is created.

Please confirm that RRD will produce all documents it or its counsel considers, analyzes, examines, or investigates as prior art in the Tesseron Suit, along with all related documents, as soon as such documents are identified or created.

### Request for Production 61

Similarly, RRD's response to Request No. 61 is also insufficient. In this Request, Defendants sought "[a]ll documents that are alleged ... to support or refute, in whole or part, Tesseron's claim for damages in the Tesseron Suit." As above, there is no reason why RRD cannot produce to Defendants here all documents it alleges refute Tesseron's claim for damages, since the Protective Order in this litigation more than sufficiently protects RRD's confidential information. Further, there is no basis for RRD delaying such production until such time as it "produces such information in the Tesseron Suit." RRD should produce such information as soon as it is identified by RRD.

Please confirm that RRD will produce all documents that are alleged to support or refute, in whole or part, Tesseron's claim for damages, as soon as such documents are identified.

### Request for Production 63

In Request No. 63, Defendants seek "[a]ll documents and things that indicate or refer to RRD's earliest knowledge of any Accused Software Product." This specific information is relevant to Defendants' asserted defenses, including laches, and equitable estoppel. In response, RRD states only that it will provide documents relating to "the operation of any Accused Software Product by any [RRD] employee whose job or responsibilities included investigating infringement of [RRD] patents." RRD's response, once again, is woefully insufficient.

First, RRD has inappropriately attempted to limit its production of documents under this Request to those regarding RRD's "earliest knowledge *of the operation* of any Accused Software Product." This is the subject matter of Defendants' Request No. 64. Defendants are entitled to documents regarding both RRD's earliest knowledge of the accused products, and RRD's earliest knowledge of the operation of the accused products. Both aspects may relate to laches and other

Jamie Secord, Esq.
June 28, 2007
Page 7

equitable defenses. RRD's attempt to limit its production to only the latter is
inappropriate and unjustified.

Second, RRD has inappropriately attempted to limit its search for such
responsive documents. By only agreeing to produce documents showing the earliest
knowledge of "any [RRD] employee whose job or responsibilities included
investigating infringement of [RRD] patents," RRD attempts to cut-out a large
number of individuals that may have relevant knowledge. By way of example,
individuals tasked with software purchasing or competitive intelligence may very
well have had RRD's earliest knowledge of the accused software products. Such
knowledge is highly relevant for Defendants' equitable defenses. Defendants are
entitled to documents indicating or referring to RRD's earliest knowledge of the
accused products wherever it may have resided.

Please confirm that RRD will produce all documents and things indicating or
referring to RRD's earliest knowledge of any Accused Software Product.


**Request for Production 64**

RRD's response to Request No. 64 is similarly insufficient. Defendants are
again entitled to documents evidencing such knowledge from individuals other than
only those "whose job or responsibilities included investigating infringement of
[RRD] patents."

Please confirm that RRD will produce all documents and things indicating or
referring to RRD's earliest knowledge of the operation of any Accused Software
Product.


Defendants request that RRD respond to this letter no later than Tuesday
July 3rd. Additionally, Defendants request that a meet-and-confer conference be
scheduled on Friday July 6th, to discuss any disputes that may remain after
Defendants receive RRD's response.

Please let me know if you have any questions.

Jamie Secord, Esq.
June 28, 2007
Page 8

Best regards,

Nathaniel Grow

cc:    Richard McMillan, Jr.
       Frederick L. Cottrell III

# EXHIBIT F



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

BEIJING        LOS ANGELES
BRUSSELS       NEW YORK
CHICAGO        SAN FRANCISCO
DALLAS         SHANGHAI
FRANKFURT      SINGAPORE
GENEVA         SYDNEY
HONG KONG      TOKYO
LONDON         WASHINGTON, D.C

jescord@sidley.com
(312) 853-2205

FOUNDED 1866

July 6, 2007

**Via Facsimile and U.S. Mail**

Nathaniel Grow
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
202-624-2709 (telephone)
202-628-5116 (facsimile)

      Re:    *R.R. Donnelley & Sons Company v. Creo, Inc., Eastman Kodak Company, and*
            *Kodak Graphic Communications Company*, No. 06-032-JJF (D. Del.)

Dear Nathaniel:

      This letter responds to your letter of June 28, 2007.

