IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 06-032 (JJF) |
| CREO, INC., NEXPRESS SOLUTIONS, | ) |
| INC., KODAK VERSAMARK, INC., | ) |
| EASTMAN KODAK COMPANY, and | ) |
| KODAK GRAPHIC COMMUNICATIONS | ) |
| COMPANY, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF R.R. DONNELLEY & SONS COMPANY'S
CLAIM CONSTRUCTION ANSWERING BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
*Attorneys for Plaintiff
R.R. Donnelley & Sons Company*

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

August 30, 2007

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iv

INTRODUCTION ........................................................................................ 1

DISCUSSION OF LEGAL PRINCIPLES ................................................... 1

ARGUMENT ............................................................................................... 6

I.    U.S. PATENT NO. 6,327,599 ............................................................ 6

      A.   **"Template File"** (Element 1) (Claim 11 of '599 Patent) ...................... 6

      B.   **"Fixed Information"** (Element 2) (Claim 11 of '599 Patent) .............. 8

      C.   **"Variable Information"** (Element 3) (Claim 11 of '599 Patent) ........ 12

      D.   **"The Master Page File"** and **"Wherein The Master Page File Defines the Fixed Information"** (Element 5) (Claim 11 of '599 Patent) ........ 14

      E.   **"A Database Having Entries Therein Each Representing Variable Information"** (Element 4) (Claim 11 of the '599 patent) .................... 17

      F.   **"Converting the Template File, the Database and the Master Page File into Press Commands Specifying Sequence and Content of Page Production by the Press"** (Element 6) (Claim 11 of '599 Patent) .......... 18

      G.   **"Press Commands Specifying Sequence and Content of Page Production by the Press"** (Element 7) (Claim 11 of '599 Patent) .......... 20

II.   U.S. PATENT NO. 6,844,940 ........................................................ 21

      A.   **"Template"** (Element 8) (Claims 11, 17, 18, 19, 20, 22 of '940 Patent) ........... 22

      B.   **"Reusable Object"** (Element 10) (Claims 11, 18 of '940 Patent) ...... 24

      C.   **"Position Data"** (Element 11) (Claim 11 of '940 Patent) ................. 26

      D.   **"Variable Object"** (Element 12) (Claims 11, 20, 21, 22 of '940 Patent) .......... 27

      E.   **"Master Data"** (Element 9) (Claims 11, 18, 19 of '940 Patent) ........ 29

      F.   **"Developing A Database Having A Number Of Entries Each Of Which Represents A Variable Object"** (Element 13) (Claim 11 of '940 Patent) ............................................................... 31

G.    **"Causing the Electronic Press to Print Output Pages with The Reusable Objects and Variable Objects by Separating the Master Data from the Position Data for Each Data Set"** (Element 14) (Claim 11 of '940 Patent) ................................................................. 32

H.    **"Separating The Master Data From The Position Data For Each Data Set In Preparation For Rasterization"** (Element 15) (Claim 11 of '940 Patent) ................................................................................................. 34

I.    **"Page Sequence Commands"** (Element 16) (Claim 12 of '940 Patent) ............. 35

J.    **"Wherein The Master Data Of The First And Second Data Sets Are Identical"** (Element 17) (Claim 19 of '940 Patent) ............................... 36

K.    **"Wherein The Variable Objects Of The First And Second Data Sets Are Identical"** (Element 18) (Claim 20 of '940 Patent) ...................................... 37

III.    **U.S. PATENT NO. 6,205,452** ................................................................. 38

A.    **"Template Page File"** (Element 22) (Claims 1, 7 of '452 Patent) ..................... 38

B.    **"Fixed Information"** (Element 24) (Claim 1 of '452 Patent) ........................... 40

C.    **"Variable Information"** (Element 21) (Claim 1 of '452 Patent) ...................... 40

D.    **"Variable Graphics Information"** (Element 19) (Claims 1, 2, 10 of '452 Patent) .......................................................................................................... 40

E.    **"Master Data"** (Element 23) (Claim 1 of '452 Patent) ...................................... 41

F.    **"A Database Having A Number Of Fields, Each Of Which Represents Variable Information Or Variable Graphics Information"** (Element 20) (Claim 1 of '452 Patent) .................................................................. 41

G.    **"Causing the Display Device to Display the Pages with the Fixed Information, Selected Variable Information from the Database, and Selected Variable Graphics Information from the Database"** (Element 25) (Claim 1 of '452 Patent) .......................................................... 43

H.    **"Executing a Graph File to Generate a Graph"** (Element 26) (Claim 2 of '452 Patent) ....................................................................................... 44

I.    **"QuarkXPress"** (Element 27) (Claim 7 of '452 Patent) ................................ 45

IV.    **U.S. PATENT NO. 6,952,801** ................................................................. 46

A.    **"Storing a First Number of Pages"** (Element 28) (Claim 1 of '801 Patent) .......................................................................................................... 46

**B.**     **"Pagination Information"** (Element 31) (Claims 1, 4, 5, 13, 16, 17, 25 of '801 Patent) ........................................................................................ 48

**C.**     **"Specifying A First Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In The First Book"** (Element 29) and **"Specifying A Second Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In The Second Book"** (Element 30) (Claim 1 of '801 Patent) ............................................................. 48

**D.**     **"Determining Whether A Stored Page Is To Be Assembled Into The First Book Based On The First Set Of Pagination Information Wherein A Second Number Of Stored Pages To Be Assembled Into The First Book Is Less Than The First Number"** (Element 32) and **"Determining Whether A Stored Page Is To Be Assembled Into The Second Book Based On The Second Set Of Pagination Information Wherein A Third Number Of Stored Pages To Be Assembled Into The Second Book Is Different Than The Second Number And No Greater Than The First Number"** (Element 33) (Claim 1 of '801 Patent) .................... 50

CONCLUSION ........................................................................................................ 52

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                              Page(s)

*Acumed LLC v. Stryker Corp.*,
    483 F.3d 800 (Fed. Cir. 2007)...............................................................3, 28, 35, 37

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
    268 F.3d 1352 (Fed. Cir. 2001)...............................................................25

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005)................................................... *passim*

*D.M.I., Inc. v. Deere & Co.*,
    755 F.2d 1570 (Fed. Cir. 1985)...............................................................16

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
    257 F.3d 1364 (Fed. Cir. 2001)................................................... *passim*

*Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*,
    34 F.3d 1048 (Fed. Cir. 1994)...............................................................4, 20, 26

*Free Motion Fitness, Inc. v. Cybex*,
    423 F.3d 1343 (Fed. Cir. 2005)...............................................................5, 39, 46

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    123 F.3d 1445 (Fed. Cir. 1997)...............................................................5, 48

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004)...............................................................2, 3, 23, 26

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
    370 F.3d 1131 (Fed. Cir. 2004)...............................................................36

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)...............................................................2

*Intamin Ltd. v. Magnetar Techs. Corp.*,
    483 F.3d 1328 (Fed. Cir. 2007)...............................................................4, 20

*Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*,
    863 F.2d 867 (Fed. Cir. 1988)...............................................................4, 21

*Lampi Corp. v. American Power Prods., Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000)...............................................................5, 17, 31

*Masco Corp. v. United States*,
   303 F.3d 1316 (Fed. Cir. 2002)...............................................................32, 33, 43

*O.I. Corp. v. Tekmar Co.*,
   115 F.3d 1576 (Fed. Cir. 1997).........................................................................33

*Omega Eng'g Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003).........................................................................11

*In re Omeparazole Patent Litig.*,
   483 F.3d 1364 (Fed. Cir. 2007)......................................................................2, 16

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*,
   355 F.3d 1353 (Fed. Cir. 2004).........................................................................51

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006)...........................................................................3

*Pfizer, Inc. v. Teva Pharm., U.S.A., Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)..............................................................13, 49, 50

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................ *passim*

*RF Delaware Inc. v. Pacific Keystone Techs. Inc.*,
   326 F.3d 1255 (Fed. Cir. 2003).......................................................................2, 23

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997).......................................................................5, 17

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001)..........................................................28, 36, 37, 38

*In re Roberts*,
   470 F.2d 1399 (CCPA 1973) .............................................................................33

*S3 Inc. v. Nvidia Corp.*,
   259 F.3d 1364 (Fed. Cir. 2001).............................................................................3

*Seal-Flex, Inc v. Athletic Track & Court Constr.*,
   172 F.3d 836 (Fed. Cir. 1999)............................................................................33

*Ex Parte Simpson*,
   218 U.S.P.Q. 1020 (Bd. Pat. App. 1982) ...........................................................45

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004)...........................................................27

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004).............................................................25

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
   831 F.2d 1017, 1023 (Fed. Cir. 1987)..................................................22

*Versa Corp. v. Ag-Bag Int'l, Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004)....................................................14, 24

*Ex Parte Zimmerley*,
   153 U.S.P.Q. 367 (Bd. Pat. App. 1966)...............................................33

**FEDERAL STATUTES**

35 U.S.C. § 112, ¶1 ....................................................................................4

35 U.S.C. § 112, ¶6 ..................................................................................32

**OTHER AUTHORITIES**

American Heritage Dictionary (2d ed. 1991) ........................................ *passim*

Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000).....................5, 48

Microsoft Computer Dictionary (2d ed. 1994). ...................................................44

Webster's Third New International Dictionary (1993)............................................ *passim*

## INTRODUCTION

Defendants seek to limit the claims to the preferred embodiment in the specification by arguing that the patents-in-suit describe a "page-based approach" to variable data printing. Defendants then contrast this "page-based approach" to an "element-based assembly approach" that, perhaps not surprisingly, Defendants believe themselves to utilize.

Defendants' "page-based approach," however, relies on a fundamentally flawed proposition: that the claims cover only the exact system disclosed in the specification. A basic patent law principle is that the claims, not the specification, determine the scope of a patent. The specification may help define a claim term, but the claims do not incorporate features appearing in the specification unless the specification evidences an intent to so limit the claims. No such intent is present here and, notably, Defendants never argue that RRD had any such intent.

The Court should disregard Defendants' "page-based approach." RRD's construction is faithful to the actual language appearing in the claims. The Court should apply the claim language and use the specification as a dictionary to define terms, not to limit the claims. Following this well-established procedure will lead the Court to adopt RRD's construction.

## DISCUSSION OF LEGAL PRINCIPLES

Defendants argue that the specification discloses only a "page-based system" and seek to limit the asserted claims to such a "page-based approach," transparently trying to exclude their supposedly "element-based" infringing products. *See* Defs.' Br. at 7-10, 12-18. The claims, however, lack any indication that they cover only a "page-based system."

Unquestionably, the specification discloses a "page-based system." And in support of their "page-based approach," Defendants claim that "Donnelley developed *only one* approach." Defs.' Br. at 2 (emphasis in original). But none of this matters because it is an

elemental principle of patent law that the specification does not limit more general claims.  The claims, not the specification, define the scope of a patent.[1]  Indeed, Defendants make the exact argument rejected in *Phillips*:  "we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."[2]

Claims are construed based on their language, with the specification helping to define the meaning of their terms.[3]  Quite simply, RRD's claims can encompass a broader scope than the preferred embodiment.  Indeed, "[a]n independent claim *usually* covers a scope broader than the preferred embodiment."[4]  "A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification."[5]

Defendants never offer any legally cognizable reason to limit the claims to a "page-based approach."  For claims to be limited to the specific embodiment in the specification, the patentee must have demonstrated "clear intent" to so limit the claims.[6]  Such intent requires that the specification have "an intentional disclaimer, or disavowal, of claim scope by the

---

[1]  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

[2]  *Phillips*, 415 F.3d at 1323.

[3]  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.

[4]  *RF Delaware Inc. v. Pacific Keystone Techs. Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003) (emphasis added).

[5]  *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004).

[6]  *In re Omeparazole Patent Litig.*, 483 F.3d 1364, 1372 (Fed. Cir. 2007) ("Absent some clear intent to the contrary, this court does not import examples from the specification into the claims.").

inventor."[7]   Alternatively, the specification may show that "the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive."[8]   Defendants' argument that the specification discloses only a "page-based approach" is not sufficient.[9]

Defendants offer no proof, or even argument, that RRD intended to disclaim claim scope or that RRD intended the specification to be coextensive with the claims.  Indeed, the specification says the opposite.[10]   Defendants do nothing more than point to the obvious fact that the patents-in-suit disclose a particular embodiment.  *See*, *e.g.*, Defs.' Br. at 15 ("Page-by-page processing is thus critical to all of the asserted patents.").   By providing a detailed disclosure, however, RRD was "not narrowly defining the term[s] [at issue] or otherwise limiting the claims, but merely discharging [its] statutory duties 'to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.'"[11]

In addition to offering no proof that RRD intended to limit the claims, Defendants admit that RRD had no such intent – but then read the specification into the claims anyway. With respect to the '940 patent, Defendants argue that "[f]aced with the reality of having out-of-date patents, Donnelley's patent attorneys crafted new patent claims, which attempted to obfuscate and expand upon the meaning of 'fixed information' and 'variable information,' while

---

[7]    *Phillips*, 415 F.3d at 1316.

[8]    *Phillips*, 415 F.3d at 1323.

[9]    *Home Diagnostics*, 381 F.3d at 1357 ("[T]he applicant's choice to describe only a single embodiment does not mean that the patent clearly and unambiguously disavowed other embodiments.").

[10]   '599 Patent col.5, ll.35-40 (stating that the invention is "not limited to use with a particular type of demand printer or a particular system for controlling a printer"); *see also Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (finding no disclaimer where the specification stated that "[t]hese examples are illustrative and are not to be read as limiting the scope of the invention as it is defined by the appended claims").

[11]   *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 (Fed. Cir. 2007); *Cf. S3 Inc. v. Nvidia Corp.*, 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The purpose of claims is not to explain the technology or how it works, but to state the legal boundaries of the patent grant.").

avoiding any mention of a 'page.'" Defs.' Br. at 17.[12]  But after claiming that RRD's attorneys

intentionally sought broad claim scope, Defendants still conclude that "the '940 patent claims

recite a page-based method as does the '599 patent." Defs.' Br. at 18.  Defendants rely on the

fact that RRD cited the '599 patent as providing the written description for the '940 patent's

claims under 35 U.S.C. § 112, ¶1.  Defendants then assume that the '940 patent's claims must be

identical to the preferred embodiment in the specification.  Defendants, however, ignore that

claims are limited by their language, not by the preferred embodiment[13] and that claims can be

broader than the preferred embodiment.[14]  In any event, RRD had no intent to limit the claims of

any of the patents-in-suit to a "page-based approach," and Defendants offer no proof of such

intent.

          Not only do Defendants read the specification into the claims, but they read

limitations not even in the specification into the claims.  For example, Defendants read the

"database" steps to require that the database contain only "variable information" (or "variable

objects").  Defs.' Br. at 30.  The specification, however, contains a database with a control code

that is not "variable information."[15]  Similarly, Defendants want the "fixed information" to

---

[12]     To be sure, there is nothing wrong with adding claims intended to capture an existing method.  *See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (holding that it is not improper "to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application").

[13]     The Federal Circuit has explained that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.

[14]     *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("As this court has repeatedly noted . . . a narrow disclosure in the specification does not necessarily limit broader claim language."); *see also Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").

[15]     '599 Patent col.10, ll.50-59.

include the "location" of the fixed information on the page. Defs.' Br. at 26. Yet the specification describes the location of the "fixed information" as changeable and only the content of the "fixed information" as constant.[16]

In addition, Defendants also misapply other claim construction law. The claims at issue in this case are open-ended "comprising" claims. "Comprising" is an open-ended term meaning that, in addition to the recited steps and features, the claim can perform other, unclaimed steps.[17] Put simply, the law allows for any number of unclaimed steps between, before, or after the claimed steps.[18]

Similar to their handling of "comprising," Defendants also misapply the law relating to other open-ended terms. Defendants ignore that unless the specification indicates otherwise, claiming an element "having" some features does not prohibit it from "having" other features too.[19] Similarly, when the term "including" lists claimed features, it does not exclude other, unclaimed features.[20]

---

[16]    '599 Patent col.7, ll.36-50, col.13, ll.31-35, Figs. 6a, 7a.

[17]    *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("'[C]omprising'…is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.") (internal citations and quotation omitted); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1353 (Fed. Cir. 2005) ("[T]he 'comprising' language allows additional features."); *see also Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380-81 (Fed. Cir. 2001).

[18]    *See CollegeNet*, 418 F.3d at 1235.

[19]    *See Lampi Corp. v. American Power Prods., Inc.*, 228 F.3d 1365, 1376 (Fed. Cir. 2000); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1573 (Fed. Cir. 1997).

[20]    *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997) ("The claim term 'including' is synonymous with 'comprising,' thereby permitting the inclusion of unnamed components."); Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000) ("The transitional term 'comprising,' which is synonymous with 'including,' …is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.").

In sum, Defendants' claim construction is inconsistent with the law. This leads Defendants to an incorrect and narrow claim construction. The Court should apply the law and find that the disputed claim terms should be construed as RRD proposes. *See* Am. Ex. A.

## ARGUMENT

### I.      U.S. PATENT NO. 6,327,599[21]

#### A.      "Template File" (Element 1) (Claim 11 of '599 Patent)[22]

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file | a file that stores template pages, which are single page layouts defining the content and position of fixed information and the position of variable information on that page |

The parties dispute three issues relating to the "template file": (1) whether "single page layouts" belongs in the construction, (2) whether the "template file" must "store[] template pages," and (3) whether the "template file" identifies the source of the "variable information."

Defendants frankly admit their goal of limiting this term to "page-based processing" and that they added "single page layout" to do so.[23] Defs.' Br. at 25. Defendants, however, never offer any legally cognizable reason to support such a limitation. The claim language speaks generally about the "template file" and what it contains – "a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page." Similarly, the specification defines "template file" (*see*

---

[21]      For the Court's convenience, attached hereto is Amended Exhibit A, which lists each disputed term and each party's proposed constructions.

[22]      This term appears in the following context in the claim: "template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page."

[23]      As explained in RRD's Opening Brief, neither the '599 patent specification nor claims refer to a "single page layout," making it unclear what Defendants even mean by the phrase. RRD's Br. at 12. Defendants' attempt to add a so-called "clarifying phrase" to the construction of "template file" (Defs.' Br. at 25) is in fact another restriction with no support in the intrinsic record.

RRD's Br. at 12) but never says that the invention is limited to the specific disclosure or demonstrates any intent to limit this term to the preferred embodiment. In sum, there is no reason to limit this term to "page-based processing."

With regard to the second dispute, although the claim recites "a template file defining pages to be printed," Defendants read this language as "a template file defines *and stores template pages.*" Defs.' Br. at 25 (emphasis added). As discussed in RRD's Opening Brief, "defines" and "stores" are not synonymous. *See* RRD's Br. at 13.[24] And Defendants' addition of "template pages" lacks any basis in the claim. The term "template page" does not appear anywhere in the claim.[25] Defendants also wrongly read this element to cover only plural "pages." The law interprets a "template file defining pages to be printed" to refer to one or more pages.[26]

On the third dispute, Defendants dispute whether the "template file" contains information about where to find the data representing the variable information – *i.e.*, in the corresponding entry (or entries) in the database. Although Defendants claim that such language is "unsupported and superfluous" (Defs.' Br. at 25), RRD's proposed language comes directly from asserted claim 11. The "template file" holds information "defining pages to be printed with

---

[24]  "Define" in an ordinary sense indicates the data included therein. *See* '599 Patent col.8, ll.16-23; *see also* American Heritage Dictionary (2d ed. 1991), Ex. M, at 375 (describing "define" as "[t]o describe the nature or basic qualities of; explain" or "to specify distinctly"); Webster's Third New International Dictionary (1993), Ex. N, at 592 (describing "define" as "to discover and set forth the meaning of"). "Store," on the other hand, means "to record (information) in an electronic device (as a computer) from which the data can be obtained as needed." Webster's Third New International Dictionary (1993), Ex. N, at 2252; *see also* American Heritage Dictionary (2d ed. 1991), Ex. M, at 1201 (defining "store" as "[t]o reserve or put away for future use").

[25]  A variant of "template page" is a disputed term in another patent (the '452 patent), but there is no reason to read that term into this claim, and Defendants never offer one. *See also* RRD's Br. at 12.

[26]  *See CollegeNet*, 418 F.3d at 1232 (finding it "well settled" that a singular term can mean "'one or' more").

. . . variable information" and part of defining such pages requires identifying the data to substitute for the "variable information."  Fully defining "variable information" requires identifying where to find the data to substitute for the variable placeholder.

Other than mentioning their unsupported "page-based processing" theory, Defendants offer only a single citation to the specification in support of their construction. Defs.' Br. at 25.  But even that part of the specification supports including a reference to the entries in the database, as RRD proposes:

> The variable information may be stored in a database created by the publisher and the *template file(s) specify the locations on particular pages for variable information stored in the database* as noted in greater detail hereinafter.

'599 Patent col.6, ll.6-9 (emphasis added).

B.     **"Fixed Information"** (Element 2) (Claim 11 of '599 Patent)[27]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information that does not vary from printed product to printed product** | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |

The parties dispute whether "fixed information" (1) includes the location of the fixed information, (2) must be "common to all of the pages *to be printed*," and (3) does not vary from "page to page" or "printed product to printed product."

RRD's construction uses the ordinary meaning and the specification to define "fixed information" and does not have the potential to confuse the jury with respect to multi-page output (*e.g.*, a book or magazine).  Although Defendants mention consulting the intrinsic evidence (Defs.' Br. at 26), they ignore the claim language and the portions of the '599 specification that define "fixed information."  The specification confirms that the '599 patent

---

[27]     This term appears in the following context in the claim: "fixed information common to all of the pages."

defines "fixed information" consistent with its ordinary meaning[28] as "printed information which does not vary from book to book of the same version."[29]

The parties' first dispute relates to whether the "fixed information" must be at the same location on every printed product. The claim never says that it does, despite Defendants' argument to the contrary. Defs.' Br. at 26. Moreover, the specification clearly weighs in RRD's favor. The specification provides an example where "fixed information" appears in different locations:

> [T]he present invention is not limited to production of books of the same "version" (i.e., books having the same master information). For example, the book versions of FIGS. 7a, 7b and 8a, 8b may be produced together with the book version of FIG. 6a and 6b in the same production run or job. The book version example of FIGS. 7a and 7b includes pages P5-P8 to be reproduced a number of times to produce individual books. The book version of FIGS. 7a and 7b is identical to of the book version of FIGS. 6a and 6b except that an additional area 113 is provided on the page P5 for placement of variable information, in addition to the areas 110 and 112. *Because of the addition of the area 113, the remaining master information appearing in an area 114 differs from master information appearing in an area 116 of the page P1 of FIG. 6a.*[30]

The figures cited in the above quotation are reproduced below and show that the addition of more variable information into Figure 7(a) (denoted by area 113 in Figure 7(a)), moves the fixed information (denoted by area 116 in Figure 6(a) and area 114 in Figure 7(a)) to a different location on the printed pages:[31]

---

[28]    In its Opening Brief, RRD cited dictionary definitions showing that, in the ordinary sense, "fixed" indicates that the information does not vary. American Heritage Dictionary (2d ed. 1991), Ex. M, at 508 (describing "fixed" as "[n]ot subject to change or variation"); Webster's Third New International Dictionary (1993), Ex. N, at 861 (defining "fixed" as "not adjustable"); RRD's Br. at 13 & n.49.

[29]    '599 Patent col.6, ll.2-4.

[30]    '599 Patent col.7, ll.36-50; *see also* col. 13, ll.31-35.

[31]    RRD's Br. at 14 & n.53 discusses other places where the specification explains that fixed information may appear in a different position on different pages.



To support adding "location," Defendants cite to a discussion of "template files" in the specification rather than "fixed information":

> [O]ne or more template files 106 are developed by a publisher specifying the content (including appearance) of fixed information and the positioning of all information (*i.e.*, fixed and variable) on the different books or book versions.
>
> * * *
>
> The template files 106 include data specifying the position and content of fixed information on the pages to be printed.[32]

This language sheds no light on "fixed information." And although Defendants argue that both the substance *and location* of the fixed information must be the same on every printed page, the language quoted above states only that template files include data *specifying* the position and content of fixed information, not that the fixed information must always appear in the same location on every printed page. That position could be *specified* in a way that allows the "fixed information" to move – *e.g.*, a specified amount away from some variable information that varies in size.

Defendants also support their "location" argument by reference to their "page-based processing" argument, claiming that "fixed information" must "be tied to the notion of page." Defs.' Br. at 27. As throughout their brief, Defendants offer no reason to limit this claim element to "page-based processing," providing no citations to any intrinsic or extrinsic evidence

---

[32]    Defs.' Br. at 26, *citing* '599 Patent col.8, ll.6-9, 16-17.

10

or to case law.  As discussed above, the *location* of the fixed information need not be "common to all pages."

With regard to the parties' second dispute, RRD does not dispute that in claim 11, the *content* of the "fixed information" must be "common to all pages" – the claim says that. Defendants, however, overstate what this means.  The claim does not require that the "fixed information" be, as Defendants assert, "common to all the pages *to be printed*," only that it be common to "the pages."  "The pages" does not necessarily refer to every page in a print job. This claim is an open-ended "comprising" claim, meaning that "all pages" refers to "all pages" being described in the claim, not to all pages in the job or all pages in a printed product.[33]  *See* RRD's Br. at 14.  For example, in printing a two-page advertisement, the claim does not require that the same "fixed information" appear on both pages.

Finally, Defendants complain about RRD's use of "printed product" in its proposed construction.  Defs.' Br. at 27.  In defining "fixed information," the specification speaks of the "printed information" not varying "from book to book of the same version."[34]  The '599 patent defines "book" to mean such things as "magazines, catalogs or any other printed and bound matter," all of which have more than one page.[35]  The phrase "printed product" is better than "page" because it signifies that the printed output may have one or more pages.  RRD

---

[33]    *See CollegeNet*, 418 F.3d at 1235.  "Fixed information" also appears in the '452 patent without the "all pages" language, and the disputed term should be construed to have the same meaning in all the patents-in-suit.  *See Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).  Defendants, however, try to incorporate "all pages" into that patent as well.  *See* Section III.B.  Additionally, even though the term "fixed information" does not appear in the '940 patent claims, Defendants attempt to import that term – with all the additional restrictions Defendants place on "fixed information"– into the '940 patent's claims.  Further, the '940 patent claims do not recite that the "fixed information" must be common to all pages.

[34]    '599 Patent col.6, ll.2-4.

[35]    '599 Patent col.1, ll.20-21.

further believes the jury will understand "printed product" better than "book" because the '599 patent uses "book" to mean more than just a traditional hardback or paperback book. Defendants' use of "page" ignores that the printed output can be more than a single page and that every page does not need to have the same "fixed information."

### C.     "Variable Information" (Element 3) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| information that typically varies from printed product to printed product | information that varies from printed page to printed page and is retrieved from a database |

The parties dispute (1) whether "variable information" must be retrieved from the database, (2) whether the variable information may "typically" vary between printed products, (3) whether the construction must include the "notion of a page," and (4) whether the term "printed product" is appropriate.

Regarding the first dispute, Defendants want to mandate that the "variable information" be "retrieved from a database." Defs.' Br. at 28.[36] The claim language, however, does not require "variable information" to be "intertwined" with the "database," as Defendants assert. Although the database holds "variable information," the claim does not require that *all* the variable information be in the database or that every item in the database be variable information. As discussed in RRD's Opening Brief, the specification clearly states that "variable information *may* be stored in a database," not that it *must* be retrieved from a database.[37] RRD's Br. at 16. And the specification discusses variable images that are not located in the database at

---

[36]     Defendants argue that "variable information is the information contained in the database, and the information in the database consists of variable information, and only variable information, since by the terms of the claim language itself, 'each entry' in the database is variable information." Defendants, however, do not quote the entire claim term, which describes the database as "having entries therein each representing variable information to be printed." Under the relevant law, the database may "hav[e]" other entries as well. *See* Section I.E.

[37]     '599 Patent col.6, ll.5-7 (emphasis added).

all (*e.g.*, the database contains a record that selects amongst a collection of variable images).  *See* RRD's Br. at 16; '599 patent, col. 10, ll.22-25.

Defendants next take issue with the word "typically" in RRD's construction, claiming that "there is no basis for insertion of the word 'typically' into the definition" of "variable information."  Defs.' Br. at 29.  Contrary to Defendants' statement, the specification expressly defines variable information as "information (which *typically* varies from book to book)."[38]  Defendants' proposed construction incorrectly requires information *always* to vary from one printed product to the next.  As discussed in RRD's Opening Brief, the specification contains a sample database where each customer lives in the same state.  *See* RRD's Br. at 5.  A proposed construction that is inconsistent with the specification is not correct.[39]

With respect to the third dispute, Defendants again make their "page-based" argument, complaining that RRD "does not include any notion of a page" in its construction. Defs.' Br. at 29.  Defendants' sole support is the prosecution history, which they take out of context to suggest that RRD in some way embraced "page-based processing" while prosecuting the '599 patent.  Defendants claim that "when arguing about the prior art to the Examiner, Donnelley belittled the prior art for not disclosing how variable information 'could be placed in a fixed location on a finished page . . .'"  Defs.' Br. at 29.  Defendants ignore, however, that the language they quote does not describe the claims in suit.  Unlike the claims in suit, the claims that RRD was discussing included an element requiring "area data representing an area of a page in which the variable information is to be printed" – *i.e.*, "variable information" "placed in a

---

[38]    '599 Patent col.6, l.5 (emphasis added).  In its Opening Brief, RRD cited additional examples from the '599 specification where the variable information does not vary for every printed product.  *See* RRD's Br. at 15-16.

[39]    *See Pfizer, Inc. v. Teva Pharm., U.S.A., Inc.,* 429 F.3d 1364, 1374 (Fed. Cir. 2005).

fixed location on a finished page" as RRD's attorney told the Patent Office.[40]   When RRD's

attorney made this statement, the Examiner had already allowed the claims in suit, leaving RRD

no reason to be commenting on their patentability.  Indeed, RRD's attorney expressly identified

the claims he was discussing – the ones still pending and not the ones that had already been

allowed.[41]   The claims in suit, which the Examiner had previously approved, do not have this

"area data" limitation, making this file history irrelevant.

> With respect to the fourth dispute, as in its construction of "fixed information,"
> RRD uses the phrase "printed product." RRD believes the jury will understand "printed product"
> better than "book" given that "book" in the '599 patent can mean more than a traditional
> hardback or paperback book.[42]   As discussed above, the '599 specification expressly states that
> variable information "typically varies from *book* to *book*."[43]   Defendants' construction is
> confusing because a "page" in the claim may be one page or many, which the jury may not
> appreciate.[44]

> **D.**    **"The Master Page File" and "Wherein The Master Page File Defines
> the Fixed Information"** (Element 5) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data representing "fixed information," which is stored in a file | a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information |
| the "master page file" identifies the "fixed information" | plain meaning using the definitions for "master page file" and "fixed information" |

---

[40]   *See* RRD004574-77, Defs.' Br. at Ex. FW1.

[41]   *See* RRD004576, Defs.' Br. at Ex. FW1.

[42]   '599 Patent col.1, ll.20-21.

[43]   '599 Patent col.6, l.5 (emphasis added).

[44]   *See CollegeNet*, 418 F.3d at 1232 (finding it "well settled" that a singular term can mean "'one or' more"); *see also Versa Corp. v. Ag-Bag Int'l, Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("[P]lural can describe a universe ranging from one to some higher number.").

The parties have four disputes about these terms: (1) whether to incorporate the preferred embodiment into this term, (2) whether the "master page file" must contain the "location" as well as the content of the "fixed information," (3) whether the "master page file" defines "only" this information, and (4) whether "identifies" and "defines" are synonymous in construing the "wherein" clause.[45]

The parties' first dispute goes to the heart of claim construction law – whether to apply the claim language as written or to read in the exact process described in the specification. RRD's proposed construction for "master page file" tracks the claim language and does not inappropriately incorporate the exact process discussed in the specification into the claim. RRD's Br. at 16-17. Defendants offer no legally recognizable reason to incorporate the process of the preferred embodiment – "stripp[ing] of the placeholders for variable information." The claim generically describes a process with an end result – "developing" a "master page file" that "defines the fixed information" – not the specific process that produces the "master page file." *See* RRD's Br. at 17.

