IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| R.R. DONNELLEY & SONS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 06-032 (JJF) |
| CREO, INC., NEXPRESS SOLUTIONS, | ) | |
| INC., KODAK VERSAMARK, INC., | ) | |
| EASTMAN KODAK COMPANY, and | ) | |
| KODAK GRAPHIC COMMUNICATIONS | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO PRECLUDE PLAINTIFF'S EXPERTS FROM ACCESSING DESIGNATED
INFORMATION AND TO DEFENDANTS' MOTION TO DISQUALIFY
PLAINTIFF'S EXPERT DR. CHRISTOPHER VELLTURO**

1.      Plaintiff R.R. Donnelley & Sons Company ("RRD") hereby opposes Defendants' "Motion To Preclude Plaintiff's Experts From Accessing Designated Information" (D.I. 188) and Defendants' "Motion To Disqualify Plaintiff's Expert Dr. Christopher Vellturo" (D.I. 202).

2.      Defendants seek to disqualify Dr. Christopher Vellturo from being an expert for RRD and seek to preclude Mr. Frank Braswell from receiving designated information.

**Dr. Vellturo**

3.      R.R. Donnelley has sought the services of Dr. Christopher Vellturo, an economic consultant, to assist R.R. Donnelley in preparing its patent damages case.

4.      Although Defendants first filed a motion to preclude Dr. Vellturo from receiving access to Kodak's "designated information" (D.I. 188), Defendants did not argue that Dr. Vellturo should be precluded from receiving confidential information.  Indeed, Defendants admit to having provided Dr. Vellturo with confidential information themselves.  Instead,

Defendants seek to disqualify Dr. Vellturo based on his work for Kodak in an unrelated case involving different parties and different technology. Defendants then filed another motion (D.I. 202), in which they make the same arguments as in their first motion. RRD will respond to both motions here.

5.      Defendants seek to disqualify Dr. Vellturo from ever being adverse to Kodak. Defendants argue that Dr. Vellturo should be forever barred from being adverse to Kodak based on his and his firm's work as an expert for Kodak in unrelated and now completed litigation (the "Sony Litigation"). (*See* D.I. 202 at 2-4.) Defendants admit that the Sony Litigation ended in January 2007. *Id.* at 4. Defendants also admit that the Sony Litigation involved different products and different technology from what is at issue here. *Id.* at 2-4. The three apparently related cases in the Sony Litigation involved "cameras and photofinishing products, printer dock products, medical imaging printing technology, and laser printer technology." *Id.* at 3.[1]

6.      Defendants' entire argument relies on *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996), which cites a common test for disqualifying an expert: "First, was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the expert?" *Id.*

7.      The *Koch* case, however, involved a different factual situation than is present here. In *Koch*, the expert in question had consulted previously on the matters at issue in that case. *See Koch*, 85 F.3d at 1181. Although the expert did not switch sides, the party who

---

[1]      Defendants characterize the Sony Litigation as "three separate litigations" (D.I. 202 at 6), even though, based on Defendants' description, the three cases appear to be related litigation in two separate courts.

hired the expert did. *Id.* An insurance company first retained the expert in its insurance dispute with the owners and charterers of a sunken barge. After the insurance dispute settled, the insurance company joined forces with the owners and charterers. Meanwhile, another group, the tug interests, hired the expert to help with its case involving the same sunken barge. *Id.*

8.     Here, by Kodak's own admission, Dr. Vellturo's work involved a different matter and different technology. (D.I. 202 at 2-4.) This case involves digital printing presses and software used with them. In particular, this case involves the products of several companies that Kodak has purchased, including NexPress, Creo, and Versamark. The earlier Sony Litigation, on the other hand, involved consumer and medical equipment, including digital cameras and related peripherals. (D.I. 202 at 3.) The Sony Litigation did not involve the digital printing business units involved in this case.

9.     In such circumstances, there is no disqualification. In *Syngenta Seeds, Inc. v. Monsanto Co.*, 2004 WL 2223252, *4 (D. Del. 2004), Judge Robinson denied a disqualification motion, in part, because the moving party did not "identify specific confidential information defendant gave to Dr. Lee or *explain how this information relates to the present matter*." *Id.* at *3 (emphasis added).

10.    Other courts have ruled similarly on disqualification motions based on prior work on *unrelated* litigation. *See, e.g., Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092-93 (N.D. Cal. 2004); *U.S ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 251 (D.N.J. 1997). Indeed, the "rule" that Defendants cite (D.I. 202 at 5) has been rephrased to distinguish the situation in this case: "disqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed

confidential information to the expert *that is relevant to the current litigation*." *Hewlett-Packard*, 330 F. Supp. 2d at 1092-93 (emphasis added). It is "necessary to make a distinction between confidential business and financial records and confidential communications related to a particular litigation. The court accepts the argument that [the expert] must have been privy to business and financial information of HRS, such as billing and reimbursement data, which it had a legal and professional duty to keep confidential *and which may be relevant to this litigation*." *U.S ex rel. Cherry Hill*, 994 F. Supp. at 251 (emphasis added).

11.    Defendants brush past the requirement that the prior relationship with the expert have some relevancy to the current case. Instead, Defendants argue that "[i]t is nearly impossible to imagine a scenario where Vellturo, Almeida, and QES -- as a result of their confidential relationship with Kodak and its legal staff -- would not gain knowledge of Kodak's 'modus operandi, patterns of operations, decision-making process, and the like,' all of which would be highly relevant to this litigation." (D.I. 202 at 6.) Defendants fail to identify, however, any confidential information or knowledge that Dr. Vellturo or his colleagues may have gained in the Sony Litigation case that relates to this case. *See Syngenta Seeds*, 2004 WL 2223252, at *3.

12.    Indeed, Defendants misquote *Koch* when they state that confidential information such as Kodak's "modus operandi, patterns of operations, decision-making process, and the like" can serve as a basis for disqualifying Dr. Vellturo. (D.I. 202 at 6.) *Koch* notes that knowledge of a party's "modus operandi, patterns of operations, decision-making process, and the like" is a concern only for a "*longstanding series of interactions*." *Koch,* 85 F.3d at 1182. Other courts have similarly limited this concern to a "longstanding series of interactions."

*Hewlett-Packard*, 330 F. Supp. 2d at 1093; *Syngenta Seeds*, 2004 WL 2223252, at \*2. Defendants do not claim a "longstanding series of interactions" with Dr. Vellturo.

13.    Defendants do not and cannot show that the substance of Dr. Vellturo's prior work for Kodak has any relation to this matter.  Instead, Defendants seek to impose a poisoned chalice rule, where any expert who has worked for Kodak can never thereafter work for a party adverse to Kodak.

