**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY, <br><br>     Plaintiff, <br><br>     v. <br><br> CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY, <br><br>     Defendants. | C. A. No. 06-032-JJF |
| EASTMAN KODAK COMPANY, <br><br>     Counterclaim-Plaintiff, <br><br>     v. <br><br> R.R. DONNELLEY & SONS COMPANY, <br><br>     Counterclaim-Defendant. | **REDACTED -- PUBLIC VERSION** |

## KODAK'S RESPONSIVE CLAIM CONSTRUCTION MEMORANDUM

OF COUNSEL:

Richard McMillan, Jr.
  rmcmillan@crowell.com
Jeffrey D. Sanok
  jsanok@crowell.com
Brian M. Koide
  bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Dated: September 5, 2007

Frederick L. Cottrell, III (#2555)
  cottrell@rlf.com
Jameson A.L. Tweedie (#4927)
  tweedie@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorneys for Defendants Eastman Kodak Company, Kodak Graphic Communications Company, Creo, Inc., NexPress Solutions, Inc., and Kodak VersaMark, Inc.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.    DONNELLEY CANNOT REWRITE ITS SPECIFICATION AND CLAIMS ................. 1

    A.    Donnelley Cannot Ignore that the Overwhelming Teaching of the Patents
         Requires Page-Based Processing ........................................................................... 3

    B.    Donnelley Cannot Use Dictionary Definitions to Supplant the
         Specification ........................................................................................................ 12

    C.    Donnelley Cannot Ignore Express Claim Language ............................................. 15

II.    TERM-BY-TERM ANALYSIS ...................................................................................... 16

    A.    Page-Based Terminology in the '599, '940, and '452 Patents .............................. 16

         1.    "template file" ('599 patent) (Element 1), "template" ('940 patent)
              (Element 8) , and "template page file" ('452 patent) (Element 22)............ 16

         2.    The "fixed information" terms....................................................................... 20

             a.    "fixed information" ('599 patent) (Element 2) and "fixed
                  information" ('452 patent) (Element 24) ............................................ 20

             b.    "reusable objects" ('940 patent) (Element 10)..................................... 23

         3.    "variable information" ('599 patent) (Element 3), "variable objects"
             ('940 patent") (Element 12), and "variable information" ('452 patent)
             (Element 21) ................................................................................................. 25

         4.    The "master" elements.................................................................................. 28

             a.    "master page file" ('599 patent) (Element 5)...................................... 28

             b.    "master data" ('940 patent) (Element 9) and "master data"
                  ('452 patent) (Element 23)..................................................................... 30

         5.    The Database Terms (Elements 4, 13, and 20) ............................................. 31

6. The Press Command Terms .................................................................... 33

    a. "press commands specifying sequence and content of page production by the press" ('599 patent) (Element 7) ............................. 33

    b. "page sequence commands" ('940 patent) (Element 16) ...................... 35

7. The Step-Plus-Function Elements – "Causing" Something to Occur (Elements 25 and 14) .................................................................... 35

B. Terms Unique to the '452 and '801 Patents .......................................................... 36

1. "executing a graph file to generate a graph" ('452 patent) (Element 26) .................................................................................... 36

2. "storing a first number of pages" ('801 patent) (Element 28) ...................... 37

III. CONCLUSION .................................................................................................. 38

## TABLE OF AUTHORITIES

Page

**CASES**

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003) ............................................................... 11

*Anderson v. Int'l Eng'g & Mfg., Inc.,*
  160 F.3d 1345 (Fed. Cir. 1998) ............................................................... 14

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
  334 F.3d 1294 (Fed. Cir. 2003) ............................................... 16, 21, 27

*Hockerson-Halberstadt, Inc. v. Converse, Inc.,*
  183 F.3d 1369 (Fed. Cir. 1999) ............................................................... 16

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006) ........................................................ 10-11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ............................................... 17, 25, 30

*Liebscher v. Boothroyd,*
  258 F.2d 948 (CCPA 1958) ..................................................................... 12

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ............................................................... 11

*Moleculon Research Corp. v. CBS, Inc.,*
  793 F.2d 1261 (Fed. Cir. 1986) ............................................................... 31

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001) ............................................................... 15

*Omega Eng'g, Inc, v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................... 31

*Pause Tech. LLC v. TiVo, Inc.,*
  419 F.3d 1326 (Fed. Cir. 2005) ............................................................... 16

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ................................................ 2, 3, 12, 13

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) ................................................... 3, 12

iii

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) .................................................................. 11

*Spectrum Int'l, Inc. v. Sterilite Corp.,*
    164 F.3d 1372 (Fed. Cir. 1998) .................................................................. 31

*Tehrani v. Hamilton Med., Inc.,*
    331 F.3d 1355 (Fed. Cir. 2003) .................................................... 17, 25, 30

*Terlep v. Brinkmann Corp.,*
    418 F.3d 1379 (Fed. Cir. 2005) ................................................................ 1, 21

*Toro Co. v. White Consol. Indus., Inc.,*
    199 F.3d 1295 (Fed. Cir. 1999) ................................................................ 7, 14

*United States Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) .................................................................. 15

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 2, 13

*Watts v. XL Sys., Inc.,*
    232 F.3d 877 (Fed. Cir. 2000) ................................................................... 11

**STATUTES**

37 C.F.R. § 1.83 (a)...................................................................................... 7

35 U.S.C. § 112 ...................................................................................... 35-36

## GLOSSARY OF EXHIBITS[1]

Exhibit Q          P.H. COLLIN, DICTIONARY OF PRINTING AND PUBLISHING (1989) (selected
                   excerpts)

Exhibit R          THE AMERICAN HERITAGE DICTIONARY (2d college ed. 1991) (selected
                   excerpts)

Exhibit S          Deposition of Mark G. Dreyer, December 19, 2006 (selected excerpts)

Exhibit T          MICROSOFT PRESS, COMPUTER DICTIONARY (2d ed. 1994) (selected
                   excerpts)

---

[1]     Attached as Exhibits to Declaration of Nathaniel Grow.

In its Opening Brief (D.I. 172), Plaintiff R. R. Donnelley & Sons Co. ("Donnelley") repeatedly applies a set of erroneous legal principles to justify its proposed constructions. In response, Defendants Eastman Kodak Company, Kodak Graphic Communications Company, Creo, Inc., NexPress Solutions, Inc., and Kodak Versamark, Inc. (collectively "Kodak") – rather than proceed on a term-by-term basis – first address these persistent legal errors (*see* Section I, below), and then address select disputed terms (*see* Section II, below).[2]

## I.    DONNELLEY CANNOT REWRITE ITS SPECIFICATION AND CLAIMS

Unlike golf, there are no mulligans in patent law. By the time a patent issues, the claims and the supporting description in the specification are set. A patentee does not have the luxury to take another shot. Yet it is apparent from its Opening Brief that Donnelley – more than a decade after filing its earliest application – is trying to do just that by enlarging the scope of its claims beyond what the inventors had described as their inventions. Although Donnelley's attempts to recast its claims anew, long after issuance, are pervasive throughout its Opening Brief, its tactics predictably fall into three categories – all of which run afoul with Federal Circuit precedent.[3]

First, Donnelley seeks to eradicate what the inventors actually invented and intended to envelop within their claims. Since its inception, the Federal Circuit has held that "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; *it is the single best guide to the meaning of a disputed term.*'" *Phillips v. AWH*

---

[2]    Kodak adopts the "Element" number designation used by Donnelley in its Opening Brief to facilitate the Court's comparisons. D.I. 172 at 11 n.38.

[3]    Donnelley makes several bald statements that conflict with black-letter law. For instance, Donnelley denigrates Kodak for proffering constructions that include words or phrases that do not appear in the claims. *E.g.*, D.I. 172 at 12, 27. There is, of course, no such rule. To the contrary, "[t]he construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) (internal citations omitted).

1

*Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) (emphasis added). While Donnelley pays lip service to small snippets of the specification in its Opening Brief, it does so only in a perfunctory way and as a matter of convenience. But Donnelley's approach ignores the overall teaching of the specification – which shows a page-based process variable data printing ("VDP") system.

Donnelley now goes so far as to describe the construction of each printed page as the "collag[ing]" of "elements," rather than the overlaying or merging of a variable page containing variable information with a master page containing fixed information. D.I. 172 at 6. Yet nowhere does Donnelley describe such an approach other than in its Opening Brief. The inventors certainly didn't. To the contrary, before the United States Patent and Trademark Office ("PTO"), the inventors clarified that press commands "associate the pages of the files" by "overlay[ing] variable pages on the master pages."[4] Donnelley thus is forced in its Opening Brief to dance around the inventors' own objective (i.e. non-litigation induced) description of their page-based VDP system.

