IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| R.R. DONNE LLEY & SONS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 06-cv-032-JJF |
| CREO, INC., NEXPRESS SOLUTIONS, INC., KODAK VERSAMARK, INC., EASTMAN KODAK COMPANY, and KODAK GRAPHIC COMMUNICATIONS COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| EASTMAN KODAK COMPANY, | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| R.R. DONNELLEY & SONS COMPANY, | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
FOR RULE 26(c)(1) PROTECTIVE ORDER and
PLAINTIFF'S CROSS-MOTION TO COMPEL**

1.     Plaintiff R.R. Donnelley & Sons Company ("RRD") hereby opposes Defendants Creo, Inc., NexPress Solutions, Inc., Kodak Versamark, Inc., Eastman Kodak Company, and Kodak Graphic Communications Company (collectively, "Defendants") "Motion For Rule 26(c)(1) Protective Order" (D.I. 228) and cross-moves to compel Defendants to produce a witness (or witnesses) in response to RRD's Notice of Deposition.

2.      On August 23, 2007, RRD served a Notice of Deposition of Defendants Pursuant to Federal Rule of Civil Procedure 30(b)(6) (D.I. 198) seeking a witness (or witnesses) to testify about the facts underlying several of Defendants' defenses.

3.      Defendants have moved for a protective order to quash RRD's Notice of Deposition, arguing that Topics 1-13 and 15 fail to satisfy Rule 30(b)(6)'s "reasonable particularity" requirement and are improper contention topics. (D.I. 228.)

4.      RRD moves herein to compel Defendants to provide a witness (or witnesses) in response to RRD's deposition notice. RRD seeks the facts underlying Defendants' defenses, not Defendants' contentions. These facts are not otherwise available to RRD. Moreover, RRD's deposition topics are reasonably particular because they identify the information sought -- the facts underlying Defendants' defenses. Further detail is solely within Defendants' control.

**Defendants Should Be Compelled To Provide Discovery On Their Prior Art.**

5.      Topic 15 asks Defendants to designate an individual to testify about "[t]he *factual basis* for Defendants' claims that the patents-in-suit are invalid, including but not limited to (1) any such allegations supported by, refuted by, or relating to products produced by, distributed by, developed by, or used by Defendants or (2) any such allegations relating to Begin, DijiComp, Catalogic, Kodak Ektaprint, Forms Merge, Printstreamer, Access, FoxPro, IBM Graphical Data Display Manager, and Paradox." (D.I. 198 at 9 (emphasis added).) The information RRD seeks -- how the alleged prior art works -- is both reasonably particular and factual.

6.      Defendants should be compelled to provide whatever factual information they have about the alleged prior art. This case is somewhat unusual in that Defendants allege

that their own software products, including Begin, DijiComp, Scitex Catalogic, Kodak Ektaprint, and Forms Merge, are prior art. Defendants should be compelled to produce a Rule 30(b)(6) witness (or witnesses) concerning Defendants' understanding of how these products work. Because these are proprietary products, there is no other source available to RRD for determining how these products work other than through Defendants.

       7.    Defendants claim incorrectly that they have "previously provided Donnelley with the information sought in the depositions via contention interrogatory responses." (D.I. 228 at 6.) Specifically, Defendants refer to their responses to RRD's Interrogatory No. 5, which asks for the factual and legal bases for Defendants' invalidity defenses related to anticipation and obviousness. (D.I. 24 at 8.) As explained below, however, Defendants' response to Interrogatory No. 5 does not explain how Defendants understand any of the alleged prior art products to work. And, in any event, Defendants' interrogatory response does not relieve them of their obligation to produce a Rule 30(b)(6) witness concerning the alleged prior art products.

       8.    Defendants should be compelled to provide all pertinent information about how these products work, not just the information Defendants chose to include in their interrogatory response. Depositions are a means for parties, like RRD, to probe beyond the facts that Defendants have chosen to provide in an interrogatory response.

       9.    Further, Defendants' interrogatory response is sparse and does not detail how these alleged prior art references operate. Defendants' claim charts compare the alleged prior art to the asserted claims at only the highest level of detail. For some references, Defendants provide claim charts comparing the alleged prior art with the claims of the patents in

suit but do not explain how the references work.[1]  For others, including many of Defendants' own software products (*e.g.*, Begin and Catalogic), Defendants provide no claim charts at all but merely cite generally to reference manuals and overviews in their entirety.   Given that Defendants claim to have developed and sold these products, Defendants likely have additional information about how these products operate.   Defendants should be compelled to provide whatever factual information they have.

      10.    Defendants should also be compelled to provide whatever facts they have about how alleged third-party prior art operates.  For the third-party software products listed in Topic 15, such as FoxPro and IBM Graphical Data Display Manager, Defendants simply identify the products as prior art without any reference to their functionality.  (*See* Ex. A, Defs.' Redacted Fourth Supp. Resp. to RRD's First Set of Interrogs., at 41.)  If Defendants have no information beyond what they have provided in discovery (*i.e.*, documents produced and interrogatory responses), Defendants should say so and RRD will forego the deposition, provided that Defendants are precluded from later presenting further information about these products.

      11.    Defendants also complain that RRD's deposition topic lacks reasonable particularity (D.I. 228 at 6), although any further particularity rests with Defendants themselves. Defendants have identified certain products as allegedly prior art -- including their own products. Defendants, not RRD, know how those products operate with respect to the issues in this case. RRD must only "reasonably particularize the subjects of the intended inquiry so as to facilitate the responding party's selection of the most suitable deponent." *Prokosch v. Catalina Lighting,*

---

[1]    For example, in many instances in Defendants' claim charts in their response to Interrogatory No. 5, Defendants merely restate the claim language and do not provide RRD with any information as to the functionality of the prior art reference. (*See, e.g.,* Ex. A, Defs.' Redacted Fourth Supp. Resp. to RRD's First Set of Interrogs., at 28.)

*Inc.*, 193 F.R.D. 633, 638 (D. Minn. 2000); *see also Mitsui & Co. v. P.R. Water Res. Auth.*, 93 F.R.D. 62, 66 (D.P.R. 1981) (the "reasonable particularity" standard is satisfied if the Rule 30(b)(6) notice informs the defendant "of the matters which will be inquired into at the deposition" so the corporate defendant may "determine the identity and number of persons whose presence will be necessary"). Defendants unquestionably know the prior art products on which they are relying and the features of those products that relate to their invalidity claims. Defendants certainly can identify and prepare a witness to testify about these products.

12. In asserting that RRD's deposition notice is not reasonably particular, Defendants cite several cases that are simply inapposite. For example, *Kimberly-Clark Corp. v. Tyco Healthcare Retail Group*, 2007 WL 601837 (E.D. Wis. 2007), involved a deposition notice from *defendant* asking the plaintiff/patentee generally for information about "the validity of the patents-in-suit," but not specifying a subject to allow the patentee to find and/or prepare a witness. *Id.* at *3. In other words, the defendant was asking the plaintiff about defendant's own affirmative defense. In contrast, RRD seeks information about the operation of the products that Defendants allege invalidate the patents in suit.[2] Similarly, even the quotation Defendants include from *Sheehy v. Ridge Tool Co.*, 2007 WL 1548976, *1 (D. Conn. 2007), does not support Defendants' position. (D.I. 228 at 3.) RRD has not asked for a person "most knowledgeable as to the subject complaint" -- an obviously broad and general topic. Rather, RRD seeks information about how particular alleged prior art operates.

13. "As a general rule, courts will not grant protective orders that prohibit the taking of deposition testimony." *United States Equal Employment Opportunity Comm'n v.*

---

[2] To the extent that Defendants have any confusion on this point, RRD's correspondence has made it clear that it seeks information about alleged prior art only. (*See* Ex. B, RRD's Counsel's letter to Defs.' Counsel dated Sep. 20, 2007, at 2.)

*Caesars Entm't, Inc.*, 237 F.R.D. 428, 432 (D. Nev. 2006).   An order that seeks to quash a deposition under Rule 30(b)(6) in its entirety will not be granted absent "extraordinary" circumstances, which Defendants do not even purport exist.   *See Bucher v. Richardson Hosp. Auth.* 160 F.R.D. 88, 92 (N.D. Tex. 1994); *Motsinger v. Flynt*, 119 F.R.D. 373, 378 (M.D.N.C. 1988).

14.    Defendants should therefore be compelled to provide a Rule 30(b)(6) witness (or witnesses) to testify about their understanding of how alleged prior art products operate, particularly those products developed and sold by Defendants.

**Defendants Should Be Compelled To Provided Discovery On The Facts Underlying Their Affirmative Defenses.**

15.    Topics 1-13 call for "[t]he factual bases allegedly supporting, refuting, or relating to Defendants'" affirmative defenses. (D.I. 198 at 4-6.)  Discovery ends on November 2, 2007.  This case is not new.  Defendants should be compelled to provide deposition testimony related to the facts underlying their alleged defenses.

16.    Here too, Defendants' complaint that RRD's topics lack reasonable particularity rings hollow.  RRD is asking about the facts that underlie *Defendants'* defenses. Defendants must know what facts underlie their own defenses.  "Reasonable particularity" requires identifying topics such that Defendants can find and prepare a witness.  *See Mitsui*, 93 F.R.D. at 66; *Caesars*, 237 F.R.D. at 432.  Under this standard, RRD's topics are sufficiently particular.

17.    Moreover, RRD seeks the *facts underlying* Defendants' defenses, not "contention deposition topics" as Defendants argue.  (D.I. 228 at 2.)  RRD is not seeking Defendants' contentions, legal theories or positions.  Nor is RRD seeking to have a witness apply the facts to the law.  RRD just wants the facts that Defendants believe support their defenses.

18.     Topics 1-13 in RRD's Notice of Deposition (D.I. 198) are proper Rule 30(b)(6) deposition topics to discover underlying facts.  Indeed, "it would seem reasonable to expect that a party that asserts that certain defenses are available to it would be able to provide a witness to testify to the factual bases for those defenses."  *AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F. Supp. 808, 831 (M.D. Pa. 1994); *see also Omega Patents, LLC v. Fortin Auto Radio,* 2006 WL 2038534, *2 (M.D. Fla. 2006) (ordering defendants to designate a corporate witness on topics relating to the factual bases for defendants' defenses and counterclaims and ordering a second deposition at the defendants' expense upon determining that the designated individual was unprepared to address those topics); *Caesars*, 237 F.R.D. at 436 (requiring defendants to designate a corporate witness on the factual bases for defenses because it would not raise privilege issues or cause undue burden); *Security Ins. Co. of Hartford v. Trustmark Ins. Co.*, 218 F.R.D. 29, 34 (D. Conn. 2003) ("It is of no consequence that contention interrogatories may be the more appropriate route to obtain the information as nothing precludes a deposition either in lieu of or in conjunction with such interrogatories.").

19.     Defendants argue that "Kodak has already identified the factual bases for each of its defenses, pursuant to Donnelley's interrogatories." (D.I. 228 at 5, n.3.) However, Defendants' responses to RRD's Interrogatories contain little factual detail.  For example, Defendants assert a defense of laches and in support of that defense generally claim that they suffered evidentiary and economic prejudice.  The sum total of the supporting "facts" Defendants provide in their interrogatory response is:

> Due to RRD's delay in bringing suit, Defendants have suffered substantial prejudice.  By way of example, due to RRD's delay, Defendants may be unable to present a full and fair defense on the merits because of the loss of records and other evidence, the inability to find material witnesses having knowledge of past events, the destruction of third-party documents, and the

unreliability of memories of long past events. With respect to business prejudice, Defendants have continued to invest in and develop the accused software products during this delay period.

(Ex. A, Defs.' Redacted Fourth Supp. Resp. to RRD's First Set of Interrogs., at 48.) Defendants should be compelled to answer such questions as: what material witnesses are Defendants missing? What documents were destroyed? Whose memory is unreliable and what did he or she know? Similarly, Defendants should be compelled to identify what investments Defendants made and when and how RRD's patents would have affected those investments. Defendants' responses to RRD's other interrogatories are similarly sparse. (*See* Ex. A, Defs.' Redacted Fourth Supp. Resp. to RRD's First Set of Interrogs., at 48-58.) Moreover, even to the extent Defendants have identified facts, RRD has the right to probe those facts and learn what other relevant facts exist.

20.    In addition, although Defendants' interrogatory responses identify certain individuals as allegedly knowledgeable about their defenses, none of these witnesses deposed so far has had any pertinent knowledge.[3] It is simply inefficient for RRD to depose every single person listed to get further information when Rule 30(b)(6) exists to get that information efficiently.

---

[3]    For example, Defendants identified Gershon Alon, Roger Parrett, and William Sullivan in responses to various Interrogatories as having knowledge of the factual or legal bases of Defendants' defenses. (*See* Ex. A, at 11, 13, 48, 50, 52, 53, 55, 57 and 62.) Yet when asked about the bases of these defenses at deposition, the witnesses replied they could only answer at a "very high level" because they had "very little" knowledge of Defendants' factual and legal bases. (*See* Ex. C, Deposition of Gershon Alon, Aug. 9, 2007, at 131 ("I don't have much knowledge about the facts here."); Ex. D, Deposition of Roger Parrett, Aug. 16, 2007, at 166 ("I guess I can speak to it at some very high level."); Ex. E, Deposition of William Sullivan, Jul. 19, 2007, at 113 ("This is in legal jargon talking about a lot of the different claims, and I'm not familiar with all those.").)

## CONCLUSION

For these reasons, Defendants should be compelled to produce a Rule 30(b)(6) witness (or witnesses) on Topics 1-13 and 15 of RRD's Notice of Rule 30(b)(6) Deposition. These topics are sufficiently particular to identify the sought-after information and seek facts underlying Defendants' defenses. For the same reasons, RRD asks the Court to deny Defendants' motion for a protective order to quash RRD's Notice of Rule 30(b)(6) Deposition.

Alternatively, if Defendants truly believe their interrogatory responses are sufficiently detailed, RRD asks the Court to preclude Defendants from adding in any manner to their current responses to Interrogatory Nos. 1-12 and 17, including any new and/or additional facts, conclusions, or nuances. Any later disclosure would unfairly prejudice RRD.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street, P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
   *Attorneys for Plaintiff*
   *R.R. Donnelley & Sons Company*

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

October 9, 2007
1258050

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 9, 2007, he caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Frederick L. Cottrell III
> Richards Layton & Finger, P.A.

