## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| R.R. DONNELLEY & SONS COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | C.A. No. 06-cv-032-JJF |
| CREO, INC., NEXPRESS SOLUTIONS, ) | |
| INC., KODAK VERSAMARK, INC., ) | |
| EASTMAN KODAK COMPANY, and ) | |
| KODAK GRAPHIC COMMUNICATIONS ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| EASTMAN KODAK COMPANY, ) | |
| ) | |
| Counterclaim-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| R.R. DONNELLEY & SONS COMPANY, ) | |
| ) | |
| Counterclaim-Defendant. ) | |
| ) | |

## PLAINTIFF R.R. DONNELLEY & SONS COMPANY'S
## REPLY IN SUPPORT OF ITS MOTION TO COMPEL RULE 30(b)(6) DEPOSITION
## OF PRINTABLE TECHNOLOGIES, INC.

In opposing R.R. Donnelley & Sons Company's ("RRD") motion to compel its Rule 30(b)(6) deposition, Printable Technologies, Inc. ("Printable") makes the remarkable argument that parties should immediately run to court rather than work together to attempt to schedule depositions. Printable contends that, after it repeatedly claimed scheduling difficulties when it cancelled deposition dates and refused to schedule a deposition over a four month period, RRD should not have worked with Printable to accommodate Printable and its counsel's schedules but should have immediately filed a motion to compel Printable's deposition.

Moreover, instead of working with Printable to schedule its deposition, Printable further contends that RRD should have run to file a motion to compel before the close of discovery and that RRD's "time has run out" to conduct the deposition. Printable apparently believes that, rather than attempting to accommodate the other party's schedule, a party seeking a deposition should seek the Court's intervention when the slightest scheduling problem arises. RRD does not believe this should be the case. Indeed, RRD filed its motion to compel only after Printable had thwarted all attempts to schedule its deposition amicably.

As explained in RRD's motion, RRD has diligently sought to schedule Printable's deposition since initially serving the subpoena in July 2007. RRD has attempted on countless occasions to schedule the deposition, offering myriad specific dates and ranges of dates including August 28, 2007; mid-October, 2007; early November, 2007; November 13, 14, 15, 27, 28, and 29; December 6, 17, 18, 19, 26, 27, and 28; and January 3, 4, 7, 8, 9, 10, 30, and 31. Each time RRD offered a date or a range of dates, Printable either responded that the date was unacceptable or initially agreed, only to cancel the deposition later. Every time RRD agreed to postpone the deposition, it was for Printable's benefit, due to Printable's counsel's unavailability on the proposed date.

If RRD had known back in July 2007 that Printable would not have agreed to a deposition date in the six months to follow, RRD certainly would have filed the present motion much earlier. However, it was not until December that RRD, its patience exhausted, realized Printable would never schedule a deposition without the Court's intervention.

Although Printable now alleges that its deposition is not necessary, it offers no support for that proposition. Indeed, RRD *never* indicated to Printable that scheduling the deposition was anything less than a very high priority. Despite Printable's periodic insistence

that the deposition may no longer be necessary, RRD regularly emphasized to Printable the deposition's seriousness and importance. *See* RRD's Br., D.I. 268, Ex. C ("[w]e would strongly prefer to conduct this deposition in November"); RRD's Br., D.I. 268, Ex. E ("we can assure you that the deposition is still very necessary and we must find a date to schedule this deposition immediately").

Further, Printable *never* indicated that it was altogether unwilling to provide a designee for the deposition, always framing the issue as scheduling. Printable's objections to the deposition were directed toward the deposition's location and date. *See* RRD's Br., D.I. 268, Ex. B, at 2 ("August 28 is not available, and Delaware is not an appropriate location. Please confirm … that Donnelley agrees to cooperate to locate the deposition to a more convenient venue."). RRD maintains that Delaware is a proper deposition location, because Printable is incorporated in Delaware and employs an agent for service in the state. But in the spirit of compromise, RRD has expressed its openness to consider alternate deposition locations. Currently, the parties have not agreed on a deposition location, but RRD remains confident that the parties can resolve the question of location.