**R.R. Donnelley's Objection to Definition of "RRD"**

      R.R. Donnelley objected to Defendants' Definition A, which defines "RRD" or
"you," as overly broad insofar as Defendants are attempting to require R.R. Donnelley to search
for every last document that may be responsive to Defendants' requests from every last person at
every single R.R. Donnelley subsidiary, successor, predecessor, etc. The Federal Rules of Civil
Procedure do not require such an unduly burdensome and overly broad search, as Defendants
have acknowledged. Indeed, Defendants included the following "General Objection" in their
responses to R.R. Donnelley's requests for production:

            4.    . . . Creo will make a good-faith effort to conduct a
                  reasonable search of documents and things within its
                  possession, custody, or control. Such good-faith efforts
                  will include identifying – to the best of Creo's ability –
                  relevant Creo individuals with knowledge relevant to the
                  claim or defense of any party or the subject matter of the
                  action and searching documents of [sic] within the
                  possession of those individuals.

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

CH1 3927655v 1



Nathaniel Grow
July 6, 2007
Page 2

*See, e.g.*, Defs.' Second Supp. Resp. to R.R. Donnelley's First Request for Production of Documents, dated Jan. 19, 2007, at 4.

R.R. Donnelley has made a good-faith effort to conduct a reasonable search of documents within its possession, custody, or control. In doing so, R.R. Donnelley identified relevant individuals with knowledge relevant to the claims, counterclaims, and defenses of the parties or the subject matter of the action, and searched for documents within the possession of those individuals, as Defendants themselves agreed to do. *See id*

### R.R. Donnelley's Objection to Definition of "Barco-Xeikon Entity"

R.R. Donnelley objected to Defendants' Definition Z, which defines "Barco-Xeikon Entity," as overly broad because Defendants are seeking documents related to "*all* parent, subsidiary, sister, predecessor, or successor companies, corporations of either [Barco or Xeikon], partnerships, or other business entities of either entity, and the officers, directors, agents, employees, partners, and all other persons acting or purporting to act on behalf of or who are subject to the direction or control of any of the foregoing." Barco and Xeikon are two entirely separate companies from R.R. Donnelley. We have no knowledge of Barco's and Xeikon's corporate structures or of "all" individuals serving as officers, directors, agents, employees, partners, etc. of those companies.

Nevertheless, and subject to and without waiving its objections, as part of R.R. Donnelley's reasonable search of documents within its possession, custody, or control, R.R. Donnelley also searched for and produced documents from other Barco entities, including Barco N.V., Barco Inc., and Esko Graphics, as you note in your letter.

### R.R. Donnelley's Use of "Sufficient to Show"

Defendants concede that it may be permissible to use "sufficient to show" when the response can be "summarized objectively." (Ltr. from N. Grow to J. Secord at 3.) Given such a concession, we do not understand why – under Defendants' own interpretation of when a "sufficient to show" response is appropriate – such a response is somehow "improper" with respect to at least Request Nos. 63 and 64. Those requests seek a summary of when R.R. Donnelley first knew of or first knew about the operation of any accused software product.

Nonetheless, and subject to and without waiving its objections, pursuant to Request Nos 50, 63, 64, and 66, R.R. Donnelley made a good-faith effort to conduct a

CH1 3927655v 1



Nathaniel Grow
July 6, 2007
Page 3

reasonable search of documents within its possession, custody, or control and has produced or
will produce non-privileged documents identified as a result of its search.[1]

### Defendants' Request for Production 54

Defendants argue that they are entitled to "[d]ocuments that summarize,
memorialize, describe, outline, or define R.R. Donnelley's patent licensing practices, policies,
and procedures, whether formal or informal" without regard to the time period such documents
were created, even though the Patents in Suit did not issue until 2001 or later. (Ltr. from N.
Grow to J. Secord at 4.) Request No. 54 seeks information that is neither relevant to the claims,
counterclaims, or defenses in the action nor reasonably calculated to lead to the discovery of
admissible evidence. Moreover, Request No. 54 is overly broad and unduly burdensome because
there is no reasonable time frame limitation.

R.R. Donnelley previously offered a reasonable date by agreeing to search for
responsive documents relating to the Patents in Suit from 2000 to present. In the spirit of
compromise, and subject to and without waiving its objections, R.R. Donnelley agrees to
produce non-privileged documents that summarize, memorialize, describe, outline, or define
R.R. Donnelley's patent licensing practices, policies, and procedures from 1997 to present, to the
extent such documents exist, have not already been produced in the present litigation, and are
located through a reasonable search.