The second dispute involves Defendants' attempt to have the "master page file" contain the "location" of the fixed information. Defs.' Br. at 31. The claim never says that the location of the fixed information must be in the "master page file." Moreover, even though the "template file" contains the location of the fixed information, there is nothing in the claim requiring that location to be in the "master page file," too. Indeed, Defendants' argument that

---

[45] Defendants also raise a red herring, claiming that RRD's definition is too broad because a "master page file" could be considered part of a "template file" and RRD differentiated between the two in prosecuting the '599 patent. Defs.' Br. at 31-32. RRD is not claiming that the "master page file" can be part of the "template file." RRD is willing to add "separate and apart from a template file" to its construction to eliminate any confusion. In any event, Defendants' argument provides no reason to adopt their construction or add other restrictions to this term.

"[i]nformation isn't really fixed if it can vary all over the page" is simply inconsistent with the specification[46] and the '940 patent, which contains a dependent claim demonstrating that the same "master data" can appear in different positions.  In sum, the location is not fixed; the content is fixed.

Defendants conclude that the "location" should be in the "master page file" because they have read the preferred embodiment into the claim.  Defs.' Br. at 31.  The specification discloses a particular technique of "stripping" variable information from the template and identifying the remaining information as the "master page file."  But this claim is not coextensive with the specification, and Defendants identify no reason to import features in the specification into the claim.[47]  The specification does not state that it is intended to limit the claim.  To the contrary, it clearly states that it "is to be construed as illustrative only" and that "the exclusive use of all modifications which come within the scope of the appended claims is reserved."[48]

With regard to the third dispute, Defendants propose that the "master page file" "defines *only* the content and location of the fixed information."  (Emphasis added.)  The claim contains no language, however, requiring the "master page file" to contain anything except the "fixed information."  As an open-ended "comprising" claim, the claimed method still covers processes with additional steps or features not mentioned in the claim.[49]  Further, unasserted claim 6 recites that "the master page file includes data defining the fixed information only."  Claim 11 contains no such language.[50]

---

[46]     *See, e.g.*, '940 Patent col. 13, ll.31-35.

[47]     *See In re Omeparazole Patent Litig.*, 483 F.3d at 1372; *Phillips*, 415 F.3d at 1323.

[48]     '599 Patent col.19, ll.14-23.

[49]     *See CollegeNet*, 418 F.3d at 1235.

[50]     *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985).

Finally, with respect to the broader phrase "wherein the master page file defines the fixed information," the parties agree that the construction of the phrase hinges on the constructions of the disputed terms "master page file" and "fixed information." *See* Defs.' Br. at 32. Defendants complain, however, about RRD's use of "identifies" to explain "defines" to the jury. The two terms are clearly synonymous in this context. Indeed, "define" means "[t]o describe the nature or basic qualities of; explain" or "to specify distinctly,"[51] and "identify" means "[t]o ascertain the origin, nature, or definitive characteristics of."[52] Defendants, however, just repeat the word "define."

E.    **"A Database Having Entries Therein Each Representing Variable Information"** (Element 4) (Claim 11 of the '599 patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| a collection of data representing the "variable information" | each entry in the database represents variable information |

The parties dispute whether each and every entry in the database must contain variable information or whether some entries in the database can hold other information, such as control codes. Defendants seek "total congruence" between the database and the "variable information." Defs.' Br. at 30.

Defendants simply ignore the law on construing a claim with the term "having." Claim 11 recites "a database *having* entries therein each representing variable information." (Emphasis added.) As explained in RRD's Opening Brief (RRD's Br. at 19 & n.74), the term "having" does not preclude the database from having other features and other types of data in

---

[51]    American Heritage Dictionary (2d ed. 1991), Ex. M, at 375; *see also* Webster's Third New International Dictionary (1993), Ex. N, at 592 (describing "define" as "to discover and set forth the meaning of").

[52]    American Heritage Dictionary (2d ed. 1991), Ex. M, at 639; *see also* Webster's Third New International Dictionary (1993), Ex. N, at 1123 (describing "identify" as "to establish the identity of").

addition to those recited in the claims.  Specifically, the database may contain entries in addition to the entries recited in the claim that represent variable information.  These other entries need not represent "variable information."  Further, a term using "having" must be interpreted in light of the specification.[53]  Here, the specification makes clear that not all entries in the database represent variable information.  *See* RRD's Br. at 18-19.  For example, some entries represent a "control code" or the number of copies.[54]  Furthermore, the specification states that, "[t]he variable information *may* be stored in a database created by the publisher."[55]  Some entries represent variable information, but there can be others that do not.  And some "variable information" may not be located in the database as the claim never says that all the "variable information" is located there.

Finally, Defendants make no effort to define the key term in the disputed phrase – "database."  RRD's proposed construction does so ("a collection of data representing the 'variable information'"), and, in their brief, Defendants themselves agree that "the database consists of the data representing 'variable information.'"  Defs.' Br. at 30.

F.    **"Converting the Template File, the Database and the Master Page File into Press Commands Specifying Sequence and Content of Page Production by the Press"** (Element 6) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **using the "template file," the "database," and the "master page file" to produce "press commands specifying sequence and content of page production by the press"** | Generating instructions to a press for sequencing pages defined by the template files, the database and the master page file |

---

[53]    *See Lampi*, 228 F.3d at 1376; *Regents of the Univ. of Cal.*, 119 F.3d at 1573.

[54]    '599 Patent col.9, ll.40-50, col.10, ll.22-32, 40-50, 57-59.

[55]    '599 Patent col.6, ll.5-7 (emphasis added).

The parties dispute whether one creates the "press commands" using the "template file," "database," and "master page file" or whether those sources "define" the press commands.[56]

The claim language itself answers that it is the former, not the latter. The claimed method uses the "template file," "database," and the "master page file" to produce the press commands ("converting … into"); the press commands themselves are not defined by these sources. *See* RRD's Br. at 19, 21. The specification supports this conclusion.[57] The claim language does not require any particular method or technique for "converting" these sources into "press commands," and indeed, in a comprising claim, other sources could be used as well. The specification describes, for example, also using "variable page files."[58]

Defendants, in arguing that these sources "define" the press commands, ignore the claim language and base their argument on the specification's preferred embodiment. *See* Defs.' Br. at 33 ("According to the entire teaching of the patent, the pages that are sent to the press are *defined* by the content of the template file and the database."; "Based on this specific description of the process [in the specification] of generating process commands."). Again here, Defendants make no effort to show that RRD somehow intended to limit this claim to the preferred embodiment in the specification – nor could they given that the claim language does not support Defendants' proposed limitation and that the specification states it is *not* intended to be coextensive with the claims.[59]

---

[56]     The parties also dispute whether this element generates "instructions to a press." This dispute is discussed in Section I.G.

[57]     *See, e.g.*, '599 Patent col.16, l.23 – col.17, l.7.

[58]     *See* '599 Patent col.16, ll.59-62.

[59]     *See* '599 Patent col.19, ll.14-23.

G.     **"Press Commands Specifying Sequence and Content of Page Production by the Press"** (Element 7) (Claim 11 of '599 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **commands specifying what information goes where on the printed page and the order of the pages** | instructions to a press for sequencing pages defined by the template files, the database and the master page file |

The parties dispute (1) whether the "press commands" are "instructions to a press," (2) whether to include a construction of the claimed "content of page production" and (3) whether the "press commands" are "defined by the template files, the database and the master page file."

Defendants' construction requires the "press commands" to be "instructions to a press." This is unnecessarily restrictive because the "press commands" could "specify[] sequence and content of page production by the press" indirectly. For example, the "press commands" could go to and be processed by an intermediate unit such as a collator or RIP before going to the press.[60] The claim language only requires that the "press commands" "specify[] sequence and content of page production," not that the "press commands" themselves instruct the press what to print.

Defendants' construction also lacks any acknowledgement that the "press commands specify[] . . . content of page production," as set forth in the claim. Nevertheless, Defendants complain about the "what information goes where" portion of RRD's construction as "impl[ying] that the press commands arrange the components on the page." Defs.' Br. at 34. Defendants ignore, however, that the claim language itself specifies that "press commands specify[] . . . [the] content of page production by the press" – *i.e.*, "what information goes where on the printed page." The "press commands" can do so as disclosed in the specification by

---

[60]     *See, e.g.,* '599 Patent col.6, ll.41-65.

20

combining files containing fixed and variable information or they can do so in other ways.[61]  The claim language does not recite any particular technique.

Indeed, Defendants' argument is no more than their "page-based approach" reprised.  *See also* Defs.' Br. at 34 ("Kodak's construction is true to the page-based approach").  But as explained above, Defendants never show that their "page-based approach" has any support in the intrinsic evidence.  Defendants' "page-based approach" is nothing more than a transparent attempt to read the preferred embodiment into the claims.

Defendants also apply their "page-based approach" to assert that "all that is left for the press commands is to instruct the merging or overlaying of the pages, not their assembly."  Defs.' Br. at 34.  In a comprising claim like this one, the law allows for any number of unclaimed steps before or after the elements of the claim, including before the instructions are provided to the press.[62]  Moreover, nothing in the claim restricts the "page commands" from describing the "assembly" of the page.[63]

Finally, the parties dispute whether the "press commands" are "defined by the template files, the database and the master page file."  This dispute is discussed in Section I.F.

## II.    U.S. PATENT NO. 6,844,940

As described above, Defendants wrongly incorporate the preferred embodiment into the broad claims of the '599 patent.  Worse yet, Defendants apply the same narrow construction to the '940 patent even though they argue that RRD intentionally sought broad claims to cover the manner in which the industry had progressed.  *See* Defs.' Br. at 16-17.  There is of course nothing wrong with writing claims to cover your competitors' products, even if you

---

[61]    *See Intamin*, 483 F.3d at 1335; *see also Electro Med. Sys.*, 34 F.3d at 1054.
[62]    *See CollegeNet*, 418 F.3d at 1235.
[63]    *See Phillips*, 415 F.3d at 1312 (stating that it is the claims, and not the specification that define the scope).

did not know about those products when you filed your patent application.[64]    Indeed, while concluding that "the '940 patent claims recite a page-based method as does the '599 patent," Defendants argue that RRD intentionally sought patents that "avoid[ed] any mention of a 'page.'"  Defs.' Br. at 17.  At bottom, RRD's claims are not limited to the preferred embodiment because RRD lacked any intent to so limit the claims.

A.    **"Template"** (Element 8) (Claims 11, 17, 18, 19, 20, 22 of '940 Patent)[65]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing the position and content of one or more "reusable objects" and identifying the position and corresponding entry (or entries) in the database of one or more "variable objects"** | a single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page |

Both parties agree that the construction of "template" in the '940 patent should largely track the construction of "template file" in the '599 patent.  The parties' dispute largely parallels the dispute over that term.  *See* RRD's Br. at 22; Defs.' Br. at 36; *see* Section I.A. Additionally, the parties disagree about whether terms not used in the '940 patent claims – namely, "fixed information" and "variable information" – should be imported into the construction of "template."

The '940 patent claims use the terms "reusable objects" and "variable objects," not "fixed information" and "variable information."  Even so, Defendants baldly assert that the words "fixed information" and "variable information" – along with all of the unsupported

---

[64]    *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (it is not improper "to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application").

[65]    This term appears in the following context in the claim: "developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed."

limitations Defendants propose for each term in the context of the '599 patent – should be imported into the construction of "template" in the '940 patent. Without citing any legal authority, Defendants argue that the different words automatically must be given the same meaning. Defs.' Br. at 36-37. It is improper, however, to ascribe the same meaning to different claim terms appearing in related patents, even if the patents share a common specification.[66]

Indeed, Defendants tell a tale about how RRD's prosecuting attorneys allegedly tried to get different coverage with these different words. *See* Defs.' Br. at 36-37. Nonetheless, Defendants still construe these different terms the same way – to cover only the preferred embodiment. Defendant rely heavily on RRD's citations to the '599 patent's specification as providing the required written description for these claims. Defs.' Br. at 37. But this does not limit the claims because so long as there is support in the specification, claims can be broader than the preferred embodiment. Indeed, "[a]n independent claim usually covers a scope broader than the preferred embodiment."[67] "A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification."[68] Here, Defendants argue, without any legal or factual support, that despite actually trying to get broad claims, RRD's attorneys nonetheless failed to do so. Not only do Defendants' unsupported limitations not belong in the constructions of "fixed information" and "variable information" in the '599 patent, but they certainly do not belong in the construction of "template" in the '940 patent.

---

[66]     *See Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

[67]     *RF Delaware*, 326 F.3d at 1264.

[68]     *Home Diagnostics*, 381 F.3d at 1357.

Defendants' brief also glosses over the fact that their proposed construction limits "template" to "a single page layout" defining content "on that page." Defs.' Br. at 37. In support, Defendants offer little more than their "page-based approach" to claim construction (here called "page connotation"). Defs.' Br. at 37. The claim, however, contains no such language. The claim language never says that a "template" consists only of a single page. Furthermore, the specification makes numerous references to the "template" representing multiple pages.[69] A "template" therefore can represent one or more than one printed page.

Defendants' proposed construction, moreover, requires "template" to represent plural "reusable object*s*" and "variable object*s*." Defs.' Br. at 36. This simply ignores the law. According to the Federal Circuit, a claimed "plural can describe a universe ranging from one to some higher number."[70]

B.    **"Reusable Object"** (Element 10) (Claims 11, 18 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| element of **"master data"** that is reused from printed product to printed product | fixed information |

Although the parties agree that "reusable object" should be construed similarly to the disputed term "fixed information" that appears in the '599 and '452 patents (RRD's Br. at 24; Defs.' Br. at 40; *see* Sections I.B and III.B), the parties dispute whether to literally define "reusable object" to mean "fixed information," as Defendants propose.[71]

The term "fixed information" does not appear in the '940 patent claims. It is not appropriate to define "reusable object" to be the "fixed information" from the '599 and '452 patents, especially given the number of inappropriate limitations Defendants add to "fixed

---

[69]    *See, e.g.*, '940 Patent col.10, ll.38-40.
[70]    *See Versa*, 392 F.3d at 1330.
[71]    As explained in Section I.B, Defendants' proposed construction of "fixed information" contains a number of unsupported limitations.

information." "Reusable object" therefore must be construed on its own merits. To be clear, RRD does not propose "wholly different meaning[s]" for "reusable object" and "fixed information," as Defendants assert. Defs.' Br. at 40. RRD proposes that "fixed information" in the '599 and '452 patents be construed as "information that does not vary from printed product to printed product." RRD's proposed construction of "reusable object" – "element of master data that is reused from printed product to printed product" – is not drastically different and properly takes into account the different language used in the '940 patent claims. Here, as explained in RRD's Opening Brief, "reusable object" has a similar meaning to "fixed information," without, of course, the unnecessary limitations Defendants wish to add to "fixed information." *See* RRD's Br. at 24.

Defendants acknowledge that "fixed information" does not appear in the '940 patent claims. And Defendants concede that the prosecuting attorneys used "different words" in the '940 patent than those that appear in the '599 patent and that the prosecuting attorneys intended the claims to have broad scope. Defs.' Br. at 41. Presumably then, even Defendants should agree that "reusable object" can have a broader meaning than "fixed information."[72]

But in spite of different language, Defendants still seek the same meaning – along with the same proposed improper limitations – for both terms. Defendants assert that because "reusable object" is not defined in the specification, the term should be construed to mean "fixed information" – and should include all the unsupported limitations that Defendants propose for "fixed information." Defs.' Br. at 41.[73] Claims are not required to use only terms appearing in

---

[72]     Indeed, applying Defendants' worldview, this element's use of "object" is the quintessential "element-based" approach.

[73]     The case to which Defendants cite in passing, *Ballard Medical Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1360-61 (Fed. Cir. 2001), does not support their position. The Court in *Ballard* was construing means-plus-function claims under § 112, ¶

the specification.  Claim terms, whether they appear in the specification or not, are still construed

consistent with their ordinary meaning.  Indeed, this follows directly from the principle that

claims are not limited to the preferred embodiment.[74,75]  "The patent's preferred embodiment is

just that – one way of using the invention."[76]

### C.    "Position Data" (Element 11) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| information about the location of a "variable object" on a page | data representing a position on a page at which a variable object is to be printed |

Although at first glance the parties do not appear to dispute much about the

meaning of "position data," they appear to intend that their constructions have different

meanings.  RRD's Br. at 24; Defs.' Br. at 39.  Defendants read this element to require the

"variable objects" to be in the exact same position on every printed page.  RRD, on the other

hand, reads the claim to require only information "about" the location of the "variable

information" and contemplates, for example, that the location of the "variable information" can

depend on other information on the page.

Defendants seek to place the "variable object" at an exact and unvarying location

on a page.  Defs.' Br. at 39.  But in their indignation that the "location of a variable object must

---

6 that "derive their scope from the structure disclosed in the written description."  *Id.* at 1360-61.  The claims at issue here do not derive their scope from the disclosed structure in the specification.

[74]  *See Phillips*, 415 F.3d 1323; *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

[75]  Defendants interpret the Examiner's Reasons for Allowance as defining the term "position data."  Defs.' Br. at 39.  However, in the Reasons for Allowance, the Examiner merely repeated claim language in stating that "[t]he prior art neither teaches nor suggests a method or apparatus for controlling an electronic press to separate the master data… from the position data… for each set of template data in preparation for rasterization nor specifying sequence and content of page production."  RRD005420, Defs.' Br. at Ex. FW1.

[76]  *Home Diagnostics*, 381 F.3d at 1357.

be specified accurately" (Defs.' Br. at 39), Defendants ignore that a variable object's "position" can be relative to another object – e.g., longer text or a bigger graphic can push the "variable object" down on the page. RRD's construction allows for this common situation (i.e., "information about the location"), which is also discussed in the specification.[77]

        Defendants also do not like RRD's use of "about" and suggest that "representing" would be a more precise term.[78] Defs.' Br. at 39. RRD has no objection to using "representing the relative location" instead of "about the location" if the Court believes this would be more instructive for the jury. RRD believes that the jury should understand the "position data" does not have to specify the exact spot on the page where the variable data will be located.[79] Rather, the "position data" must just "represent" that position, even if relative to some other element. RRD believes its language better informs the jury about the scope of the claim.

        **D.**    **"Variable Object"** (Element 12) (Claims 11, 20, 21, 22 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| element of information that typically varies from printed product to printed product | variable information that is retrieved from a database and separately defined for each printed page |

        Both parties construe "variable object" in a similar manner to their proposed constructions for "variable information," a disputed term in the '599 and '452 patents. RRD's

---

[77] '940 Patent col.10, ll.3-6 ("Because of the addition of the area 113, the remaining master information appearing in an area 114 differs from master information appearing in an area 116 of the page P1 of FIG. 6a."), col.13, ll.31-32 ("The fixed and/or variable information may vary in terms of content or appearance (i.e., style, location, rotation, position, etc.) or both in different versions.").

[78] Defendants appear to be taking the wrong definition of "about." "About," in this context, means "in reference to; relating to." American Heritage Dictionary (2d ed. 1991), Ex. M, at 68; see also Webster's Third New International Dictionary (1993), Ex. N, at 5. Defendants argue against "approximately; nearly." American Heritage Dictionary (2d ed. 1991), Ex. M, at 68; see also Webster's Third New International Dictionary (1993), Ex. N, at 5.

[79] Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed. Cir. 2004).

Br. at 24-26; Defs.' Br. at 44; *see* Sections I.C and III.C.  Again here, Defendants attempt to define "variable object" to literally mean "variable information" and thereby to add additional unsupported limitations that they add to "variable information" in the '599 patent.  Moreover, Defendants add a new limitation into "variable object" – *i.e.*, "separately defined for each printed page."

Defendants seek to include all the extraneous limitations they added to "variable information" to "variable object" even though "variable information" does not appear in the '940 patent claims and they agree that RRD sought broad claims in the '940 patent.  Like "variable information," the ordinary meaning of "variable object" is clear.[80]  The specification defines "variable object" as RRD does.[81]  Contrary to Defendants' argument, the claim language is not limited to the exact process disclosed in the specification.[82]

Defendants provide no support for the additional limitations they add to "variable object," including that a "variable object" *must* be "retrieved from a database" and be "separately defined for each printed page."  As discussed in RRD's Opening Brief, these extraneous limitations lack support in the intrinsic evidence.  *See* RRD's Br. at 25-26.  The '940 patent claims do not require a "variable object" to be retrieved from a database.  Although the database contains "variable objects," the claim never requires that *all* variable objects come from the database.  *See* Section II.F.

Similarly, the claim language of the '940 patent does not require a "variable object" to be "separately defined for each printed page."  It is not even clear what Defendants

---

[80]    As discussed in Section I.C, "variable" means "[l]iable or likely to vary" or "able or apt to vary or change."  American Heritage Dictionary (2d ed. 1991), Ex. M, at 1337; Webster's Third New International Dictionary (1993), Ex. N, at 2533.

[81]    '940 Patent col.7, ll.50-51.

[82]    *See Phillips*, 415 F.3d at 1323; *Acumed*, 483 F.3d at 808.

mean here, and they did nothing in their Opening Brief to shed any light on this proposed limitation.  Defendants appear to argue that each printed page output by the press requires a separately defined "variable object."  Doing so, of course, directly contradicts the reason to use variable printing in the first place.  Regardless, "variable objects" on different pages may be the same.[83]

### E.     "Master Data" (Element 9) (Claims 11, 18, 19 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| data representing information that does not vary from printed product to printed product | data that defines the position and content of reusable (fixed) objects not contained in the database |

The parties' dispute about this claim term largely tracks their dispute about the "master page file" in the '599 patent.  *See* Section I.D.  Defendants argue that "master data" should have the same meaning in both the '940 and '452 patents and a related meaning to the "master page file" in the '599 patent.  Defs.' Br. at 42.  Although RRD largely agrees, RRD has proposed constructions that take into account and incorporate the different claim language used in the various patents.  RRD's Br. at 26-27; *see* Sections I.D and III.E.

Consequently, RRD agrees that "master data" in the '940 patent includes the *concept* of "fixed information" – or "information that does not vary from printed product to printed product," and RRD reproduced its definition of "fixed information" in the definition of "master data."  *See* Section I.B.[84]     Defendants erroneously argue that this term literally is

---

[83]     *See* Dependent claim 20 ("[T]he variable objects of the first and second data sets are identical.").  *See also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

[84]     Defendants claim that the relationship between the patents-in-suit, and their specifications, "is a major problem for Donnelley."  Defs.' Br. at 42-43.  Far from it, RRD has construed "master data" consistently throughout the claims but, importantly, by reference to other terms in the patent in which the term appears.  All RRD did was

"fixed" information, even though the '940 patent claims do not mention "fixed information," and Defendants try to add many additional limitation to "fixed information" in the '599 patent. Defs.' Br. at 42.  Given that "fixed information" is a disputed term in the '599 and '452 patents and does not appear in the '940 patent claims, that term should not be imported into "master data" in the '940 patent.  Indeed, Defendants even agree that RRD sought broad claims in the '940 patent.

Substantively, Defendants also incorrectly assert that "master data" should be limited to "defin[ing] the *position* and content of reusable . . . objects."  Defs.' Br. at 42 (emphasis added).  The claim language does not mention the reusable objects' "position" in the "master data," as discussed in RRD's Opening Brief.  *See* RRD's Br. at 27.  And Defendants' proposed construction is blatantly inconsistent with claim 19, which is dependent on claim 11, which claims that "the master data of the first and second data sets are identical, and a position of the master data in the first template differs from a position of the master data in the second template."

Defendants further attempt to narrow the meaning of "master data" by requiring it "not [be] contained in the database."  This restriction similarly has no support in the claim language or specification.  *See* RRD's Br. at 27.  Although the claim indicates that the "master data" represents "reusable objects," it says nothing about whether "master data" also includes data from the database (or any other data).  As a "comprising" claim, claim 11 is not limited other than by the elements recited therein.[85]

Finally, Defendants complain that RRD omits "any concept of page-related master data."  Defs.' Br. at 43.  As explained previously, the claim language lacks any concept of

---

[85]     reproduce its definition of "fixed information" in the definition of "master data."
*See CollegeNet*, 418 F.3d at 1235; *Dow Chem.*, 257 F.3d at 1380.

"page-related" anything.  See Section I.A.  Further, as explained above, RRD's use of "printed product" is intended to avoid confusing the jury with "book," the term the patent specification uses and particularly defines.  *See* Section I.B.

**F.**    **"Developing A Database Having A Number Of Entries Each Of Which Represents A Variable Object"** (Element 13) (Claim 11 of '940 Patent)[86]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| placing data representing one or more "variable object[s]" in a "database," as defined below | each entry in the database represents a variable object |
| "a database having a number of entries each of which represents a variable object" means a collection of data representing the "variable objects" | "a database having a number of entries each of which represents a variable object" means that each entry in the database represents variable information |

Seeing no need to repeat its construction of "variable object" in the construction of every term reciting a "variable object," RRD's construction refers to the term "variable object" which is construed elsewhere.  In other words, the parties' dispute about "variable object" does not need to be repeated here.[87]

The only substantive dispute here is, similar to the '599 patent, whether the database must hold only "variable objects" or whether it can hold other data as well.  Defendants

---

[86]    As a point of clarification, in their Opening Briefs both parties set forth their constructions for the phrase "a database having a number of entries each of which represents a variable object," rather than their constructions for the broader phrase in claim 11 of the '940 patent "*developing* a database having a number of entries each of which represents a variable object" while setting forth their opponent's proposed constructions for the broader phrase.  *See* RRD's Br. at 28; Defs.' Br. at 45.  The table above provides the constructions for both phrases, as set forth in the July 2, 2007 Proposed Claim Constructions.  *See* RRD's Br. at Exs. K, L.  Amended Exhibit A, attached hereto, also includes both terms and phrases and the parties' proposed constructions.

[87]    Defendants state that "variable object" "does not appear in either the '599 patent or the '940 patent."  Of course, "variable object" appears in the claims of the '940 patent and cannot be construed away because it does not appear in the specification.

ignore how the law construes claims with "having" language.[88]  Defs.' Br. at 45.  The open-ended "having" language means that the database has entries, and of those entries, some represent "variable objects."[89]  As explained in Section I.E, not *every* entry in the database must represent a variable object.  In addition to the claimed entries that represent "variable objects," there may be other entries that do not represent "variable objects."  The specification confirms RRD's interpretation in describing entries that do not represent a variable object.[90]

Defendants' proposed construction is further deficient in that it does not even define the key term "database."  Defendants instead parrot back that key word in their construction.  RRD, on the other hand, defines "database" as "a collection of data representing the 'variable objects.'"

### G.    "Causing the Electronic Press to Print Output Pages with The Reusable Objects and Variable Objects by Separating the Master Data from the Position Data for Each Data Set" (Element 14) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| providing the electronic press with information so it can "print output pages with the reusable objects and variable objects" "by separating the master data from the position data for each data set" | This claim term is a step-plus-function limitation and should be interpreted under 35 U.S.C. § 112, ¶6.  The corresponding acts are disclosed in Figure 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |

The parties dispute whether this term is in "step-plus-function" form with Defendants contending that the Court should apply a step-plus-function analysis.  There are two

---

[88]    *See* RRD's Br. at 28.
[89]    *See Lampi*, 228 F.3d at 1376.
[90]    *See* '940 Patent col.13, ll.26-27.

ways a step-plus-function analysis could apply.  First, if a claim uses the phrase "step for," there is a presumption that step-plus function analysis applies.[91]  The parties agree that the claim does not contain the presumptive "step for" language.  Defs.' Br. at 46.  That leaves the second possibility: step-plus function analysis applies only if the claim terms "contain nothing that can be construed as an act."[92]  RRD's claim, however, recites an act.

Defendants' burden to show a lack of an "act" is not easily satisfied – the Federal Circuit, to RRD's knowledge, has never applied step-plus function analysis to a claim.[93]  Defendants instead rely on two 30-plus-year-old CCPA decisions that are apparently the only time *any* court has *ever* found this doctrine to apply.  Defs.' Br. at 23.[94]  Thus, Defendants' arguments are (1) rare and (2) nearly always unsuccessful (and in the last 30-plus years, always unsuccessful).

The result here is no different.  The disputed term recites acts that perform the claimed functions.  Claim 11 accomplishes "causing the electronic press to print output pages" by the acts of (1) printing output pages with reusable objects and variable objects and (2) separating the master data from the position data for each data set.[95]  Not disputing that "separating" is an act, Defendants state that "[e]ven the add-on recitation of 'separating' provides no clue toward how output pages are caused to be printed."  Defs.' Br. at 48.  In an open-ended

---

[91]    *See Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002).

[92]    *Masco*, 303 F.3d at 1327.

[93]    *See id.* at 1316 ("transmitting" in "transmitting a force" was both a function and an act so step-plus-function analysis did not apply); *Seal-Flex, Inc v. Athletic Track & Court Constr.*, 172 F.3d 836 (Fed. Cir. 1999); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed. Cir. 1997) (declining to apply step-plus-function analysis to "the steps of . . . passing the analyte slug through a passage").

[94]    *See Seal-Flex,* 172 F.3d at 850 n.5 (Rader, J., concurring) ("Only a few cases have found the existence of a step-plus-function claim element.") (citing *In re Roberts*, 470 F.2d 1399 (CCPA 1973) and *Ex Parte Zimmerley*, 153 U.S.P.Q. 367 (Bd. Pat. App. 1966)).

[95]    '940 Patent col.65, ll.21-24.

"comprising" claim, an element does not need to recite *every* act necessary to perform the claimed function of "causing the electronic press to print output pages." "Separating" is one of the acts that "caus[es]" the press to print. It is sufficient, as RRD has done here, to describe one or more acts. Therefore, the Court should not apply step-plus-function analysis to this claim.

   H.   **"Separating The Master Data From The Position Data For Each Data Set In Preparation For Rasterization"** (Element 15) (Claim 11 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| distinguishing the "master data" from the "position data" for each "data set" | separating each data set, corresponding to a particular page (i.e., template), into a subset of reusable objects for that page and a separate subset of position data for variable objects for that page |

The parties have two disputes about this element: (1) the meaning of the term "separating" and (2) whether to read the preferred embodiment's separating process into the specification.

RRD interprets the term "separating" consistent with its ordinary meaning – "distinguishing the 'master data' from the 'position data' for each 'data set'" without incorporating the specification into the claim. *See* RRD's Br. at 31. RRD's definition is consistent with the relevant intrinsic evidence. RRD's Br. at 31-32. And according to at least one dictionary, "separating" is commonly understood to mean "distinguishing."[96] Defendants just repeat the word "separating" in their proposed construction.

Rather than define "separating," Defendants simply incorporate the process described in the specification into the claims. Although Defendants cite *Phillips*, Defendants ignore that *Phillips* requires defining claim terms, not reading limitations from the specification

---

[96]   *See* American Heritage Dictionary (2d ed. 1991), Ex. M, at 1118 (defining "separate" as "distinguish"); *see also* Ex. N, at 2069.

into the claim.[97]  Defs.' Br. at 49.  Indeed, Defendants even admit they are trying to limit the claims to the specific embodiment discussed in the specification.  Defs.' Br. at 50.  In Defendants' own words, "Kodak's proposed construction . . . emphasizes the 'stripping' operation, which…sorts template data into two separate subsets. . . ."  Defs.' Br. at 49, citing '940 Patent col.10, ll.44-52.

Defendants offer no reason to incorporate the exact process defined in the specification.[98]  Defendants make no attempt to argue that RRD intended that the claims and the specification be "coextensive" or that RRD disclaimed any claim scope.

Finally, Defendants' proposed construction does not follow the claim language in other ways too.  For example, it inexplicably changes "master data" in the claim into "reusable objects."  It also implies that the "data set" corresponds to a "particular page (i.e., template)" although the "data set" in the claim can represent one or more pages.  *See* Section II.A.

I.     **"Page Sequence Commands"** (Element 16) (Claim 12 of '940 Patent)[99]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| commands specifying what information goes where on the printed page and the order of the pages | instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database |

The parties agree that this term contains phrases similar to the "press commands" in Element 7 of the '599 patent and so should receive a similar construction.  *See* Section I.G.  Like they did for the term "press commands," Defendants improperly limit the term "page sequence commands" to the preferred embodiment.  Defs.' Br. at 50-51.