14.    Indeed, Defendants seek to disqualify Dr. Vellturo using a stricter standard than applies to attorneys, even though experts are held to a lower standard than attorneys.  *See U.S ex rel. Cherry Hill*, 994 F. Supp. at 249 ("Application of the same standard in both cases is not appropriate because experts and attorneys assume different roles in litigation.  Experts act as sources of information and opinions in order to assist parties and triers of facts to understand evidence.  Attorneys act as advocates of their client's positions and, thus, owe a higher level of fiduciary duty to the client than do experts.") (internal citations omitted).

15.    "The Delaware Lawyers' Rules Of Professional Conduct" would allow Kodak's attorneys in the Sony Litigation to be adverse to Defendants here.  Rule 1.9 restricts an attorney from being adverse to an ex-client only with regard to the "same or a substantially related matter" to the attorney's representation of that ex-client.  Ex. A, Rule 1.9.  Certainly, an attorney has a least as much, and likely far more, general knowledge of an ex-client's "modus operandi, patterns of operations, decision-making process, and the like" than an expert in an unrelated matter, such as Dr. Vellturo.  Defendants cannot hold Dr. Vellturo to a stricter standard than even governs attorneys.

16.    Defendants also impugn Dr. Vellturo's integrity.  Defendants argue that "the motivation behind QES's present listing of Kodak as a 'Selected Client' is unclear.  Most small consulting companies, such as QES, list brand name companies like Kodak to elevate their overall stature and to legitimize their operations.  But here, by listing of Kodak on QES's website, Vellturo is essentially offering his inner knowledge of Kodak's operations to any Kodak adversary willing to pay his fees. The Court should not condone such behavior."  (D.I. 202 at 7.) Defendants have no basis for such wild accusations.

17.    Defendants' own expert's (Dr. Sims) firm, CRA International, similarly lists prior clients, presumably also to show their "overall stature and to legitimize their operations."  Attached as Exhibit B is CRA International's "Intellectual Property Consulting" brochure, obtained from CRA International's website (http://www.crai.com/category.asp?typeid=7&parentid=54).  The background (on pages 3 and 8) lists myriad law firms and companies who are prior clients of that company.[2]  Presumably,

---

[2]    On page 8, CRA International lists (with commas added):  "Procter & Gamble Company, KPMG LLP, Telecom New Zealand Limited, Canadian Ministry of Energy, Clifford Chance LLP, Pillsbury Winthrop Shaw Pittman LLP, Sony Pictures Entertainment, Proskauer Rose LLP, American Chemical Society, Michael Best & Friedrich LLP, State of Oregon, Public Utilities Commission (PUC), New York Mercantile Exchange, Inc., Anheuser-Busch Companies, Inc., McLeodUSA Incorporated, Ernst & Young LLP, Universal Studios, Motorola Incorporated, FirstMark Communications Europe S.A., Kerr-McGee Corporation, Polaroid Corporation, The World Bank, Research In Motion Limited, Clausen Miller P.C., Irell & Manella LLP, California High-Speed Rail Authority, Societe Generale de Financement du Quebec (SGF), TAP Pharmaceutical Products Inc., Keker & Van Nest LLP, McMillan Binch Mendelsohn LLP, Scott Paper Company, Bacardi-Martini Ltd., Foley & Lardner LLP, Great Western Chemical Company, Air Products and Chemicals, Inc., Northeastern University, KNBC, Janssen Pharmaceutica Products, L.P., Jenkins & Gilchrist, a Professional Corporation, Heller Ehrman LLP, Shell Oil Company, Reserve Bank of Australia, Boeing Company, Texaco, Inc., Star Tribune, WeirFoulds LLP, Calfee, Halter & Griswold LLP, Ciba-Geigy Corporation, Resources for the Future, Sprint Nextel, Winn-Dixie Stores, Inc., Ontario Ministry of Finance, W.R. Grace & Company, Bromberg & Sunstein LLP, Schwartz, Cooper, Greenberger & Krauss, Chartered, Chevron Corporation, American Automobile

Defendants do not believe that their own expert is offering his "inner knowledge of [these companies'] operations to any [] adversary willing to pay his fees."

Manufacturers Association, British Horseracing Board, CAJUN Electric Power Cooperative, Inc., Bristol-Myers Squibb Company, Coors Brewing Company, Compaq Computer Corporation, United Airlines, Inc., Cravath Swaine & Moore LLP, US Department of Transportation, Robins, Kaplan, Miller & Ciresi L.L.P., Metropolitan West Securities, Inc., CSX Corporation, Perkins Coie, Brown & Bain P.A., Massachusetts Institute of Technology, CitiPower, Medtronic, Inc., Japan-US Cable Network, Intel Corporation, Albertson's, Inc., Sutherland Asbill & Brennan LLP, The Childrens Mercy Hospital, American Home Products Corporation, Comisión Federal de Telecomunicaciones, Simpson Thacher & Bartlett LLP, Amgen, Inc., Lotus Development Corporation, Epstein Becker & Green, P.C., Jefferson Smurfit Corporation, Metallgesellschaft Corporation, Paramount Communications, Power Pool of Alberta, Nokia Corporation, Montedison S.p.A., United Parcel Service, Inc. (UPS), Preston Gates Ellis & Rouvelas Meeds LLP, Delhaize Le Lion, Baker Botts L.L.P., Sutts, Strosberg LLP, Corporation for Public Broadcasting, Volvo Car Corporation, PRIMESTAR, Reynolds Metal Company, Telecom-Empresa Nacional de Telecommunicaciones, Thompson Hine LLP, Morgan, Lewis & Bockius LLP, NOVA Chemicals Corporation, Eli Lilly and Company, Smurfit-Stone Container Corporation, El Taller Colaborativo, PC, Amway Corporation, Miller Brewing Company, Williams & Connolly LLP, City of Chicago, Honigman Miller Schwartz and Cohn LLP, Tropicana Petris Technology, Inc., ABC, Inc., Katten Muchin & Rosenman LLP, Time Warner Inc., Constantine Cannon, P.C., CNA Financial Corporation, Toshiba Corporation, Federal Trade Commission, LTD Financial Services, L.P., Fitch, Even, Tabin & Flannery, Indianapolis Power & Light Company, Novartis Pharmaceuticals Corporation, Elf Antar France, Daicel Chemical Industries, Ltd., Seyfarth Shaw LLP, American Standard Companies, Inc., Thelen Reid & Priest LLP, Saab AB, Con Edison Energy, Quaker State Corporation, Tasmania Magnesite NL, Bausch & Lomb Inc., Townsend and Townsend and Crew LLP, Blake, Cassels & Graydon LLP, Sealy Hoyts Cinemas LTD., Enterprise Canada Gas Research Institute, Hunton & Williams LLP, Pitney Bowes Inc., Mt. Sinai Medical Center, National Basketball Association, Dorsey & Whitney LLP, Gardner Carton & Douglas LLP, Caterpillar Inc., Affleck Greene Orr LLP, Freeborn & Peters LLP, Monsanto Company, Ashland Inc., Bickel & Brewer, PepsiCo, Inc., Quarles & Brady LLP, O'Melveny & Myers LLP, Ericsson Inc., Omnitel Pronto Italia S.p.A., Ford Motor Company, Briggs & Stratton Corporation, American Iron and Steel Institute, Hinshaw & Culbertson LLP, Sprint Corporation, Dickstein Shapiro Morin & Oshinsky LLP, Chicago Mercantile Exchange Inc., Bechtel Group, Inc., Welsh & Katz, Ltd., Sunoco Inc., PEPSICO, INC., Allied Van Lines, Inc., Sprint PCS, Purdue University, New York State Attorney General, Pharmaceutical Research and Manufacturers of America (PhRMA), [and] AgrEvo."