Second, Donnelley attempts to supplant the specification with pieced-together dictionary definitions of claim words such as "converting," "defining," "causing," "fixed," "variable," and "sequence" – all of which Donnelley contends provide support for the "ordinary and customary meaning." *See, e.g.*, D.I. 172 at 13, 15, 16. Donnelley's approach eschews the bedrock principle of treating the specification as the "single best guide," elevating dictionaries in importance over the specification. Adopting Donnelley's claim construction approach would undoubtedly

---

[4]    In the later-filed '452 patent, which discusses the inventors' original '599 patent, the inventors used the exact language from the original '599 patent concerning the press commands associating pages together but clarified that what is meant is an "overlay [of] the variable pages on the master pages." *Compare* '599 patent, col. 16:66-67 *with* '452 patent, col. 27:56-58.

produce the "absurd results" that occur when parties "arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended." *Phillips*, 415 F.3d at 1322 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Third – perhaps even more untenable than ignoring its own specification – Donnelley ignores its own claim language. Donnelley refuses to properly defer to the claim language surrounding the disputed terms, and instead prefers to construe the disputed claim terms in a vacuum without any context or grounding in the rest of the claim. Donnelley also denigrates Kodak's constructions as not covering supposed preferred embodiments, which Donnelley claims is "rarely, if ever correct." *E.g.*, D.I. 172 at 16. But the alleged "rar[e]" occurrence is, in reality, only an artifice of Donnelley's strained and distorted application of Kodak's construction. When properly applied, Kodak's constructions cover all embodiments, including the preferred ones.

### A.  Donnelley Cannot Ignore that the Overwhelming Teaching of the Patents Requires Page-Based Processing

Once page-based processing is understood as the teaching of the patents, the true claim constructions – in view of the intrinsic evidence – flow as a natural and unavoidable consequence. As can be seen relatively easily from the parties' competing constructions set forth below, Donnelley consistently substitutes "product" for "page," or is silent as to the page dimension of the claims. This dimension starts, of course, with the "template file," which the patent defines as "pages to be produced with master or fixed printed information (i.e., printed information which does not vary from book to book of the same version) and variable printed information (which typically varies from book to book)." '599 patent, col. 6:1-5. Because "template files" specify pages, the "fixed information" of each page must specify both the

location and content of the information on the page. To only consider "fixed information" as content – as Donnelley contends – would merely connote the notion of disembodied elements of content floating around on a page without any anchor. This is not the teaching of the patents. To the contrary, the patents teach that a page of variable information is overlaid onto a master page of fixed information. If the location of the fixed information is not set on the master page, then the merging or overlay operation of the page of variable information would, quite simply, not work. Thus, the page layouts stored in the template file must define the content and position of fixed information and the position of variable information on the page.

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| template file ('599 patent) (Element 1) | A "template file" is a file that stores template pages, which are single page layouts defining the content and position of fixed information and the position of variable information on that page. | data representing the position and content of the "fixed information" and identifying the position and corresponding entry (or entries) in the database of the "variable information," which is stored in a file |
| fixed information ('599 patent) (Element 2) | Information is "fixed" if the substance (*i.e.*, content) and location of the information is common to all of the pages to be printed and does not vary from page to page. | information that does not vary from printed product to printed product |
| variable information ('599 patent) (Element 3) | "Variable information" is information that varies from printed page to printed page and is retrieved from a database. | information that typically varies from printed product to printed product |
| master page file ('599 patent) (Element 5) | A "master page file" is a copy of the template file stripped of the placeholders for the variable information and defines only the content and location of the fixed information. | data representing "fixed information," which is stored in a file |

| Claim Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| press commands specifying sequence and content of page production by the press ('599 patent) (Element 7) | "[P]ress commands specifying sequence and content of page production by the press" means instructions to a press for sequencing pages defined by the template files, the database and the master page file. | commands specifying what information goes where on the printed page and the order of the pages |
| template ('940 patent) (Element 8) | A "template" is a single page layout defining the content and position of reusable objects (fixed information) and the position of variable objects (variable information) on that page. | data representing the position and content of one or more "reusable objects" and identifying the position and corresponding entry (or entries) in the database of one or more "variable objects" |
| reusable object ('940 patent) (Element 10) | A "reusable object" is fixed information. | element of "master data" that is reused from printed product to printed product |
| variable object ('940 patent) (Element 12) | A "variable object" is variable information that is retrieved from a database and separately defined for each printed page. | element of information that typically varies from printed product to printed product |
| master data ('940 patent) (Element 9) | "[M]aster data" is data that defines the position and content of reusable (fixed) objects not contained in the database. | data representing information that does not vary from printed product to printed product |
| page sequence commands ('940 patent) (Element 16) | "[P]age sequence commands" are instructions to merge or overlay, on a page-by-page basis, pages of the master page file with corresponding pages containing variable information extracted from the database. | commands specifying what information goes where on the printed page and the order of the pages |

RLF1-3195912-1

As noted in Kodak's Opening Brief, perhaps the best description of the invention in the patents is contained in Figure 5 (shown on the right), which illustrates the method of the present invention for processing



page-based files. Figure 5 shows how the template file is processed in the uppermost and middle flow paths, respectively. In the uppermost path, the master page files are formed by taking a copy of the template file and stripping out all variable information. In the middle path, the variable page files are formed by taking another copy of the template file and stripping out the fixed information. Both master and variable page files are ultimately overlaid or merged to form the final pages based on the press commands. Figure 5 leaves no doubt that it is limited to the processing of page-based files (as opposed to files that define only an element that might appear somewhere on a page).

Tellingly, Figure 5 and any reference to it are nowhere found in Donnelley's Opening Brief.[5]  And yet – as any reader of the '599 patent will readily understand – one cannot appreciate what the inventors actually developed until Figure 5 is understood. Indeed, the vast majority of each asserted patent specification focuses on Figure 5 and the corresponding

---

[5]    Throughout its Opening Brief, Donnelley comes close to recognizing the existence of Figure 5 by citing to lines of text describing Figure 5. But in each instance, Donnelley carefully extracts any reference to Figure 5 in its Opening Brief and fails to recognize the existence of the remaining fifty-seven lines of text describing Figure 5. *See* D.I. 172 at 4 n.8, 5 n.9, 7 n.15, 7 n.16, 11 n.39, 12 n.42, 13 n.45, 16 n.63, 18 n.73, 22 n.88, 23 n.92, 23 n.93.

processing shown in Figures 10a-10f. So why did Donnelley avoid reference to Figure 5?
Because Figure 5 provides an accurate general description of Donnelley's page-based VDP
inventions – and that does not suit their case against an element-based VDP approach.

Donnelley's position today stands in stark contrast to its characterization of Figure 5 at
the time it filed its earliest application, which is pure intrinsic and objective evidence, rather than
a litigation-inspired spin.[6] In particular, Donnelley twice described Figure 5 as a "generalized"
form of the "method of the present invention." *E.g.*, '599 patent, col. 4:26-27 ("FIG. 5 is a
*generalized diagram* of the steps implemented by the method of the *present invention*."); *id.*, col.
6:66-67 ("FIG. 5 illustrates in diagrammatic *generalized form* the method of the *present
invention*."). Thus, not only does Figure 5 describe what Donnelley objectively viewed as the
"present invention," it also describes what Donnelley envisioned as the broadest and most-
generalized form. It is not merely a preferred embodiment as Donnelley now contends. *See,
e.g.*, D.I. 172 at 17.