I also certify that copies were caused to be served on October 9, 2007, upon the following in the manner indicated:

### BY EMAIL AND BY HAND

> Frederick L. Cottrell III
> Richards Layton & Finger, P.A.
> One Rodney Square
> 920 N. King Street
> Wilmington, DE 19801
> cottrell@rlf.com

### BY EMAIL

> Richard McMillan, Jr.
> Crowell & Moring LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, DC 20004-2595
> rmcmillan@crowell.com

> /s/ Rodger D. Smith II
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
> rsmith@mnat.com

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>CREO, INC., NEXPRESS SOLUTIONS,<br>INC., KODAK VERSAMARK, INC.,<br>EASTMAN KODAK COMPANY, and<br>KODAK GRAPHIC COMMUNICATIONS<br>COMPANY,<br><br>    Defendants. | CIVIL ACTION No. 06-cv-032-JJF<br><br>~~ATTORNEYS EYES ONLY~~<br>~~PURSUANT TO PROTECTIVE ORDER~~ |
| EASTMAN KODAK COMPANY,<br><br>    Counterclaim-Plaintiff,<br><br>    v.<br><br>R.R. DONNELLEY & SONS COMPANY,<br><br>    Counterclaim-Defendant, | |

## CREO, INC.'S, EASTMAN KODAK COMPANY'S, AND KODAK GRAPHIC COMMUNICATIONS COMPANY'S FOURTH SUPPLEMENTAL RESPONSE TO R.R. DONNELLEY & SONS COMPANY'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 33 and 26(e) of the Federal Rules of Civil Procedure, Creo, Inc.,

Eastman Kodak Company, and Kodak Graphic Communications Company ("Defendants")

provide the following fourth supplemental response to the First Set of Interrogatories to

Defendants Creo, Inc., Eastman Kodak Company, and Kodak Graphics Communications

Company ("the Interrogatories") propounded by R.R. Donnelley & Sons Company ("RRD"):

## I.    GENERAL RESPONSES

Defendants' responses to the Interrogatories are made to the best of Defendants' current employees' present knowledge, information, and belief.  These responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of Defendants' recollection, are subject to such refreshing of recollection, and such additional knowledge of facts, as may result from its further discovery or investigation.

1.    Defendants reserve all objections or other questions as to the competency, relevance, materiality, privilege or admissibility as evidence in any subsequent hearing or proceeding of this or any other action for any purpose whatsoever of these responses.

2.    Defendants reserve the right to object on any ground at any time to such other or supplemental interrogatories as RRD may at any time propound involving or relating to the subject matter of the Interrogatories.

## II.    GENERAL OBJECTIONS

Defendants make the following general objections, whether or not separately set forth, in response to each of the Interrogatories:

1.    Defendants object generally to the Interrogatories insofar as they seek information protected by the attorney-client privilege and/or the work-product doctrine.  Such information shall not be produced in response to any interrogatory, and any inadvertent response thereto shall not be deemed a waiver of any privilege with respect to such information or of any work-product doctrine which may attach thereto.

2.    Defendants object to the introductory definitions and instructions to the Interrogatories to the extent the definitions and instructions purport to enlarge, expand, or alter in

2

any way the plain meaning and scope of any specific interrogatory, on the ground that such

enlargement, expansion, or alteration renders the interrogatory vague, ambiguous, unintelligible,

unduly broad, and uncertain.

      3.      Defendants object to all instructions, definitions, and interrogatories to the extent

they seek information not currently in Defendants' possession, custody, or control, or refer to

persons, entities, or events not known to Defendants, on the grounds that such instructions,

definitions, or interrogatories seek to require more of Defendants than any obligation imposed by

law, would subject to unreasonable and undue annoyance, oppression, burden, and expense, and

would seek to impose upon Defendants an obligation to investigate or discover information or

materials from third parties or sources who are equally accessible to RRD.

## III.    SPECIFIC OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

### INTERROGATORY NO. 1

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 46 of their Answer that "RRD has failed to state a claim upon which relief may be granted," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the persons most knowledgeable about the factual bases for those allegations.

### SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1

Subject to the foregoing general objections, RRD has failed to state a claim upon which

relief can be granted for direct and indirect infringement of the asserted patents with respect to

many of Defendants' products. RRD broadly and vaguely alleges that Kodak has infringed the

asserted patents by performing actions, "which *include but are not limited to* (i) the making,

using, offering to sell, and selling of one or more of the Kodak Software; (ii) the sale of one or

more Digital Presses…; (iii) marketing and encouraging its customers to purchase, install, and

use infringing third party software packages …; and (iv) providing and supporting its Variable

3

Print Specification ('VPS') ...."  *See* Amended Complaint ¶¶ 23, 28, 33, and 38 (emphasis

added).   Given that Defendants offer a multitude of diverse products and services, and

collectively employ tens of thousands of employees worldwide, the above generic reference to

unlimited and unspecified actions, which do not involve the specifically-named products alleged

to directly or indirectly infringe RRD's patents, is not sufficient to satisfy proper notice pleading

requirements under the Rules.

## INTERROGATORY NO. 2

State in detail all factual and legal bases for Defendants' allegations set forth in
Paragraph 47 of their Answer that "Creo has not directly infringed any claim of the '452 patent,
the '599 patent, the '940 patent or the '801 patent (collectively "Patents in Suit"), either literally
or under the doctrine of equivalents," including, but not limited to, claim charts that set forth
each claim element that allegedly is not met by Defendants' Software Products, the reasons each
such element is not met (both literally and under the doctrine of equivalents) and the identity of
the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 2

Defendants object to this interrogatory because it is overly broad and unduly burdensome

to the extent it seeks information defined by the term "Defendants' Software Products," which is

broadly defined to include "any other software product designed, marketed, sold, offered for

sale, made, used, or imported by Defendants for use in Variable Digital Printing."  The term

Variable Digital Printing is also broadly defined by RRD as "digital printing in which the content

of a page may be varied or in which the number of pages in a document may be varied."  (RRD's

1st Interrogs. at 5.)   RRD has admitted, however, that this broad definition encompasses

technologies completely unrelated to the subject matter of this suit, such as "the ink jet printer

sitting in many homes today."  (D.I. 35 at 2.)  In contrast, the Amended Complaint specifically

identifies only "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme

DL-1000 Variable Data Software, and Composer" (hereinafter "Kodak Software") as infringing

its patents. Yet RRD still seeks discovery on improper and overly broad subject matter. Defendants also object to this interrogatory as overbroad to the extent it seeks a response with respect to claims that RRD does not assert.

Defendants additionally object to this interrogatory as premature in view of the Court's Scheduling Order of February 15, 2007. Under that Order, the parties are not required to exchange proposed claim constructions until June 1, 2007. Subject to the foregoing general and specific objections, Defendants respond as follows.

With respect to the asserted apparatus claims, the Kodak Software does not contain all elements of the asserted claims, either literally or by equivalence.

With respect to the asserted method claims, Defendants do not directly infringe by selling, offering to sell, or making the Kodak Software in the United States and/or importing the software into the United States. As a matter of law, method claims can only be directly infringed by a "use," not through the sale, offer for sale, manufacture, or importation of software that allegedly performs the steps. Defendants also contend that Kodak Software does not infringe the asserted method claims, either literally or by equivalence, because when used, Kodak Software does not perform each step of the asserted method claims, for at least the reasons discussed below.

Although Defendants are not able at this juncture to fully itemize all grounds on which they should be found not to directly infringe the asserted claims of the patents in suit (once the terms of those claims are properly construed), Defendants nevertheless set forth the following preliminary bases for their non-infringement positions and reserve the right to update these bases once the Court issues its claim construction ruling.

5

In addition, with respect to the Kodak NexTreme DL-100 Variable Data Software and Kodak NexTreme DL-1000 Variable Data Software, Defendants are not in possession, custody or control of the source code for these products. Defendants also do not have detailed information regarding the functionality of these products. Accordingly, Defendants' responses with respect to these products are preliminary and, to a large extent, are based on current information and belief.

The Kodak Software does not directly infringe independent claim 1 of the '599 patent, or any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 of the '599 Patent | Non-Infringement Position |
|---|---|
| 1. An apparatus for controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | Kodak Software is not an apparatus for controlling an electronic press. |
| [a] first means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | When installed on a computer, Kodak Software does not perform the function of developing a template file using the same or equivalent structure as shown in Figs. 3-5 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not develop a template file defining pages that will be printed from fixed information and variable information. |
| [b] a database having entries therein each representing variable information to be printed; | Kodak Software does not have a database wherein each entry represents variable information to be printed. |
| [c] second means responsive to the first developing means for developing a master page file from the template file wherein the master page file defines the fixed information; and; | When installed on a computer, Kodak Software does not perform the function of developing a master page file from a template file using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not develop a master page file. |

| Claim 1 of the '599 Patent | Non-Infringement Position |
|---|---|
| [d] means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying sequence and content of page production by the press. | When installed on a computer, Kodak Software does not perform the function of converting a template file and a database into press commands using the same or equivalent structure as shown in Figs. 5 & 11 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not utilize press commands. |

In operation, Kodak Software does not directly infringe independent claim 11 of the '599 patent, or any claims depending from claim 11, for at least the reasons provided below:

| Claim 11 of the '599 Patent | Non-Infringement Position |
|---|---|
| 11. A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | In operation, Kodak Software does not control an electronic press. |
| [a] developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | In operation, Kodak Software does not perform the step of developing a template file defining pages that will be printed from fixed information and variable information. |
| [b] assembling a database having entries therein each representing variable information to be printed; | In operation, Kodak Software does not perform the step of assembling a database wherein each entry represents variable information to be printed. |
| [c] developing a master page file from the template file wherein the master page file defines the fixed information; and; | In operation, Kodak Software does not perform the step of developing a master page file.<br><br>In operation, Kodak Software does not perform the step of developing a master page file from a template file. |
| [d] converting the template files[,] the database and the master page file into press commands specifying sequence and content of page production by the press. | In operation, Kodak Software does not utilize press commands.<br><br>In operation, Kodak Software does not perform the step of converting a template file, a database, and a master page file into press commands. |

The Kodak Software does not directly infringe independent claim 1 of the '940 patent, or any claims depending from claim 1, for at least the reasons provided below:

7

| Claim 1 – '940 Patent | Non-Infringement Position |
|---|---|
| 1. An apparatus for controlling an electronic press, comprising: | Kodak Software is not an apparatus for controlling an electronic press. |
| means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed; and | When installed on a computer, Kodak Software does not perform the function of developing template data using the same or equivalent structure as shown in Figs. 3-5 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not develop template data defining pages that will be printed from master data representing reusable objects and position data representing variable objects. |
| means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable object and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. | When installed on a computer, Kodak Software does not perform the function of causing an electronic press to print output pages by separating master data from position data using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not have a database having a number of entries representing variable objects.<br><br>When installed on a computer, Kodak Software does not cause an electronic press to print output pages by performing the function of separating master data from position data using the same or equivalent structure as shown in Figs. 5 & 10 and corresponding descriptions.<br><br>When installed on a computer, Kodak Software does not separate master data from position data for each set of template data in preparation for rasterization. |

In operation, Kodak Software does not directly infringe independent claim 11 of the '940 patent, as well as any claims depending from claim 11, for at least the reasons provided below:

8

| Claim 11 of the '940 Patent | Non-Infringement Position |
|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | In operation, Kodak Software does not control an electronic press. |
| [a] developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | In operation, Kodak Software does not perform the step of developing a data set of master data. In operation, Kodak Software does not develop data sets representing templates defining pages that will be printed from master data representing reusable objects and position data representing variable objects. |
| [b] developing a database having a number of entries each of which represents a variable object; and; | In operation, Kodak Software does not perform the step of developing a database wherein each entry represents a variable object. |
| [c] causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | In operation, Kodak Software does not perform the act of causing an electronic press to print output pages by separating master data from position data. Nor does Kodak Software act in accordance with or equivalent to Figs. 5 & 10 and corresponding descriptions. In operation, Kodak Software does not separate master data from position data for each data set in preparation for rasterization. |

In operation, Kodak Software does not directly infringe independent claim 1 of the '452 patent, or any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 of the '452 Patent | Non-Infringement Position |
|---|---|
| 1. A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | In operation, Kodak Software does not perform the step of developing a template page file of master data. |

9

| Claim 1 of the '452 Patent | Non-Infringement Position |
|---|---|
| (b) selecting areas of the page for the variable graphics information; | |
| (c) specifying graph parameters; and | |
| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | In operation, Kodak Software does not perform the act of causing a display device to display pages in accordance with or in a manner equivalent to Figs. 5, 9 & 10 and corresponding descriptions. |

In operation, Kodak Software does not literally infringe claim 1 of the '801 patent, as well as any claims depending from claim 1, for at least the reasons provided below:

| Claim 1 – '801 Patent | Kodak's Proposed Constructions |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | In operation, Kodak Software does not assemble books. |
| (A) storing a first number of pages; | In operation, Kodak Software does not perform the step of storing a first number of pages. |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | In operation, Kodak Software does not perform the step of specifying a set of pagination information by indicating whether a stored page is to be selectively included in a book. |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | In operation, Kodak Software does not perform the step of specifying a set of pagination information by indicating whether a stored page is to be selectively included in a book. |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a book. In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a first book based on a first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number. |

10

| Claim 1 – '801 Patent | Kodak's Proposed Constructions |
|---|---|
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a book. In operation, Kodak Software does not perform the step of determining whether a stored page is to be assembled into a second book based on a second set of pagination information wherein a third number of stored pages to be assembled into the second book is less than the second number and no greater than the first number. |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | |
| (G) producing the first and second books in a single press run. | |

Defendants contend that for at least the reasons given above, Kodak Software does not directly infringe the asserted claims of the patents in suit when properly construed.

Persons knowledgeable about these facts include, but are not limited to, Ronen Cohen, Ron Peleg, Ronit Konfidan, Nardi Jaacobi, Gershon Alon, Roger Parrett, John Desautels, William Sullivan, the named inventors of the patents in suit, and unnamed individuals of Datalogics, Inc. and Printable Technologies, Inc.

Defendants reserve the right to supplement their response to this interrogatory after receipt of RRD's claim construction and infringement contentions, after the Court's order on claim construction, and at other appropriate times in this litigation.