Perhaps realizing its responsibility for the six-month-and-counting delay, Printable now claims that its deposition is not critical to the instant case because "Printable is only a third party, and RRD bases its allegations of infringement against Defendants only 'in part' on their alleged use of Printable's software." *See* Printable's Opp'n, D.I. 276 at 5. Yet Printable is no ordinary third party. Printable is Defendants' sole supplier of three of the Accused Software Products in this case: DL-100, DL-1000, and FusionPro. Indeed, Printable

appears to be the only entity with extensive technical knowledge of these products.[1]  Finally,

Printable appears to have been in close communication with Defendants at least after RRD

subpoenaed Printable.[2]  Printable is not an innocent third party.  Printable holds information

crucial to RRD's infringement case regarding Accused Products DL-100, DL-1000, and

FusionPro.  Thus, consistent with RRD's repeated statements to the same effect, Printable's

deposition *is* critical to RRD's case.

For the reasons stated above, Plaintiff's Motion to Compel Rule 30(b)(6)

Deposition of Printable Technologies, Inc. (D.I. 268) should be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiff*
  *R.R. Donnelley & Sons Company*

---

[1]  Printable acquired the DL-100 product line from Datalogics and developed the successor program, FusionPro.  Defendants' 30(b)(6) designee for topics related to the DL software testified at deposition that "over time we worked less and less intimately with Datalogics" and "[w]hen they sold the project to Printable it was even less."  Ex. A, William Sullivan Dep. Tr., Jul. 19, 2007, at 96:4-6.

[2]  When RRD objected in writing to Defendants' notice of deposition of Paul Notredame as being served on the eve of the close of discovery, which is also the subject of a pending motion, Defendants countered that "RRD's deposition of third party Printable has now been delayed until December."  Ex. B, Letter from Defs.' counsel to RRD's counsel dated Nov. 7, 2007, at 1.  At the time, RRD had not yet communicated this information to Defendants.  RRD can only deduce that Printable communicated with Defendants about the deposition date.  Although RRD has asked Defendants for any communications with Printable, Defendants have provided none.

OF COUNSEL:

John G. Hutchinson
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5398

Douglas I. Lewis
Jamie L. Secord
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

January 14, 2008

1383166

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 14, 2008, he caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Frederick L. Cottrell III
Richards Layton & Finger, P.A.

I also certify that copies were caused to be served on January 14, 2008, upon the following in the manner indicated:

### <u>BY EMAIL AND BY HAND</u>

Frederick L. Cottrell III
Richards Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
cottrell@rlf.com

Richard K. Herrmann
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
rherrmann@morrisjames.com

### <u>BY EMAIL</u>

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
rmcmillan@crowell.com

Kent Walker
Cooley Godward Kronish LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
walkerkm@cooley.com

*/s/ Rodger D. Smith II (#3778)*
Rodger D. Smith II (#3778)

# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - x

4    R.R. DONNELLEY & SONS COMPANY,   :

5              Plaintiff,             :

6         v.                         :

7                                     :

8    CREO, INC., NEXPRESS SOLUTIONS, : C.A. No.

9    INC., KODAK VERSAMARK, INC.,    : 06-032-JJF

10   EASTMAN KODAK COMPANY, and KODAK:

11   GRAPHIC COMMUNICATIONS COMPANY, :

12             Defendants.            :

13   - - - - - - - - - - - - - - - - x

14

15                        Thursday, July 19, 2007

16                        Washington, D.C.

17

18        Deposition of WILLIAM SULLIVAN, commencing

19   at 9:03 a.m., held at the offices of Sidley

20   Austin, 1501 K Street, N.W., Washington, D.C.,

21   before Keith Wilkerson, a notary public in and for

22   the District of Columbia.

W. SULLIVAN

94

1  reviewed this document. I don't know if there's
2  any contributing factors.
3      Q. Take a look at the bottom right at the Bates
4  number that starts with K and it's the number that
5  ends in 572, Section 4.2, Inserted Pages Support
6  for DL-100. Why don't you read from there to page
7  574, basically Section 4.2? And read anything
8  else you'd like, too.
9      A. I've read Section 4.2.
10     Q. Does Section 4.2 describe the conditional
11  inserting of pages we talked about this morning?
12     A. This is a Datalogics written document. Yes,
13  it describes not the rules portion of what we
14  discussed but the ability to flag those pages
15  through the GUI of the Acrobat plug-in in DL-100
16  rather than how the previous application called DL
17  Formatter handled those operations.
18     Q. So Exhibit 1 focuses on the GUI aspect, not
19  the underlying functionality?
20     A. Yes, how the GUI would be built for the
21  plug-in to handle this functionality.
22     Q. It was just accessed by the user in a

95

1  different manner?
2      A. Yes, I believe so, but I never used DL
3  Formatter.
4          (Sullivan Exhibit No. 2
5              was marked for identification.)
6      Q. The court reporter has handed you,
7  Mr. Sullivan, what's been marked as Sullivan
8  Exhibit 2. Even though it's a long document I
9  really only want to ask you about one small
10  section.
11     A. What document is this?
12     Q. If you look on the fourth page, it's
13  entitled FusionPro Server, VDP Production Package.
14  Have you seen this document before?
15     A. I'm not sure if I've seen this specific
16  version of the document. This is a training set
17  of materials that was updated frequently, but I
18  have seen this training package before. I can't
19  identify which specific version it is. My tenure
20  with the program ended shortly after it turned to
21  FusionPro, so I may not have seen this iteration
22  of it.