### Defendants' Request for Production 56

Defendants' Request No. 56 is clearly unreasonable. Defendants acknowledge
they should already have at least draft or final agreements between RRD and any Kodak entity
regarding the use of the 10 software products enumerated in Request No. 56. At the same time,
however, Defendants inexplicably claim that "[s]uch documents are not as readily available to
Defendants as they are to RRD." (Ltr. from N. Grow to J. Secord at 4.) Defendants appear to be
placing the burden on R.R. Donnelley to search for such agreements because Defendants do not
wish to shoulder the cost and burden of searching for such documents themselves.

Moreover, as exemplified by Defendants' statement that "some of the agreements
at issue may be as many as 20 years old" (Ltr. from N. Grow to J. Secord at 5), Request No. 56
seeks information that is neither relevant to the claims, counterclaims, or defenses in the action
nor reasonably calculated to lead to the discovery of admissible evidence. Please explain how
the requested documents are relevant to the claims, counterclaims, or defenses of the parties.

---

[1] There is further discussion below of R.R. Donnelley's search for documents in response to Request Nos 63 and
64.

CHI 3927653v.1



Nathaniel Grow
July 6, 2007
Page 4

       With respect to "any documents or notes reporting, discussing, summarizing, or otherwise memorializing any negotiations related to such agreements," such materials are similarly not relevant to the claims, counterclaims, or defenses in the action and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, such documents are likely privileged and a search for any non-privileged documents or notes would be unduly burdensome. Please explain why R.R. Donnelley should undertake a burdensome search for such irrelevant materials.

       Subject to and without waiving R.R. Donnelley's objections, we agree to discuss with our client whether it would be unduly burdensome to undertake a search for final agreements between R.R. Donnelley and Kodak regarding the use of the 10 software products enumerated in Request No. 56 from 2000 to present. Given the Fourth of July holiday this week, we do not expect to have a response until next week.

**Defendants' Request for Production 60**

       Defendants' Request No. 60 is premature, as stated in R.R. Donnelley's objections. There is a pending dispute in the Tesseron Suit as to which accused products are even at issue. Moreover, Defendants' request seeks information largely protected by the work product doctrine and attorney-client privilege.

       To the extent Defendants' request calls for third-party or Tesseron materials that are subject to the Protective Order in the Tesseron Suit, R.R. Donnelley's ability to produce such materials is also limited by the Protective Order in that case. For example, documents showing the inner workings of a publicly available Tesseron or third-party product might be prior art but could still be confidential to Tesseron or that third-party. The Protective Order in our case does not overrule the Protective Order in the Tesseron case. We would be happy to send you a copy of the Tesseron Protective Order if you would like to review it.

       R.R. Donnelley is subject to the same Federal Rules of Civil Procedure in the Tesseron litigation that it is subject to in the pending litigation with Defendants. Therefore, to the extent that the requested documents are identified for production in the Tesseron Suit, and without waiving its objections and subject to the Protective Order in the Tesseron Suit, R.R. Donnelley will produce responsive, non-privileged documents, to the extent such documents have not already been produced in the present litigation and are located through a reasonable search.

CHI 3927655v.1



Nathaniel Grow
July 6, 2007
Page 5


## Defendants' Request for Production 61

Defendants' Request No. 61 is similarly premature, as stated in R.R. Donnelley's objections. Tesseron has not even alleged a damages claim in the Tesseron Suit. Moreover, Defendants' request seeks information largely protected by the work product doctrine and attorney-client privilege.

To the extent Defendants' request calls for third-party or Tesseron materials that are subject to the Protective Order in the Tesseron Suit, R.R. Donnelley's ability to produce such materials is also limited by the Protective Order in that case. As mentioned above, we would be happy to send you a copy of that Protective Order if you would like to review it.

Also as stated above, R.R. Donnelley is subject to the same Federal Rules of Civil Procedure in the Tesseron litigation that it is subject to in the pending litigation with Defendants. Therefore, to the extent that the requested documents are identified for production in the Tesseron Suit, and without waiving its objections and subject to the Protective Order in the Tesseron Suit, R.R. Donnelley will produce responsive, non-privileged documents, to the extent such documents have not already been produced in the present litigation and are located through a reasonable search.