---

[97]     *Phillips*, 415 F.3d at 1313.

[98]     *See Phillips*, 415 F.3d at 1323; *see also Acumed*, 483 F.3d at 808.

[99]     This term appears in the following context in the claim: "converting the data sets and the database into page sequence commands for the electronic press specifying sequence and content of page production."

Defendants construe "page sequence commands" to be exactly what the specification describes for the preferred embodiment: "instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database." Defs.' Br. at 50. The claim, however, does not mention performing a "merge or overlay," performing any step "on a page-by-page" basis, or acting on "pages of the master page file with corresponding pages containing variable information extracted from the database." And the specification does not indicate that "the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive."[100] Thus, the claim language and the specification provide no reason to limit the claims as Defendants propose.[101]

### J.    "Wherein The Master Data Of The First And Second Data Sets Are Identical" (Element 17) (Claim 19 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the "master data" in the first and second "data sets" are the same | the content of the master data of the first and second data sets are identical |

RRD's construction incorporates the definition of "master data" and notes, as the claim does, that the "master data" in the first and second data sets are the same. Defendants, however, manage only to argue that RRD's construction is "imprecise." Defs.' Br. at 52. Defendants' construction for this term, however, is inconsistent with their construction of the term "master data" in parent claim 11.[102]

Defendants argue for two different constructions of the same term: "master data." On one hand, Defendants argue that "master data" (Element 9) means "data that defines the

---

[100]    *Phillips*, 415 F.3d at 1323.
[101]    *See Acumed*, 483 F.3d at 808; *Phillips*, 415 F.3d at 1323.
[102]    *See Rexnord*, 274 F.3d at 1342. Moreover, claim 19 is a dependent claim of claim 11. Therefore, claim 19 also includes all of the terms and limitations of claim 11. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1146 (Fed. Cir. 2004).

*position* and *content* of reusable (fixed) objects not contained in the database." Defs.' Br. at 42. On the other hand, Defendants argue that "master data" (Element 17) means data that defines the "*content*" only of the "master data" because "[t]he only reasonable interpretation is that while the positions of the master data in the two data sets can differ, their content cannot. Thus, the content of the master data of the first and second data sets must be identical (with no restriction that the position also be identical)." Defs.' Br. at 51-52.

Indeed, in expressing shock that the first and second half of the claim "contradict" each other, Defendants demonstrate that their construction of "master data" is just wrong.[103] The term "master data" need not include the "position" of the "reusable objects."

Defendants do not cite even one case to support their contradictory positions, which is not surprising, given that the case law holds the opposite. It is black-letter law that the same claim terms within the same claim or patent should be given the same meaning.[104]

**K.    "Wherein The Variable Objects Of The First And Second Data Sets Are Identical"** (Element 18) (Claim 20 of '940 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| the "variable objects" in the first and second "data sets" are the same | the content of the variable objects of the first and second data sets are identical |

Defendants' construction inexplicably changes the claim language to require that "content" of the "variable objects" be the same. The claim, however, just requires that the "variable objects" be the same, as reflected in RRD's construction. For example, the two "data

---

[103]    Defendants argue: "If the master data of the first and second data sets are identical in all respects, then their positions must also be identical. But this is contradicted by the second half of the claim, which requires the positions of the master data to differ. The only reasonable interpretation is that while the positions of the master data in the two data sets can differ, their content cannot." Defs.' Br. at 52. More logically, the "master data" does not include the position, as RRD argues. *See* Section II.E.

[104]    *See Rexnord*, 274 F.3d at 1342 ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."); *Cf. Phillips*, 415 F.3d at 1314.

sets" could each have a "variable object" for "first name" (*i.e.*, identical "variable objects") but other, unclaimed steps could change the data for one such that the content substituted for the variable objects is different (*e.g.*, ensuring proper capitalization, etc.) or the variable objects could simply contain different data (*e.g.*, the first name of different people in the database).

Interestingly, Defendants' reasoning for their construction contradicts their interpretation of the term "variable objects." Defendants define "variable objects" to be "variable information that is retrieved from a database and separately defined for each printed page." Defs.' Br. at 44. But here, Defendants acknowledge that in dependent Claim 20 "variable objects of the first and second data sets are identical." Defs.' Br. at 51-52. If the "variable objects" in the first and second data sets are identical, the variable objects cannot be "separately defined for each printed page." Thus, Defendants' construction of "variable objects" is incorrect as a matter of law.[105]

## III.    U.S. PATENT NO. 6,205,452

### A.    "Template Page File" (Element 22) (Claims 1, 7 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file | a file containing a single page layout defining the content and position of fixed information and the position of variable information on that page (that is, a template page file is a single page version of a template file) |

The parties agree that "template page file" in the '452 patent should be interpreted consistently with "template file" in the '599 patent. *See* RRD's Br. at 35; Defs.' Br. at 38. In addition to the problems with Defendants' proposed construction of "template file" in the '599

---

[105]    *See Rexnord*, 274 F.3d at 1342 ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."); *Cf. Phillips*, 415 F.3d at 1314.

patent (*see* Section I.A), Defendants improperly attempt to limit the meaning of "template page file" to a "single page layout" or a "single page version of a template file."

Defendants again apply their "page-based approach" to claim construction, even though nothing in the '452 patent restricts the number of pages on which the data in a "template page file" may appear. Defendants refer to claim 1 as allegedly supporting "the idea that an individual 'template page file' represents a single page layout." Defs.' Br. at 38. Claim 1 nowhere states that a "template page file" must be limited to a single page. Instead, claim 1 recites that each *page file* contains master data and placeholders for the "variable information."

The '452 specification also does not support limiting "template page file" to a single page. The '452 specification describes "template pages" as follows:

> The template files 106 include data specifying the position and content of fixed information on the pages to be printed. Specifically, the template files 106 define template pages wherein *each template page includes data representing any fixed information to be reproduced on corresponding pages of the books or book versions and area data representing any area(s) on the corresponding pages where variable information is to be reproduced.*[106]

Accordingly, a "template page" includes in part data representing fixed information that may encompass multiple "corresponding *pages.*"

In any event, the Federal Circuit construes a singular claim term to also include the plural.[107] In *Free Motion Fitness*, the Court found a presumption that a singular term should be interpreted to mean "one or more" where the claim uses the transitional phrase "comprising," as is the case here.[108]

---

[106]     '452 Patent col.11, ll.51-58 (emphasis added).
[107]     *Free Motion Fitness*, 423 F.3d at 1350-51.
[108]     423 F.3d at 1350. *See also CollegeNet*, 418 F.3d at 1232 (finding it "well settled" that a singular term can mean "'one or' more").

Defendants also wrongly claim that RRD is somehow improperly seeking to broaden the meaning of this element from a "file" to "data." Defs.' Br. at 38. This is simply wrong. As reproduced above, RRD's construction states clearly that the "data … is stored in a file." The file, of course, contains data, as reflected in RRD's construction.

**B.    "Fixed Information"** (Element 24) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| information that does not vary from printed product to printed product | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |

Even though the '452 patent is not related to the '599 patent, the parties agree that "fixed information" should be construed consistently in both the '452 and '599 patents. RRD's Br. at 36; Defs.' Br. at 40. *See* Section I.B.

**C.    "Variable Information"** (Element 21) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| information that typically varies from printed product to printed product | information that varies from printed page to printed page and is retrieved from a database" |

The parties also agree that "variable information" should be interpreted consistently in both the '452 and '599 patents. RRD's Br. at 36; Defs.' Br. at 43. *See* Section I.C.

**D.    "Variable Graphics Information"** (Element 19) (Claims 1, 2, 10 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "variable information" used to produce graphics | information for use in graphs that varies from printed page to printed page and is retrieved from a database" |

The parties agree that "variable graphics information" is a particular kind of "variable information" that can be used to produce graphics. RRD's Br. at 37; Defs.' Br. at 52.

Accordingly, the dispute hinges on the outcome of the disputed term "variable information." *See* Sections I.C and III.C.

### E.    "Master Data" (Element 23) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **data representing "fixed information"** | data that defines the position and content of fixed information not contained in the database |

Both parties agree that the proposed construction of "master data" in the '452 patent should largely track the construction of "master data" in the '940 patent.[109]  RRD's Br. at 37; Defs.' Br. at 42.  RRD therefore incorporates herein its discussion in Section II.E.

Defendants complain that RRD offers slightly different proposed constructions for "master data" in the '940 and '452 patents.  Defs.' Br. at 42.  The only reason for this is that the '940 patent claims do not use the term "fixed information," so RRD could not incorporate that term by reference, as it does here. The '452 patent, on the other hand, uses the term "fixed information," the parties have construed it, and RRD can incorporate it by reference.  RRD has substantively defined both terms the same.

### F.    "A Database Having A Number Of Fields, Each Of Which Represents Variable Information Or Variable Graphics Information" (Element 20) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a collection of data representing the "variable information" and the "variable graphics information"<br><br>Defendants did not include RRD's proposed construction in their Opening Brief.  Defs.' Br. at 45. | each entry in the database represents a variable object<br><br>In their Opening Brief, Defendants modified their proposed construction to read as follows: each entry in the database represents variable information.  Defs.' Br. at 45. |

---

[109]    RRD's proposed construction of "master data" is also similar to its proposed construction of "master page file" in the '599 patent, but without the requirement that the "master data" in the '452 patent be in a "file."  *See* Section I.D.

Defendants evidently included the wrong claim language for this phrase in their proposed construction filed with the Court on July 2, 2007.[110]  RRD made several attempts to determine whether Defendants believed a construction was necessary for the "database" phrase actually used in the '452 patent.  Based on Defendants' Opening Brief, it appears that Defendants believe a dispute exists and that they now offer the following proposed construction: "each entry in the database represents variable information."

As an initial matter, Defendants' proposed construction is flawed because it ignores that the database holds data relating to "variable graphics information" as well as "variable information."  Defendants skip the "variable graphics information."

In addition, and as discussed in Sections I.E and II.F, Defendants improperly attempt to narrow the claim by requiring "total congruence" between the "database" and "variable information."  *See* Defs.' Br. at 30.  This term uses open-ended "having" language that means that the database has claimed fields, and of those claimed fields, each represents variable information or variable graphics information.  The claim language does not prohibit the existence of other fields that do not represent "variable information" or "variable graphics information" or require *all* fields in the database to represent "variable information or variable graphics information."  *See* Section I.E.

---

[110]    Defendants used "a database having a number of entries each of which represents a variable object" (*see* RRD's Br. at Ex. L), rather than the actual phrase recited in claim 1 of the '452 patent.

42

G.     **"Causing the Display Device to Display the Pages with the Fixed Information, Selected Variable Information from the Database, and Selected Variable Graphics Information from the Database"** (Element 25) (Claim 1 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| providing the "display device" information such that it can "display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" | "[C]ausing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" is a step-plus-function limitation. The corresponding acts are disclosed in Fig. 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |

The Defendants argue that this term should also be construed using "step-plus-function" analysis. They apply the same analysis for this claim term that they did for Element 14. *See* Section II.G.

For the same reasons that RRD discussed above (Section II.G), step-plus-function analysis is inapplicable here. First, the parties agree that the claim does not contain the phrase "step-for," which means that the "step-plus-function" analysis presumptively does not apply.[111] Defs.' Br. at 46. And second, this term contains an act, making the "step-plus-function" analysis inapplicable.[112] Claim 1 of the '452 patent accomplishes "causing the display device to display the pages" by the act of displaying the pages (as defined in the "template page file") using identified information – fixed information, selected variable information, and selected variable graphics information.[113]

---

[111]     *See Masco*, 303 F.3d at 1327.
[112]     *See id.*
[113]     '452 Patent col.76, ll.58-63.

H.    **"Executing a Graph File to Generate a Graph"** (Element 26) (Claim 2 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| interpreting a graph file to generate a graph | using a graph file to generate a graph |

Defendants posit that "'execute,' as applied to computer file [sic], simply means that the operation is carried out, or executed."  Defs.' Br. at 53.  "[I]t requires no construction. . . ."  *Id*.  And if it does, it should mean "using a graph file to generate a graph."  *Id*.  RRD disagrees; the claim term means "interpreting a graph file to generate a graph."  RRD's Br. at 39.

Defendants cite nothing in support of their proposition: not the specification, case law, or extrinsic evidence.  And in fact, Defendants' construction contradicts each of these supporting sources.

In the specification, the term "executing" is used in connection with the phrase "interpreting."  The specification lists that one of the steps in the method is "*interpreting* the page files, including *executing* a graph file to generate a graph using the specified graph parameters and variable graph data entries."[114]

The extrinsic evidence also contradicts Defendants.  A court may look to extrinsic evidence, especially technical dictionaries, to help it "better understand the underlying technology and the way in which one of skill in the art might use the claim terms."[115]  Here, a relevant technical dictionary defines "interpret" as "[t]o decode and execute a statement or an instruction.  The term usually refers to executing a program by decoding a statement, executing it, decoding the next statement, executing it, and so on."[116]

---

[114]    '452 Patent col.5, ll.19-21 (emphasis added).
[115]    *Phillips*, 415 F.3d at 1318 (internal quotation and citations omitted).
[116]    Microsoft Computer Dictionary (2d ed. 1994), RRD's Br. at Ex. G, at 220.

I.    **"QuarkXPress"** (Element 27) (Claim 7 of '452 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| a program distributed by Quark, Inc. called QuarkXPress® | the page make-up programs named QuarkXPress® existing as of Oct. 29, 1997 |

Defendants limit this term to the versions of QuarkXPress existing as of October 29, 1997, the '452 patent's filing date. Defs.' Br. at 53-54. Defendants argue that to include later versions of QuarkXpress in the claim construction would be "imprecise, uncertain and indefinite." Defs.' Br. at 54. Like many of Defendants' other arguments, they do not cite to the claims or the specification to support their construction.

The analysis begins, as it must, with the intrinsic evidence.[117] The claim recites that the template page files simply use "QuarkXpress."[118] And the specification is similar. It does not reference a specific aspect of QuarkXPress that would restrict the claims to the versions as of Defendants' date and/or that would indicate this restriction is intended to limit the invention.[119] For example, the specification states "[t]he programming may be written as an extension of QuarkXPress®, a page make-up program distributed by Quark, Inc. of Denver, Colo."[120]

Defendants cite *Ex parte Simpson* to support their construction.[121] This Board of Patent Appeals case involved a brand chemical product, called Hypalon.[122] The issue in that case was whether Hypalon covered the "specific group of additives employed by the owner of

---

[117]    *See Phillips*, 415 F.3d at 1314-17.
[118]    '452 Patent col.77, ll. 20-21; *see Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive.").
[119]    *See CollegeNet*, 418 F.3d at 1231-32.
[120]    '452 Patent col.13, ll. 31-33.
[121]    218 U.S.P.Q. 1020 (Bd. Pat. App. 1982).
[122]    See id.

the 'Hypalon' trademark . . . or . . . broadly encompass[ed] every synthetic resin."[123]    The

appellants argued for a broad construction and did "not intend all of the appealed claims to be

restricted only to products sold under the trademark 'Hypalon.'"[124] That is not the case here.  No

party is arguing that the term "QuarkXPress®" includes every page make-up program.

## IV.    U.S. PATENT NO. 6,952,801

### A.    "Storing a First Number of Pages" (Element 28) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| storing data describing a number of pages | storing all the pages from which the first and second books are to be printed |

The parties dispute whether this element requires storing "*all* the pages from

which the first and second books are to be printed" with Defendants arguing that it must.  Defs.'

Br. at 55 (emphasis added).  RRD believes Defendants' construction is inappropriately narrow

because the books can contain other pages as well.  Defendants reach their construction only by

ignoring a key term in the claim – "comprising."

This claim contains a number of steps introduced by the term "comprising."

"Comprising" is an open-ended term that means that the claim can perform other, unclaimed

steps.[125]  The "storing a first number of pages" step does not preclude an accused process from

performing other unclaimed steps, such as including pages in a book that are not part of the "first

number of pages."[126]  The first and second books, therefore, can have other pages outside of

those stored in this step.

Defendants argue, without explanation, that if the term "'storing a first number of

pages' does not require all of the pages to be stored, then the other limitations that refer to a

---

[123]    *Id.* at 1021-22.
[124]    *Ex parte Simpson*, 218 U.S.P.Q. at 1022.
[125]    *See CollegeNet*, 418 F.3d at 1235; *Dow Chem.*, 257 F.3d at 1380-81.
[126]    *See CollegeNet*, 418 F.3d at 1235; *Dow Chem.*, 257 F.3d at 1380-81.

stored page are rendered indefinite or meaningless."[127]  Defs.' Br. at 56.  Defendants, however,

ignore that because of the term "comprising," the claim terms are "open" and thus do not exclude

additional unrecited elements, or steps.[128]  A book could have pages that are not one of "a first

number of pages," and yet, the claimed process would still be practiced.[129]  Indeed, the

specification describes just that.[130]

      Defendants' other argument is that "a first number of pages" should be restricted

to "all the pages" because "the pages themselves . . . already exist and have been stored in

computer files" at the time the "determination is made to print a given page."  Defs.' Br. at 56-

57.  Obviously, the stored pages have to exist before being printed.  And RRD's construction

does not require anything different.  But Defendants wrongly assume that all pages in the first

and second books are the "stored pages" in this step.  Pages not included in the "first number of

pages" may not exist at that point and may be created later, for example, before printing.

Defendants ignore that because the claim term is "open ended," it "does not exclude additional

unrecited elements, or steps," such as printing pages in a book other than those in a "first number

of pages."[131]

      In a somewhat related argument, Defendants criticize RRD's construction of this

term as "imprecise" because it purportedly "could also be read as storing almost any type of data

that would 'describe[e]' pages."  Defs.' Br. at 55-56.  The information "describing a number of

---

[127]    Although Defendants state that "this feature of the invention is evident throughout the disclosure," they do not offer one citation to the specification in support.  Defs.' Br. at 56.

[128]    *See Dow Chem. Co.*, 257 F.3d at 1380.

[129]    *See Free Motion Fitness*, 423 F.3d at 1353 ("[T]he 'comprising' language allows additional features."); *CollegeNet, Inc.*, 418 F.3d at 1235 ("'[C]omprising'…is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.") (internal citations and quotation omitted); *Dow Chem. Co.*, 257 F.3d at 1380.

[130]    '801 Patent col.21, ll.30-53.

[131]    *See Dow Chem. Co.*, 257 F.3d at 1380.

pages" in RRD's construction is the "pages" themselves – *i.e.*, the information defining what the pages are. Indeed, RRD's construction is more precise than Defendants', who just propose "storing . . . the pages from which the first and second books are to be printed." Defs.' Br. at 55.

     **B.**    **"Pagination Information"** (Element 31) (Claims 1, 4, 5, 13, 16, 17, 25 of '801 Patent)[132]

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **information about a page, including whether that page should be included in a book** | information specifying whether a stored page is to be selectively included for printing in a book |

     Defendants contend that "pagination information" specifies only whether a "stored page is to be selectively included for printing in a book." Defs.' Br. at 57. But in addition to this data, "pagination information" could include other data as well.

     Defendants ignore the open-ended term "including": "pagination information *including* an indication of whether a stored page is to be selectively included."[133] (Emphasis added.) The term "including" in ordinary English[134] and in black-letter patent law, is an open term, which means that the "indication of whether a stored page is to be selectively included" in the book is not the sole function of the "pagination information."[135] Defendants improperly try to limit the function of "pagination information" solely to the specifically enumerated function in the claim, and so their construction is incorrect.

     **C.**    **"Specifying A First Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In**

---

[132]   This term appears in the following context in the claim: "pagination information including an indication of whether a stored page is to be selectively included."

[133]   '801 Patent col.62, ll.59-60.

[134]   *See* Webster's Third New Int'l Dictionary (1993), Ex. N, at 1143.

[135]   *See Hewlett-Packard*, 123 F.3d at 1451 ("The claim term 'including' is synonymous with 'comprising,' thereby permitting the inclusion of unnamed components."); Manual of Patent Examining Procedure § 2111.03 (7th ed. rev. 2000) ("The transitional term 'comprising,' which is synonymous with 'including,' …is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.").

**The First Book"** (Element 29)
**and**
**"Specifying A Second Set Of Pagination Information Including An Indication Of Whether A Stored Page Is To Be Selectively Included In The Second Book"** (Element 30) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **Providing a first set of information that describes whether a stored page should be included in the first book** | identifying whether each stored page is to be selectively included for printing in the first book |
| **Providing a second set of information that describes whether a stored page should be included in the second book** | identifying whether each stored page is to be selectively included for printing in the second book |

Defendants argue that "pagination information" must exist for "each stored page." But this construction improperly narrows the term to a small subset of what is claimed.

The claim language does not require "each" "stored page" to have pagination information, as Defendants' assert.[136]  Some pages do, but the claim language referring to "a stored page" is clear that not all need to.  "A stored page" does not refer to every page in the book because, as discussed above, this "comprising" claim allows the books to have pages other than the "stored pages."

The specification also shows that Defendants' construction is incorrect.  The specification explains that in the preferred embodiment some pages do not have "pagination information," namely "master pages" that are always in the book.[137]  Therefore, Defendants' construction runs counter to both the claim language and the preferred embodiment in the specification and is incorrect.[138]

Defendants also complain about RRD's use of "should be" in its construction. Defs.' Br. at 59.  Yet the specification uses RRD's  phrase "should be" extensively in discussing

---

[136]    *See Phillips,* 415 F.3d at 1314.
[137]    '801 Patent col.21, ll.31-33, 40-44.
[138]    *See Pfizer*, 429 F.3d at 1374.

which pages are to be included in a book and printed. "If the block 366 determines that the page

is not a master page (i.e. it's a variable page), a decision-making block 370 determines whether

the variable page *should be* printed at all times."[139]  In this context, "should be" means the page

will be included if the "indication" – *i.e.*, the "pagination information" – so specifies.

> **D.** **"Determining Whether A Stored Page Is To Be Assembled Into The First Book Based On The First Set Of Pagination Information Wherein A Second Number Of Stored Pages To Be Assembled Into The First Book Is Less Than The First Number"** (Element 32) **and**
> **"Determining Whether A Stored Page Is To Be Assembled Into The Second Book Based On The Second Set Of Pagination Information Wherein A Third Number Of Stored Pages To Be Assembled Into The Second Book Is Different Than The Second Number And No Greater Than The First Number**" (Element 33) (Claim 1 of '801 Patent)

| RRD's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| using the "pagination information" to decide whether to include a stored page in the first book.  The "second number of pages," which is the number of pages in the first book, is less than the "first number of pages." | verifying that the number of stored pages specified for the first book is smaller than the total number of stored pages |
| using the "pagination information" to decide whether to include a stored page in the second book.  The "third number of pages," which is the number of pages in the second book, is less than the "first number of pages" and different from the "second number." | verifying that the number of stored pages specified for the second book is (a) different from the number of stored pages in the first book and (b) no greater than the total number of stored pages |

Defendants' construction requires "verifying" (1) that the number of pages in the

first and second book is less than the stored pages and (2) that the number of pages in each book

is different.  But Defendants' construction (1) focuses on a function not even in the claim and (2)

does not interpret the entire claim.

---

[139]   '801 Patent col.21, ll.40-44 (emphasis added); *see also* '801 Patent col.21, ll.18-20, 31-33, 36-39.

Nothing in the claim language requires adding the "verifying" step Defendants propose. The claim language simply states that the "number of stored pages" in both books is less than the first number of pages and that the number of pages in each book is different. Defendants' term "verifying" implies a proactive check that the number of pages in each book is less than the total number of stored pages and that the number of pages in each book is different.

The specification also refutes Defendants' claim construction. Nowhere does the specification mention a proactive "verifying" step – either that the number of pages in the books is less than the number in the page store or that the number of pages in the two books are different.[140] The difference is an effect of the process itself: the specification describes selecting pages for each book from a common page store, which will result in fewer pages in the book than in the page store (unless all of the pages are selected). Likewise, the specification describes two books with different numbers of pages – but it does not actively "verify" that.

Finally, Defendants argue that RRD's construction "would eviscerate the public notice function of the claim." Defs.' Br. at 61. The public notice function of claims ensures that one can read the claims and determine what falls within them.[141] RRD's construction clearly delineates the boundary of the claims; a potential infringer can easily tell whether the number of pages in the first and second books is the same or not and whether the number of pages in either book is less than the total number of stored pages.

---

[140]    *See Pfizer*, 429 F.3d at 1374.

[141]    *See PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004).

## CONCLUSION

RRD respectfully requests that the Court construe the disputed claim terms as proposed by RRD in Exhibit A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiff*
  *R.R. Donnelley & Sons Company*

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

August 30, 2007
1224240

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 30, 2007, he caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Frederick L. Cottrell III
Richards Layton & Finger, P.A.

I also certify that copies were caused to be served on August 30, 2007, upon the following in the manner indicated:

**BY EMAIL AND BY HAND**

Frederick L. Cottrell III
Richards Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
cottrell@rlf.com

**BY EMAIL**

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
rmcmillan@crowell.com

*/s/ Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com

# AMENDED
# EXHIBIT A

**Disputed Claim Terms and Phrases in the '599 Patent**

| No. | Claim | Disputed Term and/or Phrase | R.R. Donnelley's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 1. | 11 | template file | data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file | a file that stores template pages, which are single page layouts defining the content and position of fixed information and the position of variable information on that page |
| 2. | 11 | fixed information | information that does not vary from printed product to printed product | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |
| 3. | 11 | variable information | information that typically varies from printed product to printed product | information that varies from printed page to printed page and is retrieved from a database |
| 4. | 11 | a database having entries therein each representing variable information | a collection of data representing the "variable information" | each entry in the database represents variable information |
| 5. | 11 | master page file | data representing "fixed information," which is stored in a file | a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information |
| 6. | 11 | converting the template file, the database and the master page file into press commands specifying sequence and content of page production by the press | using the "template file," the "database," and the "master page file" to produce "press commands specifying sequence and content of page production by the press" | generating instructions to a press for sequencing pages defined by the template files, the database and the master page file |
| 7. | 11 | press commands specifying sequence and content of page production by the press | commands specifying what information goes where on the printed page and the order of the pages | instructions to a press for sequencing pages defined by the template files, the database and the master page file |

## Disputed Claim Terms and Phrases in the '940 Patent

| No. | Claim | Disputed Term and/or Phrase | R.R. Donnelley's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 8. | 11, 17-20, 22 | template | data representing the position and content of one or more "reusable objects" and identifying the position and corresponding entry (or entries) in the database of one or more "variable objects" | a single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page |
| 9. | 11, 18, 19 | master data | data representing information that does not vary from printed product to printed product | data that defines the position and content of reusable (fixed) objects not contained in the database |
| 10. | 11, 18 | reusable object | element of "master data" that is reused from printed product to printed product | fixed information |
| 11. | 11 | position data | information about the location of a "variable object" on a page | data representing a position on a page at which a variable object is to be printed |
| 12. | 11, 20-22 | variable object | element of information that typically varies from printed product to printed product | variable information that is retrieved from a database and separately defined for each printed page |
| 13. | 11 | developing a database having a number of entries each of which represents a variable object | placing data representing one or more "variable object[s]" in a "database," as defined below<br><br>"a database having a number of entries each of which represents a variable object" means a collection of data representing the "variable objects" | each entry in the database represents a variable object<br><br>"a database having a number of entries each of which represents a variable object" means that each entry in the database represents variable information |
| 14. | 11 | causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set | providing the electronic press with information so it can "print output pages with the reusable objects and variable objects" "by separating the master data from the position data for each data set" | This claim term is a step-plus-function limitation and should be interpreted under 35 U.S.C. § 112 ¶6.  The corresponding acts are disclosed in Figure 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |
| 15. | 11 | separating the master data from the position data for | distinguishing the "master data" from the "position data" for each "data set" | separating each data set, corresponding to a particular page (i.e., template), into a subset of reusable objects for that page |

| | | each data set | | and a separate subset of position data for variable objects for that page |
|---|---|---|---|---|
| 16. | 12 | page sequence commands | commands specifying what information goes where on the printed page and the order of the pages | instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database |
| 17. | 19 | wherein the master data of the first and second data sets are identical | the "master data" in the first and second "data sets" are the same | the content of the master data of the first and second data sets are identical |
| 18. | 20 | wherein the variable objects of the first and second data sets are identical | the "variable objects" in the first and second "data sets" are the same | the content of the variable objects of the first and second data sets are identical |

## Disputed Claim Terms and Phrases in the '452 Patent

| No. | Claim | Disputed Term and/or Phrase | R.R. Donnelley's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 19. | 1, 2, 10 | variable graphics information | "variable information" used to produce graphics | information for use in graphs that varies from printed page to printed page and is retrieved from a database |
| 20. | 1 | a database having a number of fields, each of which represents variable information or variable graphics information | a collection of data representing the "variable information" and the "variable graphics information" | each entry in the database represents a variable object |
| 21. | 1 | variable information | information that typically varies from printed product to printed product | information that varies from printed page to printed page and is retrieved from a database |
| 22. | 1, 7 | template page file | data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file | a file containing a single page layout defining the content and position of fixed information and the position of variable information on that page (that is, a template page file is a single page version of a template file) |
| 23. | 1 | master data | data representing "fixed information" | data that defines the position and content of fixed information not contained in the database |
| 24. | 1 | fixed information | information that does not vary from printed product to printed product | the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page |
| 25. | 1 | causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database | providing the "display device" information such that it can "display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" | "[C]ausing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database" is a step-plus-function limitation. The corresponding acts are disclosed in Fig. 5 including, but not limited to, the acts of (1) creating separate master page and variable page files, and (2) generating press commands to instruct the display device to display the pages, on a page-by-page basis, by merging or overlaying each variable page with a corresponding master page, as disclosed therein. |

| 26. | 2 | executing a graph file to generate a graph | interpreting a graph file to generate a graph | using a graph file to generate a graph |
| 27. | 7 | QuarkXPress | a program distributed by Quark, Inc. called QuarkXPress® | the page make-up programs named QuarkXPress® existing as of Oct. 29, 1997 |

**Disputed Claim Terms and Phrases in the '801 Patent**

| No. | Claim | Disputed Term and/or Phrase | R.R. Donnelley's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 28. | 1 | storing a first number of pages | storing data describing a number of pages | storing all the pages from which the first and second books are to be printed |
| 29. | 1 | specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book | providing a first set of information that describes whether a stored page should be included in the first book | identifying whether each stored page is to be selectively included for printing in the first book |
| 30. | 1 | specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book | providing a second set of information that describes whether a stored page should be included in the second book | identifying whether each stored page is to be selectively included for printing in the second book |
| 31. | 1, 4, 5, 13, 16, 17, 25 | pagination information | information about a page, including whether that page should be included in a book | information specifying whether a stored page is to be selectively included for printing in a book |
| 32. | 1 | determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number | using the "pagination information" to decide whether to include a stored page in the first book. The "second number of pages," which is the number of pages in the first book, is less than the "first number of pages." | verifying that the number of stored pages specified for the first book is smaller than the total number of stored pages |
| 33. | 1 | determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into second book is different than the second number and no greater than the first number | using the "pagination information" to decide whether to include a stored page in the second book. The "third number of pages," which is the number of pages in the second book, is less than the "first number of pages" and different from the "second number." | verifying that the number of stored pages specified for the second book is (a) different from the number of stored pages in the first book and (b) no greater than the total number of stored pages |

# EXHIBIT M

**Second College Edition**

# The American Heritage Dictionary

Words that are believed to be registered trademarks
have been checked with authoritative sources. No in-
vestigation has been made of common-law trademark
rights in any word, because such investigation is im-
practicable. Words that are known to have current
registrations are shown with an initial capital and are
also identified as trademarks. The inclusion of any
word in this Dictionary is not, however, an expres-
sion of the Publisher's opinion as to whether or not it
is subject to proprietary rights. Indeed, no definition
in this Dictionary is to be regarded as affecting the
validity of any trademark.

Copyright © 1982, 1985, 1991 by Houghton Mifflin
Company. All rights reserved.