18.    Defendants forget that "disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'"  *Syngenta Seeds*, 2004 WL 2223252, at *1.  Defendants have not satisfied their burden of showing that Dr. Vellturo should be disqualified.

**Mr. Braswell**

19.    R.R. Donnelley has sought the services of Mr. Frank Braswell, a consultant for the print industry, to assist R.R. Donnelley in preparing its infringement case against Defendants.

20.    Defendants also seek to preclude Mr. Braswell from reviewing documents marked Confidential or Attorneys' Eyes Only.  But Defendants' arguments go too far and would bar any expert with an actual business from qualifying under the Protective Order.

21.    Defendants speculate that Mr. Braswell might make "use of Designated Information -- either inadvertent or advertent -- to assist third parties [that] would not be traceable by Defendants."  (D.I. 188 at 2.)  Defendants have no reason to believe, however, that Mr. Braswell will violate the Protective Order.  The only argument that Defendants make is that any violation "would not be traceable by Defendants."  (*Id.* at 2.)  That concern, however, is nearly always present and cannot support Defendants' attempt to bar RRD's preferred expert.  Presumably, anyone intending to violate a Protective Order would do so seeking not to be discovered.  Moreover, a potential that a Protective Order violation would not be discovered is no reason to bar Mr. Braswell when there is no reason to believe that he would violate the Protective Order.

22.    Defendants complain that "Braswell and his firm, SMI, are apparently actively engaged in the development of VDP applications for third parties, including companies

capable of developing products, or components of products, that compete with Defendants in the VDP field." (D.I. 188 at 8.) Obviously, an expert has to be knowledgeable about the technology at issue in a case. Any expert with a business outside of being a litigation expert will likely work on projects relating to technology similar to that in an adverse party's products. Defendants' argument would bar any expert who is not solely a litigation expert.

23.     Section 9 of the Protective Order limits the use of Attorneys' Eyes Only or Confidential Information to this action, and states that this information "shall not be used by such … persons … for any business or other purpose…." Defendants provide no reason to believe that Mr. Braswell will use any information he receives inappropriately.

24.     Indeed, Defendants' technical expert, Mr. Weger, also has a business relating to the technology at issue in this case. Mr. Weger's company, Elara Systems, provides publishing systems and applications for the graphic arts industry, including designers, publishers, and printers. *See* Ex. C, Weger CV, attached to letter from N. Grow to J. Secord of July 9, 2007. Mr. Weger could similarly ignore the Protective Order and use RRD's documents to develop products.

25.     Defendants also make wild accusations about Mr. Braswell. According to Defendants, "Braswell's firm also prides itself on cracking open the intellectual property of other companies. In particular, SMI has worked on at least one project where it 'decrypt[ed]' a proprietary file format of a third-party company." (D.I. 188 at 8.) In reality, Mr. Braswell's firm expanded the functionality of a "proprietary file format" "to perform custom color processing of the images." Ex. D, http://www.systemsofmerritt.com/projects.shtml. Helping a client perform "custom color processing of images" by legally reverse-engineering a file format should not bar Mr. Braswell from receiving confidential material in this case.

26.    Defendants also mention their offer of a compromise on this issue. (D.I. 188 at 9.) Defendants offer, however, was for "Mr. Braswell not [to] work on any variable digital printing-related projects both during the pendency of this litigation, as well as for a finite period of time after the conclusion of the litigation." Ex. E, Letter from B. Koide to A. Hein of Aug. 9, 2007. Defendants are asking Mr. Braswell to agree not to work in his area of expertise for years. That is not an acceptable solution to Defendants' objections to Mr. Braswell, especially given their speculative nature.

## CONCLUSION

27.    Defendants' motion to disqualify Dr. Vellturo should be denied. His prior work for Kodak did not relate to any of the matters at issue in this case. Defendants' motion to preclude Mr. Braswell from accessing designated information should also be denied. Defendants' allegations that Mr. Braswell might misuse designated information are speculative at best.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiff*
  *R.R. Donnelley & Sons Company*

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

September 4, 2007
1226086

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 4, 2007, he caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Frederick L. Cottrell III
Richards Layton & Finger, P.A.

I also certify that copies were caused to be served on September 4, 2007, upon the following in the manner indicated:

**BY EMAIL AND BY HAND**

Frederick L. Cottrell III
Richards Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com

**BY EMAIL**

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
rmcmillan@crowell.com

*/s/ Rodger D. Smith II (#3778)*
_____
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com

# EXHIBIT A

# THE DELAWARE LAWYERS' RULES OF PROFESSIONAL CONDUCT

Preamble: A lawyer's responsibilities

Rule
1.0     Terminology
1.1.    Competence
1.2.    Scope of representation
1.3.    Diligence
1.4.    Communication
1.5.    Fees
1.6.    Confidentiality of information
1.7.    Conflict of interest: Current clients
1.8.    Conflict of interest: Current clients: Specific rules
1.9.    Duties to former clients
1.10.   Imputation of conflicts of interest: General rule
1.11.   Special conflicts of interest for former and current government officers and employees
1.12.   Former judge, arbitrator, mediator or other third-party neutral
1.13.   Organization as client
1.14.   Client with diminished capacity
1.15.   Safekeeping property
1.15A.  Trust account overdraft notification
1.16.   Declining or terminating representation
1.17.   Sale of law practice
1.18.   Duties to prospective client
2.1.    Advisor
2.2.    Intermediary (Deleted)
2.3.    Evaluation for use by third persons
2.4.    Lawyer serving as third-party neutral
3.1.    Meritorious claims and contentions
3.2.    Expediting litigation
3.3.    Candor toward the tribunal
3.4.    Fairness to opposing party and counsel
3.5.    Impartiality and decorum of the tribunal
3.6.    Trial publicity
3.7.    Lawyer as witness
3.8.    Special responsibilities of a prosecutor
3.9.    Advocate in nonadjudicative proceedings
3.10.   Communication with or investigation of jurors (Deleted)