Examining the figure itself, page files are clearly shown. *See* '599 patent, Fig. 5
(depicting "STRIPPED MASTER PAGE FILE(S)," "PDL MASTER PAGE FILE(S),"
"IMPOSED MASTER PAGE FILES," "STRIPPED VARIABLE PAGE FILE(S)," and
"IMPOSED FINAL VARIABLE PAGE FILES"). Moreover, the specification's description of
Figure 5 confirms that Donnelley's "present invention" is limited to page-based concepts. '599
patent, col. 8:27-9:3 (describing "stripped master page files," "template pages," "[page-

---

[6]     Donnelley cannot run away from its drawings as it was required during prosecution to
illustrate every claimed feature in its drawings. *See Toro Co. v. White Consol. Indus., Inc.*, 199
F.3d 1295, 1301 (Fed. Cir. 1999) (construing the claims as being limited to the structure shown
in the drawings and noting, inter alia, that the PTO rules require that the drawings "must show
every feature of the invention specified in the claims") (citing 37 C.F.R. § 1.83 (a) ("The
drawing in a nonprovisional application must show every feature of the invention specified in the
claims."); M.P.E.P. 608.02(d) (requiring "Complete Illustration in Drawings")).

description language] master page files," "imposed master page files . . .each representing a side of a piece of paper to be printed," "intermediate page files," "variable page files," "imposed final variable page files," and the "merg[ing]" of "page files").[7]

The whole notion of page-based processing is so integral to the invention that even Donnelley cannot avoid citing to portions of the specification that prove the point. For instance, Donnelley is forced to rely on the portion of the specification that refers to "master and variable page files." D.I. 172 at 20 (quoting '599 patent, col. 5:29-31). But in doing so, Donnelley attempts to soften the impact and describe its construction as merely being "consistent with" this description of "page files." D.I. 172 at 20. Again, the specification itself – the best authority – says otherwise. The portion of the specification that Donnelley quotes describes Figure 2, which is a "block diagram of a method of producing books according to the *present invention*." '599 patent, col. 4:18-19; *see also id.*, col. 5:18-32. Thus, page-based processing *is* the present invention, not merely "consistent with" the present invention.

A far more frequent Donnelley tactic is the careful – and inaccurate – use of redactions and paraphrasing. This is best revealed in its description of the collator and raster image processor ("RIP"). Both collator and RIP are not recited in the claims, but both parties recognize that an understanding of these components is critical to understand the invention. *Compare* D.I. 169 at 6 *with* D.I. 172 at 5-6. Yet when Donnelley quotes or cites to the specification's description of the collator and RIP, it goes out of its way to avoid discussing what the collator actually does—collate pages. For illustrative purposes, the portions of the text that Donnelley quotes are shown below un-bolded in Roman text and the portions that Donnelley only cites to

---

[7]     The use of "master page" in the patents comports with how the term is defined in the field of printing as a "standard layout for the pages of a book, prepared on screen in desktop publishing." Ex. Q (Dictionary of Printing and Publishing (1989)) at 147.

are in italic text; however, Donnelley fails to otherwise recognize the remaining bold text throughout its Opening Brief:

> **The master and variable page files and the press command file are** converted by a collator and raster image processor (RIP) into bitmaps which may be stored in a memory. The stored bitmaps are used to control one or more demand printers and/or any other type of display device, such as a laser printer, a CRT, an LCD display or the like so that the device displays pages having fixed and variable information thereon.
>
> * * *
>
> A collator is an electronic device for storing raster image processor files (i.e., bitmap files) and delivering selected files to a digital press in real time, such that the digital press can run at full speed while processing and printing unique page data for each book produced on the press. *The RIP 82 converts the page files to bitmap format or any other format, such as a symbolic printer control language.* **The collator 81 includes memory in the form of mass storage drives and physical memory and collates the bitmap page files. If desired, the collator 81 and/or RIP 82 may comprise a part of the press controller 80. The controller 80 instructs the collator 81 to send page files to the demand printer 84. The print system 79 may comprise the PrintStreamer system, manufactured and marketed by Barco Graphics of Belgium, while the demand printer 84 may comprise the Xeikon DCP-1 digital color press noted above.**

'599 patent, col. 5:42-49, 6:47-62 (cited and quoted in part in D.I. 172 at 3, 5-6).

This comparison is instructive. First, Donnelley completely removes the reference to "master and variable page files" being converted by the collator and RIP. *See* D.I. 172 at 3. In its place, Donnelley substitutes the term "printed product" – a phrase that does not appear in the patents and is simply Donnelley's attempt to broaden its claims through the construction process. *Id.* By using the term "printed product," Donnelley attempts – after the fact – to go beyond the master page files and variable page files, to which it should be properly restricted.

Second, Donnelley eliminates the page-based terms when it paraphrases the description of a RIP in the specification. A comparison between Donnelley's paraphrasing and the actual language of the specification shows how Donnelley again creates a whole new word – "job" – and uses it as a replacement for "page files:"

- 9 -

| Donnelley's Opening Brief (D.I. 172 at 4, n.6) | '599 Patent, col. 6:51:53 |
|---|---|
| "Rasterization is the process of converting the *job* into bitmaps that the digital press can print. Rasterization is done by the raster image process or RIP. *See* '599 Patent col. 6, ll. 51-53." | "The RIP 82 converts the *page files* to bitmap format or any other format, such as a symbolic printer control language." |

Third, the portions of the specification that Donnelley avoids make clear that the RIP not only takes in page-based files, but outputs page-based files ("bitmap page files"), which are stored by the collator. The collator in turn "collates the bitmap page files," and then – under direction of a controller – sends these bitmap "page files to the demand printer."[8] '599 patent, col. 6:47-62. All of these statements confirm that the collator receives and outputs paged-based files.[9]

Donnelley argues that, because the preferred embodiments are page-based, the Court should not limit the claims to only that which is the disclosed embodiment. D.I. 172 at 17. This is not a case, however, of limiting the claims by looking at a preferred embodiment. The page-based concepts are the essence of the invention, and, in fact, the only general embodiment. The specification supports that conclusion. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312,

---

[8]     The inventors selected the word "collator" for use in their specification because in the printing field, a "collator" is "a machine which takes sheets or printed signatures [i.e., folded sheets of paper] and puts them in order for stapling or binding." Ex. Q (Dictionary of Printing and Publishing (1989)) at 43; *see also id.* (defining "collating machine" as a "machine which collates signatures of a book or pages of document in correct order ready for binding"). An electronic collator referenced in the specification uses electronic memory to store each page, and then print each page from memory in the proper order. It makes no sense, however, to use the word "collator" for something that would piece together elements on a page – or to "collage" as Donnelley now contends.

[9]     Mark Dreyer, an inventor on all four patents, confirmed that

REDACTED

1318 (Fed. Cir. 2006) (limiting a claimed "component" to a fuel filter since the fuel filter was described as "this invention" or "the present invention" and not merely discussed as a preferred embodiment).[10] The common portions of the specification, shared by all four patents, informs the public that the page-based processing of Figure 5 was "the general invention." Kodak should be able "take the patentee at [its] word." *Honeywell*, 452 F.3d at 1318.

Despite giving the public its word on what it invented, Donnelley now seeks – in its Opening Brief – to transform the inventors' specifications from ones that overlay pages together into something vastly different and not contemplated by the inventors, i.e., "collaging" together random elements of content:

> After the RIP rasterizes this information, the press commands allow assembling the resulting stored bitmaps into the final printed product, *in a manner akin to creating a collage.*

D.I. 172 at 6 (emphasis added).

Donnelley's counsel's selection of "collage" to suggest that a collator can somehow piece together individual elements of text and graphics to form an entire page is not accidental. More importantly, it is wrong. Should Donnelley succeed in advocating that viewpoint, it would presumably argue that its claims cover element-based VDP methods. As noted above, there is no

---

[10] *See also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (construing claim to require feature that was "central to the functioning of the claimed invention[]"); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (construing claim to include limitation because "very character of the invention requires that the limitation be part of every embodiment"); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882-83 (Fed. Cir. 2000) (construing claim to include limitation, in part, because specification limited invention to embodiments with that feature). The *Microsoft* court held that "[w]hen the specification 'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'" *Id.* at 1348 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).

such support in the specification for this concept, and any such claim construction that would allow for it cannot align with the specification.

**B.    Donnelley Cannot Use Dictionary Definitions to Supplant the Specification**

Donnelley's Opening Brief is laced with citations to dictionary definitions of common words such as "converting," "defining," "causing," "fixed," "variable," "template," and "sequence." Donnelley often relies on these dictionary definitions as a surrogate for the specification because the specification – the "single best guide to the meaning of a disputed term" – conflicts with its current litigation-inspired advocacy. In other instances, Donnelley conveniently ignores dictionary definitions.

But the Federal Circuit sitting en banc has resolved that dictionary definitions have extremely limited value and under no circumstances should serve as a substitute for the specification as Donnelley now attempts to do:

> Dictionaries, by their nature, provide an expansive array of definitions. General dictionaries, in particular, strive to collect all uses of particular words, from the common to the obscure. By design, general dictionaries collect the definitions of a term as used not only in a particular art field, but in many different settings. In such circumstances, it is inevitable that the multiple dictionary definitions for a term will extend beyond the "construction of the patent [that] is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending." Thus, the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent. For that reason, we have stated that "a general-usage dictionary cannot overcome art-specific evidence of the meaning" of a claim term.