## INTERROGATORY NO. 3

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 48 of their Answer that "Creo has not indirectly infringed any claim of the Patents in Suit, either literally or under the doctrine of equivalents," including, but not limited to, claim charts that set forth each claim element that allegedly is not met by Defendants' Software

11

Products and Third Party Software Products suitable for the use with Defendants' Hardware Products (including, but not limited to, software products made or developed by XMPie, Atlas Software, Datalogics, GMC Software, Pageflex, PrintSoft, and Extream), the reasons each such element is not met (both literally and under the doctrine of equivalents) and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 3

Defendants object to this interrogatory because it is overly broad and unduly

burdensome to the extent it (i) seeks information defined by the terms "Defendants' Software

Products," "Defendants' Hardware Products" and "Third Party Software Products" and (ii)

references XMPie, Atlas Software, Datalogics, GMC Software, Pageflex, PrintSoft, and

Extream. The Amended Complaint only references "Kodak Software," which is defined as

including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-

1000 Variable Data Software, and Composer." Further, the only hardware referenced in the

Amended Complaint as allegedly "intended for use with infringing software" are "Digital

Presses," which are defined in the Amended Complaint as including "the NexPress 2100 Plus

Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the

NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak

Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300,

CS 340, CS400, and CS600." Moreover, Defendants object to being required to answer

Interrogatories relating to the operation of the Third Party Software Products given the absence

of any specific allegations by RRD concerning such products. Defendants also object to this

interrogatory as a premature contention interrogatory given that the Court has yet to construe the

claims.

Subject to the foregoing general and specific objections, Defendants respond by

incorporating by reference their response to Interrogatory No. 2 with respect to the Kodak

Software. Defendants further respond that they cannot — as a matter of law — be found liable

12

for inducing infringement under 271(b) before becoming aware of the patents in suit and without

having an affirmative intent to cause direct infringement. As a result, Defendants cannot be held

liable for inducing infringement when Defendants are not in possession or control of information

sufficient to explain how an accused product functions. Defendants did not intentionally engage

in conduct or otherwise take action to induce infringement of the patents in suit by users of

Kodak Software or Digital Presses, as those terms are defined in the Amended Complaint.

Likewise, Defendants are not liable for contributory infringement under 271(c) prior to

first becoming aware of the patents in suit. Defendants are also not liable for indirect

infringement to the extent that no single entity practices each of the steps or elements of the

patents in suit, and thus, directly infringes. Finally, the Kodak Software and Digital Presses

identified in the Amended Complaint are capable of substantial, noninfringing uses.

Persons knowledgeable of these facts include, but are not limited to, Ronen Cohen, Ron

Peleg, Ronit Konfidan, Nardi Jaacobi, Gershon Alon, Leonid Khain, Eli Shalhon, Benny

Shimshoni, Roger Parrett, John Desautels, William Sullivan, William Schweinfurth, John Peck,

and the named inventors of the patents in suit.

Defendants reserve the right to supplement their response to this interrogatory after

receipt of RRD's claim construction and infringement contentions, after the Court's order on

claim construction, and at other appropriate times in this litigation.

## INTERROGATORY NO. 4

State in detail all factual and legal bases for Defendants' allegations set forth in
Paragraph 49 of their Answer that "RRD is estopped from alleging that Creo infringes the claims
of the Patents in Suit under the doctrine of prosecution history estoppel," including, but not
limited to, the identification of all documents and communications on which Defendants rely to
support their contention and the identity of the persons most knowledgeable about the factual
bases for those allegations.

13

## RESPONSE TO INTERROGATORY NO. 4

Subject to the foregoing general objections, Defendants respond as follows:

The documents and communications on which Defendants intend to rely include the patents in suit, prior art of record, prosecution histories of the patents in suit, and the prosecution histories of patents related thereto. The prosecution histories include numerous arguments and narrowing amendments that limit the scope of the asserted claims through argument-based estoppel and/or amendment-based estoppel. Ultimately, whether prosecution history estoppel applies will depend on the claim construction and any range of equivalents asserted by RRD. It is premature at this time, with a *Markman* hearing scheduled for September 2007, to speculate how RRD will attempt to read the claims and whether RRD will take a position that contradicts the prosecution histories. To date, however, Defendants have identified at least the following actions taken by RRD in the prosecution history, which may form estoppels.

### U.S. Patent No. 6,952,801

- Supplementary Amendment dated May 18, 2000 in U.S. Application Ser. No. 08/802,337 at 2-3 (claim amendments) & 4-5 (arguments to distinguish claims over prior art).

- Amendment A dated November 4, 2002 at 6-7 (arguments to distinguish claims over prior art).

- Amendment B dated March 28, 2003 at 2-3 (claim amendments) & 4 (remarks re claim amendments).

- Amendment C dated September 8, 2003 at 4-6 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated March 4, 2004 at 1-5 (remarks re prior art).

14

- Amendment D dated March 8, 2004 at 2-5 (claim amendments) & 6-7 (arguments to distinguish claims over prior art).

- Amendment E dated Jul 26, 2004 at 2-5 (claim amendments) & 6-8 (arguments to distinguish claims over prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 1 of the '801 patent:

| Claim Language | Estoppel |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | Amendment D (amendment) |
| (A) storing a first number of pages; | Amendment B (amendment; argument); Amendment C (argument) |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment D (amendment); Amendment E (amendment) |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment E (amendment) |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment D (amendment); Amendment E (amendment; argument) |
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | Amendment A (argument); Amendment B (amendment; argument); Amendment C (argument); Amendment E (amendment; argument) |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | Amendment C (argument); Amendment D (amendment; argument); Amendment E (amendment; argument) |
| (G) producing the first and second books in a single press run. | Amendment D (amendment; argument); Amendment E (amendment; argument) |

15

**U.S. Patent No. 6,844,940**

- Preliminary Amendment dated January 12, 2004 at 3-6 (claim amendments) & 7 (remarks).

- Supplemental Preliminary Amendment dated March 29, 2004 at 2-5 (claim amendments) & 6 (remarks).

- Petition to Make Special Under MPEP § 708.02 dated March 29, 2004 at 1-4 (arguments to distinguish claims over prior art).

- Request for Reconsideration of Petition to Make Special dated June 10, 2004 at 1-4 (arguments to distinguish claims over prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 11 of the '940 patent:

| Claim Language | Estoppel |
|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | |
| developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | Supplemental Preliminary Amendment (amendment) |
| developing a database having a number of entries each of which represents a variable object; and | Supplemental Preliminary Amendment (amendment) |
| causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | Petition to Make Special (argument); Request for Reconsideration (argument) |

**U.S. Patent No. 6,327,599**

- Amendment A dated November 11, 1996 at 2 (claim amendments) & 3 (remarks).

- Amendment B dated May 19, 1997 at 1-3 (claim amendments) & 4-8 (arguments to distinguish claims over prior art).

16

- Amendment C dated November 19, 1997 at 1-2 (claim amendments) & 2-4 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated December 17, 1997 at 1-2 (remarks re prior art).

- Response After Final Rejection dated April 30, 1998 at 1 (claim cancellations and remarks).

- Amendment D dated April 2, 2001 at 1 (claim amendments) & 2-5 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated June 20, 2000 at 1-2 (remarks re prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 11 of the '599 patent:

| Claim Language | Estoppel |
|---|---|
| 11. A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | Amendment A (amendment; argument) |
| developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | |
| assembling a database having entries therein each representing variable information to be printed; | |
| developing a master page file from the template file wherein the master page file defines the fixed information; and | Amendment B (argument) |
| converting the template files the database and the master page file into press commands specifying sequence and content of page production by the press. | Amendment B (amendment; argument); Amendment D (argument) |

17

## U.S. Patent No. 6,205,452

- Amendment "A" dated January 7, 2000 at 2-3 (claim amendments) & 3-8 (arguments to distinguish claims over prior art).

- Response dated June 27, 2000 at 1-7 (arguments to distinguish claims over prior art).

- Supplemental Information Disclosure Statement dated July 20, 2000 at 1-2 (remarks re prior art).

Defendants have identified at least the following estoppels with respect to the limitations of asserted claim 1 of the '452 patent:

| Claim Language | Estoppel |
|---|---|
| 1.  A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | Amendment A (argument) |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | |
| (b) selecting areas of the page for the variable graphics information; | Amendment A (argument); Response (argument) |
| (c) specifying graph parameters; and | |
| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | Amendment A (argument); Response (argument) |

Persons knowledgeable of these facts include, but are not limited to, the named inventors of the patents in suit and those individuals involved in the prosecution of the patents in suit,

RLF1-3138885-1

including William E. McCracken, G. Christopher Braidwood, Danielle M. Holmes, Trevor B.

Joike, Mark G. Hanley, and Erin J. Fox.

Defendants reserve the right to supplement their response to this interrogatory after

receipt of RRD's claim construction and infringement contentions, after the Court's order on

claim construction, and at other appropriate times in this litigation.

**INTERROGATORY NO. 5**

State in detail all factual and legal bases for Defendants' allegations set forth in
Paragraph 50 of the Answer that "[o]ne or more claims of the Patents in Suit are invalid under
the patent laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35
U.S.C. §§ 101, 102, 103, and 112," including, but not limited to, an identification of all facts,
documents, prior art (with references to specific portions of the prior art by page, line, figure, or
description in claim chart format), activities, and alleged motivation or suggestion to combine
references.

**RESPONSE TO INTERROGATORY NO. 5**

Defendants object that this interrogatory is overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to

this interrogatory as premature in that RRD has yet to reveal its claim construction and

infringement contentions, the Court has yet to construe the claims and expert reports are not yet

due. Defendants also object to this interrogatory as unduly burdensome to the extent it seeks

"identification of *all* facts, documents, prior art ..., activities, and alleged motivation or

suggestion to combine references," and "references to specific portions of the prior art by page,

line, figure, or description in claim chart format." Defendants will respond to the extent required

by the Federal Rules of Civil Procedure.

Subject to the foregoing general and specific objections, Defendants respond as follows:

This response is based on information currently available to Defendants, including

Defendants' present understanding of RRD's claim construction and infringement contentions.

19

Defendants reserve the right to assert claim construction positions that are inconsistent with the claim construction positions relied on here. Defendants further reserve the right to supplement their response to this interrogatory—such as by identifying new prior art and/or identifying new portions of the cited prior art—in support of its defenses as this case progresses including, for example, at such time after the Court issues its claim construction.

**U.S. Patent Nos. 6,327,599**

Claims 1 and 11 of the '599 patent may be invalid under 35 U.S.C. § 102(f) because James L. Warmus and Mark G. Dreyer did not invent the subject matter to be patented. Defendants contend that individuals associated with Barco Graphics, including Paul Notredame, may have invented all, or a portion, of the claimed subject matter.

Claims 1 and 11 of the '599 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by a variable printing application called "DijiComp," which was developed and used by a subsidiary of Kodak in the 1980s and 1990s, and which was marketed and sold as Begin Software. To the extent the asserted claims are interpreted to read on Darwin as RRD has contended in its responses to Defendants' Interrogatory No. 1, the asserted claims must also read on the prior art DijiComp application, rendering the claims invalid. *See, e.g.,* DijiComp PC Design, dated May 3, 1993 (K00004908-K00005098; K00557682-K00557885; K01200862-K01201061).

Claims 1 and 11 of the '599 patent also may be invalid under 35 U.S.C. § 102(b) as anticipated by one or more of (i) U.S. Patent No. 4,649,513 to Martin *et al.,* which issued on March 10, 1987, and (ii) Kodak's Forms Merge Software Package (Forms Merge), which was developed and commercialized by Eastman Kodak in at least 1987 and 1988. *See, e.g.,* User's Guide to Forms Merge, dated March 3, 1988 (K01863184-K01863213). The claim charts,

20

below, identify exemplary portions of each prior art reference that are sufficient to support

Defendant's contention that each element of the asserted claims may be disclosed therein:

| Claim 1 of the '599 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 1. An apparatus for controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| first means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | Forms Merge includes means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See, e.g.,* User's Guide to Forms Merge at 1 & 3-7. | The '513 patent discloses means for developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See,* e.g., '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |
| a database having entries therein each representing variable information to be printed; | Forms Merge includes a database having entries therein representing information to be printed. *See, e.g.,* User's Guide to Forms Merge at 7. | The '513 patent discloses a database having entries therein representing information to be printed. *See,* e.g., '513 patent, col. 6, 48 to col. 7, l. 8 & Fig. 4. |
| second means responsive to the first developing means for developing a master page file from the template file wherein the master page file defines the fixed information; and | Forms Merge includes a second means responsive to the first developing means for developing a master pages file from the template file. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses a second means responsive to the first developing means for developing a master pages file from the template file. *See,* e.g., '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |

21

| | | |
|---|---|---|
| means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying sequence and content of page production by the press. | Forms Merge includes means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying the sequence and content of page production by the press. *See, e.g.,* User's Guide to Forms Merge at 10. | The '513 patent discloses means responsive to the database and the first and second developing means for converting the template file and the database into press commands specifying the sequence and content of page production by the press. *See, e.g.,* '513 patent, Figs. 7 and 18a-b and accompanying text. |

| Claim 11 of the '599 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 11. A method of controlling an electronic press wherein the press includes a controller responsive to press commands, comprising: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| [a] developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page; | In operation, Forms Merge includes developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See, e.g.,* User's Guide to Forms Merge at 1 & 3-7. | The '513 patent discloses a program performing the step of developing a template file defining pages to be printed with fixed information common to all of the pages and variable information unique to each page. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |
| [b] assembling a database having entries therein each representing variable information to be printed; | In operation, Forms Merge includes assembling a database containing variable data to be merged with fixed information for printing. *See, e.g.,* User's Guide to Forms Merge at 7-8. | The '513 patent discloses a program that assembles a database storing variable information to be printed. *See,* e.g., col. 6, 48 to col. 7, l. 8 & Fig. 4. |

22

| [c] developing a master page file from the template file wherein the master page file defines the fixed information; and | In operation, Forms Merge converts the fixed information from the template file to a master page file defining the fixed information. *See, e.g.*, User's Guide to Forms Merge at 10. | The '513 patent discloses a program that develops a master page file defining fixed information from the template file. *See, e.g.*, '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |
| [d] converting the template files[,] the database and the master page file into press commands specifying sequence and content of page production by the press. | In operation, Forms Merge converts the template files, the variable data and the master page file into commands specifying sequence and content of page production. *See, e.g.*, User's Guide to Forms Merge at 10. | The '513 patent discloses a program that converts the template files, variable data and the master page file into commands specifying the sequence and content of page production. *See, e.g.*, '513 patent, Figs. 7 & 18a-b, and accompanying description. |

Defendants also assert that claims 1 and 11 of the '599 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following prior art: (i) DijiComp, (ii) Forms Merge, (iii) U.S. Patent No. 4,649,513, (iv) the prior art of record cited on one or more of the patents in suit, and/or (v) one or more of the references set forth below. The identified prior art is directed to variable printing systems that create a template file and merge variable data for printing. Defendants contend that claims 1 and 11 may have been obvious to a person having ordinary skill in the art in view of the combined teachings.