96

1      Q. What do you mean by your tenure with the
2  program?
3      A. I was closely involved with working with
4  Datalogics, and over time we worked less and less
5  intimately with Datalogics. When they sold the
6  project to Printable it was even less, and within
7  Kodak someone else took over managing the
8  relationship with Printable, so during a lot of
9  the FusionPro time frame I wasn't as intimate with
10  the program.
11     Q. I want to ask you about the page that ends
12  in 981, so why don't you start by going there? It
13  starts with talking about tagging in the database
14  file. If you'd just read that section to the next
15  page, and then I'll ask you some questions.
16         MR. FINDLEY: You should make sure that
17  this portion of the transcript is designated
18  confidential because you're referencing
19  confidential documents.
20         MR. LEWIS: Hold that thought and let me
21  ask him a couple of questions about it first.
22     Q. Before I ask you any questions about what

97

1  you just read, the document, Sullivan Exhibit No.
2  2, did you say this was a training manual?
3      A. Right.
4      Q. And who was trained using this manual,
5  customers?
6      A. This particular document would be in the
7  case of a customer who purchased DL-1000 or
8  FusionPro Server.
9      Q. And were those customers required to sign
10  the confidentiality agreements, to your knowledge,
11  before taking training?
12     A. Not that I'm aware of, no. I didn't deal
13  with those customers directly.
14     Q. Would that be inconsistent with your
15  experience, to have customers sign confidentiality
16  agreements before taking training?
17     A. Yes.
18     Q. Turning to page 981, we talked earlier about
19  whether or not you could put tagged information in
20  a data source other than a tagged file.
21     A. Yes.
22     Q. Does this section on page 981 of Exhibit 2

25  (Pages 94 to 97)

# EXHIBIT B

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

# crowell moring

Nathaniel Grow
202-624-2709
ngrow@crowell.com

November 7, 2007

025140.0000051

### VIA FACSIMILE AND U.S. MAIL

Benedict Frey, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

> Re: *R.R. Donnelley & Sons Co. v. Creo, Inc., Eastman Kodak Co., and Kodak Graphic Communications Co.*, (D. Del.) (Civil Action No. 06-032-JJF)

Dear Ben:

I write in response to your November 2nd letter. Under Local Rule 30.1, a party must provide seven business days notice for a deposition. Defendants provided eight business days notice in advance of the noticed deposition date of Mr. Notredame. Moreover, as a courtesy, Defendants informed RRD on the day the notice was served that Mr. Notredame's deposition would not be proceeding on the noticed date. Therefore, the notice provided by Defendants for the deposition was both sufficient and timely.

While the deposition of Mr. Notredame will be held after the close of fact discovery, Defendants note that RRD has itself deferred a number of depositions until after the close of fact discovery. As but one example, RRD's deposition of third party Printable has now been delayed until December. Additionally, RRD has reserved the right to depose Messrs. Benny Shimshoni and Nardi Jaacobi at an unspecified future date. At no point have Defendants objected to RRD deferring a deposition until after the close of fact discovery; Defendants would expect the same response from RRD.

Mr. Notredame has previously informed Defendants that he is willing to voluntarily be deposed in Belgium; therefore, the deposition poses no issues under Belgian law. Defendants did not intend to depose Mr. Notredame until recently, in light of Grant Miller's testimony during his October 23rd deposition. Defendants noticed Mr. Notredame's deposition within the fact discovery period, while

Benedict Frey
November 7, 2007
Page 2

explaining to RRD that the noticed deposition date was only a placeholder subject to
Mr. Notredame's availability. Defendants have attempted to contact Mr.
Notredame to schedule a deposition date, but now understand that Mr. Notredame
is hospitalized after two major surgeries. Once Defendants are able to contact Mr.
Notredame, we will notify RRD of the official time, place, and date for his
deposition. Given these circumstances, please confirm that RRD will not object to
Defendants' deposition of Mr. Notredame in Belgium.

Best regards,

Nathaniel Grow

cc:    Richard McMillan, Jr.