## Defendants' Request for Production 63

In response to R.R. Donnelley's requests for the production of documents, Defendants stated that they would "make a good-faith effort to conduct a reasonable search of documents and things within its possession, custody, or control. Such good-faith efforts will include identifying . . . relevant . . . individuals with knowledge relevant to the claim or defense of any party or the subject matter of the action and searching documents of [sic] within the possession of those individuals." *See, e.g.*, Defs.' Second Supp. Resp. to R.R. Donnelley's First Request for Production of Documents, dated Jan. 19, 2007, at 4.

R.R. Donnelley took the same approach in response to Defendants' Request No. 63. R.R. Donnelley agreed to undertake a reasonable search of documents within its possession, custody, or control to look for documents related to R.R. Donnelley's earliest knowledge of any accused software product. As part of its reasonable search, R.R. Donnelley agreed to identify relevant R.R. Donnelley individuals with knowledge relevant to the claims, counterclaims, and defenses of the parties or the subject matter of the action (*i.e.*, those R.R. Donnelley employees likely to have knowledge of the Patents in Suit and/or of Defendants' infringing activities).

Subject to and without waiving its objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to show earliest knowledge of any accused



Nathaniel Grow
July 6, 2007
Page 6

software product, to the extent such documents exist, have not already been produced in the
present litigation, and are located through a reasonable search as identified above.

### Defendants' Request for Production 64

R.R. Donnelley incorporates by reference the language above relating to
Defendants' Request No. 63. R.R. Donnelley further states that subject to and without waiving
its objections, R.R. Donnelley will produce responsive, non-privileged documents sufficient to
show earliest knowledge of the operation any accused software product, to the extent such
documents exist, have not already been produced in the present litigation, and are located
through a reasonable search as identified above.

\* \* \*

As stated in my letter of July 3, 2007, we are generally available for a meet and
confer on July 10 or 11, 2007, should you wish to conduct such a conference.

Sincerely,

Jamie L. Secord /nk

Jamie L. Secord

CHI 3927655v1

# EXHIBIT G



| | SIDLEY AUSTIN LLP<br>ONE SOUTH DEARBORN<br>CHICAGO, IL 60603<br>(312) 853 7000<br>(312) 853 7036 FAX | BEIJING<br>BRUSSELS<br>CHICAGO<br>DALLAS<br>FRANKFURT<br>GENEVA<br>HONG KONG<br>LONDON | LOS ANGELES<br>NEW YORK<br>SAN FRANCISCO<br>SHANGHAI<br>SINGAPORE<br>SYDNEY<br>TOKYO<br>WASHINGTON, D.C |

jsecord@sidley.com
(312) 853-2206

FOUNDED 1866

July 10, 2007

**Via Facsimile and U.S. Mail**
Nathaniel Grow
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
202-624-2709 (telephone)
202-628-5116 (facsimile)

Re:    *R.R. Donnelley & Sons Company v. Creo, Inc., Eastman Kodak Company, and
Kodak Graphic Communications Company*, No. 06-032-JJF (D. Del.)

Dear Nathaniel:

This letter follows up on our telephone discussion today.

**R.R. Donnelley's Responses to Defendants' Second Set of Requests for Production**

*Defendants' Request No. 56*

As stated in my letter to you of July 6, 2007, pursuant to Defendants' Request No. 56, we agreed to discuss with our client whether it would be unduly burdensome to undertake a search for final agreements between R.R. Donnelley and Kodak regarding the use of the 10 software products enumerated in Request No. 56 from 2000 to present. Our client is investigating this issue, and we will let you know when we learn the results of the investigation.

To the extent Defendants are seeking such final agreements prior to 2000, please explain why such documents are relevant to the claims, counterclaims, or defenses of the parties in this litigation.

*Defendants Request Nos. 63 and 64*

Also as stated in my letter to you of July 6, 2007, R.R. Donnelley agreed to undertake a reasonable search of documents within its possession, custody, or control to look for documents related to R.R. Donnelley's earliest knowledge of any accused software product or of the operation of any accused software product. As part of its reasonable search, R.R. Donnelley agreed to identify relevant R.R. Donnelley individuals with knowledge relevant to the claims,

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

CH1 3932065v 1



Nathaniel Grow
July 10, 2007
Page 2

counterclaims, and defenses of the parties or the subject matter of the action (*i.e.*, those R.R.
Donnelley employees likely to have knowledge of the Patents in Suit and/or of Defendants'
infringing activities).