No part of this work may be reproduced or transmitted
in any form or by any means, electronic or mechani-
cal, including photocopying and recording, or by any
information storage or retrieval system without the
prior written permission of Houghton Mifflin Com-
pany unless such copying is expressly permitted by
federal copyright law. Address inquiries to Permis-
sions, Houghton Mifflin Company, 2 Park Street, Bos-
ton, MA 02108.

**Library of Congress Cataloging in Publication Data**
Main entry under title:
American Heritage dictionary.

  Rev. ed. of: American Heritage dictionary of the
English language. New college ed. c1976.
  1. English language—Dictionaries.  I. Morris,
William, 1913–
PE1625.A54  1982    423    82-9346
ISBN 0-395-32943-4
ISBN 0-395-32944-2 (thumb index)
ISBN 0-395-33959-6 (deluxe edition)

    Manufactured in the United States of America

**abolition | abscess**

**ab·o·li·tion** (ăb'ə-lĭsh'ən) *n.* **1.** An act of abolishing or the state of being abolished. **2.** The termination of slavery in the United States. [Fr. < Lat. *abolitio* < *abolitus,* p.part. of *abolēre,* to abolish.] **—ab'o·li'tion·ar'y** (-ə-nĕr'ē) *adj.*

**ab·o·li·tion·ism** (ăb'ə-lĭsh'ə-nĭz'əm) *n.* Advocacy of the abolition of slavery in the United States. **—ab'o·li'tion·ist** *n.*

**ab·o·ma·sum** (ăb'ō-mā'səm) *n., pl.* **-sa** (-sə). The fourth division of the stomach in ruminant animals, in which true digestion takes place. **—ab'o·ma'sal** (-səl) *adj.*

**A-bomb** (ā'bŏm') *n.* An atomic bomb.

**a·bom·i·na·ble** (ə-bŏm'ə-nə-bəl) *adj.* **1.** Unequivocally detestable; loathsome. **2.** Thoroughly unpleasant or disagreeable: *abominable weather.* [ME *abominable* < OFr. < Lat. *abominabilis < abominari,* to abhor. —see ABOMINATE.] **—a·bom'i·na·bly** *adv.*

**abominable snowman** *n.* A hirsute manlike animal reportedly inhabiting the snows of the high Himalayas.

**a·bom·i·nate** (ə-bŏm'ə-nāt') *tr.v.* **-nat·ed, -nat·ing, -nates. 1.** To detest thoroughly; abhor. **2.** *Informal.* To dislike intensely. [Lat. *abominari, abominat-,* to deprecate as a bad omen : *ab-,* away + *omen,* omen.] **—a·bom'i·na'tor** *n.*

**a·bom·i·na·tion** (ə-bŏm'ə-nā'shən) *n.* **1.** An abhorrence for someone or something; disgust. **2.** Something that elicits great dislike or abhorrence.

**ab·o·ral** (ăb-ôr'əl, -ōr'-) *adj.* Opposite to or away from the mouth.

**ab·o·rig·i·nal** (ăb'ə-rĭj'ə-nəl) *adj.* **1.** Existing from the beginning or being the earliest of its type in an area; indigenous. **2.** Of or pertaining to aborigines. **—n.** An aborigine. **—ab'o·rig'i·nal·ly** *adv.*

**ab·o·rig·i·ne** (ăb'ə-rĭj'ə-nē) *n.* **1.** An autochthonous inhabitant of a region. **2.** *aborigines.* The flora and fauna native to a geographical area. [< Lat. *aborigines,* original inhabitants : *ab-,* from + *origine,* beginning.]

**a·born·ing** (ə-bôr'nĭng) *adv.* While coming into being or getting under way : *a revolution that almost died aborning.*

**a·bort** (ə-bôrt') *v.* **a·bort·ed, a·bort·ing, a·borts. —intr. 1.** To terminate pregnancy prematurely. **2.** To cease growth before full development or maturation. **3.** To terminate an operation or procedure with a missile or a space vehicle before completion, esp. because of equipment failure. **—tr. 1.** To cause to terminate pregnancy prematurely. **2.** To interfere with the development of; conclude prematurely. **3.** To terminate before completion. **4.** To end the operation or procedure with a missile or space vehicle before completion, esp. because of equipment failure. [Lat. *abortare,* freq. of *aboriri,* to disappear, miscarry : *ab-,* away + *oriri,* to appear.]

**a·bor·ti·fa·cient** (ə-bôr'tə-fā'shənt) *adj.* Causing abortion. **—n.** Anything used to induce abortion.

**a·bor·tion** (ə-bôr'shən) *n.* **1.** Induced termination of pregnancy before the fetus is capable of survival as an individual. **2.** A fatally premature expulsion of an embryo or fetus from the womb. **3.** Cessation of normal growth, esp. of an organ, prior to full development or maturation. **4.** An aborted organism. **5.** Something malformed or incompletely developed.

**a·bor·tion·ist** (ə-bôr'shə-nĭst) *n.* One who performs abortions.

**a·bor·tive** (ə-bôr'tĭv) *adj.* **1.** Failing to accomplish an intended objective; fruitless. **2.** Partially or imperfectly developed. **—a·bor'tive·ly** *adv.* **—a·bor'tive·ness** *n.*

**ABO system** (ā'bē'ō') *n.* The antigenic system of human blood, which, by functioning genetically as an allelic unit, produces the four human blood groups or types, A, B, AB and O.

**a·bou·li·a** (ə-bōō'lē-ə) *n.* Variant of **abulia.**

**a·bound** (ə-bound') *intr.v.* **a·bound·ed, a·bound·ing, a·bounds. 1.** To be great in number or amount. **2.** To be fully supplied or filled: teem. [ME *abounden* < OFr. *abonder* < Lat. *abundare,* to overflow : *ab-,* from + *undare,* to flow < *unda,* wave.]

**a·bout** (ə-bout') *adv.* **1.** Approximately; nearly: *lasted about an hour.* **2.** Almost: *just about done.* **3.** To a reversed position or direction. **4.** In no particular direction: *wandering about town.* **5.** All around; on every side. **6.** In the area or vicinity; near. **7.** In succession; one after another: *Turn about is fair play.* **—prep. 1.** On all sides; surrounding. **2.** In the vicinity of; around. **3.** Almost the same as; close to; near. **4.** In reference to; relating to. **5.** In the possession of; *had his wits about him.* **6.** Ready or prepared to do something: *The chorus is about to sing.* **7.** Involved with or engaged in: *went about his business. —adj.* Moving here and there; astir: *be up and about.* [ME *onbūtan* < OE *on, in + būtan,* outside.]

*Synonyms: about, around, round.* These terms are sometimes interchangeable, as adverbs and prepositions. However, *around* either specifies or suggests complete encirclement of something, whereas *about* and *round* are less exact and indicate, more or less, semiencirclement: *The children gathered about (or round) the fireplace, then they danced around the table.*

*Usage:* The construction *not about to* is often used to express determination: *We are not about to negotiate with*

terrorists. A majority of the Usage Panel considers this usage acceptable in speech but not in formal writing.

**a·bout-face** (ə-bout'fās') *n.* **1.** The act of pivoting to face in the opposite direction from the original, esp. in a military maneuver. **2.** A total change of attitude or standpoint. **—intr.v. -faced, -fac·ing, -fac·es.** To reverse direction.

**a·bove** (ə-bŭv') *adv.* **1.** Overhead; on high: *the clouds above.* **2.** In heaven; heavenward. **3.** Upstairs: *a table in the dining room above.* **4.** In or to a higher place. **5.** In an earlier part of a given text: *figures quoted above.* **6.** In or to a higher rank, or position; the ranks of major and above. **—prep. 1.** Over or higher than: *a spring above the timberline.* **2.** Superior to in rank, position, or number; greater than: *principles above expediency.* **3.** Beyond the level or reach of: *a shot heard above the music.* **4.** In preference to. **5.** Too honorable to bend to: *above petty intrigue.* **6.** More than: *somewhat above normal temperature.* **—n.** Something that is above. **—adj.** Appearing earlier in the same text: *flaws in the above interpretation.* **—idiom. above all.** First of all; most important. [ME *aboven* < OE *abufan : a-,* on + *be,* by + *ufan,* up.]

*Usage:* The use of *above* as an adjective or noun in referring to a preceding text is standard, common in business and legal writing. In general writing its use as an adjective (*the above figures*) is accepted by a majority of the Usage Panel, but its use as a noun (*read the above*) is accepted by only a minority.

**a·bove·board** (ə-bŭv'bôrd', -bōrd') *adv. & adj.* Without deceit or trickery.

**a·bove·ground** (ə-bŭv'ground') *adj.* **1.** Situated on or above the surface of the ground. **2.** Operating or existing within the establishment or in accordance with conventional standards: *journalistic practices unacceptable to the aboveground press.*

**ab o·vo** (ăb ō'vō) *adv.* From the beginning. [Lat., from the egg.]

**a·bra·ca·dab·ra** (ăb'rə-kə-dăb'rə) *n.* **1.** A word once held to possess magical powers to ward off disease or disaster. **2.** Foolish or unintelligible talk. [LLat.]

**a·bra·chi·a** (ə-brā'kē-ə) *n.* Congenital absence of arms. [A-¹ + Gk. *brakhiōn,* arm.]

**a·brad·ant** (ə-brād'nt) *n.* An abrasive. **—adj.** Abrasive.

**a·brade** (ə-brād') *tr.v.* **a·brad·ed, a·brad·ing, a·brades.** To rub off or wear away by friction, erode. [Lat. *abradere,* to scrape off : *ab-,* away + *radere,* to scrape.]

**A·bra·ham** (ā'brə-hăm') *n.* In the Old Testament, the first patriarch and progenitor of the Hebrew people; father of Isaac. [ME < LLat. < LGk. < Heb. *Abrāhām.*]

**a·bran·chi·ate** (ā-brăng'kē-ĭt, -āt') also **a·bran·chi·al** (-kē-əl) or **a·bran·chi·ous** (-kē-əs) *adj.* Having no gills. [Gk. *a-,* not + *brankhia,* gills.]

**a·bra·sion** (ə-brā'zhən) *n.* **1.** The process of wearing down or rubbing away by means of friction. **2.** A scraped or worn area. [Med. Lat. *abrasio* < Lat. *abradere,* to scrape off. —see ABRADE.]

**a·bra·sive** (ə-brā'sĭv, -zĭv) *adj.* Causing abrasion: harsh; rough. **—n.** A substance that abrades.

**ab·re·act** (ăb'rē-ăkt') *tr.v.* **-act·ed, -act·ing, -acts.** To release (repressed emotions) by acting out, such as in words, actions, or the imagination, the situation causing the conflict. [Transl. of G. *abreagieren : ab-,* away + *reagieren,* to react.] **—ab're·ac'tion** *n.*

**a·breast** (ə-brĕst') *adv.* **1.** Side by side. **2.** Up to date with: *keeping abreast of the latest developments.* [ME *abrest < on breast : on,* by + *brest,* breast.]

**a·bridge** (ə-brĭj') *tr.v.* **a·bridged, a·bridg·ing, a·bridg·es. 1.** To reduce the length of (a written text); condense. **2.** To curtail; cut short. [ME *abregen* < OFr. *abregier* < LLat. *abbreviare,* to shorten. —see ABBREVIATE.] **—a·bridg'er** *n.*

**a·bridg·ment** also **a·bridge·ment** (ə-brĭj'mənt) *n.* **1.** The action of abridging. **b.** The state of being abridged. **2.** Condensation of a book.

**a·broach** (ə-brōch') *adj.* **1.** Opened or positioned so that a liquid, such as wine, can be let out. **2.** Moving about, astir. [ME *abroche < a, in + broche,* a pointed object.]

**a·broad** (ə-brôd') *adv.* **1.** Out of one's own country. **2.** In a foreign country or countries. **3.** Away from one's home. **4.** In circulation, at large. **5.** Covering a large area; widely. **6.** Not on target; in error. [ME *abrod, wide < on brod : on, a' + brod,* broad.]

**ab·ro·gate** (ăb'rə-gāt') *tr.v.* **-gat·ed, -gat·ing, -gates.** To abolish or annul by authority. [Lat. *abrogare, abrogat- : ab-,* away + *rogare,* to propose.] **—ab'ro·ga'tion** *n.*

**a·bro·sia** (ə-brō'zhə) *n.* **1.** Abstinence from food; fasting. **2.** A wasting away. [Gk. *abrōsia,* fasting : *a-,* not + *brōsis,* eating.]

**a·brupt** (ə-brŭpt') *adj.* **1.** Unexpectedly sudden. **2.** Suprisingly curt; brusque. **3.** Touching on one subject after another with sudden transitions: *abrupt, nervous prose.* **4.** Steeply inclined. **5.** *Biol.* Appearing to be cut or broken off short; truncate. [Lat. *abruptus,* p.part of *abrumpere,* to break off : *ab-,* away + *rumpere,* to break.] **—a·brupt'ly** *adv.* **—a·brupt'ness** *n.*

**a·brup·tion** (ə-brŭp'shən) *n.* An instance of suddenly breaking away or off.

**ab·scess** (ăb'sĕs') *n.* A localized collection of pus in any

part of the body, rounded by an in... **-scess·es.** To for... *abcedere,* to go a... **ab·scise** (ăb-sīz')... move; cut off. *—... dere, abcsis- : ab-...* **ab·scis·ic acid** a... mon abscisin tha... **ab·scis·in** or **ab**... hormones that re... certain other grow... **ab·scis·sa** (ăb-sĭ...) coordinate repre... *y*-axis in a plan... along a line para... (line) cut off < ... cise.] **ab·scis·sion** (ăb-... process by which... **ab·scond** (ăb-s... -sconds.** To lea... esp. to avoid arre... *ab-,* away + *co...* **ab·sence** (ăb'sən... time during which... ing something ne... **ab·sent** (ăb'sənt... tent; lacking. **3.**... away. [ME < OF... away : *ab-,* away... **ab·sen·tee** (ăb'sə... pertaining to one... Usage note at **-e...** **absentee ballot**... by a voter away... **ab·sen·tee·ism** (... pear, esp. for wo... **ab·sent-mind·ed**... immediate surrou... tion with unrela... **—ab'sent-mind'e...** **absent without l**... tary post or duty... the intention to d... **ab·sinthe** also **a**... having a bitter li... prepared from w... wood. [Fr. < Lat...] **ab·so·lute** (ăb'sə-... or nature; comp... **3. a.** Not limite... tional: *absolute...* total: *absolute si...* sion or other re... of anything else... tive: *absolute pr...* a sentence that h... clause. For exam... *home, Their ship...* taining to a trans... stated. For exam... spires. **c.** Pertain... alone, the noun ... *For example, T...* **8.** *Physics.* **a.** Pe... surement derived... mass, and time ... **9.** *Law.* Comple... thing that is abso... regarded as the n... **b.** Something reg... anything else. [N... *luere,* to finish : ... *ness* **n.**

**absolute alcoho...** one per cent of ...

**absolute ceiling**... at which an airc... under standard ...

**ab·so·lute·ly** (ăb... and completely;... does not take an ... *Usage:* Because... "quite," as in *an...* of *absolute* ver... **absolute magni**... computed as if v... light-years.

**absolute music**... on its rhythmic,...

**absolute pitch** *n*... established by it... **2.** The ab...

**absolute scale** *n*...

ă pat / ā pay / âr care / ä father / b bib / ch church / d deed / ĕ pet / ē be / f fife / g gag / h hat / hw which / ĭ pit / ī pie / îr pier / j judge / k kick / l lid, needle / m mum / n no, sudden / ng thing / ŏ pot / ō toe / ô paw, for / oi noise / ou out / ōō took / ōō boot /

p pop / r roar / s s... th vision / ə abo...

374

375

defense mechanism | defoliate

**nes.** 1. To at- 2. *Archaic.* To at. *diffamare* n.

task or fulfill ial obligation, court. 3. To participate in lit-ing, faults. To fail to pay appear in court pearing. 4. To contest. —*tr.* (a case) by art in or com. n default of. *defiaure* < OFt. *illere.* to fail

t or rendering l. 3. A clause ulment. [ME nt. pt.part. of

ng annulled or ess n. 1. To win vic- thwart: *defeat* l. —*n.* 1. The failure to win, he act of mak- gured < OFr. at. *disfacere*: *er* n. *, rout. subdue* the better of ot necessarily lecisive wide- final mastery, *lefeat*, though dies not only ary to flight. ssion or tam- an opponent e of the con- plies courage

ns. —*intr.* To hemical sub- *fae* s, dregs.]

ething neces- s; deficiency. lected. *deci-* sion, an idle l. [ME < Lat. *de-*, from

*fect;* faulty orms normal may in Eng. be physically lv. —*de-fec-*

t of defense. l. —*tr.* 1. To support l. *Law.* 3. To l case. b. To ke a defense to ward off.]

*esignation to*

*, shield, safe-* langer or at- repelling an wer to repel eeping watch ive measures eriod. *Shield* or someone 1. *Safeguard* minent dan-

whom an ac-

of throwing - Lat. *fenes-*

ainst attack, l defends or 4. An aggra- ng. 5. *Law.* l complaints unsel. 6. The

*ie* / ir *pier* / k / do boot /

science or art of defending oneself; self-defense. **7.** *Sports.* The team or those players on the team attempting to stop the opposition from scoring. —*tr.v.* **-fensed, -fens-ing. -fens-es.** *Sports.* To attempt to stop (the opposition) from scoring. [ME < OFr. < Lat. *defensa* < fem. p.part. of *defendere,* to ward off.] —**de-fense'less** *adj.* —**de-fense'less-ly** *adv.* —**de-fense'less-ness** *n.*

**defense mechanism** *n.* **1.** *Biol.* A reaction of an organism used in self-defense, as against germs. **2.** *Psychoanal.* A usu- ally involuntary mental mechanism, such as repression or projection, that protects an individual from shame, anxiety, or loss of self-esteem.

**de-fen-si-ble** (di-fĕn'sə-bəl) *adj.* Capable of being defended, protected, or justified. —**de-fen'si-bil'i-ty, de-fen'si-ble-ness** *n.* —**de-fen'si-bly** *adv.*

**de-fen-sive** (di-fĕn'sĭv) *adj.* **1.** Intended or appropriate for defense. **2.** Done for defense. **3.** Of or pertaining to defense. —*n.* **1.** A means of defense. **2.** An attitude of defense. —**de-fen'sive-ly** *adv.* —**de-fen'sive-ness** *n.*

**de-fer** (di-fûr') *v.* **-ferred, -fer-ring, -fers.** —*tr.* **1.** To put off until a future time; postpone: *deferred writing until now.* **2.** To postpone the induction of (one eligible for the mili- tary draft). —*intr.* To procrastinate; delay. [ME *differren* < OFr. *diferer* < Lat. *differre.* —see DIFFER.] —**de-fer'ra-ble** *adj.* —**de-fer'rer** *n.*

**de-fer** (di-fûr') *intr.v.* **-ferred, -fer-ring, -fers.** To comply with or submit to the wishes, opinion, or decision of an- other: *deferred to his mother.* [ME *deferren* < OFr. *deferer* < Lat. *deferre,* to carry away, bring to : *de-,* away + *ferre,* to carry.] —**de-fer'rer** *n.*

**def-er-ence** (dĕf'ər-əns, dĕf'rəns) *n.* **1.** Submission or cour- teous yielding to the opinion, wishes, or judgment of an- other. **2.** Courteous respect.

**def-er-ent** (dĕf'ər-ənt, dĕf'rənt) *adj.* Showing deference; deferential.

**def-er-en-tial** (dĕf'ə-rĕn'shəl) *adj.* **1.** Carrying down or away. **2.** Adapted to carry or transport. [Lat. *deferens, defer- ent-,* pr.part. of *deferre,* to carry away. —see DEFER.]

**def-er-en-tial** (dĕf'ə-rĕn'shəl) *adj.* Marked by deference; a *deferential attitude.* —**def-er-en'tial-ly** *adv.*

**de-fer-ment** (di-fûr'mənt) also **de-fer-ral** (-fûr'əl) *n.* The act of delaying or putting off; postponement.

**de-ferred** (di-fûrd') *adj.* **1.** Postponed or delayed. **2.** With benefits or payments withheld until a future date. **3.** Having had one's compulsory military service postponed.

**de- fer-ves-cence** (dĕf'ər-vĕs'əns) *n.* The abatement of a fe- ver. [< Lat. *defervescens, defervescent-,* pr.part. of *deferves- cere,* to stop boiling : *de-,* off, away + *fervescere,* to begin to boil < *fervēre,* to boil.]

**de-fi-ance** (di-fī'əns) *n.* **1.** Bold resistance to an opposing force or authority. **2.** Intentionally provocative behavior or attitude. [ME *defiaunce* < OFr. *desfiance* < *desfier,* to defy.]

**de-fi-ant** (di-fī'ənt) *adj.* Marked by defiance. —**de-fi'ant-ly** *adv.*

**de-fib-ril-late** (dē-fĭb'rə-lāt') *tr.v.* **-lat-ed, -lat-ing, -lates.** To stop the fibrillating of (a heart). —**de-fib'ril-la'tion** *n.* —**de- fib'ril-la'tive** *adj.* —**de-fib'ril-la'tor** *n.* —**de-fib'ril-la-to'ry** (-lə-tôr'ē, -tōr'ē) *adj.*

**de-fi-cien-cy** (di-fĭsh'ən-sē) *n.,* *pl.* **-cies.** **1.** The quality or condition of being deficient. **2.** A lack or shortage; insuffi- ciency.

**deficiency disease** *n.* A disease, as rickets or scurvy, caused by a dietary deficiency of specific vitamins and min- erals.

**de-fi-cient** (di-fĭsh'ənt) *adj.* **1.** Lacking an essential quality or element. **2.** Inadequate in amount or degree; insufficient. [Lat. *deficiens, deficient-,* pr.part. of *deficere,* to fail. —see DEFECT.] —**de-fi'cient-ly** *adv.*

**def-i-cit** (dĕf'ĭ-sĭt) *n.* The amount by which something, as a sum of money, falls short of the required or expected amount; shortage. [Fr. *déficit* < Lat. *deficit,* it is lacking.]

**deficit spending** *n.* The spending of public funds obtained by borrowing.

**de-fi-lade** (dĕf'ə-lād', -läd') *tr.v.* **-lad-ed, -lad-ing, -lades.** To arrange (fortifications) so as to give protection from enfilad- ing and other fire. —*n.* The act or procedure of defilading. [DE- + (EN)FILADE.]

**de-file** (di-fīl') *tr.v.* **-filed, -fil-ing, -files.** **1.** To make filthy or dirty; pollute. **2.** To render impure; corrupt. **3.** To profane or sully (a good name, for example). **4.** To make unclean or unfit for ceremonial use; desecrate. **5.** To violate the chas- tity of. [ME *defilen,* blend of *filen,* to defile (< OE *fŷlan*) and *defoulen,* to injure. < OFr. *defouler : de-,* down (< Lat.) + *fouler,* to trample. —see FULL.] —**de-file'ment** *n.* —**de-fil'er** *n.* —**de-fil'ing-ly** *adv.*

**de-file** (di-fīl') *intr.v.* **-filed, -fil-ing, -files.** To march in single file or in files or columns. —*n.* **1.** A narrow gorge or pass that restricts lateral movement, as of troops. **2.** A march in a line or lines. [Fr. *défiler : dé-,* off (< Lat. *de-*) + *filer,* to march in files < OFr., to spin < LLat. *filare* < Lat. *filum,* thread.]

**de-fine** (di-fīn') *v.* **-fined, -fin-ing, -fines.** —*tr.* **1.** To state the precise meaning of (a word or sense of a word, for example). **2.** To describe the nature or basic qualities of; explain: *de- fine the properties of a new drug.* **3.** To delineate the outline or form of: *a shape defined by a line.* **4.** To specify distinctly:

*define the weapons to be used in limited warfare.* **5.** To serve to distinguish; characterize. —*intr.* To make a definition. [ME *diffinen* < OFr. *definer* < Lat. *definire,* to limit : *de-,* off + *finis,* end.] —**de-fin'a-bil'i-ty** = **de-fin'a-ble** *adj.* —**de- fin'a-bly** *adv.* —**de-fine'ment** *n.* —**de-fin'er** *n.*

**de-fin-i-en-dum** (di-fĭn'ē-ĕn'dəm) *n.,* *pl.* **-da** (-də). A word or expression that is defined by a definiens. [Lat., neuter ge- rund. of *definire,* to define.]

**de-fin-i-ens** (di-fĭn'ē-ĕnz') *n.,* *pl.* **-tin-i-en-ti-a** (-ĭn'ē-ĕn'shē-ə, -shə). The word or words serving to define another word or expression, as in a dictionary entry. [Lat., pr.part. of *defi- nire,* to define.]

**def-i-nite** (dĕf'ə-nĭt) *adj.* **1.** Having distinct limits: *definite restrictions on liquor sales.* **2.** Known positively; certain: *a definite victory.* **3.** Clearly defined; precise and explicit: *a definite statement of the terms of the will.* **4.** *Gram.* Limiting or particularizing. **5.** *Bot.* **a.** Of a specified number not ex- ceeding 20, as certain floral organs, esp. stamens. **b.** Cymose; determinate. [ME *diffinite* < Lat. *definitus,* p.part. of *definire,* to define.] —**def'i-nite-ly** *adv.* —**def'i-nite- ness** *n.*

**definite article** *n.* *Gram.* The article *the,* which restricts or particularizes the noun or noun phrase following it.

**definite integral** *n.* The limit of sums with terms of the form $f(x_i)\Delta x_i,$ where $f$ is a function defined in the interval be- tween two numbers $a$ and $b,$ $\Delta x_i$ is the length of one of several intervals into which the interval from $a$ to $b$ is di- vided, $x_i$ is a number in that interval, and the sums increase as the lengths of the subintervals become smaller.

**def-i-ni-tion** (dĕf'ə-nĭsh'ən) *n.* **1.** The act of stating a precise meaning or significance. **2.** The statement of the meaning of a word, phrase, or term. **3.** The act of making clear and distinct: *a definition of one's intentions.* **4.** The state of being closely outlined or determined. **5.** A determination of out- line, extent, or limits: *the definition of a nation's authority.* **6.** The degree of clarity with which a televised image is re- ceived or a radio receives a given station. **7.** The clarity of detail in an optically produced image, as a photograph, ef- fected by a combination of resolution and contrast. [ME *diffinicioun* < OFr. *definition* < Lat. *definitio* < *definire,* to define.] —**def'i-ni'tion-al** *adj.*

**de-fin-i-tive** (di-fĭn'ĭ-tĭv) *adj.* **1.** Precisely defining or outlin- ing; explicit. **2.** Determining finally; decisive: *authority that has been influential but not definitive.* **3.** Authoritative and complete: *a definitive biography.* —*n.* *Gram.* A word that defines or limits, such as the definite article or a demonstra- tive pronoun. —**de-fin'i-tive-ly** *adv.* —**de-fin'i-tive-ness** *n.*

**de-fin-i-tude** (di-fĭn'ĭ-tōōd', -tyōōd') *n.* The quality of being definite or exact; precision.

**def-la-grate** (dĕf'lə-grāt') *intr.* & *tr.v.* **-grat-ed, -grat-ing, -grates.** To burn or cause to burn with great heat and in- tense light. [Lat. *deflagrare, deflagrat- : de-* (intensive) + *flagrare,* to burn.] —**def'la-gra'tion** *n.*

**de-flate** (di-flāt') *v.* **-flat-ed, -flat-ing, -flates.** —*tr.* **1. a.** To release contained air or gas from. **b.** To collapse by releas- ing contained air or gas. **2.** To reduce or lessen the confi- dence, pride, self-esteem, or certainty of. **3.** *Econ.* To reduce the value or amount of (currency), effecting a decline in prices. —*intr.* To be or become deflated. [DE- + (IN)FLATE.] —**de-fla'tor** *n.*

**de-fla-tion** (di-flā'shən) *n.* **1.** The act of deflating or the con- dition of being deflated. **2.** *Econ.* A reduction in available currency and credit that results in a decrease in the general price level. —**de-fla'tion-ar'y** (-shə-nĕr'ē) *adj.* —**de-fla'tion- ist** *n.*

**de-flect** (di-flĕkt') *intr.* & *tr.v.* **-flect-ed, -flect-ing, -flects.** To turn aside or cause to turn aside; swerve. [Lat. *deflectere : de-,* away + *flectere,* to bend.] —**de-flect'a-ble** *adj.* —**de- flec'tive** *adj.* —**de-flec'tor** *n.*

**de-flec-tion** (di-flĕk'shən) *n.* **1.** The act of deflecting or the condition of being deflected. **2.** Deviation or the amount of deviation. **3.** The deviation from zero shown by the indica- tor of a measuring instrument. **4.** The movement of a struc- ture or structural part as a result of stress.

**de-flexed** (di-flĕkst', dē'flĕkst') *adj.* *Bot.* Bent or turned downward at a sharp angle: *deflexed petals.* [< Lat. *deflexus,* p.part. of *deflectere,* to deflect.]

**de-flex-ion** (di-flĕk'shən) *n.* Chiefly Brit. Variant of **deflec- tion.**

**de-flo-ra-tion** (dĕf'lə-rā'shən) *n.* The act of deflowering. [ME *defloracioun* < LLat. *defloratio* < *deflorare,* to deflower.]

**de-flow-er** (dē-flou'ər) *tr.v.* **-ered, -er-ing, -ers.** **1.** To rupture the hymen of (a virgin) by sexual intercourse. **2.** To destroy the innocence of; violate. **3.** To spoil the appearance or na- ture of; mar. [ME *deflouren* < OFr. *deflorer* < LLat. *deflo- rare :* Lat. *de-,* away + Lat. *flos,* flower.] —**de-flow'er-er** *n.*

**de-fo-cus** (dē-fō'kəs) *tr.v.* **-cused, -cus-ing, -cus-es** also **-cussed, -cus-sing, -cus-ses.** To cause (a beam or a lens) to deviate from an accurate focus. —*n.* The result of defocus- ing.

**de-fog** (dē-fŏg', -fôg') *tr.v.* **-fogged, -fog-ging, -fogs.** To re- move fog from. —**de-fog'ger** *n.*

**de-fo-li-ant** (dē-fō'lē-ənt) *n.* A chemical sprayed or dusted on plants to cause the leaves to fall off.

**de-fo-li-ate** (dē-fō'lē-āt') *v.* **-at-ed, -at-ing, -ates.** —*tr.* **1.** To deprive (a tree or other plant) of leaves. **2.** To cause the

**fish protein concentrate** *n.* A flour or paste rich in protein that is prepared from ground fish and used as a nutritional additive to foods.

**fish-skin disease** (fish'skin') *n.* Ichthyosis.

**fish stick** *n.* An oblong piece of breaded fish fillet.

**fish story** *n. Informal.* An implausible and boastful story. [From the fact that fishermen traditionally exaggerate the size of their catch.]

**fish-tail** (fish'tāl') *adj.* Resembling or suggestive of the tail of a fish in shape or movement. —*intr.v.* **-tailed, -tail-ing, -tails.** To swing the tail of an airplane or the rear end of an automobile or other vehicle from side to side while moving forward.

**fish-wife** (fish'wīf') *n.* **1.** A woman who sells fish. **2.** A coarse, abusive woman; shrew.

**fish-y** (fish'ē) *adj.* **-i-er, -i-est. 1.** Resembling or suggestive of fish, as in taste or odor. **2.** Cold or expressionless: *a fishy stare.* **3.** *Informal.* Inspiring suspicion; dubious. —**fish'i-ly** *adv.* —**fish'i-ness** *n.*

**fissi-** *pref.* **1.** Fission: *fissiparous.* **2.** Split; cleft: *fissipalmate.* [< Lat. *fissus,* p.part. of *findere,* to split.]

**fis-sile** (fis'əl, -īl') *adj.* **1.** Capable of being split. **2.** *Physics.* Fissionable, esp. by neutrons of all energies. [Lat. *fissilis* < *fissus,* split. —see FISSI-.] —**fis-sil'i-ty** (fi-sil'ĭ-tē) *n.*

**fis-sion** (fish'ən) *n.* **1.** The act or process of splitting into parts. **2.** *Physics.* A nuclear reaction in which an atomic nucleus splits into fragments, usually two fragments of comparable mass, with the evolution of approximately 100 million to several hundred million electron volts of energy. **3.** *Biol.* An asexual reproductive process in which a unicellular organism splits into two or more independently maturing daughter cells. [Lat. *fissio,* a cleaving < *fissus,* split. —see FISSI-.]