Rule
4.1.    Truthfulness in statements to others
4.2.    Communication with person represented by counsel
4.3.    Dealing with unrepresented person
4.4.    Respect for rights of third persons
5.1.    Responsibilities of partners, managers, and supervisory lawyers
5.2.    Responsibilities of a subordinate lawyer
5.3.    Responsibilities regarding non-lawyer assistants
5.4.    Professional independence of a lawyer
5.5.    Unauthorized practice of law; multijurisdictional practice of law
5.6.    Restrictions on right to practice
5.7.    Responsibilities regarding law-related services
6.1.    Voluntary pro bono publico service
6.2.    Accepting appointments
6.3.    Membership in legal services organization
6.4.    Law reform activities affecting client interests
6.5.    Non-profit and court-annexed limited legal-service programs
7.1.    Communications concerning a lawyer's services
7.2.    Advertising
7.3.    Direct contact with prospective clients
7.4.    Communication of fields of practice and specialization
7.5.    Firm names and letterheads
7.6.    Political contributions to obtain government legal engagements or appointments by judges
8.1.    Bar admission and disciplinary matters
8.2.    Judicial and legal officials
8.3.    Reporting professional misconduct
8.4.    Misconduct
8.5.    Disciplinary authority; choice of law

## RULE 1.9  DUTIES TO FORMER CLIENTS

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b)     A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1)     whose interests are materially adverse to that person; and

(2)     about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent, confirmed in writing.

(c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1)     use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2)     reveal information relating to the representation except as these Rules would permit or require with respect to a client.

**Comment**

[1]     After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule. Under this Rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. So also a lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction. Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent. See Comment [9]. Current and former government lawyers must comply with this Rule to the extent required by Rule 1.11.

[2]     The scope of a "matter" for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that

transaction clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client. Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdictions. The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

[3]    Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

**Lawyers Moving Between Firms**

[4]    When lawyers have been associated within a firm but then end their association, the question of whether a lawyer should undertake representation is more complicated. There are several competing considerations. First, the client previously represented by the former firm must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many lawyers to some degree

limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

[5]    Paragraph (b) operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(c). Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict. See Rule 1.10(b) for the restrictions on a firm once a lawyer has terminated association with the firm.

[6]    Application of paragraph (b) depends on a situation's particular facts, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients. In such an inquiry, the burden of proof should rest upon the firm whose disqualification is sought.

[7]    Independent of the question of disqualification of a firm, a lawyer changing professional association has a continuing duty to preserve confidentiality of information about a client formerly represented. See Rules 1.6 and 1.9(c).

[8]    Paragraph (c) provides that information acquired by the lawyer in the course of representing a client may not subsequently be used or revealed by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.

[9]    The provisions of this Rule are for the protection of former clients and can be waived if the client gives informed consent, which consent must be confirmed in writing under paragraphs (a) and (b). See Rule 1.0(e). With regard to the effectiveness of an advance waiver, see Comment [22] to Rule 1.7. With regard to disqualification of a firm with which a lawyer is or was formerly associated, see Rule 1.10.

# EXHIBIT B

# Intellectual Property Consulting

The Right Decision Matters.



INTERNATIONAL



**Case Study:** To help a large manufacturing and services company extract value from its patent portfolio, CRA identified patents that had significant potential value outside of the client's core business. After identifying the relevant patents, CRA conducted a valuation of the patent portfolio that included a competitive assessment of other patents in the same technology areas. CRA then identified potential acquirers of the patents, created marketing presentations, and led negotiations on the client's behalf. The client was ultimately able to sell the patent portfolio to a strategic buyer for $24 million.

Pillsbury Winthrop Shaw Pittman LLP   Sony Pictures Entertainment   Proskauer Rose LLP   American Chemical Society   Michael Best & Friedrich LLP   State of
Oregon Public Utilities Commission (PUC)   New York Mercantile Exchange, Inc.   Anheuser-Busch Companies, Inc.   McLeodUSA Incorporated   Ernst & Young
LLP   Universal Studios   Motorola Incorporated   FirstMark Communications Europe S.A.   Kerr-McGee Corporation   Polaroid Corporation   The World Bank
Research In Motion Limited   Clausen Miller P.C.   Irell & Manella LLP   California High-Speed Rail Authority   Societe Generale de Financement du Quebec (SGF
TAP Pharmaceutical Products Inc.   Keker & Van Nest LLP   McMillan Binch Mendelsohn LLP   Scott Paper Company   Bacardi-Martini Ltd.   Foley & Lardner LLP
Great Western Chemical Company   Air Products and Chemicals, Inc.   Northeastern University   KNBC   Janssen Pharmaceutica Products, L.P.   Jenkins & Gilchrist
a Professional Corporation   Heller Ehrman LLP   Shell Oil Company   Reserve Bank of Australia   Boeing Company   Texaco, Inc.   Star Tribune   WeirFoulds LLP
Calfee, Halter & Griswold LLP   Ciba-Geigy Corporation   Resources for the Future   Sprint Nextel   Winn-Dixie Stores, Inc.   Ontario Ministry of Finance   W.R.
Grace & Company   Bromberg & Sunstein LLP   Schwartz, Cooper, Greenberger & Krauss, Chartered   Chevron Corporation   American Automobile Manufacturers
Association   British Horseracing Board   CAJUN Electric Power Cooperative, Inc.   Bristol-Myers Squibb Company   Coors Brewing Company   Compaq Computer
Corporation   United Airlnes, Inc.   Cravath Swaine & Moore LLP   US Department of Transportation   Robins, Kaplan, Miller & Ciresi L.L.P.   Metropolitan Wes

# Finding solutions to complex problems

CRA International is the world's premier economic consulting firm dedicated to helping organizations address
their most critical IP-related issues. Businesses engage CRA to help them shape corporate IP strategy and
assess the value drivers behind key transactions. Litigators rely on CRA to value the economic harm resulting
from infringement or misappropriation of intellectual property assets. In both types of assignments we are able
to apply the same rare combination of talents: deep industry specialization, broad functional experience that
crosses sector boundaries, and proven analytical approaches. Whether you face a high-stakes legal proceeding
or crucial business strategy decision, you can rely on us for clear, objective answers based on hard facts and
rigorous analysis. That's why CRA is the partner of choice when the right decision matters.