*Phillips*, 415 F.3d at 1321-22 (internal citations omitted); *see also Renishaw PLC*, 158 F.3d at 1250 (quoting *Liebscher v. Boothroyd*, 258 F.2d 948, 951 (CCPA 1958) ("Indiscriminate reliance on definitions found in dictionaries can often produce absurd results.... One need not

arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim.")).[11]

In its Opening Brief, Donnelley cites to more than twenty definitions in three different dictionaries to support the constructions of more than a third of the thirty-three disputed terms. Donnelley provides no justification for selecting these three particular dictionaries out of the many thousands of dictionaries available at the time the inventors developed its inventions. Donnelley in many instances cites to only one of three dictionaries and provides no explanation why the other definitions are lacking. *E.g.*, D.I. 172 at 21, n. 83 ("convert"); *id.* at 32, n. 116 ("separate"); *id.* at 40, n. 132 ("interpreting").

The en banc *Phillips* panel noted the flaws of the very same methods employed by Donnelley – what it called an "arbitrarily pick and choose" method – for the following reasons:

> Moreover, different dictionaries may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another. Finally, the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language. The resulting definitions therefore do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it.

415 F.3d at 1322 (internal citations omitted).

Donnelley also makes seemingly arbitrary – but no doubt intentional – decisions in selecting one alternate definition from the very same dictionary. For instance, in the context of

---

[11]    Of course, courts can rely on dictionaries for claim construction "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23 (citing *Vitronics*, 90 F.3d at 1584 n.6). In this Responsive Brief, Defendants reference alternate definitions Donnelley did not bring to the Court's attention. *See* Ex. R; Ex. T.

construing the phrase "separating the master data from the position data for each data set in preparation for rasterization" ('940 patent) (Element 15), Donnelley states as a matter of fact that "[t]he ordinary meaning of 'separating' is 'distinguishing.'" D.I. 172 at 31. Donnelley thus advocates a position where the master data is merely distinguished from position data, and would not require any division or splitting. But Donnelley fails to acknowledge that the other definitions of "separate" – from the very same dictionary it relies on – conflict with the "distinguishing" concept:

- "To set or keep apart; disunite"

- "To space apart; scatter"

- "To remove from a mixture or combination; isolate"

- "To become disconnected to severed; come apart"

- "To become divided into components or parts: *Oil and water tend to separate*"

- "Separate applies to both putting apart by removing one or more components from a mass or by the act of dissociating and to keeping apart by occupying a position between things."

Ex. R at 1118.

All of these definitions are problematic for Donnelley because any sense of "separating" that would be narrower than the broad sense of "distinguishing" would not cover the way that variable data printing ("VDP") is practiced commonly today. The point of this example, of course, is that dictionary definitions are useless without any grounding in the specification.

Donnelley's use of dictionary definitions also fails to recognize the context of its invention. In particular, dictionary definitions of "ordinary words" are "rarely dispositive of their meaning in a technological context." *Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1348 (Fed. Cir. 1998); *Toro*, 199 F.3d at 1299-1300 (reasoning that "dictionary definitions of common words are often less useful than the patent documents themselves in establishing the

usage of ordinary words in connection with the claimed subject matter"). As noted, Donnelley uses two general dictionaries to construe words such as "convert," "fixed," "represent," "store," and "define." While each of these words – as the dictionaries that Donnelley cites to prove – has some ordinary sense in a vacuum, they provide absolutely no guidance into the mind of one skilled in the art.

Apparently, to Donnelley, the claim construction process is merely a translation process where carefully selected dictionary definitions are plugged in as replacements for claim language. Indeed, Donnelley's approach fails to take into account that the claim construction process often requires more than just determining what the words of the claim mean. In some instances, a court must construe not only what the words themselves mean, but also the "legal scope" of a claim. *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) (reasoning that "the claims are construed to state the legal scope of the patented invention"). "'Claim construction' is the judicial statement of *what is and is not covered by the technical terms* and other words of the claims." *Id.* (emphasis added). "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). In contrast, Donnelley's dictionary-based approach will provide little wisdom and guidance to the claim construction process.

### C. Donnelley Cannot Ignore Express Claim Language

Even the claim language itself is not sacred to Donnelley. Donnelley frequently ignores claim language as a matter of convenience. For instance, Donnelley often focuses only on the disputed claim terms in a vacuum without consideration of the surrounding claim language or the context of the claim as a whole. A telltale sign of Donnelley's misguided approach is its failure

- 15 -

to cite the surrounding claim language in the body of its Opening Brief. Rather, reference to undisputed, but contextual, claim language is relegated by Donnelley to footnotes – and even then for only five of the thirty-three disputed terms – and an attachment. The entirety of Donnelley's forty-five-page Opening Brief fails to recite or provide any claim in its entirety.

Donnelley's isolation and segregation approach conflicts with Federal Circuit precedent requiring all of the claim language (including the disputed and undisputed terms) to be considered in construing the claims. *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, *the context of the surrounding words of the claim also must be considered* in determining the ordinary and customary meaning of those terms."); *accord Pause Tech. LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ("Proper claim construction … demands interpretation of the entire claim in context, not a single element in isolation.") (quoting *Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999)). More often than not, the surrounding claim language specifies how the disputed claim language functions. *Id.*

## II.    TERM-BY-TERM ANALYSIS

### A.    Page-Based Terminology in the '599, '940, and '452 Patents

#### 1.    "template file" ('599 patent) (Element 1), "template" ('940 patent) (Element 8) , and "template page file" ('452 patent) (Element 22)

The related terms "template file," "template," and "template page file" are recited in the claims of the '599, '940, and '452 patents, respectively. Donnelley does not dispute all three terms cover the same concept. D.I. 172 at 22 ("'template' should be interpreted consistently with 'template file' . . . . the ordinary meaning of the terms is no different between [the '599 and '940 patents]"); *id.* at 35 (same comparison between the terms "template file" and "template page

file"). This is because – as Donnelley twice admits – both the '452 patent and '940 patent use the same language to describe "template." D.I. 172 at 22, 35.

> For instance, all three patents provide the following description:

> [T]emplate files [specify] pages to be produced with master or fixed printed information (*i.e.*, printed information which does not vary from book to book of the same version) and variable printed information (which typically varies from book to book). The variable information may be stored in a database created by the publisher and the template file(s) specify the locations on particular pages for variable information stored in the database as noted in greater detail hereinafter.

*See, e.g.*, '599 patent, col. 6:1-9; '940 patent, col. 7:47-55; '452 patent, col. 8:59-67.

Despite Donnelley's admissions that there is "no differen[ce]" between the terms and that the specifications rely on the same description of "template," Donnelley is reluctant to admit that all three terms essentially mean the same thing. In the context of "template file" ('599 patent) and "template page file" ('940 patent), Donnelley accuses Kodak's constructions of "import[ing] this term ["page"] into the '599 patent," which accordingly to Donnelley would "confuse the jury." D.I. 172 at 12. Donnelley makes similar protestations with respect to Kodak's construction of "template" ('940 patent).

But Donnelley's admissions that all three terms use the "same language" in the specification seal its fate. Indeed, patentees often use "different words" in a claim "to express similar concepts, even though it may be confusing drafting practice." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004). The different words should nevertheless be given the same meaning when "[t]he context does not make clear" that the two different words were intended to have different meanings. *Id.* (construing "associated" and "connected" as having the same meaning); *Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1361 (Fed. Cir. 2003) (concluding that "intrinsic evidence indicates that the patentee meant for

- 17 -

["indicative of" and "representing"] to be interchangeable and to carry the same meaning within the claims").

Here, by Donnelley's own admission, the context of the intrinsic evidence makes clear that there is no difference between the three template terms. Kodak's constructions vary to reflect the difference that a "template file" can store many individual "templates" or "template page files." All three terms, however, deal with the notion of defining position and content of fixed information and position of variable information on single page layouts. Donnelley's construction lacks any requirement that the fixed information be fixed in location, which is essential for page-based processing.

Donnelley – enamored with the use of dictionary definitions – adopts the bizarre strategy of quoting not only dictionary definitions of disputed claim language, but also quoting dictionary definitions of words appearing in the parties' proposed claim constructions. For the term "template file," Donnelley feels compelled to contrast the dictionary definitions of two words in Donnelley's and Kodak's proposed constructions. Donnelley uses the word "representing;" Kodak uses the word "stores."[12] Neither word appears in the claims. Yet Donnelley somehow thinks that the dictionary definitions of both words are somehow probative to claim construction.