In addition to the prior art of record cited on the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other references, to the invalidity of claims 1 and 11 under 35 U.S.C. §§ 102 and 103(a):

- U.S. Patent Nos. 4,417,322; 4,445,795; 4,454,576; 4,470,120, 4,470,129, 4,649,513; 4,651,278; 4,809,220; 4,826,333; 4,860,219; 4,870,611; 4,878,085; 4,903,229; 4,939,670; 4,944,614; 5,091,868; 5,104,245; 5,144,693; 5,563,998; 5,563,999; 6,049,390; 6,330,073.

23

- Begin Software for High Speed Printing Systems (6/22/1994)

- Scitex Begin User's Guide (7/1/1995)

- Scitex Begin Reference Manual (7/1/1995)

- Scitex Catalogic Overview (8/23/1994)

- RR Donnelly Catalog Publishing System - Discussed in Retail Advertising and Catalogs, Seybold Special Report, vol. 2, no. 8 (4/29/1994)

- Specification PostScript Extension for Xeikon Variable Data System (7/1/1996)

- Adobe Technical Note #5113, published March 31, 1992.

- Interpress, The Source Book (published 1988).

- TrueForm User Guide. Adobe Systems, 1989.

- PostScript Language Reference Manual, Second Edition. Adobe Systems Incorporated, 1990.

- Guide to Document Processing, Kodak Ektaprint 1392 Printer, Model 24. June, 1991.

### U.S. Patent No. 6,844,940

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(f) because James L. Warmus and Mark G. Dreyer did not invent the subject matter to be patented. Defendants contend that individuals associated with Barco Graphics, including Paul Notredame, may have invented all, or a portion, of the claimed subject matter.

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by a variable printing application called "DijiComp," which was developed and used by a subsidiary of Kodak in the 1980s and 1990s, and which was marketed and sold as Begin Software. To the extent the asserted claims are interpreted to read on Darwin as RRD has

24

contended in its responses to Defendants' Interrogatory No. 1, the asserted claims must also read on the prior art DijiComp application, rendering the claims invalid. *See, e.g.,* DijiComp PC Design, dated May 3, 1993 (K00004908-K00005098; K00557682-K00557885; K01200862-K01201061).

Claims 1, 2, 7-12 and 17-22 of the '940 patent may be invalid under 35 U.S.C. § 102(b) as anticipated by one or more of (i) U.S. Patent No. 4,649,513 to Martin *et al.*, which issued on March 10, 1987, and (ii) Kodak's Forms Merge Software Package (Forms Merge), which was developed and commercialized by Eastman Kodak in at least 1987 and 1988. *See, e.g.,* User's Guide to Forms Merge, dated March 3, 1988 (K01863184-K01863213). The claim charts, below, identify exemplary portions of each prior art reference that are sufficient to support Defendant's contention that each element of the asserted claims may be disclosed therein:

| Claim 1 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 1. An apparatus for controlling an electronic press, comprising: | *See, e.g.,* User's Guide to Forms Merge at 1. | *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |
| means for developing first and second sets of template data representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed; and | Forms Merge includes means for developing first and second sets of template date representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed. *See, e.g.,* User's Guide to Forms Merge at 1-7, 10 & 27. | The '513 patent discloses means for developing first and second sets of template date representing associated first and second templates, respectively, each set of template data having master data representing a reusable object to be printed and position data representing a position on a page at which a variable object is to be printed. *See,* e.g., '513 patent col. 6, l. 48 to col. 8, l. 61; col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Figs. 5 & 6. |

25

| | | |
|---|---|---|
| means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable object and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. | Forms Merge includes means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable objects and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. *See, e.g.*, User's Guide to Forms Merge at 7 & 10. | The '513 patent discloses means responsive to the developing means and to a database having a number of entries representing variable objects for causing the electronic press to print output pages with the reusable objects and the variable objects wherein the causing means comprises means for separating the master data from the position data for each set of template data in preparation for rasterization. *See, e.g.*, col. 6, 48 to col. 7, l. 8 & Figs. 4, 7, 18a-b, and accompanying text. |

| Claim 2 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 2. The apparatus of claim 1, wherein the causing means includes means for converting the sets of template data and the database into commands for the electronic press specifying sequence and content of page production. | Forms Merge includes means for converting template data and variable data into commands specifying the sequence and content of page production. *See, e.g.*, User's Guide to Forms Merge at 10. | The '513 patent discloses means for converting template data and variable data into commands specifying the sequence and content of page production. *See, e.g.*, 513 Patent at Figs. 7 & 18a-b and accompanying text. |

| Claim 7 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 7. The apparatus of claim 1, wherein the first set of template data and the second set of template data are different so that the first and second template pages are different. | Forms Merge may be used with two different templates. *See, e.g.*, User's Guide to Forms Merge at 1. | The '513 patent discloses using multiple templates. *See, e.g.*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

26

| Claim 8 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 8. The apparatus of claim 7, wherein the master data of the first and second sets of template data are different such that the reusable objects of the first and second template pages are different. | Forms Merge may be used with two different sets of master data. *See, e.g.*, User's Guide to Forms Merge at 1. | The '513 discloses use of two different sets of master data. *See, e.g.*, '513 patent col. 13, l. 32 to col. 14, l. 2. |

| Claim 9 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 9. The apparatus of claim 1, wherein the master data of the first and second sets of template data are identical, and a position of the master data in the first template page differs from a position of the master data in the second template page. | Forms Merge may be used with two different templates. *See, e.g.*, User's Guide to Forms Merge at 1. | The '513 patent discloses use of two different templates. *See*, '513 patent, col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |

| Claim 10 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 10. The apparatus of claim 1, wherein the variable objects of the first and second sets of template data are identical, and the position of the variable object in the first template page differs from the position of the variable object in the second template page. | Forms Merge may be used with two different templates. *See, e.g.*, User's Guide to Forms Merge at 1. | The '513 patent discloses use of two different templates. *See*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 11 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 11. A method of controlling an electronic press, the method comprising the steps of: | *See, e.g.*, User's Guide to Forms Merge at 1. | *See*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 1 & 3. |

27

| [a] developing first and second data sets representing associated first and second templates, respectively, each data set having master data representing reusable objects to be printed and position data representing a position on a page at which a variable object is to be printed; | In operation, Forms Merge includes developing multiple templates having master data representing reusable objects to be printed and position data representing a position on the page at which a variable object is to be printed. *See, e.g.*, User's Guide to Forms Merge at 1-7 and 27. | The '513 patent discloses a program performing the step of developing multiple templates having master data representing resusable objects to be printed and position data representing a position on the page at which a variable object is to be printed. *See, e.g.*, '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6; col. 11, l. 29 to col. 14, l. 41; col. 27, ll. 12-16 & Fig. 5. |
|---|---|---|
| [b] developing a database having a number of entries each of which represents a variable object; and | In operation, Forms Merge includes developing a database storing variable objects. *See, e.g.*, User's Guide to Forms Merge at 7. | The '513 patent discloses a program performing the step of developing a database storing variable objects. *See, e.g.*, '513 patent, col. 6, 48 to col. 7, l. 8 & Fig. 4. |
| [c] causing the electronic press to print output pages with the reusable objects and variable objects by separating the master data from the position data for each data set in preparation for rasterization. | In operation, Forms Merge causes the printing of output pages with reusable objects and variable objects by separating master data from position data in preparation for rasterization. *See, e.g.*, User's Guide to Forms Merge at 10. | The '513 patent discloses the step of causing the printing of output pages with reusable objects and variable objects by separating master fata from position data in preparation for rasterization. *See, e.g.*, Figs. 7, 18a-b and accompanying text.. |

| Claim 12 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 12. The method of claim 11, wherein the step of causing includes the step of converting the data sets and the database into page sequence commands for the electronic press specifying sequence and content of page production. | In operation, Forms Merge discloses the step of converting the data sets and the database into page sequence commands specifying sequence and content of page production. *See, e.g.*, User's Guide to Forms Merge at 10. | The '513 patent discloses the step of converting the data sets and the database into page sequence commands specifying sequence and content of page production. *See, e.g.*, Figs. 7, 18a-b and accompanying text.. |

| Claim 17 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 17. The method of claim 11, wherein the first data set and the second data set are different so that the first and second templates are different. | Forms Merge may be operated using different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 18 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 18. The apparatus of claim 17, wherein the master data of the first and second data sets are different such that the reusable objects of the first and second templates are different. | Forms Merge may be operated using different templates. *See, e.g,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 19 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 19. The apparatus of claim 11, wherein the master data of the first and second data sets are identical, and a position of the master data in the first template differs from a position of the master data in the second template. | Forms Merge may be operated using different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 20 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 20. The apparatus claim 11, wherein the variable objects of the first and second data sets are identical, and the position of the variable object in the first template differs from the position of the variable object in the second template. | Forms Merge may be operated using different templates. *See, e g,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

29

| Claim 21 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 21. The apparatus of claim 11, wherein the variable objects of the first and second data sets are different. | Forms Merge may be operated using different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

| Claim 22 of the '940 Patent | Forms Merge | U.S. Patent No. 4,649,513 |
|---|---|---|
| 22. The apparatus of claim 21, wherein the position of the variable object in the first template is the same as the position of the variable object in the second template. | Forms Merge may be operated using different templates. *See, e.g.,* User's Guide to Forms Merge at 1. | The '513 patent discloses using different templates. *See, e.g.,* '513 patent col. 6, l. 48 to col. 8, l. 61 & Figs. 5 & 6. |

Defendants also assert that claims 1, 2, 7-12 and 17-22 of the '940 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following references: (i) DijiComp, (ii) Forms Merge, (iii) U.S. Patent No. 4,649,513, (iv) the prior art of record cited on one or more of the patents in suit, and/or (v) one or more of the references listed below. Each of the identified prior art is directed to a variable printing system that creates a template file and merges variable data for printing. Defendants contend that claims 1, 2, 7-12 and 17-22 may have been obvious to a person having ordinary skill in the art in view of the combined teachings.

In addition to the prior art of record cited on one or more of the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other references, to the invalidity of asserted claims 1, 2, 7-12 and 17-22 under 35 U.S.C. §§ 102 and 103(a):

- U.S. Patent Nos. 4,417,322; 4,445,795; 4,454,576; 4,470,120, 4,470,129, 4,649,513; 4,651,278; 4,809,220; 4,826,333; 4,860,219; 4,870,611; 4,878,085;

RLF1-3138885-1

4,903,229; 4,939,670; 4,944,614; 5,091,868; 5,104,245; 5,144,693; 5,563,998; 5,563,999; 6,049,390; 6,330,073.

- Begin Software for High Speed Printing Systems (6/22/1994)
- Scitex Begin User's Guide (7/1/1995)
- Scitex Begin Reference Manual (7/1/1995)
- Scitex Catalogic Overview (8/23/1994)
- RR Donnelly Catalog Publishing System - Discussed in Retail Advertising and Catalogs, Seybold Special Report, vol. 2, no. 8 (4/29/1994)
- Specification PostScript Extension for Xeikon Variable Data System (7/1/1996)
- Adobe Technical Note #5113, published March 31, 1992.
- Interpress, The Source Book (published 1988).
- TrueForm User Guide. Adobe Systems, 1989.
- PostScript Language Reference Manual, Second Edition. Adobe Systems Incorporated, 1990.
- Guide to Document Processing, Kodak Ektaprint 1392 Printer, Model 24. June, 1991.

### U.S. Patent No. 6,205,452

Defendants assert that claims 1, 2, 7-10, 12 and 14 of the '452 patent may be invalid under 35 U.S.C. § 102(b) because, on information and belief,

*REDACTED*

*REDACTED*

Defendants also assert that each of claims 1, 2, 7-10, 12 and 14 of the '452 patent may be invalid under 35 U.S.C. § 102(b) and/or § 103(a) in view of at least the following prior art:

1. The Admitted Prior Art disclosed in the Background Art section of the '452 patent which includes, among other prior art references, *Warmus*, et al, U.S. patent application Ser. No. 08/802,337, filed February 11, 1997, and *Vinberg, et al.*, U.S. Patent No. 4,800,510.

2. Microsoft Access 7.0 (also known as Microsoft Access 95), is a relational database management system released in 1995. In addition to the Microsoft Access 7.0 software itself, the prior art listed below provide further documentary evidence of the relevant features of Microsoft Access 7.0:

   - Browne, Allen & Alison Balter, *Essential Access 95*, 1995. K01114235-0001 to K01114235-0523.

   - Balter, Alison, *Mastering Access 95 Development, Premier Edition*, 1996. K01104499-K01102313.

   - Getz, Ken & Paul Litwin, *Microsoft Access 95 How-To*, 1996. K01114238-0001 to K01114238-0789.

RLF1-3138885-1

- Barker, F. Scott, *Access 95 Power Programming*, 1996.   K0109980-K01100732.

- Homer, Alex, *The Beginner's Guide to Access 95*, 1996.   K01095441-K01096119.

- Simpson, Alan & Elizabeth Olson, *Mastering Microsoft Access for Windows 95*, 1996.  K01101279-K01102313.

- Cassel, Paul, *Teach Yourself Access 95 in 14 Days*, 1995.   K001097988-K01098669.

- Gifford, Dwayne, et al, *Access 95 Unleashed*, 1996.  K01103503-K01104498.

- Schneider, Bob, *Using Access 95: The Fast and Easy Way to Learn*, 1995.  K01097585-K01097987.

- Litwin, Paul, *Microsoft Access 95 Developer's Handbook*, 1996.  K01104499-K01106079.

- Microsoft Access Language Reference.  Microsoft 1995.

3. Paradox for Windows, Version 5.0 (Paradox 5.0), is a relational database management system released in 1994 by Borland Software Corporation.   In addition to the Paradox 5.0 software itself, the following prior art further evidences the relevant features of Paradox 5.0:

- Salcedo, Greg & Martin W. Rudy, *Paradox 5 For Windows Power Programming Secrets*, 1995.  K01114236-0001 to K01114236-933.

- Ageloff, Roy, *Comprehensive Paradox 5 for Windows*, 1995.  K01114234-0001 to K01114234-586.

33

- Ageloff, Roy, *Introductory Paradox 5.0 for Windows*, 1995. K01100945-K01101278.

- Prestwood, Mike, *What Every Paradox 5 For Windows Programmer Should Know, Second Edition,* 1994. K01114237-0001 to K01114237-1246.