You indicated today that Defendants believe persons who purchase software for
R.R. Donnelley and/or persons who market competitive activities in the marketplace should also
be included in R.R. Donnelley's search.  Please explain how these persons could possibly have
knowledge relevant to the claims, counterclaims, and defenses of the parties if they had no
knowledge of the Patents in Suit and/or of Defendants' infringing activities.  Please also send us
authority showing that such persons may have relevant knowledge.

### Defendants' Document Production Pursuant to R.R. Donnelley's Interrogatory Nos. 18-19

Following up on my June 5 and 21, 2007 letters and our discussion today, we are
still awaiting the production of documents in response to R.R. Donnelley's Interrogatory Nos. 18
and 19.  Defendants merely stated in their responses that they would "provide RRD with
documents pursuant to [Fed. R. Civ. P. 33(d)]."  Defendants have not yet produced all such
responsive documents.  You indicated today that such documents would hopefully be produced
this week.  If that is not the case, please let us know as soon as possible.

Sincerely,

Jamie L. Secord

CHI 3932065v 1

# EXHIBIT H

# crowell [ moring

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Nathaniel Grow
202-624-2709
ngrow@crowell.com

July 13, 2007

025140 0000051

**VIA FACSIMILE AND U.S. MAIL**

Jamie Secord
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Re:   *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and*
      *Kodak Graphic Communications Co., (D. Del.) (Civil Action No. 06-032-*
      *JJF)*

Dear Jamie:

I write to confirm our telephone conversation of July 10th, and to respond to
your letter of the same date.

During our call you confirmed the following:

- Definition of "Barco-Xeikon Entity": RRD will produce responsive
  documents discussing or relating to Barco N.V., Barco Inc., Esko
  Graphics, and Xeikon N.V;

- RRD's Use of "Sufficient to Show": RRD did not limit its search for, and
  is not now withholding, any documents responsive to Request Nos. 50,
  63, 64, and 66 on the basis of the "sufficient to show" limitation in its
  written response to Defendants' requests for production;

Please let me know if any of the above fails to accurately memorialize the substance
of our discussion.

While Defendants acknowledge RRD's eventual concession on these two
matters, Defendants remain concerned about RRD's response to other aspects of our
requests for production, including those addressed in your July 10th letter.

Jamie Secord
July 13, 2007
Page 2

## Request No. 56:

Defendants are entitled to all draft and final agreements between RRD and Defendants (and all non-privileged documents related thereto) for the 10 identified software products, including agreements prior to 2000. Many of the agreements at issue were likely entered into before the year 2000.

Defendants have already explained the relevance of such agreements in both my June 28th letter, as well as Defendants' response to RRD's Interrogatory No. 8. Moreover, contrary to the allegation in your letter, Defendants are not seeking to place the sole burden to search for such documents on RRD; Defendants have in fact searched their own records for all such agreements. However, due to the reasons explained in my letter of June 28th (including RRD's long delay in filing suit), Defendants no longer have all such agreements in their possession and/or have been unable to locate them after conducting a search.

While these agreements are highly relevant, Defendants would also note that RRD is misstating the rule for discoverability. Under the Federal Rules, a discovery request must be "reasonably calculated to lead to the discovery of admissible evidence." *See* FRCP 26(b)(1); *see also Advanced Medical Optics, Inc. v. Alcon Inc.*, 2004 WL 1877724; *2 (D.Del. 2004) (noting the "broad scope of discovery" under the FRCP). All documents sought by Request No. 56 are reasonably calculated to lead to the discovery of admissible evidence, and therefore must be produced by RRD. Please confirm RRD will produce all such documents immediately.