**fis-sion-a-ble** (fish'ə-nə-bəl) *adj.* Capable of undergoing fission, esp. capable of being induced to undergo nuclear fission by slow neutrons. —**fis-sion-a-bil'i-ty** *n.*

**fission bomb** *n.* An atomic bomb.

**fis-si-pal-mate** (fis'ə-pǎl'māt') *adj.* Having lobed or partially webbed separated toes, as the feet of certain birds.

**fis-sip-a-rous** (fĭ-sĭp'ər-əs) *adj.* Reproducing by biological fission. —**fis-sip'a-rous-ly** *adv.* —**fis-sip'a-rous-ness** *n.*

**fis-si-ped** (fis'ə-pĕd') *adj.* Having the toes separated from one another, as certain carnivorous mammals. —*n.* A fissiped carnivorous mammal. [LLat. *fissipes, fissiped-,* clovenfooted : Lat. *fissus,* split + Lat. *pes,* foot.]

**fis-sure** (fish'ər) *n.* **1.** A narrow crack or cleft, as in a rock face. **2.** The process of separation or division. **3.** A schism; split. **4.** *Anat.* A groove or furrow, as in the liver or brain, that divides an organ into lobes or separates it into areas. —*intr. & tr.v.* **-sured, -sur-ing, -sures.** To form a fissure or cause a fissure in; crack. [ME, cut < OFr. < Lat. *fissura* < *fissus,* split. —see FISSI-.]

**fist** (fist) *n.* **1.** The hand closed tightly with the fingers bent against the palm. **2.** *Informal.* A grasp; clutch. **3.** An index (sense 3). —*tr.v.* **fist-ed, fist-ing, fists. 1.** To clench into a fist. **2.** To grasp with the fist. [ME < OE *fȳst.*]

**fist-fight** (fist'fīt') *n.* A fight with the fists.

**fist-ful** (fist'fŏŏl') *n., pl.* **-fuls.** A handful.

**fist-ic** (fis'tĭk) *adj.* Of or pertaining to boxing; pugilistic.

**fist-i-cuffs** (fis'tĭ-kŏfs') *pl.n.* **1.** A fistfight. **2.** Boxing. —**fist'i-cuff'er** *n.*

**fis-tu-la** (fis'chə-lə) *n., pl.* **-las** or **-lae** (-lē'). An abnormal duct or passage from an abscess, cavity, or hollow organ to the body surface or to another hollow organ. [ME < Lat.]

**fis-tu-lous** (fis'chə-ləs) *adj.* **1.** Of or resembling a fistula. **2.** Tubular and hollow; reedlike.

**fit** (fĭt) *v.* **fitted** or **fit, fit-ted, fit-ting, fits.** —*tr.* **1. a.** To be the proper size and shape for. **b.** To cause to fit. **2.** To be appropriate or suitable to. **3.** To be in conformity or agreement with: *observations that fit in nicely with my theory.* **4.** To make suitable. **5.** To make ready; prepare: *Specialized training fitted her for the job.* **6.** To equip; outfit: *fit out a ship.* **7.** To provide a place or time for: *The doctor can fit you in today.* **8.** To insert or adjust so as to be properly in place: *fit a handle on a door.* —*intr.* **1.** To be the proper size and shape. **2.** To be suitable; belong: *doesn't fit in with these people.* **3.** To be in harmony; agree: *Her good mood fit in with the joyful occasion.* —*adj.* **fit-ter, fit-test. 1.** Suited, adapted, or acceptable for a given circumstance or purpose: *not a fit time for discussion.* **2.** Appropriate; proper: *Do as you see fit.* **3.** Physically sound; healthy. —*n.* **1.** The state, quality, or way of being fitted. **2.** The manner in which clothing fits. **3.** The degree of precision with which surfaces are adjusted or adapted to each other in a machine or collection of parts. [ME *fitten,* to be suitable.] —**fit'ly** *adv.* —**fit'ness** *n.*

   **Synonyms:** *fit, suitable, meet, proper, appropriate, apt, fitting, happy, felicitous.* These adjectives mean right or correct in view of the circumstances that exist. *Fit* implies adaptability or conformability. *Fit,* in this sense, refers to what is adapted to certain requirements or capable of measuring up to them: *tools fit for the job; fit for heavy duty. Suitable* also implies ability to meet requirements related to a particular need or to an occasion: *suitable for everyday wear. Meet* applies to what is precisely suitable or suitable in the sense of being morally right or just: *a meet reward. Proper* describes what is harmonious, either by nature or because it harmonizes



fjord

---

son, custom, propriety, or the like: *a proper setting for a monument; the proper form of addressing a clergyman.* What is *appropriate* to a thing or for an occasion especially befits it, and what is *apt* is notably to the point: *appropriate remarks; an apt reply. Fitting* suggests close agreement with a prevailing mood or spirit: *a fitting observance of the holiday. Happy* and *felicitous* are applicable to what seems especially suited to an occasion by its nature or by its timeliness: *a happy turn of phrase; an unplanned but felicitous development.*

   **Usage:** Either *fitted* or *fit* is correct as the past tense of *fit: The suit fitted* (or *fit*) *me well the last time I tried it on.* When the verb is used to mean "to cause to fit," only *fitted* is used as the past tense: *The tailor fitted* (not *fit*) *the suit in a few minutes.*

**fit[2]** (fĭt) *n.* **1.** *Med.* **a.** A sudden and acute attack of a disease. **b.** The sudden appearance of a symptom such as coughing. **c.** A convulsion. **2.** A sudden outburst of emotion: *a fit of jealousy.* **3.** A sudden period of vigorous activity. —*idiom.* **by** (or **in**) **fits and starts.** With irregular intervals of action and inaction; intermittently. [ME, hardship.]

**fit[3]** (fĭt) *n. Archaic.* A section of a poem or ballad. [ME < OE.]

**fitch** (fĭch) *n.* The fur of the Old World polecat. [ME *fiche.*]

**fitch-ew** (fĭch'ōō) also **fitch-et** (fĭch'ĭt) *n. Archaic.* The Old World polecat or its fur. [ME *ficheux* < OFr. *ficheau* < MDu. *vitsou.*]

**fit-ful** (fĭt'fəl) *adj.* Occurring in or characterized by intermittent bursts of activity; irregular. —**fit'ful-ly** *adv.* —**fit'ful-ness** *n.*

**fit-ting** (fĭt'ĭng) *adj.* Suitable or appropriate to the circumstances. —*n.* **1.** The act of trying on clothes whose fit is being adjusted. **2.** A small, detachable part for a machine or an apparatus. **3.** *Usually* **fittings.** *Brit.* Furnishings or fixtures. —**fit'ting-ly** *adv.* —**fit'ting-ness** *n.*

**five** (fīv) *n.* **1.** The cardinal number that is next after the number 4 and equal to the sum of 4 + 1. **2.** The fifth in a set or sequence. **3.** Something having five parts, units, or members, esp. a basketball team. **4.** *Informal.* A five-dollar bill. [ME < OE *fīf;* akin to G. *fünf,* Lat. *quinque,* Gk. *pente,* and Skt. *pañca.*] —**five** *adj. & pron.*

**five-and-dime** (fīv'ən-dīm') *n.* A five-and-ten.

**five-and-ten** (fīv'ən-těn') *n.* A variety store selling inexpensive commodities.

**five-fin-ger** (fīv'fĭng'gər) *n.* Any of several plants having compound leaves with five leaflets, such as the cinquefoil.

**five-fold** (fīv'fōld') *adj.* **1.** Consisting of five parts. **2.** Five times as many or as much. —**five'fold'** *adv.*

**fiv-er** (fī'vər) *n. Informal.* **1.** A five-dollar bill. **2.** *Chiefly Brit.* A five-pound note.

**fix** (fĭks) *v.* **fixed, fix-ing, fix-es.** —*tr.* **1. a.** To place or fasten securely. **b.** To make fast to; attach. **2.** To put into a stable or unalterable form; set, as in *Chem.* To make (a substance) nonvolatile or solid. **b.** *Biol.* To convert (nitrogen) into a usable, biologically assimilable compounds. **c.** To kill and keep (a specimen) intact for microscopic study. **d.** To prevent discoloration of (a photographic image) by washing or coating with a chemical preservative. **3.** To direct steadily: *fixed her eyes on the page.* **4.** To establish definitely: *fix a time.* **5.** To assign: *fixing the blame.* **6.** To set right; adjust. **7.** *Computer Sci.* To convert data from floating-point notation to fixed-point notation. **8.** To restore to proper condition or working order; repair. **9.** To make ready; prepare. **10.** To spay or castrate (an animal). **11.** *Informal.* To take revenge upon; get even with. **12.** To influence or arrange the outcome of by unlawful means. —*intr.* **1.** To become concentrated, directed, or attached. **2.** To become stable or firm; harden. **3.** *Regional.* To intend: *was fixing to take the children with her.* —*n.* **1.** A difficult or embarrassing condition; predicament. **2.** The position, as of a ship or aircraft, as determined by observations or radio. **3.** An instance of arranging for special consideration or exemption from a requirement, esp. by means of bribery. **4.** *Slang.* An intravenous injection of a narcotic. [ME *fixen* < *fix,* fixed in position < Lat. *fixus,* p.part. of *figere,* to fasten.] —**fix'a-ble** *adj.* —**fix'er** *n.*

**fix-ate** (fĭk'sāt') *v.* **-at-ed, -at-ing, -ates.** —*tr.* **1.** To make fixed, stable, or stationary. **2.** To focus one's eyes or concentrate one's attention on. **3.** *Psychol.* To attach (oneself) to a person or thing in an immature or neurotic fashion. —*intr.* **1.** To focus or concentrate one's attention. **2.** *Psychol.* **a.** To form a fixation. **b.** To be arrested at an immature stage of psychosexual development.

**fix-a-tion** (fĭk-sā'shən) *n.* **1.** The act or process of fixing or fixating. **2.** *Psychol.* **a.** A strong attachment to a person or thing, esp. such an attachment formed in childhood or infancy and persisting in immature or neurotic behavior.

**fix-a-tive** (fĭk'sə-tĭv) *n.* Anything that fixes, protects, or preserves, esp. **a.** A liquid preservative applied to art work, such as water-color paintings or charcoal drawings. **b.** A solution used to preserve fresh tissue for microscopic examination. **c.** A liquid mixed with perfume to prevent rapid evaporation. —**fix'a-tive** *adj.*

**fixed** (fĭkst) *adj.* **1.** Firmly in position; stationary. **2.** *Chem.* **a.** Nonvolatile: *fixed oils.* **b.** In a stable combined form. **3.** Not subject to change or variation; constant. **4.** Firmly often dogmatically held: *a fixed notion.* **5.** Illegally prear-

---

ranged as to outcome. —**ness** (-sĭd-nĭs) *n.*

**fixed head** *n.* A stationary head, that reads and impr... of magnetic tape.

**fixed oil** *n.* A nonvolatile o... from an essential oil.

**fixed-point** (fĭks'point') *n.* ... method of writing numbers named number of digits at... single, unchanging position...

**fixed star** *n.* A star so dist... ments can be measured on... long periods of time.

**fix-ings** (fĭk'sĭngz) *pl.n. Inf...* being fixed; stability. **2.** S... able.

**fix-ture** (fĭks'chər) *n.* **1.** So... us. or appliance: *plumbi...* bound to reality. **4.** A pers... established in, or restricted... function. **5. a.** The action o... tion of being fixed. [Var. of... *fixus.* —see FIX.]

**fizz** (fĭz) *intr.v.* **fizzed, fizz-i...** bubbling sound. —*n.* **1.** ... **2.** Effervescence. **3.** An effe...

**fiz-zle** (fĭz'əl) *intr.v.* **-zled, -z...** in sputtering sound. **2.** *Inf...* after a hopeful beginning. ... [Prob. < obs. *fist,* to break ... **fipld** (fyēld) *n.* A high, barr... countries. [Dan. < ON *fjall,...*

**fjord** also **fiord** (fyôrd, fyōrd)... inlet from the sea between s... ON *fjọrðr.*]

**flab** (flǎb) *n.* Body tissue ... [Back-formation < FLABBY.]

**flab-ber-gast** (flǎb'ər-gǎst')... To overwhelm with astonish...

**flab-by** (flǎb'ē) *adj.* **-bi-er, -b...** cid. **2.** Lacking force or vital... *flappy,* tending to flap < F... **ness** *n.*

**Ra-bel-la** (flə-běl'ə) *n.* Plural...

**fla-bel-late** (flə-běl'ĭt, flǎb'ə-...** *flabellum,* small fan.] ...

**fla-bel-li-form** (flə-běl'ə-fôrm')... **fla-bel-lum** (flə-běl'əm) *n., p...* anatomical structure. [Lat. ...

**flac-cid** (flǎk'sĭd, flǎs'ĭd) *adj...* tence: *flaccid cheeks.* **2.** Lack... cid + -ID. —see FLACCID-.] ... (-sĭd'ĭ-tē). —**flac'cid-ness** *n.* ...

**flack** (flǎk) *n.* A press agen... sucks. To act as a flack. [O... ...

**flac-on** (flǎk'ən, -ŏn') *n. Fren...** with a tight-fitting stopper or...

**flag[1]** (flǎg) *n.* **1.** A piece of c... and design, used as a symbol... **2.** *Mus.* A cross stroke adde... quarter note in value. **3.** A thi... ral, flagship. **4.** The mastheadt...tively shaped or marked ta... *Computer Sci.* A bit or set o... uses, used in computer se... piece of information. —*tr.v.* ... To mark with a flag for identif... To signal with or as if with... [Orig. unknown.] —**flag'ger** ...

**flag[2]** (flǎg) *n.* Any of various... leaves, such as an iris or catta...

**flag[3]** (flǎg) *intr.v.* **flagged, fl...** timely; droop. **2.** To decline i... *set began to flag.* **3.** To declin... *flagged.* [Orig. unknown.]

**flag[4]** (flǎg) *n.* **1.** A slab of flags... stone. —*tr.v.* **flagged, flag-gin...**

**Flag Day** *n.* June 14, comme... of the official U.S. flag.

**fla-gel-la** (flə-jĕl'ə) *n.* Plural of...

**flag-el-lant** (flǎj'ə-lənt, flə-jĕl'...** one who scourges himself by v... public penance. **2.** One who ... beating or being beaten by an... *flagellans,* pr.part. of *flagellare*...

**flag-el-lar** (flə-jĕl'ər) *adj.* Of o...

**flag-el-late** (flǎj'ə-lāt') *v.* **-lat-...** ing of flog; scourge. **2.** To pu... ... as unicellular organism [Mastophora]. **2.** Resembling ...

---

Case 1:06-cv-00032-JJF    Document 208-2    Filed 08/30/2007    Page 14 of 28

representation or picture...
elf regarded as sacred, esp...
churches. [Lat. < Gk. *ikon*...

...ning to or having the char...
conventional formulae or...
ies and busts.
con: *iconulary.* [Gk. *eik*...

*n.* 1. The action or doct...
2. The attacking of relig...
attitudes. [< iconoclast...
1. One who destroys or a...
d seeks to overthrow tra...
titutions. [Med. Lat. *icon*...
tés : Gk. *eikōn,* image...
*icon•o•cla* —**i•con'o•clas...**

*n., pl.* -**phies.** 1. a. Pictor...
1. The collected represent...
A set of specified or trad...
i with the subject or tra...
conventions defining the...
ship. 3. A treatise or trea...
*eikonographia,* [descript...
-graphia, -graphy] —**i-c...**
*graphic* (-ə-grăf'ĭk), *reprod...*

'he worship of images d...

the branch of art histo...
sis, and interpretations o...
—**i•con'o•log'i•cal** (-lə-...

A television-camera tube...
information-storing, pho...

'*of* -**ses** (-sēz'). The scie...
nan body of an Eastern...
*ostation,* shrine : *eikō...*

*n., pl.* -**dra** (-drə) al...
faces. [Gk. *eikosāedron :*...
—*ico'sa•he'dral* adj...
knowledge; skill; *graphic*...
of; *athletics.* 3. Qualitie...
< (n.pl. suffix, tran...
lj. suffix.]
t to or having jaundic...
emedy for jaundice. [ic...

Causing jaundice. [ic...

at. < Gk. *ikteros.*]
*athol.* A sudden attack...
ike.]
ning or covered with ice...
terly cold; freezing: *an i...*
a smile.
associated with instinc...
mediate satisfaction of...

ild.

Lat. *-is, -id,* fem. pat...

ng a photograph that i...
n admits.

e. [G. *-id* < Fr. *-ide* (a...

...ds in the mind, poten...
tal activity, such as a...
spinion, conviction, or...
al *ideas.* 3. A plan...
pecific action or una...
cy. 6. *Obs.* A mental...
us. A theme or moti...
tto, an archetype of...
onmenal reality is an...
of a Kant, a concept of...
pirical. c. In the phil...
mplete and ultimate re...
at concept. [Lat. <...

f something in its...
ded as a standard or m...
n ultimate object of at...
the principle or aim...
mbodying an idea...
standard of perfec...
best of its kind...
*'he location is ideal...*
ry. b. Lacking prac...
5. Of, pertaining to o...
6. *Philos.* a. Exis...

pii- / i pie / ĭ pier /
öō took / ō boot /

---

ing as an archetype or pattern, esp. as a Platonic idea or
perception. **b.** Of or pertaining to idealism. [Fr. < LLat.
*idealis* < Lat. *idea,* idea.]
**Synonyms:** *ideal, model, exemplar, standard, prototype,
archetype.* These nouns refer to things or, less often, to per-
sons that serve as the basis of direction or guidance in work
or behavior. An *ideal* is a goal or perfection in the form of a
person or thing, sometimes imaginary. A *model* is a pattern
or a person who serves as a pattern in the creation of some-
thing; in a related sense the term refers to a person or thing
worthy of imitation. The latter sense approaches that of
*exemplar,* a person or thing that serves as an ideal example
by reason of being either very worthy or truly representative
of a type, admirable or otherwise. A *standard* is an estab-
lished criterion or recognized level of excellence used as a
measure of achievement. *Prototype* and *archetype* both de-
note original models of things subsequently reproduced.
What develops from a *prototype* may represent significant
modifications from the original. An *archetype,* in contrast, is
usually construed as an ideal form that establishes an un-
changing pattern for all things of its kind.
**i•de•al•ism** (ī-dē'ə-lĭz'əm) *n.* 1. The action or practice of en-
visioning things in an ideal form. 2. Pursuit of one's ideals.
3. An idealizing treatment of a subject in literature or art.
4. The philosophical theory that the object of external per-
ception, in itself or as perceived, consists of ideas.
**i•de•al•ist** (ī-dē'ə-lĭst) *n.* 1. One whose conduct is influenced
by ideals, esp. when they conflict with practical consider-
ations. 2. One who is unrealistic and impractical. 3. An art-
ist or writer whose work is imbued with idealism. 4. An
adherent of any system of philosophical idealism.
**i•de•al•is•tic** (ī-dē'ə-lĭs'tĭk) *adj.* Pertaining to or having the
nature of an idealist or idealism. —**i•de•al•is'ti•cal•ly** *adv.*
**i•de•al•i•ty** (ī'dē-ăl'ĭ-tē) *n., pl.* -**ties.** 1. The state or quality of
being ideal. 2. Existence in idea only.
**i•de•al•ize** (ī-dē'ə-līz') *v.* -**ized,** -**iz•ing,** -**iz•es.** —*tr.* 1. To re-
gard as ideal. 2. To make or envision as ideal. —*intr.* 1. To
render something as an ideal. 2. To conceive an ideal or
ideals. —**i•de'al•i•za'tion** *n.* —**i•de'al•iz'er** *n.*
**i•de•al•ly** (ī-dē'ə-lē) *adv.* 1. In conformity with an ideal; per-
fectly. 2. In theory or imagination; theoretically.
**i•de•ate** (ī'dē-āt') *v.* -**at•ed,** -**at•ing,** -**ates.** —*tr.* To form an
idea of; imagine; conceive. —*intr.* To conceive mental im-
ages; think. —**i•de•a'tion** *n.* —**i•de•a'tion•al** *adj.*
**i•dée fixe** (ē-dā fēks') *n., pl.* **i•dées fixes** (ē-dā fēks'). A fixed
idea; obsession. [Fr.]
**i•dem** (ī'dĕm') *pron.* Used to indicate a reference previously
mentioned. [Lat., the same. cf. **id.** it.]
**i•den•tic** (ī-dĕn'tĭk) *adj.* 1. Designating diplomatic action or
language in which two or more governments agree to use
the same forms in their relations with other governments.
2. *Archaic.* Identical. [Med. Lat. *identicus,* identical.]
**i•den•ti•cal** (ī-dĕn'tĭ-kəl) *adj.* 1. Being the same: *used the
senator's identical words.* 2. Being exactly equal and alike.
3. Having such a near similarity or resemblance as to be
essentially equal or interchangeable. 4. *Biol.* Of or pertain-
ing to a twin or twins developed from the same ovum. [Med.
Lat. *identicus* < LLat. *identitas,* identity.] —**i•den'ti•cal•ly**
*adv.* —**i•den'ti•cal•ness** *n.*
**Usage:** Some authorities on usage specify *with* as the
preferred preposition after *identical.* But either *with* or *to* is
now acceptable.
**i•den•ti•fi•ca•tion** (ī-dĕn'tə-fĭ-kā'shən) *n.* 1. The act of iden-
tifying. 2. The state of being identified. 3. Proof or evidence
of identity. 4. *Psychol.* **a.** An individual's recognition of a
personal or group identity. **b.** The transferal of response to
an object considered identical to another.
**identification card** *n.* An ID card.
**i•den•ti•fi•er** (ī-dĕn'tə-fī'ər) *n.* 1. One that identifies. 2. *Com-
puter Sci.* A symbol that serves to identify, indicate, or name
a body of data.
**i•den•ti•fy** (ī-dĕn'tə-fī') *v.* -**fied,** -**fy•ing,** -**fies.** —*tr.* 1. To
establish the identity of. **b.** To ascertain the origin, nature,
or definitive characteristics of. 2. To determine the taxo-
nomic classification of. 3. To consider as identical or
united; equate. 4. *Psychol.* To associate or affiliate (oneself)
closely with a person or group. —*intr.* To establish an iden-
tification with another or others. [Med. Lat. *identificare* :
LLat. *identitas,* identity + Lat. *facere,* to make.] —**i•den'ti-
fi•a•ble** *adj.* —**i•den'ti•fi'er** *n.*
**Usage:** *Identify* is well established in the sense, popu-
larized by psychology, of "to see oneself as one with." A
majority of the Usage Panel accepts this example: *He iden-
tified himself with the hero of a new novel.* A majority also
accepts the same example without the reflexive pronoun:
*He identified with the hero of a new novel.*
**i•den•ti•ty** (ī-dĕn'tĭ-tē) *n., pl.* -**ties.** 1. The collective aspect of
the set of characteristics by which a thing is definitively
recognizable or known. 2. The set of behavioral or personal
characteristics by which an individual is recognizable as a
member of a group. 3. The quality or condition of being the
same as something else. 4. The distinct personality of an
individual regarded as a persisting entity; individuality.
5. *Math.* **a.** An equality satisfied by all values of the vari-
ables for which the expressions involved in the equality are

---

defined. **b.** A unity. [LLat. *identitas* < Lat. *idem,* the same <
*id,* it.]
**identity crisis** *n.* 1. A psychosocial state or condition of
disorientation and role confusion occurring esp. in adoles-
cents as a result of conflicting pressures and expectations.
2. An analogous state of confusion occurring in a social
structure, as an institution or a corporation.
**identity element** *n.* The element of a set of numbers that
when combined with another number in an operation leaves
that number unchanged. For example, 0 is the identity ele-
ment under addition for the real numbers, since if *a* is any
real number, $a + 0 = 0 + a = a$. Similarly, 1 is the
identity element under multiplication for the real numbers,
since $a \times 1 = 1 \times a = a$.
**identity matrix** *n.* A square matrix with numeral 1's along
the diagonal from upper left to lower right and 0's in all
other positions.
**identity sign** *n.* A mathematical symbol ($\equiv$), used to denote
identity rather than equality.
**ideo–** *pref.* Idea: *ideography.* [Fr. *idéo-* < Gk. *idea,* form,
idea.]
**id•e•o•gram** (ĭd'ē-ə-grăm', ī'dē-) also **id•e•o•graph** (-grăf')
*n.* 1. A character or symbol representing an idea or thing
without expressing a particular word or phrase for it, as
Chinese characters. 2. A graphic symbol, as $, \&, \$, $ or @.
**id•e•og•ra•phy** (ĭd'ē-ŏg'rə-fē, ī'dē-) *n.* 1. The representation
of ideas by graphic symbols. 2. The use of ideograms to
express ideas. —**id•e•o•graph'ic** (-ə-grăf'ĭk) *adj.*
**i•de•o•log•i•cal** (ī'dē-ə-lŏj'ĭ-kəl, ĭd'ē-) also **i•de•o•log•ic**
(-lŏj'ĭk) *adj.* 1. Of or relating to ideology. 2. Of or concerned
with ideas.
**i•de•ol•o•gist** (ī'dē-ŏl'ə-jĭst, ĭd'ē-) *n.* 1. An advocate or ad-
herent of a given ideology. 2. *Archaic.* A visionary; theorist.
**i•de•o•logue** (ī'dē-ə-lôg', ĭd'ē-) *n.* An advocate of a given ide-
ology, esp. one of its official exponents. [Fr. *idéologue,* back-
formation < *idéologie,* ideology.]
**i•de•ol•o•gy** (ī'dē-ŏl'ə-jē, ĭd'ē-) *n., pl.* -**gies.** The body of
ideas reflecting the social needs and aspirations of an indi-
vidual, group, class, or culture. [Fr. *idéologie : idéo-,* ideo- +
-*logie,* -logy.]
**i•de•o•mo•tor** (ī'dē-ə-mō'tər, ĭd'ē-) *adj.* Of or being a motor
response to an ideational rather than a sensory stimulus.
**Ides** (īdz) *n.* (used with a sing. verb) In the ancient Roman
calendar, the 15th day of March, May, July, or October or
the 13th day of the other months. [ME *idus* < OFr. *ides* <
Lat. *idus.*]
**idio–** *pref.* 1. Private; personal; one's own: *idiolect.* 2. Dis-
tinct; separate: *idioplasm.* [Gk. < *idios,* personal, private.]
**id•i•o•blast** (ĭd'ē-ə-blăst') *n.* A plant cell that differs notice-
ably in form from neighboring cells. —**id'i•o•blas'tic** *adj.*
**id•i•o•cy** (ĭd'ē-ə-sē) *n., pl.* -**cies.** 1. *Psychol.* A condition of
subnormal intellectual development or ability, characterized
by intelligence in the lowest measurable range. 2. Extreme
folly or stupidity. 3. A foolish or stupid utterance or deed.
[< IDIOT.]
**id•i•o•lect** (ĭd'ē-ə-lĕkt') *n.* The speech of an individual, con-
sidered as a linguistic pattern unique among speakers of his
language or dialect. [IDIO- + (DIA)LECT.] —**id'i•o•lec'tal, id'-
i•o•lec'tic** *adj.*
**id•i•om** (ĭd'ē-əm) *n.* 1. A speech form or expression of a
given language that is peculiar to itself grammatically or
that cannot be understood from the individual meanings of
its elements. 2. The specific grammatical, syntactic, and
structural character of a given language. 3. A regional
speech or dialect. 4. A specialized vocabulary used by a
group of people; jargon: *legal idiom.* 5. A style of artistic
expression characteristic of a given individual, school, pe-
riod, or medium: *the idiom of the French impressionists.*
[OFr. *idiome* < LLat. *idioma* < Gk. < *idiousthai,* to make
one's own < *idios,* own, personal, private.]
**id•i•o•mat•ic** (ĭd'ē-ə-măt'ĭk) *adj.* 1. Peculiar to or characteris-
tic of a given language. 2. Resembling or having the nature
of an idiom. 3. Using many idioms. —**id'i•o•mat•i•cal•ly** *adv.*
**id•i•o•mor•phic** (ĭd'ē-ə-môr'fĭk) *adj.* Having a characteristic
shape. Used of well-crystallized minerals. [< Gk. *idiomor-
phos,* having one's own form : *idios,* own + *morphē,* shape.]
—**id'i•o•mor'phi•cal•ly** *adv.*
**id•i•op•a•thy** (ĭd'ē-ŏp'ə-thē) *n. Med.* 1. A disease of unknown
origin or cause; primary disease. 2. A disease for which no
cause is known. [Gk. *idiopathia,* disease having its own ori-
gin : *idios,* own + *pathos,* suffering.] —**id'i•o•path'ic**
(-ə-păth'ĭk) *adj.* —**id'i•o•path'i•cal•ly** *adv.*
**id•i•o•plasm** (ĭd'ē-ə-plăz'əm) *n.* A hypothetical structural
unit of germ plasm. —**id'i•o•plas'mic, id'i•o•plas•mat'ic**
(-ə-plăz-măt'ĭk) *adj.*
**id•i•o•syn•cra•sy** (ĭd'ē-ō-sĭng'krə-sē) *n., pl.* -**sies.** 1. A struc-
tural or behavioral characteristic peculiar to an individual
or group. 2. A physiological or temperamental peculiarity.
3. Hypersensitivity to a drug. [Gk. *idiosunkrasia : idiot,* own
+ *krasis,* mixture, temperament (sun-, together + *krasis,*
mixture).] —**id'i•o•syn•crat'ic** (-sĭn-krăt'ĭk) *adj.* —**id'i•o•syn-
crat'i•cal•ly** *adv.*
**id•i•ot** (ĭd'ē-ət) *n.* 1. *Psychol.* A mentally deficient person,
having intelligence in the lowest measurable range, being
unable to guard against common dangers and incapable of
learning connected speech. 2. A foolish or stupid person.

---


tree


grove, forest


faggot bundle
hence, to bind


the sun


the sun seen in the trees
hence, east

root (of a tree):
hence, origin
**ideogram**
Chinese characters

**sentimental | Septuagesima**      1118     1119

sion of delicate and sensitive feeling, as in art and literature. **7.** A vague feeling or awareness; sensation: *"overpowered by an intense sentiment of horror"* (Poe). [ME *sentement* < OFr. < Med. Lat. *sentimentum* < Lat. *sentire*, to feel.]

**sen·ti·men·tal** (sĕn′tə-mĕn′tl) *adj.* **1. a.** Characterized by or swayed by sentiment. **b.** Affectedly or extravagantly emotional. **2.** Resulting from or colored by emotion rather than reason or realism. **3.** Appealing to the sentiments, esp. to romantic feelings: *sentimental music.* —**sen′ti·men′tal·ly** *adv.*

**sen·ti·men·tal·ism** (sĕn′tə-mĕn′tl-ĭz′əm) *n.* **1.** A predilection for the sentimental. **2.** An idea or expression marked by excessive sentiment. —**sen′ti·men′tal·ist** *n.*

**sen·ti·men·tal·i·ty** (sĕn′tə-mĕn-tăl′ĭ-tē) *n., pl.* **-ties. 1.** The condition or quality of being excessively or affectedly sentimental. **2.** A sentimental idea or an expression of it.

**sen·ti·men·tal·ize** (sĕn′tə-mĕn′tl-īz′) *v.* **-ized, -iz·ing, -iz·es.** —*tr.* To regard with sentiment; be sentimental about. —*intr.* To behave in a sentimental manner. —**sen′ti·men′tal·i·za′tion** *n.*

**sen·ti·nel** (sĕn′tə-nəl) *n.* One that keeps guard; sentry. —*tr.v.* **-neled, -nel·ing, -nels** or **-nelled, -nel·ling, -nels.** **1.** To watch over as a sentinel. **2.** To provide with a sentinel. **3.** To post as a sentinel. [Fr. *sentinelle* < Ital. *sentinella*, prob. < *sentire*, to watch < Lat. *sentire*, to feel.]