Securities, Inc.   CSX Corporation   Perkins Coie Brown & Bain P.A.   Massachusetts Institute of Technology   CitiPower   Medtronic, Inc.   Japan-US Cable
Network   Intel Corporation   Albertson's, Inc.   Sutherland Asbill & Brennan LLP   The Childrens Mercy Hospital   American Home Products Corporation   Comisión
Federal de Telecomunicaciones   Simpson Thacher & Bartlett LLP   Amgen, Inc.   Lotus Development Corporation   Epstein Becker & Green, P.C.   Jefferson
Smurfit Corporation   Metallgesellschaft Corporation   KPMG LLP   Paramount Communications   Power Pool of Alberta   Nokia Corporation   Montedison S.p.A.
United Parcel Service, Inc. (UPS)   Preston Gates Ellis & Rouvelas Meeds LLP   Delhaize Le Lion   Baker Botts L.L.P.   Sutts, Strosberg LLP   Corporation for
Public Broadcasting   Volvo Car Corporation   PRIMESTAR   Reynolds Metal Company   Telecom-Empresa Nacional de Telecommunicaciones   Thompson Hine LLP
Morgan, Lewis & Bockius LLP   NOVA Chemicals Corporation   Eli Lilly and Company   Smurfit-Stone Container Corporation   El Taller Colaborativo, PC   Amway
Corporation   Miller Brewing Company   Williams & Connolly LLP   City of Chicago   Honigman Miller Schwartz and Cohn LLP   Tropicana   Petris Technology
Inc.   ABC, Inc.   Katten Muchin & Rosenman LLP   Time Warner Inc.   Constantine Cannon, P.C.   CNA Financial Corporation   Toshiba Corporation   Federa
Trade Commission   LTD Financial Services, L.P.   Fitch, Even, Tabin & Flannery   Indianapolis Power & Light Company   Novartis Pharmaceuticals Corporation
Elf Antar France   Daicel Chemical Industries, Ltd.   Seyfarth Shaw LLP   American Standard Companies, Inc.   Thelen Reid & Priest LLP   Saab AB   Con Ediso

# Hard Facts. Clear Focus.

**It's our job to bring clarity to your most complex issues.** Our insight comes from a unique combination of talents. We offer you highly specialized experience in virtually every aspect of intellectual property, a broad range of functional skills that span the spectrum of IP issues, and the most rigorous economic and financial analysis in the business.

### Deep industry experience

At CRA, you work with consultants who have years of experience addressing IP issues. Our IP professionals are experts in intellectual property and also have hands-on project experience across literally dozens of industries, including everything from consumer products to biotechnology. We've authored numerous articles on topics ranging from the cost of "bad" patents to innovative approaches to confronting the online piracy of entertainment assets. Our IP specialists also draw from a large, diverse staff of professionals across CRA, who have worked with industry-leading companies for which patents, trademarks, copyrights, and trade secrets represent key corporate assets. As a result, we offer clients a deep and nuanced understanding of IP strategies, valuation methodologies, and transactions employed within specific industry contexts.

### Broad functional expertise

CRA is one of the world's only integrated providers of both IP business advisory and litigation support services. This synergy—further strengthened by our acquisition of InteCap in 2004—benefits both CRA and the firms we advise. Our experience advising corporate clients on IP-related valuation transactions and business negotiations adds considerable credibility to our testimony in litigation matters, which often centers on the value of IP, determination of reasonable royalty rates, and the likely outcomes of "hypothetical" negotiations. Similarly, our experience in legal proceedings enables us to advise corporate clients with respect to the risk and financial implications of IP-related strategy decisions.

### Rigorous economic and financial analysis

We scrutinize problems with exceptional rigor and thoughtfulness, and bring an extraordinary reserve of intellectual capital to every assignment. Nearly all of our senior consultants hold advanced degrees, offering clients a rare combination of MBAs, PhDs and CPAs—all under one roof. CRA has developed sophisticated decision-tree models to help businesses understand their exposure to IP-related damages across a range of probabilities and assumptions. In addition to helping corporate clients apply cutting-edge approaches to leveraging IP assets, our analysis and testimony within the litigation setting has helped to establish legal precedent in matters involving computation of lost profits. With more than one hundred senior IP consultants on staff, you can rely on us to offer you sophisticated analytical approaches tempered with results-focused, practical experience.



**Case Study:** A CRA vice president consulted to a food products company that had been found to infringe a patent covering a specialty food additive. The patent owner sought lost profits damages, including lost profits on lost sales, price erosion, and accelerated market entry. In addition, the plaintiff put forth a position claiming a significant reasonable royalty. In evaluating these damages positions, CRA conducted an in-depth analysis of the overall product market, including such issues as customers' purchase criteria, alternatives available to customers and the infringer, and the extent to which sales of the accused products influenced sales of other products. We also evaluated the effects of infringement on pricing and examined the elasticity of demand for the patented product. Our analyses involved thorough independent research, rigorous analytical studies, and a critical evaluation of available evidence to reconstruct the market as it likely would have developed "but for" the infringement. Based on our reconstruction of the market, the CRA expert concluded that the patent owner did not suffer lost profits and should receive only a reasonable royalty as compensation for the infringement. The court agreed with our analysis and denied all forms of lost profits damages. In addition, the court assessed a reasonable royalty consistent with our analysis of the business and economic factors impacting the hypothetical negotiation, including our client's cost of implementing an acceptable non-infringing alternative.



# Objective analysis

**Truth is the core of our culture.** When you work with CRA, you will receive unvarnished and direct recommendations, each grounded on a solid foundation of hard data and quantitative analysis. We offer you an unbiased perspective, clear and concise conclusions, and an independent viewpoint.

### An objective perspective

CRA's success depends on its reputation. Our consultants are literally sworn to tell the truth in some of the highest-stakes litigation proceedings. We carry that same commitment into our work in business strategy, asset valuation, and IP licensing and transaction services. Our fact-based analysis enables us to draw conclusions and present arguments that are credible and on point. We provide information and insights that can be soundly defended and presented in a manner that is as clear and compelling to a trier of fact as it is to corporate management, investors, or licensing partners.

### Data-driven analysis

Whenever a question turns on data, you need an advisor with the cutting-edge skills, technology, and techniques to analyze it. Clients trust CRA to provide accurate and comprehensive analysis of the economic benefits derived from IP, its fair market value, the most likely results of a hypothetical negotiation (often a central focus of IP litigation), the economic impact of infringement on the IP owner, and the impact of alternative licensing approaches. We have spent more than two decades helping corporate clients to maximize the value of their IP portfolios and helping law firms by providing accurate analysis and testimony on the economic impact of infringement. Working with us, you can be assured that our recommendations are backed by thorough analysis of all available information.

### Creative vision

Tough problems demand innovative solutions. CRA has the tenacity to break through dead ends and the creativity to discover original solutions. We develop novel strategies, uncover sources of information that are often unknown to our clients, and apply established theory in creative ways. CRA has a long record of thought leadership in intellectual property, pioneering new approaches that have set legal precedent, and generating lasting results for clients.



## Results at the focal point

While complex analytics lie at the heart of what we do, clients come to us to help them break through strategic roadblocks and implement practical solutions to complex problems. Most want to maximize the value of IP in the context of an asset sale or licensing program; assess the value of patents, trademarks, or copyrights in the context of a sale or licensing negotiation; or gain an objective assessment of economic harm resulting from infringement. In return, we deliver understandable analysis, clear testimony, and concrete action plans that enable clients to meet those objectives.