Indeed, even the dictionary definitions that Donnelley cites actually support Kodak's proposed construction. For "template file," Donnelley points to a computer science dictionary definition of "template" as "[a] pattern or form." But Donnelley fails to note that the very same definition provides alternate definitions, all of which are highly context sensitive:

---

[12]     Donnelley faults Kodak's use of the word "stores" in its construction of "template file" because the "claim does not require 'stor[es].'" D.I. 172 at 3. But Donnelley provides no reason why the word "stored" is proper in its own construction of the very same term. *Id.* at 11.

> **template** A pattern or form. An application package, for example, might include an overlay for keyboard that defines special keys and key combinations. ... *In spreadsheet programs, a template is a predesigned spreadsheet that contains formulas, labels and other elements and can be used simply by inserting information in the appropriate locations.* In MS-DOS, the template is a small portion of memory that holds the most recently typed MS-DOS commands; this command can be edited with the F1 through F5 function keys.

Ex. T at 385 (emphasis added).

While none of these context-sensitive definitions literally substitute for the specification itself, the spreadsheet definition most closely aligns with the VDP field and the notion of page-based processing described in the specification. Yet Donnelley banishes this definition from its brief.[13]

With respect to "template file" ('599 patent) and "template page file" ('452 patent), Donnelley's construction attempt to soften the impact of the word "file" in its claim. Under Donnelley's construction, a "template file" and "template page file" are merely "data . . . , which is stored in a file." Donnelley's construction would thus cover any data, which happens to be stored in some file structure somewhere. This could be a file that stores only the template-type data or it could include any file that contains other data. In computer applications, however, almost all data is eventually stored in a file somewhere. Both terms require either a "template *file*" or a "template page *file*," not a file that contains template data by happenstance.

---

[13]     It is questionable whether a general computer science dictionary is the proper authority for this invention. Indeed, the "Technical Field" for all four patents relates generally to "reproduction methods and systems." Mark Dreyer, a listed inventor on all four patents, admitted                    REDACTED                                        . A definition from a printing dictionary more closely comports with Kodak's definition of a page-based concept. Ex. Q (Dictionary of Printing and Publishing (1989)) at 237 (defining "template" in the context of text processing as "standard text (such as a standard letter or invoice) into which specific details (company address or prices or quantities) can be added").

Donnelley's selective reliance on dictionary definitions is also transparent here. Donnelley is quick to cite to a dictionary definition of "template." One would thus also expect Donnelley to cite a dictionary definition of "file," at a minimum to be intellectually consistent. But a dictionary definition of "file" is nowhere found in Donnelley's Opening Brief. This is because the very same computer dictionary that Donnelley relies upon for "template" provides a definition of "file," which is not helpful to Donnelley's cause – i.e., "[a] complete, named collection of information, such as a program, a set of data used by a program, or a user-created document. A file is the basic unit of storage that enables a computer to distinguish one set of information from another." Ex. T at 164. Thus, a "template file" or "template page file" is not merely data that happens at some point to be stored in a file as Donnelley contends, but a separate file.

### 2.     The "fixed information" terms

#### a.     "fixed information" ('599 patent) (Element 2) and "fixed information" ('452 patent) (Element 24)

The parties do not dispute that "fixed information" should have the same meaning in both the '599 and '452 patents, and only dispute what "fixed information" should mean. *Compare* D.I. 169 at 40 *with* D.I 172 at 36. The proper construction of "fixed information" in both patents flows as a natural and unavoidable consequence after analyzing the intrinsic evidence. Consistent with the page-based nature of the invention, the word "fixed" is used in the '599 patent to describe the concept of content that is common to all of the pages to be printed from a particular template page. Accordingly, both the content *and* the location are "fixed" on a printed page. Donnelley's construction of "fixed information" has at least three flaws.

First, Donnelley is wrong to attack the phrase "to be printed" in Kodak's construction. According to Donnelley, Kodak's construction is flawed because the claim itself "does not state

that the fixed information is 'common to all pages to be printed.'" D.I. 172 at 14. As an initial matter, under Donnelley's view, one questions the purpose of claim construction process at all if a proper construction could only include words from the claims. Such a rule would result in merely reshuffling the "normally terse claim language," and would not provide any wisdom to "understand and explain, but not to change, the scope of the claims." *See Terlep*, 418 F.3d at 1382. Further, Donnelley's attack on the "to be printed" portion of Kodak's construction conflicts with Donnelley's own construction of the very same term. Specifically, Donnelley claims that "to be printed" in Kodak's construction is too narrow because "pages could be produced for viewing on a monitor or stored later." D.I. 172 at 14. In other words, Donnelley faults Kodak's construction for being limited to printed products, and excluding the notion of displayed or stored images. But Donnelley hypocritically fails to reconcile why it own construction of the very same term recites "printed product." D.I. 172 at 13-14. The words "printed product" in Donnelley's construction would likewise exclude the notion of stored pages or displayed pages.

Second, Donnelley fails to reconcile the effect of the surrounding claim language on construction of the disputed term "fixed information." For instance, in claim 11 of the '599 patent, "fixed information" is recited in the context of the following term:

> developing a template file defining pages *to be printed* with *fixed information common to all of the pages* and variable information unique to each page

'599 patent, col. 20:36-38.

Thus, the surrounding claim language establishes that "fixed information" relates to "pages to be printed" and that it is "common to all of the pages." In the '599 patent, the very earliest patent that was filed, the inventors were merely adding claim language to further clarify and define what "fixed information" meant. *Brookhill*, 334 F.3d at 1299. The '599 patent

- 21 -

describes and claims only one type of "fixed information," which is "common to all of the pages" and which is "to be printed." By the time the inventors filed the '452 patent, they no longer needed to add this clarifying language. The prior definition was already set in the '599 patent, a related patent that was filed more than two years before. Thus, in the '452 patent, the inventors merely used the phrase "fixed information" without recitation of "pages to be printed" and "common to all of the pages" in the claims. But the later-filed '452 patent could not erase what was already set by the '599 patent. Thus, "fixed information" as first defined in the context of the '599 patent should also apply to the '452 patent.

Third, Donnelley's construction improperly applies a portion of the specification relating to versions, which was described as one alternative embodiment. Donnelley recites only a small portion of the discussion of versions out of context. Read in its entirety, an understanding of versions becomes clear:

> As noted above, the apparatus and method of the present invention may be utilized to produce not only books of a single version (i.e., where corresponding pages differ only in terms of the variable information stored in the database) but also books of different versions. In the latter case, the books of different versions have different fixed and variable information. The fixed and/or variable information may vary in terms of content or appearance (i.e., style, location, rotation, position, etc.) or both in different versions.

*See, e.g.*, '599 patent, col. 13:26-35.

Thus, Donnelley's patents describe a single-version embodiment and mutli-version embodiment. In the single-version embodiment, the fixed information is the same for every page and the "pages differ only in terms of the variable information stored in the database." *See id.*, col. 13:29-30. In the multiple-version embodiment, there are several different versions each with separate masters. For any given version, however, just like the single-version embodiment, the fixed information is the same for every page within that version and the pages will again differ only with respect to variable information. '599 patent, col. 6:3-4 ("fixed printed information

(i.e., printed information which does not vary from book to book of the same version)"). If one compares fixed information from different versions, it may of course vary in terms of location and content.

Kodak's construction is entirely consistent with versions. As noted above, claim 11 of the '599 patent recites "developing a template file defining pages with fixed information common to all of the pages and variable information unique to each page." *See* '599 patent, col. 20:36-38. The claim only requires the development of "a" – meaning a single – template file. A single template file would correspond to the single-version embodiment as there would only be one template for each page. In the context of the multi-version embodiment, the same template file could also correspond to the template file of a particular version. Other versions (and correspondingly other template files) could be covered as the claim only recites at least one template file being created. But the creation of other template files does not change the definition of "fixed information." For a given template file, the information does not vary in content or position. Because only one template – which corresponds to one version – is claimed, there is no need to account for the differences between versions in the claim construction of "fixed information." Kodak's construction would still cover the different versions, as more than one template file can be created.

### b.    "reusable objects" ('940 patent) (Element 10)

Donnelley – no doubt intentionally – devotes little discussion to its construction of "reusable objects." D.I. 172 at 23-24. The discussion is devoid of any reference to the specification, which is not surprising as the phrase "reusable objects" is absent from the specifications of all four asserted patents, and indeed first saw the light of day in the claims of the '940 patent. Accordingly, the only evidence that Donnelley can point to support its construction is the claim language "master data representing reusable objects to be printed" from

- 23 -

the '940 patent. From this claim language, Donnelley concludes – without providing any explanation – that a "reusable object is a subset of 'master data' that is reused from printed product to printed product or, in other words, an element of the 'master data' that does not vary from printed product to printed product." D.I. 172 at 24.