- Wagner, Richard, et al., *Inside Paradox 5 For Windows*, 1994

- Robinson, Celeste, *Paradox 5.0 for Windows Handbook*, 1994. K01102314-K01102953.

- Jones, Edward C., *Paradox 5.0 for Windows Power Toolkit*, 1995. K01102954-K01103502.

- Chalnick, Leon, et al., *Killer Paradox 5 for Windows*, 1994. K01106080-K01107309.

- Anderson, Derek, et. al, *Using Paradox 5 for Windows*, 1994. K01098670-K01099879.

- Weingarten, Jan, *Paradox 5 for Windows Illustrated*, 1995. K01100733-K01100944.

- Borland Paradox for Windows, Version 5.0: ObjectPAL Quick Reference. Borland Software, 1994.

- Borland Paradox for Windows, Version 5.0: Workgroup Desktop Guide. Borland Software, 1994.

- Borland Paradox for Windows, Version 5.0: Guide to ObjectPAL. Borland Software, 1994.

- Borland Paradox for Windows, Version 5.0: User's Guide. Borland Software, 1994 ("Paradox 5.0 User's Guide").

34

The claim charts, below, provide an exemplary illustration of how the '452 patent may be anticipated and/or rendered obvious by each of Access 7.0, Paradox 5.0 and the Admitted Prior Art:

| Claim 1 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 1. A method of controlling a display device to display variable graphics information in graph format, wherein the variable graphics information is provided in a database having a number of fields, each of which represents variable information or variable graphics information, the method comprising the steps of: | Access 7.0 is a relational database management system capable of generating database reports for display on a display device, the generated reports including charts that vary depending on data stored in the database. *See, e.g.,* "Sales by Category" Report, Northwind Traders Sample Database. | Paradox 5.0 is a relational database management system capable of generating database reports for display on a display device, the generated reports including charts that vary depending on data stored in the database. *See, e.g.,* Paradox 5.0 User's Guide at pp. 431-525. | It was known in the prior art to preprocess variable graphics information for use in the prior art variable printing systems. *See, e.g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50. |
| (a) developing template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information; | In Access 7.0, a report template, including fixed information and placeholders for variable information, may be developed using Access 7.0 Report Designer or Report Wizard features. *See, e.g.,* "Sales by Category" Report, Northwind Traders Sample Database. | In Paradox 5.0, the Report Designer, Quick Report and Report Expert features allow the development of a report template including fixed information and placeholders representing an area of a page for variable information. | It was known in the prior art systems to develop template page files, each page file having master data representing fixed information and placeholders representing an area of a page for variable information. *See, e.g.,* '452 Patent, col. 1, l. 23 to col. 3, l. 50. |

35

| (b) selecting areas of the page for the variable graphics information; | Access 7.0 Report Designer allows the user to insert a chart at a user-selected location in the report template. | Paradox 5.0 Report Designer allows the user to insert a graph placeholder at a user-selected location in the report template. | It was known in the prior art systems to preprocess variable graphics as variable image files for merging with template page files at the location of a corresponding image placeholder. *See, e.g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50. |
| --- | --- | --- | --- |
| (c) specifying graph parameters; and | In Access 7.0, after the user inserts a chart, the user is prompted to specify graph parameters for the accompanying chart, including chart type, chart layout, and axis scale. | In Paradox 5.0, after the user inserts a graph placeholder in a report template, the user is prompted to specify graph parameters for the corresponding graph, including graph type, titles and labels. | It was known in the prior art for users to input graph format parameters. *See, e.g.,* '452 patent, col. 1, l. 23 to col. 3, l. 50. |

36

| | | | |
|---|---|---|---|
| (d) causing the display device to display the pages with the fixed information, selected variable information from the database, and selected variable graphics information from the database, wherein the selected variable graphics information is displayed according to the specified graph parameters. | In Access 7.0, the user may run a report for printing on a printer or for display on the monitor through the "Preview" report option. The displayed report pages will display the fixed information from the report template, and variable information from the Access 7.0 database. The chart placeholder will be converted into a chart in accordance with the corresponding parameters and variable information from the Access 7.0 database. The chart may be generated by Microsoft Graph 5.0 via object linking and embedding. | In Paradox 5.0, the user may preview a report on the screen, or send the report to a printer. The displayed report pages will display the fixed information from the report template, and variable information retrieved from the Paradox 5.0 database.<br><br>The graph placeholder will be converted into a graph in accordance with the graph parameters and variable information from the Paradox 5.0 database. | It was known in the prior art systems to cause the display device to display pages with fixed information and selected variable information from the database, including variable image files representing preprocessed variable graphics information in accordance with specified graph parameters. '452 patent, col. 1, l. 23 to col. 3, l. 50. |

37

| Claim 2 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 2.  The method of claim 1, wherein the step of causing the display device to display the pages with the selected variable graphics information from the database further comprises executing a graph file to generate a graph. | Access 7.0 stores chart parameters in a graph object, which may be a Microsoft Graph 5.0 object.  The graph information is passed to Microsoft Graph 5.0 to generate the graph. | Paradox 5.0 graph data is stored in a graph object embedded in the report template.  The graph object is executed to generate the graph. | Admitted prior art inherently executed a graph file to generate a graph. |

| Claim 7 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 7. The method of claim 1, wherein the template page files are creating using QuarkXPress®. | Access 7.0 includes template page files. | Paradox 5.0 includes template page files. | It was known in the prior art systems to use QuarkXPress to generate a template page file. |

| Claim 8 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 8.  The method of claim 1, wherein the step of specifying the graph parameters comprises prompting a user to specify the graph type, scaling, labels and other graph parameters. | Access 7.0 includes prompts for the user to specify graph type, scaling, labels and other graph parameters. | Paradox 5.0 includes prompts for the user specify graph type, scaling, labels and other graph parameters. | Admitted prior art inherently prompts user to specify graph parameters. |

| Claim 9 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 9. The method of claim 8, further comprising the step of assigning a default value for each graph parameter that the user does not select. | Access 7.0 assigns default values to graph parameters. | Paradox 5.0 assigns default values to graph parameters. | Admitted prior art inherently assigns default values to graph parameters. |

38

| Claim 10 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 10. The method of claim 1, wherein the step of causing the display device to display the pages further comprises the steps of: | Access 7.0 causes the display device to display report pages in preview mode. | Paradox 5.0 causes the display device to display report pages in preview mode. | Prior art systems discloses causing the display device to display the pages. |
| determining if a page file contains an area selected for variable graphics information; and

if a page file contains an area selected for variable graphics information, saving the specified graph parameters and selected fields from the database representing variable graphics information, and executing a graph file to generate a graph using the specified graph parameters and selected database fields. | Access 7.0 stores chart parameters in a graph object that defines the chart. The graph information is passed to an external program called Microsoft Graph 5.0 to generate the graph | Paradox 5.0 graph data is stored in a graph object embedded in the report template. The graph object is executed to generate the graph. | Admitted prior art inherently includes determining area of page for variable graphics information and saving corresponding parameters. |

| Claim 12 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 12. The method of claim 1, wherein the display device is a demand printer which prints the pages. | Access 7.0 allows a user to print reports including variable graphs. | Paradox 5.0 allows a user to print reports including variable graphs. | It was known in the admitted prior art to use a demand printer which prints the pages. |

39

| Claim 14 of the '452 Patent | Access 7.0 | Paradox 5.0 | Admitted Prior Art |
|---|---|---|---|
| 14. The method of claim 1, wherein the variable graphics information is displayed as a bar chart and the step of causing the display device to display the pages with selected variable graphics information further comprises the steps of:<br><br>(i) generating a bar chart at the selected area on the page, wherein the chart includes a bar for each database field representing variable graphics information and each bar corresponds to a maximum value of the database entries representing variable graphics information; and<br><br>(ii) analyzing each database field representing variable graphics information and covering a portion of the bar corresponding to that field based on a comparison of the value of that field with the maximum value. | Access 7.0 charts in include bar chart types. | Paradox 5.0 graphs include bar graph types. | Admitted prior art discloses bar graphs as variable graphics information. |

Defendants also assert that each of the claims 1, 2, 7-10, 12 and 14 of the '452 patent may be obvious under 35 U.S.C. § 103(a) in view of a combination of one or more of the following references: (i) Access 7.0, (ii) Paradox 5.0, (iii) the Admitted Prior Art, (iv) the prior art of record cited in one or more the patents in suit, and/or (v) the prior art set forth in the list below. These references, alone or in combination, disclose systems and methods for developing a report template including fixed, variable and variable graphics information, generating a graph in accordance with stored data and graph parameters, and displaying the resulting pages.

40

In addition to the prior art of record in the patents in suit, Defendants have identified the following prior art as being potentially relevant, either alone or in combination with other prior art, to the invalidity of claims 1, 2, 7-10, 12 and 14 of the '452 patent under 35 U.S.C. §§ 102 and 103(a):

- U.S. Patent Nos. 4,723,209; 4,847,785; 4,852,019; 5,237,498; 5,245,535; 5,440,745; 5,937,708

- Japanese Patent Publication Nos. JP H08-44802; JP H08-115178; JP H09-16791; JP H08-171649

- Microsoft FoxPro Relational Database Management System for Windows, Versions 2.5 (1993) and 2.6 (1994)

- Microsoft FoxPro Relational Database System for Windows, Developer's Guide. Microsoft Corporation, 1993. K01097033-K01097584.

- Holzgang, David A, *Understanding Postscript, For Postscript Levels 1 & 2*, 1992.

- Mueller, John & Wallace Wang, *OLE For Dummies*, 1995. K01096120-K01096483.

- Wickham-Jones, Tom, *Mathematica Graphics*, 1994.

- *Your "Un" Official Guide to using OLE Automation with Microsoft Office and Microsoft BackOffice*. Microsoft, 1995.

- Microsoft Office 95 Data Access Reference. Microsoft, 1995.

- IBM Graphical Data Display Manager (GDDM).

Defendants also assert that the claims of the '452 patent may be invalid under 35 U.S.C. § 112 for indefiniteness, lack of written description and/or lack of enablement, in that the claims require "causing" things to occur without adequate description or explanation. In addition, claim

41

7 may be invalid under 35 U.S.C. § 112 for being indefinite as to the scope and meaning of the trademarked term QuarkXPress®.

### U.S. Patent No. 6,952,801

Defendants assert that claims 1, 3-5, 12, 13, 15-17, 24 & 25 of the '801 patent may each be invalid under 35 U.S.C. § 112, first or second paragraphs, on the ground that one or more of the following claim limitations recited in independent claim 1 is indefinite and/or that the specification does not enable, provide a written description of, or disclose the best mode for practicing one or more of the following claim limitations:

(C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book;

(D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number;

(E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number;

(F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information;

(G) producing the first and second books in a single press run.

In the event that the claims are ultimately found to be in compliance with 35 U.S.C. § 112, Defendants also assert that each of the asserted claims 1, 3-5, 12, 13, 15-17, 24 & 25 of

42

the '801 patent me be invalid under 35 U.S.C. § 102(b) and/or § 103(a) in view of at least the following prior art:

- The prior art of record cited in the patents in suit.

- Interpress, The Source Book (published 1988). Interpress is a page description language (PDL) developed by Xerox.

- U.S. Patent Nos. 4,498,150; 4,709,348; 5,136,316; 5,436,196; 5,442,732; 5,448,691; 5,495,561

- JP H06-180494

The claim charts, below, provide an exemplary illustration of how claims 1, 3-5, 12, 13, 15-17, 24 & 25 of the '801 patent may be anticipated and/or rendered obvious in view of one or more of U.S. Patent Nos. 5,390,354 (de Heus), 5,907,836 (Sumita), 5,346,196 (Nussbaum), 5,535,677 (Fannin) and 5,442,732 (Matysek). During the prosecution of the '801 patent before the United States Patent and Trademark Office, RRD argued that the pending claims were allowable over the prior art cited by the Examiner because, in part, none of the cited references "discloses or suggests the step of producing such first and second books in a single press run." The PTO, however, did not consider U.S. Patent No. 5,442,732 to Matysek, or other prior art, which discloses that it was known in the prior art to store multiple print jobs (e.g., first and second books), which are then sent to the printer as an individual print job.

RLF1-3138885-1

| Claim 1 of the '801 Patent | Prior Art |
|---|---|
| 1. A method of assembling first and second different books, the method comprising the steps of: | *See, e.g.,* de Heus. |
| (A) storing a first number of pages; | *See, e.g.,* Sumita.<br><br>*See, e.g.,* Matysek, cols. 1-2. |
| (B) specifying a first set of pagination information including an indication of whether a stored page is to be selectively included in the first book; | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |
| (C) specifying a second set of pagination information including an indication of whether a stored page is to be selectively included in the second book; | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |
| (D) determining whether a stored page is to be assembled into the first book based on the first set of pagination information wherein a second number of stored pages to be assembled into the first book is less than the first number; | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14;<br><br>*See also* Sumita, Fig. 143.<br><br>*See also* Nussbaum, cols. 1-3. |
| (E) determining whether a stored page is to be assembled into the second book based on the second set of pagination information wherein a third number of stored pages to be assembled into the second book is different than the second number and no greater than the first number; | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14.<br><br>*See also* Sumita, Fig. 143.<br><br>*See also* Nussbaum, cols. 1-3. |
| (F) generating page description language instructions for production of the first and second books in accordance with the first and second sets of pagination information; and | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

44

| (G) producing the first and second books in a single press run. | *See, e.g.,* Fannin, cols. 1-2. |
| | *See, e g,* Matysek, cols. 1-2. |

| Claim 3 of the '801 Patent | Prior Art |
|---|---|
| 3. The method of claim 1, further comprising the step of analyzing press commands directed to production of the first book to determine whether the page is to be assembled into the first book. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 4 of the '801 Patent | Prior Art |
|---|---|
| 4. The method of claim 1, further comprising the step of generating a pagination file having data representative of the first set of pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 5 of the '801 Patent | Prior Art |
|---|---|
| 5. The method of claim 1, further comprising the step of deriving a maximum number of pages for the first book based on the pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 12 of the '801 Patent | Prior Art |
|---|---|
| 12. The method of claim 1, further comprising the step of delivering page description language instructions to an electronic press to print the first book. | *See, e g,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 13 of the '801 Patent | Prior Art |
|---|---|
| 13. The method of claim 1, wherein the step of specifying the first set of pagination information comprises the step of providing a user interface for entry of the pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

RLF1-3138885-1

| Claim 15 of the '801 Patent | Prior Art |
|---|---|
| 15. The method of claim 1, further comprising the step of analyzing press commands directed to production of the second book to determine whether the page is to be assembled into the second book. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 16 of the '801 Patent | Prior Art |
|---|---|
| 16. The method of claim 1, further comprising the step of generating a pagination file having data representative of the second set of pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 17 of the '801 Patent | Prior Art |
|---|---|
| 17. The method of claim 1, further comprising the step of deriving a maximum number of pages for the second book based on the pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 24 of the '801 Patent | Prior Art |
|---|---|
| 24. The method of claim 1, further comprising the step of delivering page description language instructions to an electronic press to print the second book. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

| Claim 25 of the '801 Patent | Prior Art |
|---|---|
| 25. The method of claim 1, wherein the step of specifying the second set of pagination information comprises the step of providing a user interface for entry of the pagination information. | *See, e.g.,* de Heus, col. 3, l. 25 to col. 4, l. 14. |

Persons knowledgeable of these facts with respect to Defendants' response to Interrogatory No. 5 include Timothy Donahue, Pat McGrew, John Desautels, Paul Notredame, unknown individuals of Hewlett-Packard, and unknown individuals of Quark, Inc. The prior art, and documents describing the prior art, speak for themselves.