## Request Nos. 60 and 61:

Defendants are also entitled to all documents sought in Request Nos. 60 and 61. Defendants are aware that the Northern District of Ohio has resolved the discovery dispute in the Tesseron Suit regarding the scope of accused products. Even if the dispute remains unresolved however, the scope of accused products has no bearing on the documents RRD considers, analyzes, examines, or alleges to be prior art. A prior art investigation is driven by the patents in suit, not the scope of the accused products. RRD's investigation may very well commence – if it has not already – before a final decision is rendered in the Tesseron Suit on the scope of the accused products. Once RRD begins such an investigation, Defendants are entitled to the production of all documents considered by RRD – whether or not such documents have been "identified for production" by RRD. Similarly, if RRD is

Jamie Secord
July 13, 2007
Page 3

aware of any documents that refute Tesseron's damage claim such documents
should be produced immediately in this litigation.[1]

We have also reviewed the Tesseron Protective Order, which states that the
Tesseron court "does not intend to preclude another court from finding that such
information may be relevant and subject to disclosure in another case." Tesseron
Stipulated Protective Order at 18. Given the Tesseron court's clear intent, we are
somewhat puzzled why RRD – as a party to both suits – believes that it is "limited"
by the Tesseron Protective Order. Moreover, the Tesseron Protective Order
provides as follows:

> Any person or party subject to this Protective Order who
> may be subject to a . . . motion or court order in another
> case to disclose information that is designated by another
> party in this case as CONFIDENTIAL or HIGHLY
> CONFIDENTIAL in this case shall promptly notify that
> other party of the . . . motion or court order so that it may
> have an opportunity to appear and be heard on whether
> such information should be disclosed prior to disclosure.

To the extent that RRD maintains that it is not presently subject to a "motion or
court order . . . to disclose" the requested information, RRD seemingly ignores the
Court's Scheduling Order, which requires RRD to comply with its discovery
obligations, generally, and Defendants' recent motion to compel. If RRD still
maintains that it is not subject to a "motion or court order . . . to disclose," please let
us know if RRD would stipulate to a motion requiring RRD to produce the
information response to Request Nos. 60 and 61.[2]

---

[1]    We are also troubled by the false statement in your July 6th letter that
"Tesseron has not even alleged a damages claim in the Tesseron Suit." This, as you
know, is false. Tesseron's complaint claims that Tesseron is entitled to damages.
*See, e.g.*, Tesseron Complaint at 7-9. Moreover, RRD has previously acknowledged
that Tesseron made a claim for damages. *See* RRD's Response to Defendants'
Second Set of Requests for Production at 16 (admitting that RRD's "investigation
and analysis of Tesseron's claim for damages is ongoing").

[2]    The Tesseron Protective Order explicitly acknowledges our earlier point that
RRD is not restricted in disclosing its own information. Tesseron Stipulated
Protective Order at 14 ("A party is free to do whatever it desires with its own
information.").

Jamie Secord
July 13, 2007
Page 4

Please confirm that RRD will produce: 1) all documents RRD considers, analyzes, examines, or alleges to be prior art in the Tesseron Suit (along with all related, non-privileged documents), and 2) all documents alleged to support or refute Tesseron's claim for damages (along with all related, non-privileged documents), as soon as such documents are identified by RRD.

**Request Nos. 63 and 64:**

During our discussion on Tuesday, I explained that Defendants are entitled to documents indicating RRD's earliest knowledge of any Accused Software Product (and its operation), including knowledge residing with individuals other than those that RRD determines are "likely to have knowledge of the Patents in Suit and/or of Defendants' [allegedly] infringing activities." In many cases, those who purchase and/or use software, or those tasked with competitive intelligence, will have had RRD's first knowledge of the accused products. Documents evidencing such knowledge – in and of themselves – are highly relevant to Defendants' equitable defenses. Moreover, these documents may show that individuals knowledgeable of the Patents in Suit had earlier knowledge of the accused products than their own documents evidence.

Further, as noted above, under the Federal Rules a discovery request must be "reasonably calculated to lead to the discovery of admissible evidence." All documents sought in Request Nos. 63 and 64 are not only highly relevant, but are also likely to lead to the discovery of admissible evidence. Therefore, RRD must produce all such documents. Please confirm that RRD will do so without delay; otherwise, please provide case support for the assertion that such documentation is not discoverable.

Please let us know if your availability to meet and confer regarding the topics of this letter.

Best regards,

Nathaniel Grow

cc:    Richard McMillan, Jr.