**sen·try** (sĕn′trē) *n., pl.* **-tries. 1.** A guard, esp. a soldier posted at a given spot to prevent the passage of unauthorized persons. **2.** The duty of a sentry; watch. [Perh. alteration of obs. *sentry*, sanctuary.]

**sentry box** *n.* A small shelter for a sentry on his post.

**se·pal** (sē′pəl) *n.* One of the usually green segments forming the calyx of a flower. [N.Lat. *sepalum* < *sepa*, sepal < Gk. *skepē*, covering.] —**se′paled**, **sep·a·lous** (sĕp′ə-ləs) *adj.*



sentry box

**se·pal·oid** (sē′pə-loid′, sĕp′ə-) also **se·pal·ine** (-līn′, -lĭn) *adj.* Resembling or characteristic of a sepal.

**–sepalous** *suff.* Having a specified kind or number of sepals: *gamosepalous.* [SEPAL + -OUS.]

**sep·a·ra·ble** (sĕp′ər-ə-bəl, sĕp′rə-) *adj.* Capable of being separated. [OFr. < Lat. *separabilis* < *separare*, to separate.] —**sep′a·ra·bil′i·ty** *n.* —**sep′a·ra·bly** *adv.*

**sep·a·rate** (sĕp′ə-rāt′) *v.* **-rat·ed, -rat·ing, -rates.** —*tr.* **1. a.** To set or keep apart; disunite. **b.** To space apart; scatter. **c.** To sort. **2.** To differentiate or discriminate between; distinguish. **3.** To remove from a mixture or combination; isolate. **4.** To part (a married couple), often by decree: *He was separated from his wife last March.* **5.** To terminate a contractual relationship, as military service, with; discharge. —*intr.* **1.** To become disconnected or severed; come apart. **2.** To withdraw: *The state threatened to separate from the Union.* **3.** To part company; disperse. **4.** To stop living together as husband and wife. **5.** To become divided into components or parts: *Oil and water tend to separate.* —*adj.* (sĕp′ər-ĭt, sĕp′rĭt). **1.** Set apart from others; detached. **2.** Archaic. Withdrawn from others; solitary. **3.** Existing as an entity; independent. **4.** Dissimilar; distinct. **5.** Not shared; individual. —*n.* (sĕp′ər-ĭt, sĕp′rĭt). A garment, such as a blouse or skirt, or a pair of slacks, that may be purchased separately and worn in various combinations with other garments. [ME *separaten* < Lat. *separare* : *se-*, apart + *parare*, to make ready.] —**sep′a·rate·ly** *adv.* —**sep′a·rate·ness** *n.*



sepal

**Synonyms:** *separate, divide, part, sever, sunder, divorce, diverge, segregate.* These verbs refer to disjoining or disuniting. *Separate* applies both to putting apart by removing one or more components from a mass or by the act of dissociating and to keeping apart by occupying a position between things: *The Pyrenees separate France and Spain. Divide* also has both these senses. With respect to putting apart *divide* usually implies separation into predetermined portions or groups. The term can also refer to voluntary splitting or branching off. With respect to keeping apart *divide* often implies separation into opposing or hostile groups. *Part* refers most often to separation of persons or of segments: *The curtains parted. Sever* usually applies to cutting a part from the whole or cutting a whole into sections, or it can refer figuratively to ending a relationship. In every case abruptness and force are implied. *Sunder* stresses violent separation by tearing or wrenching apart. *Divorce* most often refers to the dissolution of a marriage or other close union. *Diverge* involves disjoining by going off in different directions from a common starting point or norm. *Segregate* principally refers to setting a group of persons apart from the mass or community at large; usually it implies discriminatory action against a racial group or social class thus isolated.

**sep·a·ra·tion** (sĕp′ə-rā′shən) *n.* **1. a.** The act or process of separating. **b.** The state of being separated. **2.** The place where a division or parting occurs. **3.** An interval or space that separates; gap. **4. a.** *Law.* An agreement or court decree terminating the conjugal relationship of a husband and wife. **b.** Discharge, as from employment or military service. [ME *separacion* < OFr. < Lat. *separatio* < *separare*, to separate.]

**sep·a·ra·tion·ist** (sĕp′ə-rā′shə-nĭst) *n.* A separatist.

**sep·a·ra·tist** (sĕp′ər-ə-tĭst, sĕp′rə-tĭst, sĕp′ə-rā′tĭst) *n.* One who secedes or advocates separation, esp. from an established church; sectarian. —**sep′a·ra·tism** (-tĭz′əm) *n.* —**sep′a·ra·tis′tic** *adj.*

**sep·a·ra·tive** (sĕp′ə-rā′tĭv, sĕp′ər-ə-tĭv, sĕp′rə-tĭv) *adj.* Tending to separate or to cause separation.

**sep·a·ra·tor** (sĕp′ə-rā′tər) *n.* One that separates. **2.** A device for separating cream from milk.

**Se·phar·di** (sə-fär′dē) *n., pl.* **-dim** (-dĭm). A member of the branch of European Jews who settled primarily in Spain, Portugal, and northern Africa. (Modern Heb. *Sĕphāradhī* < *Sĕphārad*, Spain.) —**Se·phar′dic** (-dĭk) *adj.*

**se·pi·a** (sē′pē-ə) *n.* **1. a.** A dark-brown ink or pigment originally prepared from the secretion of the cuttlefish. **b.** A drawing or picture done in this pigment. **c.** A photograph in a brown tint. **2.** A dark grayish yellowish brown to dark or moderate olive brown. —*adj.* **1.** Of the color sepia. **2.** Done or made in sepia. [Ital. *seppia* < Lat. *sepia* < Gk. *sēpia*.]

**se·pi·o·lite** (sē′pē-ə-līt′) *n. Mineral.* Meerschaum (sense 1). [G. *Sepiolith* : Gk. *sēpion*, cuttlebone (< *sēpia*, cuttlefish) + Gk. *lithos*, stone.]

**se·poy** (sē′poi′) *n.* In some Middle Eastern countries, a native regular soldier, esp. a native Indian soldier formerly serving under British command. [Prob. < Port. *sipae* < Urdu *sipāhī* < Pers. < *sipāh*, army.]

**sep·pu·ku** (sĕp′ōō-kōō) *n.* Hara-kiri. [J., self-disembowelment : *seppu*, to cut + *ku*, abdomen.]

**sep·sis** (sĕp′sĭs) *n., pl.* **-ses** (-sēz′). The presence of pathogenic organisms or their toxins in the blood or tissues. [Gk. *sēpsis*, putrefaction < *sēpein*, to make rotten.]

**sept** (sĕpt) *n.* A division of a tribe, esp. in ancient and medieval Ireland; clan. [Prob. alteration of SECT.]

**sep·ta** (sĕp′tə) *n.* Plural of **septum.**

**sep·tal** (sĕp′tl) *adj.* Of or pertaining to a septum.

**sep·tar·i·um** (sĕp-târ′ē-əm) *n., pl.* **-i·a** (-ē-ə). An irregular polygonal system of calcite-filled cracks occurring in certain rock concretions. [SEPT(UM) + -ARIUM.] —**sep·tar′i·an** *adj.*

**sep·tate** (sĕp′tāt′) *adj.* Having a septum or septa. —**sep·ta′tion** *n.*

**Sep·tem·ber** (sĕp-tĕm′bər) *n.* The ninth month of the year according to the Gregorian calendar. See table at **calendar.** [ME *Septembre* < OFr. < Lat. *September*, the seventh month (< *septem*, seven.)]

**sep·tem·brist** (sĕp-tĕm′brĭst) *n.* **1.** One of the mob that massacred the imprisoned royalists in Paris, France, in September, 1792. **2.** A bloodthirsty revolutionist.

**sep·te·nar·i·us** (sĕp′tə-nâr′ē-əs) *n., pl.* **-i·i** (-ē-ī′). A Greek or Latin verse containing seven feet. [Lat. *septenarius*, of seven < *septeni*, seven each < *septem*, seven.]

**sep·ten·ni·al** (sĕp-tĕn′ē-əl) *adj.* **1.** Occurring every seven years. **2.** Consisting of or continuing for seven years. —*n.* An event that occurs every seven years. [< Lat. *septennium*, period of seven years < *septennis*, of seven years : *septem*, seven + *annus*, year.] —**sep·ten′ni·al·ly** *adv.*

**sep·ten·tri·on** (sĕp-tĕn′trē-ən′, -ən) *n. Obs.* The north; northern regions. [ME *septemtrioun* < OFr. *septentrion* < Lat. *septentrion-*, stem *septentrio-*, the seven principal stars of Ursa Major or Ursa Minor : *septem*, seven + *triones*, pl. of *trio*, plow ox.] —**sep·ten′tri·o·nal** (-ĕ-ənl) *adj.*

**sep·tet** also **sep·tette** (sĕp-tĕt′) *n.* **1.** A group of seven. **2.** *Mus.* **a.** A composition for seven voices or instruments. **b.** The musicians performing such a composition. [G. < Lat. *septem*, seven.]

**sep·tic** (sĕp′tĭk) *adj.* **1.** Of, pertaining to, or having the nature of sepsis. **2.** Causing sepsis; putrefactive. —*n.* A putrefactive substance. [Lat. *septicus*, putrefying < Gk. *sēpikos* < *sēptos*, rotten < *sēpein*, to make rotten.] —**sep·tic′i·ty** (-tĭs′ĭ-tē) *n.*

**sep·ti·ce·mi·a** (sĕp′tĭ-sē′mē-ə) *n.* A systemic disease caused by pathogenic organisms or their toxins in the blood stream. —**sep′ti·ce′mic** (-mĭk) *adj.*

**sep·ti·cid·al** (sĕp′tĭ-sīd′l) *adj. Bot.* Splitting along or through the septa. Used of a seed capsule. [SEPT(UM) + -CID(E) + -AL.] —**sep′ti·cid′al·ly** *adv.*

**septic sore throat** *n.* An infection of the throat, often epidemic, caused by hemolytic streptococci and characterized by fever and inflammation of the tonsils.

**septic tank** *n.* A sewage-disposal tank in which a continuous supply of waste material is decomposed by anaerobic bacteria.

**sep·ti·fra·gal** (sĕp-tĭf′rə-gəl) *adj. Bot.* Characterized by the breaking away of certain parts of the plant from its dividing walls. [SEPTUM + Lat. *frangere*, to break.]

**sep·ti·lat·er·al** (sĕp′tĭ-lăt′ər-əl) *adj.* Seven-sided. [Lat. *septem*, seven + LATERAL.]

**sep·til·lion** (sĕp-tĭl′yən) *n.* **1.** The cardinal number that is written 10²⁴. **2.** *Chiefly Brit.* The cardinal number that is written 10⁴². [Fr. : *septi-*, seven + *million*, million.] —**sep·til′lion** *adj.*

**sep·til·lionth** (sĕp-tĭl′yənth) *n.* **1.** The ordinal number that matches the number one septillion in a series. One of a septillion equal parts. —**sep·til′lionth** *adj. & adv.*

**sep·tu·a·ge·nar·i·an** (sĕp′tōō-ə-jə-nâr′ē-ən, -tyōō-) *n.* A person who is seventy years old or between the ages of seventy and eighty. —*adj.* **1.** Being seventy years old or between the ages of seventy and eighty. **2.** Of or pertaining to a septuagenarian. [< Lat. *septuagenarius*, of the number seventy < *septuageni*, seventy each < *septuaginta*, seventy < *septem*, seven.]

**Sep·tu·a·ges·i·ma** (sĕp′tōō-ə-jĕs′ə-mə, -tyōō-) *n.* The third Sunday before Lent. [ME < OFr. < LLat. *septuagesima* <

*(continued column at right, partially obscured)*
Lat. *septuagesimus*, seventieth *septem*, seven.]

**Sep·tu·a·gint** (sĕp′tōō-ə-jĭnt, -tyōō-) *n.* A Greek translation of the Old Testament ... (text partially illegible) ...

**sep·tum** (sĕp′təm) *n., pl.* **-ta** (-tə). A partition or membrane between two cavities of a plant or animal. [Lat. *saeptum* < *saepire*, to hedge in < *saepes*, fence.]

**sep·tu·ple** (sĕp′tōō-pəl, -tyōō-, sĕp-tōō′pəl) *adj.* **1.** Sevenfold. **2.** Based on a scale of seven. —*n.* ... (text partially illegible)

**se·pul·cher** (sĕp′əl-kər) *n.* **1. a.** A burial vault. **b.** A receptacle for sacred relics, esp. in an altar. —*tr.v.* **-chered, -cher·ing, -chers.** To place in a sepulcher. [ME < OFr. *sepulcre* < Lat. *sepulcrum* < *sepelire*, to bury.]

**se·pul·chral** (sə-pŭl′krəl) *adj.* ... (partially illegible)

**se·pul·chre** (sĕp′əl-kər) *n. & v.* Chiefly British variant of **sepulcher.**

**se·pul·ture** (sĕp′əl-chŏŏr′, -chər) *n.* ... burial. **2.** A sepulcher. ... (partially illegible)

**se·qua·cious** (sĭ-kwā′shəs) *adj.* ... (partially illegible) —**se·qua′cious·ly** *adv.* —**se·quac′i·ty** (-kwăs′ĭ-tē) *n.*

**se·quel** (sē′kwəl) *n.* ... (partially illegible)

**se·que·la** (sĭ-kwē′lə) *n., pl.* ... (partially illegible)

**se·quence** (sē′kwəns, -kwĕns′) *n.* ... (partially illegible)

**se·quent** (sē′kwənt) *adj.* ... (partially illegible)

**se·quen·tial** (sĭ-kwĕn′shəl) *adj.* ... (partially illegible) —**se·quen′tial·ly** *adv.*

**se·ques·ter** (sĭ-kwĕs′tər) *v.* ... (partially illegible)

**se·ques·tra·tion** (sĕ′kwĕs-trā′shən, ...) *n.* ... (partially illegible)

**se·ques·trum** (sĭ-kwĕs′trəm) *n., pl.* ... (partially illegible)

**se·quin** (sē′kwĭn) *n.* ... (partially illegible)

**se·quoi·a** (sĭ-kwoi′ə) *n.* ... (partially illegible)







**1200**

leaves and variously colored
ried plants.
ne that cuts or carves stone.
ne —**stone**'cut ting *n.*
Intoxicated; drunk. **2.** Under
g drug.
nipletely deaf.
**stonefish** or **-fishes.** Any of
of the family Scorpaenidae,
fly venom.
merous winged insects of the
looks of streams and used as
and adult stage.

*adj.* Ground in a buhrstone.

manmial. *Martes foina,* hab-
ertar. **2.** The fur of the stone

A person who prepares and
**e'ma sonry** *n.*
an plant, *Cunila origanoides,*
sh or whitish flowers.
nce.
ed, **-walking,** **-walks.** —*intr.*
nan trying to secret in cricket.
-laying tactics; stall; "*Stone-
doing the merely gap*" (James
or exasperate. —*tr. Informal.*
ate with; resist or rebuff: "*I
were plead the Fifth Amend-
**stone'wall'er** *n.*
ry; nonporous pottery.
try. The technique or process of
le of stone; stone masonry.

Any of various green algae
submerged in fresh or brack-
rusted with calcium carbon-

-**ier, -iest. 1.** Covered with
ing stone, as in hardness
I. Rigid; impassive: *a ston*
r paralyzing. —**ston'i·ly** *adv.*

*adj.* Devoid of kindness or
**y-heart·ed·ness** *n.*
past participle of **stand.**
man to a comedian. **2.** One
or another's profit; puppet.
led, **stoog·ing, stoog·es** To
unknown.]
nd harmless single seat sup-
A low bench or support for
kneeling, as a footrest. **3.** A
movement. **b.** Fecal matter.
produces shoots or suckers:
ich a stump or rootstock.
ts. **1.** To send up shoots or
-els: defecate. **3.** *Slang* To
OE *stōl.*]
n (sense 3).
nd as a decoy. **2.** *Slang* A
ng. An informer or decoy.
the practice of lying about.

-**ring, stoops.** —*intr.* **1.** To
t waist or the middle of the
the head and upper back
d; downward. **4.** To lower
ht; submit. **6.** To swoop
orey. —*tr.* **1.** To bend (the
-*n.* **2.** To debase; humble.
s forward bending of the
habitual. **3.** Self-abasement
as of a bird of prey. [ME

*ilatform,* or staircase lead-
building. [Du. *stoep,* front

**s.**
; patterned on baseball in
ainst a stoop or wall and

**stops.** —*tr.* **1.** To close (an
nt plugging up. **2.** To con-
To obstruct or block pas-
mate; prevent the flow or
ease, or desist. **6.** To desist
order a bank to withhold
**3.** To cause (a motor, for
ction); halt. **9. a.** To press
ament) on the fingerboard
a close (a hole on a wind
ounding a desired pitch.

*uch / ĭ pit / ī pie / îr pier /
-ŭ out / ŏŏ took / ŏŏ boot /*

**1201**

—*intr.* **1.** To cease moving, progressing, acting, or operat-
ing; come to a halt. **2.** To pause, as if at what one is doing;
cease. **3.** To interrupt one's course or journey for a brief
visit or stay; *stop off at the store.* —*n.* **1. a.** The act of stop-
ping. **b.** The condition of being stopped; cessation. **2.** A fin-
ish; end. **3.** A stay or visit, as during a trip. **4.** A place
stopped at; *a bus stop.* **5. a.** A device or means that obstructs,
blocks, or plugs up. **b.** An order given to a bank to withhold
payment on a check. **7. a.** A part in a machine that stops or
regulates movement. **b.** A perforated screen or diaphragm
that limits the effective aperture of a lens, producing an
image of improved definition but lowered intensity. **8.** A
mark of punctuation, esp. a period. **9.** *Mus.* **a.** The act of
stopping a string or hole on a musical instrument. **b.** A hole
on a wind instrument. **c.** A fret on a stringed instrument.
**d.** A device such as a key for closing the hole on a wind
instrument. **10.** *Mus.* **a.** A tuned set of pipes, as in an organ.
**b.** A knob, key, or pull that regulates such a set of pipes.
**11.** *Naut.* A line used for securing something temporarily: *a
sail stop.* **12.** A consonant, such as English *p, t,* or *k,* charac-
terized by an articulation in which the air passage is com-
pletely closed. **13.** The depression between the muzzle and
top of the skull of a dog. —*adj.* Of, pertaining to, or being of
use at the end of an operation or activity: *a stop code.* [ME
*stoppen* < OE *stoppian* < LLat. *stuppare* < Lat. *stuppa,* tow,
broken flax < Gk. *stuppē.*]
**stop·cock** (stŏp'kŏk') *n.* A valve that regulates the flow of
fluid through a pipe; faucet.
**stope** (stōp) *n.* An excavation in the form of steps made by
the mining of ore from steeply inclined or vertical veins.
—*tr. & intr.v.* **stoped, stop·ing, stopes** To remove (ore)
from or mine by means of a stope. [Perh. < LG, step.]
**stop·gap** (stŏp'găp') *n.* An improvised substitute for some-
thing lacking; temporary expedient.
**stop·light** (stŏp'līt') *n.* **1.** A traffic signal. **2.** A light on the
rear of a vehicle that is activated when the brakes are ap-
plied.
**stop order** *n.* An order to a broker to buy or sell a stock
when it reaches a specified level of decline or gain.
**stop·o·ver** (stŏp'ō'vər) *n.* **1.** An interruption in the course of
a journey for stopping or visiting at a certain place. **2.** A
place visited briefly in the course of a journey.
**stop·page** (stŏp'ĭj) *n.* **1.** The act of stopping. **2.** The condi-
tion of being stopped.
**stop payment** *n.* An order to one's bank not to honor a
check.
**stop·per** (stŏp'ər) *n.* **1.** A device, as a cork or plug, inserted
to close an opening. **2.** One that causes something to stop.
**3.** *Computer Sci.* The topmost memory location in a device
or system. —*tr.v.* **-pered, -per·ing, -pers** To close with or as
if with a stopper.
**stop·ple** (stŏp'əl) *n.* A stopper; plug. —*tr.v.* **-pled, -pling,
-ples** To close with a stopple. [ME *stappell* < *stoppen,* to
stop.]
**stop sign** *n.* A traffic sign that orders traffic to come to a
stop.
**stop street** *n.* A street intersection at which a vehicle must
come to a complete stop before entering a through street.
**stop·watch** (stŏp'wŏch') *n.* A timepiece that can be instantly
started and stopped by pushing a button.
**stor·age** (stôr'ĭj, stōr'-) *n.* **1. a.** The act of storing goods.
**b.** The state of being stored. **c.** A space for storing goods.
**d.** The price charged for keeping goods stored. **2.** The
charging or regenerating of a storage battery. **3.** *Computer
Sci.* The part of a computer that stores information for sub-
sequent use or retrieval.
**storage battery** *n.* A group of reversible or rechargeable
secondary cells acting as a unit.
**storage cell** *n.* **1.** A secondary cell. **2.** *Computer Sci.* An
elementary unit of storage.
**sto·rax** (stôr'ăks', stōr'-) *n.* **1.** Any of various trees of the
genus *Styrax,* some of which yield an aromatic resin. **2.** An
aromatic resin obtained from a storax tree. **3.** A brownish,
aromatic resin used in perfume and medicine and obtained
from any of several trees of the genus *Liquidambar,* esp. *L.
orientalis,* of Asia Minor. [ME < Lat., alteration of *styrax* <
Gk. *sturax,* perh. of Semitic orig.]
**store** (stôr, stōr) *n.* **1.** A place where merchandise is offered
for sale; shop. **2.** A stock or supply reserved for future use.
**3. stores.** Supplies, esp. of food, clothing, or arms. **4.** A
place where commodities are kept; warehouse or store-
house. **5.** A great quantity or number; abundance. —*tr.v.*
**stored, stor·ing, stores. 1.** To reserve or put away for future
use. **2.** To fill, supply, or stock. **3.** To deposit or receive in a
warehouse or warehouse for safekeeping. —*idioms,* **in
store.** Forthcoming. **set store by.** To regard with esteem;
value. [ME *stor* < OFr. *estor* < *estorer,* to build < Lat. *instau-
rare,* to restore.]
**store-bought** (stôr'bôt', stōr'-) *adj. Informal.* Manufactured
and purchased at retail: *store-bought clothes.*
**store cheese** *n.* Cheddar cheese.
**store-front** (stôr'frŭnt', stōr'-) *n.* **1.** The side of a store facing
a street. **2.** A room or suite of rooms in a store building at
street level: *a political office in a storefront.* —**store'front'**
*adj.*
**store-house** (stôr'hous', stōr'-) *n.* **1.** A place in or building in

**stopcock | stout**

which goods are stored; warehouse. **2.** An abundant source
or supply: *a storehouse of knowledge.*
**store-keep·er** (stôr'kē'pər, stōr'-) *n.* **1.** A person who keeps
a retail store or shop; shopkeeper. **2.** A person in charge of
receiving or distributing stores or supplies, as military or
naval supplies.
**store-room** (stôr'rōōm', -rŏŏm', stōr'-) *n.* A room in which
things are stored.
**sto·rey** (stôr'ē, stōr'ē) *n.* Variant of **story²**.
**sto·ried¹** (stôr'ēd, stōr'-) *adj.* **1.** Celebrated or famous in his-
tory or story: "*the starred infamies of the Emperor Tiberius
on the Isle of Capri*" (George Marye). **2.** Ornamented with
designs representing scenes from history, legend, or story:
*storied tapestry.*
**sto·ried²** also **sto·reyed** (stôr'ēd, stōr'-) *adj.* Having or con-
sisting of a specified number of stories: *a three-storied house.*
**stork** (stôrk) *n.* Any of various large wading birds of the
family Ciconiidae, chiefly of warm regions, having long legs
and a long straight bill. [ME < OE *storc.*]
**stork's-bill** (stôrks'bĭl') *n.* Any of various plants of the genus
*Erodium,* having fruit with a narrow, beaklike point.
**storm** (stôrm) *n.* **1.** An atmospheric disturbance manifested
in strong winds accompanied by rain, snow, or other pre-
cipitation and often by thunder and lightning. **2.** *Meteorol.*
A wind ranging from 64 to 72 miles per hour. **3.** A heavy
shower of objects, such as bullets or missiles. **4.** A strong or
violent outburst, as of emotion or excitement. **5.** A violent
disturbance or upheaval, as in political, social, or domestic
affairs. **6.** A violent, sudden attack on a fortified place. —*v.*
**stormed, storm·ing, storms.** —*intr.* **1. a.** To blow forcefully.
**b.** To rain, snow, hail, or sleet. **2.** To be extremely angry;
rant and rage. **3.** To move or rush tumultuously, violently,
or angrily: *stormed into the room.* —*tr.* To capture or try to
capture by a violent, sudden attack: *stormed the fortress.*
[ME < OE *storm.*]
**storm-bound** (stôrm'bound') *adj.* Delayed, confined, or cut
off from communication by a storm.
**storm cellar** *n.* A cyclone cellar
**storm center** *n.* **1.** The central area covered by a storm, esp.
the point of lowest barometric pressure within a storm. **2.** A
center of trouble, disturbance, or argument.
**storm door** *n.* An outer or additional door added for protec-
tion against inclement weather.
**storm petrel** *n.* Any of various small sea birds of the family
Hydrobatidae, esp. *Hydrobates pelagicus,* of the North At-
lantic and the Mediterranean.
**storm trooper** *n.* **1.** A member of the Nazi militia noted for
brutality and violence. **2.** A person who resembles a Nazi
storm trooper.
**storm window** *n.* A secondary window attached over the
usual window to protect against the wind and cold.
**storm·y** (stôr'mē) *adj.* **-i·er, -i·est. 1.** Subject to, character-
ized by, or agitated by storms; tempestuous. **2.** Character-
ized by violent emotions, passions, speech, or actions: *a
stormy argument.* —**storm'i·ly** *adv.* —**storm'i·ness** *n.*
**sto·ry¹** (stôr'ē, stōr'ē) *n., pl.* **-ries. 1.** The storm petrel. **2.** A person who
brings discord or appears at the onset of trouble; rebel.
**sto·ry¹** (stôr'ē, stōr'ē) *n., pl.* **-ries. 1.** The narration of an
event or series of events, either true or fictitious. **2.** A prose
or verse narrative, usually fictional, intended to interest or
amuse the hearer or reader; tale. **3.** A short story. **4.** The
plot of a narrative or dramatic work. **5.** A report, statement,
or allegation of facts. **6. a.** A news article or broadcast.
**b.** The event, situation, or other material for such an article.
**7.** An anecdote. **8.** A lie. **9.** Romantic legend or tradition.
—*tr.v.* **-ried, -ry·ing, -ries. 1.** To decorate with scenes repre-
senting historical or legendary events. **2.** *Archaic.* To tell as
a story. [ME *storie* < OFr. *estorie* < Lat. *historia.* —see **HIS-**
**TORY.**]
**sto·ry²** also **sto·rey** (stôr'ē, stōr'ē) *n., pl.* **-ries** also **-reys. 1.** A
complete horizontal division of a building, comprising the
area between two adjacent levels. **2.** The set of rooms on the
same level of a building. [ME < Med. Lat. *historia* (prob.
from painted windows or sculpture on the front of build-
ings) < Lat., history. —see **HISTORY.**]
**sto·ry·book** (stôr'ē-bŏŏk', stōr'-) *n.* A book containing a col-
lection of stories, usually for children. —*adj.* Occurring in
or resembling the style of a storybook; romantic.
**story line** *n.* The plot of a story or a dramatic work.
**sto·ry·tell·er** (stôr'ē-těl'ər, stōr'-) *n.* **1.** A person who tells or
writes stories. **2.** *Informal.* A person who tells lies; fibber.
**stoss** (stôs, stŏs, shtôs) *adj.* Facing the direction from which
a glacier moves. Used of a rock or slope in its path. [< G.
*stossen,* to push < OHG *stōzan.*]
**sto·tin·ka** (stō-tĭng'kə) *n., pl.* **stotinki.** See **table** at **currency.**
[Bulgarian.]
**stound** (stound) *n. Obs.* A short time; while. [ME < OE
*stund.*]
**stoup** also **stoop** (stōōp) *n.* **1.** *Eccles.* A basin or font for
holy water at the entrance of a church. **2.** *Scot.* A bucket or
pail. **3.** A drinking vessel such as a cup or tankard. [ME
*stoup,* bucket < ON *staup.*]
**stout** (stout) *adj.* **-er, -est. 1.** Determined, bold, or brave: *a
stout heart.* **2.** Strong in body; sturdy. **3.** Strong in structure
or substance; substantial. **4.** Bulky in figure; corpulent.
**5.** Powerful; forceful. **6.** Staunch; firm. —*n.* **1. a.** A stout

*George Miksch Sutton*
**stork**

**stoup**

Case 1:06-cv-00032-JJF    Document 208-2    Filed 08/30/2007    Page 17 of 28

play the part of a vamp.
adj.

—nated trooper that is be-
night to seek the blood of
his prey upon others, as
who uses sexual attraction
us tropical American bats
n feed on the blood of liv-
other bats, as those of the
usly believed to feed on
Slav. org.] —vam-pir-ic

Belief in vampires. 2. The

closed truck or wagon for
2. Chiefly Brit. A closed
gauge or freight. [Short for

irefront. [Short for VAN.

A winnowing device, as a
van, both < Lat. vannus]
three amonts. VO₃, VO₄, or

n. 1. An acid containing
VO₄, or H₄V₂O₇; not exist-
pentoxide.

, vân'a-dē'nit) n. A deep
ndium and lead ore, essen-
+ ΣΣΣ + -ITE.]

-nbed V A bright white soft
several minerals, notably
good structural strength
ced tools, as a carbon sta-
n-steel bonding agent, and
2; atomic weight 50.942;
int 3,000°C; specific grav-
ON Vanadis, the goddess

to red crystalline powder,
s organic reactions and as
dium salts.
with vanadium for added
perature stability.
ther of two zones of high-
ipped on the earth's mag-
lanet, beginning at an alti-
ters and extending several
ito space. [After James A.