### contact

If you face a key business decision or a significant legal case regarding intellectual property assets, find out how CRA can help. To learn more about our expertise and service offerings within the IP arena, contact your CRA consultant, our nearest regional office, or visit us on the Web at www.crai.com.

## Related areas of expertise

CRA offers an array of industry experience and consulting services that complement our work within the intellectual property sector, including:

- Agricultural and food products
- Automotive
- Aviation, aerospace, and defense
- Biotechnology
- Chemicals
- Computer software and hardware
- Consumer products
- E-commerce
- Electric, gas, and water utilities
- Electronics
- Financial services
- Industrial products
- Medical devices
- Oil and gas
- Pharmaceuticals and drug delivery systems
- Process industries
- Semiconductors
- Sports, media, and entertainment
- Telecommunications
- Transportation

Procter & Gamble Company  KPMG LLP  Telecom New Zealand Limited  Canadian Ministry of Energy  Clifford Chance LLP  Pillsbury Winthrop Shaw Pittman LLP  Sony Pictures Entertainment  Proskauer Rose LLP  American Chemical Society  Michael Best & Friedrich LLP  State of Oregon Public Utilities Commission (PUC)  New York Mercantile Exchange, Inc.  Anheuser-Busch Companies, Inc.  McLeodUSA Incorporated  Ernst & Young LLP  Universal Studios  Motorola Incorporated  FirstMark Communications Europe S.A.  Kerr-McGee Corporation  Polaroid Corporation  The World Bank  Research In Motion Limited  Clausen Miller P.C.  Irell & Manella LLP  California High-Speed Rail Authority  Societe Generale de Financement du Quebec (SGF)  TAP Pharmaceutical Products Inc.  Keker & Van Nest LLP  McMillan Binch Mendelsohn LLP  Scott Paper Company  Bacardi-Martini Ltd.  Foley & Lardner LLP  Great Western Chemical Company  Air Products and Chemicals, Inc.  Northeastern University  KNBC  Janssen Pharmaceutica Products, L.P.  Jenkins & Gilchrist, a Professional Corporation  Heller Ehrman LLP  Shell Oil Company  Reserve Bank of Australia  Boeing Company  Texaco, Inc.  Star Tribune  WeirFoulds LLP  Calfee, Halter & Griswold LLP  Ciba-Geigy Corporation  Resources for the Future  Sprint Nextel  Winn-Dixie Stores, Inc.  Ontario Ministry of Finance  W.R. Grace & Company  Bromberg & Sunstein LLP  Schwartz, Cooper, Greenberger & Krauss, Chartered  Chevron Corporation  American Automobile Manufacturers Association  British Horseracing Board  CAJUN Electric Power Cooperative, Inc.  Bristol-Myers Squibb Company  Coors Brewing Company  Compaq Computer Corporation  United Airlnes, Inc.  Cravath Swaine & Moore LLP  US Department of Transportation  Robins, Kaplan, Miller & Ciresi L.L.P.  Metropolitan West Securities, Inc.  CSX Corporation  Perkins Coie Brown & Bain P.A.  Massachusetts Institute of Technology  CitiPower  Medtronic, Inc.  Japan-US Cable Network  Intel Corporation  Albertson's, Inc.  Sutherland Asbill & Brennan LLP  The Childrens Mercy Hospital  American Home Products Corporation  Comisión Federal de Telecomunicaciones  Simpson Thacher & Bartlett LLP  Amgen, Inc.  Lotus Development Corporation  Epstein Becker & Green, P.C.  Jefferson Smurfit Corporation  Metallgesellschaft Corporation  Paramount Communications  Power Pool of Alberta  Nokia Corporation  Montedison S.p.A.  United Parcel Service, Inc. (UPS)  Preston Gates Ellis & Rouvelas Meeds LLP  Delhaize Le Lion  Baker Botts L.L.P.  Sutts, Strosberg LLP  Corporation for Public Broadcasting  Volvo Car Corporation  PRIMESTAR  Reynolds Metal Company  Telecom-Empresa Nacional de Telecommunications  Thompson Hine LLP  Morgan, Lewis & Bockius LLP  NOVA Chemicals Corporation  Eli Lilly and Company  Smurfit-Stone Container Corporation  El Taller Colaborativo, PC  Amway Corporation  Miller Brewing Company  Williams & Connolly LLP  City of Chicago  Honigman Miller Schwartz and Cohn LLP  Tropicana  Petris Technology, Inc.  ABC, Inc.  Katten Muchin & Rosenman LLP  Time Warner Inc.  Constantine Cannon, P.C.  CNA Financial Corporation  Toshiba Corporation  Federal Trade Commission  LTD Financial Services, L.P.  Fitch, Even, Tabin & Flannery  Indianapolis Power & Light Company  Novartis Pharmaceuticals Corporation  Elf Antar France  Daicel Chemical Industries, Ltd.  Seyfarth Shaw LLP  American Standard Companies, Inc.  Thelen Reid & Priest LLP  Saab AB  Con Edison Energy  Quaker State Corporation  Tasmania Magnesite NL  Bausch & Lomb Inc.  Townsend and Townsend and Crew LLP  Blake, Cassels & Graydon LLP  Sealy  Hoyts Cinemas LTD.  Enterprise Canada  Gas Research Institute  Hunton & Williams LLP  Pitney Bowes Inc.  Mt. Sinai Medical Center  National Basketball Association  Dorsey & Whitney LLP  Gardner Carton & Douglas LLP  Caterpillar Inc.  Affleck Greene Orr LLP  Freeborn & Peters LLP  Monsanto Company  Ashland Inc.  Bickel & Brewer  PepsiCo, Inc.  Quarles & Brady LLP  O'Melveny & Myers LLP  Ericsson Inc.  Omnitel Pronto Italia S.p.A.  Ford Motor Company  Briggs & Stratton Corporation  American Iron and Steel Institute  Hinshaw & Culbertson LLP  Sprint Corporation  Dickstein Shapiro Morin & Oshinsky LLP  Chicago Mercantile Exchange Inc.  Bechtel Group, Inc.  Welsh & Katz, Ltd.  Sunoco Inc.  PEPSICO, INC.  Allied Van Lines, Inc.  Sprint PCS  Purdue University  New York State Attorney General  Pharmaceutical Research and Manufacturers of America (PhRMA)  AgrEvo





INTERNATIONAL

**Headquarters**
John Hancock Tower
200 Clarendon Street, T-33
Boston, Massachusetts 02116-5092
+1-617-425-3000 Tel
+1-617-425-3132 Fax

**www.crai.com**

# EXHIBIT C

Charles Weger
10161 Wavell Rd.
Fairfax, VA 22032
703.426.4044
cweger@elara.com

EMPLOYMENT HISTORY
Oct 92 – present  President, Elara Systems Inc. (publishing technology
consulting)
Jan 89 - Sep 92   Manager of Advanced Technologies, the Lanman
Companies (prepress)
Jan 88 - Jan 89   Project Manager, Clinical Biochemistry, Flinders
Medical Centre (database)
Dec 82 - Dec 87   Principal, Charles Weger Computer Consulting
(graphics & UI design)
Oct 80 - Dec 82   Senior Member of  Technical Staff, Computer Sciences
Corp (programming)