Donnelley's arguments do not even pass the red-face test. First, the claim language upon which Donnelley relies only states that master data "represent[s]" reusable objects to be printed. It does not suggest or imply – as Donnelley claims – that "reusable objects" are subsets or elements of "master data."

Second, Donnelley's construction is essentially reading its claim in a vacuum without any reference to the specification. When read in the context of the specification, it becomes clear that "reusable objects" to the extent Donnelley is entitled any scope of coverage, is limited to the concept of "fixed information." *See* D.I. 169 at 40-41. Because the term "reusable object" is nowhere found in the specification, Donnelley is caught in a classic Catch-22 when it comes to the construction of that term. On the one hand, Donnelley claims to have developed two separate concepts – "fixed information" and "reusable objects" – each of which should be construed differently. On the other hand, however, Donnelley is bound by the limitations of the specification, and that the only support for either concepts traces back to the exact same legacy language recited in the '599 patent specification. Even Donnelley admits the nature of its Catch-22 by acknowledging that the two constructions are "similar" and "largely parallel[]." D.I. 172 at 24.

But Donnelley's after-the-fact distinction between "fixed information" and "reusable objects" is nothing more than an idea spawned in the minds of Donnelley's litigation counsel by the prosecution counsel that coined the term in the first place. It is not distinguishable from the

specifications. Nowhere does the specification of the '940 patent disclose two separate concepts or even use the term "reusable objects." Moreover, as Kodak has previously noted, Donnelley claims that the written support for "reusable objects" dates back to the '599 specification. The portions of the '599 patent to which Donnelley claims support for "reusable objects" all link back to "fixed information." As noted above, "different words" may express "similar concepts" when the "context does not make clear" that the two different words were intended to have different meanings. *Innova/Pure*, 381 F.3d at 1121 (construing "associated" and "connected" as having the same meaning); *Tehrani*, 331 F.3d 1355, 1361 (Fed. Cir. 2003) (concluding that "intrinsic evidence indicates that the patentee meant for ["indicative of" and "representing"] to be interchangeable and to carry the same meaning within the claims"). Here, Donnelley admits that the context for both "fixed information" and "reusable objects" is the same, and thus leaves no doubt that both terms should be construed to have the same meaning.

3.    **"variable information" ('599 patent) (Element 3), "variable objects" ('940 patent") (Element 12), and "variable information" ('452 patent) (Element 21)**

Donnelley lodges two main disputes with Kodak's construction of "variable information" ('599 patent) (Element 3), "variable objects" ('940 patent) (Element 12), and "variable information" ('452 patent) (Element 21).

First, applying a distorted view of Kodak's construction that would require that information "must vary," Donnelley summarily concludes that Kodak's construction does not cover a preferred embodiment. But Donnelley can only create this occurrence by distorting Kodak's proposed constructions. Donnelley assumes that Kodak's use of the word "varies" in its constructions means "must vary." But even the same specification language that Donnelley relies to construe this term illustrates that the word "varies" can be qualified. For instance, Donnelley relies on the specific portion of the specification:

- 25 -

> As noted in greater detail hereinafter, the data may be specified by a publisher using a personal computer 54 or any other type of computer and may comprise one or more template files specifying pages to be produced with master or fixed printed information (i.e., printed information which does not vary from book to book of the same version) and variable printed information (which *typically varies* from book to book).

'599 patent, col. 5:65-6:5 (emphasis added).

The inventors thus recognized in the specification that the word "varies" has a range of meanings, and attempted to qualify their description here with "typically varies." Thus, the word "varies" itself can cover situations where something varies all the time ("must vary") or varies sometimes ("typically varies"). Kodak merely uses the word "varies" consistent with the specification, and Kodak is of course well aware that certain "variable information" in the sample database might not change from printed page to printed page because of the way a particular database is structured. Kodak opted to not use the word "typically" in its construction because – as explained in its Opening Brief – the specification does not provide any precision to this term. D.I. 169 at 29. Kodak's constructions – when properly applied – thus cover the preferred embodiments. If it would help the Court address Donnelley's "issue" here, Kodak would propose the following clarification:

| Term | Kodak's Construction | Donnelley's Construction |
|---|---|---|
| "variable information" ('599 patent) (Element 3) | information that [can] var[y] from printed page to printed page and is retrieved from a database | information that typically varies from printed product to printed product |
| "variable information" ('452 patent) (Element 21) | information that [can] var[y] from printed page to printed page and is retrieved from a database | information that typically varies from printed product to printed product |

Donnelley's next major bone of contention regarding the construction of these terms is the requirement in Kodak's proposed constructions that the "variable information" and "variable objects" must be "retrieved from a database." D.I. 172 at 25. Here, similar to the discussion of "fixed information" above, the "variable" limitations should be construed in the context of the

surrounding claim language. *Brookhill*, 334 F.3d at 1299. Turning first to the '599 patent, the relevant claim language recites:

> assembling a database having entries therein each representing variable information to be printed

'599 patent, col. 20:40-41.

The claims require that each entry of the database represent "variable information." Donnelley's support to the contrary amounts to mere gossamer, and once again demonstrates how Donnelley attempts to avoid the specification through the careful use of redactions and paraphrasing. Donnelley claims:

> Nor is Defendants' added restriction supported by the specification. Indeed, immediately after defining variable information, the specification states that the "variable information may be stored in a database . . ." [quoting '599 patent, col. 6:5-7].

D.I. 172 at 16.

Donnelley thus suggests that the specification teaches that the storage of variable information in a database is optional. Presumably the variable information can appear out of thin air. That is not the intent, however, of the portion of the specification quoted by Donnelley, when read in its surrounding context:

> The variable information may be stored in a database *created by the publisher* and the template file(s) specify the locations on particular pages for variable information stored in the database as noted in greater detail hereinafter.

'599 patent, col. 6:5-9 (emphasis added).

In other words, the inventors were merely saying that one type of database that could have been used was a particular type of database, which was "created by the publisher" – they were not foreclosing other types of databases created by other means. Moreover, in "greater detail" the specification goes onto to link the database and variable information:

RLF1-3195912-1

> A database 108 is also developed by the publisher using the personal computer 54 specifying the content of variable information to be placed in variable information areas, for example, the areas 110, 112 on the pages P1, P4, respectively, of FIGS. 6a and 6b.

'599 patent, col. 8:10-14.

The specification thus leaves no doubt that "variable information" is retrieved from the database.

### 4.    The "master" elements

#### a.    "master page file" ('599 patent) (Element 5)

Donnelley lobs two primary objections to Kodak's construction of "master page file" in the '599 patent. First, Donnelley portrays Kodak's construction as the "the exact process the preferred embodiment uses to produce the 'master page file.'" D.I. 172 at 17. The corresponding section of the specification describes the generation of the master page file:

> The template files are duplicated to create working files. One set of working files is stripped of all area data relating to placement of variable information to create stripped master page files 120 defining template pages having only fixed information thereon.

'599 patent, col. 8:24-27.

At bottom, the dispute relates to whether the above-quoted language is describing a preferred embodiment or the general description of the invention. But the Court need not look any further than the specification itself to resolve this issue. The above-quoted portion of the specification is part of the description of Figure 5, which as noted above, was twice described in the specification as a "generalized" form of the "method of the present invention." '599 patent, col. 4:26-27 ("FIG. 5 is a *generalized diagram* of the steps implemented by the method of the *present invention.*"); *id.*, col. 6:66-67 ("FIG. 5 illustrates in diagrammatic *generalized form* the method of the *present invention.*"). Accordingly, the specification – the most-objective and

honest view of Donnelley's invention – describes Kodak's construction as merely a generalized form of the invention, not a preferred embodiment as Donnelley contends.[14]

Second, Donnelley faults Kodak's construction for requiring "*only* the content and location of the fixed information." D.I. 172 at 17. Donnelley relies on claiming conventions and ascribes an open meaning to these terms – i.e., that the claim language requires merely that the master page file "define" the fixed information, and is not limited "only" to holding such information. In making this argument, Donnelley ignores the overwhelming teaching of the specification that the invention of the patents is limited to a master page file with only fixed information. Indeed, as noted in the specification language quoted above, this is exactly what is described as part of the generalized invention. '599 patent , col. 8:24-27 ("One set of working files is stripped of all area data relating to placement of variable information to create stripped master page files 120 defining template pages having **only** fixed information thereon.").[15] Thus, the specification's definition of master page files trumps any general open meaning that might be ascribed to "defined" in a vacuum.