RLF1-3138885-1

## INTERROGATORY NO. 6

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 51 of their Answer that "RRD's claim for damages accruing prior to the filing of the Complaint is barred, in whole or part, by the doctrine of laches," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 6

Subject to the foregoing general objections, Defendants respond by incorporating its response to Interrogatory Nos. 7, 8, 10, 11, and 14. Defendants further respond that the doctrine of laches precludes RRD from any alleged damages that may have been incurred due to Defendants' actions prior to the time that RRD filed and served its Complaint on January 17, 2006.

*REDACTED*

RRD thus delayed in bringing suit against Defendants by waiting over 4 years from the issuance of the '599 and '452 patents,

*REDACTED*                    to file suit. During this period, RRD did, and continued to do, regular business with Defendants. At no point during this delay did RRD provide Defendants with any indication that it ever intended to file suit for patent infringement. Given the circumstances, RRD's delay was unreasonable and inexcusable.

47

RLF1-3138885-1

Due to RRD's delay in bringing suit, Defendants have suffered substantial prejudice. By way of example, due to RRD's delay, Defendants may be unable to present a full and fair defense on the merits because of the loss of records and other evidence, the inability to find material witnesses having knowledge of past events, the destruction of third-party documents, and the unreliability of memories of long past events. With respect to business prejudice, Defendants have continued to invest in and develop the accused software products during this delay period.

Persons knowledgeable of these facts include, but are not limited to, William E. McCracken, Joseph Guiliano, Ronen Cohen, Gershon Alon, Ronny Fogel, James Katerberg, John Desautels, Roger Parrett, John Peck, William Scheinfurth, Venkat Purushotham, Nachum Shamir, and James Langley.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 7

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 52 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of equitable estoppel," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 7

Subject to the foregoing general objections, Defendants respond by incorporating its responses to Interrogatories Nos. 6, 8, 10, 11, and 14. Defendants further respond that RRD engaged in misleading conduct during both its business relationships with Defendants, and its participation in various standards-making bodies.

48

*REDACTED*

RRD thus delayed in bringing suit against Defendants by waiting over 4 years from the issuance of the '599 and '452 patents,                    *REDACTED*

to file suit. During this period, RRD did, and continued to do, regular business with Defendants. At no point during this delay did RRD provide Defendants with any indication that it ever intended to file suit for patent infringement. Given the circumstances, RRD's conduct was misleading.

Further, RRD engaged in misleading conduct while participating in the CGATS.20 standard-making process. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard." K00388563-K00388565. In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564. Moreover, at no time during the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants, or any other entities. RRD's filing of the Patent Holder Statement and subsequent silence regarding its litigation intentions during the CGATS.20 standards-making process was misleading.

Defendants relied on RRD's misleading conduct when deciding to continue to invest in and develop the accused software products. Defendants now face material prejudice as a result of RRD's misleading conduct. In particular, due to RRD's misleading conduct, Defendants may be unable to present a full and fair defense on the merits because of the loss of records and other evidence, the inability to find material witnesses having knowledge of past events, the destruction of third-party documents, and the unreliability of memories of long past events. Defendants may also experience material economic prejudice, as a result of Defendants' continuing investment in and development of the accused software products.

Persons knowledgeable of these facts include, but are not limited to, William E. McCracken, Joseph Guiliano, Riyaz Asaria, Mary Abbott, Timothy Donahue, Ronen Cohen, Gershon Alon, Ronny Fogel, James Katerberg, John Desautels, Roger Parrett, John Peck, William Scheinfurth, Venkat Purushotham, Nachum Shamir, and James Langley.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 8

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 53 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of waiver," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 8

Subject to the foregoing general objections, Defendants respond by incorporating by reference its response to Interrogatories Nos. 6-7, 10, 11, and 14.

RRD voluntarily and intentionally relinquished its rights against Defendants with respect to the patents in suit, when it failed to pursue litigation against Defendants for more than 4 years

set

after the issuance of the '599 and '452 patents.

*REDACTED*

. During this period, RRD did, and continued to do, regular business with Defendants.   RRD's silence and inaction constituted a waiver of any allegations of infringement of the patents in suit.

RRD also waived its right to pursue claims of infringement of the patents in suit against Defendants by virtue of its participation on the CGATS.20 standard-making committee. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard."  K00388563-K00388565.  In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564.  Moreover, at no time in the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants or any other entities. Therefore, RRD has waived the right to seek more than a license under reasonable terms and conditions for the patents in suit.

Finally, RRD has waived its right to pursue patent infringement claims against Defendants by virtue of agreements signed by RRD with Scitex.

*REDACTED*

51

*REDACTED*

Scitex was

subsequently acquired by Versamark, which was then acquired itself by Kodak;

*REDACTED*

Persons knowledgeable of these facts include, but are not limited to, Riyaz Asaria, Paul

Lovern, Jim Gibson, Chloma Jarrett, Michael Spaul, William E. McCracken, Timothy Donahue,

Mary Abbott, Ronen Cohen, Gershon Alon, and Ronny Fogel.

Defendants reserve the right to supplement their response to this interrogatory at

appropriate times in this litigation.

## INTERROGATORY NO. 9

State in detail all factual and legal bases for Defendants' allegations set forth in paragraph 54 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of prosecution laches," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 9

Defendants object that this interrogatory is overly broad and unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing

general and specific objections, Defendants respond that at least claims of the '599 patent, '940

patent and '801 patent are barred by the doctrine of prosecution laches.

RLF1-3138885-1

In the prosecution of the '599 patent, a Notice of Allowability issued on May 12, 1998, but RRD delayed the issuance of the allowed claims for over three and a half years by withdrawing the patent application from issue and filing successive Continued Prosecution Applications. *See* RRD004598-RRD004815. The delay was unreasonable and inexcusable, and Defendants will experience material economic prejudice as a result of its continued investment in and development of the Kodak Software during the period of delay without knowledge of RRD's intention to patent the subject matter of the '599 patent claims.

Regarding the '940 patent and '801 patent, RRD filed the earliest application to which these patents in suit claim on their face priority on June 7, 1995. The application that led to the issuance of the '801 patent was filed almost six years later; the application that led to the issuance of the '940 patent was filed 8 1/2 years later. RRD's delay in prosecuting these applications is unreasonable and unexplained and Defendants will experience material economic prejudice as a result of its continued investment in and development of the Kodak Software during the period of delay without knowledge of RRD's intention to patent the subject matter of the '940 and '801 patent claims.

Persons knowledgeable of these facts include, but are not limited to, the named inventors of the patents in suit, persons involved in the prosecution of the patents in suit, Ronen Cohen, Ron Peleg, Nardi Jaacobi, Gershon Alon, Roger Parrett, John Desautels, William Schweinfurth, John Peck, and William Sullivan.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

53

## INTERROGATORY NO. 10

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 55 of their Answer that "RRD's claims are barred, in whole or part, by the doctrines of license and/or implied license," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 10

Subject to the foregoing general objections, Defendants incorporate by reference its response to Interrogatory Nos. 6, 7, 8, 11, and 14. Defendants respond that there are two methods by which RRD has effected an implied license to Defendants.

First, RRD has granted Defendants an implied license to the patents in suit through equitable estoppel. The Kodak Software was developed to be compatible with the CGATS.20 standard. As further detailed in Defendants' responses to Interrogatory No. 7, RRD disclosed the existence of the patents in suit and/or their applications in RRD's "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard" to CGATS.20. K00388563-K00388565. In the statement, RRD represented that it would provide a license to the patents in suit "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564.

*REDACTED*

Having relied on RRD's conduct, Defendants will be materially prejudiced by its continued investment in and development of the accused software products if RRD is allowed to proceed with its infringement claims.

Second, an implied license arose from the course of conduct between RRD and Defendants. RRD has used and had access to various technologies produced by Defendants,

54

including those of Scitex. Scitex was purchased by Versamark and has since been acquired by Kodak.

*REDACTED*

The reasonable expectations of the parties and the dictates of fairness and equity support an implied license when RRD and its assigns acquiesced in the development of this variable data software.

Persons knowledgeable of these facts include, but are not limited to, Ronen Cohen, Gershon Alon, Ronny Fogel, Timothy Donahue, Paul Lovern, Jim Gibson, Chloma Jarrett, Michael Spaul, Riyaz Asaria, Mary Abbott, and unknown representative(s) of RRD.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 11

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 56 of their Answer that "RRD's claims are barred, in whole or part, by the doctrine of unclean hands," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 11

Subject to the foregoing general objections, Defendants incorporate by reference its response to Interrogatory Nos. 6, 7, 8, 10, and 14.

RRD engaged in unconscionable and inequitable conduct during the prosecution of the patents in suit. Specifically, RRD deceived the Patent and Trademark Office ("PTO"), by

RLF1-3138885-1

withholding material prior art references and other information known to RRD. By way of example, such withheld material includes the over 50 prior art references that were not disclosed by RRD to the PTO during the prosecution of the '599 patent, but were subsequently identified during the prosecution of the '452 patent. Moreover, RRD failed to disclose material information known to RRD regarding commercial activities and other disclosures of Barco Graphics and Xeikon that occurred prior to the filing dates of the patents in suit. Further, RRD intentionally deceived the PTO by "burying" material references during the prosecution of the patents in suit, and by submitting only selected excerpts of cited references while withholding from the PTO non-cumulative material information disclosed elsewhere in the cited references.

RRD is also engaged in unconscionable and inequitable conduct in light of its participation on the CGATS.20 standard-making committee. Specifically, during the CGATS.20 standard-making process, RRD filed a "Statement of Patent Holder Concerning the Use of Patented Device or Design in Conjunction With an American National Standard." K00388563-K00388565. In this document, RRD stated that it would "provide a license under any [of the above-listed] patents to the producer and/or user of any [products complying with an American National Standard Institute (ANSI)], as needed, under reasonable terms and conditions that are demonstrably free of any unfair discrimination." K00388564. Moreover, at no time in the course of the CGATS.20 standard-making process did RRD indicate that it intended to assert its patents against Defendants or any other entities. Therefore, it is inequitable and unconscionable for RRD to now seek more than a license under reasonable terms and conditions for the patents in suit.

By engaging in such unconscionable and inequitable conduct, RRD claims are barred by the doctrine of unclean hands.

56

Persons knowledgeable of these facts include, but are not limited to, persons involved in the prosecution of the patents in suit, Ronen Cohen, Gershon Alon, Ronny Fogel, Charles Cornelius, Paul Notredame, Rob Haak, Karel Tavernier, Grant Miller, Stefaan De Smedt, Francois Kremer, Brian L. Michaelis, Yves Vanhauwaert, Mary Lee Schneider, Ronnie Sarkar, Stella Shaw, Jim Turner, Barb Schetter, Jack Oberhill, Daryl P. Jones, Timothy Donahue, Riyaz Asaria, and Mary Abbott.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 12

State in detail all factual and legal bases for Defendants' allegations set forth in Paragraph 57 of their Answer that "RRD's alleged damages are barred or limited, in whole or part, by 35 U.S.C. §§ 286 and/or 287," including, but not limited to, the identification of all documents and communications on which Defendants rely to support their contention and the identity of the persons most knowledgeable about the factual bases for those allegations.

## RESPONSE TO INTERROGATORY NO. 12

Defendants object that this interrogatory is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to this interrogatory as premature to the extent that discovery remains ongoing. Further, it is premature at this time, given that Defendants' rebuttal expert report including its damages analysis is not due under the Court's Rule 16 Scheduling Order until November 6, 2007. Subject to the foregoing general and specific objections, Defendants respond that RRD has failed to mark products and/or services as required by 35 U.S.C. § 287. Moreover, RRD has failed to provide actual notice to the extent it has failed to charge infringement of specific patents in suit against a specific Kodak accused product and/or service. In particular, RRD has failed to provide any actual notice of any product except for the Amended Complaint's references to "Kodak

57

Software," which is defined as including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer," and "Digital Presses," which are defined as including "the NexPress 2100 Plus Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300, CS 340, CS400, and CS600." With respect to 35 U.S.C. § 286, RRD is barred from recovering any damages resulting from any infringement committed more than six years prior to the filing of the Complaint on January 17, 2006.

Persons knowledgeable of these facts include, but are not limited to, unknown representative(s) of RRD.

Defendants reserve the right to supplement their response to this interrogatory at appropriate times in this litigation.

## INTERROGATORY NO. 13

Identify and quantify all revenue and profit on a monthly, quarterly, and annual basis derived or earned by defendants, broken down by product, in connection with each of the Defendants' Software Products and Defendants' Hardware Products (beginning with the first receipt by Defendants of any such revenue) and explain how Defendants derive that revenue and profit, either directly or indirectly.