# EXHIBIT I



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

**Nathaniel Grow**
202-624-2709
ngrow@crowell.com

July 19, 2007

025140.0000051

**VIA FACSIMILE AND U.S. MAIL**

Jamie Secord
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Re:     *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and Kodak Graphic Communications Co.*, (D. Del.) (Civil Action No. 06-032-JJF)

Dear Jamie:

Defendants are still awaiting RRD's response on a number of discovery-related issues, including the following:

- Defendants' July 6th letter proposing August 16th as a deposition date for Roger D. Parrett (the location for which was changed to Dayton, OH in my July 18th letter);
- Defendants' July 9th letter, regarding deposition dates for Jim Warmus, Grant Miller, Riyaz Asaria, and Topics 1-5, 6, 7, and 8-11 in Defendants' First 30(b)(6) Notice;
- My e-mail of July 13th, requesting that you let Defendants know by July 18th whether Sidley Austin will be representing former RRD employee Mark Fleming, and is willing to accept service on Mr. Fleming's behalf;
- Defendants' July 13th letter requesting a meet-and-confer conference on RRD's deficient responses to Defendants' Requests for Production;
- Our July 16th conversation during which Defendants requested RRD provide a list of specific individuals and 30(b)(6) topics for which it seeks deposition dates in its Motion to Compel of July 13th; and
- My voicemail of July 16th, in which Defendants asked RRD to confirm deposition dates for Lewis Waltman, Mary Lee Schneider, and the topics in Defendants' Second 30(b)(6) Notice.

Jamie Secord
July 19, 2007
Page 2

     While Defendants remain willing to work with RRD on these issues, the lack of a response from RRD has made it difficult to reach a reasonable resolution. Please respond to each of the above-listed issues as soon as possible.

Best regards,

Nathaniel Grow

cc:    Richard McMillan, Jr.

# EXHIBIT J



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Nathaniel Grow
202-624-2709
ngrow@crowell.com

August 10, 2007

025140 0000051

**VIA FACSIMILE AND U.S. MAIL**

Jamie Secord
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Re:   *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and
      Kodak Graphic Communications Co.,* (D. Del.) (Civil Action No. 06-032-
      JJF)

Dear Jamie:

Nearly a month ago (July 13), Defendants addressed RRD's improper objections to Defendants' Request for Production Nos. 56, 60, 61, 63, and 64, and asked for a meet and confer conference. Defendants again asked for a response on July 19. To date, Defendants have not yet received a response from RRD, nor has RRD proposed a date for a meet and confer conference.

In light of the Court's Order entered last Friday regarding similar deficiencies in RRD's document production, Defendants presume that RRD will withdraw its objections and produce all responsive documents. If this is not the case, however, Defendants request that you let us know your availability for a meet and confer conference on these issues next week.

Best regards,

Nathaniel Grow

cc:   Richard McMillan, Jr.

# EXHIBIT K



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Nathaniel Grow
202-624-2709
ngrow@crowell.com

August 15, 2007

025140 0000051

**VIA FACSIMILE AND U.S. MAIL**

Jamie Secord
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Re:    *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and
Kodak Graphic Communications Co.*, (D. Del.) (Civil Action No. 06-032-
JJF)

Dear Jamie:

I write to confirm this morning's meet and confer conference.

**RRD's Interrogatory No. 21:**

With respect to Defendants' response to RRD's Interrogatory No. 21,
Defendants explained that we have fully answered RRD's Interrogatory, pursuant
to our objections to the imprecise terms "marketed" and "promoted." For instance,
Defendants would not view the mere fact that one or more of Defendants' Hardware
Products that is compatible with the format produced by a third party software
product to be a "promotion." Given the imprecision of "marketed" and "promoted" –
and RRD's failure to provide any definition for these terms – Defendants were faced
with two options: (1) to object to the terms "marketed" and "promoted" and only
identify what was "offered" or "sold" or (2) to object to the definitions, but
nevertheless identify the universe of third party products that may be compatible
with Defendants' Hardware Products. In the spirit of cooperation, we provided the
latter. With Defendants' response, RRD may determine those third party software
products that RRD believes Defendants have "offered, sold, marketed, or promoted
for use." Thus, Defendants have provided Donnelley with the information it seeks.

Furthermore, RRD's Interrogatory did not request that Defendants
specifically delineate the third party products that Defendants "offered" versus
those that were "sold," "marketed," or "promoted," but instead asked Defendants to
generally identify all such products. While Defendants may have themselves

Jamie Secord
August 15, 2007
Page 2

requested marketing materials or advertisements from RRD, RRD did not object to these terms, and even if it had done so, the context would be different. Thus, Defendants have validly objected to the terminology, and have answered RRD's Interrogatory accordingly.