-vän-ka-) n. An antibiotic
otomyces orientalis that is
d spirochetes. [vanco- (of

of a Germanic people that
1 Africa in the 4th and 5th
in A.D. 455. 2. vandal. A
ly defaces or destroys pub-
idalus, of Germanic orig.]

z willful or malicious de-
perty —van'dal·is'tic adj
-iz·ing, -iz·es. To destroy
perty) willfully or mali-

p gră'l') n. An electrostatic
rge is either removed from
spherical electrode by a
figurations producing po-
used with an acceleration
ator. [After Robert J. Van

vōlz's) n. A force between
nporary change in dipole
of orbital electrons to one
similar shift in adjacent
tion and attraction. [After
-1923).]
yke beard. 2. A Vandyke
at is part of a decorative
de up of such points.
ted beard. [After Sir An-

grayish brown. [After Sir
om its frequent use in his
y.
of linen or lace having a
y. [After Sir Anthony Van-

nts on an elevated object,
the direction of the wind.
thin, rigid, flat, or some-
inted along an axis that is
3. The flattened, weblike
series of barbs on either
r target on a leveling rod.

ich / i pit / i pie / ir pier /
u out / ōō took / ōō boot /

b. A sight on a quadrant or compass. **5.** One of the metal
guidance or stabilizing fins attached to the tail of a bomb or
other missile. [ME < OE. *fana*, flag.]
**vang** (văng) *n. Naut.* A guy rope running from the peak of a
gaff or derrick to the deck. [Du., a catch < *vangen*, to catch.]
**van-guard** (văn'gärd') *n.* **1.** The foremost position in an
army or fleet. **2. a.** The foremost or leading position in a
trend or movement. **b.** Those occupying a foremost posi-
tion. [ME *vandgard* < *avaunt garde* < OFr. *avant-garde* :
*avant*, before + *garde*, guard < *garder*, to guard.]
**va-nil-la** (va-nĭl'a) *n.* **1.** Any of various tropical American
orchids of the genus *Vanilla*, esp. *V. planifolia*, cultivated for
its long, narrow seed pods from which a flavoring agent is
obtained. **2.** The aromatic seed pod of a vanilla. **3.** A fla-
voring extract prepared from the seed pods of a vanilla or
produced synthetically. [Sp. *vainilla*, dim. of *vaina*, sheath <
Lat. *vagina* (from the shape of its seed pods).]
**vanilla bean** *n.* Vanilla (sense 2).
**va-nil-lic** (va-nĭl'ĭk) *adj.* Of, relating to, or derived from va-
nilla or vanillin.
**va-nil-lin** (va-nĭl'ĭn, văn'a-lĭn) *n.* A white or yellowish crys-
talline compound, C₈H₈O₃, found in vanilla beans and cer-
tain balsams and resins and used in perfumes, flavorings,
and pharmaceuticals. [VANILL(A) + -IN.]
**Va-nir** (vä'nĭr') *pl.n. Myth.* An early race of Norse gods who
dwelt with the Aesir in Asgard. [ON.]
**van-ish** (văn'ĭsh) *intr.v.* **-ished, -ish-ing, -ish-es. 1.** To disap-
pear or become invisible, esp. quickly or in an unexplained
manner. **2.** To fade or decay to nothing; pass out of exis-
tence. **3.** *Math.* To become zero. Used of a function or vari-
able. [ME *vanisshen* < OFr. *esvenir*, *evanniss-* < Lat.
*exvanire*, alteration of Lat. *evanescere* : *e-*, ex- + *vanescere*,
to vanish < *vanus*, empty.] —**van'ish-er** *n.*
**vanishing cream** *n.* A cosmetic preparation containing less
oil than cold cream, used as a powder base and night cream.
**vanishing point** *n.* **1.** A point in a drawing at which parallel
lines drawn in perspective converge or seem to converge.
**2.** A point at which a thing disappears or ceases to exist.
**van-i-ty** (văn'ĭ-tē) *n., pl.* **-ties. 1.** The quality or condition of
being vain. **2.** Excessive pride in one's appearance or ac-
complishments; conceit. **3.** Lack of usefulness, worth, or ef-
fect; worthlessness. **4. a.** Something that is vain, futile, or
conceited. **b.** A vanity case. **5.** A dressing table. [ME *vanite* <
OFr. < Lat. *vanitas* < *vanus*, empty.]
**vanity case** *n.* **1.** A woman's compact. **2.** A small handbag
or case used by women for carrying cosmetics or toiletries.
**Vanity Fair** also **vanity fair** *n.* A place or scene of ostenta-
tion or empty, idle amusement and frivolity. [< *Vanity-Fair*,
the fair in *Pilgrim's Progress* by John Bunyan (1628–1688).]
**vanity plate** *n.* An automobile license plate bearing a combi-
nation of letters or numbers selected by the purchaser.
**vanity press** *n.* A publisher that publishes a book at the
expense of the author.
**vanity publisher** *n.* A vanity press.
**van-quish** (văng'kwĭsh, văn'-) *v.* **-quished, -quish-ing,**
**-quish-es. 1. a.** To defeat or conquer in battle; subjugate.
**b.** To defeat in a contest, conflict, or competition. **2.** To
overcome or subdue (an emotion, for example); suppress.
*His success vanquished his fears.* [ME *vayngvisshen* < OFr.
*vainquir, vainquiss-* < Lat. *vincere*.] —**van'quish-a-ble** *adj*
—**van'quish-er** *n.* —**van'quish-ment** *n.*
**van-tage** (văn'tĭj) *n.* **1.** An advantage in a competition or
conflict; superiority. **2.** Something, as a strategic position,
that provides superiority or advantage. **3.** *Sports.* An advan-
tage (sense 4). [ME, short for OFr. *avantage*, advantage.]
**van-ward** (văn'wärd) *adj.* Located in the van or front; ad-
vanced. —*adv.* Toward or to the van or front; forward.
**vap-id** (văp'ĭd, vā'pĭd) *adj.* Lacking liveliness, zest, or inter-
est; flat. [Lat. *vapidus*.] —**va-pid'i-ty** (vă-pĭd'ĭ-tē, vă-, vo-),
**vap'id-ness** *n.* —**vap'id-ly** *adv.*
**va-por** (vā'par) *n.* **1.** Barely visible or cloudy diffused matter,
such as mist, fumes, or smoke, suspended in the air.
**2. a.** The state of a substance that exists below its critical
temperature and that may be liquefied by application of
sufficient pressure. **b.** The gaseous state of a substance that
is liquid or solid under ordinary conditions. **3. a.** The va-
porized form of a substance for use in industrial, military,
or medical processes. **b.** A mixture of a vapor and air, as the
explosive gasoline-air mixture burned in an internal-
combustion engine. **4.** *Archaic.* **a.** Something insubstantial,
worthless, or fleeting. **b.** A fantastic or foolish idea. **5. va-**
**pors.** also *Archaic.* Exhalations within a bodily organ, esp. the
stomach, supposed to affect the mental or physical condi-
tion. **b.** A hysterical or depressed emotional condition. —*v.*
**-pored, -poring, -pors.** —*tr.* To vaporize. —*intr.* **1.** To give
off vapor. **2.** To evaporate. **3.** To engage in boastful talk.
[ME *vapour* < OFr. < Lat. *vapor*.] —**va'por-er** *n.*
**va-por-es-cence** (vā'pə-rĕs'əns) *n.* The formation of vapor.
—**va'por-es'cent** *adj.*
**va-por-if-ic** (vā'pə-rĭf'ĭk) *adj.* **1.** Producing or turning to va-
por. **2.** Having the nature of vapor; vaporous. [VAPOR +
-FIC.]
**va-por-ing** (vā'par-ĭng) *n.* Boastful or bombastic talk or be-
havior: *"all his . . . dreams of fame were the vaporings of a
shoddy aesthete without talent"* (Thomas Wolfe).
**va-por-ish** (vā'pər-ĭsh) *adj.* **1.** Suggestive of or resembling

vapor. **2.** *Archaic.* Given to spells of hysteria or low spirits.
—**va'por-ish-ness** *n.*
**va-por-i-za-tion** (vā'pər-ĭ-zā'shən) *n.* **1.** The act or process of
vaporizing. **2.** The condition of being vaporized.
**va-por-ize** (vā'pə-rīz') *tr. & intr.v.* **-ized, -iz-ing, -iz-es.** To
convert or be converted into vapor. —**va'por-iz'a-ble** *adj.*
**va-por-iz-er** (vā'pə-rī'zər) *n.* One that vaporizes, esp. a de-
vice used to vaporize medicine for inhalation.
**vapor lock** *n.* A pocket of vaporized gasoline in the fuel line
of an internal-combustion engine that obstructs normal
flow of fuel.
**va-por-ous** (vā'pər-əs) *adj.* **1.** Pertaining to or resembling
vapor. **2.** Producing vapors; volatile. **b.** Giving off or full
of vapors. **3.** Insubstantial, vague, or ethereal: *"the impon-
derable mysterious and vaporous illusions of twilight"* (John
C. Ciardi). **4.** Extravagantly fanciful; high-flown: *vaporous
conjecture.* —**va'por-os'i-ty** (vā'pə-rŏs'ĭ-tē), **va'porous-ness**
*n.* —**va'por-ous-ly** *adv.*
**vapor pressure** *n.* The pressure exerted by a vapor in equi-
librium with its solid or liquid phase.
**vapor trail** *n.* A contrail.
**va-por-y** (vā'pə-rē) *adj.* Vaporous.
**va-pour** (vā'pər) *n. & v. Chiefly Brit.* Variant of **vapor.**
**va-que-ro** (vä-kâr'ō) *n., pl.* **-ros.** *Southwestern U.S.* A cow-
boy; herdsman. [Sp. < *vaca*, cow < Lat. *vacca*.]
**va-ra** (vä'rä) *n.* **1.** A Spanish, Portuguese, and Latin Ameri-
can unit of linear measure varying from about 81 to 109
centimeters, or 32 to 43 inches. **2.** A square vara. [Sp. and
Port. *vara*, rod, fourth < Lat. *vara*, forked pole < *varus*, bent.]
**va-rac-tor** (va-răk'tər, vâ-) *n.* A semiconductor device in
which the capacitance is sensitive to the applied voltage at
the boundary of the semiconductor material and an insula-
tor. [VAR(YING) + (RE)ACTOR.]
**vari-** *pref.* Variant of **vario-.**
**vari-a** (vâr'ē-ə, vâr'-) *n.* A miscellany, esp. of literary works.
[Lat., neuter pl. of *varius*, various.]
**var-i-a-ble** (vâr'ē-ə-bəl, vâr'-) *adj.* **1.** Liable or likely to
vary; subject to variation. **b.** Inconstant; fickle. **2.** *Biol.*
Tending to deviate from an established type; aberrant.
**3.** *Math.* Having no fixed quantitative value. —*n.* **1.** Some-
thing that varies or is prone to variation. **2.** *Astron.* A vari-
able star. **3.** *Math.* **a.** A quantity capable of assuming any of
a set of values. **b.** A symbol representing such a quantity.
—**var'i-a-bil'i-ty, var'i-a-ble-ness** *n.* —**var'i-a-bly** *adv.*
**variable cost** *n.* A cost that fluctuates directly with output
changes.
**variable field** *n. Computer Sci.* A set of adjacent columns on
a punchcard that may be varied in length according to need.
**variable logic** *n. Computer Sci.* A form of internal machine
logic that may be changed to match programming formats.
**variable star** *n.* A star whose brightness varies because of
internal changes or periodic eclipsing of component stars.
**var-i-ance** (vâr'ē-əns, vâr'-) *n.* **1. a.** The act of varying.
**b.** The state or quality of being variant or variable; vari-
ation. **c.** A difference between what is expected and what
actually occurs. **2.** A difference of opinion; dissension.
**3.** *Law.* **a.** A discrepancy between two statements or docu-
ments in a legal proceeding. **b.** The license to engage in an
act contrary to a usual rule: *a zoning variance.* **4.** *Statistics.*
The mean of the squares of the variations from the mean of
a frequency distribution. **5.** *Chem.* The number of thermo-
dynamic variables required to specify a state of equilibrium
of a system, given by the phase rule. —*idiom.* **at variance.**
Differing; conflicting.
**var-i-ant** (vâr'ē-ənt, vâr'-) *adj.* **1.** Having or exhibiting vari-
ation; differing. **2.** Tending or liable to vary; variable.
**3.** Deviating from a standard, usually by only a slight differ-
ence. —*n.* Something that differs in form only slightly from
something else, as a different spelling or pronunciation of
the same word. [ME < OFr. < Lat. *varians, variant-*, pr part.
of *variare*, to vary.]
**var-i-ate** (vâr'ē-ĭt, -āt', vâr'-) *n.* **1.** Something that varies;
variable. **2.** *Statistics.* A random variable with a numerical
value that is defined on a given sample space. [< Lat. *varia-
tus*, p.part. of *variare*, to vary.]
**var-i-a-tion** (vâr'ē-ā'shən, vâr'-) *n.* **1. a.** The act, process, or
result of varying. **b.** The state or fact of being varied. **2.** The
extent or degree to which something varies: *a variation of
ten pounds in weight.* **3.** Magnetic declination. **4.** Something
that is slightly different from another of the same type.
**5.** *Biol.* Marked difference or deviation from characteristic
form, function, or structure. **6.** *Math.* A function that relates
the values of one variable to those of other variables. **7. a.** A
musical form that is an altered version of a given theme,
diverging from it by melodic ornamentation and by changes
in harmony, rhythm, or key. **b.** One of a series of musical
forms based on a single theme. **8.** A solo dance, esp. one
forming part of a larger work. —**var'i-a'tion-al** *adj.*
**varic-** *pref.* Variant of **varico-.**
**vari-cel-la** (văr'ĭ-sĕl'ə) *n.* Chicken pox. [NLat. < *variola,*
variola.] —**var'i-cel'loid'** (-sĕl'oid') *adj.*
**var-i-ces** (văr'ĭ-sēz') *n.* Plural of **varix.**
**varico-** or **varic-** *pref.* Varix; varicose vein: *varicosis.* [<
Lat. *varix, varic-*, varix.]
**var-i-co-cele** (văr'ĭ-kō-sēl') *n.* A varicose condition of veins



vanilla

ih / i pit / ī pie / îr pier /
ŭ cut / ûr urge / v valve / w with / y yes / z zebra, size /
ə about, item, edible, gallop, circus / œ Fr. feu, Ger. schön / ü Fr. tu, Ger. über / KH Ger. ich, Scot. loch / N Fr. bon.

# EXHIBIT N

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE
## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1993 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 1993 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language,
unabridged: a Merriam-Webster/editor in chief, Philip Babcock
Gove and the Merriam-Webster editorial staff.
p.     cm.
ISBN 0-87779-201-1

1. English language—Dictionaries.   I. Gove, Philip Babcock,
1902–1972.   II. Merriam-Webster, Inc.
PE1625.W36 1993
423–dc20                                                        93-10630
                                                                    CIP

*All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA

4B4960QPH9796

abolitionary · abreast

**ab·o·li·tion·ary** \-,nerē\ *adj* : relating to or favoring abolition

**ab·o·li·tion·dom** \-əndəm\ *n* -s : ABOLITIONISTS; *specif* : the northern states in the American Civil War

**ab·o·li·tion·ism** \-,nizəm\ *n* -s : the principles or measures favoring abolition (as of slavery or capital punishment) : the tenets or practices of abolitionists

**ab·o·li·tion·ist** \-ənəst\ *n* -s *often attrib* : an advocate of abolition

**ab·o·li·tion·ize** \-,īz\ *vt* -ED/-ING/-s : to make abolitionists of (the members of a corporate body) ⟨~ Kansas⟩

**abo·ma** \ə'bōmə\ *n* -s [Fg. F. & AmerSp. prob. modif. of Kongo *mboma* python] : any of several large So. American snakes of the genus *Constrictor* or of related genera

**ab·o·ma·sal** \,abō'māsəl, -bə'-\ *adj* [NL *abomasum* + E -al] : of, belonging to, or involving the abomasum

**ab·o·ma·sum** \-'səm\ *also* **ab·o·ma·sus** \-səs, n, pl **aboma·sa** \-sə\ *also* **ab·o·ma·si** \-,sī,-,sē\ [NL, fr. *ab-* L *omasum* tripe of a bullock] : the fourth or true digestive stomach of a ruminant

**ta·bomb** \'t\, *n, usu cap A* : ATOM BOMB

**ta·bomb** \' \, *n, usu cap A* : ATOM BOMB

**a·bomb·er** \'t,-'t\ *n, usu cap A* : an aircraft capable of delivering, or an atom bomb) on a target

**abom·i·na·ble** \ə'bäm(ə)nəbəl, *adj* [ME, fr. MF, fr. L *abominabilis*, fr. *abominari* + *-abilis* -able] 1 : worthy of or causing loathing or hatred : exceedingly unnatural : DETESTABLE, LOATHSOME 2 : quite disagreeable or unpleasant ⟨~ weather⟩ — abom·i·na·bly \-blē, -li\ *adv*

**abominable snowman** *n, often cap A&S* [prob. intended as trans. of Tibetan *mi-te*, lit., man-bear] : an animal reported as existing in the high Himalayas and usu. thought to be a bear

**abom·i·nate** \ə'bämə,nāt, *also* -'bän-V\ *vt* -ED/-ING/-s [L *abominatus*, past part. of *abominari* to deprecate as an ill omen, to detest, fr. *ab-* + *ab-* + *ominari* to forebode, presage, fr. *omin-, omen* omen] 1 : to hate or loathe intensely : ABHOR ⟨~ a crime⟩ *syn* see HATE

**abom·i·nate** \-,mənāt, -ṃ̀āt\ *adj* [L *abominatus*] : ABOMINATED

**ab·o·ri·na·tion** \ə,bämə'nāshən\ *n* -s [ME *abominacion*, fr. MF *abomination, abominacion*, fr. L *abominatus, abominacion*-, *abominatio*- fr. *abominari*] 1 : something that is abominable (guilty of ~⟨⟩) : a wonderful wooden statue . . . now replaced by the usual metal ~ —Norman Douglas⟩ 2 : a feeling of extreme disgust and hatred : ABHORRENCE, DETESTATION, LOATHING ⟨tobacco . . . was held in ~ —T.B.Macaulay⟩

**abom·i·na·tor** \ə'bämə,nād-ə(r), -ātə\ *n* -s : one that abominates

**abon·go** \ə'bäŋ(,)gō\ *n, pl abongo or* **abongos** *usu cap* 1 : a Negrito people on the Ogowe river, Gabon, French Equatorial Africa — called also *Obongo* 2 : a member of the Abongo people — compare PYGMY

**aboon** \ə'bün, -'bún\ *adv or prep also* **abune** \-'byün\ [ME *aboue*, fr. *above*] *chiefly Scot* : ABOVE

**ab·oos·pore** \'(a)bō,spō(ə)r, *n* -s [*ab-* + *oospore*] : an oospore spore functioning as an oospore but produced without sexual union

**abor** \'t,ȧ,bō(ə)r, *n, pl abor or* **abors** *usu cap* 1 : a primitive people inhabiting the Brahmaputra river region about 100 miles north of the town of Dibugarh in northern Assam 2 : a member of the Abor people

**ab·o·rad** \(')a'bō,rad, -ȧ(r)-\ *adv* [*bab* + *orad*] : away from the mouth

**ab·o·ral** \(')a'bōrəl, -ȯr-, ȧr-\ *adj* [*ab-* + *oral*] : opposite to or away from the mouth — **ab·o·ral·ly** \-əlē, -i\ *adv*

**'abord** *n* -ED/-ING/-s [ME *aborden*, fr. *abord*, n. fr. *abord advb. & prep.*] *archaic* : APPROACH, ACCOST

**'abord** *n* -s *archaic* : APPROACH : manner of approach

**abor·dage** *n* -s [*abord* + *-age*] *archaic* : boarding a ship in an attack

**lab·o·rig·i·nal** \,abə'rijinəl, -jnəl\ *adj* [*aborigine* + *-al*] 1 a : first according to historical record or scientific analysis : INDIGENOUS ⟨~ flora⟩ b : PRIMITIVE ⟨~ tribes⟩ ⟨a great safely value for the ~ human impulses —Lewis Mumford⟩ 2 : of or belonging to aborigines (~ languages) (~ weapons)

**2aboriginal** \" \, *n* -s : ABORIGINE

**ab·o·rig·i·nal·i·ty** \,abə,rijə'nalad-ē\ *n* -ES : the quality or state of being aboriginal

**ab·o·rig·i·nal·ly** \,-jən(ə)lē, -jnəlē, -li\ *adv* : from the beginning : from earliest known times

**ab·o·rig·i·ne** \,abə'rijə,nē\ *also* **ab·o·rig·i·nes** \ə'börəjən, -tēr\, -s [back-formation fr. *aborigines*, pl., fr. L. perh. *irreg. fr. ab-origine* from the beginning] 1 : an indigenous inhabitant of a country : one of the native people esp. as contrasted with an invading or colonizing people 2 **aborigines** *pl* : the original fauna and flora of a geographical area

**ab·o·ring·i·ne** \" \, *also adj* [L] : from the beginning

**abor·i·mi** \,ȧ,bȯr'ēmē\ *n, usu cap A&M* : a language spoken in northern Assam

**'abort** \ə'bȯrt, -'bȯʳ, *vb* -ED/-ING/-s [L *abortus*, past part. of *aboriri*] 1 a *of a fetus* : to be born prematurely or dead b : to bring forth or produce ⟨the moment of birth ⟩ before coming to completion — used esp. in the phrase *die aborning* (a resolution that died ~)

**2aborning** \" \, *adj* : being born or produced ⟨the ~ social evolution of the gale —Fannie Hurst⟩ ⟨a new world was ~ —B.Wolfe⟩

**'abort** \ə'bö(ȧ)rt, -ȯ)t\ *vb* -ED/-ING/-s [L *abortare*, fr. *abortus* abortion] *vi* 1 : to bring forth premature or stillborn offspring (cows with brucellosis often ~) 2 : to become checked in development so as to remain rudimentary or to shrink away (pollen grains that ~) 3 : to stop or fail in the early stages (many colds ~ without treatment) (the plans have ~ed) (the bomber ~ed from its mission) *vt* 1 : to bring forth (offspring) prematurely (~ed a 3-month-old fetus) : cause to be delivered of a stillborn or nonviable fetus (~ a malformed patient); *esp* : to terminate pregnancy of before term 2 a : to terminate prematurely (~ a project) : stop in the early stages (~ a disease) b : to turn back without completion 3 : to check as to produce rudimentary development or a shrinking away (~ branches of trees)

**2abort** \" \, *n* -s [ME, fr. L. *abortus*, fr. *aborior*, past part. of *aboriri* to disappear, miscarry, fr. *ab-* + *oriri* to rise, be born — more at ORIENT] 1 *obs* : ABORTION 2 : an abortive flight by an aircraft on a combat or bombing mission; *also* : an aircraft making such a flight

**abor·ti·cide** \ə'bȯrd-ə,sīd\ *n* -s [*abort-* + *-i-* + *-cide*] 1 : act of destroying a fetus within the uterus 2 : an agent that destroys the fetus and causes abortion

**abor·ti·fa·cient** \ə'bȯrd-ə,fāshənt, ,ə,ṛ'sā-\ *adj* [*abort +* *-i- + -facient*] : inducing abortion

**2abortifacient** \" \, *n* -s : a drug or other agent that induces abortion

**abort·in** \ə'bȯrt'n, *n* -s [NL *abortus* (specific epithet of *Brucella abortus*, fr. L, past part.) + E *-in*] : an extract made from cultures of a bacterium (*Brucella abortus*) and used in the diagnosis of contagious abortion of cattle

**abor·tion** \ə'bȯrshən, -'ȯ(ə)h-\, *n* -s [L *abortion-, abortio,* fr. *abortus* (past part.) + *-ion-, -io -tion*] 1 : the expulsion of a nonviable fetus: **a** : spontaneous expulsion of a human fetus during the first 12 weeks of gestation — compare MISCARRIAGE **b** : induced expulsion of a human fetus **c** : expulsion often due to infection of a fetus by a domestic animal at any time before completion of pregnancy — see CONTAGIOUS ABORTION, VIBRIONIC ABORTION; TRICHOMONIASIS 2 **a** : a misshapen thing or person : MONSTROSITY **b** : something that fails to attain full

⟨an ~ case of poliomyelitis⟩ — **abort·ive·ly** \-ə̇vlē, -li\ *adv* — **abortiveness** \-ivnəs, -ēv-\, *n* -s

**'abor·tive** \" \, *n* -s [ME, fr. L *abortivus*, adj.] : one that is abortive (as a bombing mission)

**abor·to·gen·ic** \ə,bȯrd-ə'jenik\ *adj* [*abort- + -o- + -genic*] : causing abortion : ABORTIFACIENT

**abor·tus** \ə'bȯrd-əs\, *n* -ES [NL, fr. L, abortion] : an aborted fetus; *specif* : a human fetus less than 12 weeks old or weighing at birth less than 17 ounces

**abos** *pl of* ABO

**abo system** \ā,bē'ō-, ,ābē'ō-\ *n, usu cap A&B&O* : the basic system of antigens of human blood behaving in heredity as an allelic unit to produce any of the four blood groups A, B, AB, or O according to the particular antigens passed from parents to child — called also *ABO group*; compare ISOANTIBODY, RH FACTOR

**à bouche** \abüsh\ *adj* [F, with a bouche] *heraldry, of a shield* : having a bouche on the dexter side

**about** *past of* ABY

**abou·lia** *var of* AKULIA

**'abound** \ə'baůnd\, *vi* -ED/-ING/-s [ME *abounden*, fr. MF *abonder, fr. L. *abundare* to abound, overflow, fr. *ab-* + *undare* to rise in waves, fr. *unda* wave — more at WATER] 1 : to be present or available in large numbers or in great quantity ⟨wild animals ~⟩ ⟨fruit that is not in ~ confidence⟩ 2 a *obs* : to be wealthy ⟨free one may fall b ~ : to be full to overflowing ⟨~ing with ~ treasure⟩ c : to be highly productive ⟨~ing soil⟩ 3 : to become copiously supplied—used with *in* or *with* ⟨the city ~ is in historic remains⟩ ⟨the fields ~ with stones⟩

**'about** \ə'baůt, usu -d-+ V\ *adv* [ME *about*, *aboute*, fr. OE *abūtan*, fr. *a-* + *būtan* outside, without — more at BUT] 1 : on all sides ⟨in every direction ⟩ AROUND ⟨'tis time to look ~ —Shak.⟩ 2 a : in rotation ⟨ROUND ⟨they go ~ in circles⟩ b : around the outside ⟨in circumference ⟨the lake is a mile ~ and a half mile across⟩ c : in a circuitous way ⟨round about ⟨the river . . . is subject to frequent shifts of position, and winds ~ —P.E. James⟩ 3 a : with some approach to exactness in quantity, number, or time : APPROXIMATELY ⟨~ four feet of snow⟩ ⟨~ eight o'clock⟩ b : almost ⟨: NEARLY ⟨~ as serious⟩ : little less than ⟨~ starved⟩ 4 : here and there at random ⟨tools lying ~⟩ : from one place to another ⟨carry money ~ with him⟩ 5 : in the vicinity : near ⟨the spoke to the people standing ~⟩ 6 : in succession ⟨one after the other⟩ : ALTERNATELY ⟨turn ~ is fair play⟩ 7 a : in the opposite direction ⟨face ~⟩ ⟨bring a ship ~⟩ : in reverse order ⟨arranged the other way⟩ : from back to front ⟨wrong side to⟩ : in an opposite state of being ⟨~ cast⟩ — the opposite tack — see COME ABOUT

**2about** \" \, *adj usu -d-+ V\ *adj* [ME *about, aboute*, fr. OE *abūtan*, adj.] 1 a : moving about from place to place : ACTIVE ⟨few people were ~ on the streets⟩ 2 : being in existence, in evidence, or in circulation : about (plenty of money ~) (more rumors and less emotion ~ —Herbert Hoover) 3 : normally active or capable (as after a confining illness) (eager to be up and ~ again)

**'about-face** \ə̇'baůt,fās, *also* ,ȧ-, *n* -s [fr. the imper. phrase *about face*, fr. *'about + face* imv.] 1 : the act of facing in the opposite direction as a military maneuver (soldiers did an about-face and marched away—Dorothy C. Fisher) 2 a : a reversal of direction (the river goes an *about-face*) b : a reversal of attitude or point of view (an about-face of foreign policy)

**2about-face** \,·\, *vi* -ED/-ING/-s t : to execute an about-face
**2about ship** *vi* [fr. the imper. phrase *about ship*, fr. *'about + ship*, n.] : *Scot* : usu. used as an order
**about-turn** \,·'ȯr,·\, *vi* [fr. the imper. phrase *about turn*, fr. *'about + turn*, v.] : ABOUT-FACE

**'above** \ə'bəv\, *adv* [ME *above, aboven*, fr. *above, aboven*, adv.] 1 : overhead : in a higher place ⟨the courts above⟩ 2 a : in or to a higher place than (the house perched ~ the road) : directly over ⟨a room — the store⟩ : higher than b : farther up than (as on a mountain or river) (anchored 10 miles—the city) : on the other side of : BEYOND (hunted ~ the farm) c : farther north (as the ship sank just ~ the Azores) d : on top of — used chiefly (across ~ a matter of borrowed . . . raiment —Ellen Glasgow⟩ 2 a : superior to or surpassing in any respect (higher than any in rank, position, quality, or degree) (filial piety is ~ self-interest) (out of reach of : most likely to be affected by : not exposed to ⟨~ suspicion⟩ : in preference to / over against ⟨preoccupation with design—all other elements⟩ 1 : too proud or honorable to stoop or condescend to (~ taking profits for himself) : averse to (disinclined to (she is not reading her poems)) 3 : exceeding in number, quantity, or size ⟨more than ⟨men ~ 50 years old⟩ 4 : in addition to : BESIDES ⟨~ and beyond his good nature⟩ — **above oneself** : showing or feeling self-importance (when he gets a bit above himself . . . he inclines to be a nuisance —Nicholas Blake)

**2above** \" \, *n* -s [ME, fr. *above*, adv.] 1 a : something earlier in place or rank above mentioned (see the ~) : preceding (as in a book, list, etc.) (the ~ figures) b : a person whose name is written higher on the same page or on a preceding page (he — the above) : the owner of this (we ~) 2 a : higher region : HEAVEN (every perfect gift is from ~ —Jas 1:17 (AV))

**'above** \" \, *adj* 1 : being located, written, or discussed higher on the same page or on a preceding page (the ~ chart) 2 : of heaven : HEAVENLY (think on things ~)

**'above** *all adv* : before every other consideration : ESPECIALLY (this above all)

**above-board** \ə,·'·,·\, *adv* [*above + board*; fr. the difficulty of cheating at cards when the hands are above the table] : in a straightforward manner : OPENLY

**above·ground** \ə·,·\, *adj* 1 : located on or above the surface of the ground 2 : existing, operating, etc., in an open manner : not secret or underground

scoring of honors, penalties, and premiums — used of any score that does not count toward game except certain premiums — compare CONTRACT BRIDGE 2 : classified as an ordinary or routine expense or revenue item or as a current expense or asset (an *above-line* surplus)

**above-wa·ter** \,·,·'·,·; ·'·,·\ *adj* 1 : above the surface of the water 2 : above the waterline of a ship
**ab ovo** \(')ȧ'bōvō,ab'·, ,·\ *adv* [L, lit., from the egg] : from the beginning (develops every thought *ab ovo*, leading the reader up to the finest ramifications —Arnold Brecht)

**abox** \ə'bäks\ *adj* [*a- + box*] : BRACED ABACK — used of head yards when the headsails only are aback
**ab·ox** \ə'bäks, no *'bȯt),·ȯ)h\, n, or* **abox·zi** \ȧ,·,·'jē\ *pl* [It *abbozzo*, fr. *abbozzare* to make a rough sketch or draft, fr. (fr. L. ad-) + *bozzare* to make a rough sketch or draft, fr. *bozza* boss, swelling, roughened stone, rough sketch or draft — more at BOSS] : a rough sketch or draft (as of a picture or a sculpture)
**abp** *abbr, often cap* archbishop
**Abr** *abbr* abridged; abridgment

**ab·ra·ca·dab·ra** \,abrəkə'dabrə\, *n* -s [LL] 1 : a charm or incantation : a magical formulas (relied on effigies and ~ to produce results —B.A. Hoebel) — used as a word to ward off calamity esp. when written on an amulet in a mystical design 2 : confused or unintelligible language : JARGON, NONSENSE (pseudoscientific ~)

<div align="right">
A B R A C A D A B R A
A B R A C A D A B R
A B R A C A D A B
A B R A C A D A
A B R A C A D
A B R A C A
A B R A C
A B R A
A B R
A B
A
</div>

abracadabra

**'ab·ra·dant** \ə'brād'nt, a'-, -ā,ȧ-\, *adj* [L] : ABRASIVE
**2abradant** \" \ *n* : ABRASIVE
**abrade** \ə'brād, a'-\, *vb* -ED/-ING/-s [L *abradere* to scrape off, fr. *ab-* +ab- + *radere* to scrape — more at RAT] *vt* 1 : to rub or wear away esp. by friction : ERODE (the waves ~ the rocks) b : to irritate by rubbing : CHAFE (broad tape . . . abraded her soft skin —Arnold Bennett) c : to roughen the surface of (abraded yarns) 2 : to wear down or exhaust (as a person or a person's spirit) : IRRITATE (the ~ing troll . . . abraded him more and more —Robert Shaplen) *vi* : to undergo abrasion
**abrad·er** \-ə(r)\, *n* -s : one that abrades (a good, scourge or ~ . . . of the local authorities —Keith Williams) : as a tool or machine for abrading b *or* **abrading stone** *archaeol* : a primitive stone artifact usu. of sandstone for smoothing, sharpening, or shaping