EDUCATION
BA (Geography), Columbia University, 1973
Ph.D. program (Geography), Columbia University, 1973-75 (not completed)
Graduate work in Science Policy, George Washington University, 1979-80
(no degree)


PATENT CASES
2000-2001: Consultant to Lane Powell Spears Lubersky (Seattle, WA)
Case: Markzware v. Creativepro.com
Relevant patent(s): 5,963,641

2002-2003: Expert Witness (case settled before trial) to Morgan &
Finnegan,L.L.P. (New York, NY)
Case: Heidelberger v. Corel
Relevant patent(s): 4,393,399

2007: Consultant to RatnerPrestia (Wilmington, DE)
Case: Markzware v. Enfocus Software, Artwork Systems Group, N.V., and
Artwork Systems, N.V.
Relevant patent(s): 5,963,641


DETAILED PROFESSIONAL EXPERIENCE

October 1992 to present
Independent Consultant • Elara Systems Inc. • Fairfax, VA

I design publishing systems and workflow automation technology for the
Graphic Arts industry, including designers, publishers, and printers. I
also concentrate on publishing and imaging applications. Because the
professional graphic arts are still largely Macintosh-based, I focus on
that platform, but I am comfortable with Windows and UNIX as well.
During this period, I spent two years as part-time CTO for RoboCatalog

Corp., a small startup providing catalog automation software. In the years since forming Elara Systems, I have served over fifty different clients in the graphic arts and computing industries. Client details upon request.

January 1989 to September 1992
Manager, Advanced Technology • The Lanman Companies • Washington, DC

I was a jack of all trades at this large color trade shop, leading the transition from traditional and high-end electronic production to desktop. I installed most of the 50 Macs, selected the first imagesetter, configured and implemented the plant-wide network. I worked with customers, plant workers, and management to help ensure smooth systems operation throughout the shop. I was an Apple and Quark developer, and when I had the time I developed mini-applications to assist in production. I was principle researcher in a Mac Photoshop vs. Scitex study that received considerable press attention. I left my job at Lanman amicably, and occasionally work on projects with them, including PhotoCD production and high-speed networks.

January 1988 to December 1989
Project Manager • Clinical Biochemistry • Flinders Medical Centre • Adelaide, Australia

I was in Australia for a year on a kind of working holiday, arranged so that my wife could visit her family. For the Biochemistry department of this 500-bed hospital, I ran a small team (4 people) designing online data collection and reporting systems based on PC compatibles networked via Ethernet to a hospital-wide VAXCluster. The PCs ran custom C software, and connected to online lab instruments for collection of specimen results. In addition to designing this system, I introduced Macs into the department and taught several short courses on the Macintosh way of doing things, including Word, Excel, etc., to biochemists and others.

December 1982 to December 1987
Principal • Charles Weger Computer Consulting • Alexandria, Virginia

As an independent consultant, I specialized in computer graphics and user-computer interface technology, but also did systems design, custom programming, and systems integration work. I worked extensively with James Foley, the well-known computer graphics expert, and his firm Computer Graphics Consultants (CGC). Some of my consulting assignments:
    For NASA, I worked with a government/contractor design team to develop user interface systems technology for NASA's Space Station and other projects, including the design of a user interface prototyping tool. On this project, I worked extensively with early versions of X-Windows. I also researched and wrote a technology survey of large-format WORM drives, including recommendations and techniques for interfacing opticals to VAXes.
    For a manufacturer of high-resolution graphics display boards for PCs and compatibles, I designed and implemented on-board firmware, including a structured display list package.

2

For a major mapping firm, I designed the graphical user interface for a line of mini-based mapping/cadastral systems for the utilities industry. I also designed and implemented (in C) a user interface testbed

For CSC/NASA, I did the overall systems requirements analysis and recommended hardware and software for a graphical spacecraft tracking system, running on an SGI Iris. I then worked on the team to design and implement the software on the IRIS, and on a NAS 8340 mainframe.

October 1980 to December 1982
Senior Member of Technical Staff • Computer Sciences Corporation • Silver Spring, MD

At CSC, I designed and programmed software for NASA projects such as Landsat D and the Massively Parallel Processor (a large-array SIMD machine).  I was in charge of a team that developed Human Factors concepts for NASA/Goddard satellite control room designers. I was principle author of many reports, including one on color and graphics issues in display design. I worked with the ACM/Siggraph Core graphics system, installing and modifying it on VAX/VMS systems, as well as with many other graphics configurations.

September 1979 to October 1980
Graduate Student, Science Policy • George Washington University • Washington, DC

In a brief respite from computing, I was a full-time graduate student in Science Policy. During this time I also was Staff Assistant to the Science Advisory Board of the U.S. EPA.

August 1978 to July 1979
Staff Programmer • Clinical Biochemistry • Flinders Medical Centre • Adelaide, Australia

I developed programs for collection and analysis of laboratory data, and for graphical display, on PDP-11 systems. I also developed a patient tracking system that evolved over time into the overall hospital patient database system.

February 1987 to August 1978
Scientific Officer • Department for the Environment • South Australian Government

I specified, designed, and developed software for a mobile Landsat data collection truck working in the Outback. I worked on field survey expeditions to collect Landsat ground truth in the Outback.

January 1977 to January 1978
Senior Computer Graphics Specialist • University Computer Center • City University of NY

I was responsible for all graphics technology for a site which served over 30 remote campuses around New York City. I evaluated and recommended graphics hardware and software for the user community, as

well as developing custom graphics systems and application software,
including a typesetter simulator for Versatec plotters and UNIX troff.

August 1976 to January 1977
Senior Programmer • GTE Information Systems • Goddard Institute for
Space Studies • NYC

I designed and wrote software for interactive display of Landsat data
on a Ramtek high-resolution color graphics display system, connected to
an Amdahl 470. I also wrote channel-level code for an Interdata
computer which interfaced the display to the Amdahl.

June 1975 to August 1976
User Services Staff • Columbia University Center for Computing
Activities • NYC

I did general user support at this large academic computer center,
assisting users with FORTRAN IBM Assembler, and PL/1 programs. I also
designed and wrote computer graphics software for Tektronix storage
tube terminals and Gould electrostatic plotters, and did limited system
programming on IBM OS/360 computers.

# EXHIBIT D

 Systems of Merritt, Inc. 

## Projects and Clients

### Our Focus

As you will see, the development team has a heavy emphasis on printing and prepress, however we also entertain other projects as needs arise. Below is a list of some of our projects and clients.