---

[14]     The inventors' use of the term "generalized" stands in contrast to the practice of many other inventors that carefully characterize their figures as merely illustrating one aspect or a particular embodiment of the invention. Here, the Donnelley inventors intentionally chose the exact opposite tact by describing Figure 5 as a generic representation if its invention. The inventors should be held to that description.

[15]     Donnelley also claim that Kodak's construction would "improperly import" the word "only" from independent apparatus claim 6 into independent method claim 11. D.I. 172 at 17. As evinced by their failure to cite any authority, there is no such doctrine.

b.    "master data" ('940 patent) (Element 9) and "master
      data" ('452 patent) (Element 23)

The parties agree that "master data" should be construed consistently in both the '940 and
'452 patents, although they dispute what meaning should be ascribed. *Compare* D.I. 169 at 42-
43 *with* D.I. 172 at 37.

Kodak's construction of "master data" is consistent with its construction of "master page
file" in the '599 patent. As with the other analogous terms discussed above, both "master data"
and "master page file" – although different on their face – should nevertheless be construed to
have the same scope because the context provided by the intrinsic evidence does not distinguish
between the two. As noted above, "different words" may express "similar concepts" when the
"context does not make clear" that the two different words were intended to have different
meanings. *Innova/Pure*, 381 F.3d at 1121 (construing "associated" and "connected" as having
the same meaning); *Tehrani*, 331 F.3d 1355, 1361 (Fed. Cir. 2003) (concluding that "intrinsic
evidence indicates that the patentee meant for ["indicative of" and "representing"] to be
interchangeable and to carry the same meaning within the claims"). As is evident from
Donnelley's silence, no where does the intrinsic evidence distinguish the concept of "master
data" from "master page files." Such discussion is lacking because, at bottom, there is only one
"master" concept, which is page-based. Accordingly, Kodak's proposed constructions construe
"master data" as covering the same concept as "master page file."

Donnelley further apparently argues that "master data" should not define the "position"
as Kodak contends because claim 19, which depends from claim 11, recites "a position of the
master data in the first template differs from a position of the master data in the second
template." D.I. 172 at 27. This merely supports Kodak's proposed construction by showing that
"position" is inherently part of the concept of "master data." Claim 19 merely addresses the

- 30 -

inventors' conception of having "versions," where two different sets or versions of master data – each with corresponding templates – can have the same content but be located in different positions within their respective versions.[16]

### 5.    The Database Terms (Elements 4, 13, and 20)

In the construction of the database terms, Donnelley – once again – distorts Kodak's construction to support its contention that Kodak leaves out the preferred embodiments. D.I. 172 at 19. That is not the case. Donnelley makes the following argument:

> Defendants wrongly assert that "each entry in the database represents variable information." In a patent claim, "having," as in a database having entries there," means the database has entries that represent variable information, not all entries do. The specification explains that not all entries in the database represent variable information – some represent a "control code": "[t]he COPIES field may be used as a control code to select the number of book copies to be produced.

Kodak understands that transitional verbs such as "having" or "comprising" sometimes have a conventional open-ended meaning. However, they should not be used as "weasel word[s] with which to abrogate claim limitations." *See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986) (holding that a step which recites engaging "eight cube pieces as a composite cube" does not read on a step which engages more than eight cube pieces, despite the use of the transitional term "comprising").

---

[16]    In the support of this term and throughout its Opening Brief, Donnelley cites to *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) for the proposition that claim terms are presumed to have the same meaning across all patents. But *Omega* is a case that relates to prosecution disclaimer. In particular, the *Omega* court noted that the presumption that the "same claim term in the same patent or related patents carries the same construed meaning" applies when the disputed term is the same "throughout all five patents in the genealogy" and "the patentee made a clear and unmistakable disclaimer of claim scope in its prosecution" in the parent application. *Id.* at 1334. Thus, by citing and relying on *Omega*, Donnelley concedes that a "clear and unmistakable disclaimer" was made during prosecution of the '599 patent, and that the prosecution disclaimer should apply throughout all of the asserted patents.

Here, the claim language itself specifies that the 'database ha[s] entries therein," and that "each" entry in the database "represent[s] variable information." *See* '599 patent, col. 19:31-32. Accordingly, there is no entry in the database that is not variable information. Kodak's construction is completely consistent with the sample database described in the specification. The sample database is described as having a number of fields (e.g., Addressline1, Addresssline2, etc.) and shows nine records:

| Version | Addressline1 | Addressline2 | Addressline3 | Addressline4 | Addressline5 | Price1 | Image1 | Price2 | Copies | Barcode | Townsort |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | William Doe | 123 Elm | Chicago | Illinois | 606248923 | $22.95 | Shoes | $21.95 | 1 | 16062489231 | |
| 03 | Hugh Jorgensen | 56 Maple | Chicago | Illinois | 606248923 | $21.95 | Shirt | $20.95 | 1 | 16062489231 | |
| 02 | Jay P. Morgan | 1313 Park | Chicago | Illinois | 606248924 | $24.95 | Pants | $22.95 | 1 | 16062489241 | ■ |
| 02 | Joe Louis | 819 Elm | LaGrange | Illinois | 605251093 | $19.95 | Pants | $18.95 | 1 | 16052510931 | |
| 03 | John Smith | 926 Cossit | LaGrange | Illinois | 605251093 | $19.95 | Shoes | $15.25 | 1 | 16052510931 | |
| 01 | Len Johnson | 882 Monroe | LaGrange | Illinois | 605251093 | $19.95 | Shoes | $17.25 | 1 | 16052510931 | |
| 02 | Janet Cizmar | 916 Monroe | LaGrange | Illinois | 605251094 | $24.95 | Pants | $21.95 | 1 | 16052510941 | ■ |
| 03 | Jay Schroeder | 88 W. 77th | Brookfield | Illinois | 605241391 | $21.95 | Shirt | $19.95 | 1 | 16052413911 | |
| 03 | John Doe | 129 Madison | Brookfield | Illinois | 605241391 | $22.95 | Shirt | $19.95 | 1 | 16052413911 | ■ |

'599 patent, col. 9:36-50, 10:36-50.

But there is no description in any of the asserted patents that suggests that all of the data listed in the databases is an "entry." Rather, the word "entry" or "entries" is only used to refer to data in the databases that corresponds to variable information:

> At this point, data are also contained in each of the files 130, 132 identifying the entries in the database 108 to be placed in the areas 110, 112 during printing.

> The files 130, 132 are then converted into variable page files 134, 136. The files 134, 136 are identical to the files 130, 132, respectively, except that the data in each file identifying entries in the database are replaced by the actual data stored at such entries.

'599 patent, col. 8:53-61.

Accordingly, an "entry" only corresponds to the variable information listed in the database. Such "entries" include the Addressline1 (i.e., the recipient's name), Addressline2 (i.e., the street address), and other information that would vary from record to record. Other data

- 32 -

listed in the database that does not constitute variable information – such as the Control Code – is not an "entry" as that term is used in the '599 patent.

In sum, Kodak's proposed constructions read on the sample database of the '599 patent, and Donnelley should not hide behind "having" as a "weasel word" when the surrounding claim language makes clear that all entries in the database represent variable information.

6.    The Press Command Terms

a.    "press commands specifying sequence and content of page production by the press" ('599 patent) (Element 7)

Donnelley's justification for its construction of "press commands specifying sequence and content of page production by the press" best illustrates its disregard for the specification, and its use of dictionary definitions as a surrogate. To start, Donnelley bases its claim construction – not from the specification – but from dictionary definitions for "sequence." D.I. 172 at 19. But Donnelley isn't content in relying solely on dictionary definitions. Donnelley – without citing any authority, intrinsic or extrinsic – fabricates out of thin air a definition of "content of page production" as "the information on the page and where on the page it goes." *Id.* By failing to cite any authority, Donnelley thus concedes that it has nothing more than attorney argument – and opinion – to hang its hat.