## RESPONSE TO INTERROGATORY NO. 13

Defendants object that this interrogatory is overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. In particular, Defendants object to the interrogatory to the extent it seeks revenue and profit "beginning with the first receipt by Defendants of any such revenue." Such "first receipt" predates any notice (if any) provided by RRD and/or the issue dates of the patents in suit. Defendants also object that this interrogatory is overly broad and unduly burdensome and not relevant to the claim or defense of

58

any party or the subject matter of the action. In particular, Defendants object to the interrogatory as seeking information defined by the "Defendants' Software Products" and "Defendants' Hardware Products." The Amended Complaint only references "Kodak Software," which is defined as including "Darwin, Kodak NexTreme DL-100 Variable Data Software, Kodak NexTreme DL-1000 Variable Data Software, and Composer," and "Digital Presses," which are defined as including "the NexPress 2100 Plus Digital Production Color Press, the NexPress 2500 Digital Production Color Press, the NexStation digital press controller, the Kodak Versamark V-Series Printing System, the Kodak Versamark D-Series Printing System, and the following digital press controllers: CS150, CS300, CS 340, CS400, and CS600." Subject to the foregoing general and specific objections, Defendants will respond to this interrogatory by producing business records with financial data as early as March 2001, to the extent the financial data exists, for "Kodak Software" and "Digital Presses," as those terms are defined in the Amended Complaint. Defendants will also produce summaries of financial information, to the extent it exists. To date, Defendants have produced the following documents responsive to this interrogatory:

K00001484-K00001484, K00003328-K00003344, K00005108-K00005109,
K00006655-K00006664, K00012563-K00012658, K00015737-K00015740,
K00015882-K00015883, K00015946-K00015949, K00015950-K00015953,
K00017845-K00017869, K00018364-K00018365, K00019098-K00019099,
K00019100-K00019101, K00019556-K00019564, K00019565-K00019575,
K00022203-K00022208, K00022272-K00022288, K00022479-K00022479,
K00022926-K00022927, K00025360-K00025360, K00025747-K00025749,
K00026103-K00026104, K00026109-K00026110, K00026356-K00026356,
K00029598-K00029598, K00029599-K00029600, K00029601-K00029601,
K00029639-K00029640, K00029715-K00029715, K00030453-K00030455,
K00030478-K00030479, K00030480-K00030481, K00035544-K00035544,
K00035589-K00035589, K00035606-K00035607, K00036240-K00036241,
K00036832-K00036832, K00036835-K00036835, K00037697-K00037713,
K00037714-K00037727, K00037728-K00037741, K00037933-K00037941,
K00037942-K00037952, K00038552-K00038567, K00038927-K00038927,
K00039645-K00039645, K00039668-K00039669, K00039996-K00039996,

59

K00042629-K00042663, K00042664-K00042664, K00046065-K00046065,
K00046515-K00046518, K00046519-K00046522, K00046557-K00046558,
K00046564-K00046565, K00046566-K00046567, K00046610-K00046615,
K00047051-K00047055, K00047096-K00047100, K00047132-K00047136,
K00048486-K00048496, K00048497-K00048507, K00048754-K00048766,
K00048788-K00048788, K00049239-K00049243, K00049244-K00049252,
K00049253-K00049263, K00049287-K00049291, K00049292-K00049296,
K00049315-K00049335, K00049372-K00049393, K00049394-K00049394,
K00050160-K00050165, K00050196-K00050201, K00050332-K00050363,
K00050364-K00050370, K00050969-K00050971, K00050972-K00050973,
K00051160-K00051173, K00051867-K00051867, K00051910-K00051918,
K00051919-K00051925, K00052008-K00052018, K00053562-K00053572,
K00053629-K00053635, K00054282-K00054504, K00056739-K00056744,
K00058365-K00058367, K00058443-K00058447, K00058448-K00058453,
K00061286-K00061304, K00061305-K00061341, K00062219-K00062251,
K00064613-K00064624, K00066093-K00066118, K00066119-K00066131,
K00066132-K00066157, K00066158-K00066179, K00066180-K00066207,
K00066208-K00066234, K00066235-K00066261, K00066262-K00066287,
K00066288-K00066300, K00068366-K00068368, K00068369-K00068371,
K00069475-K00069696, K00069697-K00069925, K00070277-K00070420,
K00070421-K00070499, K00071477-K00071822, K00073008-K00073082,
K00073310-K00073387, K00073565-K00073748, K00074419-K00074491,
K00074492-K00074577, K00075089-K00075093, K00076595-K00076596,
K00076597-K00076600, K00078622-K00078691, K00078745-K00078746,
K00078747-K00078748, K00082420-K00082464, K00082713-K00082737,
K00083027-K00083082, K00083111-K00083123, K00084233-K00084318,
K00085489-K00085494, K00085518-K00085534, K00086267-K00086271,
K00087549-K00087554, K00088084-K00088123, K00088124-K00088158,
K00090230-K00090250, K00090929-K00090936, K00093677-K00093690,
K00127004-K00127012, K00127013-K00127023, K00127077-K00127077,
K00140943-K00140943, K00153430-K00153430, K00153431-K00153431,
K00153432-K00153433, K00154784-K00154788, K00154789-K00154793,
K00154846-K00154847, K00154916-K00154918, K00154919-K00154921,
K00154950-K00154950, K00154966-K00154972, K00155091-K00155092,
K00155093-K00155117, K00155118-K00155152, K00155176-K00155177,
K00155195-K00155196, K00155201-K00155207, K00155208-K00155214,
K00155215-K00155215, K00155216-K00155218, K00155219-K00155219,
K00155220-K00155220, K00155221-K00155279, K00155283-K00155296,
K00155297-K00155297, K00155298-K00155298, K00155299-K00155310,
K00155311-K00155312, K00155313-K00155336, K00155337-K00155367,
K00155368-K00155378, K00155379-K00155389, K00155427-K00155460,
K00155477-K00155478, K00155479-K00155479, K00155480-K00155480,
K00155481-K00155489, K00155544-K00155551, K00155564-K00155565,
K00155636-K00155654, K00155771-K00155779, K00156024-K00156031,
K00156173-K00156174, K00156191-K00156225, K00156376-K00156448,
K00156755-K00156810, K00157592-K00157624, K00157657-K00157672,

60

K00158100-K00158121, K00169460-K00169532, K00169626-K00169647,
K00170948-K00171023, K00176673-K00176697, K00176698-K00176722,
K00176723-K00176747, K00176748-K00176760, K00176761-K00176785,
K00176786-K00176810, K00176819-K00176843, K00176844-K00176868,
K00194119-K00194132, K00194397-K00194397, K00195415-K00195415,
K00195716-K00195717, K00196779-K00196783, K00199371-K00199374,
K00202010-K00202010, K00202981-K00202981, K00203567-K00203577,
K00203578-K00203588, K00208168-K00208176, K00208177-K00208187,
K00213644-K00213648, K00215973-K00216044, K00231063-K00231063,
K00231073-K00231073, K00231089-K00231089, K00231093-K00231093,
K00276267-K00276267, K00285606-K00285646, K00285655-K00285664,
K00285665-K00285705, K00285940-K00285980, K00332715-K00332716,
K00333703-K00333704, K00333883-K00333883, K00335356-K00335360,
K00336946-K00336947, K00336958-K00336959, K00340223-K00340223,
K00340632-K00340632, K00344628-K00344644, K00344653-K00344669,
K00352212-K00352213, K00353387-K00353395, K00353396-K00353404,
K00353794-K00353804, K00354615-K00354619, K00355572-K00355576,
K00355998-K00355998, K00356039-K00356043, K00356258-K00356266,
K00356448-K00356452, K00357134-K00357138, K00359610-K00359626,
K00361061-K00361071, K00361072-K00361080, K00361137-K00361141,
K00363895-K00363896, K00366300-K00366340, K00371203-K00371218,
K00374725-K00374733, K00374734-K00374744, K00416831-K00416831,
K00418111-K00418111, K00419250-K00419257, K00419289-K00419363,
K00419384-K00419457, K00420476-K00420487, K00420693-K00420693,
K00421067-K00421140, K00425078-K00425085, K00455482-K00455482,
K00458961-K00458985, K00458986-K00459010, K00459011-K00459035,
K00459036-K00459048, K00459049-K00459073, K00459074-K00459098,
K00459107-K00459131, K00459132-K00459156, K00459653-K00459666,
K00459667-K00459680, K00459681-K00459694, K00459695-K00459708,
K00460015-K00460025, K00460026-K00460036, K00460037-K00460047,
K00460280-K00460290, K00465902-K00465909, K00466516-K00466520,
K00469079-K00469090, K00469114-K00469125, K00469130-K00469141,
K00469142-K00469153, K00469487-K00469498, K00469948-K00469959,
K00471562-K00471577, K00473662-K00473673, K00474450-K00474463,
K00474464-K00474477, K00475165-K00475175, K00475176-K00475186,
K00475651-K00475666, K00477736-K00477747, K00483967-K00483974,
K00483975-K00483986, K00484314-K00484325, K00484503-K00484510,
K00485078-K00485082, K00490539-K00490609, K00491064-K00491103,
K00491104-K00491143, K00491144-K00491217, K00491259-K00491266,
K00493983-K00493990, K00494852-K00494868, K00495505-K00495511,
K00503221-K00503231, K00503232-K00503242, K00504903-K00504918,
K00526068-K00526089, K00555535-K00555537, K00595173-K00595192,
K00612305-K00612365, K00616038-K00616038, K00684340-K00684340,
K00707179-K00707239, K00709869-K00709870, K00709881-K00709881,
K00717759-K00717759, K00717760-K00717760, K00717763-K00717765,
K00753081-K00753100, K00788946-K00788946, K00815693-K00817167,

61

K00887843-K00887846, K00888261-K00888264, K00888265-K00888268,
K00888278-K00888281, K00888374-K00888376, K00888377-K00888379,
K00921810-K00921812, K00921834-K00921834, K00921838-K00921838,
K00921866-K00921868, K00921869-K00921871, K00924744-K00924746,
K00961495-K00961501, K00986846-K00986856, K00987256-K00987294,
K00987723-K00987725, K00990028-K00990040, K01004918-K01004929,
K01004931-K01004942, K01005465-K01005465, K01005466-K01005471,
K01005472-K01005472, K01005473-K01005478, K01009205-K01009205,
K01009206-K01009206, K01009208-K01009208, K01019983-K01019983,
K01083220-K01083221, K01084559-K01084560, K01094655-K01094665.

Persons knowledgeable of these facts include, but are not limited to, Gershon Alon,

Ronen Cohen, Benny Shimshoni, Eli Shalhon, Chris O'Connor, Roger Parrett, John Desautels,

John Peck, William Schweinfurth, and David Beck.

Defendants reserve the right to supplement their response to this interrogatory at

appropriate times in this litigation.

As to objections only,

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Gregory E. Stuhlman (#4765)
stuhlman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
*Attorneys for Defendants Creo, Inc.,
NexPress Solutions, Inc., Kodak
VersaMark, Inc., Eastman Kodak
Company, and Kodak Graphic
Communications Company*

OF COUNSEL:
Richard McMillan, Jr.
  rmcmillan@crowell.com
Jeffrey D. Sanok
  jsanok@crowell.com
Brian M. Koide
  bkoide@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500

Dated: April 13, 2007

62

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2007, I served the foregoing on counsel as follows:

**BY HAND AND ELECTRONIC MAIL**

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

| | | |
|---|---|---|
| Douglas I. Lewis | John G. Hutchinson | Jamie L. Secord |
| SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP |
| One South Dearborn Street | 787 Seventh Avenue | One South Dearborn Street |
| Chicago, IL  60603 | New York, NY  10019 | Chicago, IL  60603 |
| (312) 853-4169 | (212)839-5398 | (312) 853-2206 |
| dilewis@sidley.com | jhutchinson@sidley.com | jsecord@sidley.com |

Gregory E. Stuhlman(#4765)
stuhlman@rlf.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007, I served the foregoing on counsel as follows:

### BY HAND AND ELECTRONIC MAIL

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

### VIA FEDERAL EXPRESS AND ELECTRONIC MAIL

| | | |
|---|---|---|
| Douglas I. Lewis | John G. Hutchinson | Jamie L. Secord |
| SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP | SIDLEY AUSTIN, LLP |
| One South Dearborn Street | 787 Seventh Avenue | One South Dearborn Street |
| Chicago, IL  60603 | New York, NY  10019 | Chicago, IL  60603 |
| (312) 853-4169 | (212)839-5398 | (312) 853-2206 |
| dilewis@sidley.com | jhutchinson@sidley.com | jsecord@sidley.com |

_____
Gregory E. Stuhlman(#4765)
stuhlman@rlf.com

# EXHIBIT B



| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | LOS ANGELES |
| ONE SOUTH DEARBORN | BRUSSELS | NEW YORK |
| CHICAGO, IL 60603 | CHICAGO | SAN FRANCISCO |
| (312) 853 7000 | DALLAS | SHANGHAI |
| (312) 853 7036 FAX | FRANKFURT | SINGAPORE |
| | GENEVA | SYDNEY |
| | HONG KONG | TOKYO |
| | LONDON | WASHINGTON, D.C. |

bfrey@sidley.com
(312) 853-7294                    FOUNDED 1866

September 20, 2007

**Via Facsimile and U.S. Mail**
Nathaniel Grow
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
202-628-5116 (facsimile)

Dear Nathaniel:

        This letter summarizes our meet and confer of September 17, 2007 regarding
Defendants' objections to R.R. Donnelley & Sons Company's ("RRD")' Fourth 30(b)(6) Notice
of Deposition ("RRD's Fourth Notice" (D.I. 198)).

*Topics 1-13*

        RRD has requested that Defendants designate a 30(b)(6) witness (or witnesses)
with knowledge of the "factual bases allegedly supporting, refuting, or relating to" Defendants'
alleged defenses, as set forth in Topics 1-13 of RRD's Fourth Notice. Defendants have refused
to provide any witnesses on these Topics.

        In their objections to Topics 1-13, Defendants claimed that RRD was improperly
seeking deposition testimony related to legal contentions. As we stated during our telephone
discussion, however, RRD is seeking information related to the *facts* underlying Defendants'
alleged defenses, not legal arguments related thereto.

        Defendants have also claimed that their interrogatory responses sufficiently set
forth the facts underlying their alleged defenses. Given the sparse level of factual detail included
in many of Defendants' interrogatory responses, however, RRD does not want to be prejudiced
should Defendants later introduce new and/or additional facts related to their alleged defenses.

        RRD reserves the right to move to compel Defendants to produce a 30(b)(6)
witness (or witnesses) on Topics 1-13 of RRD's Fourth Notice. RRD will also seek, however, to
preclude Defendants from later adding new and/or additional facts to their current interrogatory
responses related to Defendants' alleged defenses. Any later disclosure would unfairly prejudice
RRD.

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



Nathaniel Grow
September 20, 2007
Page 2


*Topic 14*

In Topic 14, RRD requested information about Defendants' CS400 data prep software and the CS400 controller. Defendants objected to producing a witness on Topic 14, claiming that RRD had not accused any CS400 products in this case. (D.I. 219 at 18.)

As we pointed out during the meet and confer, however, RRD expressly identified CS400 in its Amended Complaint of January 16, 2007. (D.I. 109 at 4, 5.) As a result, Defendants agreed to reconsider their previous objections to Topic 14.