Due to RRD's imprecision, Defendants further offered, as an alternative, to amend our response to identify the third party products that Defendants have "offered" or "sold." RRD rejected this proposal.

Further, as we noted this morning, RRD's position in this case stands in stark contrast to the position it has taken in the *Tesseron* Suit. As noted in our August 1st Reply brief, RRD – more than a year-and-a-half into the case – has yet to identify a single third party product by name, and has never provided any infringement claim charts for such products. Nor has RRD taken any discovery from these third party software makers. Should RRD move to compel Defendants on Interrogatory No. 21, Defendants will highlight the *Tesseron* Suit and RRD's failure to pursue the third party aspect of this case in a timely manner, and ask the Court to set a date certain by which RRD must specifically identify such third party products and provide claim charts.

## Defendants' Requests for Production:

With respect to Defendants' Request for Production No. 56, Defendants reiterated the relevance of the documents sought by this Request, as was previously stated in my June 28th and July 13th letters, as well as Defendants' response to RRD's Interrogatory No. 8. You agreed to check with your client regarding whether RRD will search for documents dating back to 1990. Defendants can confirm whether we searched for similar agreements dating back to at least 1990, if you would like.

Regarding Defendants' Request for Production No. 60, you stated that RRD does not currently have any documents which (i) RRD has considered, analyzed, examined, or alleged to be prior art in the *Tesseron* Suit and (ii) have not been produced in this case. Defendants requested that you provide written confirmation that RRD will produce any such documents to Defendants as soon as they are identified by RRD, regardless of whether they have been produced in the *Tesseron* Suit.

With respect to Defendants' Request for Production No. 61, you expressed a concern that RRD may presently be unable to produce documents responsive to this Request under the *Tesseron* Protective Order. You stated that the *Tesseron* Protective Order requires that RRD be under a court order before producing such documents in this case. Defendants stated that RRD is presently under two court

Jamie Secord
August 15, 2007
Page 3

orders to produce documents responsive to this Request. In particular, both the
Court's Scheduling Order as well as its Order of August 3rd mandate such
production by RRD. You indicated that you would take into consideration whether
either Order would qualify as a "court order" under the *Tesseron* Protective Order.
In the alternative, however, Defendants asked whether RRD would agree to
stipulate to (or agree to not oppose) a motion specifically ordering RRD to produce
responsive documents in the *Tesseron* Suit. You stated you would inquire about
whether RRD would so stipulate (or not oppose).

Finally, regarding Defendants' Requests for Production Nos. 63 and 64,
Defendants again explained that RRD's limitation of its search for responsive
documents to only those residing with individuals "likely to have knowledge of the
Patents in Suit and/or of Defendants' [allegedly] infringing activities" is
unreasonable. Defendants noted that under the Federal Rules parties are entitled
to seek discovery reasonably calculated to lead to the discovery of relevant
documentation. Here, for instance, evidence of knowledge by individuals tasked
with purchasing and/or using VDP software, or those tasked with competitive
intelligence, is likely to lead to documentation regarding RRD's earliest knowledge
of the accused products and their operation. Accordingly, Defendants expressed our
belief that both Request Nos. 63 and 64 are reasonable and appropriate as written.

Defendants consider our obligation to meet and confer on these subjects
satisfied. Due to the significant time that has elapsed since Defendants first served
its Requests for Production on May 1st, Defendants request that you provide by no
later than August 20th:

1) confirmation that RRD will agree to search back to 1990 for documents
   response to Defendants' Request No. 56;
2) confirmation that RRD will produce documents responsive to Request No. 60
   as soon as they are identified by RRD, regardless of whether they have been
   produced in the Tesseron Suit; and
3) confirmation that RRD agrees that it is presently under a "court order" as
   used in the *Tesseron* Suit to produce responsive documents from the *Tesseron*
   Suit in this litigation, or that RRD will otherwise agree to stipulate to a
   motion specifically requiring RRD to produce such documents.

Please let me know if you believe any of the above mischaracterizes our
conversation.

Jamie Secord
August 15, 2007
Page 4

Best regards,

Nathaniel Grow

cc:    Richard McMillan, Jr.

Crowell & Moring LLP ▪ www.crowell.com ▪ Washington, DC ▪ California ▪ New York ▪ London ▪ Brussels