**abra·ham·man** \'abrə,ham,man, -haə(ōm,maa(ō)n, 'Ebrəm,·, 'ābrəəm,·\ *also* **abram-man** \'abrəm,·, *n, pl* **abra-ham·men** *also* **abram-men** *usu cap A* [after Abraham or Abram, Biblical patriarch of the Jews; prob. fr. the New Testament reference (Lk 16: 19–31) to the beggar Lazarus, who is said to have rested in Abraham's bosom after death] : one of a class of beggars who roamed through England esp. in the 16th and 17th centuries usu. feigning lunacy to obtain alms
**abraham's bosom** *n, usu cap A* [trans. of LL *sinus Abrahae*, trans. of Gk *kolpos Abraam*] : the abode of bliss in the other world : PARADISE — so called in allusion to Jewish writings and to the New Testament, in Lk 16:22 (RSV)
**abram** *obs var of* ABRAHAM
**ab·ra·mis** \'abrəmis\, *n, cap* [NL, fr. Gk, a kind of mullet] : a genus of fishes (family Cyprinidae) including the European freshwater bream
**abran·chia** \(')ā'braŋkēə\, *n pl, cap* [NL, fr. *a-* + *-branchia*] : a former division of annelids comprising forms without specialized respiratory structures (as most of the oligochaetes and leeches)

**abran·chi·al** \(')ā'braŋkēəl\ *adj* [*a- + branchial*] : ABRANCHIATE
**abran·chi·al·ism** \,·,·'·,·izəm\, *n* -s [*abranchial + -ism*] : the condition of being without gills (as certain mollusks of the genus *Firoloida*)
**abran·chi·an** \(')ā'braŋkēən, -ȧ-\, *adj or n* [NL, fr. *a- + branchi-* + *-an*] *of ABRANCHIA*
**abran·chi·a·ta** \·,·,·ē'ād-ə, -ȧd-\, *n pl, cap* [NL] : any of several groups of gill-less animals other than ABRANCHIA
**abran·chi·ate** \(')ā'braŋkēət, -,āt\ *adj* [*a- + branchi-* + *-ate* or *-ous*] : lacking gills
**abran·chi·ous** \(')ā'braŋkēəs\ *also* **abran·chi·ous** \·kēəs\, *adj* [*a- + branchi-* + *-ous*] : ABRANCHIATE
**abras·er** \ə'brāz(ə)r, a'-\, *n* -s : ABRADER
**abrash** \ə'brash, -rāsh\ *n* -ES [Ar, mottled] : a variation or deviation of a color in Oriental rugs
**abra·sin oil** \ə'brāzə,n-, a'-\, *n* -s [prob. fr. F *huile d'abrasin* : TUNG OIL

**abra·si·om·e·ter** \ə,brāzē'imad-ə(r), ,ȧ,·\, *n* -s [*abrasion + -meter*] : a device for measuring the resistance of surfaces to abrasion
**abra·sion** \ə'brāzhən, a'-\, *n* -s [ME *abrasion-, abrasio*, fr. L *abrasus* (past part. of *abradere* to scrape off) + *-ion-, -io* -tion — more at ABRADE] 1 : wearing, grinding, or rubbing away by friction 2 a : the rubbing or scraping of the surface layer of cells or tissue from an area of the skin or mucous membrane; *also* : a place so abraded b : the mechanical wearing away of the tooth surfaces by chewing
**abrasion platform** *n* : the portion of the submerged margin of a continent or island that has been planed off by marine abrasion as distinct from the portion that has been built up to its present level by the deposition of marine sediments
**'abra·sive** \ə'brāsiv, -siv, -āziv\, *adj* [*abrasion + -ive*] 1 : tending to abrasion : causing abrasion 2 : causing irritation (~ relationships between member nations)
**2abrasive** \" \, *n* -s 1 a : any of a wide variety of natural or manufactured substances used to grind, wear down, rub away, smooth, scour, clean, or polish other substances 1 : a mineral or other hard material such as emery, sand, garnet, etc. used to make grinding wheels or affixed with glue to the surface of paper or cloth b : something made of an abrasive (as sandpaper) 2 : rock fragments, mineral particles, or sand grains used by running water, wind, waves and currents, and glaciers in abrading a land surface
**ab·ra·um** \'ä,praum\, *n* -s [G, lit., rubbish, fr. *ab* (fr. OHG *aba* away) + *raum* space, fr. OHG *rūm* — more at OF, ROOM] : a red ocher used to darken mahogany
**ab·ra·xas** \ə'braksəs, a-\, *n, cap* [LL *Abraxas*, a god, fr. Gk *Abraxas*; perh. regarded as a charm fr. the numerical value of the Greek letters, which is 365] 1 — used as a charm on an amulet or talisman in Europe, Asia Minor, and No. Africa from the 2d century B.C. until the 13th century 2 *also* **abraxas stone** *n* -s : a gem engraved with the word *abraxas*
**abra·zo** \ə'brä(z)ō, ä'-\, *n* -s [Sp, fr. *abrazar* to embrace, fr. *a-* (fr. L. *ad-*) + *brazo* arm, fr. L *brachium* — more at BRACE] : an embrace (as of salutation) employed in Latin America
**ab·re·act** \,abrē'akt\, *vt* -ED/-ING/-s [part. trans. of G *abreagieren*, tr. of *ab* (away from, down from (fr. OHG *aba* away)) + *reagieren* to react — more at OF) : to relieve (psychic or emotional tension or emotion previously repressed or forgotten) (~ his repressed guilt)
**ab·re·ac·tion** \,abrē'akshən\, *n* -s [part. trans. of G *abreagierung*, tr. of *ab + reagierung* reaction] : the discharge of the emotional energy supposed to be attached to a repressed idea esp. by the conscious verbalization of that idea in the presence

abreast

**defi**    592    **defluxion**    **defoar**

Case 1:06-cv-00032-JJF Document 208-2 Filed 08/30/2007 Page 23 of 28

[...] gaze upon (his mother ~es him [...] : to direct an unwavering [...] her with his eye —Agnes S. Turnbull) —Samuel Taylor) (3) : to hold fast : CAPTURE (tried to ~ her eyes with his, but she was . . . looking away —Marcia Davenport) (seemed capable of being . . . attractive without wanting to ~ the attention of every man near her —Jane Austen) **2 a :** to set or place definitely : STATION, SETTLE (~*ed* his residence in the city) (~*ed* himself in New York) **b :** to assign precisely : settle on : DETERMINE, DEFINE (federal and state courts ~ not only wages but hours and working conditions as well —Nathaniel Peffer) (~ the limits of a debate) (wonder why such a lonely spot was ~*ed* in the first place —Sydney Moorhouse) (difficult to ~ the place of this remarkable statesman in history) (no time or place has yet been ~*ed* —Jess Whitworth) **c :** ASSIGN, PLACE (~ responsibility) (~ the guilt) (so many mistakes were made . . . that it was difficult to ~ the blame —Isaac Rosenfeld) **3 a :** to set or place in order or in a certain pattern : adjust or settle properly or for a desired end (~*ed* his face in an expression of mock disgust —C.B.Flood) (~*ed* his spectacles and read aloud —George Meredith) (~*ed* its door so that it couldn't be opened from the outside —Raymond Chandler) **b :** to line the hearth of (a furnace) with fettling **4 a** (1) : to put in neat-appearing order : ARRANGE, PREPARE (~*ed* the same room for you —Ellen Glasgow) (~*ed* their hair in the Hollywood manner —Norman Cousins) (asked me to ~ the table for the family dinner); *specif* : to get (food) ready (~*es* lunches for the children to take to school —*N.Y. Times*) (coffee ~*ed* with milk —Lorraine Calhoun) (~*ed* himself a drink) (2) : REPAIR, MEND (they know how to ~ their cars —Feliks Gross) (called in a plumber to ~ the drain); *also* : to improve the physical condition of : RESTORE, CURE — often used with *up* (that doctor ~*ed* up my son fine) (told her that food would ~ her up —E.D.Radin) (3) : to take care of : see to : SOLVE (getting your name in the society columns won't ~ anything —*Better Homes & Gardens*) (anything that's wrong with our life today, people expect the schools to ~ —Hannah Lees) — often used with impersonal *it* as object (the battalion surgeon ~*ed* it so I didn't have to go to the hospital —P.B.Kyne) (4) : CASTRATE, SPAY (5) : to remove a principal means of defense from (as a pet skunk) **b :** to do for (someone) : get even with : PUNISH (wish I could ~ them —P.G.Wodehouse) (God'll ~ you —Dan Browne) (the vigilante committee warned sheepmen away . . . on the threat of ~*ing* them up —*Amer. Guide Series: Oregon*) **c** (1) : to determine the outcome of (a contest) by bribery or other improper methods (all his fights have been ~*ed* —Budd Schulberg) (arrested for ~*ing* games —*Sports Illustrated*) (he can ~ an election so that one of his stooges becomes a key official —Malcolm Johnson) : tamper with in advance (a horse ~*ed* to lose a race) (a ~*ed* slot machine) (2) : to induce by bribery or influence to give a favorable decision (the jury had been ~*ed*) : obtain the quashing or disposal of by tampering or other arrangement (~*es* a traffic ticket or bribes a building inspector —Herman Kogan) **5** *slang* : to give (someone) a narcotic ~ *vi* **1 :** to become fixed; *esp* : to become firm or stable **2 a :** to settle or remain permanently : cease from wandering **b :** to direct the gaze or attention : FOCUS, FIXATE (her eyes ~*ed* sideways for an instant) — often used with *on* or *upon* (the examinee is then directed to ~ on the examiner's right eye —H.G.Armstrong) **c :** ARRANGE, DETERMINE, AGREE, DECIDE (the general had ~*ed* to be out by that hour —Jane Austen) — usu. used with *on* or *upon* (~ with a contractor on a sum to be paid for the job —*Glasgow Sunday Post*) (had ~*ed* on the first week in November —Edna Ferber) (~*ed* on a cabin by the lake to spend vacation) **3 :** to get set : be about to : PREPARE, INTEND — used chiefly in the present participle (are ~*ing* to ship some cattle —F.B.Gipson) (~*ing* to cop the first postwar contract in the shipbuilding industry —*Time*) (~*ing* to leave town for good —Erskine Caldwell) (~*ing* to rain) **syn** see FASTEN, SET — **fix bayonets 1 :** to attach a bayonet to a rifle — used as a command **2 :** to raise the right hand in a mass swearing-in ceremony — used of Salvationists

²**fix** \"\ *n* -ES **1 a :** a position of difficulty or embarrassment : PREDICAMENT, DILEMMA (found himself in an awful ~) **b :** the position (as of a ship or airplane) obtained by bearings of fixed objects, by observations of heavenly bodies, or by radio means; *also* : a determination of one's position **2 :** FETTLING **3 a** (1) : an arrangement whereby relative immunity from application of the law is obtained through the employment of economic, political, or social influence and esp. through the payment of money to law-enforcement officers or other authorities (collusion between state party officials and the local collector of internal revenue led to tax ~*es* for gamblers, racketeers, and businessmen —*New Republic*) (2) : the money paid (as by the owner of a gambling house) to a law-enforcement officer or other person wielding influence or authority for protection from the law : BRIBE **b :** an instance of collusion or private agreement that gives special or unfair advantage to one of the parties (in the dream life of the little businessman the sure ~ is replacing the open market —C.W. Mills); *specif* : a sports contest whose outcome is prearranged (virtually impossible for a spectator to recognize a ~ even if he is told —O.R.Cohen) **4** *slang* : a shot of a narcotic **5 :** a tall drink made with alcoholic liquor, lemon juice, and sweetening, served in cracked ice, and decorated with fruit (brandy ~) (gin ~) **syn** see PREDICAMENT

**fix·able** \'fiksəbəl\ *adj* : capable of being fixed

**fix·ate** \'fik,sāt, *usu* -ād·+V\ *vb* -ED/-ING/-S [L *fixus* (past part. of *figere* to fasten, pierce) + E *-ate* — more at DIKE] *vt* **1 :** to make fixed, stationary, or unchanging : FIX (it is the groups that become *fixated* by orthodoxy that decline —D.F. Fleming) (Protestants have been *fixated* in defending the thought of the reforming sixteenth century —J.W.Nixon) **2 :** to focus one's eyes upon : concentrate one's gaze on (~ a word on the moving sheet —R.S.Woodworth) **3 :** to direct (the libido) toward a pregenital form of gratification ~ *vi* **1 :** to focus or concentrate one's gaze or attention — usu. used with *on* or *upon* (an infant with normal vision . . . will ~ on a light held before him —*Jour. Amer. Med. Assoc.*) **2 :** to undergo arrestment at a certain stage of development (men and women of a certain caliber ~ in any job —H.A.Overstreet); *specif* : to undergo arrestment at a certain stage of psychosexual development

**fixated** *adj* [*fixate* + *-ed*] : arrested at a certain phase of adjustment or development; *esp* : arrested at a pregenital level of psychosexual development

**fix·a·tif** *like* FIXATIVE, *or* ¦fiksə¦tēf\ *n* -S [F, prob. fr. E *fixative*] : FIXATIVE

**fix·a·tion** \fik'sāshən\ *n* -S [ME *fixacioun*, fr. ML *fixation-*, *fixatio*, fr. L *fixus* + *-ation-*, *-atio* -ation] **1 :** the act of fixing or fixating : the state of being fixated (~ of the kidney by operative means) (would entail the ~ of their present condition of inferiority —*New Republic*) (a marketing board should concentrate . . . on distribution and not on price ~ —*Farmer's Weekly (So. Africa)*) **2 :** the act or an instance of focusing the eyes upon an object **3 :** a persistent concentration of libidinal energies upon pregenital zones, objects, persons, or substitute figures and consequent arrest of libidinal development at an immature level **4 a :** a habit formation : persistent, obsessive, or compulsive behavior **b :** an excessive, obsessive, or unhealthy preoccupation or attachment : OBSESSION (public ~ on the rising tide of juvenile delinquency —*Nervous Child*) (~s about cleanliness) (isn't really love, it's just a ~ —Malcolm Cowley) **5 :** the immobilization of the parts of a fractured bone esp. by the use of various metal attachments **6 :** NITROGEN FIXATION

**fix·a·tive** \'fiksəd·iv, -ətiv\ *n* -S [fr. *fixative*, adj., "tending to fix", fr. ¹*fix* + *-ative*] : something that fixes or sets: as **a :** a substance (as musk or benzoin) added to a perfume esp. for preventing the more volatile ingredients from evaporating too rapidly **b :** a varnish usu. applied by spraying and used esp. for the protection of crayon drawings **c :** a substance or mixture of substances used to fix living tissue

**fixed** \'fikst\ *adj* [ME, fr. past part. of *fixen* to fix — more at ¹FIX] **1 a :** securely placed or fastened (a ~ piece of wood) : not adjustable (a ~ resistor) : permanently and definitely located : STATIONARY, IMMOVABLE (there were no ~ theaters in the provinces —G.M.Trevelyan) **b** (1) : NONVOLATILE (a ~ acid) (~ carbon [...] migrants) **c** (1) : not subject to change or fluctuation : ABSOLUTE, SETTLED, DEFINITE (revolution [...] could never be a ~ right —S.W.Chapman) (urged the assembly to grant him a ~ salary) (a ~ rate pays for transportation . . . and food on tours —*Current Biog.*) (2) : held to tenaciously and often blindly or obsessively : UNSWERVING, SET (is very ~ in his ways and thought) (the man of ~ ideas . . . is today a public danger —*Nation*) (3) : having a final or crystallized form or character : incapable of further development : FROZEN (America is not yet a ~ and settled land —Barbara Ward) (the respect of the eighteenth century for ~ forms —R.B. West) (animal species are ~ and it is possible to define them in static terms —H.M.Parshley) (4) : recurring on the same date from year to year (~ feast) **d :** RIGID, IMMOBILE, CONCENTRATED (sat with a look of ~ attention on his face) (her thick glasses gave her eyes a ~ stare —Allen Tate) **2 :** supplied with a definite amount of something needed or desirable : PROVIDED (how are we ~ for seamen —*Argosy*); *esp* : supplied with money : WELL-FIXED

**fixed accent** *n* **1 :** word accent occurring regularly on a specified syllable of a word or on a syllable which is specified in terms of vowel length or consonant combinations in the word **2 :** word accent occurring on the same syllable in derivative and inflectional forms of a root or stem

**fixed ammunition** *n* : ammunition in which the projectile is permanently attached to a case that contains the primer and the propellant in distinction from separate-loading ammunition

**fixed arch** *n* : an arch without hinges

**fixed armament** *n* : guns or weapons that are permanently emplaced

**fixed assets** *n pl* : tangible assets (as land, buildings, machinery, equipment) of a permanent or long-term nature — compare CAPITAL ASSETS

**fixed bayonet** *n* : a bayonet when fitted in its place on the end of a rifle

**fixed beam** *n* : a restrained or built-in beam

**fixed block** *n* **1 :** a tackle block that is immovable **2 :** one of the sheaves in a ship's chesstree

**fixed capital** *n* : capital that is durable in character (as buildings and machinery) and can be used over an extended period of time without replacement

**fixed cell** *n* : a usu. large, irregular, and branching phagocytic cell existing in certain tissues (as connective tissue), lymph nodes, or spleen but sometimes becoming amoeboid and moving through the tissues — compare WANDERING CELL

**fixed charge** *n* : a recurring expense (as rent, insurance, depreciation, interest on funded debt, taxes on real estate) that is constant and does not fluctuate with business volume

**fixed cost** *n* : cost that remains constant and does not vary with short-term changes in production

**fixed–do system** \'fiks(t)'dō-\ *n* : the system of solmization in which a certain syllable (as *do* for C, C♯, C♭) is used for a given tone and its chromatic derivatives without regard to its key relation

**fixed exchange** *n* : a system of foreign exchange that quotes the value of a foreign unit of currency in terms of the money of the home country — called also *direct exchange;* compare INDIRECT EXCHANGE

**fixed–focus** \'=¦==\ *adj* : not provided with a focusing adjustment — used of a camera having a lens of small aperture focused at about 8 to 15 feet

**fixed gunnery** *n* : the firing of a gun having no traverse so that the entire gun platform or aircraft must be maneuvered for aiming — compare FLEXIBLE GUNNERY

**fixed idea** *n* [prob. trans. of F *idée fixe*] **1 :** a preconceived belief : PREPOSSESSION **2 :** a usu. delusional idea that dominates the whole mental life during a prolonged period (as in certain mental disorders)

**fixed–income** \'=¦=(,)=\ *adj* : having a uniform or relatively uniform annual income or yield (bonds and preferred stocks are *fixed-income* securities) (inflation has its hardest impact on such *fixed-income* groups as people who have retired on social security)

**fixed liability** *n* : a liability (as a bond or mortgage) that does not mature for at least one year from the date incurred or from a given balance-sheet date — called also *funded debt*

**fixed light** *n* **1 :** a light that emits constant beams — compare LIGHTHOUSE **2 :** a circular port with a fixed glass and cover used on a ship (as in a deckhouse or skylight)

**fixed·ly** \-sədlē, -stl-, -li\ *adv* : in a fixed manner (staring ~ into the empty fireplace —Aldous Huxley) (smiling ~ in a travesty of carefree good nature —Erle Stanley Gardner)

**fixed·ness** \-sədnəs, -s(t)n-\ *n* -ES : the quality or state of being fixed

**fixed oil** *n* : a nonvolatile oil; *esp* : FATTY OIL — distinguished from *essential oil*

**fixed point** *n* : any one of several definite temperatures determined by natural phenomena (as the freezing point of water) and used as reference points in the calibrating of thermometers

**fixed price** *n* **1 :** a uniform price for all customers as opposed to a price obtained by bargaining **2 :** a price fixed by international agreement or by a governmental price-fixing agency **3 :** a price established by a contract and not subject to subsequent change

**fixed service** *n* : communication service carried on among fixed stations

**fixed sign** *n* : one of the four zodiacal signs Taurus, Leo, Scorpio, and Aquarius

**fixed signal** *n* : a signal of fixed location used to indicate a condition affecting the movement of a train or engine

**fixed spool** *n* : a fishing spool that remains stationary when line is wound onto it or cast off it

**fixed–spool fishing** *n* : SPINNING

**fixed star** *n* : a true star at such great distance that its motion can be measured only by very precise observations over long periods as distinguished from a planet or other obviously moving body

**fixed station** *n* : a permanently located radio transmitting station used for communicating with similar stations

**fixed virus** *n* : a virus made constant in its reactions by repeated passage through a host other than the usual host

**fixed year** *n* : a calendar year remaining constant in relation to the seasons

**fix·er** \'fiksə(r)\ *n* -S **1 :** one that fixes: as **a :** a worker who sets up and adjusts knitting and sewing machines for specific operations **b :** LOOMFIXER **c :** one that is employed in industry to make parts for or to make repairs upon machinery **2 a :** one that intervenes with police officials or other authorities for a person in legal difficulty or with government officials for a person seeking a political favor often with use of corrupt methods and for a fee or other consideration : an influence peddler (a big politico, a ~ you have to see if you want to open a gambling hall —Raymond Chandler) **b :** a go-between (as a lawyer) employed by a circus to make arrangements with officials in advance of performance **c :** one that adjusts matters and esp. smooths over disputes (as between factions of a party) by negotiation : TROUBLESHOOTER (party ~s hustled around to put the pressure on deviating Democrats —*Time*) **d :** PLAY DOCTOR **3 :** FIXATIVE; *specif* : a fixing bath in photographic work **4** *slang* : a peddler of dope

**fixer mason** *n* : a mason whose main occupation consists in placing the great blocks of stone accurately into position in a building

**fixer–upper** \¦fiksə(r)¦əpə(r)\ *n* -S : one that fixes up a person or thing (storewide sale of *fixer-uppers* for walls and floors —Evelyn Kanter)

**fixes** *pres 3d sing of* FIX, *pl of* FIX

**fixing** *in sense 1 often* -ən *by persons who ordinarily pronounce the ending "-ing"* iŋ *or* ēŋ\ *n* -S [fr. gerund of ¹*fix*] **1 fixings** *pl* : TRIMMINGS, EMBELLISHMENTS, ACCESSORIES; *esp* : the accessories or supplements of a meal (turkey with all the ~s, including mince pie) **2 :** FETTLING

**fix·i·ty** \'fiksəd·ē, -sətē, -i\ *n* -ES [ML *fixitas*, fr. L *fixus* (past part. of *figere* to fasten, pierce) + *-itas* -ity — more at DIKE] **1 :** the quality or state of being fixed or stable (the idea of the ~ of species —M.F.A.Montagu) (all grammars —Frank Thilly) (now inventing rules, the unfixing of fixities —E.A.Overstreet)

**fix·ture** \'fikschə(r)\ *n* -S [modif. (influenced by *mixture*) of LL *fixura*, fr. L *fixus* + *-ura* -ure] **1 :** the act of fixing : the state of being fixed (its final definite ~ for the 25th was probably due to an attempt to harmonize it with the pre-Christian Roman calendar —G.G.Coulton) **2 a :** something that is fixed or attached as a permanent appendage or a structural part (hanging glass ~s) (a plumbing ~); *specif* : an electric lighting device usu. ornamental and permanently mounted in place (~s providing enough light to read by) **b** (1) : a device for supporting work during machining without guiding the cutting tools (2) : a similar device for holding parts in the correct position during assembly or testing **c** (1) : a chattel that has been so wrought into or annexed to realty (as a house) that it may be regarded as legally a part of it usu. depending upon such considerations as whether it may be removed without irreparable damage, whether the parties (as landlord and tenant) regarded or are presumed by law to have regarded it as removable, whether its annexation was intended to be permanent and to further the purposes for which the structure is designed, or whether its annexation is really necessary to the contemplated use of the structure or only ornamental or convenient — called also *immovable fixture;* opposed to *fitting* (2) : such a chattel still legally the property of the annexer — called also *movable fixture* (3) : a chattel (as shelving or machinery) annexed to realty for purposes of trade or manufacture and legally still the property of the annexer — called also *trade fixture* **d :** an accessory or article that serves a special purpose (an efficient cooking stove . . . alone represented the twentieth century in the ~s of the house —Arnold Bennett) (this new display ~ has been carefully designed to build you year-round sales —*Circle & Monogram*) **3 a** (1) : one of a scheduled series of sporting events (as a game, contest, race) (the winner will then meet the leader of the western section, where several ~s have still to be played —*Weekly Scotsman*) (2) : a regularly scheduled event (as a festival or exhibition) (a three-monthly classified calendar of ~s —*Britain: Information & Events*) (submitting a fairly large team of 2½-year-old rams at this ~ —*Westralian Farmers Co-op. Gazette*) (racegoers feel there should be more ~s there —*Sydney (Australia) Bull.*) **b :** a familiar, invariably present, or permanent item, element, or feature in some particular setting (a simile so vivid that it has become a ~ in anthologies —Bernard DeVoto) (resolved to make foreign economic aid a budget ~ as long as the cold war lasts —*Newsweek*); *esp* : a person of long and continued association (as through residence or employment) with some place, activity, or other setting (now a ~ in the stock department, being a member of the office force there —*Nightmare*) (the year in which he became a ~ at second base —*Current Biog.*) (a ~ in most rosters of the world's best-dressed women —*Time*)

**fix up** *vt* **1 a :** to arrange a settlement of : bring to a conclusion (*fix up* a dispute) (today a contract was definitely *fixed up* —Arnold Bennett) **b :** CONTRIVE, DEVISE (*fixed up* an emergency mast) **c :** FURNISH, EQUIP (*fixed* the room *up* as a study) **2 :** to provide or accommodate with something needed or desirable : SUPPLY, FURNISH (*fix up* a small loan) — often used with *with* (*fixed up* his relations with positions —*N.Y. Times*) (can sew up a client merely by *fixing* him *up* with a memorable game at his club —*Time*) **3 :** to dress up : spruce up (*fixed* myself *up* as well as I could —J.B.Benefield)

**fix·ure** \'fikshə(r)\ *n* -S [LL *fixura* — more at FIXTURE] *archaic* : fixed position : FIRMNESS

**fixy** \'fiksē\ *adj* [¹*fix* + *-y*] *dial* : FUSSY, PARTICULAR, ELEGANT

**fi·ze·ly·ite** \fə'zālē,īt\ *n* -S [Hung *fizélyit*, fr. Sandor *Fizély*, 20th cent. Hung. mining engineer, its discoverer + Hung *-it* -ite] : a mineral $Pb_5Ag_2Sb_8S_{18}$(?) consisting of a lead silver antimony sulfide occurring as a metallic lead-gray prism

**fiz·gig** \'fiz,gig\ *n* -S [alter. of earlier *fisgig*, perh. fr. *fise* flatus (fr. ME) + *gig* (girl); akin to ME *fist* flatus — more at FEIST] **1** *archaic* : a gadding flirting girl or woman **2 :** a firework of damp powder that fizzes or hisses when it explodes **3 :** WHIRLIGIG 1 **4 :** FISHGIG

¹**fizz** \'fiz\ *vi* -ED/-ING/-ES [prob. of imit. origin] **1 :** to make a hissing or sputtering sound (as of a freshly poured effervescent beverage or a burning fuse) : EFFERVESCE **2 :** to exhibit strong excitement or exhilaration (~*ing* with the desire to learn the latest hot news —P.G.Wodehouse) (letters home ~*ed* with high spirits —*Time*)

²**fizz** \"\ *n* -ES **1 a :** a hissing sound (the ~ of champagne) **b :** LIVELINESS, ACTIVITY **2 :** an effervescent beverage (as ginger ale or champagne); *specif* : a tall drink variously made of spirituous liquor, carbonated water, and lemon juice often with the yolk or the white of an egg or both, sweetened, and chilled (sloe-gin ~) (brandy ~)

**fizz·er** \-zə(r)\ *n* -S [¹*fizz* + *-er*] : a very fast ball in cricket

¹**fiz·zle** \'fizəl\ *vi* **fizzled; fizzled; fizzling** \-z(ə)liŋ\ **fizzles** [prob. alter. of *fist* to break wind (fr. ME *fisten*) + *-le* — more at FEIST] **1** *obs* : to break wind quietly **2 :** to make a hissing or sputtering sound (had to drink it hot while it *fizzled* —C.T.Jackson) **3 :** to fail or peter out esp. after a promising start : end feebly or lamely (the attempt at surrender having *fizzled* —P.W.Thompson) (every coach knows the agony of watching a . . . rally ~ —W.L.Myers) — often used with *out* (all attempts at friendliness seemed to ~ out —Clive Arden)

²**fizzle** \"\ *n* -S **1** *archaic* : the act of breaking wind quietly **2 :** HISS, SPUTTER, FIZZ **3 :** an abortive effort : FAILURE, FIASCO (the store was a ghastly ~ —E.J.Kahn)

**fizzwater** \'=,==\ *n* : SODA WATER 2a

**fizzy** \'fizē, -zi\ *adj* -ER/-EST : EFFERVESCENT, FIZZING (poured out the ~ liquid —G.A.Wagner)

**fjäll** \fē'el, 'fyel\ *n* -S *usu cap* [Sw, lit., mountain, fr. OSw *fiæll;* akin to ON *fjall* mountain, fell — more at FELL] : a Swedish breed of small white polled dairy cattle with red or black points and flecking on the sides

**fjeld** \fē'el, 'fyel\ *n* -S [Dan; akin to ON *fjall* mountain] : a barren plateau of the Scandinavian upland

**fjord** *or* **fiord** \fē'ȯ|(ə)rd, 'fyȯ|, |(ə)d\ *n* -S [Norw *fjord*, fr. ON *fjörthr* — more at FORD] : a narrow generally deep inlet of the sea between high cliffs or steep slopes (as on the coasts of Norway and Alaska); *also* : an embayment of the coast in a Scandinavian country regardless of the adjacent topography

**fjord·ed** \-ȯrdəd,-ȯ(ə)dəd\ *adj* : cleft by fjords

**fjord shoreline** *n* : a shoreline of submergence characterized by the presence of many fjords

**fl** *abbr* **1** flange **2** flash; flashing **3** flood **4** floor **5** [L *flores*] flowers **6** florin **7** [L *floruit*] he flourished **8** flour **9** fluid **10** flush **11** flute

**FL** *abbr* **1** [L *falsa lectio*] false reading **2** flag lieutenant **3** flight lieutenant **4** focal length **5** footlambert **6** foreign language

**flab** \'flab\ *n* -S [back-formation fr. *flabby*] : soft flabby body tissue

**flab·ber·gast** \'flabə(r),gast, -gaa(ə)st, -gaist,-gäst\ *vt* -ED/-ING/-S [origin unknown] : to overwhelm with shock, surprise, or wonder (as by extraordinary statements or unexpected news) **syn** see SURPRISE

**flab·ber·gast·ing·ly** \'==,===, ,==¦===\ *adv* [*flabbergasting* (pres. part. of *flabbergast*) + *-ly*] : to a flabbergasting degree (a ~ precise young man)

**flab·bi·ly** \'flabəlē, -li\ *adv* : in a flabby manner

**flab·bi·ness** \-bēnəs, -bin-\ *n* -ES : the quality or state of being flabby (the ~ of wasted unused muscles) (moral ~)

**flab·by** \'flabē, -bi\ *adj* -ER/-EST [alter. of *flappy*] **1** *of body tissues* **a :** slack and flaccid : yielding to the touch and easily moved or shaken : lacking tone and resilience or firmness (a sagging ~ belly hanging over his belt) **b :** weak and enfeebled (muscles ~ from disuse) **2 :** weak and ineffective : FEEBLE (~ liberals) (dull ~ writings); *sometimes* : tending to cause a flabby state (as of the mind or will) (roused from his ~ despondency)

**flabel** *n or vb* [*flabel*, n., fr. L *flabellum* fan; *flabel*, v., fr. *flabel*, n.] *obs* : FAN

**flab·el·lar·i·um** \,flabə'la(a)rēəm\ *n, pl* **flabellar·ia** \-rēə\ [NL, fr. L *flabellum*] : VIBRACULUM

**fla·bel·late** \flə'belət, 'flabə,lāt\ *also* **fla·bel·li·form** \flə-

Case 1:06-cv-00033 · Document 208-2 · Filed 08/30/2007 · Page 24 of 28

Case 1:06-cv-00032-JJF    Document 208-2    Filed 08/30/2007    Page 25 of 28

**storage**     **2252**     **stormy**     **storm**

*[Dense dictionary text in multiple columns; entries include headwords such as storage, storage battery, storage cell, store, storehouse, storekeeper, storeroom, storey, storied, storiette, stork, storm, storm cellar, storm center, storm cloud, storm door, storm petrel, stormy, etc.]*

Case 1:06-cv-00032-JJF   Document 208-2   Filed 08/30/2007   Page 28 of 29