### CT/LW File Processing



This MGI project required the decryption of the proprietary Scitex (new) CT/LW file format, in order to perform custom color processing of the images. The fact that the CT/LW file format was undocumented, made the project more challenging, however we routinely handle a variety of image file formats (jpeg, tiff, etc.) from within Adobe plug-ins or from stand-alone applications which we write.

### Acrobat PDF/X-1a File Processing

This project required the application of a special color correction technology to PDF/X-1a files. The Acrobat plug-in was required to read color tables and then color correct each object in the pdf file.

### Automatic Label Printing



Our friends at Wellness Works faced a big problem each afternoon as they filled orders of nutritional supplements. Each customer required a separate custom label for each supplement bottle on the order. With hundreds of customers, multiple label sizes and almost two hundred products, printing the labels was an extremely time consuming and tedious manual process.

As an Intuit Developer, we were able to directly access the customer order information from QuickBooks. From the customer order, the label information was determined. Our experience with the PostScript Language allowed us to write code to automatically generate and print the label sheets.

### Automated Quark Xpress Layout

Producing hundreds of custom layouts each day is impossible without some kind of



Producing hundreds of custom layouts each day is impossible without some kind of automation. This project required reading job files which contained layout commands, and then building the files with a Quark Xtension. Workflow controls (stop, start, redo, approvals, etc.) and file handling were also implemented.

## Adobe Illustrator Automation Plug-in



This Illustrator Plug-in saves E-Spec customers enormous amounts of time by automatically saving design files in the proper format. Each time a designer finishes a design, they are required to also save a jpeg version. This means navigating through numerous menus and settings. With the new plug-in, the jpeg version of the file is automatically saved each time the Illustrator design file is saved.

## PostScript Analyzer Software

PostScript language files are the lifeblood of a prepress workflow system. In addition to driving imaging devices, they can provide important technical information about the job. The job data is actually carried in the PostScript file itself. With the advent of desktop su computing capability it is now possible to extract this job information from the PostScrip file in a timely manner.

The PostScript Analyzer software is an essential piece of a high-volume prepress workflo system. It is designed to keep defective files from entering the system. A defective file is one which may contain runtime (PostScript) errors, or a file which doesn't meet the prop technical specifications. A workflow system which allows faulty or corrupt production fi to enter will compromise its effectiveness, efficiency and bottom line cost.

The PostScript Analyzer technology allows the move to a hands-off workflow, necessary for high-volume prepress. Human operators are no longer required to check file characteristics before the file is entered into the production workflow. High-volume workflow systems simply cannot tolerate the cost and inefficiency of manual file checkin



The PostScript Analyzer is a proven concept. Here's what Hallmark has to say:

"Our custom Postscript file analyzer enables Hallmark to use a completely digital workfl process, so we can print high-quality products more efficiently and accurately. The analy allows us to validate the digital components within that workflow so we can maintain ou high throughput for imposable digital files."

## Process Controls for Prepress & Printing



These quality control devices were designed to give added control during the pre-press a

printing processes. For more product information:

View these target samples detailing some of the work done for GATF.
   Download in PDF format.

Visit the Graphic Arts Technical Foundation (GATF) - click on process controls.

---

## Cross-Platform InDesign Plug-in Manages Yearbook Pictures



Managing lots of templates, clip art, backgrounds and student pictures can be a real problem for the yearbook staff. This InDesign plug-in written for Friesen Yearbooks provides an elegantly useful tabbed palette interface featuring drag-and-drop image thumbnails. A black-and-white mode allows the automatic conversion of color pictures to black & white for panel pages. Additionally, images are automatically scaled, compressed, converted and color corrected according to the requirements of the yearbook manufacturer.



## Yearbook Planning Software.

This cross-platform product helps student plan their yearbook pages. In the past this was done by hand on large paper charts.

---

## Dual-Platform Yearbook Page Layout Application



The Tempo application was written for Taylor Publishing to interface directly to its production workflow systems. Through the use of page templates, the user could quickly build yearbook pages and spreads. Custom page layouts could also be created by the placement of picture and text areas. It also featued a spelling and hyphenation dictionary, plus the ability to bundle groups of pages for delivery to Taylor. The picture area boxes indicate where Taylor will place scanned photos during production.

The application was designed and written for both PC and Macintosh as a simple-to-use entry-level yearbook design program. The program output was designed to directly drive Taylor's proprietary imaging systems.



## Prepress Workflow Software.

Finding ways to make prepress workflow more efficient is one of our strongest areas of expertise. We have developed a range of technologies for advanced font handling, PostScript file processing and preflight analysis of application files using Adobe plug-in technologies and Quark Xtensions.

## Clients Include:















The above logos and trademarks are the property of their respective owners.

**Dallas**
**New York - Los Angeles**
**Moscow - London**
**Tokyo - Sydney**

**Contact info:**
info@systemsofmerritt.com
220 W. McCabe Ave.
Upland, IN 46989 U.S.A.
765.998.2133

Copyright ©2007 Systems of Merritt, Inc.

[Home] [Projects] [Engineering Staff]

# EXHIBIT E



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

Brian M. Kolde
202-624-2931
bkoide@crowell.com

August 9, 2007

025140.0000051

**VIA FACSIMILE AND U.S. MAIL**

Andrew R. Hein, Esq.
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

      Re:    *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and*
             *Kodak Graphic Communications Co.,* (D. Del.) (Civil Action No. 06-032-
             JJF)

Dear Andrew:

      This letter confirms this morning's meet and confer conference, regarding
Defendants' objections to RRD's proposed expert witnesses Christopher Vellturo
and Frank Braswell. Specifically, during our call Defendants asked RRD to further
investigate several issues.

      Regarding Dr. Vellturo, Defendants asked that RRD investigate three issues.
First, Defendants inquired when RRD first retained Dr. Vellturo and Quantitative
Economic Solutions ("QES"). Second, Defendants asked whether RRD planned to
use the services of Dr. Almeida, QES's vice president. Defendants also asked
whether RRD would agree to not work with Dr. Vellturo or QES until such time as
this dispute has been resolved.

      With respect to Mr. Braswell, Defendants asked whether Mr. Braswell
currently is working on any variable digital printing-related projects. Defendants
further inquired as to whether RRD and Mr. Braswell would agree that Mr.
Braswell not work on any variable digital printing-related projects both during the
pendency of this litigation, as well as for a finite period of time after the conclusion
of the litigation. Defendants believe this latter request is reasonable under the
circumstances, and would largely assuage our concerns.

      Defendants await RRD's response on these issues. In the meantime, and
given the timing set out in Paragraph 8 of the Stipulated Protective Order,
Defendants believe that they have satisfied the duty to meet and confer on these

Andrew R. Hein
August 9, 2007
Page 2

issues, although we remain available to meet and confer after we file our motion
today.

Best regards,

Brian M. Koide

cc:    Richard McMillan, Jr.