With respect to the specification, Donnelley cites to one small snippet. Yet in doing so, Donnelley turns to the specification not for doctrinal support, but merely to show that its dictionary-sourced definition is "consistent" with the specification. D.I. 172 at 20. Moreover, Donnelley fails to acknowledge the portions of the specification that provide "greater detail" on press commands. Nor does Donnelley acknowledge the objective, non-litigation induced statement made by the inventors in the '452 patent regarding the overlaying of pages by the press commands (the portions that Donnelley quotes are shown in italic text; the portions of the

- 33 -

specification that have been clarified in the '452 patent are shown in bold text with insertions underlined):

> In addition, as noted in greater detail hereinafter, a press command file is developed which *specifies the manner in which data contained within the master and variable page files are to be merged to produce printed pages.*
> * * *
> The result of the programming of FIGS. 10a-10f is a press command file having a sequence of press commands which cause printing of pages in a desired order. In the example of FIGS. 6a and 6b, the press command file would read as follows:
> * * *
> In the foregoing example, "file.m" is a file name identifying the master page file 122 and "file.1" and "file.4" are file names identifying the variable page files 137 and 138, respectively. The number following each file name designates a particular page of the file identified by the file name. Thus, for example, "file.m" 1 designates the first page of the master file "file.m" and "file.1" designates the second page of the variable page file "file.1." The @ sign means to associate the pages of the files linked by such sign **(i.e., overlay the variable pages on the master page).**

'452 patent, col. 7:67-8:4, 27:14-18, 27:49-56.

Thus, in the '452 patent, the inventors further clarified that the press commands specify how to overlay a variable page onto a master page.[17] Even the specification language quoted by Donnelley supports Kodak's construction, not Donnelley's. Master page files and variable page files can only be "merged" by overlaying one on top of the other. This is described by way of the example in the above-quoted text.

Donnelley further faults Kodak's use of the word "defined" in its construction, purportedly as a replacement for the claim term "converting." But here – one of the few times that Donnelley actually looks at surrounding claim language (i.e., the word "converting) –

---

[17]     Kodak does not contend that the specification of the '452 patent (a related patent to the '599 patent) should be treated as the specification of the '599 patent per se. But the same inventors clarified the meaning of the same language from their earlier '599 patent, which objectively and unmistakably demonstrates the inventors' intent that merging or associating of the master and variable pages means to "overlay" them.

Donnelley refuses to look to the supporting description in the specification, which describes the press commands as being the "result of the programming of FIGS. 10a-10f." Figures 10a-10f show that the press commands are the result of – or defined by – the template file, database, and master page file. Accordingly, the additional recitation in the claims to "converting" does not erase the fact that the press commands themselves are defined by the template file, database, and master page file.

### b.     "page sequence commands" ('940 patent) (Element 16)

Donnelley's argument against Kodak's construction of "page sequence commands" amounts to nothing more than the claims "do not mention" the words in Kodak's proposed construction. D.I. 172 at 32-33. As noted in footnote 1, above, there is no such doctrine in patent law. Donnelley knows this, and is forced to cast Kodak's construction as "the exact process described in the specification." D.I. 172 at 33.

Again, strikingly absent from Donnelley's discussion of "page sequence commands" is any reference to the specification. This is because – as noted in Kodak's Opening Brief – "page sequence commands" are not found in the specification – just the claims. But the concept of "page sequence commands" must be supported in the specification, and the only arguable support is the same description for "press commands" in the context of the '599 patent. Accordingly – as noted in Kodak's Opening Brief – "page sequence commands" of the '940 patent should be construed consistent with the concept of "press commands" of the '599 patent.

### 7.     The Step-Plus-Function Clauses – "Causing" Something to Occur (Elements 25 and 14)

Donnelley attempts to avoid the strictures of 35 U.S.C. § 112, ¶ 6 by arguing that a "result" is a specific "act" under the statute. In claim 11 of the '452 patent in particular, Donnelley at least agrees that the mere recitation of "causing the display device…" to do

- 35 -

something is not a specific "act" that would avoid an interpretation under § 112, ¶ 6. D.I. 172 at 39. For it certainly informs no one as to "how" to cause such a thing to occur. Rather, it is just the "function" in a step plus function limitation.[18] To try and escape from its use of mere functional language, Donnelley argues that the result of the "causing" function, i.e., "causing a display device to display..." somehow is a specific act under the statute. But it is apparent that Donnelley is double counting the verb "display" as both a function and an act. Properly read, "causing a display to display" merely recites a function – "causing" – and a result—causing something "to display." Nothing in the clause states how, i.e., a specific act, that result is caused to be accomplished. As such, the disputed "causing" phrases should be accorded an interpretation pursuant to 35 U.S.C. § 112, ¶ 6.

**B.     Terms Unique to the '452 and '801 Patents**

      **1.     "executing a graph file to generate a graph" ('452 patent) (Element 26)**

The sole dispute with respect to the "executing a graph file to generate a graph" is the construction of "executing" in the context of the phrase as a whole. As discussed in Kodak's Opening Brief, Kodak maintains that no construction of the word "executing" is needed as the term is readily understood. D.I. 168 at 53. To the extent the Court deems construction necessary, however, Kodak proposes that "executing a graph file to generate a graph" be construed as "using a graph file to generate a graph." *Id*.

As with its other proposed construction, Donnelley starts not with the specification, but a dictionary definition. But Donnelley quotes to the dictionary definition of "interpreting" – a word that Donnelley has selected in its construction – not "executing" the word that appears in

---

[18]    Donnelley agrees that the function is "causing the display device to display pages". D.I. 172 at 39.

RLF1-3195912-1

the claim. According to Donnelley's flawed logic, because its definition of "interpreting" makes reference to "executing," the two terms are synonymous. D.I. 172 at 39-40. But Donnelley's relied-upon definition for "interpreting" shows that it does not mean just "executing:"

> **interpret** To decode and execute a statement or an instruction. The term usually refers to executing a program by decoding a statement, executing it, decoding the next statement, executing it, and so on. . . .

Ex. T at 220.

Thus, the definition of "interpret" – based on Donnelley's own dictionary definition – includes both the steps of decoding and execution, and accordingly the words "interpret" and "execute" are not interchangeable. One questions why Donnelley felt compelled to look to the definition of "interpret" to support its strained construction as opposed to "execute." The answer is found in the definition of "execute" – taken from the very same dictionary that Donnelley relies upon for "interpret" to understand – "**execute** To perform one or more instructions. . . ." Ex. T at 154. This definition of "execute" is problematic for Donnelley because it only requires that an instruction is performed, and thus is wholly consistent with Kodak's proposed construction – i.e., when a graph file is used it means that at least one instruction from the graph file is being performed. Accordingly, the Court should not condone Donnelley's pick-and-choose dictionary definition methodology. Donnelley's argumentation regarding this term lacks any integrity or consistency, and is merely driven by the end result. That should not be the goal of the claim construction process.

### 2. "storing a first number of pages" ('801 patent) (Element 28)

In proposing its construction of "storing a first number of pages," Donnelley again myopically focuses only on the disputed claim language at issue and ignores the surrounding claim language to provide context. In Donnelley's proposed construction, "storing a first number of pages" merely requires "storing a *first number*," which happens to represent pages.

For instance, in Donnelley's construction, the "first number" could be just the number "17." But the claim language as a whole clearly demonstrates that "storing a first number of pages" means that 17 pages must be stored, not just numbers. For instance, claim 1 of the '801 patent recites the following steps:

> (A) *storing a first number of pages*;

> (D) determining whether *a stored page* is to be assembled into the first book based on the first set of pagination information *wherein a second number of stored pages to be assembled into the first book is less than the first number*;

'801 patent, col. 62:54-65.

Thus step (D) establishes that the data that is stored is a "stored page," and that the total number of "stored pages" is compared between a "first number" of stored pages and a "second number" of stored pages. The surrounding claim language thus provides the only context necessary to construe this term.

## III.  CONCLUSION

For the reasons noted herein, the Court should adopt Kodak's proposed constructions.

Frederick L. Cottrell, III (#2555)
   cottrell@rlf.com
Jameson A.L. Tweedie (#4927)
   tweedie@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

OF COUNSEL:

Richard McMillan, Jr. (pro hac vice)
   rmcmillan@crowell.com
Jeffrey D. Sanok (pro hac vice)
   jsanok@crowell.com
Brian M. Koide (pro hac vice)
   bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Attorneys for Defendants Eastman Kodak Company, Kodak Graphic Communications Company, Creo, Inc., NexPress Solutions, Inc., and Kodak VersaMark, Inc.

Dated:  August 30, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2007, I electronically filed the foregoing with the

Clerk of Court using CM/ECF which will send notification of such filing(s) to the following,

who have also been served as noted:

**BY HAND DELIVERY**

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE   19899

I hereby certify that on September 5, 2007, the foregoing was sent to the following non-

registered participants in the manner indicated:

**BY FEDERAL EXPRESS**

Douglas I. Lewis                          John G. Hutchinson
Jamie L. Secord                           Sidley Austin, LLP
Sidley Austin, LLP                        787 Seventh Avenue
One South Dearborn Street                 New York, NY   10019
Chicago, IL   60603

_____
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com