Defendants are now offering to designate a 30(b)(6) witness (or witnesses) on the following portions of Topic 14: 14(b), 14(h), 14(i), 14(k), 14(l), 14(m), 14(n), 14(o), 14(p), 14(q), and 14(r). (*See* Letter from N. Grow to J. Secord of Sept. 19, 2007.) RRD hereby accepts Defendants' offer to produce a 30(b)(6) witness (or witnesses) on these portions of Topic 14. RRD agrees to produce claim charts for CS400 at least two weeks prior to any depositions regarding Topic 14.

*Topic 15*

In Topic 15, RRD requested 30(b)(6) testimony regarding the factual bases for Defendants' invalidity defense related to the following software products: Begin, DijiComp, Catalogic, Kodak Ektaprint, Forms Merge, Printstreamer, Access, FoxPro, IBM Graphical Data Display Manager, and Paradox, as set forth in Topic 15 of RRD's Fourth Notice. Defendants own many of the enumerated products, including Begin, DijiComp, Kodak Ektaprint, and Forms Merge. Yet Defendants have refused to provide any witnesses on this Topic.

With respect to the alleged prior art software products that Defendants own, including Begin, DijiComp, Kodak Ektaprint, and Forms Merge, RRD is entitled to all facts about these products that are related to Defendants' invalidity defense. RRD is not limited to the selective information that Defendants chose to include in their response to RRD's Interrogatory No. 5 regarding Defendants' invalidity defense.

Furthermore, as for the alleged prior art software products that third parties own, RRD is entitled to discover facts about how Defendants understand these products to work. Such information is not included in Defendants' response to RRD's Interrogatory No. 5.

RRD reserves the right to move to compel Defendants to designate a 30(b)(6) witness (or witnesses) on Topic 15.

# SIDLEY
SIDLEY AUSTIN LLP

Nathaniel Grow
September 20, 2007
Page 3


\* \* \*


   Defendants agreed that RRD has satisfied its meet and confer requirements on Topics 1-15 of RRD's Fourth Notice.

   Please feel free to contact me should you wish to further discuss the issues addressed in this letter.


       Sincerely,

       Benedict F. Frey

# EXHIBIT C

CONFIDENTIAL EXHIBIT

# EXHIBIT D

R. PARRETT

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3                    *    *    *

4    R.R. DONNELLEY & SONS COMPANY,

5                Plaintiff,

6        vs.                    CASE NO. 06-032-JJF

7    CREO, INC., NEXPRESS

8    SOLUTIONS, INC., KODAK

9    VERSAMARK, INC., EASTMAN KODAK

10   COMPANY, and KODAK GRAPHIC

11   COMMUNICATIONS COMPANY,

12               Defendants.

13                   *    *    *

14           Deposition of ROGER PARRETT, Witness

15   herein, called by the Plaintiff for

16   cross-examination pursuant to the Rules of Civil

17   Procedure, taken before me, Diane L. Thommes, a

18   Notary Public in and for the State of Ohio, at the

19   Dayton Airport Hotel, Business Room, 3330 Terminal

20   Drive, Vandalia, Ohio, on Thursday,

21   August 16, 2007, at 9:00 o'clock a.m.

22                   *    *    *

23

24

25

R. PARRETT

162

1  that we would use a fixed file location to
2  reference only one font character.
3      Q.  Even if that font character was a
4  graphic?
5      A.  Even if that font character was a
6  single graphic.  I mean that really is where
7  you're going to get the benefit of a fixed file
8  is why you're loading a string of graphics,
9  meaning a string of characters.
10      MR. FINDLEY:  Could we take a
11  30-second break?
12      MR. LEWIS:  Sure.
13      THE VIDEOGRAPHER:  We're off the
14  record.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  Back on the
17  record.
18  BY MR. LEWIS:
19      Q.  I'm going to hand you what's been
20  previously marked as Sullivan Exhibit 6.  So,
21  Mr. Parrett, this is an interrogatory answer
22  that Kodak's lawyers put together and you're
23  listed as knowledgeable about certain subjects,
24  and I just wanted to pursue with you and ask
25  you what you knew about it.  So if you could

163

1  take a look at interrogatory No. 2 which starts
2  on page 4 and continues onto page 1 where
3  you're stated as knowledgeable about the facts.
4  If could you take a look at that and tell me
5  what you know about the facts.
6      A.  We're on page 4?
7      Q.  Four to eleven.  I want to know
8  what you know about that subject matter.
9      A.  Do you want me to read the entire
10  thing?
11      Q.  Yeah.  Because I want to know --
12  Kodak has identified you as knowledgeable about
13  that, so I want to know what you know.  So
14  that's going to be my question when you finish.
15      A.  Okay.  How much of this legal
16  stuff -- I mean I have no idea when you say
17  exchange proposed claim construction.  Am I --
18      Q.  This was written by your lawyers,
19  so if there's something you don't know anything
20  about, that's fine.
21      A.  Well, they talk about Darwin.  I'm
22  not prepared to talk about DL-100.  Nextreme,
23  DL-1000.
24      Q.  Is your knowledge about this
25  subject matter your knowledge about how

164

1  Composer works?
2      A.  Yeah.  I have some technical
3  knowledge about how Composer works and how it
4  was designed and how it was marketed.
5      Q.  Is that it?
6      A.  I don't know what you want me to
7  do with it.  A lot of it was legal.
8      Q.  Mr. Parrett, neither do I.  But
9  you were listed as knowledgeable about the
10  facts.  I just want to know what facts here --
11  I understand what it is.  If there's nothing or
12  if it's limited to a certain area, I don't
13  know.  I didn't write this.  Your lawyers did.
14      A.  I could talk about Composer.
15      Q.  How it works?
16      A.  Right.
17      Q.  Take a look at interrogatory
18  No. 3.  Goes on through pages 12 to 13.  It's
19  the same question.  Do you have any knowledge
20  there of any of the facts, and if so, what are
21  they?
22      A.  This talks about Creo, XMPie,
23  Atlas, GMC, Pageflex.
24      Q.  I'm not asking you what you don't
25  know.  I'm asking what you do know.

165

1      A.  No.  Strike that.
2      MR. FINDLEY:  It does list
3  defendant's software products and then it does
4  start with third-party products and that kind of
5  thing.
6  BY MR. LEWIS:
7      Q.  So, again, you're only
8  knowledgeable about Composer and how it works?
9      A.  Correct.
10      Q.  Let's move on to interrogatory
11  No. 6.  You are listed as knowledgeable about
12  that.  That starts on page 47 going onto 48.
13  Again, the same question:  What knowledge do
14  you have, if any, of the facts described there?
15      A.  Again, I can talk about Composer
16  and maybe some of the Data Prep packages
17  offered at the time while we were still Scitex
18  Digital Printing.
19      Q.  What were those packages?
20      A.  It would be Begin, Proofing
21  Systems, some of the IJPDS Proofer.  Begin and
22  IJPDS Proofer.
23      Q.  What could you speak to about
24  Begin?
25      A.  Architecturally how it was put

42

R. PARRETT

---

**166**

1 together, applications that somebody would use
2 it for, how to set up applications, data files,
3 things like that.
4     Q.  When did Kodak stop distributing
5 Begin for its predecessors?  Was it before
6 2001?
7     A.  It was right around 2000.  Right
8 around 2000.
9     Q.  You're also listed on No. 7
10 starting on page 48 going to 50.  I'd like you
11 to look at that and tell me what you know about
12 those topics.
13     A.  I couldn't speak to that.
14     Q.  How about No. 9, starting on page
15 52, goes on to 53.  Same question:  What do you
16 know about the subject matter of that
17 interrogatory answer?
18     A.  I had read about the patents and I
19 guess I can speak to it at some very high
20 level.
21     Q.  You read about the patents when?
22     A.  I'm sorry?
23     Q.  When did you read about the
24 patents?
25     A.  Probably mid last year.

---

**167**

1     Q.  After the lawsuit was filed?  The
2 lawsuit was filed early last year.
3     A.  I might have seen them beforehand
4 but definitely after the lawsuit was filed.
5     Q.  So how far back does your
6 knowledge of the patents extend?
7     A.  What do you mean?
8     Q.  How far back in time did you know
9 about the patents and suit?
10     A.  Probably not much more than mid
11 last year or maybe the early part of -- I mean
12 the latter part of 2005 maybe.
13     Q.  Do you know anything else related
14 to the answer to interrogatory No. 9?
15     A.  As far as I mean they speak to
16 timing and things like that, and I can't speak
17 to that.
18     Q.  So nothing else besides what you
19 have said.
20     A.  I have read the patents.  I mean
21 that's really all I can say.
22     Q.  Okay.  Mr. Parrett, what's your
23 current title at Kodak?
24     A.  Marketing manager, workflow.
25     Q.  How long have you had that title?

---

**168**

1     A.  I believe February 2005.
2     Q.  What was your title before that?
3     A.  Engineering manager, applications
4 development.
5     Q.  And when did you get that title?
6     A.  That would have been May of '96.
7     Q.  2005 to the present you have been
8 marketing manager, workflow?
9     A.  Correct.
10     Q.  So you probably didn't get your
11 prior title in 2006.
12     A.  So I didn't what now?
13     Q.  When I asked you -- maybe I
14 misunderstood.  I thought you said your current
15 title was marketing manager, workflow?
16     A.  Correct.
17     Q.  You have had this title since '05?
18     A.  I transitioned into that
19 department, I believe, around January of 2005.
20     Q.  Then your prior title you said was
21 engineering manager, application development?
22     A.  Correct.
23     Q.  When did you get that title?
24     A.  When I joined the company.
25     Q.  Which was when?

---

**169**

1     A.  In May of 1996.
2     Q.  Was there a time when you were
3 manager of software development?
4     A.  You know, I might have had that
5 title.  I don't recall me ever having that -- I
6 mean manager of application development was
7 software development.
8     Q.  And in your current job, what are
9 your responsibilities?
10     A.  Mostly coordinating and specifying
11 software products to be either developed
12 internally or externally.
13     Q.  So, in other words, helping to
14 develop the specifications about what those
15 products should do?
16     A.  Technically.  But realistically or
17 really what I'm doing now is just advising
18 additional features that's on existing
19 products.
20     Q.  Do you have marketing
21 responsibility towards customers and potential
22 customers?
23     A.  Yes.
24     Q.  What do you do in that part of
25 your job?

---

# EXHIBIT E

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - x

4    R.R. DONNELLEY & SONS COMPANY,   :

5              Plaintiff,            :

6         v.                        :

7                                    :

8    CREO, INC., NEXPRESS SOLUTIONS, : C.A. No.

9    INC., KODAK VERSAMARK, INC.,    : 06-032-JJF

10   EASTMAN KODAK COMPANY, and KODAK:

11   GRAPHIC COMMUNICATIONS COMPANY, :

12             Defendants.           :

13   - - - - - - - - - - - - - - - - x

14

15                          Thursday, July 19, 2007

16                          Washington, D.C.

17

18       Deposition of WILLIAM SULLIVAN, commencing

19   at 9:03 a.m., held at the offices of Sidley

20   Austin, 1501 K Street, N.W., Washington, D.C.,

21   before Keith Wilkerson, a notary public in and for

22   the District of Columbia.

W. SULLIVAN

110

1  Q. Sure.
2  A. This is a design specification document
3  which, again, may have been provided to us, but
4  this was something for use internally at
5  Datalogics. We reviewed the MRD level
6  requirements. This may go into more detail from a
7  Datalogics standpoint. But page 431 --
8  Q. Actually 433. I misspoke before. What I
9  want to ask about is the DIF files. If you'd read
10 that, I'd like to know if that refreshes any
11 recollection of yours.
12 A. It doesn't change my recollection. I didn't
13 work directly with DIF files.
14 Q. So you don't know?
15 A. I think I basically characterized it as
16 holding the color dictionaries and paragraph and
17 character information. At a general level that's
18 what my understanding would be.
19 Q. How about the master page it talks about?
20 Do you have any knowledge about that?
21 A. No. That's something internal to a DIF file
22 user. I don't know anything about a master page.

111

1  Q. Right above the DIF file section there, two
2  paragraphs up it talks about annotations. Is it
3  correct that you testified earlier that you have
4  no knowledge about that, either?
5  A. No, I don't know what annotations by their
6  Acrobat plug-in they're talking about.
7         MR. FINDLEY: I want to just note for
8  the record that Sullivan No. 5 is an attorneys'
9  eyes only document. I'd like to go back and make
10 sure I have the testimony designated correctly in
11 terms of confidentiality and attorneys' eyes only
12 designations.
13        (Sullivan Exhibit No. 6
14        was marked for identification.)
15 Q. The court reporter has handed you what's
16 been labeled Sullivan Exhibit No. 6. For your
17 information, Mr. Sullivan, these are Kodak's
18 answers to interrogatories in this case. You're
19 listed as knowledgeable about three
20 interrogatories, and I just want to understand
21 whether we've covered your knowledge of these
22 topics today or whether there's more.

112

1  A. Okay.
2  Q. The first one is interrogatory number 2
3  which begins on page 4. If you'd just read the
4  single spaced portion on that page and let me know
5  when you're done.
6  A. I was not a part of Creo.
7  Q. What about as far as NexPress goes?
8  A. It doesn't mention NexPress here.
9  Q. I believe Creo is defined broadly to cover
10 all the defendants in the answer that's being
11 referred to.
12 A. I was not asked to analyze the patents on
13 whether we infringed or not.
14 Q. So your knowledge is limited to how DL
15 products work and how NexPress's work?
16 A. Yes.
17 Q. I just want to make sure that you don't have
18 any other knowledge that I should know about.
19 Turn to page 52. If you would read starting with
20 interrogatory number 9, the single spaced portion,
21 and on to the next page.
22 A. You want me to continue on?

113

1  Q. Yes, until the end of page 53.
2  A. I believe that this is beyond my scope of
3  what I have permission to answer. This is in
4  legal jargon talking about a lot of the different
5  claims, and I'm not familiar with all those.
6  Q. Do you know why your name is identified here
7  on the bottom of page 53?
8  A. I was a technical person that was involved
9  with the DL program.
10 Q. That's the only reason?
11 A. That's why I believe I was named here. Just
12 with DL, though.
13 Q. And your knowledge doesn't extend beyond
14 what you've testified to today, though?
15 A. No, it does not.
16 Q. Mr. Sullivan, which of the various companies
17 that are in this lawsuit do you work for right now
18 of the Kodak entities?
19 A. Kodak Graphic Communications Group
20 Enterprise Systems.
21 Q. And how long have you worked for that
22 entity?